**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | | |
|---|---|---|
| **BOOK PEOPLE, INC., VBK, INC. d/b/a BLUE WILLOW BOOKSHOP, AMERICAN BOOKSELLERS ASSOCIATION, ASSOCIATION OF AMERICAN PUBLISHERS, AUTHORS GUILD, INC., COMIC BOOK LEGAL DEFENSE FUND,** | § § § § § § § § | |
| **Plaintiffs,** | § § | |
| **v.** | § § | **CASE NO. 1:23-cv-858** |
| **MARTHA WONG in her official capacity as chair of the Texas State Library and Archives Commission, KEVEN ELLIS in his official capacity as chair of the Texas Board of Education, MIKE MORATH in his official capacity as Commissioner of Education,** | § § § § § § § § | |
| **Defendants.** | § § | |

---

## ORIGINAL COMPLAINT

Plaintiffs Book People, Inc., VBK, Inc. d/b/a Blue Willow Bookshop, American Booksellers Association, Association of American Publishers, Authors Guild, Inc., and Comic Book Legal Defense Fund ("Plaintiffs") bring these claims against Defendants Martha Wong, in her official capacity as Chair of the Texas State Library and Archives Commission, Keven Ellis in his official capacity as Chair of the Texas Board of Education, and Mike Morath in his official capacity as Commissioner of Education ("Defendants") and request relief from this Court based on the following:

## I.     INTRODUCTION

1.       Plaintiffs, a coalition of booksellers, publishers, and authors, bring this action to enjoin the enforcement of H.B. 900,[1] a recently enacted law that bans books deemed "sexually explicit" and restricts access to books deemed "sexually relevant" in public schools (the "Book Ban"). The Book Ban, which is scheduled to take effect on September 1, 2023, violates the First and Fourteenth Amendments to the U.S. Constitution because it is an overbroad and vague content-based law that targets protected speech and is not narrowly tailored to serve a compelling state interest. The Book Ban compels Plaintiffs to express the government's views, even if they do not agree, and operates as a prior restraint, two of the most egregious constitutional infringements.

2.       If allowed to take effect, the Book Ban would (1) require Plaintiffs to rate books based on subjective and vague standards; (2) punish Plaintiffs in retaliation for refusing to rate books or adopt the government's own ratings; and (3) establish a licensing regime that blocks the distribution of and access to books deemed "sexually explicit" or "sexually relevant" in public schools. Indeed, the Book Ban's passage has already led to school districts halting the purchase of school library books. The full implementation of the Book Ban will cause a recall of many books in K-12 public schools, bans of even more, and the establishment of an unconstitutional—and unprecedented—state-wide book licensing regime that compels private companies and individuals to adopt the State's messages or face government punishment.

---

[1] The text of H.B. 900, known as the Restricting Explicit and Adult-Designated Educational Resources ("READER") Act, is attached as Exhibit A. H.B. 900 is codified as proposed Tex. Educ. Code §§ 33.021, 35.001-002, 35.0021, 35.003-008.

3.      The Book Ban first compels each "library material vendor"[2] to separately review and rate all "library material"[3] previously sold to a "school district or open-enrollment charter school"[4] that remains in "active use" and is not part of the required curriculum *and* all books it seeks to sell to public schools that are not part of the required curriculum as "sexually explicit," "sexually relevant," or "no rating" based on unclear and arbitrary government criteria.[5] Books rated "sexually explicit" may not be sold to public schools and must be recalled by booksellers if they are in active use by a public school. Books rated "sexually relevant" may only be used by a student "outside the school library" with written parental consent. Booksellers must submit to the Texas Education Agency ("TEA") a list of their ratings, which will be posted on TEA's website. If booksellers do not rate their books and submit a list of their ratings to TEA, the State sanctions them by prohibiting them from selling *any* books to public schools (not only books deemed "sexually explicit").

4.      Although the Book Ban compels booksellers to establish an initial rating for each book, the Book Ban vests final decision-making power with the State to ultimately determine a book's rating. The Book Ban empowers TEA to review and overrule the booksellers' ratings, which, in turn, grants the government unchecked licensing authority to dictate which books are allowed in public schools and which booksellers can conduct business with public schools. If TEA disagrees with a bookseller's rating, it can overrule the bookseller's determination without

---

[2] A "library material vendor" is defined as "any entity that sells library material to a public primary or secondary school in this state." § 35.001(1) (hereinafter, "bookseller"). This definition could apply broadly to wholesalers, distributors, independent bookstores, online retailers, e-book sellers, publishers, authors, and others.
[3] "Library material" is not defined in the Book Ban. Read literally, "library material" could include an expansive collection of items, such as books, reference works, magazines, newspapers, and audio and audiovisual materials, in both physical and digital formats (hereinafter, "books").
[4] Hereinafter, "public schools."
[5] The State does not provide *any* funding to help booksellers complete this onerous task.

explanation, regardless of whether the bookseller agrees with TEA's conclusion. Booksellers that refuse to adopt TEA's "corrected rating" are blocked from selling *any* books to public schools and are publicly shamed on TEA's website as booksellers that have disobeyed the government's wishes. The law does not require TEA to provide an explanation for changing a bookseller's rating or provide any right to appeal to a bookseller (or publisher or author).

5.     The Book Ban precludes booksellers from bringing claims against school districts, open-enrollment charter schools, or their employees for any damages caused by the law.

6.     The Book Ban establishes an unconstitutional regime of compelled speech, retaliation, and licensing that violates clear First Amendment precedent and this country's history of fostering a robust marketplace of ideas. The Court should thus issue preliminary and permanent injunctive relief under 42 U.S.C. § 1983 and block the enforcement of this patently unconstitutional law.

