**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| **BOOK PEOPLE, INC., VBK, INC. d/b/a BLUE WILLOW BOOKSHOP, AMERICAN BOOKSELLERS ASSOCIATION, ASSOCIATION OF AMERICAN PUBLISHERS, AUTHORS GUILD, INC., COMIC BOOK LEGAL DEFENSE FUND,** | § § § § § § § § | |
| **Plaintiffs,** | § § | |
| **v.** | § § | **CASE NO. 1:23-cv-858** |
| **MARTHA WONG in her official capacity as chair of the Texas State Library and Archives Commission, KEVEN ELLIS in his official capacity as chair of the Texas Board of Education, MIKE MORATH in his official capacity as Commissioner of Education,** | § § § § § § § § § | |
| **Defendants.** | § | |

---

**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

---

### TABLE OF CONTENTS

I. INTRODUCTION ................................................................................................ 1

II. STATEMENT OF FACTS ................................................................................. 1

III. ARGUMENT ...................................................................................................... 7

    A.    Plaintiffs have standing to challenge the Book Ban. ............................... 7

    B.    Plaintiffs are likely to succeed in proving that the Book Ban is
          unconstitutional. ......................................................................................... 9

          1.    The Book Ban compels speech in violation of the First
                Amendment because it requires Plaintiffs to express the
                government's views. ................................................................... 9

          2.    The Book Ban is unconstitutionally vague because its unclear and
                confusing terms fail to provide explicit standards and would cause
                disparate results. ...................................................................... 11

          3.    The Book Ban is an unconstitutional prior restraint because it
                prevents the distribution of constitutionally protected works
                without judicial review. ............................................................ 13

          4.    The Book Ban is facially unconstitutional because it is a content-
                based regulation not narrowly tailored to a compelling government
                interest. ..................................................................................... 15

          5.    The Book Ban is unconstitutionally overbroad because it restricts
                and chills a substantial amount of protected speech. .............. 17

          6.    The Book Ban unconstitutionally delegates government authority
                to regulate speech to private entities and individuals. ............. 19

    C.    Plaintiffs will suffer irreparable injury because their constitutional rights
          will be violated unless the Book Ban is enjoined. ................................. 19

    D.    The balance of equities and public interest weighs heavily in favor of
          enjoining the Book Ban because the First Amendment rights of Plaintiffs
          and other Texans will be infringed if a preliminary injunction is not
          granted. .................................................................................................. 20

IV. CONCLUSION ................................................................................................. 20

CERTIFICATE OF SERVICE ............................................................................. 21

## TABLE OF AUTHORITIES

**Cases**                                           **Page(s)**

*303 Creative LLC v. Elenis,*
    143 S. Ct. 2298 (2023)................................................................9, 10, 11

*Agency for Int'l Devel. v. Alliance for Open Society Int'l.,*
    570 U.S. 205 (2013)...............................................................................11

*Ashcroft v. Free Speech Coal.,*
    535 U.S. 234 (2002)...............................................................................18

*Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico,*
    457 U.S. 853 (1982)...............................................................................18

*Book Bantam Books, Inc. v. Sullivan,*
    372 U.S. 58 (1963)...........................................................................14, 19

*Brown v. Entm't Merchants Ass'n,*
    564 U.S. 786 (2011)........................................................................16, 17

*Campbell v. St. Tammany Par. Sch. Bd.,*
    64 F.3d 184 (5th Cir. 1995) ...................................................................19

*Chiu v. Plano Indep. Sch. Dist.,*
    339 F.3d 273 (5th Cir. 2003) .................................................................13

*De Leon v. Perry,*
    975 F. Supp. 2d 632 (W.D. Tex. 2014), *aff'd sub nom. De Leon v. Abbott,* 791
    F.3d 619 (5th Cir. 2015) ......................................................................20

*Elrod v. Burns,*
    427 U.S. 347 (1976)...............................................................................19

*Erznoznik v. City of Jacksonville,*
    422 U.S. 205 (1975)...............................................................................16

*Freedman v. State of Md.,*
    380 U.S. 51 (1965).................................................................................15

*Ginsberg v. State of N. Y.,*
    390 U.S. 629 (1968), *modified by Miller v. California,* 413 U.S. 15 (1973)................4, 14, 16

*Interstate Circuit, Inc. v. City of Dallas,*
    390 U.S. 676 (1968)...............................................................................11

*Johnson v. United States,*
    576 U.S. 591 (2015)...............................................................................13

*Joseph Burstyn, Inc. v. Wilson,*
   343 U.S. 495 (1952) ..................................................................................13

*Knox v. Serv. Empl. Int'l Union,*
   567 U.S. 298 (2012) ..................................................................................10

*Martin v. City of Struthers,*
   319 U.S. 141 (1943) ..................................................................................18

*Nebraska Press Ass'n v. Stuart,*
   427 U.S. 539 (1976) ..................................................................................14

*Nken v. Holder,*
   556 U.S. 418 (2009) ..................................................................................20

*Opulent Life Church v. City of Holly Springs, Miss.,*
   697 F.3d 279 (5th Cir. 2012) ...........................................................7, 19, 20

*Penthouse Int'l, Ltd. v. McAuliffe,*
   610 F.2d 1353 (5th Cir. 1980) ..................................................................15

*Reed v. Town of Gilbert, Ariz.,*
   576 U.S. 155 (2015) ............................................................................15, 16

*Reno v. ACLU,*
   521 U.S. ....................................................................................................12

*Reno v. ACLU,*
   521 U.S. 844 (1997) ..................................................................................16

*Roark & Hardee LP v. City of Austin,*
   522 F.3d 533 (5th Cir. 2008) ....................................................................11

*Rumsfeld v. Forum for Academic & Institutional Rights, Inc.,*
   547 U.S. 47 (2006) ....................................................................................10

*Sable Commc'ns of Cal., Inc. v. Fed. Commc'ns Comm'n,*
   492 U.S. 115 (1989) ..................................................................................16

*Seals v. McBee,*
   898 F.3d 587 (5th Cir. 2018) ....................................................................18

*Smith v. Goguen,*
   415 U.S. 566 (1974) ..................................................................................11

*State of Texas v. Seatrain Int'l, S.A.,*
   518 F.2d 175 (5th Cir. 1975) ......................................................................7

