# EXHIBIT D

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| BOOK PEOPLE, INC., VBK d/b/a BLUE WILLOW BOOKSHOP, AMERICAN BOOKSELLERS ASSOCIATION, ASSOCIATION OF AMERICAN PUBLISHERS, INC., AUTHORS GUILD, INC., COMIC BOOK LEGAL DEFENSE FUND, | § § § § § § § § | |
| Plaintiffs, | § § | |
| v. | § § § | CASE NO. |
| MARTHA WONG in her official capacity as chair of the Texas State Library and Archives Commission, KEVEN ELLIS in his official capacity as chair of the Texas Board of Education, MIKE MORATH in his official capacity as Commissioner of Education, | § § § § § § § § § § | |
| Defendants. | § | |

## DECLARATION OF MATTHEW STRATTON

Pursuant to 28 U.S.C. § 1746, Matthew Stratton declares:

1. My name is Matthew Stratton. I am over twenty-one (21) years of age and am fully competent to testify about the matters contained herein. The following statements are made within my personal knowledge and are true and correct.

2. I am the Deputy General Counsel of the Association of American Publishers ("AAP").

3. The Association of American Publishers ("AAP") is a not-for-profit organization that represents the leading book, journal, and education publishers in the United States on matters of law and policy, advocating for outcomes that incentivize the publication of creative expression,

professional content, and learning solutions. AAP's membership includes approximately 130 individual members, who range from major commercial book and journal publishers to small, non-profit, university, and scholarly presses, as well as leading publishers of educational materials and digital learning platforms. AAP's members publish a substantial portion of the general, educational, and religious books produced in the United States in print and digital formats, including critically acclaimed, award-winning literature for adults, young adults, and children. AAP represents an industry that not only depends upon the free exercise of rights guaranteed by the First Amendment, but also exists in service to our Constitutional democracy, including the unequivocal freedoms to publish, read, and inform oneself.

4. The AAP has a number of members that do business in Texas who are vendors to school districts subject to House Bill 900 (the "Book Ban"). AAP also has many more members that publish titles that are distributed to Texas schools through third-party vendors subject to the Book Ban. As the latter category of AAP members will also have their books rated, they will experience the same harms discussed in paragraphs 12-16.

5. A number of AAP's members have only a partial set of records of past sales to Texas public schools or school districts. The records are limited because, among other reasons: (i) AAP members may sell books to Texas public schools or school districts without being aware of it; and (ii) AAP members may have document-retention policies under which records that are no longer needed are destroyed and/or not reasonably accessible. As a result, these AAP members are unable to comply with the Book Ban.

6. Even if AAP's members did possess these records, AAP's members have no way to know which books are in active use (or even what "active use" means), so it is impossible for

AAP members to undertake the task of rating and recalling (if applicable) these materials, absent receiving information from the schools.

7. Furthermore, schools may purchase the same books from multiple vendors so it may not be feasible to determine whether the copies of books sold by AAP members are those that remain in active use. With multiple vendors for the same book, the likelihood of consistent ratings is slim.

8. The rating system imposed by the Book Ban would be a burden on AAP's members, requiring significant time and expense to identify past sales and compare those to books in "active use." Some of AAP's members have sold tens of thousands of books to Texas schools and school districts, and it is estimated that hundreds of hours of work or even more would be required by each of these members to attempt to search sales records and compare them against lists of books in active use (assuming such lists were provided to AAP's member), as required by the Book Ban. It would be an enormous burden in terms of resources, staff, and costs, and would require significantly diverting existing staff or hiring new staff.

9. Likewise, applying ratings would be a significant burden on AAP's members. There are millions of books in Texas school libraries. Our members do not have existing staff or an existing process for the purpose of applying the ratings. It would be cost-prohibitive, difficult and time-consuming to hire and train new staff (or re-train existing staff) to apply ratings, given the vague and confusing process outlined by the Book Ban.

10. The amount of time per book (e.g., a 450-page work of fiction or non-fiction in a high school library would take significantly longer to review than a picture book in an elementary school library), but broadly speaking the time to read, analyze, and possibly solicit other viewpoints could require a substantial, double-digit number of hours per book on average.

<u>**DECLARATION OF MATTHEW STRATTON**</u>     3

11. AAP members will have difficulty applying the rating standards set forth in the Book Ban for at least the following reasons:

  a. It is unclear what it means for library material to be "directly related" to the required curriculum (and therefore exempt from the ratings). Oftentimes AAP members do not even get copies of the curriculum.

  b. It is unclear how a vendor would know if library material is being used in a way that is directly related to the required curriculum.

  c. It is unclear what "active use" means.

  d. It is unclear how a vendor will know if a library material remains in "active use."

  e. The "sexually relevant" rating is vague and confusing insofar as any de minimis, non-explicit reference, in any context, to sexual relations, could result in the rating. It could apply broadly to health-related works, religious texts, historical works, encyclopedias, dictionaries, and many other works.

  f. The "sexually explicit" rating is vague and confusing because the contextual analysis does not adjust for differences in ages or communities and does not provide for consideration of the work as a whole.

  g. Vendors may not have any knowledge about the contemporary community standards of decency nor do they know which community's standards should be considered

  h. The balancing test is entirely subjective and cannot be applied with any consistency.

12. The ratings will stigmatize books that are rated "sexually explicit" or "sexually relevant" and will risk reducing sales of these works—not just to Texas schools, but globally, since the ratings are posted online. This, in turn, risks publishers foregoing investment in important new works.

13. The ratings could also reduce royalties to authors, and therefore reduce the incentive for authors to produce new works or expose those who issue ratings to potential liability for doing so.

14. The ratings will also chill members' and their authors' constitutionally protected speech. The ratings compel our members to adopt a highly subjective opinion that they patently disagree with or suffer a significant financial penalty. If members refuse to adopt the State's speech as their own, then they lose all business with Texas public school districts.

15. By refusing to rate books, or by being placed on the State's blacklist, the universe of vendors and titles would contract. A member would be forced to weigh the prejudice to sales and distribution globally against the prospect of losing the school market in Texas. Many members would consider no longer selling books to Texas schools. The impact of the State licensing regime could extend beyond the State's borders. Other localities or states may rely on the ratings, either informally or formally. In addition, other states may decide to adopt their own ratings requirements, which could lead to a patchwork of inconsistent rating regimes and likely result in vendors adopting the most restrictive ratings for all states.

16. Members have reported that there are schools that are stopping or delaying buying books. This trend may escalate in August, when fall back-to-school buying ordinarily starts. The confusion is expected to be detrimental to our members' sales.

17. With less than 45 days until the law takes effect, our members remain confused about their responsibilities under the Book Ban, including (but not limited to) the following unanswered questions:

    a. What is the definition of a "recall"? Is a refund required if a vendor is required to recall material?

    b. How does a vendor communicate a library material rating to a school? On the library material? In marketing material? On a pro forma invoice? A list? Other?

    c. What happens if different vendors adopt different ratings for identical titles?

    d. What happens if a vendor no longer sells a book that is still in "active use" by a district? Is it then compelled to re-purchase the book and rate it?

    e. May vendors sell library material to a school prior to submission of the list with ratings for prior sales (on or before April 1, 2024), and if so, must that library material be rated?

    f. If after being added to the banned vendor list, a vendor changes its ratings as instructed by the TEA, does the TEA have discretion to refuse removal from the banned vendor list?

18. I hereby declare under penalty of perjury under the laws of the United States of America that the above is true and correct.

Executed this 21st day of July, 2023.

                                                      /s/ *Matthew Stratton*
                                                      Matthew Stratton