United States District Court
Western District of Texas
Austin Division

| | |
|---|---|
| Book People, Inc., VBK, Inc., American Booksellers Association, Association of American Publishers, Authors Guild, Inc., Comic Book Legal Defense Fund<br>          *Plaintiffs*,<br><br>v.<br><br>Martha Wong, Keven Ellis, Mike Morath,<br>          *Defendants*. | Civil No.<br>AU: 23-CV-00858-ADA |

---

### Defendants' Motion to Dismiss Pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), and Response in Opposition to Plaintiffs' Motion for Preliminary Injunction

Defendants Martha Wong (hereinafter, "Wong"), in her official capacity as Chair of the Texas State Library and Archives Commission (hereinafter, "TSLAC"), Keven Ellis (hereinafter, "Ellis"), in his official capacity as Chair of the Texas State Board of Education (hereinafter, "SBOE"), and Mike Morath (hereinafter, "Morath") in his official capacity as Commissioner of the Texas Education Agency (hereinafter, "the Agency") (collectively, "Defendants"), by and through the Office of the Attorney General of Texas, file this Motion to Dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), and Response in Opposition to Plaintiffs' Motion for Preliminary Injunction. In support thereof, Defendants respectfully offer the following.

## STATEMENT OF THE CASE

In the 88th Legislative Session, the Texas Legislature passed House Bill 900, known as the Restricting Explicit and Adult-Designated Educational Resources (hereinafter, "READER") Act, which relates to the regulation of school library books that are deemed "sexually explicit" or "sexually relevant." READER provides that the Texas State Library and Archives Commission ("TSLAC"), with approval by majority vote of the State Board of Education ("SBOE"), must adopt standards for school districts in developing or implementing the district's library collection. Tex. Educ. Code §33.021(b). The standards must prohibit the "possession, acquisition, and purchase of library material rated sexually explicit material by the selling library vendor," among other things. Tex. Educ. Code §33.021(d)(2)(A)(ii). READER also requires library material vendors, no later than April 1, 2024, to submit a list of materials rated as "sexually explicit" and "sexually relevant" previously sold to a school district and still in active use. Tex. Educ. Code §35.002(c). The list should be developed using the rating guidelines found in Section 35.0021. A library material vendor may not sell "sexually explicit" material to a school district. Tex. Educ. Code §35.002(b). Further, in order for a vendor to be qualified to sell library materials to a school district, it must have issued appropriate ratings regarding "sexually explicit" and "sexually relevant" materials, in compliance with the statute. Tex. Educ. Code § 35.002(a). The Agency may review library material that is not rated or incorrectly rated by the vendor. Tex. Educ. Code § 35.003. If the agency determines the material is required to be rated "sexually explicit" or "sexually relevant" or should receive no

rating, the Agency will provide notice to the vendor, so the vendor can correct its rating. *Id.*

Plaintiffs filed suit alleging that READER violates the First and Fourteenth Amendments. Plaintiffs' claims, however, fail for jurisdictional and merits-based reasons. The case should be dismissed for lack of subject matter jurisdiction or alternatively for failure to state a claim upon which relief can be granted. If the Court disagrees, the preliminary injunction should not be granted because Plaintiffs cannot show that they have a substantial likelihood of success on the merits, they will not suffer irreparable injury, their injury does not outweigh the threatened harm to the Defendants, and granting the preliminary injunction will disserve the public interest.

## STANDARD OF REVIEW

<u>Federal Rule of Civil Procedure 12(b)(1)</u>

Rule 12(b)(1) governs motions to dismiss for lack of subject matter jurisdiction. "Federal courts are courts of limited jurisdiction, and absent jurisdiction conferred by statute, lack the power to adjudicate claims." *Stockman v. Fed. Election Comm'n*, 138 F.3d 144, 151 (5th Cir. 1998). Accordingly, "[a] case is properly dismissed for lack of subject matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate the case." *Home Builders Ass'n of Miss. v. City of Madison, Miss.*, 143 F.3d 1006, 1010 (5th Cir. 1998) (citation omitted). "The burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001); *Howery v. Allstate Ins. Co.*, 243 F.3d 912, 916 (5th Cir. 2001). "Accordingly, the plaintiff constantly bears the burden of proof

that jurisdiction does in fact exist." *Id.* When a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, the court should consider the Rule 12(b)(1) motion before addressing any motion as to the merits. *Ramming*, 281 F.3d at 161. "If the court determines at any time that it lacks subject matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P 12(h)(3).

<u>Federal Rule of Civil Procedure 12(b)(6)</u>

Rule 12(b)(6) governs motions to dismiss for failure to state a claim upon which relief can be granted. "To survive a Rule 12(b)(6) motion, the plaintiff must plead 'enough facts to state a claim to relief that is plausible on its face.'" *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* "A claim for relief is implausible on its face when 'the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct.'" *Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 634 F.3d 787, 796 (5th Cir. 2011) (quoting *Iqbal*, 556 U.S. at 679).

Although a court accepts all well-pleaded facts as true, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. A plaintiff's obligation to demonstrate his

entitlement to relief requires more than mere conclusory statements. *Twombly*, 550 U.S. at 555. Rather, a plaintiff must plead facts with enough specificity "to raise a right to relief above the speculative level." *Id.* A plaintiff must allege more than "'labels and conclusions' or a 'formulaic recitation of the elements of a cause of action.'" *Id.* (quoting *Twombly*, 550 U.S. at 555). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citation omitted). "Where the facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has stopped short of showing that the pleader is plausibly entitled to relief." *Howe v. Yellowbook, USA*, 840 F. Supp. 2d 970, 975 (N.D. Tex. 2011).

<u>Preliminary Injunction</u>

Injunctive relief is an extraordinary remedy; one that "may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (citing *Mazurek v. Armstrong,* 520 U.S. 968, 972 (1997) (*per curiam*)). The applicants must show,

> (1) a substantial likelihood that they will prevail on the merits, (2) a substantial threat that they will suffer irreparable injury if the injunction is not granted, (3) their substantial injury outweighs the threatened harm to the party whom they seek to enjoin, and (4) granting the preliminary injunction will not disserve the public interest.

*City of El Cenizo v. Tex.*, 890 F.3d 164, 176 (5th Cir. 2018) (brackets, citation omitted).

