**FILED**
August 17, 2023
CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY: _____pg_____
                    DEPUTY

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
DISTRICT OF OREGON
AUSTIN DIVISION

| | |
|---|---|
| **BOOK PEOPLE, INC., VBK, INC., d/b/a BLUE WILLOW BOOKSHOP, AMERICAN BOOKSELLERS ASSOCIATION, ASSOCIATION OF AMERICAN PUBLISHERS, AUTHORS GUILD, INC., COMIC BOOK LEGAL DEFENSE FUND,**<br><br>**Plaintiffs**,<br><br>v.<br><br>**MARTHA WONG** in her official capacity as chair of the Texas State Library and Archives Commission, **KEVEN ELLIS** in his official capacity as chair of the Texas Board of Education, **MIKE MORATH** in his official capacity as Commissioner of Education,<br><br>**Defendants**. | Case No. 1:23-cv-00858-ADA |

**BRIEF OF *AMICI CURIAE* ASSOCIATION OF UNIVERSITY PRESSES, BARNES & NOBLE, INC., FREEDOM TO READ FOUNDATION, FREEDOM TO LEARN ADVOCATES, AND AMERICAN ASSOCIATION OF SCHOOL LIBRARIANS IN OPPOSTION TO DEFENDANTS' MOTION TO DISMISS AND IN SUPPORT OF <u>PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION</u>**

Linda J. Steinman (*pro hac vice* motion pending)
Celyra I. Myers (*pro hac vice* motion pending)
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas, 21st Floor
New York, New York 10020
Phone: (212) 489-8230
Fax: (212) 489-8340
Email:   lindasteinman@dwt.com
              celyramyers@dwt.com

Everett W. Jack, Jr.
Bar No. 24030263
DAVIS WRIGHT TREMAINE LLP
1300 SW Fifth Avenue, Suite 2400
Portland, OR  97201-5610
Phone: 503-778-5218
Fax: 503-778-5299
Email: everettjack@dwt.com

*Counsel for Amici*

## TABLE OF CONTENTS

**Page**

INTEREST OF AMICI CURIAE .................................................................................................. 1

SUMMARY OF ARGUMENT...................................................................................................... 2

ARGUMENT .................................................................................................................................. 3

I.    THE BOOK BAN IS AN UNCONSTITUTIONAL CONTENT-BASED REGULATION THAT CANNOT SURVIVE STRICT SCRUTINY ................................ 3

II.   THE BOOK BAN UNLAWFULLY COMPELS SPEECH................................................ 9

CONCLUSION............................................................................................................................. 10

# **TABLE OF AUTHORITIES**

Page(s)

**Cases**

*303 Creative LLC v. Elenis,*
   143 S. Ct. 2298 (2023) .................................................................................................. 10

*Am. Booksellers Ass'n v. McAuliffe,*
   533 F. Supp. 50 (N.D. Ga. 1981) ..................................................................................... 7

*Am. Booksellers Ass'n v. Virginia,*
   882 F.2d 125 (4th Cir. 1989) ............................................................................................ 6

*Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico,*
   457 U.S. 853 (1982) .................................................................................................... 4, 5

*Brown v. Entm't Merchants Ass'n,*
   564 U.S. 786 (2011) ........................................................................................... 3, 4, 7, 8

*Calderon v. City of Buffalo,*
   402 N.Y.S.2d 685 (App. Div. 1978) ................................................................................ 7

*Campbell v. St. Tammany Parish School Bd.,*
   64 F.3d 184 (5th Cir. 1995) ..................................................................................... 3, 4, 5

*Fayetteville Pub. Library v. Crawford Cty.,*
   No. 5:23-CV-05086, 2023 WL 4845636 (W.D. Ark. July 29, 2023) ...................... 3, 6

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp.,*
   515 U.S. 557 (1995) ...................................................................................................... 10

*Miller v. California,*
   413 U.S. 15 (1973) .......................................................................................................... 6

*Powell's Books, Inc. v. Kroger,*
   622 F.3d 1202 (9th Cir. 2010) ......................................................................................... 7

*Reed v. Town of Gilbert,*
   576 U.S. 155 (2015) ........................................................................................................ 3

