# EXHIBIT A

```
 1                  UNITED STATES DISTRICT COURT
                     WESTERN DISTRICT OF TEXAS
 2                        AUSTIN DIVISION

 3  BOOK PEOPLE, INC., ET AL ) Docket No. A 23-CA-858 ADA
                             )
 4  vs.                      ) Austin, Texas
                             )
 5  MARTHA WONG, IN HER      )
    OFFICIAL CAPACITY AS THE )
 6  CHAIR OF THE TEXAS STATE )
    LIBRARY AND ARCHIVES     )
 7  COMMISSION, ET AL        ) August 18, 2023

 8                  TRANSCRIPT OF MOTION HEARING
               BEFORE THE HONORABLE ALAN D. ALBRIGHT
 9

10  APPEARANCES:

11  For the Plaintiff:        Mr. Michael J. Lambert
                              Mr. W. Reid Pillifant
12                            Ms. Laura L. Prather
                              Ms. Catherine L. Robb
13                            Haynes & Boone, LLP
                              600 Congress Avenue, Suite 1300
14                            Austin, Texas 78701

15

16  For the Defendant:        Ms. Christina Cella
                              Ms. Amy E. Pletscher
17                            Texas Attorney General's Office
                              300 West 15th Street, 6th Floor
18                            Austin, Texas 78711

19

20  Court Reporter:           Ms. Lily Iva Reznik, CRR, RMR
                              501 West 5th Street, Suite 4153
21                            Austin, Texas 78701
                              (512)391-8792
22

23

24

25  Proceedings reported by computerized stenography,
    transcript produced by computer-aided transcription.
```

| | | |
|---|---|---|
| 08:59:49 | 1 | THE COURT:  Would you call the case, please? |
| 08:59:51 | 2 | THE CLERK:  Court calls:  A-23-CV-858, <u>BookPeople</u> |
| 08:59:55 | 3 | <u>Inc., Et Al vs. Martha Wong, Et Al</u>, for preliminary |
| 08:59:58 | 4 | injunction hearing and motion hearing. |
| 08:59:59 | 5 | THE COURT:  Could I have announcements from the |
| 09:00:01 | 6 | counsel, please? |
| 09:00:04 | 7 | MS. PRATHER:  Your Honor, Laura Prather, |
| 09:00:07 | 8 | Catherine Robb, Michael Lambert and Reid Pillifant here on |
| 09:00:10 | 9 | behalf of the plaintiffs. |
| 09:00:10 | 10 | THE COURT:  Good morning. |
| 09:00:12 | 11 | MS. PRATHER:  Good morning. |
| 09:00:15 | 12 | MS. CELLA:  Good morning, your Honor. |
| 09:00:17 | 13 | Christina Cella and Amy Pletscher for the |
| 09:00:19 | 14 | defendants. |
| 09:00:19 | 15 | THE COURT:  Good morning. |
| 09:00:20 | 16 | So it seems to me, we have a couple of things to |
| 09:00:23 | 17 | take up in no particular order, but they're all important. |
| 09:00:29 | 18 | One of which is, I'd like to hear from both sides how |
| 09:00:33 | 19 | important it is that this issue get resolved by September |
| 09:00:38 | 20 | 2nd in that, as I understand it, the state has said |
| 09:00:45 | 21 | they're not going to start enforcing immediately on the |
| 09:00:49 | 22 | 2nd -- that's right.  There won't be enforcement until |
| 09:00:50 | 23 | like April? |
| 09:00:52 | 24 | MS. CELLA:  Your Honor, the lists are not due |
| 09:00:54 | 25 | from vendors until April 1st, 2024.  So that's -- our |

| | | |
|---|---|---|
| 09:00:57 | 1 | position is nothing would happen until that date. |
| 09:00:59 | 2 | THE COURT:  So I'd like to -- and I'm not |
| 09:01:00 | 3 | planning to wait until -- I'm not thinking April.  I'm |
| 09:01:06 | 4 | trying to figure out, number one, for y'all's purposes in |
| 09:01:08 | 5 | term of our planning on what we have to get done how hard |
| 09:01:11 | 6 | and fast September 2nd is to get the injunction done |
| 09:01:15 | 7 | because we got motions to dismiss yesterday from the |
| 09:01:22 | 8 | defendants.  I'd like -- and we'll get more of that in a |
| 09:01:25 | 9 | second but how -- I'm assuming the plaintiffs aren't ready |
| 09:01:31 | 10 | to respond to this fully today.  Is that fair? |
| 09:01:35 | 11 | MS. PRATHER:  Yes, your Honor. |
| 09:01:36 | 12 | We have not -- I mean, we got it 36 hours before |
| 09:01:37 | 13 | the hearing.  But we do believe that a ruling needs to be |
| 09:01:40 | 14 | entered by the Court on the preliminary injunction before |
| 09:01:43 | 15 | September 1st.  The law does go into effect on September |
| 09:01:47 | 16 | 1st.  The AG can't bind the state not to prosecute. |
| 09:01:53 | 17 | That's not valid.  And when we look at the plain language |
| 09:01:56 | 18 | of the bill, it specifically talks about the fact that |
| 09:02:00 | 19 | vendors can no longer sell books to libraries until they |
| 09:02:06 | 20 | are rated and that is not -- |
| 09:02:13 | 21 | THE COURT:  So -- well, that's helpful.  So then, |
| 09:02:15 | 22 | here's what we're going to have to do.  I'm going to try |
| 09:02:19 | 23 | and get as much done as I can today given that those were |
| 09:02:24 | 24 | filed yesterday.  I'd like to have the plaintiffs respond |
| 09:02:29 | 25 | to the plaintiff -- to the defendants' motions to dismiss |

09:02:32  1  by the close of business next Thursday and then, a week

09:02:37  2  from Monday, we'll probably need a second hearing.  And

09:02:42  3  so, we'll be getting back together a week from Monday to

09:02:44  4  take up the things that we may not be able to do today.

09:02:48  5  And then, I'm going to try and figure out what all we can

09:02:52  6  accomplish today, given that those motions are pending,

09:02:56  7  but we may not be able to fully resolve them.

09:02:59  8       Then I know that the plaintiffs are here and

09:03:03  9  they're seeking injunctive relief, but it seems to me that

09:03:11  10  I think if I let the plaintiff go first and hear about the

09:03:18  11  preliminary injunctive relief, I'm going to hear from the

09:03:20  12  defendants as to why, before I take up the injunctive

09:03:22  13  relief, I have to take up whether I have jurisdiction to

09:03:26  14  hear whether or not there's injunctive relief.

09:03:31  15       So my thinking is, what I think I'd like to do

09:03:34  16  today is have the defendant go ahead, if you are prepared

09:03:40  17  to, to explain the basis -- to do an argument on why the

09:03:45  18  case ought to be dismissed or under -- I think you have

09:03:51  19  12(b)(1) and 12(b)(6).  I think there's several grounds

09:03:55  20  worth.  And plaintiffs can listen and then, help inform

09:03:59  21  them as they prepare their responses, briefs that they

09:04:04  22  file.  And then, after the defendant finishes explaining

09:04:08  23  to me why I shouldn't consider the preliminary injunction,

09:04:15  24  not because of the -- I'm not interested in they don't get

09:04:20  25  a preliminary injunction because they shouldn't get a

09:04:22 1 preliminary injunction.  That we'll take that up later.

09:04:25 2          What I'd like to hear from the defendant is why I

09:04:26 3 shouldn't consider their request for relief at all because

09:04:28 4 they don't have standing or there's no jurisdiction.

09:04:31 5 Whatever those issues are to whether or not they have the

09:04:34 6 right to be here.  And then, if the plaintiff wants to say

09:04:39 7 anything today in response to that, you're welcome to.  If

09:04:42 8 you want to wait until the hearing a week from Monday, you

09:04:48 9 can.  And then, once you hear their arguments, if the

09:04:52 10 plaintiff would like to make arguments why despite what we

09:04:55 11 heard, I still ought to consider taking up the preliminary

09:04:59 12 injunction or any other relief the plaintiff wants.

09:05:02 13 Despite what I've heard, I'll take that up from the

09:05:04 14 plaintiff and then, if there's any response that you all

09:05:09 15 want to have to that, that's fine.

09:05:11 16          But it's unlikely I'm going to resolve the

09:05:15 17 preliminary injunction dispute today.  I'm planning on

09:05:19 18 taking that up a week from Monday when I have your

09:05:23 19 briefing -- when I have the plaintiffs' briefing.  And

09:05:27 20 also at that hearing a week from Monday, I'll be able to

09:05:30 21 more robustly consider the -- assuming I don't go along

09:05:36 22 with what -- assuming I think they have standing and every

09:05:40 23 right to be here, then we'll take up fully the merits of

09:05:46 24 their right to injunctive relief.

09:05:47 25          That makes the most sense to me and so, unless

09:05:51  1  there is objection from the parties, that's the way we're

09:05:53  2  going to proceed.  Yes, ma'am.

09:05:56  3       MS. PRATHER:  Your Honor, can I just get some

09:05:57  4  clarification?  So are you saying that we are able to

09:05:59  5  present our -- what is set today, which is the hearing on

09:06:03  6  the preliminary injunction?

09:06:05  7       THE COURT:  I think -- I'll see once I hear from

09:06:09  8  them.  I don't -- I have reservations about moving forward

09:06:14  9  on anything with respect to the preliminary injunction

09:06:18  10 until I've had a chance to resolve your right to be here

09:06:22  11 and that's -- and so, if you want to go ahead and do it,

09:06:27  12 you know, I've got the morning, I'm happy to hear it.  If

09:06:29  13 you want to preview for them what it is, I'm happy to hear

09:06:33  14 that, too, and I'll just consider it -- I'll just say it's

09:06:38  15 part of the hearing and that I don't know that you'll have

09:06:43  16 -- I don't know that you have standing to do it but I

09:06:45  17 don't know that they'll -- I don't know that the

09:06:47  18 defendants would object to you making -- just making

09:06:49  19 argument today.

09:06:50  20      I'm not going to rule today on the motion with --

09:06:55  21 will the defendants have objections to allowing the

09:06:58  22 plaintiff to present some of their evidence to go ahead

09:07:00  23 and get that done today?

09:07:05  24      MS. CELLA:  We don't object, your Honor.

09:07:07  25      THE COURT:  Well, then I'll hear what you say

09:07:07  1  first, and then, I'll decide whether or not it's

09:07:14  2  appropriate for them to move forward.

09:07:15  3        MS. CELLA:  Thank you, your Honor.

09:07:58  4        Okay.  Thank you, your Honor.  This case should

09:08:00  5  be dismissed because plaintiffs lack standing, defendants

09:08:02  6  are entitled to sovereign immunity, and the plaintiffs

09:08:04  7  failed to state a claim upon which relief could be

09:08:07  8  granted.

09:08:08  9        House Bill 900 will be referred to as READER.  It

09:08:11  10  stands for the Restricting Explicit and Adult-Designed

09:08:14  11  Educational Resources.  Simply put, READER is meant to

09:08:17  12  keep obscene, sexually explicit material out of public

09:08:21  13  school libraries in order to protect Texas children.  And

09:08:23  14  we stand here before you today because plaintiffs seek to

09:08:26  15  place their own interests before the safety of the Texas

09:08:28  16  children this statute seeks to protect.  It is not meant

09:08:33  17  to and does not infringe on plaintiffs' First Amendment

09:08:35  18  rights.

09:08:35  19        Plaintiffs lack standing because there is no

09:08:39  20  Article III case or controversy.  Plaintiffs would have to

09:08:43  21  suffer injury in fact.  The alleged injury would have to

09:08:47  22  be fairly traceable to the defendants.  And the alleged

09:08:49  23  injuries would have to be redressable by a favorable

09:08:51  24  decision.  None of those things are true here.  The

09:08:53  25  plaintiffs have not suffered an injury in fact.  When

| | | |
|---|---|---|
| 09:08:56 | 1 | they're seeking prospective relief and there's no imminent |
| 09:08:59 | 2 | injury, there is no injury in fact.  Anything that they |
| 09:09:03 | 3 | are claiming is harm or injury is entirely speculative. |
| 09:09:08 | 4 | As we've just discussed, lists are not due until April 1st |
| 09:09:11 | 5 | of 2024.  And we don't even know if there will be a |
| 09:09:14 | 6 | disputed rating. |
| 09:09:15 | 7 | The statute provides in relevant part that not |
| 09:09:18 | 8 | later than April 1st of 2024, library material vendors |
| 09:09:21 | 9 | have to submit their lists to TEA of any material rated |
| 09:09:27 | 10 | sexually explicit or sexually relevant.  Those lists must |
| 09:09:29 | 11 | be updated by each year by September 1st, but the first |
| 09:09:31 | 12 | one is due on April 1, 2024.  The TEA can review the |
| 09:09:35 | 13 | material rate -- the library material ratings.  They don't |
| 09:09:37 | 14 | have to.  There's nothing in the statute mandating that |
| 09:09:39 | 15 | they review every single list.  So they may, they may not. |
| 09:09:44 | 16 | Any of this is all speculative.  Vendors then |
| 09:09:47 | 17 | have 60 days to correct any ratings and then, notify TEA |
| 09:09:50 | 18 | of action taken.  If the vendor fails to correct a rating, |
| 09:09:54 | 19 | the school district won't be able to purchase books from |
| 09:09:57 | 20 | them; but they can petition TEA to take them off of that |
| 09:10:01 | 21 | list and then, begin to sell books again. |
| 09:10:06 | 22 | So any economic injury here is actually from |
| 09:10:09 | 23 | school districts, it's not from the defendants.  So |
| 09:10:15 | 24 | there's just too many things that are speculative.  Will |
| 09:10:19 | 25 | TEA review the ratings?  Will they not review the ratings? |

| | | |
|---|---|---|
| 09:10:22 | 1 | Will the plaintiffs and any vendors disagree with those |
| 09:10:26 | 2 | ratings?  This is all just speculative and we won't know |
| 09:10:29 | 3 | until after April 1st, 2024.  Any alleged injury here is |
| 09:10:34 | 4 | not fairly traceable to the defendants.  As I just alluded |
| 09:10:37 | 5 | to, any injury would come from school districts.  There's |
| 09:10:40 | 6 | no economic injury that's going to be forced by |
| 09:10:43 | 7 | defendants.  Plaintiffs -- |
| 09:10:43 | 8 | THE COURT:  Can they sue the school districts? |
| 09:10:46 | 9 | MS. CELLA:  No, your Honor, they can't. |
| 09:10:47 | 10 | THE COURT:  So you have a system where you're |
| 09:10:50 | 11 | saying there's no injury traceable to your defendants.  It |
| 09:10:55 | 12 | would only be traceable to the school districts, but they |
| 09:10:58 | 13 | can get no relief from the school districts. |
| 09:11:00 | 14 | MS. CELLA:  Well, the bill does say that, you |
| 09:11:02 | 15 | know, they -- |
| 09:11:02 | 16 | THE COURT:  That's a great -- I'd love to have a |
| 09:11:04 | 17 | situation where I could, you know, say I'm going to use my |
| 09:11:09 | 18 | friend's credit card and, you know, you can -- you can't |
| 09:11:14 | 19 | sue me for that because it's my friend's credit card. |
| 09:11:17 | 20 | But, you know, so who do they get relief from? |
| 09:11:21 | 21 | MS. CELLA:  Well, your Honor, the problem here is |
| 09:11:24 | 22 | that there may not be relief to get.  I mean -- |
| 09:11:26 | 23 | THE COURT:  Oh, no, no, that's not the problem. |
| 09:11:28 | 24 | That's if there is relief they need to get, who would they |
| 09:11:31 | 25 | get it from? |

09:11:33  1          MS. CELLA:  Well, it would have to be someone
09:11:36  2  that caused them harm, which is not the defendants.
09:11:38  3          THE COURT:  I couldn't understand you.
09:11:38  4          MS. CELLA:  It would have to be whoever caused
09:11:40  5  them harm, which here, would not be the --
09:11:41  6          THE COURT:  And you just said it would be the
09:11:43  7  school districts and they can't sue the school districts.
09:11:45  8  So how would they get relief?
09:11:47  9          MS. CELLA:  Well, your Honor, maybe the answer is
09:11:50 10  they can't.  Maybe they have to rate these books and --
09:11:53 11          THE COURT:  So your position on behalf of your
09:11:57 12  clients is that they can't.
09:11:58 13          MS. CELLA:  Well, they can't sue my clients.
09:12:00 14  They can't get relief from my clients.  Even if you said,
09:12:03 15  you know, this is totally unconstitutional and this isn't
09:12:08 16  going to happen, that still is not going to force the
09:12:12 17  school district to buy books from them.  So Katy ISD in
09:12:16 18  their example.
09:12:16 19          THE COURT:  I don't understand what you're
09:12:19 20  saying.  What you said may have made sense and I just
09:12:24 21  didn't follow.  What you're saying is, were I to go along
09:12:25 22  with the plaintiff and say that the law was uncon --
09:12:28 23  something, unconstitutional or, for some other reason,
09:12:33 24  infirm, even in that case, they couldn't get relief
09:12:36 25  against your clients.  I think -- is that what you're

| | | |
|---|---|---|
| 09:12:38 | 1 | trying to say if I'm understanding you? |
| 09:12:40 | 2 | MS. CELLA:  Well, I think we're understanding |
| 09:12:43 | 3 | each other.  What I'm trying to say is, you know, let's |
| 09:12:45 | 4 | just say this bill didn't exist. |
| 09:12:47 | 5 | THE COURT:  Okay. |
| 09:12:48 | 6 | MS. CELLA:  Which is what plaintiffs are seeking |
| 09:12:50 | 7 | to do.  So if the bill didn't exist but school districts |
| 09:12:53 | 8 | still decided not to buy books from them, from the |
| 09:12:58 | 9 | plaintiffs, the plaintiffs still aren't going to get any |
| 09:13:01 | 10 | relief.  I mean, you can't make somebody buy something |
| 09:13:03 | 11 | from you. |
| 09:13:04 | 12 | THE COURT:  Okay.  But let's go back to the real |
| 09:13:06 | 13 | world.  It does exist. |
| 09:13:07 | 14 | MS. CELLA:  Yes. |
| 09:13:08 | 15 | THE COURT:  And so, I'm still trying to find out, |
| 09:13:10 | 16 | figure out who do they get relief from if this -- if this |
| 09:13:19 | 17 | bill -- I'm not saying it is, but if it is |
| 09:13:22 | 18 | unconstitutional, for whatever reason, who do they get the |
| 09:13:26 | 19 | relief from? |
| 09:13:27 | 20 | MS. CELLA:  Well... |
| 09:13:29 | 21 | THE COURT:  And here's the problem, another |
| 09:13:31 | 22 | problem, I think, is that, for example -- I tried to do my |
| 09:13:37 | 23 | best to get ready for this, but isn't it that if the |
| 09:13:43 | 24 | publishers won't do something correctly, then isn't it -- |
| 09:13:47 | 25 | who is it that TEA -- who fixes it for them if -- there's |

09:13:52  1  something where if they don't get -- if they won't put the

09:14:00  2  appropriate -- if they put the not correct different

09:14:05  3  warning labels on, then what agency is it that fixes that

09:14:09  4  for them?

