**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| **BOOK PEOPLE, INC., VBK, INC. d/b/a BLUE WILLOW BOOKSHOP, AMERICAN BOOKSELLERS ASSOCIATION, ASSOCIATION OF AMERICAN PUBLISHERS, AUTHORS GUILD, INC., COMIC BOOK LEGAL DEFENSE FUND,** | § § § § § § § | |
| **Plaintiffs,** | § § | |
| **v.** | § § | **CASE NO. 1:23-CV-00858-ADA** |
| **MARTHA WONG in her official capacity as chair of the Texas State Library and Archives Commission, KEVEN ELLIS in his official capacity as chair of the Texas Board of Education, MIKE MORATH in his official capacity as Commissioner of Education,** | § § § § § § § § | |
| **Defendants.** | § § | |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO**
**DEFENDANTS' MOTION TO DISMISS PURSUANT TO**
**FEDERAL RULES OF CIVIL PROCEDURE 12(b)(1) AND 12(b)(6)**

## TABLE OF CONTENTS

TABLE OF CONTENTS...............................................................................................I

TABLE OF AUTHORITIES ..................................................................................... iv

I. INTRODUCTION AND SUMMARY OF ARGUMENT .................................... 1

II. LEGAL STANDARD .......................................................................................... 2

III. ARGUMENT ....................................................................................................... 3

    A.    This Court has subject-matter jurisdiction over Plaintiffs' constitutional
        claims for injunctive relief. ............................................................................ 3

        1.    Plaintiffs sufficiently allege Article III standing to challenge the
            Book Ban. ...................................................................................... 3

            a.    Plaintiffs have pleaded an injury-in-fact under the
                First Amendment. ............................................................. 4

            b.    Plaintiffs' injuries are fairly traceable to
                Defendants. ...................................................................... 9

            c.    Plaintiffs' injuries will be redressed by enjoining
                 the Book Ban................................................................... 11

        2.    Plaintiffs' claims are ripe. ........................................................ 12

        3.    Defendants are not entitled to sovereign immunity. ................ 13

            a.    Defendants are tasked with enforcing the Book Ban....... 14

            b.    Enforcement of the Book Ban is imminent...................... 16

            c.    Injunctive relief would not control Defendants'
                discretion........................................................................ 17

    B.    Plaintiffs plausibly allege that the Book Ban violates their First and
        Fourteenth Amendment rights. ..................................................................... 18

        1.    Plaintiffs may seek injunctive relief under the Declaratory
            Judgment Act. ............................................................................ 18

        2.    Plaintiffs assert cognizable claims under 42 U.S.C. § 1983. .................. 18

        3.    Plaintiff booksellers, publishers, and authors have robust First
            Amendment rights to distribute books and be free from compelled
            speech......................................................................................... 19

            a.    The government speech doctrine does not apply. ............ 19

            b.    The public forum analysis does not apply. ..................... 21

            c.    The Book Ban restricts constitutionally protected
                 non-obscene material. ..................................................... 23

4.    The Book Ban compels "pure speech" entitled to First Amendment protection. ................................................................. 23

        a.    Plaintiffs' speech is fully protected under the First Amendment. ................................................................ 23

        b.    Rating books for sexual content is not an "essential operation of government." ................................................ 26

5.    Plaintiffs plausibly allege that the Book Ban is unconstitutionally vague. ............................................................................. 27

6.    Plaintiffs plausibly allege that the Book Ban is an unconstitutional prior restraint because it prevents the distribution of constitutionally protected works without judicial review. ....................... 30

7.    Plaintiffs plausibly allege that the Book Ban is a content-based regulation that fails to satisfy strict scrutiny. ........................................... 32

        a.    The First Amendment applies to the Book Ban. .............. 32

        b.    The Book Ban is a content-based regulation subject to strict scrutiny. ............................................................... 33

        c.    The Book Ban cannot survive strict scrutiny because it is not the least restrictive means of achieving a compelling government interest. ................. 34

        d.    The Book Ban cannot survive strict scrutiny because it is not narrowly tailored to a compelling government interest. ......................................................... 35

8.    Plaintiffs plausibly allege that the Book Ban is unconstitutionally overbroad because it restricts and chills a substantial amount of protected speech from Plaintiffs and other speakers. .............................. 37

9.    Plaintiffs plausibly allege that the Book Ban unconstitutionally delegates government authority to regulate speech to private entities. .................................................................................. 40

IV. CONCLUSION ...................................................................................... 40

CERTIFICATE OF SERVICE ...................................................................... 42

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PURSUANT TO FEDERAL RULES CIVIL PROCEDURE 12(B)(1) AND 12(B)(6)**

ii

# TABLE OF AUTHORITIES

**Cases**                                                                                   **Page(s)**

*303 Creative LLC v. Elenis,*
  143 S. Ct. 2298 (2023) ................................................................................. *passim*

*Abbott Labs. v. Gardner,*
  387 U.S. 136 (1967) .............................................................................................13

*Air Evac EMS, Inc. v. Tex., Dep't of Ins., Div. of Workers' Comp.,*
  851 F.3d 507 (5th Cir. 2017) ........................................................................14, 16

*Alexander v. United States,*
  509 U.S. 544 (1993) ............................................................................................31

*All. for Hippocratic Med. v. U.S. Food & Drug Admin.,*
  No. 23-10362, 2023 WL 5266026 (5th Cir. Aug. 16, 2023) ...........................5, 6, 8

*Am. Civil Liberties Union v. Ashcroft,*
  322 F.3d 240 (3d Cir. 2003)...........................................................................37, 39

*Arkansas Educ. Television Comm'n v. Forbes,*
  523 U.S. 666 (1998)............................................................................................21

*Ashcroft v. Free Speech Coal.,*
  535 U.S. 234 (2002) ...........................................................................................37

*Babbitt v. United Farm Workers Nat'l Union,*
  442 U.S. 289 (1979)..............................................................................................4

*Bantam Books, Inc. v. Sullivan,*
  372 U.S. 58 (1963) ..................................................................................4, 33, 40

*Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico,*
  457 U.S. 853 (1982)........................................................................................20, 38

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007)...............................................................................................3

*Bernard v. Gulf Oil Co.,*
  619 F.2d 459 (5th Cir. 1980) ..............................................................................32

*Bethel Sch. Dist. No. 403 v. Fraser,*
  478 U.S. 675 (1986).............................................................................................22

*Blitch v. City of Slidell,*
  260 F. Supp. 3d 656 (E.D. La. 2017) ..................................................................12

*Brown v. Entm't Merchants Ass'n,*
        564 U.S. 786 (2011).................................................................................36

*Matter of Brown,*
        960 F.3d 711 (5th Cir. 2020) ...............................................................17

*Calhoun v. Collier,*
        No. W-20-CA-380-ADA, 2022 WL 2823580 (W.D. Tex. May 26, 2022) ...........................14

*Campbell v. St. Tammany Par. Sch. Bd.,*
        64 F.3d 184 (5th Cir. 1995) ...............................................................38

*Chiras v. Miller,*
        432 F.3d 606 (5th Cir. 2005) ..............................................................20

*Chiu v. Plano Indep. Sch. Dist.,*
        339 F.3d 273 (5th Cir. 2003) .............................................................31, 32

*City of Austin v. Paxton,*
        943 F.3d 993 (5th Cir. 2019) .............................................................14, 16

*Clapper v. Amnesty Intern. USA,*
        568 U.S. 398 (2013).........................................................................9

*Coates v. City of Cincinnati,*
        402 U.S. 611 (1971).......................................................................28

*Consumer Data Indus. Ass'n v. Tex. through Paxton,*
        No. 21-51038, 2023 WL 4744918 (5th Cir. July 25, 2023)...................................11

*Contender Farms, L.L.P. v. U.S. Dep't of Agric.,*
        779 F.3d 258 (5th Cir. 2015) ..............................................................11

*Dep't of Commerce v. New York,*
        139 S. Ct. 2551 (2019)....................................................................11

*E.T. v. Paxton,*
        19 F.4th 760 (5th Cir. 2021) .............................................................18

*Fayetteville Pub. Library v. Crawford Cnty., Arkansas,*
        No. 5:23-CV-05086, 2023 WL 4845636 (W.D. Ark. July 29, 2023)...........................20, 39

*Fed. Election Comm'n v. Cruz,*
        142 S. Ct. 1638 (2022)....................................................................9

*Freedman v. State of Md.,*
        380 U.S. 51 (1965)........................................................................32

*Friends of the Earth, Inc. v. Laidlaw Envt'l. Servs. (TOC), Inc.*,
  528 U.S. 167 (2000)................................................................................................11

*Gen. Land Office v. Biden*,
  71 F.4th 264 (5th Cir. 2023) ....................................................................................2

*Hazelwood Sch. Dist. v. Kuhlmeier*,
  484 U.S. 260 (1988)..........................................................................................22, 32

*Henerey ex rel. Henerey v. City of St. Charles, Sch. Dist.*,
  200 F.3d 1128 (8th Cir. 1999) ................................................................................32

*Hobbs v. Hawkins*,
  968 F.2d 471 (5th Cir. 1992) ..................................................................................21

*Horne v. Flores*,
  557 U.S. 433 (2009)..................................................................................................3

*Interstate Circuit, Inc. v. City of Dallas*,
  390 U.S. 676 (1968)................................................................................................27

*James v. Collin Cnty.*,
  535 F.3d 365 (5th Cir. 2008) ..................................................................................19

*Joseph Burstyn, Inc. v. Wilson*,
  343 U.S. 495 (1952)................................................................................................25

*K.P. v. LeBlanc*,
  729 F.3d 427 (5th Cir. 2013) ..................................................................................13

*Kellam v. Servs.*,
  No. 12-352, 2013 WL 12093753 (N.D. Tex. May 31, 2013) ..................................27

*Kolender v. Lawson*,
  461 U.S. 352 (1983)................................................................................................37

*Little v. Llano Cnty.*,
  No. 1:22-CV-424-RP, 2023 WL 2731089 (W.D. Tex. Mar. 30, 2023) ..................20

*Lormand v. US Unwired, Inc.*,
  565 F.3d 228 (5th Cir. 2009) ....................................................................................3

*Lovell v. City of Griffin, Ga.*,
  303 U.S. 444 (1938)................................................................................................33

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992)............................................................................................3, 11

*Martin v. City of Struthers,*
  319 U.S. 141 (1943).................................................................................................1

*Miami Herald Pub. Co. v. Tornillo,*
  418 U.S. 241 (1974)...............................................................................................40

*Miller v. California,*
  413 U.S. 15 (1973).................................................................................................23

*Milwaukee Police Ass'n v. Jones,*
  192 F.3d 742 (7th Cir. 1999) ................................................................................32

*Morales v. Daley,*
  116 F. Supp. 2d 801 (S.D. Tex. 2000) ..................................................................26

*Morris v. Thompson,*
  852 F.3d 416 (5th Cir. 2017) ..................................................................................3

*Nat'l Press Photographers Ass'n v. McCraw,*
  504 F. Supp. 3d 568 (W.D. Tex. 2020) ..................................................................5

*Nat'l Press Photographers Ass'n v. McCraw,*
  594 F. Supp. 3d 789 (W.D. Tex. 2022) ................................................................29

*Nebraska Press Ass'n v. Stuart,*
  427 U.S. 539 (1976)...............................................................................................31

*NetChoice, L.L.C. v. Paxton,*
  49 F.4th 439 (5th Cir. 2022) ................................................................................31

*Opulent Life Church v. City of Holly Springs, Miss.,*
  697 F.3d 279 (5th Cir. 2012) ................................................................................12

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n,*
  460 U.S. 37 (1983)............................................................................................22, 23

*Portee v. Morath,*
  No. 1:23-CV-551-RP, 2023 WL 4688528 (W.D. Tex. July 21, 2023)...................14

*Prison Legal News v. Livingston,*
  683 F.3d 201 (5th Cir. 2012) ........................................................................4, 21, 31