## II.     PARTIES

### A.     Plaintiffs.

7.     Plaintiff Book People, Inc. (originally named Grok Books) ("BookPeople"), Texas' largest independent bookstore, has been a staple in the Austin community since 1970. *See* Declaration of Charley Rejsek, CEO of BookPeople, attached as Exhibit B ("Rejsek Decl.") ¶ 3. BookPeople has been voted the Best Bookstore in Austin for over 20 years and was named *Publisher's Weekly*'s bookstore of the year in 2005. It sells books and other library materials to schools and teachers for school use in response to RFQs from school contacts, in response to online orders, in the bookstore, and at offsite events, festivals (including the Texas Book Festival co-founded in 1995 by former First Lady, Laura Bush), school events, and conferences. *Id*. ¶¶ 5-6. BookPeople is an authorized vendor to many school districts. *Id*. ¶ 4. It has no complete record of books and library materials sold for school use since 1970. *Id*. ¶¶ 9-10.

8.      Plaintiff VBK, Inc. d/b/a Blue Willow Bookshop ("Blue Willow Bookshop") has served Texas from its West Houston location since 1996. It sells books and other library materials for school use in response to RFPs and RFQs from schools; to librarians and teachers who are reimbursed; and as a result of arranging for author visits at schools. *See* Declaration of Valerie Koehler, owner of Blue Willow Bookshop, attached as Exhibit C ("Koehler Decl.") ¶ 3. In addition to school visits, Blue Willow Bookshop arranges three large festivals for young readers every year, each with a goal of promoting literacy and fostering lifelong readers: TeenCon, Tweens Read, and Bookworm. *Id*. ¶ 4. During those festivals, schools and teachers purchase books for students and classrooms. *Id*. Blue Willow Bookshop is an authorized vendor to many school districts. *Id*. ¶ 5. Blue Willow Bookshop has no complete record of books and library materials sold for school use since 1996. *Id*. ¶ 7.

9.      Plaintiff American Booksellers Association ("ABA") was founded in 1900 and is a national not-for-profit trade organization that works to help independently owned bookstores grow and succeed. *See* Declaration of David Grogan, Director of the American Booksellers for Free Expression, Advocacy and Public Policy, a division of the ABA, attached as Exhibit D ("Grogan Decl.") ¶ 3. ABA represents over 2,100 member companies operating in over 2,500 locations. *Id*. ¶ 4. ABA's core members are key participants in their communities' local economy and culture. *Id*. To assist them, ABA provides education, information dissemination, business products, and services; creates relevant programs; and engages in public policy, industry, and local-first advocacy. *Id*. The ABA has 156 members located in Texas who are vendors to school districts subject to the Book Ban. *Id*. ¶ 5.

10.     Plaintiff Association of American Publishers ("AAP"), a not-for-profit organization, represents the leading book, journal, and education publishers in the United States

on matters of law and policy, advocating for outcomes that incentivize the publication of creative expression, professional content, and learning solutions. *See* Declaration of Matthew Stratton, Deputy General Counsel of AAP, attached as Exhibit E ("Stratton Decl.") ¶ 3. AAP's members range from major commercial book and journal publishers to small, non-profit, university, and scholarly presses, as well as leading publishers of educational materials and digital learning platforms. *Id*. AAP's members publish a substantial portion of the general, educational, and religious books produced in the United States in print and digital formats, including critically acclaimed, award-winning literature for adults, young adults, and children. *Id*. AAP represents an industry that not only depends upon the free exercise of rights guaranteed by the First Amendment, but also exists in service to our Constitutional democracy, including the unequivocal freedom to publish, read, and inform oneself. *Id*. The AAP has many members that do business in Texas who are vendors to school districts and are subject to the Book Ban. *Id*. ¶ 4. Many AAP members only have partial records of books and library materials sold to public schools. *Id*. ¶ 5.

11.     Plaintiff Authors Guild, Inc. ("Guild") was founded in 1912 and is a national non-profit association of more than 13,000 professional, published writers of all genres, 483 of whom are located in Texas. Declaration of Mary E. Rasenberger, CEO of the Guild, attached as Exhibit F ("Rasenberger Decl.") ¶ 3. The Guild counts historians, biographers, academicians, novelists, journalists, and other writers of non-fiction and fiction as members; many write for children or young adults, and are frequent contributors to the most influential and well-respected publications in every field. *Id*. ¶ 4. The Guild works to promote the rights and professional interest of authors in various areas, including copyright, freedom of expression, antitrust, fair contracts and artificial intelligence. *Id*. Many Guild members earn a substantial portion of their livelihoods through their

writing, and the ability to write freely and distribute their work is vital to their incomes, as well as to the culture. *Id*. Guild members and their works are subject to the Book Ban. *Id*.

12.     Plaintiff Comic Book Legal Defense Fund ("CBLDF") is a nonprofit organization dedicated to protecting the legal rights of the comic arts community. *See* Declaration of Jeff Trexler, Executive Director of the CBLDF, attached as Exhibit G ("Trexler Decl.") ¶ 3. With a membership that includes creators, publishers, retailers, educators, librarians, and fans, CBLDF has participated in dozens of First Amendment cases in courts across the United States and led important educational initiatives promoting comics literacy and free expression. *Id*. The CBLDF has members located in Texas subject to the Book Ban. *Id*. ¶ 5.

**B.     Defendants.**

13.     Defendant Martha Wong ("Wong") is sued in her official capacity as the Chair of the Texas State Library and Archives Commission ("TSLAC").

14.     Defendant Keven Ellis ("Ellis") is sued in his official capacity the Chair of the Texas State Board of Education ("SBOE").

15.     Defendant Mike Morath ("Morath") is sued in his official capacity as the Commissioner of the Texas Education Agency ("TEA").

16.     On information and belief, Defendants will each exercise their discretion and legal authority to implement and enforce the Book Ban.

### III.     JURISDICTION AND VENUE

17.     The Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343 because this action is brought under 42 U.S.C. § 1983 and seeks to vindicate civil rights protected by the First and Fourteenth Amendments to the U.S. Constitution.

18.     The Court has personal jurisdiction over Defendants because they are residents of Texas.

19.     Venue is proper under 28 U.S.C. § 1391(b) because any Defendant resides in this District and Defendants are residents of Texas, and a substantial part of events or omissions giving rise to Plaintiffs' claims occurred in this District.

20.     This Court has jurisdiction to issue declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202, 42 U.S.C. § 1983, and Fed. R. Civ. P. 65.