*Sund v. City of Wichita Falls, Tex.,*
   121 F. Supp. 2d 530 (N.D. Tex. 2000) ...................................................................19

*Susan B. Anthony List v. Driehaus,*
   573 U.S. 149 (2014)...............................................................................................8

*Ex parte Tucci,*
   859 S.W.2d 1 (Tex. 1993)......................................................................................1

*U.S. v. United Foods, Inc.,*
   533 U.S. 405 (2001)...............................................................................................9

*United States v. Hansen,*
   143 S. Ct. 1932 (2023)...........................................................................................18

*Universal Amusement Co., Inc. v. Vance,*
   587 F.2d 159 (5th Cir. 1978), *aff'd*, 445 U.S. 308 (1980).....................................14

*Virginia v. Am. Booksellers Ass'n.,*
   484 U.S. 383 (1988)...............................................................................................8

*W. Va. Bd. of Educ. v. Barnette,*
   319 U.S. 624 (1943)...............................................................................................9

*Zimmerman v. City of Austin,*
   Tex., 881 F.3d 378 (5th Cir. 2018) ........................................................................7

**Statutes**

42 U.S.C. § 1983......................................................................................................1

TEX. EDUC. CODE § 28.002(a).............................................................................2, 3, 5, 11

TEX. EDUC. CODE § 33.021 ..................................................................................1, 2, 11

TEX. EDUC. CODE § 33.21(a)................................................................................3, 15, 16

TEX. EDUC. CODE § 35.001 ..................................................................................1, 2

TEX. EDUC. CODE § 35.001(3)..............................................................................11

TEX. EDUC. CODE § 35.002 ..................................................................................1, 2, 8

TEX. EDUC. CODE § 35.002(b) ............................................................................6, 13, 20

TEX. EDUC. CODE § 35.002(c)..............................................................................10

TEX. EDUC. CODE § 35.0021 ................................................................................1, 4, 12

TEX. EDUC. CODE § 35.003 ...................................................................................................1

TEX. EDUC. CODE § 35.004 ...................................................................................................1

TEX. EDUC. CODE § 35.005 ...............................................................................................1, 2

TEX. EDUC. CODE § 35.006 ...................................................................................................1

TEX. EDUC. CODE § 35.007 ...................................................................................................1

TEX. EDUC. CODE § 35.008 ...................................................................................................1

TEX. PEN. CODE § 43.21 .....................................................................................3, 5, 12, 16

TEX. PEN. CODE § 43.21(a)(1) ..............................................................................................4

TEX. PEN. CODE § 43.21(a)(4) ..............................................................................................3

TEX. PEN. CODE § 43.25 ...............................................................................................2, 5, 15

TEX. PEN. CODE § 43.25(a)(2) ..............................................................................................2

**Other Authorities**

U.S. Constitution............................................................................................ *passim*

Texas Constitution ...................................................................................................1

Fed. R. Civ. Proc. 65 ...............................................................................................1

Claire Goodman, *Katy ISD halts all library book purchases, new books stored*, HOUSTON CHRONICLE (June 27, 2023) .................................................................8

Danika Ellis, *All 850 Books Texas Lawmaker Matt Krause Wants To Book Ban: An Analysis*...................................................................................................17

Plaintiffs Book People, Inc., VBK, Inc. d/b/a Blue Willow Bookshop, American Booksellers Association, Association of American Publishers, Authors Guild, Inc., and Comic Book Legal Defense Fund ("Plaintiffs") file this Motion for Preliminary Injunction under Fed. R. Civ. Proc. 65 ("Motion") and ask this Court to enjoin the enforcement of H.B. 900[1] under 42 U.S.C. § 1983 because it violates the First and Fourteenth Amendments to the U.S. Constitution.

## I.   **INTRODUCTION**

This case concerns the looming implementation of H.B. 900, a recently enacted law that bans books deemed "sexually explicit" and restricts access to books deemed "sexually relevant" in public schools in violation of the First Amendment (the "Book Ban"). The Book Ban burdens Plaintiffs—a coalition of booksellers, publishers, and authors—with impossible demands, compels their speech on controversial topics, implicates them in the recall and removal from schools of books deemed "sexually explicit," and grants the State licensing authority over what appears in school libraries. If booksellers resist these infringements on their First Amendment rights, the State will bar them from conducting business with any Texas public school and subject them to public censure. As for publishers and authors, they have no recourse and must live with the State banning their books and labeling them as unacceptable for minors. To preserve the fundamental free-speech rights guaranteed by the U.S. and Texas Constitutions,[2] the Book Ban must be enjoined.

## II.   **STATEMENT OF FACTS**

Gov. Greg Abbott signed the Book Ban on June 13, 2023, and it is scheduled to take effect

---

[1] The text of H.B. 900, known as the Restricting Explicit and Adult-Designated Educational Resources ("READER") Act, is attached as Exhibit A. H.B. 900 is codified as proposed Tex. Educ. Code §§ 33.021, 35.001-002, 35.0021, 35.003-008.

[2] *See Ex parte Tucci*, 859 S.W.2d 1, 5 (Tex. 1993) (freedom of expression protections in the Texas Constitution are broader than under the U.S. Constitution).

on September 1, 2023. The Book Ban requires that a "library material vendor"[3] rate all "library material"[4] previously sold to a "school district or open-enrollment charter school" ("public schools") as "sexually explicit" or "sexually relevant" based on vague and ambiguous content-based criteria.[5] *See* proposed TEX. EDUC. CODE §§ 33.021, 35.001, 35.002, 35.005.[6] The Book Ban offers three possible book ratings: "sexually relevant," "sexually explicit," or "no rating." These ratings ultimately determine a bookseller's ability to sell them to schools and consequently, students' ability to access them. Books deemed "sexually relevant" may only be accessed "outside the school library" with written parental consent, while books deemed "sexually explicit" are banned entirely. §§ 35.002, 35.005.