## ARGUMENT AND AUTHORITIES

**A.    Plaintiffs cannot establish subject matter jurisdiction because their claims are non-justiciable and barred by Sovereign Immunity.**

**1.  There is no Article III case or controversy.**

### a. Plaintiffs lack Article III standing.

Plaintiffs "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016); *accord El Paso County v. Trump*, 982 F.3d 332, 337 (5th Cir. 2020). The alleged "injury in fact" will suffice only if it is "concrete, particularized, and actual or imminent." *Clapper v. Amnesty Int't*, 568 U.S. 398, 409 (2013). Because standing "'is not dispensed in gross,' a party must have standing to challenge each 'particular inadequacy in government administration.'" *Legacy Cmty. Health Servs., Inc. v. Smith*, 881 F.3d 358,366 (5th Cir. 2018). At the preliminary-injunction stage, plaintiffs must make a "clear showing" that they have standing. *Barber v. Bryant*, 860 F.3d 345, 352 (5th Cir. 2017).

Here, Plaintiffs cannot establish the necessary injury in fact. As an initial matter, Plaintiffs cannot establish standing merely by invoking the First Amendment. *Abdullah v. Paxton*, 65 F.4th 204, 210 (5th Cir. 2023) (per curiam). Plaintiffs "must assert [their] own legal rights and interests, and cannot rest [their] claim to relief on the legal rights or interests of third parties." *Id.* (citation and emphasis omitted).

Nor can Plaintiffs show an injury that is actual and imminent, or one that is concrete and particularized. *See Clapper*, 568 U.S. at 409. Plaintiffs must establish standing as of "the time the action commences." *Stringer v. Whitley*, 942 F.3d 715, 724 (5th Cir. 2019). For prospective relief, Plaintiffs' injury "must be certainly

impending to constitute injury in fact"—"[a]llegations of possible future injury are not sufficient." *Clapper*, 568 U.S. at 409 (quotations omitted). Indeed "[a]llegations of only a 'possible' future injury . . . will not suffice." *Abdullah*, 65 F.4th at 208.

Here, Plaintiffs' alleged impending future injury, regarding READER's obligation to create an initial list of ratings, is entirely speculative. Plaintiffs claim that they will be unable to sell books at all unless their initial ratings capture every book sold to any school that is still in active use. ECF No. 6 at 8. But READER does not outline nor do Plaintiffs' set forth any mechanism to trace an unrated book back to a particular vendor. Rather, like business-competitor claims, Plaintiffs' alleged economic harm based on a school district's post-READER implementation purchasing decisions "depends on several layers of decisions by third parties . . . and is too speculative to confer Article III standing." *Little v. KPMG LLP*, 575 F.3d 533, 541 (5th Cir. 2009). Likewise, Plaintiffs' contention that they will be required to adopt book ratings with which they disagree also depends on layers of review that may never even crystalize into a dispute. ECF No. 6 at 9; *see also* Tex. Educ. Code §35.003. This theory is too "speculative, conjectural, [and] hypothetical" to support standing. *Clapper*, 568 U.S. at 409. So, too, is Plaintiffs' vague gesture toward a generalized, abstract stigmatic injury, which "cannot be manufactured for the purpose of litigation." *Barber*, 860 F.3d at 354.

Plaintiffs fare no better by invoking the "compelled speech" framework. ECF No. 6 at 9. In *303 Creative LLC v. Elenis*, the plaintiff showed "'a credible threat' existed that Colorado would, in fact, seek to compel speech from her that she did not

wish to produce." 143 S. Ct. 2298, 2308 (2023) (citation omitted). But the plaintiff designer in *303 Creative* sought to "engage in protected First Amendment speech" while threatened with sanctions under Colorado's public-accommodation statute to eliminate "dissenting 'ideas' about marriage." *Id.* at 2313 (citation omitted). While that dilemma "[wa]s enough" to show standing in 303 Creative, *id.* (quoting *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Group of Boston,* 515 U.S., 557, 574 (1995)), it is not present here because Plaintiffs have no protected contrary "message." Plaintiffs merely wish to sell books to public schools—they "do not contend that they carefully curate" any "speech the way a parade sponsor or composer 'selects . . . expressive units . . . from potential participants.'" *Netchoice, L.L.C. v. Paxton*, 49 F.4th 439, 461 (5th Cir. 2022) (quoting *Hurley*, 515 U.S. at 568). And unlike the "nearly identical" instances of past sanction by Colorado in *303 Creative*, it is entirely speculative what dispute, if any, over a particular book's rating will materialize from a statute which does not require ***any*** action from Plaintiffs until April 1, 2024.

Additionally, Plaintiffs' alleged injuries are not fairly traceable to the Defendants. Plaintiffs cannot manufacture standing "merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Clapper*, 568 U.S. at 416. The only economic harm identified by Plaintiffs cannot fairly be traced to Defendants because it was allegedly inflicted by a non-party: "one school district, Katy ISD, ceased all library book purchases, including from Plaintiffs, after [READER's] passage." ECF No. 6 at 8. Katy ISD's pre-implementation of READER purchasing decisions are not imputable to Defendants.

Insofar as Plaintiffs contend that they will be forced to acquiesce in ratings with which they disagree, ECF No. 6 at 9, that alleged injury is also not traceable to Defendants. *See Zimmerman v. City of Austin*, 881 F.3d 378, 390 (5th Cir. 2018). Although changing one's plans "in response to an allegedly injurious law can itself be a sufficient injury to confer standing, the change in plans must still be in response to a reasonably certain injury imposed by the challenged law." *Id.* Plaintiffs have not identified a single book rating with which they disagree and thus cannot fairly trace any alleged injury to the "State's subjective criteria." ECF No. 6 at 9. Instead, Plaintiffs "can only speculate" they will be harmed. *Clapper*, 568 U.S. at 410-12.

Finally, Plaintiffs' alleged injuries are non-redressable. Redressability requires a plaintiff to show "it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envt'l. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000). Remedies "operate with respect to specific parties." *California v. Texas*, 141 S. Ct. 2104, 2115 (2021) (citation omitted). Here, the alleged economic impact on book sales is driven by school districts, not the named Defendants. *See* ECF No. 6 at 8. Although Plaintiffs claim to have lost book sales to Katy ISD, *Id.*, the requested relief would not force Katy ISD to buy books from Plaintiffs, nor could the Court enjoin Defendants to force Katy ISD to contract with Plaintiffs. Plaintiffs essentially seek the cover of a court order to justify their refusal to comply with READER. "But under traditional equitable principles, no court may 'lawfully enjoin the world at large, or purport to enjoin challenged laws

themselves.'" *Whole Woman's Health v. Jackson*, 142 S. Ct. 522, 535 (2021) (citations omitted).