*Roth v. U.S.,*
   354 U.S. 476 (1957) ........................................................................................................ 5

*Rushia v. Town of Ashburnham,*
   582 F. Supp. 900 (D. Mass. 1983) .................................................................................. 7

*Sable Commc'ns of Cal. v. F.C.C.*,
   492 U.S. 115 (1989) .................................................................................................. 3

*Sund v. City of Wichita Falls*,
   121 F. Supp. 2d 530 (N.D. Tex. 2000) ................................................................... 7, 8

*Virginia v. Am. Booksellers Ass'n*,
   372 S.E.2d 618 (Va. 1988) ..................................................................................... 5, 8

*Wooley v. Maynard*,
   430 U.S. 705 (1977) .................................................................................................. 10

**Statutes**

H.B. 900, codified as proposed Tex. Educ. Code
   § 002 ........................................................................................................................... 2
   § 008 ........................................................................................................................... 2
   § 33.021 ...................................................................................................................... 2
   § 35.001 ...................................................................................................................... 2
   §§ 35.001(2), 35.005 .................................................................................................. 7
   §§ 35.001(3) ............................................................................................................... 7
   § 35.003 ...................................................................................................................... 2
   § 35.0021 .................................................................................................................... 2

Tex. Educ. Code §§ 35.001(3) .......................................................................................... 7

**Other Authorities**

American Library Association, ACCESS TO RESOURCES AND SERVICES IN THE SCHOOL
   LIBRARY, at
   https://www.ala.org/advocacy/intfreedom/librarybill/interpretations/accessresour
   ces ............................................................................................................................... 4

https://healthdata.dshs.texas.gov/dashboard/surveys-and-profiles/youth-risk-
   behavior-survey (last accessed Aug. 15, 2023) ....................................................... 5

https://www.ala.org/advocacy/intfreedom/labelingratingqa .................................. 9, 10

## INTEREST OF AMICI CURIAE

The Association of University Presses is an organization of more than 160 international nonprofit scholarly publishers, 80% of which are based in the United States. Since 1937, AUPresses has advanced the essential role of a global community of publishers whose mission is to ensure academic excellence and cultivate knowledge. The Association holds intellectual freedom, integrity, stewardship, and diversity and inclusion as core values. AUPresses members are active across many scholarly disciplines, including the humanities, arts, and sciences, publish significant regional and literary work, and are innovators in the world of digital publishing.

Barnes & Noble, Inc. ("Barnes & Noble") is the world's largest retail bookseller and a leading retailer of content, digital media and educational products. The Company operates approximately 600 Barnes & Noble bookstores across the United States, and one of the Web's premier e-commerce sites, BN.com. Barnes & Noble's mission is to operate the best omni-channel specialty retail business in America, helping both its customers and booksellers reach their aspirations, while being a credit to the communities it serves.

The Freedom to Read Foundation is an organization established by the American Library Association to promote and defend First Amendment rights, foster libraries as institutions that fulfill the promise of the First Amendment, support the right of libraries to include in their collections and make available to the public any work they may legally acquire, and establish legal precedent for the freedom to read of all citizens.

Freedom to Learn Advocates (FTLA) was founded to promote universal access to books and educational resources for all communities regardless of race, economic status, religion, sexual orientation, gender identity, or political affiliation. Its mission is to resist initiatives that aim to

limit access to information, often in the form of book banning policies. FTLA believes that individuals and families should be trusted to decide for themselves what to read and learn.

The American Association of School Librarians (AASL) is the preeminent national professional association for school librarians. Their *National School Library Standards* (2018) provide that the role of the school librarian is to work with students to ensure they are able to make responsible decisions regarding the use of these resources to develop critical learning skills. As a division of the American Library Association (ALA), AASL is a partner with school administrators and national educational organizations in shaping educational policy.