09:14:10  5          MS. CELLA:  TEA.

09:14:10  6          THE COURT:  Okay.  And there's -- and my

09:14:13  7  understanding is, there's no appeal for what the TEA

09:14:16  8  decides, right?

09:14:16  9          MS. CELLA:  I'm sorry.

09:14:17 10          THE COURT:  If the TEA says, publisher, you got

09:14:19 11  it wrong, it shouldn't have been -- I'm gonna do my best.

09:14:22 12  Is it sexually explicit versus whatever the different

09:14:26 13  categories are?  They have -- TEA has the right to say,

09:14:29 14  publisher, you got it wrong and we're going to do

09:14:31 15  something different and there's no appeal from that

09:14:33 16  either, right?

09:14:35 17          MS. CELLA:  I believe that's correct, your Honor.

09:14:37 18  I haven't thought that through, but I do believe that is

09:14:39 19  correct.  But the problem here is, they just haven't shown

09:14:41 20  any harm.  We don't know if any of this is actually going

09:14:43 21  to happen.  Nothing is imminent here.

09:14:44 22          THE COURT:  Well, let's just say I don't agree

09:14:52 23  with that.

09:14:52 24          MS. CELLA:  Okay.

09:14:53 25          THE COURT:  I mean, you may be right.  You may be

| | | |
|---|---|---|
| 09:14:55 | 1 | right that every school district doesn't -- I mean, yeah, |
| 09:14:59 | 2 | I guess that's right.  But are you saying they have no |
| 09:15:03 | 3 | legitimate fear that it might happen? |
| 09:15:05 | 4 | MS. CELLA:  I don't think so, your Honor.  They |
| 09:15:08 | 5 | are fearing too many things so I mean -- |
| 09:15:10 | 6 | THE COURT:  Let me try this. |
| 09:15:12 | 7 | MS. CELLA:  Sure. |
| 09:15:13 | 8 | THE COURT:  If you're so sanguine that it might |
| 09:15:17 | 9 | not happen, well then, why do you care if I enter an |
| 09:15:19 | 10 | injunction?  Because it wouldn't happen, anyway.  I'm not |
| 09:15:24 | 11 | enjoining anything. |
| 09:15:25 | 12 | MS. CELLA:  You wouldn't be enjoining anything as |
| 09:15:28 | 13 | far as the plaintiffs -- or, I'm sorry, as far as it just |
| 09:15:33 | 14 | depends of what you would enjoin.  But here, this bill |
| 09:15:35 | 15 | doesn't only talk about these ratings.  There's other |
| 09:15:38 | 16 | things that have to happen.  TSLAC and TEA have other |
| 09:15:40 | 17 | obligations under this.  They need to come up with |
| 09:15:42 | 18 | guidelines for certain things for school districts.  So |
| 09:15:45 | 19 | it's not only this issue if you enjoin this bill.  And |
| 09:15:48 | 20 | that would harm Texas children.  I mean, that's the entire |
| 09:15:51 | 21 | point of this bill is to -- |
| 09:15:52 | 22 | THE COURT:  What would harm Texas children? |
| 09:15:54 | 23 | MS. CELLA:  Enjoining this bill because then, TEA |
| 09:15:56 | 24 | and TSLAC would not come up with these other guidelines |
| 09:16:01 | 25 | that have nothing to do with the sexually explicit -- they |

| | | |
|---|---|---|
| 09:16:04 | 1 | still have to make other guidelines for the schools |
| 09:16:06 | 2 | related to this bill, but that's not the only thing in |
| 09:16:09 | 3 | this bill. |
| 09:16:09 | 4 | THE COURT:  Well, I can craft an injunction that |
| 09:16:13 | 5 | limits it to only these issues, can't I? |
| 09:16:16 | 6 | MS. CELLA:  Sure.  You could.  It's just to -- |
| 09:16:19 | 7 | THE COURT:  I mean, I've got kids.  I don't want |
| 09:16:21 | 8 | to hurt the kids of Texas. |
| 09:16:23 | 9 | MS. CELLA:  Right.  I mean, the problem is, |
| 09:16:25 | 10 | everything is just entirely too speculative.  They're |
| 09:16:28 | 11 | claiming injury that hasn't happened and it's not |
| 09:16:31 | 12 | imminent.  I mean, it's obviously not imminent because |
| 09:16:34 | 13 | their lists are not due trial April 1st, 2024.  That's |
| 09:16:38 | 14 | over seven months from now. |
| 09:16:40 | 15 | THE COURT:  Okay.  I get that argument.  And |
| 09:16:42 | 16 | actually, Ms. Prather, if you're prepared to respond to |
| 09:16:47 | 17 | that today, I'd like to hear that for sure.  But I was |
| 09:16:49 | 18 | really hoping you were going to tell me -- talk to me |
| 09:16:51 | 19 | about the issues of standing. |
| 09:16:53 | 20 | MS. CELLA:  Yes.  Well, I am.  The plaintiffs, |
| 09:16:58 | 21 | they'd have to suffer an injury in fact and I believe |
| 09:17:01 | 22 | that's what we were just discussing.  And then, they'd |
| 09:17:03 | 23 | have prove that any alleged injury is fairly traceable to |
| 09:17:06 | 24 | the defendants.  And the problem here is -- and maybe this |
| 09:17:10 | 25 | will clear up what we were just talking about.  The |

09:17:12   1   plaintiffs are attempting to sue the statute.  The

09:17:14   2   defendants here --

09:17:14   3          THE COURT:  I can't understand you.

09:17:17   4          MS. CELLA:  The plaintiffs are attempting to sue

09:17:18   5   the statute.  The defendants here, nothing is fair -- any

09:17:23   6   speculative injury, it's just not fairly traceable to the

09:17:26   7   defendants because the defendants have not done anything

09:17:28   8   and it's not imminent that they're going to do anything or

09:17:32   9   even -- there's been nothing, you know, that they're going

09:17:35   10  to threaten enforcement, that there's going to be

09:17:37   11  enforcement.  We don't even know if they're going to

09:17:38   12  review the lists.  They can under the statute.

09:17:40   13         THE COURT:  Well, as long as they can, why isn't

09:17:44   14  there the potential for harm to these folks?

09:17:46   15         MS. CELLA:  Eventually, there may be.  It's

09:17:48   16  just --

09:17:48   17         THE COURT:  I know -- okay.  I don't know how to

09:17:54   18  do this thing.  I hate to do this but, you know, when in

09:18:00   19  Roe v. Wade, you know, you could have said, well, maybe no

09:18:03   20  one will get pregnant and need an abortion so there's

09:18:07   21  really not any harm.  I mean, I'm not following you -- I

09:18:14   22  get that it might not happen.  I'm not following that it

09:18:19   23  won't -- that it can't happen.  I guess the difference is

09:18:22   24  between you're saying it might not happen and I'm saying

09:18:25   25  -- and they're saying but it could and I'd like you to

| | | |
|---|---|---|
| 09:18:29 | 1 | address that in terms of the standing. |
| 09:18:31 | 2 | MS. CELLA:  Yeah, I mean, it definitely could. |
| 09:18:33 | 3 | It is just entirely too speculative. |
| 09:18:35 | 4 | THE COURT:  Well, why -- I'm going to try again. |
| 09:18:41 | 5 | Why is it -- I don't understand what you mean and maybe |
| 09:18:45 | 6 | you think you're explaining it.  I don't understand why |
| 09:18:47 | 7 | you say it's too speculative.  I'm not following. |
| 09:18:51 | 8 | MS. CELLA:  We just don't know if there's going |
| 09:18:53 | 9 | to be an issue.  We don't know if they're going to |
| 09:18:54 | 10 | disagree with ratings.  We don't know that TEA is -- |
| 09:18:56 | 11 | THE COURT:  But it can, right? |
| 09:18:58 | 12 | MS. CELLA:  Sure, it could.  Sure. |
| 09:18:59 | 13 | THE COURT:  Okay.  And that's what the plaintiff |
| 09:19:01 | 14 | is unhappy about.  That's what they're worried about.  And |
| 09:19:05 | 15 | so, I was hoping -- if your only standing issue is that it |
| 09:19:14 | 16 | might not happen, then I'm probably ready to rule on that |
| 09:19:14 | 17 | today. |
| 09:19:18 | 18 | MS. CELLA:  Well, that's not the only issue, your |
| 09:19:18 | 19 | Honor. |
| 09:19:18 | 20 | THE COURT:  Well, then I'd like you to move on to |
| 09:19:20 | 21 | whatever other issues you have. |
| 09:19:21 | 22 | MS. CELLA:  Sure.  Defendants are also entitled |
| 09:19:23 | 23 | to sovereign immunity here.  So should we get to -- |
| 09:19:23 | 24 | THE COURT:  Yes. |
| 09:19:25 | 25 | MS. CELLA:  If you'd like to get to that, we |

09:19:27 1 absolutely can.  Sovereign immunity has not been expressly

09:19:32 2 waived.  <u>Ex Parte: Young</u> exception, I believe the

09:19:35 3 plaintiffs addressed this in their reply.  I haven't fully

09:19:38 4 digested their reply but it just -- it doesn't apply.

09:19:42 5 Plaintiffs can only overcome sovereign immunity when

09:19:45 6 they're seeking prospective injunctive relief based on an

09:19:48 7 alleged ongoing violation of federal law.  There is no

09:19:51 8 violation at this point.  I may have to address this in

09:19:54 9 the failure to state a claim.  But I'd like to stay on

09:19:59 10 sovereign immunity right now, if that's okay.

09:20:01 11        Defendants lack sufficient connection to the

09:20:04 12 enforcement provisions of READER and, again, we're going

09:20:07 13 to get back to --

09:20:08 14        THE COURT:  Maybe it's the sound.  I just can't

09:20:10 15 understand you.

09:20:13 16        MS. CELLA:  Sorry, your Honor.  Defendants lack

09:20:14 17 any sufficient connection to the enforcement provisions in

09:20:17 18 READER and any allegation doesn't even include any

09:20:22 19 potential enforcement.  So I think that the plaintiffs may

09:20:26 20 have claimed -- and this may be in the reply -- that the

09:20:30 21 state hasn't said it's not going to enforce it.

09:20:34 22        THE COURT:  You're moving back into -- I want you

09:20:38 23 to stick with the sovereign immunity issue as to why they

09:20:41 24 don't have the right to be here.  I mean, I understand the

09:20:45 25 Eleventh Amendment.  I think there is a sovereign -- I'm

09:20:48  1  not saying -- I think there is one but I don't -- I'm not

09:20:51  2  understanding your articulation of it.

09:20:55  3          MS. CELLA:  Yes.  Well, your Honor, I mean, the

09:20:58  4  reason that defendants are entitled to sovereign immunity

09:21:00  5  is, it hasn't been waived and there's no exception that

09:21:02  6  applies, and there has been no ongoing constitutional

09:21:05  7  violation.

09:21:08  8          THE COURT:  Okay.  Anything else on sovereign

09:21:13  9  immunity?

09:21:13  10         MS. CELLA:  Not on sovereign immunity, your

09:21:15  11  Honor.  I mean, it is fully laid out in our brief.  If

09:21:18  12  you'd like to go through that, we can, but I think that's

09:21:20  13  the main --

09:21:21  14         THE COURT:  No.  I'm giving you an opportunity --

09:21:24  15  anything you want to argue --

09:21:24  16         MS. CELLA:  Yes.  I understand.  I mean, that's

09:21:26  17  the main point.  It just hasn't been waived and there's no

09:21:28  18  exception that applies here.  At this point, I can and I'm

09:21:34  19  prepared to go over that the plaintiffs failed to state a

09:21:37  20  claim upon which relief can be granted.  I don't know if

09:21:39  21  that's something you want to do today.

09:21:41  22         THE COURT:  I'd like to hear everything today.  I

09:21:42  23  want to give the plaintiffs as much opportunity to hear

09:21:45  24  what your arguments are so they can respond to them

09:21:48  25  fulsomely in their briefs and then, we can be efficient on

09:21:51  1   Monday, a week.

09:21:51  2        MS. CELLA:  Yes.  Sure, your Honor.  And these

09:21:53  3   are -- these are most of the same arguments that are

09:21:59  4   involved with the preliminary injunction.  So I believe

09:22:01  5   plaintiffs have responded as far as their injunction, but

09:22:05  6   we'll go through them and we'll start there.

09:22:08  7        The plaintiffs just don't have a First Amendment

09:22:11  8   right in this forum.  So this bill concerns government

09:22:14  9   speech.  It doesn't concern plaintiff speech because it's

09:22:18  10  discussing and it's talking about school libraries.  It's

09:22:22  11  not talking about plaintiff, you know, rating their books

09:22:25  12  for any other purpose other than school libraries.  So

09:22:28  13  that's government speech and government speech is not

09:22:32  14  barred by the free speech laws.

09:22:33  15        THE COURT:  I'm not following you why it's

09:22:36  16  government speech.

09:22:38  17        MS. CELLA:  Well, it's government speech because

09:22:39  18  Texas state entities have wide authority over educational

09:22:43  19  policies and the Supreme Court has told us that education

09:22:48  20  of children is primary responsibility of parents,

09:22:51  21  teachers.

09:22:51  22        THE COURT:  So let me see if -- I'm going to say

09:22:53  23  this and you tell me if I'm following you.  That because

09:22:57  24  these books are destined for schools, then the regulation

09:23:05  25  -- the regulations that are imposed by the law that set

09:23:09  1  out different levels of sexual explicitness, that's a

09:23:20  2  government -- that's a government act and so, it becomes

09:23:23  3  government-controlled speech?

09:23:24  4          MS. CELLA:  Yes, it's government-controlled

09:23:27  5  speech.  Yes, it's government speech.  It's not the

09:23:31  6  plaintiffs' speech.  So the plaintiffs are claiming and

09:23:34  7  indicating that there are -- one of their fears is that

09:23:37  8  these ratings, people are going to think that it's their

09:23:40  9  speech but it's not.

09:23:41  10          THE COURT:  I think I may be following you now.

09:23:45  11  That you are rejecting the idea that -- well, but I follow

09:23:53  12  you that it's the government that's doing it, but really

09:23:56  13  at the first cut, you're requiring them to make the

09:23:59  14  decision.

09:24:00  15          MS. CELLA:  That's correct.  Their lists are due.

09:24:03  16          THE COURT:  So how is it government speech when

09:24:07  17  you're requiring them, the plaintiffs, to make the

09:24:12  18  decision themselves without advice by the government as to

09:24:16  19  how to do it?

09:24:17  20          MS. CELLA:  Well, there is oversight by the TEA.

09:24:19  21  They are the ones that can review these lists.

09:24:20  22          THE COURT:  Oh, they can review -- no.  I get it.

09:24:22  23  They can review them.  But what I'm saying is, how is it

09:24:26  24  not putting the weight on, you know, when I -- you know, I

09:24:35  25  want to put Of Mice And Men in the library and, you know,

09:24:42  1  there's a scene, you know, where it involves -- with

09:24:46  2  Lennie that involves rape.  How do I -- I'm the publisher,

09:24:49  3  how do I rate that?  Where does that fall in this group?

09:24:53  4          MS. CELLA:  Well, again, that would be a call.

09:24:55  5          THE COURT:  Made by who?

09:24:57  6          MS. CELLA:  At first, the vendor but TEA --

09:24:59  7          THE COURT:  Okay.  So --

09:24:59  8          MS. CELLA:  -- the state.

09:25:01  9          THE COURT:  -- made by the vendor and that's one

09:25:02  10  of their concerns, right?

09:25:03  11          MS. CELLA:  But the state has final say and have

09:25:06  12  oversight on that so it's not their speech.

09:25:08  13          THE COURT:  Okay.

09:25:09  14          MS. CELLA:  It's the state speaking.

09:25:11  15          THE COURT:  But they're making the initial

09:25:13  16  decision.

09:25:14  17          MS. CELLA:  Correct.

09:25:14  18          THE COURT:  You are requiring them to make the

09:25:16  19  initial decision.

09:25:17  20          MS. CELLA:  Correct.  And in that case, your

09:25:20  21  Honor, they may rate that book as no rating and if the TEA

09:25:23  22  does not agree with that, they may change that if they

09:25:27  23  think it's incorrect and that is the state speaking.  So

09:25:30  24  the state has final say.  They have oversight over these

09:25:33  25  ratings.