*Pullman. Palmer v. Jackson,*
  617 F.2d 424 (5th Cir. 1980) ................................................................................18

*Railroad Comm'n of Texas v. Pullman Co.,*
  312 U.S. 496 (1941)...............................................................................................18

*Reed v. Town of Gilbert, Ariz.*,
   576 U.S. 155 (2015).............................................................................33

*Richardson v. Tex. Sec'y of State*,
   978 F.3d 220 (5th Cir. 2020) .............................................................17

*Roark & Hardee LP v. City of Austin*,
   522 F.3d 533 (5th Cir. 2008) .............................................................27

*Sanchez v. R.G.L.*,
   761 F.3d 495 (5th Cir. 2014) .............................................................12

*Scott v. Schedler*,
   826 F.3d 207 (5th Cir. 2016) .............................................................18

*Seals v. McBee*,
   898 F.3d 587 (5th Cir. 2018) .............................................................37

*Serafine v. Branaman*,
   810 F.3d 354 (5th Cir. 2016) ...............................................................8

*Serv. Employees Intern. Union, Local 5 v. City of Houston*,
   595 F.3d 588 (5th Cir. 2010) .............................................................33

*Smith v. People of the State of California*,
   361 U.S. 147 (1959).............................................................................31

*Suitum v. Tahoe Reg'l Planning Agency*,
   520 U.S. 725 (1997) ...........................................................................13

*Susan B. Anthony List v. Driehaus*,
   573 U.S. 149 (2014)...................................................................4, 7, 12

*Tex. All. for Retired Americans v. Scott*,
   28 F.4th 669 (5th Cir. 2022) .............................................................16

*Tex. Entm't Ass'n, Inc. v. Hegar*,
   10 F.4th 495 (5th Cir. 2021) .............................................................33

*Turtle Island Foods, S.P.C. v. Strain*,
   65 F.4th 211 (5th Cir. 2023) ....................................................4, 9, 10

*United States v. Am. Library Ass'n, Inc.*,
   539 U.S. 194 (2003).............................................................................21

*United States v. Arnold*,
   740 F.3d 1032 (5th Cir. 2014) .........................................................26

*United States v. Hansen*,
 143 S. Ct. 1932 (2023)..................................................................................................38

*United States v. Playboy Entm't Group, Inc.*,
 529 U.S. 803 (2000)...............................................................................................34, 35

*United States v. Sindel*,
 53 F.3d 874 (8th Cir.1995) ........................................................................................26

*United States v. Stevens*,
 559 U.S. 460 (2010)...................................................................................................10

*United Transp. Union v. Foster*,
 205 F.3d 851 (5th Cir. 2000) .....................................................................................18

*Verizon Maryland, Inc. v. Pub. Serv. Comm'n of Maryland*,
 535 U.S. 635 (2002)...................................................................................................14

*Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*,
 425 U.S. 748 (1976)...................................................................................................25

*Virginia v. Am. Bookseller's Assn., Inc.*,
 484 U.S. 383 (1988)........................................................................................4, 10, 17

*Women's Med. Ctr. of Nw. Houston v. Bell*,
 248 F.3d 411 (5th Cir. 2001) .....................................................................................29

*Wooley v. Maynard*,
 430 U.S. 705 (1977)...................................................................................................19

*Ex parte Young*,
 209 U.S. 123, 160 (1908).................................................................................2, 13, 17

**Statutes**

Tex. Educ. Code § 33.021 ....................................................................................... *passim*

Tex. Educ. Code § 35.001 ..............................................................................9, 23, 36

Tex. Educ. Code § 35.002 ....................................................................................... *passim*

Tex. Educ. Code § 35.002(e).........................................................................................8

Tex. Educ. Code § 35.003 ....................................................................................... *passim*

Tex. Educ. Code § 35.003(c).........................................................................................8

Tex. Educ. Code § 35.004 ...........................................................................................32

Texas Penal Code § 43.21(a)(1)............................................................................16, 23

**Other Authorities**

*A Brief History of Public Education*, Texas Almanac,
    https://www.texasalmanac.com/articles/a-brief-history-of-public-education.........................26

Bill Chappell, *A Texas lawmaker is targeting 850 books that he says could make
    students feel uneasy*, NPR, October 28, 2021 ..........................................................21

Christopher Hooks, *Jared Patterson's School-Library Bill Would Book Ban Larry
    McMurtry's Novel*, TEXAS MONTHLY, March 22, 2023 ....................................21, 39

Claire Goodman, *Katy ISD halts all library book purchases, new books stored*,
    HOUSTON CHRONICLE (June 27, 2023) ....................................................................5

Danika Ellis, All 850 Books Texas Lawmaker Matt Krause Wants To Book Ban:
    An Analysis, BOOK RIOT, Nov. 5, 2021 ..................................................................39

Jay Janner, *Texas Gov. Abbott signs into law bill that prohibits sexually explicit
    material in schools*, AUSTIN AMERICAN-STATESMAN, June 12, 2023 ....................10

*Sexually Explicit, Pervasively Vulgar, or Educationally Unsuitable Booklist*,
    PROTECT CHILDHOOD SUBSTACK, Aug. 17, 2023 ..................................................39

Shannon Ryan, *More than $30K of taxpayers' money, 220 hours spent on single
    Spring Branch ISD book ban, docs show*, ABC 13, March 28, 2023 ........................7

Sneha Dey & Raul Trey Lopez, *Texas Senate OKs bill that aims to keep sexually
    explicit material out of school libraries*, THE TEXAS TRIBUNE, May 23, 2023 .........7

Plaintiffs Book People, Inc. ("BookPeople"), VBK, Inc. d/b/a Blue Willow Bookshop ("Blue Willow Bookshop"), American Booksellers Association ("ABA"), Association of American Publishers ("AAP"), Authors Guild, Inc. ("Guild"), and Comic Book Legal Defense Fund ("CBLDF") (collectively, "Plaintiffs") file this Response in Opposition to Defendants' Motion to Dismiss Pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) ("Response").

## I.  INTRODUCTION AND SUMMARY OF ARGUMENT

> The right of freedom of speech and press has broad scope. The authors of the First Amendment knew that novel and unconventional ideas might disturb the complacent, but they chose to encourage a freedom which they believed essential if vigorous enlightenment was ever to triumph over slothful ignorance. This freedom embraces the right to distribute literature, and necessarily protects the right to receive it.

*Martin v. City of Struthers*, 319 U.S. 141, 143 (1943) (internal citation omitted). H.B. 900 (the "Book Ban") blatantly blocks the distribution and receipt of valuable books and burdens booksellers, publishers, and authors with unconstitutional demands that oppose our nation's fundamental free speech principles.

In their Motion to Dismiss Pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) ("Motion to Dismiss" or "Mot.") (Dkt. 19), and in an attempt to save a blatantly unconstitutional law from being enjoined, Defendants assert novel procedural and substantive arguments that mischaracterize Plaintiffs' positions and misunderstand the Book Ban, all while failing to address the substance of many of Plaintiffs' claims.

The Motion to Dismiss should be denied because Plaintiffs plausibly allege in the Complaint (Dkt. 1) that this Court has subject-matter jurisdiction. Plaintiffs have suffered an injury-in-fact that is traceable to Defendants and that will be redressed by injunctive relief. Plaintiffs' injuries are "imminent" because they will be barred from selling *any* books to public

schools when the Book Ban takes effect on September 1, 2023, which will cause immediate and immense economic harm. TEX. EDUC. CODE § 35.002(a). Plaintiffs' claims are ripe because the Complaint raises "pure questions of constitutional law," and Plaintiffs will suffer hardship if review of the law is delayed. Defendants are not entitled to sovereign immunity because the *Ex parte Young* exception applies—Plaintiffs seek prospective injunctive relief from state actors in their official capacity based on constitutional violations. 209 U.S. 123, 160 (1908).

Plaintiffs also plausibly allege in the Complaint that the Book Ban is unconstitutional in at least six ways, namely, that it: (1) compels private speech, (2) is substantively and procedurally vague, (3) creates a book licensing regime that functions as a prior restraint on speech, (4) unjustifiably regulates speech based on its content, (5) broadly restricts wide swaths of constitutionally protected speech, and (6) improperly delegates government authority. The Book Ban compels Plaintiffs to communicate ideas (*i.e.* State mandated ratings as their own) about books in ways in which they disagree or face sanctions. It also fails to provide Plaintiffs a reasonable opportunity to know what is prohibited or how or whether it will be enforced, prohibits Plaintiffs from exercising their First Amendment right to distribute books, and broadly regulates expressive works based on their content. To prevent these imminent constitutional injuries, Plaintiffs respectfully respect that the Book Ban be immediately enjoined—at the latest, before September 1, 2023—and the Motion to Dismiss be denied.

## II.   LEGAL STANDARD

In considering a Rule 12(b)(1) Motion to Dismiss, "general factual allegations of injury resulting from the defendant's conduct may suffice" because Courts "presume that general allegations embrace those specific facts that are necessary to support the claim." *Gen. Land Office v. Biden*, 71 F.4th 264, 272 (5th Cir. 2023) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561

(1992)). A court should dismiss a claim for lack of subject-matter jurisdiction "only if it appears certain that the plaintiff cannot prove any set of facts that would entitle her to recovery." *Morris v. Thompson*, 852 F.3d 416, 419 (5th Cir. 2017).

In considering a Rule 12(b)(6) Motion to Dismiss, the Court must draw all reasonable inferences in favor of the plaintiffs, who need allege "only enough facts to state a claim of relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The Complaint need only allege facts giving rise to "a right to relief above the speculative level." *Id*. at 555. Motions to dismiss are disfavored and rarely granted. *Lormand v. US Unwired, Inc*., 565 F.3d 228, 232 (5th Cir. 2009).

## III.   ARGUMENT

Defendants' Motion to Dismiss should be denied because this Court has subject-matter jurisdiction over this case and Plaintiffs state a claim for injunctive relief under 42 U.S.C. § 1983 because the Book Ban violates the First and Fourteenth Amendments to the U.S. Constitution.

**A.    This Court has subject-matter jurisdiction over Plaintiffs' constitutional claims for injunctive relief.**

**1.    Plaintiffs sufficiently allege Article III standing to challenge the Book Ban.**

Article III standing exists because Plaintiffs have plausibly alleged that the Book Ban has caused Plaintiffs to suffer an injury-in-fact that is (1) "concrete and particularized" and "actual or imminent;" (2) "fairly traceable" to Defendants' actions; and (3) "is likely be redressed by" injunctive relief. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). Although only one of the six Plaintiffs needs to satisfy the standing requirement, all Plaintiffs have standing in this case. *See Horne v. Flores*, 557 U.S. 433, 446–47 (2009) (in a multi-plaintiff suit, only one plaintiff needs to satisfy the constitutional standing requirements).

Courts have found standing in similar cases involving restrictions on the right to distribute books. *See Prison Legal News v. Livingston*, 683 F.3d 201, 212 (5th Cir. 2012) ("Government interference with one's attempts to sell or distribute written material unquestionably satisfies Article III's injury-in-fact requirement;" the plaintiff's "interest in distributing books" was "more than sufficient to support its standing to sue"); *see also Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 64 n.6 (1963) (book distributors had standing to challenge law prohibiting the distribution of "objectionable" books to minors).

### a.    Plaintiffs have pleaded an injury-in-fact under the First Amendment.

Standing rules are unique in First Amendment cases because of the important constitutional issues at stake and fears of chilling speech. *See Turtle Island Foods, S.P.C. v. Strain*, 65 F.4th 211, 215 (5th Cir. 2023) ("In pre-enforcement free speech challenges, 'chilled speech or self-censorship is an injury sufficient to confer standing.'"). In a First Amendment case, "an actual and well-founded fear that the law will be enforced" against the plaintiff suffices for standing. *Virginia v. Am. Bookseller's Assn., Inc.*, 484 U.S. 383, 393 (1988). Prior enforcement of the law is not required. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158–59 (2014); *see also Turtle Island Foods*, 65 F.4th at 215 (a First Amendment plaintiff "need not have experienced an actual arrest, prosecution, or other enforcement action to establish standing"). Instead, a "plaintiff who challenges a statute must demonstrate a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement." *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979).