21.     This Court has authority to award costs and attorney's fees under 42 U.S.C. § 1988.

## IV.     LIST OF EXHIBITS

| | |
|---|---|
| Exhibit A | H.B. 900 (eff. September 1, 2023) |
| Exhibit B | Declaration of Charley Rejsek, CEO of BookPeople |
| Exhibit C | Declaration of Valerie Koehler, owner of Blue Willow Bookshop |
| Exhibit D | Declaration of David Grogan, Director of the American Booksellers for Free Expression, Advocacy and Public Policy, a division of the ABA. |
| Exhibit E | Declaration of Matthew Stratton, Deputy General Counsel of AAP |
| Exhibit F | Declaration of Mary E. Rasenberger, CEO of the Guild |
| Exhibit G | Declaration of Jeff Trexler, Executive Director of the CBLDF |

## V.     STATEMENT OF FACTS

**A.     The history of failed government censorship of expressive works demonstrates that the Book Ban conflicts with established U.S. Supreme Court precedent and this country's tradition of a robust marketplace of ideas.**

22.     Plaintiffs reallege all paragraphs above.

23.     A century ago, state and local governments actively used bodies known as "censorship boards" to dictate the dissemination of books and other expressive works, such as newspapers, magazines, and movies. Between 1923 and 1925, more than 34 states introduced censorship legislation, and by the end of the 1920s, eight states and nearly 100 municipalities had

developed censorship regimes.[6]

24.      Some of the earliest legal challenges to censorship regimes were frustrated, *see,* *e.g., Mutual Film Corp. v. Indus. Comm'n of Ohio*, 236 U.S. 230, 244 (1915) (upholding state film licensing regime and holding that states and local governments had the right to grant or withhold film licenses), but for the past 70 years courts have not hesitated to strike down censorship regimes and other laws that seek to punish the distribution of expressive works in the United States.

25.      In 1952, the U.S. Supreme Court overturned *Mutual Film* and held, 9-0, that the banning of a film by a New York censorship board for being "sacrilegious" was an unconstitutional prior restraint on speech. *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 505 (1952). Seven years later, the U.S. Supreme Court found that a New York censorship board violated the U.S. Constitution for denying a license because a film contained "immoral" content. *Kingsley Int'l Pictures Corp. v. Regents of Univ. of State of N.Y.*, 360 U.S. 684, 688–89 (1959) (banning an expressive work because it "advocates an idea" that may be considered immoral strikes "at the very heart of constitutionally protected liberty"). In *Smith v. People of the State of California*, the U.S. Supreme Court overturned the conviction of a bookstore owner for distributing allegedly obscene books. 361 U.S. 147, 155 (1959). And in *Interstate Circuit, Inc. v. City of Dallas*, the U.S. Supreme Court held that a Dallas ordinance that created the "Motion Picture Classification Board," which rated films as "not suitable for young persons," was unconstitutional. 390 U.S. 676 (1968).[7]

26.      In 1981, Maryland became the last state to shut down its censorship board.[8] Despite the end of government censorship boards (decades ago), the Texas Legislature turned the clock

---

[6] *See* Samantha Barbas, *How the Movies Became Speech*, 64 RUTGERS L. REV. 665, 676 (2012).
[7] As explained below in § V.C.1., the Book Ban applies to films.
[8] *See* Ben A. Franklin, *Last Board of Censors Fades Away After 65 Years*, THE NEW YORK TIMES, June 29, 1981.

back more than a century by enacting the Book Ban, which functions as a modern-day censorship regime. Like the Ohio State Board of Censors in *Mutual Film Corp.*, the Book Ban establishes its own censorship board—the Texas Education Agency.  Even worse, Texas seeks to force private actors, the booksellers, to do the—uncompensated and extremely onerous—heavy labor of establishing ratings for every book it has sold, which the state may overrule anyway if it believes they did the job incorrectly.

27.     The Book Ban harkens back to dark days in our nation's history when the government served as licensors and dictated the public dissemination of information. The lessons from our history should be learned, not ignored, and the constitutional prohibitions against censorship regimes should be respected, not rebuffed. This Court should heed the warnings of the past and enjoin the enforcement of the Book Ban. As guided by history and U.S. Supreme Court precedent, the government should not dictate what is allowed in the marketplace of ideas. *See Texas v. Johnson*, 491 U.S. 397, 414 (1989) ("If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable.").

**B.     The Texas Legislature adopts the Book Ban, ignoring its practical implications and constitutional concerns.**

28.     The Book Ban grew out of a 2021 inquiry by former state Rep. Matt Krause to many Texas school districts asking if their libraries contained any of 850 books related to race, sexuality, and innocuous subjects.[9]

---

[9] *See* Bill Chappell, *A Texas lawmaker is targeting 850 books that he says could make students feel uneasy*, NPR, October 28, 2021; Danika Ellis, *All 850 Books Texas Lawmaker Matt Krause Wants To Book Ban: An Analysis*, Book Riot, November 5, 2021.

29.     That list inspired Rep. Jared Patterson to seek removal of approximately three dozen books from his own school district that he identified as personally offensive.[10] Rep. Patterson became the primary author of the Book Ban, which removes local control over school libraries (where libraries choose suitable books for their students subject to parental and community input) in favor of a statewide regulatory regime. That regime compels booksellers to make initial determinations regarding a book's suitability, although ultimate authority is vested in the State.

30.     During debate on the Book Ban, proponents ignored a variety of practical and constitutional concerns about how the legislation would operate and the books that could be banned from public school libraries as a result.

31.     Legislators expressed concern that the overbroad language of the Book Ban could result in the banning or restricting of access to many classic works of literature, such as *Twelfth Night*, *A Midsummer Night's Dream*, *Romeo and Juliet*, *Of Mice and Men*, *Ulysses*, *Jane Eyre*, *Jane Eyre*, *Maus*, *Anne Frank's Diary: The Graphic Adaptation*, *The Canterbury Tales*, *I Know Why the Caged Bird Sings*, and even the Bible.[11] Rep. James Talarico, a former school teacher, said the Book Ban would likely even prohibit school libraries from offering the quintessential Texas novel *Lonesome Dove*.[12]

32.     The Book Ban's authors similarly ignored concerns about requiring book vendors to rate the sexual content of library materials based on undefined community standards of decency. In the Senate Education Committee, Sen. Pete Flores questioned whether booksellers—many of

---

[10] *See* Debate on Tex. H.B.900 in the House Committee on Public Education, 88th Leg. (Mar. 21, 2023) ("H.B. 900 House Debate").