"Sexually relevant material" is defined as "any communication, language, or material, including a written description, illustration, photographic image, video image, or audio file, other than library material directly related to the curriculum required under Section 28.002(a), that describes, depicts, or portrays sexual conduct, as defined by Section 43.25, Penal Code." § 35.001(3). The vast definition of "sexual conduct"[7] seemingly encompasses all books that mention any sexual-related topic. Plaintiffs fundamentally oppose these subjective standards and sweeping restrictions on students' access to these materials. Specifically, members of the Authors Guild have

---

[3] A "library material vendor" is defined as "any entity that sells library material to a public primary or secondary school in this state." 35.001(1) (hereinafter, "bookseller"). This definition could apply broadly to wholesalers, distributors, independent bookstores, online retailers, e-book sellers, publishers, authors, and others.

[4] "Library material" is not defined in the Book Ban. Read literally, "library material" could include an expansive collection of items, such as books, reference works, magazines, newspapers, and audio and audiovisual materials, in both physical and digital formats (hereinafter, "books").

[5] The State does not provide *any* funding to help booksellers complete this onerous task.

[6] Below references to the Education Code refer to *proposed* sections.

[7] "Sexual conduct" means "sexual contact, actual or simulated sexual intercourse, deviate sexual intercourse, sexual bestiality, masturbation, sado-masochistic abuse, or lewd exhibition of the genitals, the anus, or any portion of the female breast below the top of the areola." TEX. PEN. CODE § 43.25(a)(2).

serious concerns that even a "sexually relevant" rating, which will be posted on Texas Education Agency's ("TEA") website, could unduly stigmatize their books and affect their ability to sell or distribute them in the future.[8]

While the Book Ban exempts material "related to the curriculum" based on § 28.002(a) of the Education Code, that Section provides little guidance for what the exemption covers.[9] Because there is no statewide curriculum in Texas, there is no way to know what material is "related to the curriculum" across all 1,025 Texas school districts. Curricula vary from classroom-to-classroom within a district and from day-to-day or year-to-year within a classroom, requiring consistent reevaluation.[10] Even if there was a statewide standard, it would be unclear what is "related to" it.

The definition of "sexually explicit material" includes the above definition of "sexually relevant material" and requires that the depiction be presented "in a way that is patently offensive, as defined by Section 43.21, Penal Code." §§ 33.021(a); 35.001(2). That definition requires Plaintiffs to determine whether a book is "so offensive on its face as to affront current community standards of decency." TEX. PEN. CODE § 43.21(a)(4). But the Book Ban, confusingly, does not tell Plaintiffs whether this community standard is based on Austin, Texas, or Onalaska, Texas— or any of the more than 1,200 incorporated municipalities across Texas. Thus, Plaintiffs lack clarity to determine whether a book conforms to current community standards.[11]

---

[8] *See* Declaration of Mary E. Rasenberger, CEO of the Guild, attached as Exhibit B ("Rasenberger Decl.") ¶¶ 7-12.

[9] § 28.002(a) provides only a general list of subjects that curriculum must cover.

[10] Further, if a teacher brings a book from home to use in her lessons, would that book be presumed to "relate to the curriculum" when it enters the classroom? How would Plaintiffs even be aware of its use, much less whether it is considered "related to the curriculum" when attempting to perform their rating obligations? Questions abound. *See* Declaration of Valerie Koehler, owner of Blue Willow Bookshop, attached as Exhibit C ("Koehler Decl.") ¶ 19; Declaration of Matthew Stratton, Deputy General Counsel of AAP, attached as Exhibit D ("Stratton Decl.") ¶ 11.a-b.

[11] *See* Rejsek Decl. ¶ 17; Grogan Decl. ¶ 9; Stratton Decl. ¶ 11.g.

Besides assessing the current unspecified community standards, Plaintiffs must "perform a contextual analysis" [12] before finding that books are "patently offensive." § 35.0021. To perform the analysis, the Book Ban contains three subjective factors:

> (1)    the explicitness or graphic nature of a description or depiction of sexual conduct contained in the material;

> (2)    whether the material consists predominantly of or contains multiple repetitions of depictions [but not descriptions or portrayals] of sexual or excretory organs or activities; and

> (3)    whether a reasonable person would find that the material intentionally panders to, titillates, or shocks the reader.

§ 35.0021(b). The Book Ban prescribes a balancing test in which Plaintiffs must "weigh and balance" each of these factors while recognizing that each instance "may present a unique mix of factors." § 35.0021(c). The Book Ban also instructs booksellers to "consider the full context . . . recognizing that contextual determinations are necessarily highly fact-specific and require the consideration of contextual characteristics that may exacerbate or mitigate the offensiveness of the material." § 35.0021(d). Departing from any constitutionally recognized standards, Plaintiffs are unclear how to weigh the various factors outlined above and how to perform the required confusing contextual analyses. *See* Declaration of Charley Rejsek, CEO of BookPeople, attached as Exhibit E ("Rejsek Decl.") ¶ 17; Stratton Decl. ¶ 11.f. Plaintiffs do not believe their members or employees have the time or the training to properly make these assessments, which could lead to the banning

---

[12] The Book Ban will cause the prohibition of swaths of non-obscene, constitutionally protected books. In determining whether a book is "sexually explicit," booksellers need not consider whether the book "taken as a whole, lacks serious literary, artistic, political, and scientific value," which is an element of obscenity for minors. *See Ginsberg v. State of N. Y.,* 390 U.S. 629 (1968), *modified by Miller v. California,* 413 U.S. 15, 24 (1973); Tex. Pen. Code §43.21(a)(1). Instead, a book can be banned if it depicts "sexual conduct" in a way that is "patently offensive," regardless of whether it has societal value, and need not be considered as a whole.

of many classic works of literature.[13] *See* Rejsek Decl. ¶ 17; Koehler Decl. ¶¶ 13, 18; Declaration of David Grogan, Director of the American Booksellers for Free Expression, Advocacy and Public Policy, attached as Exhibit F ("Grogan Decl.") ¶¶ 7, 11.; Stratton Decl. ¶ 9; Trexler Decl. ¶¶ 8-9.

After considering the curriculum under Tex. Educ. Code § 28.002(a), the relevant definitions under Penal Code §§ 43.21 and 43.25, weighing the Book Ban's three principal factors under § 35.0021(b), and performing the two required contextual analyses under §§ 35.0021(c)-(d), Plaintiffs must then issue a rating *for each work they have sold or could sell in the future*. A list of each bookseller's ratings as will be posted "in a conspicuous place" on TEA's website "as soon as practicable." § 35.002(e). This process begins with the rapidly approaching 2023-2024 school year and repeats each year thereafter. *Id*. § 35.002(d).