### b. Plaintiffs' claims are unripe.

A claim is ripe, i.e., "fit for judicial decision," if it presents a pure legal question requiring no further factual development. *New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 833 F.2d 583, 586-87 (5th Cir. 1987). If a claim is "contingent [on] future events that may not occur as anticipated, or indeed may not occur at all," the claim is unripe. *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580-81 (1985) (citation omitted). Plaintiffs contend that they might be unable to issue a rating for "all books previously sold to a public school" because they lack lists of such materials. ECF No. 6 at 8. They further claim they may be forced to issue a rating with which they disagree. *Id.* at 9. But none of that alleged harm is presently ripe for resolution. Because Plaintiffs have not plausibly alleged that READER penalizes the absence of an initial rating for a particular book, Plaintiffs' theories of harm are entirely "contingent [on] future events that may not occur as anticipated, or indeed may not occur at all." *Thomas*, 473 U.S. at 580-81.

### 2. Defendants are entitled to sovereign immunity.

The Eleventh Amendment deprives a federal court of jurisdiction to hear a suit against the State of Texas, regardless of the relief sought, unless sovereign immunity is expressly waived. *Penhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100-02 (1984); *Edelman v. Jordan*, 415 U.S. 651, 662-63 (1974). A suit against a state official in his or her official capacity is effectively a suit against the state. *Will v. Michigan*

*Dep't of State Police*, 491 U.S. 58, 71 (1989). As a preliminary matter, then, any Section 1983 claim or request for declaratory relief against Defendants in their official capacities are barred by sovereign immunity unless an exception applies. *See McCarthy ex rel. Travis v. Hawkins*, 381 F.3d 407, 412 (5th Cir. 2004) (citation omitted). Under the *Ex parte Young* exception, sovereign immunity may be overcome when a suit "seeks prospective, injunctive relief from a state actor, in [his] official capacity, based on an alleged ongoing violation of the federal constitution." *K.P. v. LeBlanc*, 729 F.3d 427, 439 (5th Cir. 2013). Plaintiffs are unlikely to show this exception applies for several reasons.

First, the Defendants lack a sufficient connection to enforcement of the provisions of READER challenged by Plaintiffs. "*Ex parte Young* allows suits for injunctive or declaratory relief against state officials [in their official capacities], provided they have sufficient 'connection' to enforcing" a state action that allegedly violates federal law. *In re Abbott*, 956 F.3d 696, 708 (5th Cir. 2020) (citations omitted), *cert. granted, judgment vacated as moot sub nom. Planned Parenthood Ctr. for Choice v. Abbott*, 141 S. Ct. 1261 (2021). If there is no such connection to enforcement, "the suit is effectively against the state itself and thus barred by the Eleventh Amendment and sovereign immunity." *Id.* (citations omitted).

To have the requisite connection to enforcement, an official must have more than "the general duty to see that the laws of the state are implemented." *City of Austin v. Paxton*, 943 F.3d 993, 999-1000 (5th Cir. 2019); *Ostrewich v. Tatum*, 72 F.4th 94, 100 (5th Cir. 2023) (First Amendment challenger could not rely on Secretary

of State's "broad duties to oversee administration of Texas's election laws."). Rather, the official must have "the particular duty to enforce the statute in question and a demonstrated willingness to exercise that duty." *Tex. Democratic Party v. Abbott*, 978 F.3d 168, 179 (5th Cir. 2020) (citation omitted). This means the analysis is "provision-by-provision": The officer must enforce "the particular statutory provision that is the subject of the litigation." *Id.* (citation omitted); *see also Mi Familia Vota v. Abbott*, 977 F.3d 461, 467-68 (5th Cir. 2020). "'[E]nforcement' means 'compulsion or constraint.'" *Tex. All. for Retired Americans v. Scott*, 28 F.4th 669, 672 (5th Cir. 2022) (quoting *City of Austin*, 943 F.3d at 1000). "If the official does not compel or constrain anyone to obey the challenged law, enjoining that official could not stop any ongoing constitutional violation." *Id.* (citing *Air Evac EMS, Inc. v. Tex., Dep't of Ins., Div. of Workers' Comp.*, 851 F.3d 507, 520 (5th Cir. 2017)).

Here, Plaintiffs do not plead any facts indicating that any of the Defendants are tasked with "enforcement" of READER, within the meaning of *Ex parte Young*. Plaintiffs do not indicate what "enforcement" actions, if any, Defendants could take against them. *See City of Austin*, 943 F.3d at 1000. Consequently, Defendants lack the necessary "connection" to any enforcement of READER for the *Ex parte Young* exception to apply. Additionally, Plaintiffs fail to identify the potential "compulsion or constraint" necessary to fall within the *Ex parte Young* exception. *Tex. All. for Retired Americans*, 28 F.4th at 672; *see also Whole Women's Health*, 142 S. Ct. at 532 (describing the doctrine as "a narrow exception . . . that allows certain private parties to seek judicial orders in federal court preventing state executive officials from

enforcing state laws" against them); *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 326-327 (2015) (similar). Plaintiffs' allegations of harm do not involve such potential enforcement actions against them; instead, they allege indirect business and reputational harms. ECF No. 6 at 8–9.

Second, and related to the standing defects noted above, any threat of "enforcement" alleged is not *imminent. See Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992) (*Ex parte Young* permits enjoinment when officers "who threaten and are about to commence proceedings, either of a civil or criminal nature"). The "Article III standing analysis and *Ex parte Young* analysis 'significant[ly] overlap.'" *City of Austin*, 943 F.3d at 1002. Nothing alleged has "intimat[ed] that formal enforcement was on the horizon" based on a specific Defendant's conduct. *NiGen Biotech, L.L.C. v. Paxton*, 804 F.3d 389, 392 (5th Cir. 2015). Thus, absent any actual imminent compulsion, Plaintiffs' cannot invoke *Ex parte Young* against the Defendants.

Third, Plaintiffs' requested relief does not fall within the *Ex parte Young* exception to sovereign immunity. By seeking injunctive relief ostensibly preventing Defendants from implementing READER, *see* ECF No. 6 at p. 20, Plaintiffs improperly seek to "'control an officer in the exercise of his [or her] discretion.'" *Richardson v. Tex. Sec'y of State*, 978 F.3d 220, 242 (5th Cir. 2020) (citation omitted). Under *Ex parte Young*, a federal court "cannot control the exercise of the discretion of an officer. It can only direct affirmative action where the officer having some duty

to perform not involving discretion, but merely ministerial in its nature, refuses or neglects to take such action." 209 U.S. at 158.