## SUMMARY OF ARGUMENT

In a specious attempt to allegedly protect children, Texas has passed a draconian law riddled with massive constitutional defects that would effectively prohibit schools libraries from providing their students with a broad array of books, including some of the most seminal works of literature published.  H.B. 900, codified as proposed Tex. Educ. Code §§ 33.021, 35.001-002, 35.0021 and 35.003-008 (the "Book Ban"), would significantly impinge on the First Amendment rights of publishers, booksellers and distributors – in addition to the students.  It would impose a blatantly unconstitutional ratings scheme on booksellers, forcing them to label a book with arbitrary ratings invented by the Texas legislature before being able to sell books to school libraries.  Moreover, the Book Ban would effectively bar students in grades K-12 from borrowing any work from a public school library that merely references any "sexual conduct" unless the student obtained prior parental consent to "access" such content.  Such books would presumably include such acclaimed works as *The Handmaid's Tale* by Margaret Atwood, *Slaughterhouse-Five* by Kurt Vonnegut, or *Angela's Ashes* by Frank McCourt.  Further, the Book Ban would prohibit publishers, booksellers and other library material vendors from supplying school libraries with books that contain depictions of "explicit sexual conduct" but are of literary, scientific, or artistic

2

value. The Book Ban is unconstitutional for all the reasons set forth in Plaintiffs' Motion for a Preliminary Injunction. This amicus brief will concentrate on two of those aspects. First, the Book Ban is a content-based regulation of speech and cannot survive strict scrutiny. Any broad speech restriction aiming at protecting children that does not assess a literary work "as a whole" and that is not circumscribed to works without redeeming social or literary, scientific or artistic value for minors is unconstitutional. Second, the burdensome and coercive requirements on publishers, booksellers and distributors to rate and label literary works as "sexually relevant" or "sexually explicit" constitute unconstitutional compelled speech.

## ARGUMENT

**I.      THE BOOK BAN IS AN UNCONSTITUTIONAL CONTENT-BASED REGULATION THAT CANNOT SURVIVE STRICT SCRUTINY**

"The Supreme Court has repeatedly recognized that the broad authority of school officials over educational matters must be exercised in a manner that comports with fundamental constitutional safeguards." *Campbell v. St. Tammany Parish School Bd.*, 64 F.3d 184, 188 (5th Cir. 1995). The Book Ban is a content-based regulation of protected speech and accordingly subject to strict scrutiny.[1] "Content-based laws . . . are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed*, 576 U.S. at 163-64; *see also Brown*, 564 U.S. at 799-800. The Supreme Court underscored the extensive nature of this burden in *Brown*, which struck down as unconstitutional

---

[1] *Reed v. Town of Gilbert*, 576 U.S. 155, 163-64 (2015) ("Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed."); *Brown v. Entm't Merchants Ass'n*, 564 U.S. 786, 799-800 (2011); *Sable Commc'ns of Cal. v. F.C.C.*, 492 U.S. 115, 126 (1989); *Fayetteville Pub. Library v. Crawford Cty.*, No. 5:23-CV-05086, 2023 WL 4845636, at *18-19 (W.D. Ark. July 29, 2023)(finding procedure for challenging public library books to be content-based restriction on speech).

a California regulation that prohibited the rental of violent video games to minors without parental consent and required their packaging to be labeled "18." As the court stated in that similar case:

> The State must specifically identify an "actual problem" in need of solving, and the curtailment of free speech must be actually necessary to the solution. That is a demanding standard. It is rare that a regulation restricting speech because of its content will ever be permissible.

*Brown*, 584 U.S. at 799-800. The Supreme Court found that California could not meet this demanding standard where "it cannot show a direct causal link between violent video games and harm to minors"; as it underscored, "ambiguous proof will not suffice." *Id.*

It is important to understand what the Book Ban is not. It is not a regulation of obscene speech for adults or minors. Nor is this a case involving school curriculum or school discipline of students. Nor is this even a case in which local trained educators or librarians removed specific books from a school library following an individual review and sound educational procedures. Instead, this is a case in which the Texas legislature, a political body with no specialized training in the educational needs of children, has enacted a broad, state-wide legislative assault on books and the public school library during a period of heated "culture wars." The Texas Book Ban serves no compelling (or even reasonable) interest, it is not narrowly tailored or the least restrictive means of advancing its interests, and it is vastly overbroad.

The Book Ban takes direct aim at the school library. This is particularly problematic. Both the United States Supreme Court and the Fifth Circuit have recognized that school libraries are "a place to test or expand upon ideas presented to [the student], in or out of the classroom." *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 868-69 (1982).[2] As the Fifth Circuit stated with approval in *Campbell,* 64 F.3d at 188:

---

[2] *See also* American Library Association, ACCESS TO RESOURCES AND SERVICES IN THE SCHOOL LIBRARY, at https://www.ala.org/advocacy/intfreedom/librarybill/interpretations/accessresources.