09:25:34  1        THE COURT:  And the state has the right to do

09:25:35  2   this because the books are ultimately going to be in

09:25:39  3   school libraries.

09:25:40  4        MS. CELLA:  Yes, your Honor, public school

09:25:42  5   libraries, specifically.  And on that same line of

09:25:49  6   thinking, a school library is not a public forum, it's a

09:25:52  7   nonpublic forum.  If as long as the school facility or the

09:25:58  8   school has been reserved for its intended function, it's

09:26:02  9   not opened up by the school board for anybody to come in

09:26:05  10  for whatever reason.  If it's -- if it is a -- reserved

09:26:09  11  for its intended purpose, there's no public forum.  It's a

09:26:13  12  nonpublic forum.

09:26:14  13       THE COURT:  I understand that.

09:26:15  14       MS. CELLA:  And since Texas schools are nonpublic

09:26:18  15  forums, reasonable restrictions can be imposed.  And it is

09:26:23  16  reasonable to restrict obscene, sexually explicit material

09:26:27  17  from being in schools, in public schools that, you know,

09:26:30  18  Texas children are there so this reasonable restriction --

09:26:34  19       THE COURT:  Well, let's say for the moment I

09:26:36  20  agree with you on that.  This isn't binary between obscene

09:26:45  21  and non-obscene.  There are different levels, right?

09:26:50  22       MS. CELLA:  Yes, your Honor.

09:26:51  23       THE COURT:  And so, you're requiring -- if I

09:26:56  24  understand it, this is the question.  This isn't a

09:26:59  25  declared statement.  This is as I recall reading through

09:27:02  1  my brief -- the stuff I got on the briefing, there's --

09:27:07  2  this is my language that I'm not sure it's not exact.  But

09:27:10  3  there are books, A Farewell To Arms probably gets a no

09:27:17  4  rating, right?

09:27:19  5       MS. CELLA:  Without knowing, I would guess.

09:27:20  6       THE COURT:  No.  I'm saying there's a category

09:27:22  7  that's no --

09:27:22  8       MS. CELLA:  Yes.

09:27:23  9       THE COURT:  Category of no rating.  And then, you

09:27:26  10 have books that are in the middle that have some sexual

09:27:34  11 content, and then, there are books that are obscene,

09:27:37  12 right?  There are three, right?

09:27:38  13      MS. CELLA:  Yes.  Correct.

09:27:39  14      THE COURT:  Now, let's say for a second that I

09:27:44  15 agree with you that if something is determined to be

09:27:47  16 obscene -- let's go full on and say that, for some reason,

09:27:53  17 they want to put something that has child pornography in

09:27:56  18 it.  Just so we have something I think -- I hope even

09:28:03  19 plaintiffs would agree would qualify as obscene since I

09:28:05  20 actually sentence people for having it.  So that would

09:28:08  21 have to be obscene if it's illegal so let's say that.  I

09:28:13  22 get the argument -- it's a pretty easy argument, I think,

09:28:17  23 to keep things that are obscene out of public school

09:28:21  24 libraries.

09:28:22  25      But what is the justification for the middle

09:28:27  1  category?

09:28:27  2          MS. CELLA:  Well, it's a reasonable restriction

09:28:30  3  and because it's a nonpublic forum, it's reasonable to

09:28:33  4  keep things that are sexually relevant but not maybe in

09:28:37  5  the obscene category into the hands of consenting parents.

09:28:41  6  So anyone can check that out of the library, a sexually

09:28:46  7  relevant book or material, as long as the parent says

09:28:50  8  that's okay and gives their consent.

09:28:54  9          The Fifth Circuit has said that reasonable

09:28:58  10  restric -- or, I'm sorry, the Supreme Court has said that

09:29:03  11  education is the primary responsibility of one of them,

09:29:06  12  parents.

09:29:07  13          THE COURT:  As a parent, I'm kinda sympathetic to

09:29:11  14  that, too, but let me say this.  And Ms. Prather or

09:29:20  15  whoever on her team can correct me if I'm wrong.

09:29:22  16          But if the TEA has this interest that you -- that

09:29:30  17  the majority of the legislature found to be appropriate,

09:29:36  18  why doesn't the TEA do it?  I mean, if they want to go

09:29:42  19  through and say we're going to give the Lonesome Dove, you

09:29:48  20  know, because it has prostitutes in it, we're going to

09:29:54  21  give it the medium one and we're going to -- whatever,

09:29:54  22  child pornography, we're going to go through.  Why isn't

09:29:57  23  that the job of the TEA and not of the book -- why does

09:30:03  24  the state get to require the publishers of books to make

09:30:09  25  these decisions?

09:30:11  1          MS. CELLA:  Sure.  So as you're aware, when the

09:30:13  2      legislature wants to do something, they will, but this is

09:30:15  3      a business --

09:30:15  4          THE COURT:  That's why we have federal courts.

09:30:20  5          MS. CELLA:  Yes, but this is a business

09:30:21  6      transaction.  So if plaintiffs are seeking to sell books

09:30:24  7      in public schools and public schools have the right to

09:30:28  8      reasonably restrict material that's in there, if they want

09:30:31  9      to conduct that business transaction, this is what the

09:30:35  10     legislature has decided needs to be done.

09:30:37  11         Now, yes, TEA has oversight over that and it's

09:30:41  12     not -- it's not plaintiffs speaking.  So a reasonable

09:30:45  13     restriction -- and that's not just on obscene material.

09:30:48  14     It's reasonable restrictions on education.  But in this

09:30:53  15     context, obviously we're talking about sexually explicit

09:30:56  16     and sexually relevant library material.  But this is a

09:31:00  17     business transaction is all it is.  If the plaintiffs --

09:31:03  18         THE COURT:  What I'm trying to get -- okay.  I

09:31:06  19     was trying to avoid having to do this but let me -- I'm

09:31:11  20     trying to stay away from just the one -- because what I

09:31:22  21     really am most interested in hearing you talk about -- and

09:31:24  22     Ms. Prather may tell me I'm wrong.  She may care about

09:31:26  23     both.  But I think in terms of them having to decide what

09:31:28  24     is what, I'm sure she will.

09:31:29  25         But what I'm trying to figure out is, it seems to

09:31:34  1   me there may be a wide group of people who agree at some

09:31:40  2   level that sexually explicit material shouldn't be in

09:31:43  3   public schools and who has to make that decision.  We can

09:31:47  4   fuss over TEA versus them, the publishers or whoever.  But

09:31:54  5   what I'm trying to figure out is how the legislature can

09:32:00  6   require publishers to determine what is sexually relevant

09:32:08  7   that -- the middle category.  And I get that the state has

09:32:14  8   the power to control what books go into public school

09:32:23  9   libraries.  I get that.  But how do they get to tell

09:32:26  10  publishers that they have to come up with a decision for

09:32:30  11  all books as to whether they are sexually relevant?

09:32:36  12        MS. CELLA:  Sure.  Well, again, because the

09:32:39  13  publishers and the plaintiffs, they want to sell books in

09:32:43  14  public schools.  So if they are seeking to conduct that

09:32:47  15  business with the state, the public schools, then this is

09:32:52  16  one of the requirements and, you know, it's a partnership

09:32:56  17  with TEA.  TEA has final say over the document -- I'm

09:33:01  18  sorry, over the ratings.

09:33:04  19        So in order for this partnership to work, the

09:33:07  20  publishers will have to rate books that they seek to sell.

09:33:10  21  TEA isn't seeking -- or, you know, the public schools

09:33:12  22  aren't seeking to sell anything, they just want to buy

09:33:16  23  something.  So this is just -- this is strictly a business

09:33:19  24  transaction.  We see this in contracts all the time.  If

09:33:22  25  people want to contract with the state, there's certain

09:33:25  1  requirements they have to meet.

09:33:26  2          THE COURT:  You're saying -- but that's a truism.

09:33:30  3  I mean, yes, that's true.  That's true -- that's just

09:33:33  4  true.  I'm trying to figure out -- so are you familiar

09:33:36  5  with -- my favorite painter is Carpaccio.  Let's say they

09:33:44  6  want to have a book of Carpaccio whose -- everyone would

09:33:49  7  agree, he had some nudes in them.  Who gets to determine

09:33:54  8  -- is that -- how does the state have the power to tell

09:34:00  9  the publisher they have to decide whether a book with

09:34:03  10  Carpaccio paintings is sexually relevant or not?  That's

09:34:08  11  what I'm trying to figure out.  How do they have the power

09:34:10  12  to force commercial entities to make that decision?

09:34:16  13          MS. CELLA:  Because, your Honor, they're seeking

09:34:18  14  to sell that material, in this case, the book of

09:34:22  15  paintings --

09:34:22  16          THE COURT:  No.  I get they have the power.

09:34:25  17  Sure.  They could tell -- what I'm saying, how do they get

09:34:28  18  to regulate on this issue?  I mean, Michelangelo, I mean,

09:34:35  19  what -- I'm the lawyer for the book publisher, what do I

09:34:40  20  do with David?  What do I do with the painting of David?

09:34:44  21  How does the publisher decide what's sexually relevant?

09:34:51  22          MS. CELLA:  Well, it follows the statute, the

09:34:52  23  statute has guidelines for that.  It references the penal

09:34:55  24  code.  There's other guidelines for that.  So I mean, the

09:35:00  25  statute is not vague in that way.  Of course, it's not 100

09:35:04  1  percent perfect all the time.

09:35:05  2          THE COURT:  No, no, no.  I have it, 43.25, sexual

09:35:11  3  conduct, which is what is for sexually relevant, includes

09:35:15  4  or any portion of the female breast below the top of the

09:35:19  5  areola.  I hope I didn't offend anyone there.  But you

09:35:23  6  just included Michelangelo and Carpaccio.

09:35:27  7          MS. CELLA:  Well, your Honor.

09:35:29  8          THE COURT:  And you've required book publishers

09:35:32  9  to make that decision.

09:35:34  10         MS. CELLA:  Initially, but again, TEA has

09:35:37  11 oversight of that.  So, you know, maybe they pick up the

09:35:39  12 phone and call someone at TEA and say, hey, we're not sure

09:35:42  13 what to do with this.  Or maybe they just don't rate it.

09:35:44  14 They give it no rating and then, TEA will review that.

09:35:49  15         THE COURT:  Okay.

09:35:54  16         MS. CELLA:  So in this way, there's just -- the

09:35:56  17 plaintiffs just -- there is no First Amendment right

09:36:01  18 because it's public school libraries and everything we

09:36:04  19 just talked about.

09:36:05  20         THE COURT:  I think I heard you just say -- I

09:36:08  21 don't want to put words in your mouth -- that there are no

09:36:14  22 First Amendment rights in public school libraries?

09:36:17  23         MS. CELLA:  For the vendors.  I'm not talking

09:36:21  24 about any third-party students that may not be a part of

09:36:24  25 this lawsuit.  But the vendors do not have a First

09:36:27  1  Amendment right in the public school library.

09:36:29  2          THE COURT:  Okay.  That's a pretty bright line.

09:36:33  3  I hope the other side's taking notes and you may be right.

09:36:36  4  I don't have any special expertise in this area or any

09:36:40  5  area as it turns out.

09:36:43  6          MS. CELLA:  I don't think that's true, your

09:36:44  7  Honor.  I think a lot of patent litigators would disagree

09:36:48  8  with you.

09:36:49  9          THE COURT:  And I think most of them, actually,

09:36:49  10  the ones that lose, I think, would be the ones who would

09:36:52  11  agree the most.

09:36:55  12          MS. CELLA:  But -- and again, even if the First

09:36:58  13  Amendment did apply -- we've discussed it doesn't, but if

09:37:02  14  it did, let's just say it did, intermediate scrutiny, not

09:37:05  15  strict scrutiny as the plaintiffs have mentioned, would

09:37:07  16  apply because this is commercial speech, which we've

09:37:11  17  already talked about.

09:37:12  18          THE COURT:  I don't actually -- if you did, I

09:37:15  19  missed it.  You might want to spend another minute or two

09:37:18  20  on the fact that this is commercial speech.

09:37:21  21          MS. CELLA:  Sure.

09:37:22  22          THE COURT:  And which is a little switch -- I

09:37:25  23  mean, I get that you're saying the government controls it

09:37:26  24  but I do think -- I would be interested in hearing your

09:37:30  25  thoughts about the fact that this is sale by businesses of

09:37:36  1  books and you're not restricting their sale of the books.

09:37:41  2  You are restricting them to rate the books and then, the

09:37:45  3  school -- I think you would say the schools can do with

09:37:47  4  them what they will.  They can't take them if they're

09:37:51  5  sexually explicit, which I'm, again, carving out and we'll

09:37:54  6  take up a little bit later.

09:37:56  7       But I think I hear your argument that the law

09:38:04  8  doesn't really prevent the sale of them.  It requires them

09:38:07  9  just to be rated and then, the schools do with them what

09:38:10 10  the schools decide to do with them.  I think that's your

09:38:12 11  argument, right?

09:38:14 12       MS. CELLA:  Yes, your Honor.  As far as the

09:38:16 13  sexually relevant and the not-rated books.  Even if a

09:38:18 14  book's not rated, a school wouldn't have to buy it.  You

09:38:20 15  can't just force them to buy some book based on a rating.

09:38:25 16       THE COURT:  Right.  And that's your argument is

09:38:27 17  that because it's commercial free speech, that's

09:38:32 18  important, too.

09:38:33 19       MS. CELLA:  Yes, your Honor, because commercial

09:38:35 20  speech in Houston Balloons & Promotions vs. City of

09:38:40 21  Houston tells us that speech is no more than a commercial

09:38:44 22  transaction.  And the plaintiffs allege this is compelled

09:38:48 23  speech related solely to their economic interests and

09:38:52 24  their audience by describing goods.  Well, they're trying

09:38:56 25  to sell goods, I mean, this is strictly a commercial

09:38:58  1   transaction and --

09:39:00  2           THE COURT:  Understood.

09:39:02  3           MS. CELLA:  -- the relevant question with the

09:39:05  4   commercial transaction is, does requiring plaintiffs to

09:39:08  5   rate books they seek to sell in Texas public schools

09:39:11  6   directly advance the governmental interests of regulating

09:39:15  7   the information to which Texas students are subject?

09:39:18  8   Without a doubt, the answer to that is yes.  So because

09:39:23  9   this is commercial speech, even if the First Amendment

09:39:25  10  does apply, the test is intermediate scrutiny, not strict

09:39:29  11  scrutiny.

09:39:31  12          We have some other arguments in our brief, your

09:39:33  13  Honor.  I believe you've read them.  I don't know that we

09:39:37  14  need to go through them here unless you want to.  But --

09:39:40  15          THE COURT:  I'd like you to -- you know, we've

09:39:43  16  got the morning.  I'd like to hear any arguments you care

09:39:46  17  to make now.  We're not -- it's up to you.

09:39:50  18          MS. CELLA:  Sure, your Honor.  So I will just

09:39:51  19  talk about the vagueness and the overbreadth arguments

09:39:56  20  very briefly.  And unconstitutional -- this is not

09:40:01  21  unconstitutionally vague.  Perfect clarity is not

09:40:04  22  required.  It just has to be --

09:40:05  23          THE COURT:  I couldn't understand.

09:40:06  24          MS. CELLA:  Sorry, your Honor.  Perfect clarity

09:40:08  25  is not required for a statute.  It just needs to have some

09:40:12  1  degree of certainty and here, the statute goes through how

09:40:15  2  to rate these books.  It references the penal code.  So

09:40:19  3  it's not like it just says rate these and good luck.

09:40:23  4  There's also oversight by TEA as we discussed.

09:40:28  5        THE COURT:  Well, and I'll try one more time.

09:40:34  6  There certainly is -- this is my word, note yours.

09:40:37  7  There's the backstop of the TEA for if in their sole

09:40:50  8  discretion, they decide that something's been mislabeled,

09:40:52  9  that they can change it.  I'm reluctant to say fix it but

09:40:57  10 they can change it.

09:40:57  11       But the -- again, I don't understand your

09:41:00  12 argument that the original -- that the burden is on the

09:41:13  13 publishers to do this and dare I say -- and I don't know

09:41:16  14 how active parents are.  I'm not really sure -- I'm not

09:41:23  15 really sure who would be motivated to raise the issue of

09:41:28  16 the correctness of the -- you know, if a book -- you know,

09:41:37  17 if X book comes in and is rated as sexually explicit, I'm

09:41:42  18 not sure who's motivated to ask the TEA to re-rate it.

09:41:46  19       Let me ask you this.  Is there any self-actuating

09:41:52  20 where the TEA -- is there someone at the TEA under the

09:41:55  21 statute who is tasked with making sure they get it right?