Plaintiffs have alleged in the Complaint that they have already sustained an injury and that "an actual and well-founded fear" exists that the Book Ban will be enforced against them and cause them harm. Plaintiffs will be subject to the Book Ban, which regulates book sales to public schools,

because Plaintiffs or their members[1] have sold books to Texas public schools and intend to continue selling books to Texas public schools.[2]

In fact, Plaintiffs have already sustained injury because the Book Ban has caused at least one school district, Katy ISD, to stop purchasing library books,[3] which has caused at least one Plaintiff to lose business.[4] Because the Book Ban applies "beginning with the 2023-2024 school year," which has already begun, Plaintiffs may have already lost additional sales. *See* Book Ban § 6. Indeed, members of Defendant AAP have "reported that there are schools that are stopping or delaying buying books." Dkt. 1-5 ¶ 16.

If injury has not yet occurred, it is certainly "imminent." When the Book Ban takes effect on September 1, 2023 (*see* Book Ban § 7), Plaintiffs will be prohibited from selling *any* books to public schools (regardless of their ratings) because Plaintiffs cannot satisfy the law's book rating requirements.[5] Section 35.002(a) is clear that a bookseller "*may not sell* library materials" to a public school "*unless*" it has "issued appropriate ratings regarding sexually explicitly material and

---

[1] The non-bookstore Plaintiffs—ABA, AAP, the Guild, and CBLDF—have associational standing to bring this case on behalf of their members. *See Nat'l Press Photographers Ass'n v. McCraw*, 504 F. Supp. 3d 568, 580 (W.D. Tex. 2020) (Pitman, J.), *appeal pending*, No. 22-50337 (recognizing associational standing to bring "facial," "content-based," "vagueness," and "overbreadth" challenges). Standing does not require every member to face an injury. Standing can be based on the "likelihood that some members of a discrete group, but not all, will be injured." *See All. for Hippocratic Med. v. U.S. Food & Drug Admin.*, No. 23-10362, 2023 WL 5266026, at *12 (5th Cir. Aug. 16, 2023). As explained below and in the Declarations attached to the Complaint, Plaintiffs' members will be injured because they will be prohibited from selling *any* books to public schools and be required to review and provide ratings for all books ever sold to public schools, causing economic damages.

[2] Rejsek Decl, Dkt. 1-2 ¶¶ 3-7, Koehler Decl. Dkt. 1-3 ¶¶ 3-5, 27; Grogan Decl., Dkt. 1-4 ¶¶ 5; Stratton Decl., Dkt. 1-5 ¶ 4. Rasenberger Decl., Dkt. 1-6 ¶¶ 5-6; Trexler Decl., Dkt. 1-7 ¶ 5.

[3] *See* Claire Goodman, *Katy ISD halts all library book purchases, new books stored*, HOUSTON CHRONICLE (June 27, 2023); Plaintiffs' Reply in Support of Their Motion for Preliminary Injunction (Dkt. 25-1).

[4] *See* Compl. ¶ 36; Dkt. 1-3 ¶ 24.

[5] *See* TEX. EDUC. CODE § 35.002(a) Compl. ¶ 48 ("Booksellers that do not issue ratings are prohibited from selling *any* books to school districts or open-enrollment charter schools.").

sexually relevant material *previously sold to a district or school*." (emphasis added) Defendants agree, explaining that "in order for a vendor to be qualified to sell library materials to a school district, it must have issued appropriate ratings regarding 'sexually explicit' and 'sexually relevant' materials, in compliance with the statute." Mot. at 2. From both a logistical and substantive standpoint, Plaintiffs have testified that they cannot comply with § 35.002(a). They do not have complete records of all books "previously sold to a district or school;"[6] they do not know what books are in "active use;"[7] and they do not understand how to apply the vague, overbroad, and subjective criteria in the statute for issuing the ratings.[8] They will thus be banned from selling *any* books to public schools on September 1, 2023, which will cause them financial harm,[9] satisfying the injury-in-fact requirement. *See All. for Hippocratic Med.*, 2023 WL 5266026, at *14 ("[E]conomic harm—like damage to one's business interest—is a quintessential Article III injury.").

The Book Ban also injures Plaintiffs by requiring them to conduct the burdensome and costly task of reviewing and providing ratings for all books that are in "active use by the district or school," which Plaintiffs have testified will cause them to divert extensive resources and valuable time from their normal operations.[10] *See* TEX. EDUC. CODE § 35.002(a), (b); *All. for Hippocratic Med.*, 2023 WL 5266026, at *14 (plaintiffs "sustain a concrete injury when they are forced to divert time and resources away from their regular" jobs). For example, Plaintiff AAP testified, on behalf of its members, that complying with the Book Ban "would be cost-prohibitive,

---

[6] Dkt. 1-2 ¶ 8-10; Dkt. 1-3 ¶¶ 7-8; Dkt. 1-4 ¶ 6-7; Dkt. 1-5 ¶¶ 5-6.
[7] Dkt. 1-2 ¶ 11; Dkt. 1-3 ¶ 9; Dkt. 1-5 ¶¶ 6-8, 11.c.d.
[8] Dkt. 1-2 ¶¶ 17-18; Dkt. 1-4 ¶¶ 13-17; Dkt. 1-5 ¶ 11, 15; Dkt. 1-7 ¶ 7.
[9] Dkt. 1-2 ¶¶ 22, 26; Dkt. 1-3 ¶ 25; Dkt. 1-4 ¶ 19; Dkt. 1-5 ¶ 16; Dkt. 1-6 ¶¶ 11.
[10] Compl. at 26 n. 44; Dkt. 1-2 ¶¶ 16-17; Dkt. 1-3 ¶¶ 10, 13-16; Dkt. 1-4 ¶¶ 7, 19-20; Dkt. 1-5 ¶¶ 8-11.

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PURSUANT TO FEDERAL RULES CIVIL PROCEDURE 12(B)(1) AND 12(B)(6)**                                                                    6

difficult and time-consuming to hire and train new staff (or re-train existing staff) to apply ratings, given the vague and confusing process outlined by the Book Ban." Dkt. 1-5 ¶ 9. Plaintiff Blue Willow Bookshop estimates that it will cost between $200 and $1,000 per book and between $4 million and $500 million total to read and rate books already sold to public schools according to the Book Ban's multi-layered criteria. Dkt. 1-3 ¶¶ 14–16. These estimates do not account for the cost of reviewing future books or the cost of obtaining previously sold books that are no longer stocked by Blue Willow. *Id*. ¶ 15.  Lucy Podmore, a San Antonio librarian for Northside ISD, testified during a Texas Senate hearing[11] that her students have read more than 14,000 books from their school library during the 2022-23 school year and that six school districts alone have library collections totaling over *six million items*.[12] According to Ms. Podmore, requiring booksellers to review and rate all those books would create "unreasonable obstacles" for them.[13]

There is also a "credible threat" that the State will seek to compel Plaintiffs' speech. *See Susan B. Anthony List*, 573 U.S. at 159 ("[W]e have held that a plaintiff satisfies the injury-in-fact requirement where he alleges an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder.") (internal quotations omitted). Because the TEA can overrule Plaintiffs' ratings, Plaintiffs will be faced with a Hobson's choice—(1) adopt the State's alternative ratings—meaning

---

[11] Hearing on Tex. H.B. 900 before the Senate Comm. on Educ., 88th Leg., R.S. (May 11, 2023) (statement of Lucy Podmore) (available here, from 1:12:30 - 1:14:41).

[12] *See* Sneha Dey & Raul Trey Lopez, *Texas Senate OKs bill that aims to keep sexually explicit material out of school libraries*, THE TEXAS TRIBUNE, May 23, 2023.

[13] To put the financial burdens in perspective, it took Spring Branch ISD more than 220 hours, $30,000, and 16 employees to review *one book* in an effort to comply with a book removal request. *See also* Shannon Ryan, *More than $30K of taxpayers' money, 220 hours spent on single Spring Branch ISD book ban, docs show*, ABC 13, March 28, 2023. At that rate, meeting the Book Ban's onerous requirements of reviewing thousands of books would take tens of thousands of hours and millions of dollars.

listing the State's rating as their own (which is posted online),[14] even when they disagree—in order to sell <u>any</u> books to public schools *or* (2) follow their sincerely held beliefs by refusing to adopt State-mandated ratings with which they disagree and be permanently banned from selling books to Texas public schools. *See* TEX. EDUC. CODE § 35.003. Plaintiffs will be injured either way. They have testified that participating in the rating regime will violate their rights against compelled speech, while not participating will cause significant economic harm.[15] *See 303 Creative LLC v. Elenis*, 143 S. Ct. 2298, 2308 (2023) (plaintiff had standing because a "credible threat" existed that the State would "seek to compel speech"). Failing to change even one rating at the demand of the State will cause a party to be put on the "no buy" list.[16] Plaintiffs have also testified that they disagree with the State's criteria required to rate books and do not want the public to assume the State's ratings as their own.[17] Because Plaintiffs will be tasked with rating hundreds of thousands of books, it is all but certain that the TEA will override at least one of their ratings and require them to acquiesce to its ratings in violation of their rights against compelled speech. *See All. for Hippocratic Med.*, 2023 WL 5266026, at *15 (the "threat of being forced to violate a sincerely held moral belief is cognizable").

Finally, Plaintiffs have standing to bring an overbreadth claim on behalf of third parties, including other "library material vendors" and students. Compl. §§ 87–92; *Serafine v. Branaman*, 810 F.3d 354, 364 (5th Cir. 2016) (plaintiff had standing to challenge law as overbroad that chilled and prohibited others from disseminating protected speech). Because the Book Ban reaches

---

[14] TEX. EDUC. CODE §§ 35.002(e); 35.003(c).
[15] Dkt. 1-2 ¶¶ 19, 21; Dkt. 1-3 ¶ 17; Dkt. 1-4 ¶ 15; Dkt. 1-5 ¶ 14; Dkt. 1-7 ¶¶ 14, 16.
[16] TEX. EDUC. CODE § 35.003(c).
[17] *Id*.

constitutionally protected speech and makes no distinctions based on age, it is particularly

overbroad as to older students. *See* §§ III.B.3.c. and III.B.8 below.

### b.   Plaintiffs' injuries are fairly traceable to Defendants.

Plaintiffs' injuries are fairly traceable to Defendants, who are tasked with enforcing the

Book Ban. "[A]n injury resulting from the application or threatened application of an unlawful

enactment remains fairly traceable to such application, even if the injury could be described in

some sense as willingly incurred." *Fed. Election Comm'n v. Cruz*, 142 S. Ct. 1638, 1647 (2022).

Defendants cite to *Clapper v. Amnesty Intern. USA* to suggest that Plaintiffs are "inflicting harm

on themselves based on their fears of hypothetical future harm that is not certainly impending."

Mot. at 8; 568 U.S. 398, 416 (2013). But Plaintiffs have done nothing—and need do nothing—to

suffer harm from the statute. The Book Ban will immediately apply to Plaintiffs on September 1,

2023, forcing them to issue ratings or blocking them from doing business with public schools. In

*Clapper*, the plaintiffs "attempted to manufacture standing by voluntarily taking costly and

burdensome measures" and still "could not show that they had been or were likely to be subjected

to" the government policy. *Cruz*, 142 S. Ct. at 1647. Here, because Plaintiffs are "library material

vendors," they are subject to the Book Ban, even if they take no action. TEX. EDUC. CODE §

35.001(1). And if Plaintiffs do incur financial injury by declining to issue ratings, there is no

"exception to traceability for injuries that a party purposely incurs." *Cruz*, 142 S. Ct. at 1647.