[11] *Id.*; *see* Trexler Decl. ¶¶ 8-9.

[12] *Id.*; *see also* Christopher Hooks, *Jared Patterson's School-Library Bill Would Book Ban Larry McMurtry's Novel*, TEXAS MONTHLY (Mar. 22, 2023).

whom are not based in Texas—could accurately assess the community standards in Texas, as the Book Ban requires.[13] Sen. Angela Paxton, the Book Ban's Senate sponsor, said TEA would review booksellers' ratings and that booksellers that did not accurately identify Texas' standards "can lose their privilege of selling books to all Texas school districts."[14]

33.     Concerns about the Bill's broad definitions were also dismissed by its authors. Rep. Patterson and Sen. Paxton conceded that the definitions used in the Book Ban were compiled using disparate sources, such as judicial opinions, FCC regulations, and the Texas Penal Code.[15] But, as other legislators noted, the patchwork definitions in the Book Ban omit crucial portions of those sources and create onerous and unworkable standards.[16]

34.     The Texas House and Senate rejected a series of amendments proposed to address many of the concerns raised during the Book Ban's consideration, including its potential impact on books addressing race, civil rights, and LGBTQ topics.[17]

35.     Despite these concerns, the Texas House passed the Book Ban on April 20, 2023, and the Texas Senate approved it on May 23, 2023. Gov. Greg Abbott signed the Book Ban on June 13, 2023. The Book Ban is scheduled to take effect on September 1, 2023 and applies to the 2023-2024 school year.

---

[13] Debate on Tex. H.B. 900 in the Senate Committee on Education, 88th Leg. (May 11, 2023) ("H.B. 900 Senate Debate").
[14] Id.
[15] H.B. 900 House Debate; H.B. 900 Senate Debate.
[16] Id.
[17] Id.; Floor Amendment Nos. 1, 2, 3, S.J. of Tex. 88th Leg. (May 23, 2023).

36. The effects of the Book Ban are already being felt as school districts prepare for how the law may be implemented.[18] In June 2023, Katy ISD stopped all library book purchases and placed all incoming books in storage as it awaits the impact of the new law.[19]

**C.** **The Book Ban requires booksellers to rate books, punishes booksellers for refusing to adopt the State's ratings, establishes a licensing regime that bans access to books deemed "sexually explicit," and provides no means of recourse.**

    **1.** **The Book Ban requires booksellers to review and rate books as "sexually explicit" or "sexually relevant" based on unclear and arbitrary criteria.**

37. The Book Ban includes a series of provisions that require every bookseller to separately review and rate each book it has previously sold to public schools and all books it may sell to public schools for the fast approaching 2023-2024 school year. *See* proposed Tex. Educ. Code §§ 33.021, 35.001, 35.002, 35.005.[20]

38. The Book Ban requires that booksellers assess all books previously sold to public schools that remain in "active use" and rate them as "sexually explicit material" or "sexually relevant material," if applicable. *Id*. § 35.002.

39. "Sexually explicit material" means "any communication, language, or material, including a written description, illustration, photographic image, video image,[21] or audio file, other than library material directly related to the curriculum required under Section 28.002(a),[22] that

---

[18] *See* Koehler Decl. ¶ 24; Stratton Decl. ¶ 16.
[19] Claire Goodman, *Katy ISD halts all library book purchases, new books stored*, Houston Chronicle (June 27, 2023).
[20] Below references to the Education Code refer to *proposed* sections.
[21] The Book Ban applies broadly to films. Thus, works that are distributed in multiple mediums may be inconsistently rated such that they are banned in one form but not another. For example, the novel *Gone with the Wind* could be allowed in a school, yet the Academy-Award winning movie of the same name may be banned. *See* Grogan Decl. ¶ 17.
[22] The Book Ban does not explain how booksellers can determine what is in the required curriculum, how they will know if what is in the required curriculum changes (potentially requiring a re-evaluation of the rating), or how closely "related to" the curriculum the book must be. Because there is no statewide curriculum in Texas, there is no way to know what material is "related to the

describes, depicts, or portrays sexual conduct, as defined by Section 43.25, Penal Code,[23] in a way that is patently offensive, as defined by Section 43.21, Penal Code."[24] *Id*. § 33.021(a).

40.    "Sexually relevant material" means "any communication, language, or material, including a written description, illustration, photographic image, video image, or audio file, other than library material directly related to the curriculum required under Section 28.002(a), that describes, depicts, or portrays sexual conduct, as defined by Section 43.25, Penal Code." *Id*. § 35.001(3).

41.    While both "sexually explicit" and "sexually relevant" materials require the presence of descriptions or depictions of "sexual conduct," "sexually explicit" material requires that the description or depiction be in a way that is "patently offensive." *Id*. § 33.021(a).

42.    To determine whether books are "sexually explicit," booksellers must "perform a contextual analysis of the material to determine whether the material describes, depicts, or portrays sexual conduct in a way that is patently offensive."[25] *Id*. § 35.0021(a).

---

curriculum" across all 1,025 Texas school districts. Curricula can also vary from classroom-to-classroom within a district and from day-to-day or year-to-year, requiring consistent reevaluation.
[23] "Sexual conduct" means "sexual contact, actual or simulated sexual intercourse, deviate sexual intercourse, sexual bestiality, masturbation, sado-masochistic abuse, or lewd exhibition of the genitals, the anus, or any portion of the female breast below the top of the areola." TEX. PEN. CODE § 43.25(a)(2).
[24] "Patently offensive" means "so offensive on its face as to affront current community standards of decency." TEX. PEN. CODE § 43.21(a)(4). But the Book Ban, confusingly, does not tell booksellers whether this community standard is based on Austin, Texas, or Onalaska, Texas—or any of the more than 1,200 other incorporated municipalities across the state. Thus, Plaintiffs lack clarity to determine whether books conform to current community standards. *See* Rejsek Decl. ¶ 18; Grogan Decl. ¶¶ 10-12; .
[25] The "contextual analysis" does not account for the age of students. *See* Rejsek Decl. ¶ 17; Grogan Decl. ¶¶ 9-10; Stratton Decl. ¶ 11.f.; Rasenberger Decl. ¶ 12. Instead, the Book Ban uses a one-size-fits-all model for rating books for all K-12 students regardless of age, maturity, or school district. Under this overbroad policy, a high school senior may not have access to a book because it is deemed "sexually explicit" for a first grader. This creates a race-to-the-bottom where older students are blocked from accessing books that may be age-appropriate for them.