If TEA disagrees with any ratings, it may compel a bookseller to accept the agency's revised rating or face reprisal from the State. Upon written notice of TEA's corrected rating,[14] booksellers are required to revise their ratings "to the agency's corrected rating" within 60 days. § 35.003(b)(1). Presumably, this revised rating is then added to each bookseller's public entries on TEA's website. If a bookseller refuses to do so, it will be banned from selling *any* books to public schools. § 35.003(d). Plaintiffs are concerned that these revised ratings—which booksellers are coerced to accept by statute—will be interpreted by the public as Plaintiffs' own independent rating when it is, in fact, speech compelled by the State. *See* Rejsek Decl. ¶¶ 19-21; Koehler Decl.

---

[13] The Book Ban would appear to restrict access—or ban entirely—such classic works as *Twelfth Night*, *A Midsummer Night's Dream*, *Romeo and Juliet*, *Of Mice and Men*, *Ulysses*, *Jane Eyre*, *Maus*, *Anne Frank's Diary: The Graphic Adaptation*, *The Canterbury Tales*, *I Know Why the Caged Bird Sings*, *Lonesome Dove*, and even the Bible. *See* Debate on Tex. H.B.900 in the House Committee on Public Education, 88th Leg. (Mar. 21, 2023); Declaration of Jeff Trexler, Executive Director of the CBLDF, attached as Exhibit G ("Trexler Decl.") ¶¶ 7-9.

[14] The Book Ban does not require TEA to provide any justification for its decision to overrule a bookseller's rating or the right to appeal the rating change.

¶¶ 17, 21-22; Grogan Decl. ¶ 15; Trexler Decl. ¶¶ 14, 16.

If a bookseller refuses to accept the State's compelled rating as its own, it will not only be prohibited from selling books to public schools, but it will also face public censure by the State. Under the Book Ban, TEA must post a list of booksellers who fail to assent to the agency's compelled ratings "in a conspicuous place" on its website. § 35.003(c). School districts are barred from purchasing books from these blacklisted booksellers, who have no recourse for the loss of business. §§ 35.003(d); 35.004. This Hobson's Choice requires booksellers accept the State's compelled speech as their own or sacrifice their ability to conduct business with school districts. Plaintiffs stand to suffer significant financial—and reputational—damages from their loss of business with school districts. *See* Rejsek Decl. ¶¶ 20-22; Koehler Decl. ¶¶ 14-16, 21-25; Grogan Decl. ¶¶ 19-20; Rasenberger Decl. ¶ 7; Trexler Decl. ¶ 12. Yet the Book Ban bars booksellers from bringing claims against school districts, open-enrollment charter schools, or their employees for any damages caused by it. § 35.004.

Plaintiffs are not only banned from selling books rated as "sexually explicit" in the future, but they must "issue a recall" for all such books they have ever sold and that are still "in active use" by a public school. § 35.002(b). Plaintiffs, some of whom have been in business for decades, are unable to comply with this onerous requirement because they do not have records of every book they have ever sold to a public school. *See* Rejsek Decl. ¶¶ 9-10; Koehler Decl. ¶ 7; Grogan Decl. ¶ 6; Stratton Decl. ¶ 5. Nor would they know which books are "in active use" in a school. *See* Rejsek Decl. ¶ 11; Koehler Decl. ¶ 9; Stratton Decl. ¶ 6.

Even if they could comply with this unfunded mandate, Plaintiffs are conscripted into aiding the State in the *removal* of books from libraries based on content-based criteria with which Plaintiffs sincerely disagree and could lead to public backlash against booksellers or even liability

from authors. Such a recall would not only be antithetical to the First Amendment, but Plaintiffs are also concerned it would be interpreted as their own speech, when, in fact, their speech is being compelled by the State if they want to continue selling books, even where Plaintiffs specifically disagree with the State's rating. *See* Rejsek Decl. ¶¶ 19-21; Koehler Decl. ¶¶ 17, 21-22; Grogan Decl. ¶ 22; Stratton Decl. ¶ 14; Trexler Decl. ¶¶ 15-16. Further, although the Book Ban clearly requires booksellers to submit by April 1, 2024 a list of all "sexually relevant" and "sexually explicit" material it has sold in the past that is still in active use by school districts, it is unclear whether Plaintiffs can sell books to public schools before compiling such a list.

## III.   ARGUMENT

Plaintiffs are entitled to a preliminary injunction if they establish: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm if the injunction is not granted; (3) that the threatened injury outweighs any harm that the injunction might cause to the defendant; and (4) that the injunction will not disserve the public interest." *Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279, 288 (5th Cir. 2012). These elements are not examined in isolation but balanced in consideration of each other. *State of Texas v. Seatrain Int'l, S.A.*, 518 F.2d 175, 180 (5th Cir. 1975). As shown below, Plaintiffs can satisfy each element and are thus entitled to a preliminary injunction.

### A.   Plaintiffs have standing to challenge the Book Ban.

Plaintiffs have standing to facially challenge the Book Ban. Because Plaintiffs have sold books to public schools and intend to continue selling books to public schools, they will be subject to the Book Ban's unconstitutional requirements. *See Zimmerman v. City of Austin*, Tex., 881 F.3d 378, 388 (5th Cir. 2018) (to establish an injury sufficient to raise a facial challenge under the First Amendment, "a plaintiff must produce evidence of an intention to engage in a course of conduct

arguably affected with a constitutional interest, but proscribed by statute"); *see* Rejsek Decl. ¶ 4; Koehler Decl. ¶¶ 3-5; Grogan Decl. ¶ 5; Stratton Decl. ¶ 4; Rasenberger Decl. ¶ 6; Trexler Decl. ¶ 5. The Book Ban also violates the constitutional rights of others not before the Court, such as students and other booksellers, publishers, and authors, and chills their protected speech. *See Virginia v. Am. Booksellers Ass'n.*, 484 U.S. 383, 392–93 (1988).