If, as here, "'a statute, regulation, or policy leaves it to . . . [an] agency to determine when and how to take action, the agency is not bound to act in a particular manner and the exercise of its authority is discretionary." *Richardson*, 978 F.3d at 242 (quoting *St. Tammany Par. ex rel. Davis v. FEMA*, 556 F.3d 307, 323 (5th Cir. 2009)). And when a statute "leaves [officials] considerable discretion and latitude" in how to implement uniform standards, challengers cannot invoke *Ex parte Young*. *Id.* As the Supreme Court has recognized, states have the "high responsibility for education of its citizen," which includes the obligations to set standards for what children learn in school and to protect parents' rights to protect their children from inappropriate material. *Wisconsin v. Yoder*, 406 U.S. 205, 213 (1972). States discharge these obligations by "impos[ing] reasonable regulations for the control and duration of basic education." *Id.* This is, in fact, "the very apex of the function of a State." *Id.* Because the injunctive relief sought seeks to restrain discretion in carrying out this important responsibility, Plaintiffs cannot invoke *Ex parte Young*.

Fourth, if this Court were to find *Ex parte Young* applicable, the relief sought would be impermissible. Statewide relief would be especially improper here because Plaintiffs seek an overly vague and overbroad injunction. An injunction is considered "overly vague if it fails to satisfy the specificity requirements set out in Rule 65(d)(1), and it is overbroad if it is not narrowly tailor[ed] ... to remedy the specific action which gives rise to the order as determined by the substantive law at issue." *Scott v.*

*Schedler*, 826 F.3d 207, 211 (5th Cir. 2016). Additionally, "[i]njunctions must be narrowly tailored within the context of the substantive law at issue to address the specific relief sought." *E.T. v. Paxton*, 19 F.4th 760, 769 (5th Cir. 2021). Plaintiffs requested statewide injunction is not narrowed to the issues raised in this lawsuit because Plaintiffs have failed to allege an injury by each school district in Texas.

Alternatively, the Court should abstain from exercising jurisdiction under *Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496, 499-500 (1941). Plaintiffs (at 8-9) appear to rely on an atextual idiosyncratic interpretation of their rating obligations under READER, the construction of which belongs "to the supreme court of Texas." *Pullman*, 312 U.S. at 499-500. There is more than "a possibility that" judicial construction "will moot or present in a different posture the federal constitutional questions raised." *Palmer v. Jackson*, 617 F.2d 424, 428 (5th Cir. 1980). At a minimum, abstention is a reason to deny preliminary injunctive relief, *see, e.g.*, *Tex. Democratic Party v. Abbott*, 961 F.3d 389, 397 n.13 (5th Cir. 2020); *id.* at 417-19 (Costa, J., concurring), in addition to the reasons discussed below.

## B.   Plaintiffs fail to state a claim for relief.

### 1.   The Declaratory Judgment Act does not create a cause of action.

The Declaratory Judgment Act is not a cause of action. It is "not an independent source of federal jurisdiction; the availability of such relief presupposes the existence of a judicially remediable right." *Schilling v. Rogers*, 363 U.S. 666, 677 (1960); *see also Sid Richardson Carbon & Gasoline Co. v. Interenergy Res. Ltd.*, 99 F.3d 746, 752 n.3 (5th Cir. 1996). A request for a declaratory judgment is not a

substantive claim. Accordingly, to the extent Plaintiffs bring standalone claims under the Declaratory Judgment Act, they should be dismissed for failure to state a claim.

### 2.  Plaintiffs do not assert cognizable claims under Section 1983.

"Section 1983 provides a federal remedy for 'the deprivation of any rights, privileges, or immunities secured by the Constitution and laws.'" *Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 105 (1989). "Section 1983 speaks in terms of 'rights, privileges, or immunities,' not violations of federal law" *Id.* at 106. "To state a section 1983 claim, 'a plaintiff must (1) allege a violation of a right secured by the Constitution or laws of the United States and (2) demonstrate that the alleged deprivation was committed by a person acting under color of state law.'" *James v. Collin Cnty.*, 535 F.3d 365, 373 (5th Cir. 2008) (quoting *Moore v. Willis Indep. Sch. Dist.*, 233 F.3d 871, 874 (5th Cir. 2000)).

Plaintiffs allege violations of their First Amendment rights, specifically asserting that READER compels their speech, is vague, overbroad, facially invalid, operates as a prior restraint, and constitutes impermissible delegation of government authority. *See generally*, ECF No. 1. However, Plaintiffs First Amendment rights are not implicated when it comes to the creation and implementation of educational policy and that which is "school sponsored" in Texas public schools; thus a cognizable First Amendment violation has not and will not occur with the implementation of READER.

### 3.  Plaintiffs have no First Amendment rights in this forum.

#### a.  The devising and implementation of school-library policy is government speech.

Plaintiffs' First Amendment claim fails at the outset because READER concerns government speech. "When government speaks, it is not barred by the Free Speech Clause from determining the content of what it says." *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 207 (2015). Moreover, when "the State is speaking on its own behalf, the First Amendment strictures that attend the various types of government-established forums do not apply." *Id.* at 215.

Courts and the law have repeatedly acknowledged the wide authority regarding educational policy bestowed upon various Texas state entities, including the authority to, "develop and update a long range plan for public education," Tex. Educ. Code §7.102(c)(1), "establish curriculum and graduation requirements," Tex. Educ. Code §7.102(c)(4), and "…adopt standards for school library services." Tex. Educ. Code §33.021; see also *Chiras v. Miller*, 432 F.3d 606, 608 (5th Cir. 2005); *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 273 (1988). Those entities include but are not limited to the Agency and SBOE.

The Supreme Court has long held that, "the education of the Nation's youth is primarily the responsibility of parents, teachers, and ***state and local school officials***, and not of federal judges." *Hazelwood*, 484 U.S. at 273 (emphasis added). Further, "the government, including its educational institutions, has the discretion to promote policies and values of its own choosing ***free from forum analysis or the viewpoint-neutrality requirement***." *Chiras*, 432 F.3d at 613 (emphasis added). This remains the case, even when the government employs private "speakers" to transmit its message. *Id.*

In *Chiras*, a textbook author and high school student filed suit, alleging SBOE violated their First Amendment rights by refusing to approve Chiras's environmental science textbook. See generally, *Chiras v. Miller*, No. 3:03-CV-2651-M, 2004 WL 1660388, at *1 (N.D. Tex. July 23, 2004). The District Court found that Defendants acted within their discretion and granted their motion to dismiss, in accordance with Federal Rule of Civil Procedure 12(b)(6). Plaintiffs appealed. The Fifth Circuit affirmed the dismissal, finding that when the relevant state entities— vested with the authority to do so— devise state curriculum and select books accordingly, "it is the state speaking, and not the textbook author." *Chiras*, 432 F.3d at 614. The same can be said here: in devising and implementing educational policy, including the selection of state purchased books in accordance therewith, the government's speech is implicated, *not* that of Plaintiffs. In so finding, a forum analysis and the viewpoint-neutrality requirement are inappropriate, as there is no forum to which Plaintiffs can claim access to under the First Amendment. *Id*. At 615.