4

> The *Pico* plurality stressed the "unique role of the school library" as a place where students could engage in voluntary inquiry. It also observed that "students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding" and that the school library served as "the principal locus of such freedom."

*See also* id. ("Emphasizing the voluntary nature of public school library use, the plurality in *Pico* observed that school officials' decisions regarding public school library materials are properly viewed as decisions that do not involve the school curriculum and that are therefore subject to certain constitutional limitations.")

Moreover, "Sex, a great and mysterious motive force in human life, has indisputably been a subject of absorbing interest to mankind through the ages; it is one of the vital problems of human interest and public concern." *Roth v. U.S.,* 354 U.S. 476, 487 (1957). More than any other age group, teens need books – especially books carefully selected by school librarians, rather than inaccurate or pornographic sites on the Internet or social media – to understand sexuality.[3] Further, books on sexual violence or abuse, such as *The Color Purple* by Alice Walker and *Speak* by Laurie Halse Anderson, can help teens grapple with violence or abuse in their lives. There is no compelling (or even reasonable) rationale why Texas needs to restrict students from reading *The Grapes of Wrath* by John Steinbeck, or *Brave New World* by Aldous Huxley, or *The Sound and the Fury* by William Faulkner, solely because they contain some depictions of sex – books that many generations of students before them have read.[4]

---

[3] According to one Texas study, 11% of students age 15 or below were currently sexually active, 30% of students between 16 and 17 were sexually active, and among seniors, almost 45% were sexually active. https://healthdata.dshs.texas.gov/dashboard/surveys-and-profiles/youth-risk-behavior-survey (last accessed Aug. 15, 2023) (sorted by "sexual behavior, currently sexually active, and age").

[4] *See Virginia v. Am. Booksellers Ass'n*, 372 S.E.2d 618, 621-24 (Va. 1988) (holding that none of the 16 book titles targeted, such as *The Witches of Eastwick* by John Updike, *Forever* by Judy Blume, *Ulysses* by James Joyce, *The Family of Woman*, *The New Our Bodies, Ourselves*, or *The Penguin Book of Love Poetry* could be deemed harmful to minors because of their serious literary, artistic, political or scientific value for older adolescents).

There is significant caselaw regarding the regulation of works with sexual content. It dictates that the First Amendment interests of children, authors, and distributors are only overcome where those statutes meet critical standards that are strikingly absent here. In several adult obscenity cases culminating in *Miller v. California*, the Supreme Court made clear that sexually-oriented content may only be regulated as obscene where:

(a) the average person applying contemporary community standards would find that the work, <u>taken as a whole, appeals to the prurient interest</u>...

(b) the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and

(c) the work <u>taken as a whole, lacks serious literary, artistic, political or scientific value.</u>

*Miller v. California*, 413 U.S. 15, 24 (1973) (emphasis added). In *Ginsberg v. New York*, the Supreme Court upheld a harmful-to-minors statute because it required that the works:

(a) "predominantly appeal[ed] to the prurient, shameful or morbid interest of minors";

(b) were "patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable for minors" and

(c) were "utterly without redeeming social importance for minors."

390 U.S. 629, 633 (1968). Several subsequent decisions held that harmful-to-minors statutes are only constitutional if they do not restrict books that have serious value for a legitimate minority of older adolescents. *See, e.g.*, *Am. Booksellers Ass'n v. Virginia*, 882 F.2d 125 (4th Cir. 1989); *Fayetteville Pub. Library* 2023 WL 4845636, at *16.

The Book Ban utterly fails to meet these standards. The Book Ban burdens First Amendment rights of publishers, booksellers and students by preventing a student from taking out any library book containing "sexually relevant material" without parental consent.[5] *See* proposed

---

[5] Parental consent statutes impair First Amendment rights, even if they are not direct bans. *Brown*, 564 U.S. at 805; *Sund v. City of Wichita Falls*, 121 F. Supp. 2d 530, 549-50 (N.D. Tex. 2000).