09:42:00  22 I mean, how does it work that they would come and change

09:42:05  23 the rating?  Why would the TEA take Lonesome Dove that's

09:42:10  24 been rated as -- with no rating and change it to sexually

09:42:16  25 explicit, or vice versa?  What would cause that to happen?

| | | |
|---|---|---|
| 09:42:19 | 1 | I understand it can happen but what would motivate that to |
| 09:42:23 | 2 | happen? |
| 09:42:24 | 3 | MS. CELLA:  You know, your Honor, we haven't -- I |
| 09:42:27 | 4 | haven't thought that through yet.  I think this is still |
| 09:42:29 | 5 | being worked out because this is a new -- |
| 09:42:31 | 6 | THE COURT:  That just occurred to me, too. |
| 09:42:32 | 7 | MS. CELLA:  This is a new bill.  But, you know, |
| 09:42:34 | 8 | it may be the case they don't review it or if something's |
| 09:42:39 | 9 | a glaring -- I mean, like you said, if it's something |
| 09:42:42 | 10 | that's clearly child pornography and it's not rated. |
| 09:42:44 | 11 | THE COURT:  No, no.  I'm leaving out -- I'll go |
| 09:42:50 | 12 | on the record if anyone's recording this, I'm against |
| 09:42:53 | 13 | child pornography and so -- and I don't think the |
| 09:42:58 | 14 | publisher can offer any defense that publishers ought to |
| 09:43:02 | 15 | be able to -- I don't think that's even something to -- |
| 09:43:05 | 16 | but I just use that to do an easy of what should be kept |
| 09:43:08 | 17 | out. |
| 09:43:09 | 18 | But let me ask you this.  In that it's unclear |
| 09:43:13 | 19 | what would cause the TEA to evaluate or reevaluate or |
| 09:43:19 | 20 | change what the status is, is that something that cuts in |
| 09:43:23 | 21 | your favor that means that the plaintiffs don't have any |
| 09:43:29 | 22 | harm, or is that something that cuts in their favor that |
| 09:43:33 | 23 | says that the statute is vague? |
| 09:43:35 | 24 | MS. CELLA:  Sure.  Well, the first thing I want |
| 09:43:37 | 25 | to say is, I am also against child pornography as I'm sure |

09:43:40  1   the plaintiffs are.  I was just using your example if they

09:43:43  2   rated that as no rating and it's clearly that should be

09:43:47  3   changed, it may cause them --

09:43:47  4          THE COURT:  And my guess is -- my guess is

09:43:50  5   there's nothing that a legitimate book publisher is

09:43:53  6   putting out.

09:43:54  7          MS. CELLA:  Sure.

09:43:55  8          THE COURT:  Or that these plaintiffs are carrying

09:43:57  9   that would be considered in that area.

09:43:59  10          MS. CELLA:  Yes, I would agree with that, your

09:44:01  11   Honor.  But as far as what would cause TEA to rate it and

09:44:05  12   that being vague, I don't think that's vague.  State

09:44:08  13   agencies can come up with their own internal workings.  So

09:44:17  14   the way that they would decide what lists to look at or

09:44:20  15   not look at or maybe what books specifically to look at or

09:44:22  16   not look at, if that has been worked out, I have not

09:44:24  17   discussed that with my client at this point at the

09:44:29  18   preliminary injunction stage or the motion to dismiss

09:44:30  19   stage.  So I can't give you a definite answer.

09:44:33  20          I could certainly get with them and see if

09:44:34  21   they've come up with anything, but at this point, I don't

09:44:37  22   have a definite answer.  But I don't think that cuts

09:44:41  23   against the state just because they haven't written it in

09:44:44  24   the statute of how they're going to determine what lists

09:44:47  25   to look at or if they're going to look at them.  That

09:44:50  1  doesn't make the statute vague.  That's just a internal

09:44:53  2  working of a state agency.

09:45:00  3        And unless your Honor has any other questions

09:45:02  4  just for all the reasons we discussed and that are more

09:45:04  5  fully briefed in our motion to dismiss, we do ask this

09:45:07  6  court to dismiss plaintiffs' claims for lack of standing,

09:45:10  7  lack of jurisdiction, and failure to state a claim upon

09:45:14  8  which relief could be granted.  Thank you, your Honor.

09:45:21  9        THE COURT:  What I'm going to hear at least at

09:45:23  10  first from the plaintiff, if the plaintiff would like to

09:45:25  11  respond to anything they've heard, you're more than

09:45:29  12  welcome to.  And then, if there's any argument that the

09:45:31  13  plaintiff wants to make as to any harm that might come to

09:45:35  14  them in the interim between now and when I can have the

09:45:38  15  next hearing and why should move forward today, I'm happy

09:45:41  16  to hear that, as well.  I want to make sure that the

09:45:44  17  rights of the plaintiff are protected, as well.

09:45:46  18        The hearing was set today only because of my

09:45:52  19  trial docket and this was the date we had available.  It

09:45:57  20  didn't really work the best for when everything could be

09:46:00  21  briefed.  So I'm trying to give everyone a fair chance and

09:46:03  22  I now have an opening next week, which is why I want to

09:46:09  23  give everyone as much chance to brief and get ready as

09:46:12  24  long as your -- the plaintiffs' rights are protected, as

09:46:14  25  long as we have a hearing today and Monday and we'll get

09:46:19  1    something done by September 1st.  But you're welcome to
09:46:23  2    say whatever you care to today that you think I need to
09:47:41  3    hear.
09:47:41  4          MS. PRATHER:  Thank you, your Honor.
09:47:41  5          Your Honor, we're caught flatfooted this morning
09:47:45  6    because we're responding to papers we got about 36 hours
09:47:48  7    ago, but I'll do the best that I can and we'll certainly
09:47:51  8    supplement with followup briefing.
09:47:53  9          THE COURT:  Let me just say this also.  Obviously
09:47:58  10   they're going to listen to what you say.  I mean, but if
09:48:01  11   there's something -- I'm going to give you an opportunity
09:48:04  12   when she finishes to respond to anything she says here
09:48:07  13   today, as well.  Yes, ma'am.
09:48:10  14         MS. PRATHER:  Your Honor, we represent a
09:48:13  15   coalition of book sellers, book publishers and authors
09:48:15  16   that sell books to Texas public schools, and the case here
09:48:19  17   today is about whether the state can require ratings of
09:48:23  18   books and adoption of those state ratings by the vendors.
09:48:28  19   I know we've been talking about publishers, but this is
09:48:32  20   also just the middleman, the bookstores.  Not even the
09:48:35  21   people that produce the content.  What the case is not
09:48:40  22   about is whether the books are excluded from school
09:48:43  23   libraries.  This isn't about student speech.  This is
09:48:48  24   about vendors being required to rate books and being
09:48:50  25   compelled to put the state's ratings on the books if they

09:48:54  1  disagree with the ratings that the vendor gave them.

09:48:58  2       So we are here challenging the constitutionality

09:49:01  3  of H.B. 900.  And with regard to the reason why we need to

09:49:08  4  be here today and we need relief by September 1st, the

09:49:13  5  language in the statute is very clear.  Under 35.002(a) --

09:49:24  6  and, your Honor, in your notebook, we've put a copy of the

09:49:27  7  bill in there.  It is behind the third tab and you can go

09:49:33  8  to 35.002(a) and see that it requires a library material

09:49:38  9  vendor -- it says very clearly, a library material vendor

09:49:43  10  may not sell library materials to a school district unless

09:49:50  11  the vendor has issued appropriate ratings regarding the

09:49:56  12  sexually explicit material and sexually relevant material

09:50:00  13  previously sold to a district or school.

09:50:06  14       And so, right now, our clients are having to do

09:50:09  15  those ratings because as of September 1st, when this bill

09:50:14  16  goes into effect, according to Section 7 of the bill,

09:50:19  17  their sales will be cut off if they haven't provided the

09:50:22  18  ratings of the previous sales that they have done.

09:50:28  19  Section 6 of the bill also makes it clear that the act

09:50:33  20  applies beginning with the 2023 and 2024 school year,

09:50:38  21  which has already started.  My kids are already in school.

09:50:42  22       So even though the ratings are not, quote,

09:50:45  23  unquote, due until April 1st under 35.002(c), which is

09:50:51  24  what the government keeps referring to, they're ignoring

09:50:55  25  35.002(a), which cuts off all sales starting September 1st

09:51:02  1   if those ratings aren't in.  It's kind of like discovery

09:51:06  2   in a lawsuit.  You have the discovery deadline, but it

09:51:10  3   doesn't mean you aren't supposed to be doing the discovery

09:51:13  4   the whole time before the deadline approaches and that's

09:51:18  5   what we have here.

09:51:19  6           These vendors are having to do these ratings

09:51:23  7   right now.  And the problem with the ability to do the

09:51:26  8   ratings right now is, the law is unconstitutionally vague,

09:51:33  9   overbroad, they can't figure out how to do the ratings.

09:51:36  10  It's also simply cost prohibitive.  We have testimony that

09:51:42  11  was provided during the Senate hearings talking about just

09:51:48  12  in six school districts alone, there were more than six

09:51:53  13  million items in their library.  There are 1,200 school

09:51:57  14  districts in the state of Texas.  That's an unfathomable

09:52:01  15  amount of retroactive ratings that will need to be done

09:52:05  16  before these book sellers can sell anything.

09:52:08  17          We also have Senate committee hearing testimony

09:52:11  18  based on a TPIA request, which is linked to in our reply,

09:52:18  19  where they asked Spring Branch ISD how much it cost to

09:52:22  20  review just one book, and it took 220 staff hours and cost

09:52:29  21  the district $30,000 just to review that one book.  So

09:52:35  22  when you look at the declarations, and they are behind the

09:52:42  23  fifth tab in your notebook, there is significant testimony

09:52:46  24  about the cost, about the uncertainty, and about the

09:52:50  25  inability to do what is being asked of them under the

```
09:52:54   1   statute.
09:52:55   2            And I know the plaintiff -- I'm sorry, the
09:52:59   3   defendants have talked here about a lack of standing.
09:53:04   4   They say that the injury is not traceable to the
09:53:07   5   defendants.  But standing rules in First Amendment cases,
09:53:13   6   because of the importance of the constitutional issues and
09:53:15   7   the potential chilling effect, are actually slightly
09:53:20   8   different.
09:53:21   9            In a First Amendment case, an actual and
09:53:25  10   well-founded fear that the law will be enforced against
09:53:30  11   the plaintiffs suffices.  And that's the Virginia II case,
09:53:35  12   which is in your notebook, we put twelve cases, kind of
09:53:37  13   the twelve most significant cases we think for the Court
09:53:40  14   to review.  And it's under tab No. 12 in that notebook.
09:53:46  15   Also, the Susan B. Anthony case discusses the fact that
09:53:51  16   prior enforcement of a law is not required to establish
09:53:56  17   standing in a First Amendment case.
09:54:01  18            Your Honor asked the question of who do they get
09:54:03  19   relief from?  Who do these vendors get relief from under
09:54:06  20   this law?  And I'd refer you back to the bill itself
09:54:13  21   again.  If you look at the bill under 35.004, the answer
09:54:22  22   is, they don't get relief.  There's no avenue for relief.
09:54:25  23   There's no judicial recourse, which is another reason this
09:54:29  24   is unconstitutional.  It basically absolves the school
09:54:36  25   districts, librarians, the employees of any liability to
```

09:54:41  1  the vendors.  So the answer is to your question, who do

09:54:46  2  they get relief from, no one.

09:54:49  3      The harm here is that they actually start

09:54:55  4  reviewing of these books now, which is a costly and

09:54:58  5  essentially impossible process.  The harm is also that

09:55:03  6  they can't sell books until they are rated and the harm is

09:55:08  7  that they have to agree with the state ratings.  The other

09:55:13  8  thing that's been --

09:55:15  9      THE COURT:  Well, I'm not sure why -- setting

09:55:19  10 aside everything else, assuming everything else is okay,

09:55:20  11 why it's a harm that they have to accept the state

09:55:26  12 ratings.

09:55:27  13     MS. PRATHER:  Well, for one thing, your Honor,

09:55:29  14 it's compelled speech.  If they disagree with those

09:55:31  15 ratings under 303 Creative, which was handed down June

09:55:35  16 30th by the U.S. Supreme Court, the government can't force

09:55:40  17 a private party to convey speech that they disagree with.

09:55:45  18     THE COURT:  I'm not following that.  I understand

09:55:49  19 what you're saying.  But they're not -- I have a big

09:55:57  20 problem with them making y'all determine whether it's not

09:56:02  21 sexually explicit or is sexually explicit or is whatever

09:56:05  22 is next.  And the remedy I hear from the other side, in

09:56:09  23 part, is, well, they're not -- they're doing the first cut

09:56:14  24 and I get why and all the problems you have with that.

09:56:15  25 But ultimately, it's the TEA because we get to come in and

09:56:21 1  we're the ultimate ombudsmen and get to say, you were

09:56:23 2  wrong, Lonesome Dove isn't X, it's Y.  And that's -- but

09:56:29 3  at that point, it's no longer -- and help me why I'm

09:56:34 4  wrong.  At that point, it's no longer your speech.  It's

09:56:40 5  -- I'm not sure it's speech at all.  I mean, we could

09:56:42 6  fight -- we'll fight over that.  I'm sure you all will

09:56:44 7  fight over that.  I get it's a ranking.  But I'm not sure

09:56:48 8  how that at the point where the TEA comes in and they

09:56:52 9  modify it and it's now X -- Y instead of X, why that's

09:56:59 10  your compelled speech.

09:57:02 11        MS. PRATHER:  I can help you with that, your

09:57:04 12  Honor.  So if you go to the statute and you go to the

09:57:07 13  Section 35.003, that's where it talks about the agency

09:57:16 14  requiring the library materials to be rated, but then, it

09:57:20 15  also says if the agency determines that the material that

09:57:24 16  has been rated is not consistent with what they believe

09:57:29 17  the ratings should be, then the agency shall provide

09:57:34 18  written notice to the vendor of this corrected rating,

09:57:39 19  okay?

09:57:40 20        Then under the next section, it says no later

09:57:44 21  than the 60th day after the rating on which the library

09:57:48 22  material vendor receives this notice of the, quote,

09:57:51 23  unquote, corrected rating, the vendor shall rate the

09:57:57 24  library material according to the agency's corrected

09:58:01 25  rating.  It requires the vendor to change their rating to

09:58:08  1   what the state believes it should be.  And then, that

09:58:13  2   rating under 35.002(e) is posted on a website in a

09:58:23  3   conspicuous manner, well beyond the confines of Texas for

09:58:29  4   all the world to see that this vendor has rated the book

09:58:35  5   as whatever TEA told them to, right?

09:58:39  6              So they are compelling the vendor to apply their

09:58:46  7   corrected rating and if they don't under 35.003(c), two

09:58:53  8   things happen.  One, they're publicly shamed.  They're put

09:58:58  9   on a list on TEA's website as a vendor who has failed to

09:59:02  10  comply with the law.  So they're publicly shamed.  And,

09:59:07  11  two, under the next subsection (d), school districts are

09:59:12  12  prohibited from purchasing books from them.  Any books.

09:59:17  13  Not just that book, any books.

09:59:21  14             And these book publishers, to the extent we're

09:59:24  15  talking about publishers as opposed to vendors, they have

09:59:26  16  lots of different lines.  They have different imprints,

09:59:28  17  right?  So Penguin Random House has a whole bunch of

09:59:32  18  different imprints that, you know, deal with a whole bunch

09:59:35  19  of different topics.  It's unclear whether all of those

09:59:41  20  imprints are now banned, some of them are banned, we just

09:59:44  21  don't know.  But it is clear that it's not just the book

09:59:47  22  at issue.  The school districts are prohibited from buying

09:59:53  23  books from that vendor.

09:59:54  24             So the harm is real.  The April 20 -- the April

09:59:59  25  1st date, it keeps getting bandied about here, is not a

| | | |
|---|---|---|
| 10:00:05 | 1 | date that we can work with because September 1 is the date |
| 10:00:10 | 2 | that the sales get cut off and the AG does not -- they |
| 10:00:16 | 3 | have not said we're not going to enforce this.  There's |
| 10:00:20 | 4 | been no statement made to that effect.  And under the |
| 10:00:23 | 5 | Consumer Data Industries case -- |
| 10:00:25 | 6 | THE COURT:  What role -- I didn't get it.  What |
| 10:00:29 | 7 | role does the AG play in the enforcement of is? |
| 10:00:35 | 8 | MS. PRATHER:  I don't know.  I mean, good |
| 10:00:36 | 9 | question, your Honor. |
| 10:00:36 | 10 | THE COURT:  That's not something I got prepared |
| 10:00:38 | 11 | on. |
| 10:00:39 | 12 | MS. PRATHER:  I don't know.  Let me rephrase it a |
| 10:00:41 | 13 | different way.  No one, no state agency has made any |
| 10:00:46 | 14 | assurance that they won't enforce this law.  So we are |
| 10:00:54 | 15 | sitting here in a position where the law goes into effect |
| 10:00:57 | 16 | on September 1st.  Even if the Court were inclined to |
| 10:01:00 | 17 | accept the AG's interpretation, under Virginia II, the AG |
| 10:01:07 | 18 | cannot bind the legal interpretation of this statute.  So |
| 10:01:13 | 19 | I don't think standing is an issue.  I think a lot of the |
| 10:01:16 | 20 | response in our case, and I guess not surprisingly, was |
| 10:01:21 | 21 | procedural, not substantive. |
| 10:01:23 | 22 | So from a procedural standpoint, we've |
| 10:01:28 | 23 | established standing.  I think the next issue that the |
| 10:01:31 | 24 | defense brought up was sovereign immunity.  This case |
| 10:01:35 | 25 | falls squarely within the Ex Parte: Young exception.  That |

10:01:42  1    exception applies when a suit seeks prospective injunctive

10:01:44  2    relief from the state actor based on an alleged ongoing

10:01:48  3    violation of the Constitution.  We are right within those

10:01:53  4    goal posts.  The K.P. vs. Leblanc case, which is cited at

10:01:59  5    page 6 of our reply, it's a Fifth Circuit case, is

10:02:04  6    squarely on point.

10:02:08  7         The drone constitutional challenge, which Judge

10:02:11  8    Pitman handled last year, NPPA vs. McCraw held that Ex

10:02:19  9    Parte: Young exception applied in very circumstances.  And

10:02:23  10   just a little excerpt from that case talks about

10:02:28  11   plaintiffs having no way of knowing whether the defendants

10:02:31  12   will enforce the law moving forward.  Defendants have

10:02:35  13   provided no binding assurance and the Supreme Court has

10:02:38  14   noted that we would not uphold an unconstitutional statute

10:02:42  15   merely because the government promised to use it

10:02:46  16   responsibly.  The First Amendment protects against the

10:02:48  17   government.  It does not leave us at the mercy of noblesse

10:02:55  18   oblige.