Defendants also claim that Plaintiffs "can only speculate" that the law will be enforced

against them. Mot. at 9. But when there is a First Amendment pre-enforcement challenge to a

newly enacted law, the Court can "assume a credible threat of prosecution in the absence of

compelling contrary evidence." *Turtle Island Foods*, 65 F.4th at 218 (quoting *Speech First, Inc. v.*

*Fenves*, 979 F.3d 319, 335 (5th Cir. 2020)). No compelling contrary evidence exists.[18]

Defendants have made no public pronouncement and did not represent in their Response or at the Preliminary Injunction Hearing held on August 18, 2023 ("Hearing") that they will not enforce the Book Ban. Although Defendants suggest that they may not override Plaintiffs' ratings, this non-binding assertion is not "compelling contrary evidence" that would allow Plaintiffs or this Court to dismiss the obvious threat of enforcement contained in the law.[19] *Turtle Island Foods*, 65 F.4th at 218 (any "disclaimed intent to penalize" is not "compelling" evidence). Regardless, the Attorney General's interpretations of a law or its enforcement cannot bind courts or local authorities nor should they be relied on by this Court as an "authoritative" interpretation. *See Am. Bookseller's Assn., Inc*., 484 U.S. at 393 (an Attorney General's interpretation of a state law is not "authoritative" and does not bind courts or local authorities); *United States v. Stevens*, 559 U.S. 460, 480, (2010) ("[T]he First Amendment protects against the Government; it does not leave us at the mercy of *noblesse oblige*. We would not uphold an unconstitutional statute merely because the Government promised to use it responsibly.").

At the Hearing, Defendants' counsel was noticeably non-committal, stating more than once that Defendants "don't know" whether they will enforce the Ban.[20] Defendants' counsel stated that

---

[18] Rather, Defendants have been publicly supportive of the bill. On June 12, 2023, Defendant Mike Morath attended the signing ceremony for the Book Ban, where he was photographed smiling alongside the bill's authors, who have promised to vigorously enforce the Book Ban *See* Jay Janner, *Texas Gov. Abbott signs into law bill that prohibits sexually explicit material in schools*, AUSTIN AMERICAN-STATESMAN, June 12, 2023.

[19] Defendants' suggestion also ignores the reality that—given the vague definitions in the Book Ban—Defendants are likely to receive conflicting ratings for hundreds (if not thousands) of books, leading to considerable confusion about which books are allowed in school libraries and which books must be recalled and banned. Defendants have offered no suggestion as to how they would resolve this inevitable issue, in the absence of issuing statewide ratings for those books.

[20] Transcript of Hearing at 12:20–21, attached at Exhibit A ("We don't know if any of this is actually going to happen."); 15:11-12 ("We don't even know if they're going to review the lists. They can under the statute.").

"eventually, there may be" the potential for harm from enforcement,[21] and she told the Court that the law "definitely could" be enforced in the future.[22] These statements do not provide "compelling contrary evidence" that Defendants will refrain from enforcing the Book Ban against Plaintiffs and only serve to support the fact that Plaintiffs' injuries are fairly traceable to Defendants.

Defendants also claim that the book-buying decisions of public schools are not traceable to the law. While Plaintiffs' standing does not rely on third parties because Plaintiffs are directly subject to the law, *Lujan*, 541 U.S. at 561–62, traceability can be satisfied based on the "predictable effect of Government action on the decisions of third parties." *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2566 (2019). Here, there is a direct causal connection between the book-buying decisions of school districts and the impending application of the law, which severely restricts school districts' abilities to purchase certain books.

### c.   Plaintiffs' injuries will be redressed by enjoining the Book Ban.

Finally, Plaintiffs' First Amendment injuries will be redressed if the Book Ban is enjoined because they will no longer need to review and rate any books, can resume selling books to public schools, and will not be compelled to speak against their will. *See Friends of the Earth, Inc. v. Laidlaw Envt'l. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000). When a statutory provision is "*expressly* directed" at a specific group, like the Book Ban is directed at booksellers, such as Plaintiffs, a favorable decision would clearly redress their injury. *Consumer Data Indus. Ass'n v. Tex. through Paxton*, No. 21-51038, 2023 WL 4744918, at *5 (5th Cir. July 25, 2023); *Contender Farms, L.L.P. v. U.S. Dep't of Agric.*, 779 F.3d 258, 264 (5th Cir. 2015) ("If a plaintiff is an object

---

[21] *Id*. at 15:15.
[22] *Id*. at 16:2 ("Yeah, I mean, it definitely could.").

of a regulation 'there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it.'")

Defendants claim that a favorable ruling would not force school districts to purchase books, but a favorable ruling need only lessen the harm to meet the redressability requirements. *Sanchez v. R.G.L.*, 761 F.3d 495, 506 (5th Cir. 2014) ("When 'establishing redressability, [a plaintiff] need only show that a favorable ruling could potentially lessen its injury; it need not definitively demonstrate that a victory would completely remedy the harm.'"). In this case, an injunction would significantly lessen Plaintiffs' injury by allowing them to continue selling books to school districts and eliminating the substantial costs they would incur to comply with the Book Ban's burdensome rating system.

### 2.   Plaintiffs' claims are ripe.

Determining whether a claim is ripe for judicial review requires the evaluation of (1) "the fitness of the issues for judicial decision" and (2) "the hardship to the parties of withholding court consideration." *Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279, 286 (5th Cir. 2012); *see also Susan B. Anthony List*, 573 U.S. at 158 n.5 (Article III standing and ripeness often "boil down to the same question"). The claims are "fit for judicial decisions" because the Complaint raises constitutional questions under the First and Fourteenth Amendments, which are "pure questions of law." *Opulent Life Church*, 697 F.3d at 287 (facial and as-applied constitutional challenge to an ordinance was ripe for review because it raised "pure questions of law"). No further factual development is required to find the Book Ban unconstitutional. *See Blitch v. City of Slidell*, 260 F. Supp. 3d 656, 663 (E.D. La. 2017) (case was fit for judicial decision because it presented a legal question of whether an ordinance violated the plaintiff's First Amendment rights).

Additionally, as explained in more detail in the Complaint and above, Plaintiffs will suffer immediate hardship if review is delayed. The Book Ban states that a bookseller "may not sell" books to public schools "unless" it has "issued appropriate ratings regarding sexually explicitly material and sexually relevant material *previously sold to a district or school*." TEX. EDUC. CODE § 35.002(a). But Plaintiffs cannot fulfill this obligation because they do not have complete records of all books previously sold.[23] Thus, they will be banned from selling books to public schools when the statute takes effect in mere days. Such a "direct effect" on Plaintiffs' "day-to-day business" is a significant hardship sufficient to make a claim ripe for review. *See Abbott Labs. v. Gardner*, 387 U.S. 136, 152 (1967). The Book Ban also requires Plaintiffs to conduct the onerous task of reviewing and providing ratings for books that are in "active use by the district or school," which will divert employees' time and Plaintiffs' resources. *See Suitum v. Tahoe Reg'l Planning Agency*, 520 U.S. 725, 743–44 (1997) ("[W]here a regulation requires an immediate and significant change in the plaintiffs' conduct of their affairs with serious penalties attached to noncompliance, hardship has been demonstrated.").

### 3.      Defendants are not entitled to sovereign immunity.[24]

Any allegations of sovereign immunity are overcome because Plaintiffs' claims fall within the *Ex parte Young* exception, 209 U.S. at 160, which applies when a suit "seeks prospective, injunctive relief from a state actor, in [his] official capacity, based on an alleged ongoing violation of the federal constitution." *K.P. v. LeBlanc*, 729 F.3d 427, 439 (5th Cir. 2013). When standing

---

[23] Dkt. 1-2 ¶ 8-10; Dkt. 1-3 ¶¶ 7-8; Dkt. 1-4 ¶ 6-7; Dkt. 1-5 ¶¶ 5-6.

[24] Defendants' sovereign immunity argument is nothing more than a delay tactic in the hopes of triggering an appeal before the Court decides whether to enjoin the Book Ban. Plaintiffs implore the Court to rule on sovereign immunity at the same time it decides the merits of the Motion for Preliminary Injunction. If appealed, those issues should be considered together. A specious sovereign immunity argument should not be used to prevent a law from being enjoined days prior to it going into effect.

exists, the requirements of *Ex parte Young* are typically satisfied. *See City of Austin v. Paxton*, 943 F.3d 993, 1001 (5th Cir. 2019) (the Fifth Circuit's "Article III standing analysis and *Ex parte Young* analysis significantly overlap;" "a finding of standing tends toward a finding that the *Young* exception applies").

Determining whether *Ex parte Young* provides an exception to sovereign immunity is a "'straightforward inquiry' into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Verizon Maryland, Inc. v. Pub. Serv. Comm'n of Maryland*, 535 U.S. 635, 645 (2002). Here, Plaintiffs seek only injunctive relief and have sued Defendants in their official capacity based on "ongoing" constitutional violations.[25] Compl. ¶¶ 13–16. Thus, their claims fall squarely within the exception provided for in *Ex parte Young*.[26]

### a.     Defendants are tasked with enforcing the Book Ban.

The *Ex parte Young* analysis "turns on … whether 'the state officer, by virtue of his office, has some connection with the enforcement of the act.'" *Air Evac EMS, Inc. v. Tex., Dep't of Ins., Div. of Workers' Comp.*, 851 F.3d 507, 519 (5th Cir. 2017). While enforcement requires "compulsion or constraint," it does not require civil or criminal prosecution. *Id*. In *AirEvac EMS*, the Fifth Circuit allowed an action to proceed against state defendants based on their "pervasive authority to oversee and enforce" Texas's workers' compensation rate-reimbursement system. *Id*.

---

[25] The "ongoing" or "continuing" violation requirement "is satisfied when a state officer's enforcement of a policy allegedly in violation of federal law is threatened, even if the threat is not yet imminent." *Calhoun v. Collier*, No. W-20-CA-380-ADA, 2022 WL 2823580, at *4 (W.D. Tex. May 26, 2022) (Albright, J.).

[26] This Court has previously found that Defendant Mike Morath is subject to suit in his official capacity under *Ex parte Young*. *Portee v. Morath*, No. 1:23-CV-551-RP, 2023 WL 4688528, at *5 (W.D. Tex. July 21, 2023).

Defendants are similarly integral to the enforcement of the Book Ban, as explained in the Complaint and above. *See* Compl. ¶ 16 ("Defendants will each exercise their discretion and legal authority to implement and enforce the Book Ban."). Defendant Morath, as commissioner of the TEA, is responsible for collecting lists of ratings, reviewing booksellers' ratings, notifying booksellers when their ratings are overridden, and posting lists of ratings and recalcitrant vendors on TEA's website. Compl. ¶¶ 15, 48, 50. Booksellers that fail to comply with TEA's requirements are barred from doing business with public schools. TEX. EDUC. CODE § 35.003(d). Thus, Plaintiffs have plausibly alleged that Morath has "pervasive authority" to oversee and enforce a rating system that is premised on "compulsion" and "constraint"—compelling booksellers to issue and accept TEA's ratings—and constraining them from selling library materials to public schools.

At the Hearing, Defendants' counsel conceded that TEA is tasked with enforcing the rating regime.[27] Defendants' counsel stated that TEA has "oversight"[28] over the ratings and that "someone at TEA" would determine whether Plaintiffs properly rated library material. TEA's purview also includes "final say . . . over the ratings"[29] and any "punishment" that results from TEA's revised ratings, according to Defendants' counsel.[30] Defendants' counsel also agreed with the Court that there is no mechanism in the statute for Plaintiffs to appeal TEA's ratings,[31] which means TEA maintains total control over the enforcement of the Book Ban.