43.     In performing a "contextual analysis," booksellers must consider "three principal factors":

(1)     the explicitness or graphic nature of a description or depiction of sexual conduct contained in the material;

(2)     whether the material consists predominantly of or contains multiple repetitions of depictions [but not descriptions or portrayals] of sexual or excretory organs or activities; and

(3)     whether a reasonable person would find that the material intentionally panders to, titillates, or shocks the reader.[26]

*Id.* § 35.0021(b).

44.     Booksellers must "weigh and balance each factor and conclude whether the library material is patently offensive, recognizing that because each instance of a description, depiction, or portrayal of sexual conduct contained in a material may present a unique mix of factors." *Id.* § 35.0021(c).[27]

45.     To determine "whether a description, depiction, or portrayal of sexual conduct contained in a material is patently offensive," booksellers must "consider the full context in which the description, depiction, or portrayal of sexual conduct appears, to the extent possible, recognizing that contextual determinations are necessarily highly fact-specific and require the consideration of contextual characteristics that may exacerbate or mitigate the offensiveness of the

---

[26] The Book Ban will cause the prohibition of swaths of constitutionally protected books. In determining whether a book is "sexually explicit," booksellers need not consider whether the book "taken as a whole, lacks serious literary, artistic, political, and scientific value," which is an element of obscenity for minors. *See Ginsberg v. State of N. Y.,* 390 U.S. 629 (1968), *modified by Miller v. California,* 413 U.S. 15, 24 (1973); TEX. PENAL CODE §43.21(a)(1).

[27] The Book Ban will be excessively burdensome for booksellers to review each of the hundreds of thousands of books across all genres sold to public schools over the decades. *See* Rejsek Decl. ¶¶ 8-17; Koehler Decl. ¶¶ 8-10, 12-16; Grogan Decl. ¶¶ 7, 19-21; Stratton Decl. ¶¶ 8-11.

material."[28] *Id*. § 35.0021(d).

46.     Booksellers are banned from selling books rated "sexually explicit" and must "issue a recall"[29] for all books rated "sexually explicit" that are "in active use"[30] by a school or district. *Id*. § 35.002(b).

47.     A student may only "reserve, check out, or otherwise use outside the school library" a book rated "sexually relevant" if "written consent" is obtained from "the student's parent or person standing in parental relation." *Id*. § 35.005.

48.     By April 1, 2024, booksellers must retrospectively "develop and submit" to TEA a list of books rated as "sexually explicit" or "sexually relevant" that have ever been sold to a public school[31] and that are still in "active use" by the school. *Id*. § 35.002(c). The list of ratings will be posted "in a conspicuous place" on TEA's website. *Id*. § 35.002(e). Booksellers that do not issue ratings are prohibited from selling *any* books[32] to school districts or open-enrollment charter

---

[28] The Book Ban's convoluted instructions and subjective requirements in determining whether a book is "sexually explicit" will result in inconsistent determinations. *See* Rejsek Decl. ¶¶ 17-18; Grogan Decl. ¶¶ 13-17; Stratton Decl. ¶¶ 11, 15; Trexler Decl. ¶ 7. Books are likely to receive inconsistent ratings from booksellers, who generally have no experience or training in making these technical determinations of law, especially considering the "highly fact-specific" assessments of "each instance" of "sexual conduct" required by the Book Ban. *See* Rejsek Decl. ¶¶ 17-18; Koehler Decl. ¶ 13; Grogan Decl. ¶ 8.

[29] The Book Ban does not explain what constitutes a "recall," how a bookseller should "issue a recall," whether the books must be returned by the school, or if the bookseller must offer a refund. *See* Grogan Decl. ¶ 21; Stratton Decl. ¶ 17.a.; Trexler Decl. ¶ 15.

[30] The Book Ban does not define "active use," provide a means of determining whether a book is in "active use," or explain when it ceases to be in "active use." *See* Rejsek Decl. ¶ 11; Koehler Decl. ¶ 9; Stratton Decl. ¶¶ 6-8, 11.c-d. "Active use" could presumably include books once but no longer sold. This requires booksellers to rate *every* book *ever* sold to public schools, even if the book is not in the booksellers' inventory and they do not intend to sell the book again.

[31] Plaintiffs, such as BookPeople and Blue Willow Bookshop, do not have complete record of books and library materials sold for school use. *See* Rejsek Decl. ¶¶ 9-10; Koehler Decl. ¶ 7; Grogan Decl. ¶ 6; Stratton Decl. ¶ 5.

[32] Should they not issue the government-imposed ratings, booksellers are even barred from selling books that are not rated as "sexually explicit" or "sexually relevant."

schools. *Id*. § 35.002(a).

2.     **The Book Ban establishes a licensing regime that blocks the distribution of and access to books deemed "sexually explicit" and restricts certain uses of books deemed "sexually relevant" in public schools.**

49.     The Book Ban also includes a series of provisions vesting the State with licensing authority to decide what books are available in public schools and what booksellers can sell books to public schools. *Id*. §§ 35.003, 35.006.