Plaintiffs also have standing because of their injuries. To establish standing, a plaintiff must show an (1) "injury in fact," (2) a sufficient "causal connection between the injury and the conduct complained of," and (3) a "likel[ihood]" that the injury "will be redressed by a favorable decision." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157–58 (2014). An injury that is "concrete and particularized" and "actual or imminent" satisfies the standing requirement. *Id*. at 158.

Plaintiffs have standing because they have suffered an injury in fact caused by the Book Ban that can be redressed by issuing a preliminary injunction. Plaintiffs have been injured by the Book Ban because at least one school district, Katy ISD, ceased all library book purchases, including from Plaintiffs, after the Book Ban's passage.[15] Because Plaintiffs have lost business that, but-for the Book Ban, they would have received from Katy ISD, they have already suffered "actual" injury. Standing is sufficient on that basis alone. *Id.*

Plaintiffs also have standing because further injury is "imminent." *Id*. When the Book Ban takes effect on September 1, 2023, Plaintiffs will be required to rate all books previously sold to a public school as "sexually explicit material" or "sexually relevant material." TEX. EDUC. CODE § 35.002. But Plaintiffs cannot issue the ratings because, among other reasons, they do not have lists of all library materials sold to or in "active use" by public schools. Thus, because they cannot issue

---

[15] *See* Claire Goodman, *Katy ISD halts all library book purchases, new books stored*, HOUSTON CHRONICLE (June 27, 2023); Koehler Decl. ¶ 24.

the ratings as required, Plaintiffs will be prohibited from selling *any* books to public schools, which will cause them economic and reputational damages. § 35.002(a); *see* Rejsek Decl. ¶ ; 22; Koehler Decl. ¶¶ 7-8; Grogan Decl. ¶ 5; Stratton Decl. ¶ 5; Rasenberger Decl. ¶ 11;. Trexler Decl. ¶ 12.

Plaintiffs will suffer further injury because the State will seek to compel their speech by requiring them to rate books based on the State's subjective criteria with which they disagree. *See 303 Creative LLC v. Elenis*, 143 S. Ct. 2298, 2308 (2023) (standing is demonstrated in a compelled speech case by showing that a "credible threat" exists that the State will "seek to compel speech" from a speaker which the speaker "d[oes] not wish to produce"); Rejsek Decl. ¶¶ 19, 21; Koehler Decl. ¶ 17; Grogan Decl. ¶ 15; Stratton Decl. ¶ 14; Trexler Decl. ¶¶ 14, 16.

**B.**     **Plaintiffs are likely to succeed in proving that the Book Ban is unconstitutional.**

**1.**     **The Book Ban compels speech in violation of the First Amendment because it requires Plaintiffs to express the government's views.**

The Book Ban compels Plaintiffs to speak in ways in which they disagree, forcing them to adopt the State's preferred message or face sanctions—a fundamental and flagrant violation of the U.S. Constitution's prohibition against compelled speech.

> If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein.

*W. Va. Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). "Just as the First Amendment may prevent the government from prohibiting speech, the Amendment may prevent the government from compelling individuals to express certain views." *U.S. v. United Foods, Inc.*, 533 U.S. 405, 410 (2001).

The Book Ban directly conflicts with settled constitutional jurisprudence by compelling Plaintiffs' speech in at least two ways. First, the Book Ban coerces Plaintiffs to express that a book is "sexually explicit" or "sexually relevant" based on the government's standards with which they

disagree. Worse, the Book Ban requires Plaintiffs to revise their own independent assessments to conform with the State's views. This violates the principle that "the government may not compel a person to speak its own preferred messages." *303 Creative LLC*, 143 S. Ct. at 2312.[16] Earlier this year, in *303 Creative*, the U.S. Supreme Court struck down a Colorado law that sought "to force an individual to speak in ways that align with its views but defy her conscience about a matter of major significance." *Id*. at 2321. By forcing a person to "utter what is not in [her] mind," the State attempted "something the First Amendment does not tolerate." *Id*. at 2318.

The Book Ban is equally unconstitutional here, where the State seeks to force booksellers to adopt its preferred message. Booksellers must first "develop and submit" to the State a list of books rated as "sexually explicit" or "sexually relevant" that have ever been sold to a public school based on criteria developed by the government with which they disagree. TEX. EDUC. CODE § 35.002(c); Rejsek Decl. ¶¶ 19, 21; Koehler Decl. ¶ 17; Grogan Decl. ¶ 15; Stratton Decl. ¶ 14. Booksellers that fail to issue ratings are prohibited from selling *any* books to public schools. § 35.002(a). The government may then review the booksellers' ratings and overrule them for any book that it believes was "incorrectly rated." § 35.003(a). If a bookseller fails to adopt the government's imposed rating, public schools will be banned from purchasing *any* books from it, which will result in a significant financial injury. §§ 35.003(c), (d). The purchasing ban continues indefinitely unless and until the bookseller caves to the government's demands. The Book Ban's repressive speech regime—and the associated financial sanctions for noncompliance—are "more than enough [] to represent an impermissible abridgment of the First Amendment's right to speak

---

[16] *See also Knox v. Serv. Empl. Int'l Union*, 567 U.S. 298, 309 (2012) ("government may not . . . compel the endorsement of ideas that it approves"); *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47, 61 (2006) ("freedom of speech prohibits the government from telling people what they must say").

freely." *303 Creative,* 143 S. Ct. at 2313.[17]

      **2.**      **The Book Ban is unconstitutionally vague because its unclear and confusing terms fail to provide explicit standards and would cause disparate results.**

The Book Ban contains many unconstitutionally vague provisions. A law is unconstitutionally vague when it (1) fails to provide a "person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly" or (2) fails to provide "explicit standards" for applying the law "to avoid arbitrary and discriminatory applications." *Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 551 (5th Cir. 2008). Because the Book Ban implicates constitutionally protected expression, it must provide heightened specificity and clarity in its definitions and protections against arbitrary enforcement. *Id.* at 552 (a "more stringent vagueness test" applies when a law "threatens to inhibit the exercise of constitutionally protected rights").[18]

The Book Ban is unconstitutionally vague in at least four ways.[19] First, the definitions of "sexually explicit material" and "sexually relevant material" are inherently vague because they are created out of whole cloth by the Legislature, are confusing, and have no basis in existing law. TEX. EDUC. CODE §§ 33.021, 35.001(3). While they purport to exempt material "related to the curriculum required under Section 28.002(a)" of the Education Code, the Book Ban provides little, if any, guidance on how to know what curriculum exists and what is "related to" such a curriculum. Curricula vary from day-to-day, year-to-year, and district-to-district—and are consistently

---

[17] *See also Agency for Int'l Devel. v. Alliance for Open Society Int'l.*, 570 U.S. 205, 220 (2013) (striking law requiring the adoption of the government's views as a condition of federal funds,).