Insofar as Plaintiffs' theory depends on a putative "First Amendment right to receive information," *Campbell v. St. Tammany Par. Sch. Bd.*, 64 F.3d 184, 189 (5th Cir. 1995) (quoting *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 872 (1982) (plurality)), that argument likewise fails. This amorphous right to information ostensibly belongs to *students*, *see id.*, not third-party vendors like Plaintiffs, who ordinarily lack standing to assert the rights of others, *see Powers v. Ohio*, 499 U.S. 400, 411 (1991). And even then, a school's actions raise no First Amendment concern unless a "substantial motivation" was to deny library users

access to ideas with which [the government] disagreed." *Id.* at 190. READER does not prohibit students from possessing, buying, reading, or discussing any book, and as the *Pico* plurality noted, school districts could remove library books that were vulgar or educationally unsuitable. 457 U.S. at 871.

### b. The school library is a nonpublic forum.

To the extent this Court finds the "speech" in question to be that of Plaintiffs and not the government, Plaintiffs claims fail under a nonpublic forum analysis.

The "First Amendment does not guarantee access to property simply because it is owned or controlled by the government." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46 (1983) (citation omitted). "Public property which is not by tradition or designation a forum for public communication is governed by different standards." *Id.* "The public schools do not possess all of the attributes of streets, parks, and other traditional public forums that 'time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.'" *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 267 (1988) (citation omitted). Cf. *Widmar v. Vincent,* 454 U.S. 263, 267–268, n. 5 (1981). Therefore, "school facilities may be deemed to be public forums only if school authorities have 'by policy or by practice' opened those facilities 'for indiscriminate use by the general public,'" *Kuhlmeier*, 484 U.S. at 267 (quoting *Perry Education Assn.,* 460 U.S. at 47), "or by some segment of the public, such as student organizations. *Id.* (quoting *Perry Education Assn.,* 460 U.S. at 46, n. 7)). "If the facilities have instead been reserved for other intended purposes…then no public

forum has been created, and school officials may impose reasonable restrictions on the speech of students, teachers, and other members of the school community." *Id*. Further, "[s]urely it is a highly appropriate function of public school education to prohibit the use of vulgar and offensive terms in public discourse…[n]othing in the Constitution prohibits the states from insisting that certain modes of expression are inappropriate." *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 683 (1986). Finally, "the determination of what manner of speech in the classroom or in school assembly is inappropriate properly rests with the school board." *Id*.

In *Hazelwood Sch. Dist. v. Kuhlmeier*, the Supreme Court held that school officials who restricted speech in the student newspaper and excised several pages therefrom, on the grounds that the excised material impinged on the rights of others, did not violate the First Amendment. See generally, *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260 (1988). In so holding, the Court found that no public forum had been created. They also found that educators have authority over school-sponsored publications, which "members of the public might reasonably perceive to bear the imprimatur of the school," as they "may fairly be characterized as part of the school curriculum." *Kuhlmeier*, 484 U.S. at 271.

> Educators are entitled to exercise greater control over…expression to assure that participants learn whatever lessons the activity is designed to teach, that readers or listeners are not exposed to material that may be inappropriate for their level of maturity, and that the views of the individual speaker are not erroneously attributed to the school.

*Id*. Further,

> A school must be able to set high standards for…speech that is disseminated under its auspices—standards that may be higher than

those demanded by some newspaper publishers or theatrical producers in the "real" world—and may refuse to disseminate…speech that does not meet those standards. In addition, a school must be able to take into account the emotional maturity of the intended audience in determining whether to disseminate…speech on potentially sensitive topics, which might range from the existence of Santa Claus in an elementary school setting to the particulars of teenage sexual activity in a high school setting. A school must also retain the authority to refuse to sponsor…speech that might reasonably be perceived to advocate drug or alcohol use, irresponsible sex, or conduct otherwise inconsistent with "the shared values of a civilized social order,", or to associate the school with any position other than neutrality on matters of political controversy.

*Kuhlmeier*, 484 U.S. at 271–72 (citing *Fraser, supra,* 478 U.S., at 683).

In *Bethel Sch. Dist. No. 403 v. Fraser*, the Supreme Court found no violation of the First Amendment when a speech disseminated at a school assembly contained offensive, lewd, and indecent speech. *See generally, Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675 (1986). The Court indicated that, "First Amendment jurisprudence has acknowledged limitations on the otherwise absolute interest of the speaker in reaching an unlimited audience where the speech is sexually explicit and the audience may include children." *Bethel Sch. Dist. No. 403*, 478 U.S. at 684. Specifically noting, "and in addressing the question whether the First Amendment places any limit on the authority of public schools to remove books from a public school library, all Members of the Court, otherwise sharply divided, acknowledged that the school board has the authority to remove books that are vulgar." *Id*. (citing *Pico,* 457 U.S. at 871-72).

Similarly, in *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, the Court found no public forum had been created in the school's mail system. *See* 460 U.S. 37 (1983). There, the Court specifically deduced that,

> Implicit in the concept of the nonpublic forum is the right to make distinctions in access on the basis of subject matter and speaker identity. These distinctions may be impermissible in a public forum but are inherent and inescapable in the process of limiting a nonpublic forum to activities compatible with the intended purpose of the property.

*Perry Educ. Ass'n*, 460 U.S. at 49. Likewise here, no public forum has been created; therefore, there is no forum to which Plaintiffs have a right to speak, and, thus Plaintiffs cannot prevail on the merits.

### c. Obscenity receives no First Amendment protection.

"[O]bscene material is unprotected by the First Amendment." *Miller v. California*, 413 U.S. 15, 23 (1973) (citing *Kois v. Wisconsin*, 408 U.S. 229 (1972); *United States v. Reidel*, 402 U.S. 351 (1971); *Roth v. United States*, 354 U.S. 476 (1957)). The speech Plaintiffs seek to introduce into the schools, unregulated, contains material which is obscene and is therefore not protected under the First Amendment.

In the landmark case of *Miller v. California*, the Supreme Court laid out the framework for what constitutes "obscene" material as it relates to the First Amendment. *See generally*, *Miller v. California*, 413 U.S. 15. In so deciding, the Court determined that such an inquiry rests on,

> (a) whether 'the average person, applying contemporary community standards' would find that the work, taken as a whole, appeals to the prurient interest, (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law, and (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value.