6

Tex. Educ. Code §§ 35.001(2), 35.005. Yet "sexually relevant material" is broadly defined as any material, "including a written description, illustration, photographic image, video image or audio file" that "describes, depicts or portrays sexual conduct" – which is in turn defined to include any "sexual contact" or "masturbation." Proposed Tex. Educ. Code §§ 35.001(3); 33.024(a). Nowhere in this definition is there any requirement that the restricted works predominantly appeal to the prurient or morbid interest in sex, that the work be patently offensive as a whole, or that the work as a whole be utterly without redeeming social importance for minors or taken as a whole, lack serious literary, artistic, political or scientific value for minors.[6] The Book Ban further prohibits the sale and distribution of any "sexually explicit material" to public school libraries, yet the definition of "sexually explicit material" does not exempt works that, as a whole, have social importance for minors or literary, artistic, political, or scientific value for minors. Proposed Tex. Educ. Code §§ 35.001(3); 33.021(a); 35.0021.

As such, the Book Ban is not narrowly tailored to meet a compelling government interest.[7] As the Texas district court stated in *Sund*, 121 F. Supp. 2d at 552, with respect to a public library, "[i]t is true . . . that states may regulate children's access to materials not deemed obscene for adults; however, such regulation is permissible only where the restricted materials meet the stringent test for obscenity as to children or 'harmful to minors.'" And as the Supreme Court reiterated in *Brown,* no state may restrict access to ideas merely because it believes them to be unsuitable for minors:

---

[6] The Book Ban's provisions imposing a "patently offensive" requirement apply only to "sexually explicit materials," not "sexually relevant materials." *See* Sec. 35.0021.
[7] *See Powell's Books, Inc. v. Kroger*, 622 F.3d 1202, 1214 (9th Cir. 2010); *Rushia v. Town of Ashburnham*, 582 F. Supp. 900, 904 (D. Mass. 1983); *Am. Booksellers Ass'n v. McAuliffe*, 533 F. Supp. 50, 57 (N.D. Ga. 1981); *see also Calderon v. City of Buffalo*, 402 N.Y.S.2d 685, 689 (App. Div. 1978).

> "[M]inors are entitled to a significant measure of First Amendment protection, and only in relatively narrow and well-defined circumstances may government bar public dissemination of protected materials to them." *Erznoznik v. Jacksonville*, 422 U.S. 205, 212–213 . . . (1975) (citation omitted). . . . "Speech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them." *Erznoznik, supra,* at 213–214 . . . .

564 U.S. at 794-95 (emphasis added). That is exactly what has happened here.

In *Sund,* a regulation provided that library card holders could vote and require that selected children's books be removed to the adult section in the library in order to foster parental control of books read by their kids. The court found that the regulation was not narrowly tailored to serve a compelling state interest, emphasizing that the regulation did not meet the demanding standards of *Ginsberg*. "There is simply no interest, *let alone a compelling one*, in restricting access to non-obscene, fully protected library books solely on the basis of the majority's disagreement with their perceived message." 121 F. Supp. 2d at 552.

The Book Ban is overbroad in several other ways. First, the Supreme Court's reasoning in *Brown* applies equally here:

> Not all of the children who are forbidden to purchase violent video games on their own have parents who *care* whether they purchase violent video games. While some of the legislation's effect may indeed be in support of what some parents of the restricted children actually want, its entire effect is only in support of what the State thinks parents *ought* to want. This is not narrow . . . tailoring.

*Brown*, 564 U.S. at 804; *see also id*. at 795 n.3. Second, the Book Ban does not differentiate in any manner by age, imposing a regime whereby library material vendors are compelled to rate books with no regard to the age of the reader, and school libraries are required to treat kindergarteners and 12th graders alike in terms of the books they may borrow without parental consent. *Compare Virginia v. Am. Booksellers Ass'n*, 372 S.E.2d 618 (Va. 1988). This makes no sense. In sum, the Book Ban is a content-based regulation of speech that cannot survive strict scrutiny under the dictates of significant precedent.