10:02:55  19        Given the possibility of enforcement and the duty

10:02:58  20   of defendants to do so if a relevant situation arises, the

10:03:02  21   Court finds that plaintiffs have established sufficient

10:03:06  22   connection to enforcement for defendants to fall within Ex

10:03:10  23   Parte: Young exception to sovereign immunity.  That's from

10:03:13  24   Judge Pitman.

10:03:14  25        But your Honor probably remembers your own case,

10:03:17   1   the Calhoun vs. Collier case in which you made a similar

10:03:21   2   argument.

10:03:21   3        THE COURT:  I probably don't but you're kind to

10:03:25   4   say I would.

10:03:28   5        MS. PRATHER:  I understand.  I think the third

10:03:30   6   issue that was discussed was that somehow this is

10:03:33   7   government speech.  We talked a little bit about this.

10:03:36   8   It's not government speech.  This is speech that's being

10:03:39   9   forced upon vendors by the government.  This isn't speech

10:03:43  10   in libraries.  This is speech that is being forced on

10:03:47  11   vendors to put on public websites for all the world to see

10:03:51  12   as though it is its own.  If it were government speech,

10:03:57  13   then the government should be the one doing the ratings

10:03:59  14   and posting it as their ratings and that didn't happen.  I

10:04:01  15   mean, let's look at the legislation that passed.

10:04:04  16        Note that it did not require schools or

10:04:09  17   librarians or any governmental body to issue these ratings

10:04:12  18   and why?  Because that would have been unfunded mandate.

10:04:16  19   Instead, they pushed it off on the vendors, private

10:04:21  20   parties that should not be subjected to compelled speech.

10:04:28  21   The removal of books is also something that is, you know,

10:04:33  22   a hot topic these days.  It's something that Judge Pitman

10:04:35  23   handled earlier this year, as well, in the Llano County

10:04:41  24   case.  And I've got a copy.  This is not in our notebook

10:04:45  25   because this had to do with the reply which was filed late

| | | |
|---|---|---|
| 10:04:48 | 1 | last night.  So I've got a copy for the Court and for |
| 10:04:57 | 2 | opposing counsel. |
| 10:04:57 | 3 | THE COURT:  That actually, I'm pretty familiar |
| 10:04:59 | 4 | with. |
| 10:05:01 | 5 | MS. PRATHER:  So in that case, Judge Pitman |
| 10:05:02 | 6 | rejected the argument that book removal decisions were |
| 10:05:08 | 7 | government speech. |
| 10:05:09 | 8 | THE COURT:  But that's on appeal right now, |
| 10:05:13 | 9 | right? |
| 10:05:13 | 10 | MS. PRATHER:  It is.  There's another case that |
| 10:05:16 | 11 | is in your notebook, tab 4, it's a case involving |
| 10:05:22 | 12 | Fayetteville public libraries.  This case was handed down |
| 10:05:26 | 13 | literally days ago, July 30th, has a similar analysis |
| 10:05:28 | 14 | about why removal of books is not government speech. |
| 10:05:34 | 15 | I think the fourth issue that was brought up by |
| 10:05:37 | 16 | the defendants was school libraries and then being not |
| 10:05:40 | 17 | public forums.  This misses the mark.  I mean, once again, |
| 10:05:44 | 18 | we're not talking about speech in school libraries.  We're |
| 10:05:47 | 19 | talking about speech being forced on private parties that |
| 10:05:49 | 20 | are vendors.  This isn't about what -- you know, what |
| 10:05:54 | 21 | discussion can be held by a student in a school library. |
| 10:05:59 | 22 | And most of the cases, if not all of the cases cited by |
| 10:06:01 | 23 | the defendant in their brief, the Hazlewood case and |
| 10:06:04 | 24 | others, dealt with student speech that's inapplicable |
| 10:06:08 | 25 | here. |

| | | |
|---|---|---|
| 10:06:11 | 1 | Here, we've got a situation where under Pico and |
| 10:06:17 | 2 | under Campbell, this does not -- the public forum issue |
| 10:06:25 | 3 | simply does not apply.  School libraries in both of those |
| 10:06:30 | 4 | cases were designated public forums for the receipt of |
| 10:06:36 | 5 | information and content-based restrictions cannot be |
| 10:06:40 | 6 | imposed unless the government meets strict scrutiny.  But |
| 10:06:45 | 7 | again, we are not even talking about speech in the school |
| 10:06:50 | 8 | library.  We're talking about private parties. |
| 10:06:57 | 9 | I think the last point was about -- or actually, |
| 10:07:00 | 10 | second to last point was about commercial speech and |
| 10:07:04 | 11 | commercial speech is also not relevant in this context. |
| 10:07:10 | 12 | This is not commercial speech.  This is not speech |
| 10:07:16 | 13 | inviting a commercial transaction.  This is forcing a |
| 10:07:19 | 14 | vendor to rate books in a way in which they don't |
| 10:07:23 | 15 | necessarily agree.  It's also not -- the rating of books, |
| 10:07:29 | 16 | forcing vendors to rate books is not an essential |
| 10:07:31 | 17 | operation of government.  Making decisions about what goes |
| 10:07:35 | 18 | into a library may be an essential government function, |
| 10:07:39 | 19 | but those decisions can be made without forcing vendors to |
| 10:07:43 | 20 | adopt and endorse the ratings of the state simply is not |
| 10:07:51 | 21 | commercial speech. |
| 10:07:52 | 22 | Your Honor, opposing counsel started to get into |
| 10:07:55 | 23 | vagueness.  Vagueness and overbreadth arguments.  They |
| 10:08:01 | 24 | didn't address any of the four examples of vagueness that |
| 10:08:03 | 25 | we provided in or papers.  I think the Court raised a |

```
10:08:10   1   valid concern:  How do we know what criteria TEA is
10:08:12   2   considering when they do change the ratings?  But the
10:08:16   3   reality is, this entire statute is one that is fatally
10:08:21   4   flawed by significant vagueness of a number of the various
10:08:26   5   terms in it.
10:08:28   6          So I would like to be able to get into some of
10:08:34   7   our discussion today.  I don't know if the Court wants us
10:08:36   8   to or not, but with regard to bringing up vagueness and
10:08:41   9   overbreadth, I think we've brought up issues that pertain
10:08:44  10   to the unconstitutionality of the statute.
10:08:46  11          THE COURT:  I think it would help me here on the
10:08:51  12   vagueness issues for sure.
10:08:53  13          MS. PRATHER:  Sure.
10:08:54  14          THE COURT:  So I can -- the more information I
10:08:55  15   have today, the easier it will be for me to get an order
10:08:58  16   out in a timely manner.
10:09:01  17          MS. PRATHER:  So we believe that the statute
10:09:09  18   fails for six different reasons, okay?  We've got -- let
10:09:19  19   me back up.  Six different reasons.  The first of which
10:09:24  20   is, it compels speech, right?  We've talked about that
10:09:28  21   briefly.  It compels the booksellers to adopt the
10:09:35  22   government's views that they may disagree with.  On
10:09:37  23   vagueness, it provides -- it fails to provide clear
10:09:41  24   standards for these vendors to apply when they are
10:09:45  25   attempting to rate the books.  It actually functions as an
```

| | | |
|---|---|---|
| 10:09:50 | 1 | unconstitutional prior restraint because it gives the |
| 10:09:54 | 2 | state that exclusive control over what books are allowed |
| 10:09:57 | 3 | in public schools without any judicial review, which is |
| 10:10:00 | 4 | what you touched upon. |
| 10:10:04 | 5 | We believe it fails the strict scrutiny analysis |
| 10:10:08 | 6 | because it is content-based on its face.  It's a |
| 10:10:12 | 7 | content-based regulation and it's not narrowly tailored or |
| 10:10:17 | 8 | the least restrictive means of advancing or compelling a |
| 10:10:21 | 9 | government interest, and we believe it's overbroad.  It |
| 10:10:23 | 10 | prohibits a wide swath of constitutionally protected |
| 10:10:28 | 11 | speech and that's a significant problem. |
| 10:10:31 | 12 | Finally, the sixth ground, and we're just going |
| 10:10:35 | 13 | to rely on our briefing on this, it unconstitutionally |
| 10:10:39 | 14 | delegates government authority to regulate speech to |
| 10:10:42 | 15 | private individuals, these vendors and book publishers |
| 10:10:46 | 16 | that are going to have to be doing these ratings.  We |
| 10:10:49 | 17 | think that we actually win on all six grounds, but you |
| 10:10:51 | 18 | only need to find one to be able to enjoin the law. |
| 10:10:56 | 19 | If the law isn't enjoined by September 1st, not |
| 10:11:01 | 20 | only will the plaintiffs but countless others will suffer |
| 10:11:05 | 21 | irreparable injury because they won't be getting the |
| 10:11:08 | 22 | books.  Lucy Podmore, who's a San Antonio librarian, |
| 10:11:13 | 23 | talked about the fact that she can't order books right now |
| 10:11:18 | 24 | and that's going to be a harm to her students.  Katy ISD |
| 10:11:23 | 25 | has already announced publicly, they're not buying any |

10:11:26  1    books.  That's a harm not only to the vendors but to the

10:11:29  2    students who want and crave the ability to expand their

10:11:34  3    knowledge base.

10:11:36  4           So we talked about why we're here now.  And the

10:11:42  5    key provisions in the statute, the library standards, the

10:11:45  6    ratings, the fact that there's this automatic override, we

10:11:49  7    didn't mention earlier, as well, that those books that are

10:11:54  8    listed as sexually explicit -- and this, in part, goes to

10:11:57  9    the vagueness issue -- have to be recalled.  There's

10:12:01  10   nothing that explains how that recall works.  How does it

10:12:06  11   happen?  Do you have to recall books that you no longer

10:12:11  12   sell?  I mean, one of the things, practically speaking, is

10:12:13  13   these vendors don't necessarily sell the books anymore,

10:12:19  14   but they're being told they have to rate any book they've

10:12:23  15   ever sold to the school district that's still in active

10:12:28  16   use.  Another question is, how do the booksellers know

10:12:31  17   what is in active use?

10:12:32  18          And then, we discussed the blacklist and the lack

10:12:35  19   of judicial oversight.  So when discussing the key

10:12:41  20   provisions and the inability to actually understand and

10:12:46  21   apply them, we've got this one that deals with sexually

10:12:50  22   relevant, one that deals with sexually explicit.  But the

10:12:55  23   key thing here is that those definitions are highly

10:13:02  24   subjective and can easily result in inconsistent ratings.

10:13:08  25   There's also nothing in the law that addresses the

| | | |
|---|---|---|
| 10:13:12 | 1 | inconsistent ratings.  Another thing that's not in the law |
| 10:13:19 | 2 | that's extremely problematic is, there's no |
| 10:13:22 | 3 | differentiation as to age.  The age of the child at issue. |
| 10:13:31 | 4 | So, for instance, I have four children.  That's a |
| 10:13:39 | 5 | lot.  There's a big age gap in my kids, 10 and 12 years. |
| 10:13:46 | 6 | My children when they were five and their older sisters |
| 10:13:51 | 7 | when they were 15 and 17 were reading very different |
| 10:13:57 | 8 | books.  But under this law, there's no differentiation and |
| 10:14:00 | 9 | so, those young adult readers will be deprived of content |
| 10:14:05 | 10 | that is entirely appropriate for them because the law will |
| 10:14:08 | 11 | have to be applied to address the least common |
| 10:14:12 | 12 | denominator, what the five-year-olds read.  It's a |
| 10:14:17 | 13 | problem. |
| 10:14:21 | 14 | Now, we can go through what the definitions say |
| 10:14:27 | 15 | and the problems with the definition.  The biggest |
| 10:14:32 | 16 | problem, honestly, your Honor, is these are like |
| 10:14:35 | 17 | Frankenstein definitions, okay?  What the legislature did |
| 10:14:39 | 18 | -- and I know everyone sort of calls it sausage making, |
| 10:14:43 | 19 | right -- is they cut and pasted portions of the penal code |
| 10:14:50 | 20 | and undefined terms in case law to make entirely new |
| 10:14:55 | 21 | definitions, which inherently results in this vagueness |
| 10:14:59 | 22 | problem, right? |
| 10:15:00 | 23 | So for sexually relevant material, they took some |
| 10:15:09 | 24 | part of the Texas Penal Code.  They basically referred to |
| 10:15:14 | 25 | the Texas Penal Code's definition of sexual conduct and if |

10:15:21  1  you look in your notebook, we have these provisions of the

10:15:26  2  penal code in there.  It's behind the statutory

10:15:32  3  references.  So I'm going to go there and look and you'll

10:15:35  4  see that the Texas Penal Code is under tab 3.  Sexual

10:15:41  5  conduct is one part of that definition, but it seemingly

10:15:48  6  encompasses all books that mention any sexually related

10:15:52  7  topics.

10:15:55  8          So that difference in the inability to determine

10:15:57  9  the age of the reader and factor that in is critical here.

10:16:03  10  If you look at -- your Honor mentioned your favorite

10:16:06  11  painter and David, the statue David, right, and does that

10:16:11  12  fall within the sexually relevant definition.  I think

10:16:15  13  it's a question.  I think it's a valid question.  We've

10:16:18  14  got Pulitzer Prize-winning photos like the one on the

10:16:22  15  screen now.  This is the Terror Of War.  This is the

10:16:25  16  Pulitzer Prize-winning photo that depicted a 10-year-old

10:16:31  17  girl completely naked, running away after a napalm bomb

10:16:35  18  had been detonated in her town in Vietnam -- in her

10:16:38  19  village in Vietnam.  Is that going to be banned?  Don't

10:16:42  20  know.  Do the vendors need to rate that as sexually

10:16:47  21  relevant because it shows naked -- a naked person?

10:16:53  22          Sexually explicit is actually even more difficult

10:16:56  23  because -- and the AG here has said -- and I think this is

10:17:04  24  really telling in their briefing, they said we attempted

10:17:09  25  to mirror the definition of obscenity, which acknowledges

| 10:17:16 | 1 | that they didn't mirror the definition of obscenity. |
|---|---|---|

that they didn't mirror the definition of obscenity.

We have the definition of obscenity in our Texas Penal Code.  If you look under the first tab behind the definitions -- statutory definitions section, you'll see 43.21(a)(1) defines obscenity and that definition is entirely consistent with the U.S. Supreme Court's definition under <u>Miller vs. California</u>.  That tells you what is and isn't constitutionally protected.  That is not what the legislature incorporated into the law.

Instead, they went beyond that and only tied the definition to patently offensive, which is 43.21(a)(4). By doing that, the definition is fatally constitutionally flawed because now they have encompassed in their definition constitutionally protected material that will be restricted from access for anyone.  So that is the fact that they left out whether a work has social or literary value and considering the work as a whole is fatal to their point.

Those two factors under <u>Reno vs. ACLU</u> must be included to avoid the sweep of constitutionally protected information.  They didn't do that.  They could have, they didn't.

They also have the definition of sexually explicit tied to community standards, but they don't define community standards.  So Texas has a whole a lot of

10:19:27  1   counties, right?  I think 252.  Community standards in

10:19:32  2   Austin, Texas are very different than the community

10:19:35  3   standards in Pecan Gap.  So what community standards are

10:19:39  4   these vendors supposed to apply?  Unknown, vague, unclear.

10:19:46  5   There are so many different problems with these

10:19:48  6   definitions and the inability for the vendors to apply, it

10:19:54  7   is difficult to even go through them.

10:19:55  8           But the fact that it is not tied to the

10:19:59  9   definition of obscenity is fatal.  The fact that they have

10:20:04  10  to weigh and balance these highly subjective,

10:20:07  11  fact-specific standards is unconstitutionally vague.  And

10:20:14  12  the fact that there's no age-appropriate distinction is

10:20:17  13  also incredibly problematic.  That was one of the big

10:20:21  14  issues in the Fayetteville case that was handed down last

10:20:26  15  month.

10:20:30  16          One of the things worth mentioning when it comes

10:20:34  17  to young adult readers, there are novels like Rescuing

10:20:40  18  Hope by Susan Norris or Sold by Patricia McCormick.  Both

10:20:45  19  of these raise awareness about the horrors of child sex

10:20:49  20  trafficking.  Those books would no longer be available and

10:20:53  21  why is that a problem?  Well, it's a problem because Texas

10:20:58  22  is number two in the nation in the number of child

10:21:02  23  sex-trafficking occurrences.  And the average age of a

10:21:07  24  child that is trafficked is 12 to 14 years old.  They need

10:21:11  25  to be aware of the phenomenon.  This will inhibit their

10:21:14   1   ability to be aware of matters of public concern like

10:21:18   2   that.

10:21:18   3          The law is impossible to comply with.  We've

10:21:24   4   talked about that.  We've got declarations, the tab behind

10:21:30   5   your notebook, declaration provisions that discuss this.

10:21:35   6   One of the very real problems is, some of our clients,

10:21:39   7   some of the plaintiffs here today have been in business --

10:21:42   8   they've had the good fortune of being in business for a

10:21:43   9   really long time.  BookPeople has been in business for 53

10:21:47  10   years.  Imagine the different recordkeeping that exists

10:21:53  11   over 53 years going from no computers to computers, going

10:21:58  12   from no Windows to Windows, going from no Excel to Excel.

10:22:02  13   They have absolutely no way of tracking all the books that

10:22:06  14   they've ever sold and they don't know what's still in

10:22:09  15   active use by the schools.

10:22:16  16          Here, we've got somebody who -- this is Lucy

10:22:24  17   Podmore.

10:22:31  18          MS. CELLA:  Your Honor, we would object to any

10:22:33  19   video that --

10:22:36  20          (Audio and video file played.)

10:22:45  21          MS. CELLA:  Your Honor.