Similarly, Defendant Wong, as the chair of TSLAC, and Defendant Ellis, as chair of BOE, are responsible for formulating and promulgating mandatory library standards for public schools, which will impact how books ratings are applied. *Id*. § 33.021(b). Compl. ¶¶ 13, 14, 52–54. These

---

[27] Transcript of Hearing at 8:7–21.
[28] *Id*. at 28:11.
[29] *Id*. at 26:17–18.
[30] *Id*. at 71:1.
[31] *Id*. at 12:17–19.

mandatory standards unconstitutionally bar public schools from obtaining non-obscene library materials and constrain Plaintiffs from selling constitutionally protected materials to those schools.[32] Further, Defendants' counsel suggested at the Hearing that TSLAC and the BOE have a role in enforcing the rating regime. Asked by the Court what happens if books are "not marked" in April, Defendants' counsel stated "that would be a policy that TSLAC and Board of Education would come up with."[33] And if Plaintiffs do sell books to school districts in violation of the law, Defendants' counsel suggested that enforcement would fall to "the Defendants in this case, the Board of Education and TSLAC."[34] Thus, all Defendants have, at a minimum, "some connection with the enforcement of the act." *See Air Evac EMS, Inc.* at 519.

### b. Enforcement of the Book Ban is imminent.

For *Ex parte Young* to apply, there must only be "some scintilla of 'enforcement' by the relevant state official." *Paxton*, 943 F.3d at 1002. Actual enforcement—or even a threat of enforcement—is not required. *Air Evac*, 851 F.3d at 519. As Defendants recognize, "enforcement means compulsion or constraint." *See* Mot. at 12; *Tex. All. for Retired Americans v. Scott*, 28 F.4th 669, 672 (5th Cir. 2022). The "compulsion" to issue ratings begins immediately when the law takes effect on September 1, 2023. Tex. Educ. Code § 35.002(a); Book Ban § 7. Because Plaintiffs cannot submit ratings for all books previously sold to public schools, Plaintiffs will face a "constraint" on their First Amendment rights and economic interests on that date by being barred from selling any books to public schools. Enforcement is thus imminent on September 1, 2023, regardless of whether Defendants take any affirmative steps on that date. And as noted above,

---

[32] The Legislature could have tracked definition of obscenity in Texas Penal Code § 43.21(a)(1), but it chose not to, which extended the statutory reach beyond the limits of unprotected speech and bars constitutionally protected speech.

[33] *Id*. at 67:24–25.

[34] *Id*. at 70:14–15.

Defendants have offered no binding assurances that they will not enforce the Book Ban, nor could they. *Am. Bookseller's Assn., Inc.*, 484 U.S. at 393 (an Attorney General's interpretation of a state law is not "authoritative").

### c.   Injunctive relief would not control Defendants' discretion.

Defendants rely on inapposite case law to claim that enjoining the Book Ban would seek to "control an officer in the exercise of his [or her] discretion." Mot. at 13 (quoting *Richardson v. Tex. Sec'y of State*, 978 F.3d 220, 242 (5th Cir. 2020)). In *Richardson*, the plaintiffs sought to compel affirmative enforcement action by the Secretary of State. *Id*. In this case, Plaintiffs do not seek to control any discretionary action by Defendants. Instead, Plaintiffs seek only to enjoin Defendants from enforcing an unconstitutional law. Further, Defendants' obligations under the Book Ban are not purely discretionary. The law requires Defendants to take certain enforcement actions—the TEA "shall post each list" of ratings, "shall provide written notice" if the TEA overrides a rating, "shall post and maintain in a conspicuous place" on its website the list of noncompliant vendors, and "shall adopt standards for school library collection development." TEX. EDUC. CODE §§ 33.021(c), 35.002(e), 35.003(a), (c); Book Ban § 4; *see Matter of Brown*, 960 F.3d 711, 716 (5th Cir. 2020) ("'Shall' is a mandatory word indicating a command."). Unlike in *Richardson*, where the statute at issue stated that the Secretary "may" take certain actions, the mandatory obligations in the Book Ban do not leave Defendants "considerable discretion and latitude." Thus, Plaintiffs are entitled to invoke *Ex parte Young*. *See Richardson*, 978 F.3d at 242.

Defendants allege that if *Ex parte Young* applies, the relief sought would be impermissible because Plaintiffs seek an "overly vague and overbroad injunction." Mot. at 14–15. This argument is premature because the Court has not yet issued an injunction. In the two cases cited by Defendants, the Fifth Circuit considered whether the District Court's injunction was appropriately

defined and tailored. *See Scott v. Schedler*, 826 F.3d 207, 211 (5th Cir. 2016); *E.T. v. Paxton*, 19 F.4th 760, 769 (5th Cir. 2021). It is thus too early for Defendants to complain about the scope of an injunction that has not yet been issued.

Defendants add baseless argument that *Pullman* abstention should apply because they disagree with Plaintiffs' interpretation of the Book Ban. Mot. at 15; *Railroad Comm'n of Texas v. Pullman Co.*, 312 U.S. 496, 499–500 (1941). This proves too much, as plaintiffs and defendants will naturally have different interpretations of statutes and such a disagreement falls well short of the *Pullman* standard. Besides not explaining why judicial construction "will moot or present in a different posture the federal constitutional questions raised" (Mot. at 15), Plaintiffs fail to assert any specific "unsettled issue of state law," as required under *Pullman*. *Palmer v. Jackson*, 617 F.2d 424, 428 (5th Cir. 1980). Defendants have thus not shown that abstention is appropriate here.

**B.**      **Plaintiffs plausibly allege that the Book Ban violates their First and Fourteenth Amendment rights.**

      **1.**      **Plaintiffs may seek injunctive relief under the Declaratory Judgment Act.**

Defendants mischaracterize the Complaint to suggest that Plaintiffs have brought a cause of action under the Declaratory Judgment Act ("DJA"), 28 U.S.C. §§ 2201, *et seq*. Mot. at 15–16. But Plaintiffs have asserted claims under 42 U.S.C. § 1983 and the First and Fourteenth Amendments and have only requested injunctive relief under the DJA, which is proper. Compl. ¶ 20 ("This Court has jurisdiction to issue declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202. . ."); *United Transp. Union v. Foster*, 205 F.3d 851, 857 (5th Cir. 2000) (the DJA "provides the statutory mechanism for seeking pre-enforcement review of a statute").

      **2.**      **Plaintiffs assert cognizable claims under 42 U.S.C. § 1983.**

Plaintiffs allege that Defendants, while acting under the color of state law, violated their rights under the First and Fourteenth Amendments of the U.S. Constitution. Compl. ¶¶ 55–98.

Plaintiffs provide a series of facts supporting why the Book Ban, which is enforced by Defendants, infringes their constitutional rights against compelled speech and is unconstitutionally vague, an impermissible prior restraint on speech, a content-based restriction on speech, overbroad, and an improper delegation of state power. *Id.* These allegations are sufficient to establish a viable claim under § 1983.[35] *See James v. Collin Cnty.*, 535 F.3d 365, 373 (5th Cir. 2008); *Wooley v. Maynard*, 430 U.S. 705, 710 (1977) ("[A] litigant is entitled to resort to a federal forum in seeking redress under 42 U.S.C. § 1983 for an alleged deprivation" of a First Amendment right").

### 3. Plaintiff booksellers, publishers, and authors have robust First Amendment rights to distribute books and be free from compelled speech.

#### a. The government speech doctrine does not apply.

The government speech doctrine does not apply because this case is about the government restricting and compelling speech from private entities, not speech by the government. The Book Ban requires private entities, such as Plaintiffs, to exercise their speech rights by reviewing and rating books consistent with state-mandated criteria. The ratings are "pure speech" protected under the First Amendment because they "communicate ideas"—whether a book contains content that is "sexually explicit" or "sexually relevant." *See 303 Creative*, 143 S.Ct. at 2312. The reviews will be publicly posted as Plaintiffs' own views, not those of the government, conveying to the public that Plaintiffs believe a book is "sexually explicit" or "sexually relevant," regardless of whether Plaintiffs agree with the criteria or hold that belief. Tᴇx. Eᴅᴜᴄ. Cᴏᴅᴇ §§ 35.002(e), 35.003(c). Further, if TEA overrides a vendor's initial views, the bookseller must re-rate the book consistent with TEA's "corrected" rating. *Id.* § 35.003(b)(1). This revised rating is again posted publicly on

---

[35] Defendants provide no support for the irrelevant allegation that Plaintiffs' First Amendment rights are "not implicated when it comes to the creation and implementation of education policy." Mot. at 16.

TEA's website, where the public will view those ratings *as if* they were made by the vendor. *Id.*
§§ 35.002(e), 35.003(c). This is a design, not a flaw, of the Book Ban. This is how the Legislature
wrote the law, which is clear on its face. If the government wanted to exercise its speech rights, it
could have reviewed and rated the books themselves and posted their own ratings. But that is not
the regime established by the Book Ban. Defendants' attempts to re-write the law to support its
legal positions should be rejected.[36]

      Further, the government speech doctrine does not apply because the Book Ban authorizes
the removal of books, which is subject to the First Amendment. *See* TEX. EDUC. CODE 35.002(b)
(a "library material vendor . . . shall issue a recall"); *Bd. of Educ., Island Trees Union Free Sch.
Dist. No. 26 v. Pico*, 457 U.S. 853, 872 (1982) (a municipal actor's decision "to remove books"
from shelves implicates the First Amendment); *Little v. Llano Cnty.*, No. 1:22-CV-424-RP, 2023
WL 2731089, at *7 (W.D. Tex. Mar. 30, 2023) (Pitman, J.), *appeal pending*, No. 50224 (rejecting
the argument "that removal decisions were 'government speech to which the First Amendment
does not apply'"); *Fayetteville Pub. Library v. Crawford Cnty., Arkansas*, No. 5:23-CV-05086,
2023 WL 4845636, at *20 (W.D. Ark. July 29, 2023) (the censorship of non-obscene library
materials is not government speech).

---

[36] *Chiras v. Miller* is distinguishable. 432 F.3d 606 (5th Cir. 2005); Mot. at 17–18. Unlike in
*Chiras*, Plaintiffs sell books other than textbooks and are not asking that books be part of the
school's curriculum. In fact, the Book Ban specifically does not apply to textbooks or similar books
"directly related to the curriculum." TEX. EDUC. CODE §§ 33.021(a); 35.001(3). Rather than
challenging the refusal of state funding like the plaintiffs in *Chiras*, Plaintiffs contest the State's
burdensome requirements that they rate and review all books using the government's criteria and
adopt the State's views about those books, even if they disagree.

      **b.**      **The public forum analysis does not apply.**

Defendants assert that Plaintiffs have no First Amendment rights because the school library "is a nonpublic forum." Mot. at 19. But the forum analysis is not the correct analytical framework to assess the rights asserted by Plaintiffs.[37]

The public forum analysis only applies in limited case. "Where the property is not a traditional public forum and the government has not chosen to create a designated public forum…[it may be] not a forum at all." *Arkansas Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 678 (1998). Specifically, the Court has stated that a "public library does not … collect[] books in order to provide a public forum for the authors of books to speak," but to "facilitate research, learning, and recreational pursuits by furnishing materials of requisite and appropriate quality." *United States v. Am. Library Ass'n, Inc.*, 539 U.S. 194, 206–07 (2003). There, the Supreme Court found that forum analysis did not apply to Internet terminals in a public library because the Internet was "no more than a technological extension of the book stack." *Id.* (quoting S.Rep. No. 106–141, p. 7 (1999)).

The forum analysis does not apply to this case either. The speech at issue is Plaintiffs' right to distribute and sell books and to be free from compelled speech, which are wholly distinct from student speech rights and other speech that occurs inside the school setting. *See, e.g.*, *Prison Legal News*, 683 F.3d at 212 (the distribution of books "is precisely the type of interest at the core of

---

[37] Even if the school library was found to be a non-public forum and the Court applied the doctrine to this case, viewpoint discrimination is prohibited in *any* forum. *See Hobbs v. Hawkins*, 968 F.2d 471, 481 (5th Cir. 1992) ("[V]iewpoint discrimination violates the First Amendment regardless of the forum's classification."). The Book Ban is a viewpoint-based law enacted to remove certain disfavored books from school libraries because of the views espoused in them. *See* Compl. §§ 28–36; Bill Chappell, *A Texas lawmaker is targeting 850 books that he says could make students feel uneasy*, NPR, October 28, 2021;. Christopher Hooks, *Jared Patterson's School-Library Bill Would Book Ban Larry McMurtry's Novel*, Texas Monthly, March 22, 2023.