50.     The Book Ban provides that TEA may review and overrule the ratings for any book that was "not rated" or that it believes was "incorrectly rated."[33] *Id*. § 35.003(a). Within 60 days of being notified that a rating has been overruled by TEA, a bookseller *must* adopt TEA's "corrected rating," regardless of whether it agrees with TEA's decision. *Id*. § 35.003(b). If a bookseller does not adopt TEA's rating, its name will be posted "in a conspicuous place" on TEA's website and public schools will be banned from purchasing *any* books from it.[34] *Id*. §§ 35.003(c), (d). TEA is not required to offer a basis for the re-rating, and the law does not provide any right to appeal. Booksellers are also barred from bringing claims against school districts, open-enrollment charter schools, or their employees for any damages caused by the Book Ban. *Id*. § 35.004. Their *only* and woefully inadequate recourse to the public shaming and permanent Book Ban is to accede to TEA's unconstitutional demand for compelled speech and unquestioningly adopt TEA's rating. If a bookseller adopts TEA's rating, a list of books rated by the bookseller as "sexually explicit" will be posted on TEA's website, which will inform potential customers (not only schools) that a

---

[33] The Book Ban does not require TEA to provide any justification for its decision to overrule a bookseller's rating.

[34] The Book Ban provides no opportunity to be heard to challenge TEA's decisions to overrule a bookseller's rating or bar schools from purchasing books from it. The purchasing ban continues indefinitely unless and until the bookseller acquiesces to the government's demands.

bookseller has deemed a book "sexually explicit," even if it disagrees with the compelled designation. *Id*. § 35.003(e).

51.     Books deemed "sexually relevant" will be continuously reviewed. By January 1 of every odd-numbered year, each school district and open-enrollment charter school must review books rated as "sexually relevant" and determine whether those books should remain available— even on a heavily restricted basis—in the school library catalog. *Id*. § 35.006(a).

**3.     The Book Ban requires the adoption of "standards" for "library collection development policies."**

52.     The Book Ban also requires that the Texas State Library and Archives Commission, "with approval by a majority vote of the State Board of Education," adopt "standards" for school districts to follow "in developing or implementing the district's library collection development policies." *Id*. § 33.021(c).

53.     The standards must include a "collection development policy" that

(A)     prohibits the possession, acquisition, and purchase of:

(i)     harmful material, as defined by Section 43.24, Penal Code;

(ii)     library material rated sexually explicit material by the selling library material vendor; or

(iii)     library material that is pervasively vulgar or educationally unsuitable as referenced in *Pico v. Board of Education*, 457 U.S. 853 (1982);

(B)     recognizes that obscene content is not protected by the First Amendment to the United States Constitution;

(C)     is required for all library materials available for use or display, including material contained in school libraries, classroom libraries, and online catalogs;

(D)    recognizes that parents are the primary decision makers regarding a student's access to library material;[35]

(E)    encourages schools to provide library catalog transparency;

(F)    recommends schools communicate effectively with parents regarding collection development; and

(G)    prohibits the removal of material based solely on the:

    (i)    ideas contained in the material; or

    (ii)   personal background of:

        (a)    the author of the material; or

        (b)    characters in the material."

*Id.* § 33.021(d)(2).

54.    The standards must be reviewed and updated at least once every five years. *Id.* § 33.021(d)(1).

## VI.    CAUSES OF ACTION

### A.    Count One: 42 U.S.C. § 1983, Violation of Free Speech Rights Under the First and Fourteenth Amendments to the U.S. Constitution—Compelled Speech

55.    Plaintiffs reallege all paragraphs above.

56.    Defendants are state actors operating under color of state law.

57.    The First and Fourteenth Amendments to the U.S. Constitution prevent the government from compelling the expression of certain views. *See 303 Creative LLC v. Elenis*, 143 S. Ct. 2298, 2312 (2023) ("[T]he government may not compel a person to speak its own preferred messages.").

---

[35] This provision contradicts other aspects of the Book Ban, which remove control from parents in deciding whether books are "sexually explicit" and should be allowed in public schools.

58.     The Book Ban compels Plaintiffs' speech by coercing Plaintiffs to express that a book is "sexually explicit" or "sexually relevant" based on the government's (vague and ambiguous) standards, not their own, and requiring Plaintiffs to revise their own independent assessments to conform with the government's views. *See* Rejsek Decl. ¶ 19; Koehler Decl. ¶¶ 17, 21-22; Grogan Decl. ¶¶ 15, 22; Stratton Decl. ¶ 14; Trexler Decl. ¶¶ 14, 16.

59.     Booksellers must "develop and submit" to the State a list of books rated as "sexually explicit" or "sexually relevant" that have ever been sold to a public school based on criteria developed by the State. TEX. EDUC. CODE § 35.002(c). Booksellers that do not issue ratings are prohibited from selling *any* books to school districts or open-enrollment charter schools. *Id*. § 35.002(a). If the bookseller does issue ratings for their books, the State may then review the bookseller's ratings and overrule the rating for any book that it believes was "incorrectly rated." *Id*. § 35.003(a). If a bookseller does not adopt the State's rating, it will be banned from selling *any* books to school districts and open-enrollment charter schools. *Id*. §§ 35.003(c), (d). Banned booksellers are unable to bring claims against school districts, open-enrollment charter schools, or their employees for any damages caused by the law. *Id*. § 35.004. The ratings are posted on an official government website, allowing the public to see whether a bookseller has issued—or acquiesced in—a particular rating compelled by the State. *Id*. § 35.003(e).

60.     Compelling Plaintiffs to adopt the State's preferred speech violates the First Fourteenth Amendments to the U.S. Constitution.

**B.     Count Two: 42 U.S.C. § 1983, Violation of Free Speech and Due Process Rights Under the First and Fourteenth Amendments to the U.S. Constitution—Vagueness**

61.     Plaintiffs reallege all paragraphs above.

62.     Defendants are state actors operating under color of state law.

63.     The First and Fourteenth Amendments to the U.S. Constitution prohibit statutes that are so impermissibly vague that an ordinary person would not understand what conduct the statute prohibited or that are so standardless as to invite arbitrary enforcement.

64.     The Book Ban includes terms that are vague, indefinite, arbitrary, and subject to different meanings such that they fail to provide adequate notice of their obligations in violation of the First and Fourteenth Amendments to the U.S. Constitution. *Smith v. Goguen*, 415 U.S. 566, 582 (1974)

65.     The definitions of "sexually explicit material" and "sexually relevant material" are unconstitutionally vague. [36] TEX. EDUC. CODE § 33.02. Although their definitions exempt material "related to the curriculum required under Section 28.002(a)" of the Education Code, the Book Ban provides little, if any, guidance on what the exemption covers.[37] *Id*.; *see Nat'l Press Photographers Ass'n v. McCraw*, 594 F. Supp. 3d 789, 809 (W.D. Tex. 2022) (terms "surveillance" and "commercial purposes" as used in a Texas statute are void for vagueness).