[18] *See also Smith v. Goguen*, 415 U.S. 566, 573 (1974) (when a law is "capable of reaching expression sheltered by the First Amendment, the [vagueness] doctrine demands a greater degree of specificity than in other contexts.").

[19] *See Interstate Circuit, Inc. v. City of Dallas*, 390 U.S. 676, 682 (1968) (Dallas ordinance that created the "Motion Picture Classification Board" that rated films as "not suitable for young persons" was unconstitutionally vague).

reevaluated. The definition of "sexually relevant material" is particularly vague because it refers to Tex. Penal Code § 43.21, which defines "obscene" consistent with *Miller*, 413 U.S. at 24. But the Book Ban cherry-picks the definition of "patently offensive" from that test, noticeably excluding the third prong of the *Miller* test—whether the material "taken as a whole, lacks serious literary, artistic, political, and scientific value." The State's standard thus fails to pass constitutional muster and would be difficult for a person of ordinary intelligence to apply, resulting in arbitrary applications.[20]

Second, the convoluted "contextual analysis" required to determine whether a book is "sexually explicit" adds to the confusion. TEX. EDUC. CODE § 35.0021. To conduct a "contextual analysis," the Book Ban requires the consideration of three vague factors not found elsewhere in law: (1) the explicitness or graphic nature of a description or depiction of sexual conduct contained in the material; (2) whether the material consists predominantly of or contains multiple repetitions of depictions [but not descriptions or portrayals] of sexual or excretory organs or activities; (3) and whether a reasonable person would find that the material intentionally panders to, titillates, or shocks the reader." §§ 35.0021(b)(1)-(3). Although the Book Ban emphasizes that the analysis should be "contextual," it seemingly contradicts itself by requiring that "each instance of a description, depiction, or portrayal of sexual conduct" be considered and that "contextual determinations are necessarily highly fact-specific." §§ 35.0021(c), (d). This results in a highly personal and subjective test, which will yield widely disparate ratings—even for the same book— as dozens of booksellers attempt to categorize thousands of books. *See* Rejsek Decl. ¶ 17; Koehler Decl. ¶ 18; Grogan Decl. ¶¶ 9, 12, 13, 17; Stratton Decl. ¶ 11; Rasenberger Decl. ¶¶ 7-11.

---

[20] The Ban requires booksellers to make subjective assessments based on unclear criteria untethered to the defined bounds of the *Miller* test. *See Reno v. ACLU*, 521 U.S. at 873–74 (the third prong of the *Miller* test "critically limits the uncertain sweep of the obscenity definition").

Third, the Book Ban requires booksellers to "recall" books deemed sexually explicit if they are still "in active use." § 35.002(b). But the Book Ban provides no definition as to what constitutes a "recall" or "active use,"[21] and fails to explain  what happens if a school district fails to heed this recall. These definitions (or lack thereof) are not incidental to the Book Ban, since a bookseller's ability to contract with school districts is premised on compliance with these vague terms. Finally, the Book Ban is unclear regarding whether books can be sold by booksellers between September 1, 2023 (the Book Ban's effective date) and April 1, 2024 (the date booksellers must submit their ratings to the State). This could cause some districts to refuse to enter into contracts until ratings are received. Because these imprecise statutory terms leave "grave uncertainty" about how to understand their scope, they are void for vagueness. *See Johnson v. United States,* 576 U.S. 591, 597, 602 (2015).

### 3.     The Book Ban is an unconstitutional prior restraint because it prevents the distribution of constitutionally protected works without judicial review.

The Book Ban vests the State with unbridled discretion, without judicial oversight, to decide which books are available in public schools and which booksellers can conduct business with public schools. The State ultimately determines which books are banned in public schools by rating them as "sexually explicit," even if they are constitutionally protected, based on its own subjective criteria. Booksellers that do not adopt the State's ratings are blocked from selling *any* books to public schools, regardless of their rating. This results in an unconstitutional system of prior restraints.[22] *See Chiu v. Plano Indep. Sch. Dist.*, 339 F.3d 273, 280 (5th Cir. 2003) ("The

---

[21] The Book Ban does not define "active use," provide a means of determining whether a book is in "active use," or explain when it ceases to be in "active use." "Active use" could presumedly include books once but no longer sold. This requires booksellers to rate *every* book *ever* sold to public schools, even if the book is not in their inventory or they do not intend to sell the book.
[22] *See also Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 503 (1952) (striking down a New York law that "require[d] that permission to communicate ideas be obtained in advance from state officials who judge the content of the words and pictures sought to be communicated . . . such a

prohibition of distributing literature is a classic form of a prior restraint.").

Prior restraints, such as the Book Ban, "are the most serious and the least tolerable infringement on First Amendment rights" and face a "heavy presumption against [their] constitutional validity." *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976). In an analogous case, the U.S. Supreme Court struck down a Rhode Island law that established a Commission that reviewed and rated certain books as "objectionable for sale, distribution or display to youths under 18 years of age." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 66 (1963). The Court found that this scheme, in which distributors stopped selling the "suspect" publications in response, was an unconstitutional "system of prior administrative restraints" because it (1) suppressed the distribution of non-obscene, constitutionally protected books (2) without a judicial determination that the content could lawfully be banned. *Id.* ("[A] State is not free to adopt whatever procedures it pleases for dealing with obscenity without regard to the possible consequences for constitutionally protected speech.").