*Miller*, 413 U.S. at 15 (internal citation omitted). Plaintiffs concede— and Defendants agree— that READER will successfully prevent "obscene and harmful material" from entering schools. ECF No. 1 at ¶91. In fact, the language of READER attempts to mirror the test in *Miller*, and references the relevant and applicable Texas Penal Code statutes. Tex. Educ. Code §§33.021; 35.001; *see* Tex. Pen. Code §43.25 (defining "sexual conduct" as, "sexual contact, actual or simulated sexual intercourse, deviate sexual intercourse, sexual bestiality, masturbation, sado-masochistic abuse, or lewd exhibition of the genitals, the anus, or any portion of the female breast below the top of the areola."); Tex. Pen. Code §43.21 (defining "patently offensive" as, "so offensive on its face as to affront current community standards of decency.").

The *Miller* Court went on to hold that, "[i]f a state law that regulates obscene material is thus limited, as written or construed, the First Amendment values applicable to the States through the Fourteenth Amendment are adequately protected…" *Miller*, 413 U.S. at 25. Such is the case here. The Court went on to provide non-exhaustive examples of that which would constitute obscenity, which also parallel the language of READER and its referenced statutes: "(a) Patently offensive representations or descriptions of ultimate sexual acts, normal or perverted, actual or simulated; (b) Patently offensive representation or descriptions of masturbation, excretory functions, and lewd exhibition of the genitals." *Id*. Also notably, the *Miller* Court further stated, "[w]e are satisfied that these specific prerequisites will provide fair notice to a dealer in such materials that his public and commercial activities may bring prosecution." *Miller*, 413 U.S. at 27. That now— fifty

(50) years later— Plaintiffs complain of having to evaluate and describe the content of the goods they seek to sell, does not dispose of the fact that the Court has previously recognized their civic responsibility to do so.

Therefore, to the extent Plaintiffs seek to introduce obscene material, unregulated, into Texas schools under the façade of a First Amendment right, their claims fail for want of constitutional protection.

### d. Plaintiffs' compelled-speech claim fails.

To the extent that Plaintiffs claim READER compels their speech, their claims still fail.

In general, "the government may not compel a person to speak its own preferred messages." *303 Creative*, 143 S. Ct. at 2312; *see also Tinker v. Des Moines Independent Community School Dist.*, 393 U. S. 503, 505-06 (1969); *Miami Herald Publishing Co. v. Tornillo*, 418 U. S. 241, 256 (1974); *Wooley v. Maynard*, 430 U. S. 705, 714 (1977). This requirement does not distinguish between "whether the government seeks to compel a person to speak its message when he would prefer to remain silent or to force an individual to include other ideas with his own speech that he would prefer not to include." *303* Creative, 143 S. Ct. at 2312; *see also Hurley,* 515 U.S. at 568-70, 576. As noted above in explaining Plaintiffs' lack of standing, the Court may reject their argument because they are unlikely to show that READER compels speech in the relevant sense. However, the Court may reject Plaintiffs' compelled-speech claim for at least two alternative reasons.

### i.   The "speech" in question is commercial speech which withstands intermediate scrutiny.

Commercial speech is defined as, "expression related solely to the economic interests of the speaker and its audience," *Houston Balloons & Promotions, LLC v. City of Houston*, 589 F. Supp. 2d 834, 847 (S.D. Tex. 2008) (citing *Cent. Hudson Gas & Elec. Corp. v. Public Service Comm'n of New York,* 447 U.S. 557, 561 (1980); *see also Va. Pharm. Bd. v. Va. Citizens Consumer Council,* 425 U.S. 748 (1976)), and is "speech that does no more than propose a commercial transaction." *Id.* (quoting *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations,* 413 U.S. 376, 385 (1973) (internal quotations omitted). Here, the "speech" which Plaintiffs allege is compelled— READER's requirement for them to render a book rating— is related solely to the economic interests of the speaker (Plaintiffs) and its audience (the Agency)— by describing the goods they seek to sell, to the potential buyer— and therefore should be classified as commercial.

"Commercial speech that is not false or deceptive and does not concern unlawful activities, however, may be restricted only in the service of a substantial governmental interest, and only through means that directly advance that interest." *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 638 (1985) (citing *Central Hudson Gas & Elec. Corp. v. Public Service Commission of New York,* 447 U.S. 557, 566 (1980)). In the landmark case of *Brown v. Board of Education*, a unanimous Supreme Court recognized that, "education is perhaps the most important function of state and local governments." *Brown v. Bd. of Ed.*, 347 U.S. 483, 493 (1954), *supplemented sub nom. Brown v. Bd. of Educ.*, 349 U.S. 294 (1955). The importance of education is generally undisputed, *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411

U.S. 1, 35 (1973); it so follows, then, that regulation of the "speech" which is allowed in Texas schools is more than sufficient as to constitute a "substantial government interest."

The subsequent inquiry, then, is whether "compelling" Plaintiff's "speech" by requiring them to rate the books they seek to sell and thus introduce into Texas schools accomplishes or directly advances the governmental interest of regulating the information or "speech" to which students are subject. Unquestionably, it does. Because Plaintiffs do not allege that READER fails to withstand intermediate scrutiny, any further First Amendment inquiry is superfluous.

### ii.    Alternatively, the "speech" is unprotected because it concerns an "essential operation of government."

Insofar as the "speech" in question is not commercial speech, it constitutes an "essential operation of government" and therefore is not protected under the First Amendment. "There is no right to refrain from speaking when 'essential operations of government require it for the preservation of an orderly society.'" *United States v. Arnold*, 740 F.3d 1032, 1035 (5th Cir. 2014) (citing *United States v. Sindel,* 53 F.3d 874, 878 (8th Cir.1995) (quoting *W. Va. State Bd. of Educ. v. Barnette,* 319 U.S. 624, 645 (1943).

In *U.S. v. Arnold*, the Fifth Circuit held that a law requiring a sex offender to register, thus compelling speech he did not wish to provide, was sufficient to constitute "an essential operation of government." *See* 740 F.3d 1032. The Eighth Circuit reached the same conclusion in *Sindel*, finding that compulsion of information requested on an IRS tax form constituted "an essential operation of government" and

therefore did not violate the First Amendment. *See* 53 F.3d 874. Further, in reaching its conclusion in *Sindel*, the Court considered that, "[t]he IRS…requires Sindel only to provide the government with information…not to disseminate publicly a message with which he disagrees." *Id.* at 878. The same factor— dissemination— was considered in a district-court ruling that the Census Bureau's compulsion of demographic information was "an essential operation of government": "[s]ince it is only information being sought, and plaintiffs are not being asked to disseminate publicly a message with which [they] disagree [ ], the First Amendment protection against compelled speech does not prevent the government from requiring the plaintiffs to answer." *Morales v. Daley*, 116 F. Supp. 2d 801, 816 (S.D. Tex. 2000) (internal quotations omitted).