## II.     THE BOOK BAN UNLAWFULLY COMPELS SPEECH

The Book Ban, with its coercive scheme to require rating of books by library materials vendors, also compels speech in violation of the First Amendment.  Ratings systems for movies and video games in this country are wholly voluntary.  The book publishing community has long been strongly opposed to ratings for books.  So, too, has the American Library Association:

> Librarians employ objective professional judgment through selection, cataloging, classification, and readers' services to make available the information that library patrons want or need.  Cataloging decisions, labels, or ratings applied in an attempt to restrict or discourage access to materials or to suggest moral or doctrinal endorsement is a violation of the First Amendment and *Library Bill of Rights.*

https://www.ala.org/advocacy/intfreedom/labelingratingqa.  Rating systems for books are inevitably subjective, are used for purposes of censorship, and tar the reputation of a work, discouraging interested readers who may well find the book enlightening or enjoyable.

In the face of this principled opposition to ratings, Texas has sought to force "library materials vendors" to apply a rating system.  Book vendors would be forced to choose from the amorphously defined ratings of "sexually relevant material," "sexually explicit material" or "no rating."  "Sexually explicit material" would be prohibited completely from being sold to Texas schools. "Sexually relevant material" could only be sold to schools and circulated to students where their libraries require parental or guardian consent.  All book vendors must submit these ratings to the Texas Education Agency before being allowed to sell any title to schools.  This agency would be empowered to challenge any rating, including no rating.  The agency could then force the book vendor to recall a book if it took issue with the book vendor's rating. Moreover, the agency would maintain a public list of those book vendors who failed to comply with the agency's directives and prohibit those vendors from continuing to sell to Texas schools.  The task of rating all books currently available in Texas public school libraries and sold to them in the future is not only an impossible, Sisyphean task, but blatantly unconstitutional and completely at odds with the

9

history of bookselling. It directly conflicts with settled constitutional jurisprudence by compelling booksellers' speech in at least two ways. First, the Book Ban coerces book vendors to label a book against their principles and based on standards which are unconstitutionally vague and highly subjective. Further, the Book Ban requires book vendors to change their own independent determinations to conform to the State's views by threatening significant financial injury. A more coercive regime is hardly imaginable.

The Texas Ban runs afoul of the prohibition against compelled speech. "[T]he government may not compel a person to speak its own preferred messages." *303 Creative LLC v. Elenis*, 143 S. Ct. 2298, 2312 (2023). In *303 Creative*, the Supreme Court treated this right as so important that it trumped commonplace anti-discrimination laws. "[T]he right of freedom of thought protected by the First Amendment against state action includes both the right to speak freely and the right to refrain from speaking at all." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977) (citing *W. Va. Bd. of Educ. v. Barnette*, 319 U.S. 624, 633-34; id., at 645 (Murphy, J., concurring). "Since *all* speech inherently involves choices of what to say and what to leave unsaid, one important manifestation of the principle of free speech is that one who chooses to speak may also decide 'what not to say.'" *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp.*, 515 U.S. 557, 573 (1995). "[T]his general rule, that the speaker has the right to tailor the speech, applies not only to expressions of value, opinion, or endorsement, but equally to statements of fact the speaker would rather avoid." *Id.* Finally, there is no countervailing need for the State of Texas to require library material vendors to rate books already carefully chosen by school librarians based on the books and their reviews.

## CONCLUSION

Amici respectfully request that the Defendants' motion to dismiss be denied and Plaintiffs' motion for a preliminary injunction against the Book Ban be granted.

Dated: August 17, 2023                    Respectfully submitted,

By:    /s/ *Everett W. Jack, Jr.*
      Everett W. Jack, Jr.
      Bar No. 24030263
DAVIS WRIGHT TREMAINE LLP
1300 SW Fifth Avenue, Suite 2400
Portland, OR  97201-5610
Phone: 503-778-5218
Fax: 503-778-5299
everettjack@dwt.com

Linda J. Steinman (*pro hac vice* motion pending)
Celyra I. Myers (*pro hac vice* motion pending)
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas, 21st Floor
New York, New York 10020
Phone: (212) 489-8230
Fax: (212) 489-8340
Email:  lindasteinman@dwt.com
         celyramyers@dwt.com

*Counsel for Amici Association Of University Presses, Barnes & Noble, Inc., Freedom To Read Foundation, Freedom To Learn Advocates, and American Association Of School Librarians*

11