10:22:45  22          MS. PRATHER:  I'm sorry.

10:22:46  23          THE COURT:  We'll take that up at the next

10:22:48  24   hearing if we need to hear it.

10:22:49  25          MS. CELLA:  Thank you, your Honor.

| | | |
|---|---|---|
| 10:22:51 | 1 | MS. PRATHER:  Can I play this? |
| 10:22:52 | 2 | THE COURT:  No.  We'll take it up at the next |
| 10:22:53 | 3 | hearing if we need to hear it. |
| 10:22:56 | 4 | MS. PRATHER:  Okay.  What Ms. Podmore testifies |
| 10:23:02 | 5 | to is the fact that this is simply inconceivable.  Six |
| 10:23:08 | 6 | districts in the state of Texas have millions of copies of |
| 10:23:13 | 7 | books to be done.  I also think it's worth noting that the |
| 10:23:18 | 8 | fiscal note on this bill was $2.6 million.  Now, that's |
| 10:23:22 | 9 | just the note for the state that's not having to do the |
| 10:23:25 | 10 | ratings, right?  Think about the cost to the vendors that |
| 10:23:28 | 11 | are having to do the ratings.  The cost to the state was |
| 10:23:34 | 12 | over half-a-million dollars just to hire two people to |
| 10:23:37 | 13 | review those books that weren't rated.  So it's clearly |
| 10:23:44 | 14 | going to put small businesses like BookPeople and others, |
| 10:23:53 | 15 | Blue Willow, another one of our clients, out of business. |
| 10:23:58 | 16 | I don't know if your Honor wants me to get into |
| 10:24:00 | 17 | the preliminary injunction piece of this. |
| 10:24:04 | 18 | THE COURT:  No.  I'm not going to take that up |
| 10:24:06 | 19 | today.  I'm sure I understand these issues pretty well -- |
| 10:24:10 | 20 | I mean, at the eye level and I can take that up on next |
| 10:24:14 | 21 | Monday. |
| 10:24:14 | 22 | MS. PRATHER:  Okay.  So we've talked a little bit |
| 10:24:15 | 23 | about vagueness.  I have more discussion about vagueness |
| 10:24:17 | 24 | we can go over at the next hearing if your Honor would |
| 10:24:19 | 25 | like but same with overbreadth.  But as you can see -- |

| | | |
|---|---|---|
| 10:24:23 | 1 | THE COURT:  I'm happy to hear both vagueness and |
| 10:24:26 | 2 | overbreadth so that I can hear from -- either today or |
| 10:24:29 | 3 | next week, I'll hear a response to that.  I mean, I'm |
| 10:24:33 | 4 | happy to take up those issues today. |
| 10:24:35 | 5 | MS. PRATHER:  Okay.  Then I'll have to flip |
| 10:24:38 | 6 | through some stuff. |
| 10:24:44 | 7 | So unconstitutional vagueness, law's |
| 10:24:51 | 8 | unconstitutionally vague if it fails to provide those |
| 10:24:53 | 9 | targeted by the statute with the reasonable opportunity to |
| 10:24:56 | 10 | know what conduct is prohibited.  Or if it's so indefinite |
| 10:25:00 | 11 | that it allows arbitrary and discriminatory applications. |
| 10:25:07 | 12 | In the drone case, this was one -- this standard was |
| 10:25:12 | 13 | outlined and the drone statute was found to be |
| 10:25:17 | 14 | unconstitutionally vague. |
| 10:25:20 | 15 | We have at least four provisions of the law that |
| 10:25:22 | 16 | we are challenging.  We believe there are quite a bit |
| 10:25:27 | 17 | more.  But one of them is the requirement that books that |
| 10:25:32 | 18 | don't have to be related -- or don't have to be rated are |
| 10:25:35 | 19 | those related to the curriculum.  The second is that the |
| 10:25:40 | 20 | definitions of sexually relevant and sexually explicit are |
| 10:25:44 | 21 | unconstitutionally vague.  The third is this highly |
| 10:25:48 | 22 | subjective contextual analysis that is being required for |
| 10:25:53 | 23 | the vendors.  And the fourth is, there's no guidance for |
| 10:25:58 | 24 | what recall or active-use determinations can be made. |
| 10:26:06 | 25 | In the declarations provisions part of your |

| 10:26:09 | 1 | notebook, this is where all of the declarations of our |

10:26:09   1   notebook, this is where all of the declarations of our

10:26:12   2   clients are, behind tab 4, it has a whole list of

10:26:15   3   testimony from plaintiffs about how they're struggling

10:26:20   4   with the ambiguity in the law and their concerns about

10:26:22   5   being able to comply with it.  It is worth noting that in

10:26:33   6   the response by the state, none of the four areas that

10:26:38   7   we're getting ready to discuss were addressed.  They

10:26:41   8   simply recited the test for vagueness.

10:26:45   9        So let's start with directly related to the

10:26:47  10   curriculum.  Here's the problem.  There's no statewide

10:26:54  11   curriculum in Texas.  Curriculum vary.  They vary from day

10:27:01  12   to day, year to year, district to district.  They're

10:27:06  13   regularly reevaluated.  Vendors are not told about these.

10:27:10  14   Vendors are not part of the equation when it comes to

10:27:12  15   curriculum changes.  There's also no clarity as to if a

10:27:18  16   teacher brings a book into a classroom, does that now

10:27:20  17   become part of the curriculum?

10:27:23  18        What about books that are selected by a student

10:27:26  19   from a classroom library where they get to choose what

10:27:29  20   books they read, are those books part of the curriculum?

10:27:33  21   Does it have to be taught in the classroom?  There's no

10:27:38  22   clarity in any of this.  And as the owner of Blue Willow

10:27:42  23   said, there's no realistic way of ascertaining the

10:27:46  24   curriculum for students' grade levels, classrooms in each

10:27:49  25   of the Texas districts to which they sell books.  It

10:27:53  1  simply can't be done.

10:27:58  2       The definitions are with regard to sexually

10:28:02  3  explicit and sexually relevant, we've talked about them

10:28:05  4  briefly, but they're both unclear and overinclusive.  If

10:28:10  5  you look at the sexually relevant definition and the words

10:28:15  6  that you relayed earlier in the hearing, it would apply to

10:28:18  7  religious texts like the bible.  There's incest in the

10:28:22  8  bible.  There's all kinds of sexual acts in the bible.  Is

10:28:26  9  that now sexually relevant or sexually explicit?  Should

10:28:30  10 it be banned?  And why should the vendor be the one to

10:28:33  11 make that determination?

10:28:38  12      There are books that would be banned under these

10:28:41  13 definitions out of fear for getting crosswise with TEA,

10:28:45  14 and a lot of those books were highly acclaimed classic

10:28:49  15 novels, books like Atlas Shrugged, Friday Night Lights,

10:28:54  16 The Color Purple, which is not only a Pulitzer

10:28:57  17 Prize-winning book, it's an Academy Award-winning film.

10:29:02  18 The Catcher In The Rye, Rescuing Hope, and others.

10:29:10  19      The contextual analysis, which is under 35.0021

10:29:18  20 of the statute, it actually tells a vendor how they're

10:29:21  21 supposed to go about this analysis.  It's not only

10:29:26  22 convoluted, it's unclear, it's highly subjective, and it

10:29:29  23 will result in a widely disparate rating for each book.

10:29:36  24 And that is something that our clients in their

10:29:41  25 declarations have expressed concerns about.  The lack of

10:29:45  1  specificity in the book ban will inevitably lead to

10:29:48  2  inconsistent ratings among our members and the broader

10:29:52  3  bookselling community.  So there's nothing in here that

10:29:56  4  talks about what happens if they have inconsistent

10:29:59  5  ratings.  Nothing.

10:30:01  6       But there is clarity in the law that a law is

10:30:06  7  unconstitutionally vague if it is so indefinite, it allows

10:30:11  8  arbitrary and discriminatory enforcement, which is exactly

10:30:15  9  what would result here.  The plaintiffs don't know how to

10:30:25  10  rate the books.  It's just that simple.  They don't know

10:30:27  11  because of the vague definitions and because of the

10:30:30  12  subjective criteria.

10:30:33  13       Another point that is part of the subjective

10:30:36  14  criteria is that they are supposed to weigh and balance

10:30:41  15  three factors.  Again, these are cut and pasted from other

10:30:44  16  provisions in the law.  One of which is -- includes

10:30:51  17  determining the author's intent.  How in the world is a

10:30:55  18  vendor going to determine what the author intended?

10:31:00  19  Getting into the state of the mind of the author is an

10:31:02  20  impossible task for a vendor or anyone other than the

10:31:06  21  author.

10:31:08  22       It also eschews the review of the work as a

10:31:14  23  whole.  That's contrary to Miller vs. California and that

10:31:18  24  impedes the ability to do a proper contextual analysis.

10:31:23  25  Finally, as we've talked about before, it fails to

10:31:27  1  consider the literary and artistic value of the work as

10:31:32  2  required by the Constitution.

10:31:35  3          The last area of vagueness that we bring up and

10:31:39  4  we're not saying this is the -- these are the only four

10:31:41  5  examples.  We're just saying these are four of many

10:31:45  6  examples -- is this requirement for booksellers to recall

10:31:53  7  books deemed sexually explicit if they are still in active

10:31:58  8  use.  So the recall doesn't describe how that is executed

10:32:04  9  or what happens if a book isn't recalled.  Does it mean

10:32:08  10  that the bookseller has to give a credit for those books?

10:32:15  11  Who knows.

10:32:17  12          Active use, similarly not defined.  And there's

10:32:22  13  no way for a vendor to find out if something is or is not

10:32:27  14  in active use in all of the counties in the state of

10:32:32  15  Texas.  So these areas are completely untenable for a

10:32:40  16  vendor to be able to even attempt to rate the books and

10:32:44  17  comply with the law and certainly can't do so by September

10:32:49  18  1st.

10:32:49  19          I'll skip ahead briefly to the overbroad issue.

10:32:55  20  Like I said, we've got other constitutional infirmities to

10:32:59  21  address, the compelled speech, the prior restraint, we

10:33:01  22  could talk about that at the next hearing.  But with

10:33:04  23  regard to the law being unconstitutionally vague, the

10:33:10  24  problem here is that it captures constitutionally

10:33:14  25  protected speech.  By not tying to it the definition of

| | | |
|---|---|---|
| 10:33:19 | 1 | obscenity either in the penal code or under <u>Miller vs.</u> |
| 10:33:23 | 2 | <u>California</u>, it captures nonobscene and constitutionally |
| 10:33:28 | 3 | protected speech and that is a significant problem.  That |
| 10:33:34 | 4 | is where the overbreadth component is clear. |
| 10:33:38 | 5 | THE COURT:  What would be an example of that be? |
| 10:33:43 | 6 | MS. PRATHER:  So indecency, right?  Under <u>Reno</u> |
| 10:33:47 | 7 | <u>vs. ACLU</u>, the materials were determined to be indecent and |
| 10:33:51 | 8 | not obscene.  Obscene has to lack literary or artistic |
| 10:33:56 | 9 | value.  So books like Atlas Shrugged, books like Color |
| 10:34:02 | 10 | Purple that have literary and artistic value are not |
| 10:34:05 | 11 | considered obscene.  They will be brought within the |
| 10:34:10 | 12 | confines of this statute, Catcher In The Rye, possibly the |
| 10:34:15 | 13 | bible, because literary and artistic value is no |
| 10:34:22 | 14 | consideration nor is taking the work and looking at it as |
| 10:34:25 | 15 | a whole.  So that's where you have a huge problem, that |
| 10:34:30 | 16 | sweep of constitutionally protected materials is fatal. |
| 10:34:37 | 17 | Here's a list of books that originally trial |
| 10:34:40 | 18 | courts found to be obscene and then, they were reversed, |
| 10:34:46 | 19 | and they were reversed because of exactly what we just |
| 10:34:50 | 20 | talked about:  The books were found to have literary, |
| 10:34:53 | 21 | artistic, political, scientific merit.  Books like Catch |
| 10:34:57 | 22 | 22, Slaughterhouse-Five, Ulysses, and others.  And these |
| 10:35:02 | 23 | are already judicial decisions so you'd have a case -- |
| 10:35:10 | 24 | you'd have an incident here where you've got a judicial |
| 10:35:11 | 25 | decision saying these books are not obscene and they would |

10:35:13  1  still fall within the definition of sexually relevant or

10:35:19  2  sexually explicit under the Texas statute because it is

10:35:21  3  not tied to the definition of obscenity.

10:35:25  4       Another problem with the law being

10:35:30  5  unconstitutionally overbroad is what we've talked about a

10:35:33  6  little bit, which is the failure to distinguish

10:35:37  7  age-appropriateness.  That was a seminal issue in the

10:35:40  8  Fayetteville Public Library case, which is tab 4 in your

10:35:44  9  notebook.  The failure to distinguish what a adult or a

10:35:51 10  young adult versus a young child can view means that you

10:35:57 11  are overly broadly restricting access to constitutional

10:36:01 12  work for those young adult readers.

10:36:05 13       This is not a situation where under H.B. 900,

10:36:13 14  there's a distinction instead is a one-size-fits-all

10:36:16 15  model.  You rate the books for all K through 12 students

10:36:20 16  regardless of their age, their maturity, that's a problem.

10:36:23 17  A high school senior wouldn't have access to books about

10:36:27 18  teen pregnancy or other things that would actually be very

10:36:32 19  relevant to their lives.

10:36:34 20       I'm not exactly sure what happens with

10:36:37 21  periodicals.  I mean, I know West Lake provides

10:36:40 22  subscriptions to the New York Times to all of their

10:36:44 23  students.  What if the New York Times has articles about

10:36:47 24  trafficking, about rape, about things that would fall

10:36:51 25  within these definitions?  I don't know what happens in

10:36:53  1   that instance.  They're not -- I guess not addressed by

10:36:58  2   this because they're a periodical, not a book?  But then,

10:37:02  3   the student's still exposed to these same things that the

10:37:05  4   state is trying to keep them from being exposed to.  So

10:37:09  5   I'm not sure how it accomplishes their goal.

10:37:11  6           And then, because of the overbreadth issue, we

10:37:15  7   end up having a situation where H.B. 900 violates the

10:37:20  8   constitutional rights of third parties.  Those third

10:37:24  9   parties are all booksellers, all publishers, all authors.

10:37:29  10  Because remember these ratings go on a public website for

10:37:34  11  all the world to see and now, all of a sudden, fewer

10:37:39  12  schools feel like they can buy these books.  Publishers

10:37:45  13  are harmed in other states, not just in Texas.  Students

10:37:49  14  lose their constitutional right to receive information and

10:37:54  15  ideas from their school library.  So it's not just the

10:37:57  16  vendors here, the snowball effect is enormous.  We do have

10:38:04  17  declarations, as well, that talk about this issue.

10:38:08  18          So I think, your Honor, I've gone over the issues

10:38:10  19  with regard to the standing, the government speech, the

10:38:18  20  nonpublic forum, the different standards that would apply,

10:38:26  21  the fact that this is not commercial speech, and the

10:38:28  22  vagueness, and the overbreadth issue.  Is there anything

10:38:32  23  else that you'd like to hear from me on?

10:38:34  24          THE COURT:  No.

10:38:35  25          MS. PRATHER:  Okay.  Our concern here is, the

| | | |
|---|---|---|
| 10:38:38 | 1 | First Amendment embraces the right to distribute |
| 10:38:41 | 2 | literature and it protects the right to receive it.  This |
| 10:38:44 | 3 | law violates the Constitution in innumerable ways and we |
| 10:38:48 | 4 | believe it should be enjoined before it takes effect on |
| 10:38:50 | 5 | September 1st.  Thank you, your Honor. |
| 10:38:54 | 6 | THE COURT:  Does the state wish to respond to |
| 10:38:56 | 7 | anything?  Oh, actually, before you sit down, one thing |
| 10:39:01 | 8 | I'd like the plaintiff to focus on in their briefing is |
| 10:39:06 | 9 | anything they wish to amplify with respect to the |
| 10:39:09 | 10 | enforcement issue and its impact on Ex Parte: Young and |
| 10:39:13 | 11 | sovereign immunity. |
| 10:39:16 | 12 | MS. PRATHER:  Yes, your Honor. |
| 10:39:39 | 13 | MS. CELLA:  Thank you, your Honor. |
| 10:39:44 | 14 | With respect to the issue of the effective date |
| 10:39:47 | 15 | of the bill, plaintiffs keep saying that even though their |
| 10:39:52 | 16 | list is not due until April 1st, they can't sell any books |
| 10:39:57 | 17 | by September -- as of September 1st.  But they're parsing |
| 10:40:02 | 18 | out Section 35.002.  All of that is in the same section. |
| 10:40:07 | 19 | So insofar as the bill being effective on September 1st, |
| 10:40:11 | 20 | they still don't have any lists due.  The state does not |
| 10:40:15 | 21 | read that as meaning they can't sell any books.  Nothing |
| 10:40:19 | 22 | -- nothing is going to happen until April 1st.  That's the |
| 10:40:23 | 23 | date their lists are due. |
| 10:40:24 | 24 | THE COURT:  When you say that -- so let me ask |
| 10:40:27 | 25 | you -- let's go back to the beginning.  What is the |

| | | |
|---|---|---|
| 10:40:30 | 1 | enforcement mechanism under -- for this statute?  I mean, |
| 10:40:36 | 2 | let's just say that the plaintiffs, the publishers don't |
| 10:40:44 | 3 | do any of this.  I mean, it comes -- it's September 3rd or |
| 10:40:49 | 4 | it's April 5th.  I don't care about -- I'm leaving aside |
| 10:40:51 | 5 | the date now.  But they say forget it, we're just going to |
| 10:40:58 | 6 | sell, we're going to ignore the law.  Who enforces it? |
| 10:41:04 | 7 | MS. CELLA:  Well, I believe it would be... |
| 10:41:06 | 8 | THE COURT:  What happens? |
| 10:41:09 | 9 | MS. CELLA:  That's a good question.  A good |
| 10:41:11 | 10 | question that I don't know that anybody has thought that |
| 10:41:14 | 11 | through yet.  I mean, there's no -- in this bill -- |
| 10:41:17 | 12 | THE COURT:  Don't you think that's important?  I |
| 10:41:21 | 13 | mean, when we're talking about, you know -- for example, I |
| 10:41:27 | 14 | keep bringing this -- I mean, Texas, I think got a little |
| 10:41:31 | 15 | bit famous in their -- the bill they passed where they |
| 10:41:35 | 16 | made it difficult for -- I think they essentially made |
| 10:41:40 | 17 | people, citizens to stop women from having abortions |
| 10:41:48 | 18 | because they said a person, a private citizen had a right |
| 10:41:52 | 19 | to turn in a doctor, whatever.  I may be misstating that |
| 10:41:55 | 20 | but I'm saying -- my point, I don't care about that bill |
| 10:41:57 | 21 | as much as I care about the whole point was who enforced |
| 10:41:59 | 22 | it.  They articulated who enforced it.  And so, who |
| 10:42:04 | 23 | enforces this law? |
| 10:42:07 | 24 | MS. CELLA:  As far as if they're not -- if they |
| 10:42:10 | 25 | don't give their lists and they're still selling books, |

10:42:13   1   let's say.