First Amendment protections"); *303 Creative*, 143 S. Ct. at 2312 ("[T]he government may not compel a person to speak its own preferred messages.").

Defendants cite no cases in which the public forum analysis applies to these facts—third-party private distributors and publishers exercising their First Amendment rights outside the school setting. Instead, Defendants rely on cases involving student speech within the confines of a curricular activity.  For example, in *Hazelwood Sch. Dist. v. Kuhlmeier*, students who worked on their high school newspaper sued the school district after their faculty supervisor removed two articles from a school newspaper. 484 U.S. 260, 263 (1988). The question was "whether the First Amendment requires a school affirmatively to promote particular student speech," and the Supreme Court ultimately decided that some regulation was permitted because the newspaper was "part of the school curriculum."[38] *Id.* at 270–71. In *Bethel Sch. Dist. No. 403 v. Fraser*, a student who gave controversial remarks at a school assembly sued the district to contest his suspension. 478 U.S. 675, 685 (1986). Both cases consider the First Amendment rights of *students* within fora that were created by the school specifically for student communication as part of the curriculum. That analytical framework simply does not apply to Plaintiffs or their claims.

Similarly, Defendants cite to *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, a case in which rival teachers' unions contested which should have access to an internal mail system for teachers within a school. 460 U.S. 37 (1983). That case ultimately turned "on the *status* of the respective unions rather than their views," since one of the unions had become the exclusive bargaining unit for the teachers. *Id.* at 49. As with the student-speech cases, the forum analysis in

---

[38] Notably, the Book Ban specifically does *not* apply to books "directly related to the curriculum." TEX. EDUC. CODE §§ 33.021(a); 35.001(3).

*Perry* is not only unhelpful for the present case, it is so completely inapposite that its analytical framework should not be applied.

> ### c.   The Book Ban restricts constitutionally protected non-obscene material.

Defendants attempt to make this case about protecting children from obscenity when it is, instead, about the unconstitutional restriction of *non-obscene* material. Without support, Defendants allege that Plaintiffs "seek to introduce" obscene material into schools when Plaintiffs made no such statement and have no such intention. Mot. at 22–23. Plaintiffs have acknowledged that while the Book Ban "*may* prohibit *some* obscene and harmful material, it also prohibits a wide swath of constitutionally protected material." Compl. ¶ 91 (emphasis added).

Defendants would seem to agree, conceding that the Book Ban "attempts" but fails "to mirror the test in *Miller*." Mot. at 22; *Miller v. California*, 413 U.S. 15, 24 (1973). Neither the definitions of "sexually explicit material" or "sexually relevant material" nor the "contextual analysis" required to determine whether a book is "sexually explicit" or "sexually relevant" include *any* consideration of "whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value," as required under *Miller*. TEX. EDUC. CODE §§ 33.021(a), 35.001(3), 35.0021. The Legislature could have tracked definition of "obscenity" in Texas Penal Code § 43.21(a)(1), but it decided not to. Although Defendants claim that "non-exhaustive examples" from *Miller* "parallel the language" in the Book Ban, those examples are, in fact, completely absent from the law. Mot. at 23.

> ### 4.   The Book Ban compels "pure speech" entitled to First Amendment protection.

> ### a.   Plaintiffs' speech is fully protected under the First Amendment.

The Book Ban compels Plaintiffs' speech in at least two ways: (1) it requires Plaintiffs to review and rate books as "sexually explicit," "sexually relevant," or "no rating" based on the

government's standards with which they disagree, and (2) it requires Plaintiffs to revise their own ratings and adopt a "corrected" rating if the government believes they "incorrectly" rated a book. Compl. ¶¶ 55–60. If Plaintiffs refuse to adopt the government's views in either scenario, they will be permanently banned from selling any books to public schools. *Id*. ¶ 59; TEX. EDUC. CODE § 35.003(d). They will also be listed on the TEA's website as a vendor that failed to comply with the law. TEX. EDUC. CODE § 35.003(c).

The commercial speech doctrine plays no role in this case. The ratings compelled by the Book Ban are "pure speech" protected under the First Amendment because they "communicate ideas"—whether a book contains content that is "sexually explicit" or "sexually relevant." *See 303 Creative*, 143 S.Ct. at 2312 (websites at issue were "pure speech" under the First Amendment because they "communicate ideas"). The Book Ban requires Plaintiffs to perform a subjective, multi-step analysis based on a series of government-created factors to determine whether a book should be rated as "sexually explicit," "sexually relevant," or "no rating."

Each rating is individually decided after reviewing a book and applying the "contextual analysis" and factors outlined in the law. No two booksellers are likely to conduct the same subjective analysis, focus on the same parts of the books, or weigh the factors similarly. Each rating will thus be an "'original, customized' creation" subject to First Amendment protection. *Id*. at 2312 (each website was an "original, customized creation")

Like the law in *303 Creative*, the Book Ban "does not seek to impose an incidental burden on speech." *Id*. at 2318. Instead, it "seeks to force" Plaintiffs to "utter what is not in [their] mind" about a question of public importance—whether students should have access to certain books in their school libraries. *Id*. In today's heated political climate, these are significant decisions that reflect the value-judgments of Plaintiffs (and forced TEA ratings) that will be posted online for all

customers (not only public schools) to view.

Like in *303 Creative*, Plaintiffs "must either speak as the State demands or face sanctions for expressing [their] own beliefs." *Id*. at 2313. In *303 Creative*, sanctions included compulsory participation in remedial training, filing compliance reports, and paying fines. *Id*. at 2313. According to the majority opinion, those punishments were "more than enough" under U.S. Supreme Court precedent to "represent an impermissible abridgment of the First Amendment's right to speak freely." *Id*. at 2313. Here, the sanctions Plaintiffs face for failing to adopt the government's speech—the economic harm of being permanently barred from selling any books to Texas public schools and the reputational harm of being publicly shamed online—are just as, if not more, severe.

Contrary to Defendants' contentions, the book ratings do *not* constitute commercial speech. The fact that Plaintiffs may have economic interests in selling books does not render their speech commercial. *Id.* at 2316 (the creation of websites for profit was entitled to full First Amendment protection; speakers do not "shed their First Amendment protections by employing the corporate form to disseminate their speech"); *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501 (1952) ("That books, newspapers, and magazines are published and sold for profit does not prevent them from being a form of expression whose liberty is safeguarded by the First Amendment."); *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 761 (1976) ("Speech likewise is protected even though it is carried in a form that is 'sold' for profit, and even though it may involve a solicitation to purchase or otherwise pay or contribute money.") (internal citations omitted).[39]

---

[39] Commercial speech does "no more than propose a commercial transaction" and is "so removed from any exposition of ideas" and from "truth, science, morality and arts in general." *Virginia State Bd. of Pharmacy* 425 U.S. at 762 (internal quotation and cited omitted). The ratings

### b. Rating books for sexual content is not an "essential operation of government."

Defendants claim that a rating system that was devised in 2023 and has yet to be implemented is already an "essential operation of government." Mot. at 26–27.  But this is not so. The Texas public school system was established in 1854[40] has operated for nearly 170 years without any state-mandated rating of library materials. Millions of Texans have thrived in public schools without such a rating system, making it difficult to see how this rating regime is "essential" to the Texas education system. Courts have recognized only a tiny sliver of government operations as "essential," including the registration of sex offenders, the filing of taxes, and the completion of the federal census. *See United States v. Arnold*, 740 F.3d 1032, 1035 (5th Cir. 2014); *United States v. Sindel*, 53 F.3d 874, 878 (8th Cir.1995); *Morales v. Daley*, 116 F. Supp. 2d 801, 816 (S.D. Tex. 2000).

Courts have upheld these requirements because citizens were simply asked to provide factual or demographic information to the government and were "not being asked to disseminate publicly a message with which [they] disagree." *Morales*, 116 F. Supp. 2d at 816. Defendants' claim the rating system is "simply information being sought by the Agency." Mot. at 27. But Plaintiffs are required to perform a highly contextual, multi-step, fact-intensive analysis of sexual content, balanced against contemporary standards, which will then be posted online by the State, as if it is Plaintiffs' speech. This is wholly different from factual information provided in confidence to the government for the purposes of paying taxes or assembling the federal census.

---

required by the Book Ban do much more than propose a commercial transaction because they are an expression of a bookseller's views about a book and convey ideas.

[40] *A Brief History of Public Education*, Texas Almanac, https://www.texasalmanac.com/articles/a-brief-history-of-public-education.

As such, Defendants cannot avoid review of the Book Ban's unconstitutional compelled speech requirements by claiming they are "essential" to any government function when they are not.

### 5.   Plaintiffs plausibly allege that the Book Ban is unconstitutionally vague.

Instead of specifically addressing *any* of the many vagueness allegations asserted in the Complaint or Motion for Preliminary Injunction (Dkt. 6), Defendants recite a series of cases about the legal standard without applying any of them to this case. Mot. at 27–29.[41]

Plaintiffs plausibly allege that the Book Ban is unconstitutionally vague because it: (1) fails to provide a "person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly" and (2) fails to provide "explicit standards" for applying the law "to avoid arbitrary and discriminatory applications." *See* Compl. ¶¶ 61–69; *Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 551 (5th Cir. 2008).

Vagueness is an acute constitutional concern in this case because, as explained below, the Book Ban functions as a licensing regime. *See Interstate Circuit, Inc. v. City of Dallas*, 390 U.S. 676, 682 (1968) ("The vice of vagueness is particularly pronounced where expression is sought to be subjected to licensing."). In *Interstate Circuit*, the Supreme Court enjoined a Dallas ordinance that established the "Motion Picture Classification Board," which prohibited films that were "likely to incite or encourage delinquency or sexual promiscuity" by minors. *Id*. at 689. The Court held that the ordinance was unconstitutionally vague, in part, because "sexual promiscuity" was not defined or interpreted by state courts and was difficult to consistently apply. *Id*. at 687 (the

---

[41] Defendants have thus waived any argument that Plaintiffs failed to state a claim as to vagueness or that Plaintiffs are not likely to succeed on their vagueness claim. *See Kellam v. Servs*., No. 12-352, 2013 WL 12093753, at *3 (N.D. Tex. May 31, 2013) ("Generally, the failure to respond to arguments constitutes abandonment or waiver of the issue.").

term "could extend, depending upon one's moral judgment, from the obvious to any sexual contacts outside a marital relationship").

The Book Ban suffers from similar infirmities, leaving a "person of ordinary intelligence" without "a reasonable opportunity to know what is prohibited." The ratings process itself is riddled with unanswered questions, such as: How does one know what is "directly related to the curriculum"? What does it mean for a book to be "in active use"? Further, the definitions of "sexually explicit material" and "sexually relevant material," which are not based on the *Miller* test, are far from clear. There also little, if any, guidance in applying the "contextual analysis," which requires the balancing of three vague factors and a "fact-specific" review, which will surely result in inconsistent results. *See* Dkt. 1-4 ¶ 13. Human nature suggests that differences in experiences and perspectives are certain to cause disparate ratings among booksellers.[42] As discussed at the Hearing, there is no clear way to apply the Book Ban's definitions and confusing "contextual analysis" to many classic works of literature, including *Lonesome Dove* and *Of Mice and Men*, and timeless works of art, such as those by Michelangelo and Caravaggio.