66.     The definition of "sexually relevant material" is vague and confusing because any de minimus, non-explicit reference in any context to sexual relations could result in the rating. TEX. EDUC. CODE § 35.001(3); *see Nat'l Press Photographers Ass'n*, 594 F. Supp. 3d at 809. It could thus apply broadly to health-related works, religious texts, historical works, encyclopedias, dictionaries, and many other works.

---

[36] *See* Rejsek Decl. ¶ 17; Grogan Decl. ¶ 9; Stratton Decl. ¶ 11.f.; Rasenberger Decl. ¶¶ 7, 11-12; Trexler Decl. ¶ 7.
[37] *See* Koehler Decl. ¶ 19; Stratton Decl. ¶ 11.a.

67.     The "contextual analysis" required to determine whether a book is "sexually explicit" is unconstitutionally vague.[38] TEX. EDUC. CODE § 35.0021; *see Nat'l Press Photographers Ass'n*, 594 F. Supp. 3d at 809.

68.     The Book Ban's requirement that booksellers "recall" materials deemed "sexually explicit" if those materials are still "in active use" is unconstitutionally vague.[39] TEX. EDUC. CODE § 35.002(b); *see Nat'l Press Photographers Ass'n*, 594 F. Supp. 3d at 809.

69.     The Book Ban is unconstitutionally vague regarding whether books can be sold by booksellers between September 1, 2023 (the Book Ban's effective date) and April 1, 2024 (the date booksellers must issue their ratings).[40]

## C.    Count Three: 42 U.S.C. § 1983, Violation of Free Speech and Due Process Rights Under the First and Fourteenth Amendments to the U.S. Constitution—Prior Restraint

70.     Plaintiffs reallege all paragraphs above.

71.     Defendants are state actors operating under color of state law.

72.     The Book Ban establishes a licensing regime that blocks the distribution of and access to books in public schools deemed by the government to be "sexually explicit" and restricts access to those books deemed to be "sexually relevant."

73.     Although the Book Ban requires booksellers to review and rate books as "sexually explicit," "sexually relevant," or "no rating," the Book Ban allows the State to review and overrule the booksellers' ratings without explanation, opportunity to be heard, or right to appeal.

---

[38] *See* Stratton Decl. ¶ 11.f.; Rasenberger Decl. ¶¶ 7, 11-12.
[39] *See* Koehler Decl. ¶ 9; Stratton Decl. ¶¶ 6-7, 11.c-d.; 17.a.
[40] *See* Rejsek Decl. ¶ 24; Koehler Decl. ¶ 26.

74.     If a bookseller fails to "correct" the rating to that designated by the State, the bookseller is barred from selling books to any Texas public school or open-enrollment charter school.

75.     The Book Ban provides no due process or ability to challenge the States' final determinations with the State or a judicial body.

76.     The Book Ban forbids booksellers from bringing claims against school districts, open-enrollment charter schools, or their employees for any damages caused by the law.

77.     By giving the State unbridled and arbitrary discretion to declare books "sexually explicit" and "sexually relevant" and prohibit the sale of constitutionally protected materials by a bookseller, with no recourse and no provision for judicial review, the Book Ban constitutes a prior restraint that violates the First and Fourteenth Amendments to the U.S. Constitution. *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976); *Book Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963).

D.     **Count Four: 42 U.S.C. § 1983, Violation of Free Speech Rights Under the First and Fourteenth Amendments to the United States Constitution—Facial and As Applied Challenge**

78.     Plaintiffs reallege all paragraphs above.

79.     Defendants are state actors operating under color of state law.

80.     Content-based restrictions on speech are presumptively unconstitutional. *Reed v. Town of Gilbert, Ariz*., 576 U.S. 155, 163 (2015). The First Amendment prohibits the government from regulating speech based on its content, unless the government can demonstrate that the law is necessary to achieve a "compelling government interest," it is "narrowly tailored" to achieve that interest, and it uses the "least restrictive means" to achieve that interest.

81. The Book Ban is a content-based restriction on speech because it regulates certain "library material" based on "the topic discussed, or the idea or message expressed." The Book Ban draws distinctions based on the type of messages conveyed.

82. The Book Ban distinguishes between "sexually explicit material" and "sexually relevant material," which are subject to the law's restrictions, and material that receives "no rating," which is not subject to the law, based on their content.

83. The Book Ban distinguishes between "material directly related to the curriculum," which is not subject to the law's restrictions, and material *not* "directly related to the curriculum," which is subject to the law, based on the material's content.

84. The Book Ban violates the First and Fourteenth Amendments to the U.S. Constitution on its face because it is neither narrowly tailored nor the least restrictive means of accomplishing a compelling government interest.

85. The Book Ban violates the First and Fourteenth Amendments to the U.S. Constitution as applied to Plaintiffs because it interferes with their ability to distribute constitutionally protected works. It also stigmatizes Plaintiffs, including booksellers, publishers, and authors, by labeling books as "sexually explicit" or "sexually relevant."[41]

86. The Book Ban unconstitutionally burdens Plaintiffs by requiring them to search past records to find the entire universe of library materials they ever sold to any Texas public school and review and rate those materials based on the Book Ban's vague definitions.[42]

**E.** **Count Five: 42 U.S.C. § 1983, Violation of Free Speech and Due Process Rights Under the First and Fourteenth Amendments to the U.S. Constitution—Overbreadth**

87. Plaintiffs reallege all paragraphs above.

---

[41] *See* Rejsek Decl. ¶ 21; Koehler Decl. ¶ 21; Stratton Decl. ¶ 12; Rasenberger Decl. ¶¶ 7-10; Trexler Decl. ¶ 12.
[42] *See* Rejsek Decl. ¶¶ 9-10, 14, 16; Koehler Decl. ¶ 9; Grogan Decl. ¶ 7; Stratton Decl. ¶¶ 6-8.