So too is the situation here. First, because the Book Ban does not consider whether books have literary, artistic, political or scientific value, as required by the *Miller/Ginsberg* test, it sweeps a wide swath of constitutionally protected works within its definition of "sexually explicit material." *See Ginsberg v. State of N. Y.*, 390 U.S. 629 (1968), *modified by Miller v. California*, 413 U.S. 15, 24 (1973). It also prevents booksellers from distributing constitutionally protected books in the future based on unrelated past government determinations. *See Universal Amusement Co., Inc. v. Vance*, 587 F.2d 159, 166 (5th Cir. 1978), *aff'd*, 445 U.S. 308 (1980) ("[E]njoin(ing) the future operation of a (business) which disseminates presumptively First Amendment protected

_____

previous restraint is a form of infringement upon freedom of expression to be especially condemned").

materials solely on the basis of the nature of the materials which were sold . . . in the past" "would constitute an impermissible prior restraint.")

Second, the Book Ban improperly provides no due process or ability to challenge the State's final determinations. Booksellers have no opportunity to challenge the State's "corrected" ratings or decision to ban them from selling books to public schools before the TEA, let alone a judicial body. *See Freedman v. State of Md.*, 380 U.S. 51, 58 (1965) ("[O]nly a procedure requiring a judicial determination suffices to impose a valid final restraint."); *Penthouse Int'l, Ltd. v. McAuliffe*, 610 F.2d 1353 (5th Cir. 1980) ("There must be some judicial determination of obscenity [b]efore a seizure or 'constructive seizure' may occur.").[23] Publishers and authors are also left with no recourse against the State. Without a judicial determination that the books can be lawfully banned, the constitutionality of the statute is doomed.

### 4.   The Book Ban is facially unconstitutional because it is a content-based regulation not narrowly tailored to a compelling government interest.

The Book Ban is a content-based regulation of speech that is "presumptively unconstitutional" because it "applies to particular speech because of the topic discussed or the idea or message expressed." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015) (a content-based regulation "'on its face' draws distinctions based on the message a speaker conveys"). The Book Ban distinguishes between "sexually explicit material" and "sexually relevant material," which are subject to the law's restrictions, and material that receives "no rating," which is not restricted, based on its content.[24] The Book Ban requires booksellers to review a book's specific content, such as "a written description, illustration, photographic image, video image, or audio file," to

---

[23] Again, a bookseller's *only* (and insufficient) recourse is to agree to the government's demand of compelled speech.

[24] The Book Book Ban also distinguishes between "material directly related to the curriculum," which is not subject to the law's restrictions, and material *not* "directly related to the curriculum," which is subject to the law, based on their content. § 35.001(3).

determine whether it contains "communication, language, or material" that "describes, depicts, or portrays sexual conduct, as defined by Section 43.25, Penal Code." TEX. EDUC. CODE §§ 33.21(a); 35.001(3). If so, the book must be rated as either "sexually explicit" or "sexually relevant" and would be subject to the Book Ban. If the book also "describes, depicts, or portrays sexual conduct" "in a way that is patently offensive, as defined by Section 43.21, Penal Code," it will be rated as "sexually explicit" and will be banned entirely. § 33.21(a). Because the Book Ban applies to speech depending on the "topic discussed or idea or message expressed," it is a content-based regulation. *See Reed*, 576 U.S. at 163.

The Book Ban cannot survive strict scrutiny because even if it serves a compelling government interest, it is not narrowly tailored to achieve that interest or the least restrictive means of advancing that interest. *Sable Commc'ns of Cal., Inc. v. Fed. Commc'ns Comm'n*, 492 U.S. 115, 126 (1989). It is true that the government has an interest in protecting minors from materials that are obscene and harmful. *See Ginsberg*, 390 U.S. at 636–43. But the Book Ban goes beyond this interest and broadly blocks the distribution of constitutionally protected works. *See Erznoznik v. City of Jacksonville*, 422 U.S. 205, 213–14 (1975) ("Speech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them.").

The Book Ban improperly creates a new category of unprotected speech—books deemed "sexually explicit"—by defining it outside the bounds of obscenity. The State could have tracked the definition of "sexually explicit material" with the definition of obscenity, but it purposefully proscribed a broader category of prohibited speech not sanctioned by the U.S. Supreme Court. TEX. EDUC. CODE §§ 33.21(a); 35.001(3); *see Brown v. Entm't Merchants Ass'n*, 564 U.S. 786, 791 (2011) (although obscenity is within the "well-defined and narrowly limited classes of speech"

that are not constitutionally protected, "new categories of unprotected speech may not be added to the list by a legislature that concludes certain speech is too harmful to be tolerated."); *Reno v. ACLU*, 521 U.S. 844, 874-75 (1997) ("sexual expression which is indecent but not obscene is protected by the First Amendment").

The Book Ban is also not narrowly tailored because the ratings do not vary based on the age of the reader.[25] The Book Ban, instead, uses a one-size-fits-all model for rating books for all K-12 students regardless of age or maturity. Under this overbroad policy, a high school senior may not have access to a book about issues of significant concern, such as teen pregnancy,[26] because it is deemed "sexually explicit" for a first grader. This creates a race-to-the-bottom where older students are blocked from accessing books that may not only be age-appropriate for them but also contribute to necessary discourse about matters of public concern facing their grade level.

Besides capturing constitutionally protected speech and failing to be narrowly tailored, the Book Ban is not the least restrictive means of achieving a compelling government interest. The Book Ban excessively burdens booksellers by requiring them to rate every book they have sold to a public school as "sexually explicit" or "sexually relevant," if applicable, and provide those ratings to the State, which will post them online. For Plaintiffs that likely have sold hundreds of thousands of books to public schools over the decades, these burdens are onerous and extreme. *See* Rejsek Decl. ¶ 16; Koehler Decl. ¶¶ 8-10, 12-16; Grogan Decl. ¶ 7; Stratton Decl. ¶¶ 8-11. Because the Book Ban is neither narrowly tailored to achieve a compelling government interest nor the least restrictive means of advancing that interest, it fails strict scrutiny.

**5.**     **The Book Ban is unconstitutionally overbroad because it restricts and chills a**

---

[25] *See Brown v. Entm't Merchants Ass'n*, 564 U.S. 786, 812 (2011) (law that failed to distinguish between ages of minors was not narrowly tailored).

[26] *See* Danika Ellis, *All 850 Books Texas Lawmaker Matt Krause Wants To Book Ban: An Analysis*, BOOK RIOT, November 5, 2021 ("About 5% of the books banned have to do with pregnancy.").