Similarly, the "compelled speech" here— determining book ratings— of which Plaintiffs complain, is simply information being sought by the Agency. Plaintiffs are not being asked to "disseminate publicly a message with which [they] disagree," *Sindel*, 53 F.3d at 878; *Daley*, 116 F. Supp. 2d at 816, rather, they are simply being required to directly provide the Agency with information to be used in their review of the materials appropriate for Texas school libraries. For the foregoing reasons, READER's requirement that Plaintiffs assign and provide the Agency with book ratings concerns an "essential operation of government" and does not implicate the First Amendment.

### e.  READER is not unconstitutionally vague

"Facial invalidation 'is, manifestly, strong medicine' that has been employed by the Court sparingly and only as a last resort." *Nat'l Endowment for the Arts v. Finley,* 524 U.S. 569, 580 (1998). Further, "[a] law is not void for vagueness unless it "is impermissibly vague in all of its applications." *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 497 (1982). A law need not "'delineate the exact actions a [person] would have to take to avoid liability.'" *Doe I v. Landry*, 909 F.3d 99, 118 (5th Cir. 2018) (quoting *Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 552 (5th Cir. 2008)). As the Supreme Court has put it, "'perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity.'" *Minn. Voters Alliance v. Mansky*, 138 S. Ct. 1876, 1891 (2018) (citation omitted). Perfection, however, is exactly what Plaintiffs demand. "[S]peculation about possible vagueness in hypothetical situations not before the Court will not support a facial attack on a statute when it is surely valid 'in the vast majority of its intended applications.'" *Hill v. Colorado*, 530 U.S. 703, 733 (2000) (citation omitted); *see also SisterSong Women of Color Reproductive Justice Collective v. Governor of Georgia*, 40 F.4th 1320, 1328 (11th Cir. 2022) ("To be sure, there might be vague applications of that definition in other provisions of the Georgia Code, but challenges to those applications—like the arguments . . . about potential applications to constitutionally protected conduct—are properly brought in an as-applied manner.").

"The Fourteenth Amendment's guarantee of Due Process proscribes laws so vague that persons 'of common intelligence must necessarily guess at [their] meaning and differ as to [their] application.'" *Women's Med. Ctr. of Nw. Hous. v. Bell*, 248 F.3d

411, 421 (5th Cir. 2001) (alterations in original) (quoting *Smith v. Goguen*, 415 U.S. 566, 572 n.8 (1974)). "'[O]nly a reasonable degree of certainty is required'" for a statute to survive a vagueness challenge. *Roark & Hardee*, 522 F.3d 552–53 (quoting *United States v. Tansley*, 986 F.2d 880, 885 (5th Cir. 1993)) (emphasis and internal quotation marks omitted). READER gives that reasonable degree of certainty, so Plaintiffs' vagueness challenge fails. *See generally*, Tex. Educ. Code Ch. 35.

### f.  READER is not an unconstitutional prior restraint

Plaintiffs are also incorrect in their assertion that READER "results in an unconstitutional system of prior restraints." ECF No. 6 at 13. "The term prior restraint is used to describe administrative and judicial orders forbidding certain communications when issued in advance of the time that such communications are to occur." *Alexander v. United States*, 509 U.S. 544, 550 (1993) (internal quotations omitted). READER is plainly not such a policy.

READER does not prohibit communication of any kind. At issue is an amorphous right of students to receive information, which debatably flows from the First Amendment as an "inherent corollary of the rights of free speech and press." *Pico*, 457 U.S. at 867. Defendants are not forbidding anyone from any speech; Defendants are not forbidding any book from being published, nor are they forbidding the sale of the books containing obscene material in any forum or to any audience outside of Texas schools. Thus, the cases cited by Plaintiffs, *e.g.*, *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 504 (1952); *Chiu v. Plano ISD*, 339 F.3d 273, 280 (5th Cir. 2003), are inapposite. Plaintiffs provide no precedent as to why a prior restraint on a

student's right to access information in the form a particular school-library book would violate the First Amendment. And even if this policy were a prior restraint, Plaintiffs have not demonstrated why it would be unconstitutional, as prior restraints on speech are not always unconstitutional in a public school setting. *See Kuhlmeier*, 484 U.S. at 268-69; *Henerey ex rel. Henerey v. City of St. Charles, Sch. Dist.*, 200 F.3d 1128, 1134 (8th Cir. 1999). Indeed, "judicial decisions analyzing prior restraints have applied different standards of review depending on the restraint at issue." *Catholic Leadership Coal. v. Reisman*, 764 F.3d 409, 438 (5th Cir. 2014) (citing *Milwaukee Police Ass'n v. Jones*, 192 F.3d 742, 749 (7th Cir. 1999)). In fact, *Milwaukee Police* suggests a prior restraint in a non-public school forum need only be "reasonably related to legitimate pedagogical goals." 192 F.3d at 749. READER satisfies that minimal standard.

### g.  READER is not facially invalid

"[F]acial and as-applied challenges have different substantive requirements." *Reisman,* 764 F.3d at 425-26 (citing *Doe v. Reed,* 561 U.S. 186 (2010)). A facial challenge fails unless "no set of circumstances exists under which the Act would be valid." *U.S. v. Salerno*, 481 U.S. 739, 745 (1987). This is an "extraordinarily high" standard, *NetChoice*, 49 F.4th at 449, and courts "must be careful not to go beyond the statute's facial requirements and speculate about 'hypothetical' or 'imaginary' cases." *Wash. State Grange*, 552 U.S. at 449.

Plaintiffs maintain that READER is "'presumptively unconstitutional' because it 'applies to particular speech because of the topic discussed or the idea or message

expressed.'" ECF No. 6 at 15 (quoting *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015)). But this strict-scrutiny analysis does not apply. As discussed above, the First Amendment either does not apply, or at most triggers intermediate scrutiny, which READER undisputedly survives.

However, in considering *Reed*, Plaintiffs fail to first "identify the nature of the forum, because the extent to which the Government may limit access depends on whether the forum is public or non-public." *Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 797 (1985). As explained above, READER concerns government speech and, at most, the school library is a non-public forum. A non-public forum is, by definition, characterized by "selective access." *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 679 (1998). Thus, although Plaintiffs argue that READER fails the narrow-tailoring and least-restrictive-means requirements of strict scrutiny, Defendants are not required to satisfy that heightened standard. Even *if*— hypothetically— strict scrutiny *was* required, Defendants have more than established a compelling interest in both education and in protecting Texas children from obscenity. The requirements of READER— requiring a book vendor to reasonably describe, or rate, the content of the goods which they seek to sell— as is regularly done in commercial transactions, is the least restrictive means of doing so.