10:42:13   2           THE COURT:  Exactly.  Books -- you know, Barnes &

10:42:16   3   Noble or I always hate to say names because I don't care.

10:42:19   4   But Simon & Schuster, Barnes & Noble, BookPeople, whoever,

10:42:23   5   they just say we're going to sell to Austin Independent

10:42:27   6   School District with no -- we're not doing any of this.

10:42:34   7   Who enforces it?

10:42:35   8           MS. CELLA:  Well, the restriction is on the

10:42:38   9   school district so they can't purchase from any vendor

10:42:42  10   that doesn't comply, let's say.

10:42:45  11           THE COURT:  So --

10:42:46  12           MS. CELLA:  As far as who enforces --

10:42:47  13           THE COURT:  So you have -- let's say you have

10:42:50  14   Austin Independent School District and they do.  They say,

10:42:56  15   well, we have to have books for kids.  I mean, it's in

10:43:01  16   that way, I guess, the April thing is an even more

10:43:03  17   interesting date in that school's pretty far along then,

10:43:08  18   they'll have the books.  So let me say -- let me try this.

10:43:12  19           You said don't care about -- don't care about

10:43:14  20   September 1st because enforcement doesn't start till

10:43:18  21   April, and so, school's still in in April.  Middle of

10:43:26  22   April, these kids have books that are not marked in any

10:43:35  23   way.  Who enforces it and what happens?

10:43:38  24           MS. CELLA:  Well, I think that would be a policy

10:43:40  25   that TSLAC and board of education would come up with.  I

| | | |
|---|---|---|
| 10:43:45 | 1 | agree with you in this bill -- |
| 10:43:46 | 2 | THE COURT:  Well, that would be nice but you keep |
| 10:43:48 | 3 | saying who knows it will happen.  Who knows if that will |
| 10:43:52 | 4 | happen. |
| 10:43:52 | 5 | MS. CELLA:  Right.  I agree.  Who knows if that |
| 10:43:55 | 6 | will happen. |
| 10:43:56 | 7 | THE COURT:  So you seem much more sanguine about |
| 10:43:59 | 8 | the fact that there is no specificity on how any of this |
| 10:44:03 | 9 | works than I am.  That we don't know who won't enforce it, |
| 10:44:13 | 10 | it seems an issue.  We don't know what will happen if |
| 10:44:15 | 11 | people ignore, it seems an issue.  You've got books in |
| 10:44:21 | 12 | public school libraries that aren't marked in any way that |
| 10:44:29 | 13 | we don't know how it will be enforced. |
| 10:44:31 | 14 | And what I was going to try and get to is, let's |
| 10:44:34 | 15 | say you have a school district that has a group of school |
| 10:44:43 | 16 | board members.  You know, the way I read the news is, |
| 10:44:48 | 17 | there are some school boards that are probably more |
| 10:44:53 | 18 | conservative than others.  I'm going to guess there is a |
| 10:44:55 | 19 | school board in one county in Texas that's more |
| 10:44:57 | 20 | conservative than other school boards.  The school board |
| 10:45:01 | 21 | in Austin says we don't like this law.  We're not going to |
| 10:45:10 | 22 | obey it.  What happens? |
| 10:45:12 | 23 | MS. CELLA:  So, your Honor, I don't think the |
| 10:45:13 | 24 | question of what happens at the school board or a school |
| 10:45:18 | 25 | purchases books from some vendor that doesn't submit a |

10:45:24  1  list has anything to do with the vendors.  It actually has

10:45:27  2  to do with the schools because the prohibition is on the

10:45:29  3  schools from buying books from the vendors.

10:45:32  4          THE COURT:  Well, what did -- I think one of the

10:45:37  5  issues that has been raised that and I'm going to have to

10:45:41  6  deal with is that there seems to be -- there is an

10:45:47  7  argument of vagueness.  And it seems to me that if there

10:45:51  8  is no clear articulation of how this will be enforced and

10:45:57  9  even against whom it will be enforced, that seems like a

10:46:00  10  legitimate issue I oughta be concerned about.

10:46:04  11          MS. CELLA:  Well, the prohibition is against

10:46:07  12  school districts purchasing books.  So in this case, the

10:46:11  13  school districts are not a party.  If you're asking what

10:46:14  14  would be enforced against the plaintiffs, the prohibition

10:46:18  15  is not on the plaintiffs, it's on the school districts.

10:46:21  16  They just can't purchase books from those plaintiffs.

10:46:24  17          THE COURT:  Okay.  But let's say that they do,

10:46:26  18  what happens?

10:46:26  19          MS. CELLA:  I don't think that's an issue before

10:46:29  20  this court because the school districts are not a party

10:46:31  21  but, you know --

10:46:32  22          THE COURT:  Well, let's just say I think it is.

10:46:40  23  So what happens?  I mean, because the school -- it will

10:46:47  24  have a chilling effect.  It might or might not have a

10:46:50  25  chilling effect on a school district's willingness to buy

| | |
|---|---|
| 10:46:53 | 1 |
| 10:46:57 | 2 |

10:46:53  1  books from a publisher that haven't been marked, depending

10:46:57  2  on what the repercussions are.  What are the repercussion?

10:47:01  3          MS. CELLA:  Likely, injunctive relief would be

10:47:05  4  the repercussions.

10:47:06  5          THE COURT:  Where is that in the statute?

10:47:08  6          MS. CELLA:  Well, I mean, if --

10:47:09  7          THE COURT:  And who would file it?  Who would

10:47:11  8  file for injunctive relief?  I hate to pick on Austin

10:47:16  9  School District.  We're sitting here.  But who would file

10:47:19  10  -- who would have standing to file against Austin

10:47:22  11  Independent School District to enforce this?  Is it the

10:47:25  12  state of Texas?  Would it be the AG?  Would it be the TEA?

10:47:28  13  Would it -- who enforces this?

10:47:32  14          MS. CELLA:  Likely, the defendants in this case,

10:47:34  15  the board of education and TSLAC.  This bill is --

10:47:39  16          THE COURT:  So they have the power to enforce it

10:47:42  17  but they don't have -- but they're not subject to being

10:47:45  18  sued.

10:47:47  19          MS. CELLA:  And we see this all the time in state

10:47:51  20  agencies.  That's the whole premise of sovereign immunity.

10:47:53  21          And I'd also just like to point out that there is

10:47:56  22  no -- there's no punishment or any sort of enforcement for

10:48:01  23  any initial ratings.  So let's just say a list is

10:48:06  24  submitted and every single book is rated no rating or is

10:48:08  25  given no rating.  The only if you want to call it a

| | | |
|---|---|---|
| 10:48:14 | 1 | punishment would be if TEA reviews the list -- |
| 10:48:18 | 2 | THE COURT:  So let me -- I'm sorry to interrupt |
| 10:48:20 | 3 | you.  But you actually just hit on what I've really been |
| 10:48:26 | 4 | meaning to ask and thought.  So let's say that that's |
| 10:48:29 | 5 | exactly under this statute -- and I actually think this |
| 10:48:33 | 6 | may cut in your favor is why I wanted to ask it. |
| 10:48:37 | 7 | Let's say your argument is, there's no harm here |
| 10:48:40 | 8 | because Ms. Prather's clients can comply with the law by |
| 10:48:47 | 9 | just slapping no rating on a hundred percent of the books |
| 10:48:52 | 10 | and ship them in and now isn't -- what would be illegal |
| 10:48:58 | 11 | under this law if they put no rating on a hundred percent |
| 10:49:03 | 12 | of the books and made TEA go through or someone go through |
| 10:49:07 | 13 | and see if they were wrong?  And in fact, you haven't |
| 10:49:11 | 14 | really been able to articulate who would do that, or when |
| 10:49:14 | 15 | they would do it, or if they would do it.  In fact, you |
| 10:49:16 | 16 | said there may be no harm because maybe no one would do |
| 10:49:18 | 17 | that. |
| 10:49:19 | 18 | So why shouldn't Ms. Prather just give her |
| 10:49:23 | 19 | clients advice, forget Albright and this federal court. |
| 10:49:27 | 20 | Just slap no labels on everything and let them figure out |
| 10:49:33 | 21 | whether it's sexually explicit or not because even if we |
| 10:49:36 | 22 | take the time to do it, they could overrule us and there's |
| 10:49:41 | 23 | no appeal.  So why isn't that your argument to me that |
| 10:49:47 | 24 | they don't have to do anything? |
| 10:49:49 | 25 | MS. CELLA:  Well, that's what I was just getting |

10:49:51  1  into.  There's absolutely no punishment in this bill.

10:49:53  2         THE COURT:  So I can write an order that says I'm

10:49:57  3  denying an injunction because you've represented that if

10:50:00  4  the book folks, whoever they are, put no -- I'm saying no

10:50:06  5  labels.  No -- what's the --

10:50:08  6         MS. CELLA:  Ratings.

10:50:08  7         THE COURT:  No rating.  No labels is a political

10:50:13  8  party.  Just put no ratings on a hundred percent of books,

10:50:16  9  just ship them, have a good day.  That seems to be what

10:50:20  10  you're saying:  Just ignore it because there's no

10:50:23  11  enforcement.  Even if they tried hard and do it, y'all get

10:50:27  12  to overrule them.  Why are we -- why are these fine

10:50:32  13  lawyers taking their time to be here?  Let's just do that.

10:50:36  14         Could I put that -- I'm denying the injunction

10:50:38  15  because you've represented there's no enforcement of the

10:50:43  16  statute, which doesn't seem to be a very effective

10:50:45  17  statute?

10:50:46  18         MS. CELLA:  Well, it's not that there's no

10:50:48  19  enforcement.

10:50:50  20         THE COURT:  So who -- okay.  Who enforces it?

10:50:56  21         MS. CELLA:  So that would likely be board of

10:50:58  22  education and TSLAC.  I just am agreeing with you that --

10:51:02  23         THE COURT:  Against who?  Would they be able to

10:51:04  24  enforce it against these -- the plaintiffs?

10:51:09  25         MS. CELLA:  Well, no.  The punishment -- I mean,

| | |
|---|---|
| 10:51:11 | 1 |
| 10:51:15 | 2 |
| 10:51:20 | 3 |
| 10:51:24 | 4 |
| 10:51:27 | 5 |

I'm sorry, the school districts would be the parties that
are not able to purchase books from -- I mean, you can't
force a sale so a plaintiff can't -- a vendor can't go to
the school districts and say, I'm making you buy this.
So --

THE COURT:  So if the publishers and the
booksellers completely ignore it, there are no
repercussions against them.

MS. CELLA:  I wouldn't say that.  I would say
there's no punishment, there's no repercussion for their
initial rating.  The only time that -- I don't know if
you'd call it a punishment but if their second -- if TEA
reviews a book and they say you need to change this rating
and they -- the plaintiffs or the vendors refuse to change
that rating --

THE COURT:  Okay.  That's and I'm sure -- and I
get that.  But why not do that and make you all do the
work?

MS. CELLA:  Well, all I -- I mean, the bill is
what it is.  They should -- people should be following the
bill.  But --

THE COURT:  No, no, no.  I'm saying they are
following the bill.  They say -- they are following the
bill.  They're labeling it.  They're labeling it no
rating.  They have followed the bill.  They have put no

| | | |
|---|---|---|
| 10:52:33 | 1 | rating on a hundred percent of them.  They've followed the |
| 10:52:35 | 2 | bill. |
| 10:52:38 | 3 | MS. CELLA:  And there would be no punishment for |
| 10:52:39 | 4 | that until -- unless and until they decided. |
| 10:52:43 | 5 | THE COURT:  To -- |
| 10:52:45 | 6 | MS. CELLA:  To ignore a TEA rating change. |
| 10:52:48 | 7 | THE COURT:  So I'm just trying to frame so when |
| 10:52:50 | 8 | -- I'm worried about an injunction that the only thing |
| 10:52:54 | 9 | that these folks need to be worried about, what you're |
| 10:52:57 | 10 | saying on behalf of your client is, if down the road, they |
| 10:53:01 | 11 | refuse to comply with a change that was made by the TEA, |
| 10:53:07 | 12 | they put on -- they sell the book -- what was the big book |
| 10:53:13 | 13 | a while back?  Brokeback Mountain, wasn't that a book or a |
| 10:53:17 | 14 | movie?  It was a book and there was a big controversy at |
| 10:53:22 | 15 | one of the schools here about whether or not it was okay |
| 10:53:25 | 16 | for it to be in there -- for it to be in the library.  I |
| 10:53:28 | 17 | think that's the perfect book for this.  I never read that |
| 10:53:32 | 18 | book, but I could see where -- I think I know enough about |
| 10:53:39 | 19 | it to see where it might be no rating, it might be |
| 10:53:42 | 20 | sexually explicit, depending on your view of what sexually |
| 10:53:46 | 21 | explicit is. |
| 10:53:49 | 22 | So why don't they just slap no rating on it and |
| 10:53:55 | 23 | if someone -- and you told me, you don't even know if |
| 10:53:57 | 24 | anyone will go back and look at it.  But if someone has |
| 10:54:03 | 25 | the energy to do that and we have enough time and money in |

10:54:06   1   our state that someone would spend the time looking at

10:54:09   2   books to see if the ratings are correct and they come back

10:54:11   3   and they say no, it's sexually -- Brokeback Mountain is

10:54:17   4   sexually explicit and they tell them they've gotta put

10:54:19   5   that on the book.

10:54:20   6          Now, that's the only fight you're saying that

10:54:22   7   these folks should have is we'll -- would they be willing

10:54:27   8   to comply with the change that's ordered because someone

10:54:32   9   inside the state determines to regulate the speech and

10:54:37  10   that would be government speech, they're regulating it to

10:54:40  11   say this label -- if you're going to put Brokeback

10:54:43  12   Mountain in a public school library, it has to have this

10:54:48  13   label on it so the parents know that the state of Texas

10:54:52  14   thinks it is sexually explicit.  The only fear that this

10:54:57  15   company -- these companies have is if they refuse to make

10:55:01  16   that change.

10:55:01  17          MS. CELLA:  Which is why the plaintiffs don't

10:55:03  18   have a claim here, yes.

10:55:04  19          THE COURT:  And so -- okay.  You've said yes.

10:55:06  20   And so, that obviates, for example, their need to go back

10:55:11  21   in your opinion and do all the trouble -- some work Ms.

10:55:15  22   Prather said that her clients might have to do where they

10:55:17  23   have to figure out, well, gosh, we sold thousands of books

10:55:20  24   and do we have to go back through all of them and label

10:55:23  25   them?  You're saying that that's not a problem for them.

10:55:26  1          MS. CELLA:  Well --

10:55:27  2          THE COURT:  Because until the TEA tells them

10:55:32  3   they've gotta change it, they have no problem.

10:55:37  4          MS. CELLA:  Yes, your Honor.  I can't tell them

10:55:40  5   not to follow the law.

10:55:42  6          THE COURT:  Well, but you're saying there are no

10:55:44  7   consequences to not following the law.

10:55:46  8          MS. CELLA:  There's no punishment.

10:55:48  9          THE COURT:  And let me be more fair to you.

10:55:51  10  There's no punishment for anything they do until they

10:55:57  11  refuse to comply if, and only if, the state tells them

10:56:01  12  they've gotta change their rating on a book and you can't

10:56:05  13  even say that anyone will do that.  You don't know if

10:56:08  14  anyone will do that.  And if a school won't do it, then

10:56:12  15  you don't even know how that will be enforced.  I think

10:56:16  16  that's all -- but I think what I said is all correct,

10:56:22  17  right?

10:56:23  18          MS. CELLA:  There is no punishment in the statute

10:56:26  19  for their initial ratings.  They should rate the books

10:56:31  20  based on the statute.  If in the TEA's view, they get one

10:56:38  21  wrong, then you know where we go from there, the TEA

10:56:41  22  notifies them.

10:56:41  23          THE COURT:  Okay.