The fact that the Book Ban does not account for a child's age adds further confusion and will likely produce a race to the bottom, causing booksellers—and the TEA—to err on the side of more restrictive ratings aimed at younger students, which will prevent older students from accessing many constitutionally protected and valuable books. The law also fails to clarify which

---

[42] The Book Ban is similar to an ordinance the U.S. Supreme Court struck down as vague that banned congregating on a public sidewalk if it would be "annoying" to others because it "subject[ed] the exercise of the right of assembly to an unascertainable standard." *Coates v. City of Cincinnati*, 402 U.S. 611, 614 (1971). "Conduct that annoys some people does not annoy others. Thus, the ordinance is vague, not in the sense that it requires a person to conform his conduct to an imprecise but comprehensible normative standard, but rather in the sense that no standard of conduct is specified at all. As a result, 'men of common intelligence must necessarily guess at its meaning.'" *Id.*

community standards should be used. It instead utilizes a one-size-fits-all regime that does not account for the vast diversity of this state. And once ratings are made, it is unknown how to "issue a recall" or how a recall should be executed. These are just *some* of the many questions raised by the Book Ban's vague provisions. *See Nat'l Press Photographers Ass'n v. McCraw*, 594 F. Supp. 3d 789, 809 (W.D. Tex. 2022) (Pitman, J.), *appeal pending*, No. 22-50337 (the term "surveillance" was unconstitutionally vague because it was "impossible to know" whether one's conduct was prohibited by the term; "surveillance" was not defined in the statute, defendants could not provide a definition, and dictionary definitions were inconsistent).

Even Defendants do not seem to know what is required by the law. The Book Ban states that vendors may not sell any books to public schools unless the vendor has issued ratings for all "material previously sold to a district or school." TEX. EDUC. CODE § 35.002(a). But Defendants' counsel stated at the Hearing that "[a]s far as the prior books, there's no mechanism for tracing every prior book sold back to whenever,"[43] suggesting that not all previously sold books need to be rated. When the Court asked if Plaintiffs must review *any* previously sold books, Defendants' counsel stated: "Yes. They need to do what they know. I mean, you —obviously no one can be made to do something that they don't know."[44]   Here, neither party seems to know what is prohibited by the law, and, as a result, Plaintiffs have no opportunity to act accordingly, rendering the law unconstitutionally vague. *See McCraw*, 594 F. Supp. 3d at 809 (a "prime example of a vague statute" is one in which its unknown whether plaintiffs' conduct is included); *see also Women's Med. Ctr. of Nw. Houston v. Bell*, 248 F.3d 411, 422 (5th Cir. 2001) (unclear regulations

---

[43] Transcript of Hearing at 76:24–77:1.
[44] *Id*. at 76:24–77:5.

requiring physicians to maintain certain subjective standards of care were unconstitutionally vague because they "open[ed] the door to potentially arbitrary and discriminatory enforcement").

The Book Ban also invites "arbitrary and discriminatory application" by leaving many critical questions unanswered regarding its enforcement: How will the law be enforced? Who enforces the law? What are the penalties for noncompliance? What is the State's procedure for reviewing ratings?

At the Hearing, the State failed to provide answers for many of these questions. Asked who enforces the law if Plaintiffs ignore it, Defendants' counsel stated: "That's a good question. A good question that I don't know that anybody has thought that through yet."[45] Asked what could cause to TEA to review and revise Plaintiffs' ratings, Defendants' counsel stated: "I haven't thought that through yet. I think this is still being worked out because this is a new bill."[46] Asked how Plaintiffs may seek relief under the law, Defendants' counsel stated: "Well, your Honor, maybe the answer is they can't."[47]

With days until the Book Ban takes effect, Plaintiffs are still unclear *what* is required under the law, *when* it is required, and *how* the State plans to enforce these requirements—all questions that Defendants are similarly unable to answer. These unanswered questions demonstrate that the statute is unconstitutionally vague.

> **6.** **Plaintiffs plausibly allege that the Book Ban is an unconstitutional prior restraint because it prevents the distribution of constitutionally protected works without judicial review.**

In the Motion, Defendants mischaracterize the First Amendment rights at issue, the Book Ban's clear prohibitions on future speech, and the crux of Plaintiffs' prior restraint argument. Mot.

---

[45] *Id*. at 66:9–11.
[46] *Id*. at 33:3–4.
[47] *Id*. at 10:9–10.

at 29–30. To start, the Book Ban is not a prior restraint because it restricts the "right of students to receive information." Mot. at 29. Rather, the Book Ban is a prior restraint on Plaintiffs' First Amendment right to distribute books, a right which has been repeatedly recognized,[48] because it prohibits Plaintiffs from selling books to public schools and provides the government sole discretion to prohibit the dissemination of books without due process. *See* Compl. ¶¶ 70–77; *Chiu v. Plano Indep. Sch. Dist.*, 339 F.3d 273, 280 (5th Cir. 2003) ("The prohibition of distributing literature is a classic form of a prior restraint.")

The Book Ban is a prior restraint because it prohibits speech *before* it is communicated. *See Alexander v. United States*, 509 U.S. 544, 550 (1993) (prior restraints forbid communications "in advance of the time that such communications are to occur"). As such, it faces a "heavy presumption against [its] constitutional validity." *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976); *see also NetChoice, L.L.C. v. Paxton*, 49 F.4th 439, 453 n.5 (5th Cir. 2022) ("prior restraints were prohibited, full stop" under the First Amendment's original public meaning).

The Book Ban vests the State with the complete discretion to prevent the distribution of constitutionally protected works. New books rated as "sexually explicit" by Defendants will be prohibited from being distributed by all booksellers, including Plaintiffs, regardless of whether they are constitutionally protected. TEX. EDUC. CODE §§ 33.021(c)(2)(A)(ii); 35.002(b). The Book Ban also restrains Plaintiffs from distributing *any* books to public schools if they fail to accept Defendants' revised rating as their own. *Id*. § 35.003(d). Finally, the Book Ban provides no due process or ability to challenge the State's final determinations and meets none of the "narrowly

---

[48] *See, e.g.*, *Smith v. People of the State of California*, 361 U.S. 147, 150 (1959) (the "free publication and dissemination of books and other forms of the printed word" is protected by the First Amendment); *Prison Legal News*, 683 F.3d at 212 (the distribution of books "is precisely the type of interest at the core of First Amendment protections").

defined exceptions to the prohibition against prior restraints" because it does not "prevent direct, immediate and irreparable damage" or "comport with required procedural safeguards." *Bernard v. Gulf Oil Co.*, 619 F.2d 459, 473 (5th Cir. 1980); *Freedman v. State of Md.*, 380 U.S. 51, 58 (1965) ("[O]nly a procedure requiring a judicial determination suffices to impose a valid final restraint."). Here, not only is no judicial recourse contemplated, but there is also an express prohibition against damages in the Book Ban. TEX. EDUC. CODE § 35.004.

Defendants suggest that a lower standard may apply, but they can muster only two inapplicable student-speech cases in support of their position. Mot. at 30, citing *Kuhlmeier*, 484 U.S. at 268–69 (concerning editorial control over a student newspaper); *Henerey ex rel. Henerey v. City of St. Charles, Sch. Dist.*, 200 F.3d 1128, 1134 (8th Cir. 1999) (regarding disqualification of student body president for distributing condoms). Defendants go even further afield to suggest a "reasonably related" standard for prior restraints, which is plucked from *dicta* in a Seventh Circuit case regarding internal police department communications. Mot. at 30, citing *Milwaukee Police Ass'n v. Jones*, 192 F.3d 742, 749 (7th Cir. 1999). Defendants cannot simply lower the high bar set by the Constitution for imposing a prior restraint. In fact, the Fifth Circuit has recognized that, "even in schools there exists a clearly established right to be free of prior restraints except where they are designed to maintain discipline or to prevent school disruption and are narrowly drawn to achieve that goal." *Chiu*, 339 F.3d at 282. The Book Ban is neither designed for those goals nor narrowly drawn to achieve them.

### 7. Plaintiffs plausibly allege that the Book Ban is a content-based regulation that fails to satisfy strict scrutiny.

Defendants' allegations that neither strict scrutiny nor the First Amendment apply to the Book Ban are meritless. Mot. at 30–31.

#### a. The First Amendment applies to the Book Ban.

First, the Book Ban implicates Plaintiffs' First Amendment rights to distribute books and to be free from compelled speech. Plaintiffs are prohibited from distributing books to public schools if they do not comply with impossible task of reviewing and rating all books previously sold to public schools (records Plaintiffs and other booksellers don't have) or fail to adopt the government's compelled ratings. Compl. ¶¶ 37–38, 48, 50; *see Bantam Books, Inc.*, 372 U.S. at 64 n. 6 ("The constitutional guarantee of freedom of the press embraces the circulation of books."); *Lovell v. City of Griffin, Ga.*, 303 U.S. 444, 452 (1938) (robust First Amendment protections apply to "every sort of publication which affords a vehicle of information and opinion."); *303 Creative*, 143 S. Ct. at 2312 ("[T]he government may not compel a person to speak its own preferred messages.").

### b.    The Book Ban is a content-based regulation subject to strict scrutiny.

Second, strict scrutiny applies because the Book Ban is a content-based regulation that only applies to certain books deemed "sexually explicit" or "sexually relevant"—classifications that hinge on "the topics discussed, or the idea or message expressed."[49] Compl. ¶¶ 78–86; *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015); *see also See Tex. Entm't Ass'n, Inc. v. Hegar*, 10 F.4th 495, 512 (5th Cir. 2021) (statute applying the definition of "nude" to dancers who wore opaque latex over their breasts was subject to strict scrutiny as a content-based restriction because it was "directed at the essential expressive nature of the latex clubs' business").

In an analogous case, the U.S. Supreme Court held that Section 505 of the Telecommunications Act of 1996 was a content-based regulation subject to strict scrutiny because

---

[49] Intermediate scrutiny does not apply because the Book Ban is not a "time, place, and manner" restriction that regulates speech on a neutral basis. *See Serv. Employees Intern. Union, Local 5 v. City of Houston*, 595 F.3d 588, 596 (5th Cir. 2010).

it required cable television operators to either block or limit the transmission of channels "primarily dedicated to sexually-oriented programming." *United States v. Playboy Entm't Group, Inc.*, 529 U.S. 803, 806 (2000). The Court found that Section 505 was the "essence" of a content-based regulation because it applied *only* to channels dedicated to sexually explicit programing—not other channels. *Id.* at 811–12.

Similarly, the Book Ban applies *only* to books that "describe[], depict[], or portray[] sexual conduct, as defined by Section 43.25, Penal Code"—not other books. TEX. EDUC. CODE §§ 33.021(a) (definition of "sexually explicit material"), 35.001(3) (definition of "sexually relevant material"). Books that do not contain "sexual conduct" are not regulated by the law. Thus, like Section 505, the Book Ban is a content-based regulation that is "presumptively unconstitutional" and subject to strict scrutiny, which Defendants cannot meet.

> ### c. The Book Ban cannot survive strict scrutiny because it is not the least restrictive means of achieving a compelling government interest.

Third, even if Defendants may have "a compelling interest in both education and protecting Texas children from obscenity" (Mot. at 31), the Book Ban is not the least restrictive means of achieving those interests. The Book Ban excessively burdens booksellers by requiring them to rate *every* book they have *ever* sold to a public school, which means reviewing *every* word of every book, including books no longer sold or maintained in their inventory. Plaintiffs have testified in detail about the extreme and onerous burdens of the Book Ban.[50] As one example, Plaintiff AAP testified that it would take "a substantial, double-digit number of hours per book on average" to "read, analyze, and possibly solicit other viewpoints" to review and rate a single book. Dkt. 1-5 ¶

---

[50] Dkt. 1-2 ¶ 16; Dkt. 1-3 ¶¶ 8-10, 12-16; Dkt. 1- 4 ¶ 7; Dkt. 1-5 ¶¶ 8-11.

9. Plaintiff BookPeople testified that the "financial resources that would be required to have BookPeople's staff identify, read and rate every book" as required by the Book Ban "would be financially unsustainable" and likely cause it to go out of business. Dkt. 1-2 ¶ 16.