88.     Defendants are state actors operating under color of state law.

89.     The First and Fourteenth Amendments to the U.S. Constitution prohibit statutes that punish a substantial amount of protected speech in the course of regulating unprotected speech. Such statutes are unconstitutionally overbroad in violation of the First and Fourteenth Amendments. *United States v. Hansen*, 143 S. Ct. 1932, 1939 (2023)

90.     The Book Ban regulates substantially more speech that the First and Fourteenth Amendments permit.

91.     Although the Book Ban may prohibit some obscene and harmful material, it also prohibits a wide swath of constitutionally protected material.

92.     The Book Ban's significant overbreadth unconstitutionally chills Plaintiffs and others from engaging in protected expressive activity.[43]

**F.      Count Six: 42 U.S.C. § 1983, Violation of Free Speech and Due Process Rights Under the First and Fourteenth Amendments to the U.S. Constitution—Unconstitutional Delegation of Government Authority**

93.     Plaintiffs reallege all paragraphs above.

94.     Defendants are state actors operating under color of state law.

95.     Government authority may generally not be vested in private entities or individuals. *See Andrews v. Wilson*, 959 S.W.2d 686, 690 (Tex. App.—Amarillo 1998), *rev'd*, 10 S.W.3d 663 (Tex. 1999) (it is "generally recognized that governmental or legislative functions . . . cannot be delegated to private entities")

96.     Delegating the power to regulate speech to private entities or individuals, such as the establishment of rating systems, violates the First and Fourteenth Amendments to the U.S. Constitution. *See Swope v. Lubbers*, 560 F. Supp. 1328, 1334 (W.D. Mich. 1983) ("[I]t is well-

---

[43] *See* Stratton Decl. ¶ 5; Rasenberger Decl. ¶¶ 7, 10-11.

established" that private ratings system "may not be used as a standard for a determination of constitutional status"); *Entm't Software Ass'n v. Hatch*, 443 F. Supp. 2d 1065, 1071 (D. Minn. 2006), *aff'd sub nom. Entm't Software Ass'n v. Swanson*, 519 F.3d 768 (8th Cir. 2008) (the delegation of governmental authority to a private entity to determine what video games a child under 17 years of age could rent or purchase violated the First and Fourteenth Amendments).

97.     The Book Ban grants private "library material vendors" the authority to review and rate books as "sexually explicit," "sexually relevant," or "no rating" and determine whether they are recalled from public schools, banned from public schools, or restricted in public schools. TEX. EDUC. CODE §§ 33.021(a), 35.001(3), 35.002.

98.     The Book Ban's delegation of government authority to private entities and individuals to rate and prohibit books violates the First and Fourteenth Amendments to the U.S. Constitution. *See Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 71 (1963) (delegation of government authority to Commission that rated books as objectionable and prevented their circulation to minors was unconstitutional); *Sund v. City of Wichita Falls, Tex.*, 121 F. Supp. 2d 530, 553 (N.D. Tex. 2000) (enjoining the government's delegation of the selection and removal of library books to a group of private citizens because it was an "improper delegation of governmental authority").

## VII.   IRREPARABLE HARM

99.     There is no adequate remedy at law for the violation of Plaintiffs' constitutional rights. Unless the requested injunctive and declaratory relief is granted, Plaintiffs and their members will suffer immediate and irreparable harm.[44]

---

[44] Plaintiffs have already suffered actual injury by the Ban because at least one school district, Katy ISD, ceased all library book purchases, including those from Plaintiffs, after the Ban's passage. *See* Koehler Decl. ¶ 24. Further injury is imminent when the Book Ban takes effect on September 1, 2023. At that time, Plaintiffs will be burdened with the onerous and expensive task

100.    The existence of the Book Ban has a chilling effect on the exercise of Plaintiffs'
constitutional rights. The Book Ban will cause Plaintiffs irreparable personal and economic injury
each day it is in effect.

## VIII.   PRAYER FOR RELIEF

Plaintiffs request the following relief against Defendants:

a.    That this matter be set for a hearing on the requested preliminary injunctive relief
at the earliest practical date;

b.    That the Court enter a preliminary and permanent injunction enjoining the
Defendants and their agents, attorneys, servants, employees, and other
representatives from enforcing the Book Ban in any manner whatsoever;

c.    That the Court enter a declaratory judgment that the Book Ban is unconstitutional,
void, and of no effect;

d.    That Plaintiffs be awarded the costs of this action;

e.    That Plaintiffs recover from Defendants their reasonable attorney's fees under 42
U.S.C. § 1988; and

f.    That Plaintiffs be granted any other and further relief the Court deems proper.

---

of reviewing and rating all books sold to public schools "in active" use as "sexually explicit" and
"sexually relevant" using a vague "contextual analysis." *See* Rejsek Decl. ¶¶ 15-16, 20-22, 25-26;
Koehler Decl. ¶¶ 8-16; Grogan Decl. ¶¶ 7, 19-21; Stratton Decl. ¶¶ 8-11. Blue Willow Bookshop
estimates that it will cost between $200 and $1,000 per book and between $4 million and $500
million total to read and rate books already sold to public schools according to the Book Ban's
multi-layered criteria. *See* Koehler Decl. ¶¶ 14-16. These estimates do not account for the cost of
reviewing future books or the cost of obtaining previously sold books. *Id*. ¶ 15. Because of these
exponential costs and low margins, the Book Ban could cause bookstores to close and will likely
deter new bookstores from opening in Texas.

Respectfully submitted,

*/s/ Laura Lee Prather*

Laura Lee Prather
Texas Bar No. 16234200
laura.prather@haynesboone.com
Catherine L. Robb
Texas Bar No. 24007924
catherine.robb@haynesboone.com
Michael J. Lambert
Texas Bar No. 24128020
michael.lambert@haynesboone.com
Reid Pillifant
Texas Bar No. 24126157
reid.pillifant@haynesboone.com

**HAYNES AND BOONE, LLP**
600 Congress Avenue, Suite 1300
Austin, Texas 78701
Telephone: (512) 867-8400
Facsimile: (512) 867-8470

**ATTORNEYS FOR PLAINTIFFS**