**substantial amount of protected speech.**

The Book Ban is also constitutionally overbroad because it "prohibits a substantial amount of protected speech relative to its plainly legitimate sweep." *United States v. Hansen*, 143 S. Ct. 1932, 1939 (2023). The overbreadth doctrine prohibits the government from restricting even unprotected speech where "a substantial amount of protected speech is prohibited or chilled in the process." *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 237 (2002). When a statute, such as the Book Ban, "sweeps so broadly, encompassing any number of constitutionally protected threats…it is overbroad" and should be invalidated. *Seals v. McBee*, 898 F.3d 587, 597 (5th Cir. 2018).

While the Book Ban may legitimately prohibit some obscene material from school libraries, any legitimate applications are outnumbered by the Book Ban's sweeping prohibitions of protected speech. The Book Ban's capacious definitions of "sexually explicit" and "sexually relevant" materials encompass not only books that may be constitutionally unprotected, but also a vast amount of constitutionally protected books, including classic works of literature that no reasonable person would find obscene. In this respect, the text of the Book Ban differs significantly from the U.S. Supreme Court cases on which its definitions are purportedly based. *See Free Speech Coal.,* 535 U.S. at 256 (invalidating statute that went beyond unprotected categories recognized in prior decisions). By severely limiting access to these works, the Book Ban also threatens to "deter or chill constitutionally protected speech" and causes authors to self-censor themselves, by which "society will lose their contributions to the marketplace of ideas." *Hansen*, 143 S. Ct. at 1939.

The Court should also consider the effect on parties not presently before the Court. *Id.* at 1939 ("overbreadth doctrine allows a litigant … to vindicate the rights of the silenced, as well as society's broader interest in hearing them speak"). Here, the Book Ban also threatens to impinge on the constitutional right of students "to receive information and ideas" from their school library.

*Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 871 (1982).[27]

      **6.**     **The Book Ban unconstitutionally delegates government authority to regulate speech to private entities and individuals.**

      The delegation of government authority to regulate speech to private entities or individuals, such as the establishment of rating systems, is unconstitutional. *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 71 (1963) (delegation of government authority to Commission that rated books as objectionable and prevented their circulation to minors was unconstitutional). Because the Book Ban vests private "library material vendors" with the authority to rate and review books and determine whether they are allowed or restricted in public schools, it violates the First and Fourteenth Amendments to the U.S. Constitution. *See Sund v. City of Wichita Falls, Tex.*, 121 F. Supp. 2d 530, 553 (N.D. Tex. 2000) (state delegation of the selection and removal of library books to private citizens enjoined as an "improper delegation of governmental authority").

**C.**     **Plaintiffs will suffer irreparable injury because their constitutional rights will be violated unless the Book Ban is enjoined.**

      Because, as explained above, the Book Ban violates Plaintiffs' First Amendment rights, they will suffer irreparable injury unless the Book Ban is enjoined. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."); *Opulent Life Church*, 697 F.3d at 295 ("When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary.").

      In fact, Plaintiffs have already suffered irreparable injury because the Book Ban has caused at least one school district to stop buying books from them. *See* § III.A, *supra*; Koehler Decl. ¶ 24.

---

[27] *See also Martin v. City of Struthers*, 319 U.S. 141, 143 (1943) (the First Amendment "embraces the right to distribute literature, and necessarily protects the right to receive it."); *Campbell v. St. Tammany Par. Sch. Bd.*, 64 F.3d 184, 188 (5th Cir. 1995).

If the Book Ban takes effect, Plaintiffs' injuries will continue to mount. Because Plaintiffs do not maintain lists of all library materials sold to public schools, they will be unable to comply with the Book Ban. *See* TEX. EDUC. CODE § 35.002(b). Thus, Plaintiffs will be prohibited from selling books to public schools, which will cause them economic damages. § 35.002(a).

**D.** **The balance of equities and public interest weighs heavily in favor of enjoining the Book Ban because the First Amendment rights of Plaintiffs and other Texans will be infringed if a preliminary injunction is not granted.**

The Court's consideration of the balance of the equities and the public interest merge when, as here, a preliminary injunction is filed against the government. *Nken v. Holder*, 556 U.S. 418, 435 (2009) ("The third and fourth factors, harm to the opposing party and the public interest, merge when the Government is the opposing party."). Both the balance of the equities and the public interest favor enjoining the Book Ban because the First Amendment rights of Plaintiffs and others will be infringed if a preliminary injunction is not granted. *See Opulent Life*, 697 F.3d at 298 ("Injunctions protecting First Amendment freedoms are always in the public interest.").

By contrast, neither Defendants nor the public have a legitimate interest in the enforcement of an unconstitutional law. *See De Leon v. Perry*, 975 F. Supp. 2d 632, 664 (W.D. Tex. 2014), *aff'd sub nom. De Leon v. Abbott*, 791 F.3d 619 (5th Cir. 2015) ("There is no harm from issuing a preliminary injunction that prevents the enforcement of a likely unconstitutional statute.").

## IV.   CONCLUSION

The Book Ban must be enjoined to avoid the compulsion of unwanted government speech, the institution of a state-wide book licensing regime, and the recall, removal, and banning of many constitutionally protected books in public schools. These unconstitutional consequences, coupled with a plethora of undue practical and financial burdens placed on Plaintiffs (and others) to attempt to comply with the Book Ban's vague and overbroad requirements, offend First Amendment rights at the core of our democracy. Plaintiffs thus respectfully request that the Motion be granted.

Respectfully submitted,

*/s/ Laura Lee Prather*
Laura Lee Prather
Texas Bar No. 16234200
laura.prather@haynesboone.com
Catherine L. Robb
Texas Bar No. 24007924
catherine.robb@haynesboone.com
Michael J. Lambert
Texas Bar No. 24128020
michael.lambert@haynesboone.com
Reid Pillifant
Texas Bar No. 24126157
reid.pillifant@haynesboone.com

**HAYNES AND BOONE, LLP**
600 Congress Avenue, Suite 1300
Austin, Texas 78701
Telephone: (512) 867-8400
Facsimile: (512) 867-8470

**ATTORNEYS FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

The undersigned certifies that on the 25th day of July 2023, a true and correct copy of the above document was served via the CM/ECF system to all counsel of record.

*/s/ Laura Lee Prather*
Laura Lee Prather