### h. READER is not overbroad

The overbreadth doctrine eases a challenger's burden slightly in the First Amendment context, permitting a plaintiff to succeed "if a substantial number of [the law's] applications are unconstitutional, judged in relation to the statute's plainly

legitimate sweep." *NetChoice*, 49 F.4th at 450 (quotation omitted). But the overbreadth doctrine is "a last resort," not a saving grace, and it "attenuates as the regulated expression moves from pure speech toward conduct." *Id.* (quotation omitted).

More, nothing on the face of READER purports to burden Plaintiffs' speech, as Plaintiffs do not have a right to the speech which they claim. Any further "whataboutisms ... exemplify why it's inappropriate to hold the law facially unconstitutional in a pre-enforcement posture." *NetChoice*, 49 F.4th at 451–52. Mights and coulds and maybes are all the Plaintiffs can identify. *See id.* at 452 (courts should avoid determining the constitutionality of State statutes "in hypothetical situations where it is not even clear the State itself would consider its law applicable" (quotation omitted)); *see also Hersh v. U.S. ex rel. Mukasey*, 553 F.3d 743, 762 (5th Cir. 2008) ("[t]he fact that a court can hypothesize situations in which the statute will impact protected speech is not alone sufficient" to support a facial challenge). Speculations about unlawful applications are not "*substantial.*" *United States v. Hansen*, 143 S. Ct.1932, 1948 (2023).

Because the statutes are not facially unconstitutional, any constitutional challenge must be to the statutes as they are applied. *See id.* "Exercising judicial restraint in a facial challenge 'frees the Court not only from unnecessary pronouncement on constitutional issues, but also from premature interpretations of statutes in areas where their constitutional application might be cloudy." *Wash. State Grange*, 552 U.S. at 450 (citing *United States v. Raines*, 362 U.S. 17, 22 (1960)).

### i. READER is not an unconstitutional delegation

Finally, Plaintiffs cannot show that READER is an unconstitutional delegation. In the most general terms, the nondelegation doctrine concerns "giving public power to private bodies." *Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*, 53 F.4th 869, 880 (5th Cir. 2022). "[C]ourts have distilled the principle that a private entity may wield government power only if it 'functions subordinately' to an agency with 'authority and surveillance' over it." *Id.* at 881.

Here, Plaintiffs are unlikely to show that READER unconstitutionally delegates any power. Even assuming that the nondelegation applies to alleged delegation of State power, as opposed to federal power, the State has not given "public power to private bodies" through READER. *Id.* at 880. Plaintiffs cannot contend that they "wield government power" under READER. *Id.* at 881. By its plain terms, READER directs library material vendors to create ratings and vests the agency with oversight of those ratings. Tex. Educ. Code §35.003.

### C. Plaintiffs are not entitled to a preliminary injunction.

Plaintiffs are not entitled to the "extraordinary remedy" of a preliminary injunction. *Winter*, 555 U.S. at 24. They are not likely to succeed on the merits, they face no irreparable harm, their alleged injury does not outweigh the threatened harm an injunction would create, and granting an injunction would disserve the public interest. *See City of El Cenizo*, 890 F.3d at 176.

### 1. Plaintiffs have not demonstrated a substantial likelihood that they will prevail on the merits.

As set forth in the Motion to Dismiss outlined above, Plaintiffs lack a substantial likelihood of success on the merits.

### 2. The irreparable injury factor does not weigh in Plaintiffs' favor because they seek to greatly alter the status quo with this preliminary injunction.

"The 'purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held.'" *Benisek v. Lamone*, 138 S. Ct. 1942, 1945 (2018) (per curiam) (quoting *University of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)). Not only does a preliminary injunction in this case greatly alter the status quo, it is unnecessary. While READER is effective on September 1, 2023, each library material vendor must "develop and submit to the agency a list of library material rated as sexually explicit material or sexually relevant material" no later than April 1, 2024. This provides Plaintiffs with *seven months* before they are required to submit their list to the Agency. Additionally, READER does not purport— *anywhere*— to intermeddle in the business dealings of Plaintiffs during the interim. It is hardly necessary to grant injunctive relief under these circumstances.

Plaintiffs seek to greatly alter the relative positions of the parties through this motion for preliminary injunction and thus it is the Defendants—and ultimately the children of the state of Texas—that will suffer irreparable injury if this Court grants preliminary injunctive relief. Should a preliminary injunction be granted, it would forestall the requirement that TSLAC and SBOE create and develop standards to be used by school districts in their application of READER, which is a preliminary matter of the utmost necessity for the procession of READER. Therefore, Plaintiffs

fail prong two of the injunction standard, and their request for injunctive relief should be denied.

### 3. The equitable balance and public interest disfavor an injunction.

The balance of the equities and the public interest "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Fundamentally, state education is driven by democratic process. When legislators pass laws, and they are challenged, "the good faith of the state legislature must be presumed." *Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018). And since states have the "responsibility for education of its citizens," *Wisconsin*, 406 U.S. at 213, the Defendants' harm substantially outweighs any alleged hypothetical injury to Plaintiffs. Further, granting a preliminary injunction will disserve the public interest to protect children from obscene material in school. Moreover, Plaintiffs fail prongs three and four of the injunction standard, and their request for injunctive relief should be denied.

## PRAYER

For the foregoing reasons, Martha Wong, in her official capacity as Chair of the Texas State Library and Archives Commission, Keven Ellis, in his official capacity as Chair of the Texas Board of Education, and Mike Morath, in his official capacity as Commissioner of Education respectfully request that this Court grant Defendant's Motion to Dismiss in its entirety, or alternatively to deny Plaintiff's motion for preliminary injunction.

Respectfully submitted.

**ANGELA COLMENERO**
Provisional Attorney General

**BRENT WEBSTER**
First Assistant Attorney General

**JAMES LLOYD**
Acting Deputy Attorney General for Civil Litigation

**KIMBERLY GDULA**
Deputy Chief, General Litigation Division

**RYAN KERCHER**
Deputy Chief, General Litigation Division

*/s/ Christina Cella*
**CHRISTINA CELLA**
Assistant Attorney General
Texas State Bar No. 24106199
Telephone: (512) 475-2952
Facsimile: (512) 320-0667
Christina.Cella@oag.texas.gov

**AMY PLETSCHER**
Assistant Attorney General
Texas State Bar No. 24113663
Telephone: (512) 936-0927
Facsimile: (512) 320-0667
Amy.Pletscher@oag.texas.gov

Office of the Attorney General
General Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548

**ATTORNEYS FOR DEFENDANTS**

## CERTIFICATE OF SERVICE

I hereby certify that on August 16, 2023, a true and correct copy of the foregoing document was served on all counsels of record.

/s/ Christina Cella
**CHRISTINA CELLA**
Assistant Attorney General
Texas State Bar No. 24106199