10:56:42  24          MS. CELLA:  As far as the prior books, there's no

10:56:46  25  mechanism for tracing every prior book sold back to

| | | |
|---|---|---|
| 10:56:50 | 1 | whenever. |
| 10:56:52 | 2 | THE COURT:  Do they have to do any of them? |
| 10:56:55 | 3 | MS. CELLA:  Yes.  They need to do what they know. |
| 10:56:57 | 4 | I mean, you -- obviously no one can be made to do |
| 10:57:01 | 5 | something that they don't know.  But none of this would |
| 10:57:05 | 6 | fall on the plaintiffs.  The plaintiffs need to do their |
| 10:57:07 | 7 | due diligence based on the bill and then, TEA will review |
| 10:57:12 | 8 | their list.  That's all this is about -- we're arguing |
| 10:57:14 | 9 | over a list.  So TEA has oversight and final say on that |
| 10:57:17 | 10 | list. |
| 10:57:19 | 11 | Once they look at the list prepared by the |
| 10:57:22 | 12 | plaintiffs or any other vendor, they can then determine if |
| 10:57:27 | 13 | there's an incorrect rating or if anything's missing off |
| 10:57:29 | 14 | of that list and, you know, we go from there.  But at this |
| 10:57:35 | 15 | initial phase, there is -- I would agree with you that |
| 10:57:37 | 16 | there is no fight.  All that the vendors are required to |
| 10:57:41 | 17 | do is submit their list of ratings. |
| 10:57:45 | 18 | THE COURT:  Is there anything else you wanted to |
| 10:57:47 | 19 | say? |
| 10:57:48 | 20 | MS. CELLA:  About that in particular or in |
| 10:57:50 | 21 | general? |
| 10:57:50 | 22 | THE COURT:  Any issue. |
| 10:57:51 | 23 | MS. CELLA:  I do want to briefly touch on the |
| 10:57:55 | 24 | vagueness argument. |
| 10:57:56 | 25 | THE COURT:  Okay. |

| 10:57:58 | 1 |          MS. CELLA:  The plaintiffs make a lot of claims |
| 10:58:04 | 2 | about it doesn't provide clear standards because it's made |
| 10:58:08 | 3 | entirely of new definitions.  That's not -- that doesn't |
| 10:58:13 | 4 | make a statute vague just because there's a new definition |
| 10:58:16 | 5 | of something.  They also claim that -- |
| 10:58:20 | 6 |          THE COURT:  I don't think -- in fairness, I don't |
| 10:58:22 | 7 | think that was really the argument they made.  I mean, I'm |
| 10:58:28 | 8 | just telling you, I won't go into it, but I don't think |
| 10:58:29 | 9 | that fairly captures what their argument is.  I mean, I |
| 10:58:34 | 10 | think what I heard her say -- and Ms. Prather can correct |
| 10:58:38 | 11 | me, but I think what she said essentially was combination |
| 10:58:43 | 12 | of that the state sort of cobbled together and did a |
| 10:58:46 | 13 | Frankenstein of different, hey, look -- for this, look at |
| 10:58:48 | 14 | this criminal law, for this, look at this criminal law, |
| 10:58:50 | 15 | which private citizens may or may not be able to use that |
| 10:58:55 | 16 | and use it to apply. |
| 10:59:01 | 17 |          And second, that in her opinion that it is not |
| 10:59:03 | 18 | sufficiently clear for her clients, book publishers, |
| 10:59:09 | 19 | booksellers, whatever, that the standard should be clear |
| 10:59:12 | 20 | as to what is or isn't sexually explicit if they're |
| 10:59:16 | 21 | required to label it.  But given that you've just said |
| 10:59:21 | 22 | there's no liability for mislabeling it, I don't know how |
| 10:59:24 | 23 | compelling that argument is. |
| 10:59:26 | 24 |          MS. CELLA:  And -- |
| 10:59:29 | 25 |          THE COURT:  Let me ask you this. |

| | | |
|---|---|---|
| 10:59:31 | 1 | MS. CELLA:  Sure. |
| 10:59:31 | 2 | THE COURT:  What standard -- how would the TEA go |
| 10:59:36 | 3 | about going back through and determining whether or not |
| 10:59:40 | 4 | the publishers got it right?  What standard -- who would |
| 10:59:43 | 5 | be tasked with that and what standard would that -- how |
| 10:59:47 | 6 | would that be set? |
| 10:59:48 | 7 | MS. CELLA:  So as far as the person or a |
| 10:59:51 | 8 | department that would be tasked with that, I'm not sure, |
| 10:59:54 | 9 | but it would be someone at TEA.  As far as the standard -- |
| 10:59:56 | 10 | THE COURT:  Why do you say that?  Where does that |
| 10:59:59 | 11 | come from the statute? |
| 11:00:00 | 12 | MS. CELLA:  Sure.  I will get that for you. |
| 11:00:12 | 13 | That, I believe, is under agency review 35.003 and when it |
| 11:00:19 | 14 | says the agency, in the education code, the agency refers |
| 11:00:22 | 15 | to TEA.  So that would be TEA's review.  And as what they |
| 11:00:31 | 16 | would determine these ratings based off of is exactly |
| 11:00:33 | 17 | what's in the statute.  So I mean, it's defined in the |
| 11:00:35 | 18 | statute. |
| 11:00:36 | 19 | Of course, any sort of balancing test, that |
| 11:00:40 | 20 | doesn't make a statute vague.  That happens in law all the |
| 11:00:43 | 21 | time.  So in order to rate these -- or review these |
| 11:00:48 | 22 | ratings, TEA would just simply look at the statute and |
| 11:00:52 | 23 | make a determination based on that. |
| 11:00:56 | 24 | And I just also want to touch on plaintiffs made |
| 11:00:59 | 25 | a couple of claims, one of which is that there's nothing |

11:01:02  1  in the statute for age appropriateness, but that's not a

11:01:04  2  plaintiff issue.  The only thing plaintiff needs to do in

11:01:08  3  this case is to rate books.  Anything to do with age

11:01:12  4  appropriateness, or ratings, or if books can be allowed in

11:01:16  5  the library if they're not rated sexually explicit, we

11:01:20  6  know where that falls.  That's a school issue and a state

11:01:24  7  issue.  That is not the plaintiffs' issue.  So the age

11:01:26  8  appropriateness argument would fail in this context.

11:01:30  9         THE COURT:  Let me interrupt you just to say, I

11:01:36  10  think your point is well taken and if the plaintiff could

11:01:39  11  also address that in their briefing as to why -- I

11:01:42  12  certainly understand the concerns that are raised and if

11:01:46  13  it were being raised to the legislature about whether or

11:01:48  14  not there should be a difference between whether or not

11:01:52  15  the law -- whether the law should be -- whether the law

11:01:55  16  should be concerned about whether it's for a kindergartner

11:01:59  17  or high school senior, that's one thing.

11:02:01  18         I'd like for the plaintiff to make sure they

11:02:03  19  brief why that is -- that is an issue that impacts you

11:02:07  20  all.  And so, I understand your argument and that does

11:02:13  21  seem to go to the standing -- whether they have standing

11:02:18  22  to articulate that -- even if it is deficiency, if they

11:02:21  23  have the right to argue that deficiency.

11:02:24  24         MS. CELLA:  And I would just say the same for

11:02:26  25  their claim of inconsistent ratings, that seems to me to

| | | |
|---|---|---|
| 11:02:30 | 1 | be the TEA's issue, not the plaintiffs' issue when they're |
| 11:02:34 | 2 | rating a book. |
| 11:02:35 | 3 | THE COURT:  Well, let me say at least off the top |
| 11:02:39 | 4 | of my head, I disagree.  I would agree with that if the |
| 11:02:45 | 5 | TEA were the people that were doing the first cut.  I |
| 11:02:50 | 6 | think when you're requiring them to do it, I think that |
| 11:02:52 | 7 | issue -- I'm not saying they win or lose, but I'm saying I |
| 11:02:55 | 8 | certainly think they have the right to raise that issue. |
| 11:03:01 | 9 | Is there anything else? |
| 11:03:03 | 10 | MS. CELLA:  One second, your Honor.  There is one |
| 11:03:06 | 11 | other point I just wanted to mention.  I just wanted to |
| 11:03:16 | 12 | bring up as far as the compelled speech, because this is |
| 11:03:24 | 13 | an essential operation of the government -- so we're told |
| 11:03:27 | 14 | in the Fifth Circuit in United States vs. Arnold that |
| 11:03:31 | 15 | there is no right to refrain from speaking when essential |
| 11:03:34 | 16 | operations of government require it for the preservation |
| 11:03:36 | 17 | of an orderly society. |
| 11:03:37 | 18 | And that's exactly what's going on here.  We're |
| 11:03:40 | 19 | talking about public school children.  We're not just |
| 11:03:42 | 20 | talking about any citizen in the state that may read these |
| 11:03:47 | 21 | books.  And because we're talking about public school |
| 11:03:49 | 22 | children and because the state has the right to regulate |
| 11:03:53 | 23 | education in its schools, this is not compelled speech as |
| 11:03:58 | 24 | far as the plaintiffs go.  This is just an essential |
| 11:04:00 | 25 | operation of the government. |

| | | |
|---|---|---|
| 11:04:02 | 1 | THE COURT:  I don't understand that argument. |
| 11:04:06 | 2 | MS. CELLA:  So the reason this isn't compelled is |
| 11:04:09 | 3 | because this has to do with an operation of the |
| 11:04:12 | 4 | government.  It doesn't have to do with the plaintiff.  So |
| 11:04:17 | 5 | the plaintiffs' claim is that they're compelled to speak |
| 11:04:19 | 6 | for the government or they're compelled to speak the |
| 11:04:24 | 7 | government's message. |
| 11:04:24 | 8 | THE COURT:  Okay.  I understand that. |
| 11:04:25 | 9 | MS. CELLA:  So that's where this is an operation |
| 11:04:28 | 10 | of the government so it's not -- it's not the plaintiffs |
| 11:04:31 | 11 | speaking the government's message.  It's the government |
| 11:04:34 | 12 | speaking its message. |
| 11:04:36 | 13 | THE COURT:  I understand that argument put that |
| 11:04:40 | 14 | way. |
| 11:04:42 | 15 | MS. CELLA:  And I believe that's all I have for |
| 11:04:45 | 16 | today, your Honor.  Oh, I'm sorry, I did want to bring up |
| 11:04:51 | 17 | one other point and it will be brief.  The plaintiffs |
| 11:04:55 | 18 | claim that -- |
| 11:04:55 | 19 | THE COURT:  I've had three pretrial conferences |
| 11:04:57 | 20 | this week.  When you all -- the fact that we're almost |
| 11:05:00 | 21 | done at 11:00 brings me to tears.  So I'm very happy to be |
| 11:05:06 | 22 | here. |
| 11:05:09 | 23 | MS. CELLA:  The plaintiffs have claimed that this |
| 11:05:11 | 24 | is vague and they're not sure how they would rate books |
| 11:05:13 | 25 | and then, they put up this PowerPoint slide of books that |

11:05:16   1   would certainly be banned under the statute.  So for them
11:05:20   2   to say that they can't determine how to rate books and
11:05:23   3   then, rate five books just --
11:05:24   4          THE COURT:  Well, I don't think that's fair.  It
11:05:27   5   wouldn't be fair of me in that I'm sure I could find five
11:05:30   6   books that I -- I could find five books at least I would
11:05:38   7   find sexually explicit that might go in it that people --
11:05:42   8   The Godfather, which my dad let me read it at twelve and
11:05:48   9   he probably shouldn't have.  But I probably would under
11:05:51   10  this put that down as sexually explicit.  But I think that
11:05:57   11  doesn't follow that there aren't many books where ten
11:06:05   12  people would split five and five about whether they
11:06:07   13  thought they were sexually explicit.  I think that was
11:06:10   14  their point and that's the way I took it.
11:06:12   15         I think the fact that there are books they could
11:06:15   16  easily determine are sexually explicit doesn't mean that
11:06:17   17  there aren't books that they wouldn't be able to.  So
11:06:20   18  that's what I took from that.
11:06:22   19         MS. CELLA:  I understand, your Honor.  Just that
11:06:24   20  just doesn't make the statute vague and --
11:06:26   21         THE COURT:  Well, I think that's why I'm here.
11:06:30   22         MS. CELLA:  Right.  Sure.  My point is just that
11:06:32   23  they are assigning values to certain books.  But that is
11:06:36   24  -- with that point, that's all I have.
11:06:39   25         THE COURT:  Ms. Prather, any short followup

| | | |
|---|---|---|
| 11:06:42 | 1 | issues, just rebuttal?  I'd like to limit it to rebuttal |
| 11:06:45 | 2 | just out of fairness since I limited them on what they |
| 11:06:54 | 3 | could do.  And then, next Monday, you'll be able to bring |
| 11:06:56 | 4 | up any -- you know, whatever you want. |
| 11:06:58 | 5 | MS. PRATHER:  Understood, your Honor. |
| 11:06:59 | 6 | Super brief.  Love your idea of us just having |
| 11:07:04 | 7 | our clients submit no rating on everything.  There still |
| 11:07:10 | 8 | would be costs associated with doing that, trying to find |
| 11:07:13 | 9 | out what all books they sold, for instance.  We already |
| 11:07:17 | 10 | talked about the fact that the AG can't bind this court to |
| 11:07:25 | 11 | the fact that they aren't going to enforce something.  And |
| 11:07:30 | 12 | that's -- cited case law on that in our reply. |
| 11:07:32 | 13 | But interestingly, if we take that approach and |
| 11:07:36 | 14 | say no rating on everything and submit that by September |
| 11:07:39 | 15 | 1st so that we can continue to have school districts |
| 11:07:43 | 16 | purchase books from us, that $2.6 million fiscal note that |
| 11:07:49 | 17 | the legislative budget board put in for the two additional |
| 11:07:54 | 18 | educational specialists to review all books that were not |
| 11:07:57 | 19 | rated sexually explicit or sexually relevant is going to |
| 11:08:00 | 20 | increase exponentially because then, the burden would be |
| 11:08:05 | 21 | put back on them, which is probably where it should have |
| 11:08:09 | 22 | been to begin with. |
| 11:08:10 | 23 | On your issue of the age appropriateness and that |
| 11:08:15 | 24 | not being an issue for the plaintiff, I think the issue |
| 11:08:17 | 25 | there -- and we can brief this more in the papers that we |

11:08:21  1  file next week -- that the issue there is when a reviewer

11:08:28  2  looks at a book, they have to contemplate whether that

11:08:30  3  rating is appropriate for a child between K through 12.

11:08:37  4  And so, the sexually explicit rating for a kindergartner

11:08:42  5  is likely going to be different in many cases than the

11:08:47  6  sexually explicit rating for a twelfth-grader and that's

11:08:51  7  why it does --

11:08:51  8          THE COURT:  I'll have to look at that.

11:08:56  9          MS. PRATHER:  Impact the vendor.

11:08:56  10          This being not an essential operation -- or this

11:08:59  11  being an essential operation of the government, this is

11:09:02  12  vendors, not the government, being forced to do something.

11:09:07  13  The government can do whatever it wants with regard to

11:09:09  14  keeping books or not keeping books in a library.  No

11:09:13  15  problem.  The problem is requiring a vendor to do

11:09:16  16  something when the vendor is not the government.

11:09:19  17          And lastly, that you probably already figured

11:09:22  18  this out, those books that we put up as examples were just

11:09:26  19  ones that our team came up with.  They're not something

11:09:29  20  that has been formally rated by our clients.  Thank you,

11:09:32  21  your Honor.

11:09:40  22          THE COURT:  Okeydokey.  Thank you all for doing a

11:09:44  23  great job of helping me -- helping educate me.  I haven't

11:09:49  24  got to spend a lot of time on these issues and they're

11:09:53  25  certainly very important in every way.

| | | |
|---|---|---|
| 11:09:56 | 1 | I'll plan on getting the plaintiffs' pleadings by |
| 11:10:02 | 2 | a week -- by end of Thursday.  We will see you all back |
| 11:10:09 | 3 | here at 9:00 a.m. on Monday morning, a week from this |
| 11:10:14 | 4 | Monday. |
| 11:10:15 | 5 | Is there anything else we need to take up?  Yes, |
| 11:10:16 | 6 | ma'am. |
| 11:10:16 | 7 | MS. CELLA:  Your Honor, if the -- if we need to |
| 11:10:20 | 8 | reply to plaintiffs' response, what date should we do that |
| 11:10:24 | 9 | by? |
| 11:10:24 | 10 | THE COURT:  Well, we're having a hearing on |
| 11:10:25 | 11 | Monday.  If you want to get something to us -- whenever |
| 11:10:29 | 12 | you get it to us, you get it to us and if you get it to us |
| 11:10:31 | 13 | in time for us to review it, we'll review it. |
| 11:10:33 | 14 | MS. CELLA:  Thank you. |
| 11:10:34 | 15 | THE COURT:  Yes, ma'am.  Anything else? |
| 11:10:39 | 16 | MS. PRATHER:  (Moving head side to side.) |
| 11:10:40 | 17 | THE COURT:  Thank y'all for being here. |
| | 18 | (Proceedings concluded.) |
| | 19 | |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |

1                         * * * * * *

2

3

4   UNITED STATES DISTRICT COURT  )

5   WESTERN DISTRICT OF TEXAS      )

6

7      I, LILY I. REZNIK, Certified Realtime Reporter,

8   Registered Merit Reporter, in my capacity as Official

9   Court Reporter of the United States District Court,

10  Western District of Texas, do certify that the foregoing

11  is a correct transcript from the record of proceedings in

12  the above-entitled matter.

13     I certify that the transcript fees and format comply

14  with those prescribed by the Court and Judicial Conference

15  of the United States.

16     WITNESS MY OFFICIAL HAND this the 22nd day of August,

17  2023.

18

19

20                              /s/Lily I. Reznik
                                LILY I. REZNIK, CRR, RMR
21                              Official Court Reporter
                                United States District Court
22                              Austin Division
                                501 West 5th Street,
23                              Suite 4153
                                Austin, Texas 78701
24                              (512)391-8792
                                SOT Certification No. 4481
25                              Expires:  1-31-25