In *Playboy*, the Court held that Section 505 was not the least restrictive means of "limiting children's access to sexually explicit material" because it blocked or limited certain channels from *all* cable subscribers instead of allowing individual subscribers to choose to block channels to protect their children. 529 U.S. at 826–827 ("Even upon the assumption that the Government has an interest in substituting itself for informed and empowered parents, its interest is not sufficiently compelling to justify this widespread restriction on speech."). Similarly, the Book Ban removes access to books deemed "sexually explicit" from *all* students, regardless of age and the emotional maturity of a particular child, without considering whether parents want their children to have access to a diverse selection of books in a school library to enhance their intellectual, social, and emotional development. Allowing book-reading decisions on a more individualized basis (by those trained to do so) would allow the State to pursue its interests in educating and protecting Texas children without overburdening protected speech.

> **d.** **The Book Ban cannot survive strict scrutiny because it is not narrowly tailored to a compelling government interest.**

The Book Ban also fails strict scrutiny because it is not narrowly tailored to the State's alleged interests. Children's education can be promoted more narrowly without enacting a sweeping law that attacks fundamental constitutional rights. Instead of parsing finely, as required, the Book Ban broadly prohibits and restricts access to a wide array of First Amendment protected works by (1) failing to consider the work as whole and its literary, artistic, scientific, or political value; (2) failing to consider the age or maturity of a student; and (3) failing to account for differing community standards or the differences among schools or school districts.

Perhaps the Book Ban's most fatal flaw is that it restricts non-obscene works with "literary, artistic, political, or scientific value." As noted above, the Book Ban is *not* an obscenity statute. Defendants admit that the Book Ban does not align with the *Miller* test. Mot. at 23 (the Book Ban "attempts to mirror the test in *Miller*"). The Book Ban *could have* defined "sexually explicit material" by using the definition of "obscene" from Texas Penal Code § 43.21(a)(1), which tracks *Miller*. But the Legislature used "patently offensive" from Texas Penal Code § 43.21(a)(4), which does *not* meet the *Miller* standard. TEX. EDUC. CODE § 33.021(a). Instead, as explained during the August 18, 2023 Hearing, the Book Ban is a "Frankenstein" statute that cherry-picks various terms from the Penal Code and other sources to create novel definitions and provisions. In turn, the Book Ban suppresses a wide swath of constitutionally protected works that are not obscene as to minors, especially young adults.

The definition of "sexually relevant material" fares no better than the definition of "sexually explicit material." Because of its breadth, "sexually relevant material" could include any *de minimus*, non-explicit reference in any context to sexual relations. *See* TEX. EDUC. CODE § 35.001(3). Under this broad definition, students will be unable to access health-related works, religious texts, historical works, encyclopedias, dictionaries, and many other works outside of school without parental consent. *See* Compl. ¶ 66.

In another analogous case, the U.S. Supreme Court held that a California law prohibiting the sale or rental of "violent video games" to minors without parental consent was an unconstitutional content-based regulation not narrowly tailored to protecting minors because not all parents disapproved of their children playing violent video games. *Brown v. Entm't Merchants Ass'n*, 564 U.S. 786, 799–800 (2011). The law was "vastly overinclusive" because it restricted access to expressive works from *all* children based on what the State thought parents would want

their children to access. The Book Ban is similarly overinclusive because it prohibits access to "sexually explicit" books from *all* students, even if their parents may want their children to be exposed to those books.

      **8.**      **Plaintiffs plausibly allege that the Book Ban is unconstitutionally overbroad because it restricts and chills a substantial amount of protected speech from Plaintiffs and other speakers.**

The Book Ban should be invalidated as substantially overbroad because it "sweeps so broadly, encompassing any number of constitutionally protected" rights. Compl. ¶¶ 3 n.2, 31, 39 n.21, 42 n.25, 66, 89; *Seals v. McBee*, 898 F.3d 587, 597 (5th Cir. 2018). The overbreadth doctrine prohibits the government from restricting unprotected speech when, as here, "a substantial amount of protected speech is prohibited or chilled in the process." *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 237 (2002).

The Book Ban is overbroad for many of the same reasons it is vague and not narrowly tailored—it does not consider the work as whole, the ages or maturity of students, differing community and school standards, the differences among schools or school districts, or the "literary, artistic, political, or scientific value" of a work. To avoid repetition—and because the overbreadth analysis often engages in the same questions as vagueness and the narrow tailoring prong of a strict scrutiny analysis—Plaintiffs incorporate by reference §§ III.B.5, III.B.7.d. above. *See Kolender v. Lawson*, 461 U.S. 352, 358 n.8 (1983) ("[W]e have traditionally viewed vagueness and overbreadth as logically related and similar doctrines."); *Am. Civil Liberties Union v. Ashcroft*, 322 F.3d 240, 266 (3d Cir. 2003) ("Overbreadth analysis—like the question whether a statute is narrowly tailored to serve a compelling governmental interest—examines whether a statute encroaches upon speech in a constitutionally overinclusive manner.").

One unique aspect of the overbreadth claim is that Plaintiffs are not only asserting their

own rights, but they are also raising the rights of third parties, including other "library material vendors" and students. *See United States v. Hansen*, 143 S. Ct. 1932, 1939 (2023) ("overbreadth doctrine allows a litigant … to vindicate the rights of the silenced, as well as society's broader interest in hearing them speak").

The Book Ban infringes the constitutional right of students "to receive information and ideas" and access non-obscene materials in their school library. *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26*, 457 U.S. at 871; *Campbell v. St. Tammany Par. Sch. Bd.*, 64 F.3d 184, 188 (5th Cir. 1995). In *Pico*, a plurality of the Supreme Court specifically recognized that the "right to receive information and ideas . . . follows ineluctably from the sender's First Amendment right to send them," and applied this right to public school students. 457 U.S. at 867. The *Pico* plurality noted that, while school officials have considerable discretion in shaping curriculum, the "unique role of the school library" is a place of voluntary inquiry where students "must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding." *Id*. at 868–69.

Defendants do not even attempt to justify the Book Ban's overbroad restrictions. To the extent Defendants address *Pico*, they suggest that its right to receive information is "amorphous," but that its allowance for restricting certain "vulgar" or "educationally unsuitable" books is sound. Mot. 18–19. Defendants cannot have it both ways. The Book Ban is overbroad because it broadly restricts the First Amendment rights of Plaintiffs, students, and other third parties, vastly outweighing any constitutional applications of the law.

Although the Book Ban affects the rights of *all* students, the law is particularly overbroad as applied to older students.[51] A federal court recently struck down as overbroad an Arkansas law

---

[51] The Book Ban's lack of accounting for the differences in students' age and maturity is an independent reason for rendering it unconstitutionally overbroad. Defendants notably do not address the lack of age distinctions in the Motion to Dismiss.

that penalized booksellers (among others) for furnishing, making available, or distributing "to a minor an item that is harmful to minors." *Fayetteville Pub. Library*, 2023 WL 4845636, at *16. Because the law made no distinctions based on age, the Court reasoned that booksellers would "keep minors away from any material considered obscene as to the youngest minors—in other words, any material with any amount of sexual content." *Id*. This imposed "an unnecessary and unjustified burden on any older minor's ability to access free library books appropriate to his or her age and reading level," which rendered the law unconstitutionally overbroad. *Id*.

By not distinguishing what may be appropriate material for various ages, the Book Ban suffers from the same constitutional infirmities as the Arkansas law. The Book Ban imposes the same standard for "sexual content" on an 18-year-old high school senior as it does on a kindergartner. What may be "patently offensive" to a kindergartner may not be for a senior. This would likely bar older students from accessing classic and award-winning works that have appealed to generations of students.[52] For example, an art history book that contains Caravaggio paintings would be inaccessible to a high schooler because the painter's nudes might not be suitable for a second-grader. Similarly, Annie Proulx's elegiac short stories about Wyoming would be off-limits to a 17-year-old because *Brokeback Mountain* would not be fit for a five-year-old. This one-size-fits-all approach to sexual content "encroaches upon speech in a constitutionally overinclusive manner." *Am. Civil Liberties Union*, 322 F.3d at 266.

---

[52] The hundreds of books identified by proponents and supporters of the Book Ban as being subject to the law demonstrate the vast overbreadth of the statute's reach. *See* Christopher Hooks, *Jared Patterson's School-Library Bill Would Book Ban Larry McMurtry's Novel*, TEXAS MONTHLY, March 22, 2023; Danika Ellis, *All 850 Books Texas Lawmaker Matt Krause Wants To Book Ban: An Analysis*, BOOK RIOT, Nov. 5, 2021; *Sexually Explicit, Pervasively Vulgar, or Educationally Unsuitable Booklist*, PROTECT CHILDHOOD SUBSTACK, Aug. 17, 2023 (the list of books can be found here). Many books on this list have appeared on AP Literature exams, and one book on the list, *A Stolen Life* by Jaycee Duggard, is a memoir about the author's abduction, which she wrote to assist other survivors of sexual abuse.

### 9.     Plaintiffs plausibly allege that the Book Ban unconstitutionally delegates government authority to regulate speech to private entities.

Contrary to Defendants' assertions, the Book Ban unconstitutionally delegates vast amounts of state power to private "library material vendors," including Plaintiffs, by requiring them to review and rate every book ever sold to public schools and thus determine what books can be accessed in public schools. *See* Compl. ¶¶ 93–98; Plaintiffs' Motion for Preliminary Injunction at 19. Rather than fulfill these governmental responsibilities itself, the State has outsourced them to the private sector, likely to defer costs. Even under the current regime in which the State plays a very limited role in the reviewing and rating of books, the Legislature estimated that it will cost a total of $2.6 million and $0.6 million per year just to review books not rated as "sexually explicit" or "sexually relevant."[53] This is a fraction of the financial burden that will be incurred by Plaintiffs and other private entities under the Book Ban. The State should not be permitted to require the private sector to do its bidding, yet also claim it has not delegated government authority that clearly belongs to them. *See Bantam Books, Inc.*, 372 U.S. at 71 (delegation of government authority to Commission to rate books was unconstitutional).

## IV.     CONCLUSION

> "[I]n [Thomas] Jefferson's words, '[w]here the press is free, and every man able to read, all is safe.' Any other accommodation—any other system that would supplant private control of the press with the heavy hand of government intrusion—would make the government the censor of what the people may read and know."

*Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 260 (1974). The Book Ban is the type of government intrusion feared by our founders. The law not only attempts to prevent booksellers from distributing constitutionally protected works, but it also compels them to be mouthpieces for

---

[53] *See* Fiscal Note, 88th Legislative Regular Session, May 11, 2023.

government ideology. Beyond that, the Book Ban requires private entities to comply with vague, overbroad, and onerous standards and broadly infringes the constitutional rights of third parties.

Plaintiffs should be allowed to pursue their claims against Defendants to vindicate foundational First Amendment freedoms in this State—and to ensure other states do not follow in Texas's unconstitutional wake. For the above reasons, Plaintiffs respectfully request that the Motion to Dismiss be denied with prejudice, the Court grant the Motion for Preliminary Injunction before September 1, 2023, and Plaintiffs be awarded all such relief to which they are entitled.

Respectfully submitted,

*/s/ Laura Lee Prather*
Laura Lee Prather
Texas Bar No. 16234200
laura.prather@haynesboone.com
Catherine L. Robb
Texas Bar No. 24007924
catherine.robb@haynesboone.com
Michael J. Lambert
Texas Bar No. 24128020
michael.lambert@haynesboone.com
William Reid Pillifant
Texas Bar No. 24126157
reid.pillifant@haynesboone.com

**HAYNES AND BOONE, LLP**
600 Congress Avenue, Suite 1300
Austin, Texas 78701
Telephone: (512) 867-8400
Facsimile: (512) 867-8470

**ATTORNEYS FOR PLAINTIFFS**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on the 24th day of August 2023, a true and correct copy of the above document was served via the CM/ECF system to all counsel of record.

*/s/ Laura Lee Prather*
Laura Lee Prather