# EXHIBIT A

1           UNITED STATES DISTRICT COURT
             WESTERN DISTRICT OF TEXAS
2                 AUSTIN DIVISION

3  BOOK PEOPLE, INC., ET AL ) Docket No. A 23-CA-858 ADA
                            )
4  vs.                      ) Austin, Texas
                            )
5  MARTHA WONG, IN HER      )
   OFFICIAL CAPACITY AS THE )
6  CHAIR OF THE TEXAS STATE )
   LIBRARY AND ARCHIVES     )
7  COMMISSION, ET AL        ) August 18, 2023

8              TRANSCRIPT OF MOTION HEARING
            BEFORE THE HONORABLE ALAN D. ALBRIGHT
9

10 APPEARANCES:

11 For the Plaintiff:       Mr. Michael J. Lambert
                            Mr. W. Reid Pillifant
12                          Ms. Laura L. Prather
                            Ms. Catherine L. Robb
13                          Haynes & Boone, LLP
                            600 Congress Avenue, Suite 1300
14                          Austin, Texas 78701

15

16 For the Defendant:       Ms. Christina Cella
                            Ms. Amy E. Pletscher
17                          Texas Attorney General's Office
                            300 West 15th Street, 6th Floor
18                          Austin, Texas 78711

19

20 Court Reporter:          Ms. Lily Iva Reznik, CRR, RMR
                            501 West 5th Street, Suite 4153
21                          Austin, Texas 78701
                            (512)391-8792
22

23

24

25 Proceedings reported by computerized stenography,
   transcript produced by computer-aided transcription.

| | | |
|---|---|---|
| 08:59:49 | 1 | THE COURT:  Would you call the case, please? |
| 08:59:51 | 2 | THE CLERK:  Court calls:  A-23-CV-858, BookPeople |
| 08:59:55 | 3 | Inc., Et Al vs. Martha Wong, Et Al, for preliminary |
| 08:59:58 | 4 | injunction hearing and motion hearing. |
| 08:59:59 | 5 | THE COURT:  Could I have announcements from the |
| 09:00:01 | 6 | counsel, please? |
| 09:00:04 | 7 | MS. PRATHER:  Your Honor, Laura Prather, |
| 09:00:07 | 8 | Catherine Robb, Michael Lambert and Reid Pillifant here on |
| 09:00:10 | 9 | behalf of the plaintiffs. |
| 09:00:10 | 10 | THE COURT:  Good morning. |
| 09:00:12 | 11 | MS. PRATHER:  Good morning. |
| 09:00:15 | 12 | MS. CELLA:  Good morning, your Honor. |
| 09:00:17 | 13 | Christina Cella and Amy Pletscher for the |
| 09:00:19 | 14 | defendants. |
| 09:00:19 | 15 | THE COURT:  Good morning. |
| 09:00:20 | 16 | So it seems to me, we have a couple of things to |
| 09:00:23 | 17 | take up in no particular order, but they're all important. |
| 09:00:29 | 18 | One of which is, I'd like to hear from both sides how |
| 09:00:33 | 19 | important it is that this issue get resolved by September |
| 09:00:38 | 20 | 2nd in that, as I understand it, the state has said |
| 09:00:45 | 21 | they're not going to start enforcing immediately on the |
| 09:00:49 | 22 | 2nd -- that's right.  There won't be enforcement until |
| 09:00:50 | 23 | like April? |
| 09:00:52 | 24 | MS. CELLA:  Your Honor, the lists are not due |
| 09:00:54 | 25 | from vendors until April 1st, 2024.  So that's -- our |

| | | |
|---|---|---|
| 09:00:57 | 1 | position is nothing would happen until that date. |
| 09:00:59 | 2 | THE COURT:  So I'd like to -- and I'm not |
| 09:01:00 | 3 | planning to wait until -- I'm not thinking April.  I'm |
| 09:01:06 | 4 | trying to figure out, number one, for y'all's purposes in |
| 09:01:08 | 5 | term of our planning on what we have to get done how hard |
| 09:01:11 | 6 | and fast September 2nd is to get the injunction done |
| 09:01:15 | 7 | because we got motions to dismiss yesterday from the |
| 09:01:22 | 8 | defendants.  I'd like -- and we'll get more of that in a |
| 09:01:25 | 9 | second but how -- I'm assuming the plaintiffs aren't ready |
| 09:01:31 | 10 | to respond to this fully today.  Is that fair? |
| 09:01:35 | 11 | MS. PRATHER:  Yes, your Honor. |
| 09:01:36 | 12 | We have not -- I mean, we got it 36 hours before |
| 09:01:37 | 13 | the hearing.  But we do believe that a ruling needs to be |
| 09:01:40 | 14 | entered by the Court on the preliminary injunction before |
| 09:01:43 | 15 | September 1st.  The law does go into effect on September |
| 09:01:47 | 16 | 1st.  The AG can't bind the state not to prosecute. |
| 09:01:53 | 17 | That's not valid.  And when we look at the plain language |
| 09:01:56 | 18 | of the bill, it specifically talks about the fact that |
| 09:02:00 | 19 | vendors can no longer sell books to libraries until they |
| 09:02:06 | 20 | are rated and that is not -- |
| 09:02:13 | 21 | THE COURT:  So -- well, that's helpful.  So then, |
| 09:02:15 | 22 | here's what we're going to have to do.  I'm going to try |
| 09:02:19 | 23 | and get as much done as I can today given that those were |
| 09:02:24 | 24 | filed yesterday.  I'd like to have the plaintiffs respond |
| 09:02:29 | 25 | to the plaintiff -- to the defendants' motions to dismiss |

| | | |
|---|---|---|
| 09:02:32 | 1 | by the close of business next Thursday and then, a week |
| 09:02:37 | 2 | from Monday, we'll probably need a second hearing.  And |
| 09:02:42 | 3 | so, we'll be getting back together a week from Monday to |
| 09:02:44 | 4 | take up the things that we may not be able to do today. |
| 09:02:48 | 5 | And then, I'm going to try and figure out what all we can |
| 09:02:52 | 6 | accomplish today, given that those motions are pending, |
| 09:02:56 | 7 | but we may not be able to fully resolve them. |
| 09:02:59 | 8 |        Then I know that the plaintiffs are here and |
| 09:03:03 | 9 | they're seeking injunctive relief, but it seems to me that |
| 09:03:11 | 10 | I think if I let the plaintiff go first and hear about the |
| 09:03:18 | 11 | preliminary injunctive relief, I'm going to hear from the |
| 09:03:20 | 12 | defendants as to why, before I take up the injunctive |
| 09:03:22 | 13 | relief, I have to take up whether I have jurisdiction to |
| 09:03:26 | 14 | hear whether or not there's injunctive relief. |
| 09:03:31 | 15 |        So my thinking is, what I think I'd like to do |
| 09:03:34 | 16 | today is have the defendant go ahead, if you are prepared |
| 09:03:40 | 17 | to, to explain the basis -- to do an argument on why the |
| 09:03:45 | 18 | case ought to be dismissed or under -- I think you have |
| 09:03:51 | 19 | 12(b)(1) and 12(b)(6).  I think there's several grounds |
| 09:03:55 | 20 | worth.  And plaintiffs can listen and then, help inform |
| 09:03:59 | 21 | them as they prepare their responses, briefs that they |
| 09:04:04 | 22 | file.  And then, after the defendant finishes explaining |
| 09:04:08 | 23 | to me why I shouldn't consider the preliminary injunction, |
| 09:04:15 | 24 | not because of the -- I'm not interested in they don't get |
| 09:04:20 | 25 | a preliminary injunction because they shouldn't get a |

09:04:22  1  preliminary injunction.  That we'll take that up later.

09:04:25  2         What I'd like to hear from the defendant is why I

09:04:26  3  shouldn't consider their request for relief at all because

09:04:28  4  they don't have standing or there's no jurisdiction.

09:04:31  5  Whatever those issues are to whether or not they have the

09:04:34  6  right to be here.  And then, if the plaintiff wants to say

09:04:39  7  anything today in response to that, you're welcome to.  If

09:04:42  8  you want to wait until the hearing a week from Monday, you

09:04:48  9  can.  And then, once you hear their arguments, if the

09:04:52  10  plaintiff would like to make arguments why despite what we

09:04:55  11  heard, I still ought to consider taking up the preliminary

09:04:59  12  injunction or any other relief the plaintiff wants.

09:05:02  13  Despite what I've heard, I'll take that up from the

09:05:04  14  plaintiff and then, if there's any response that you all

09:05:09  15  want to have to that, that's fine.

09:05:11  16         But it's unlikely I'm going to resolve the

09:05:15  17  preliminary injunction dispute today.  I'm planning on

09:05:19  18  taking that up a week from Monday when I have your

09:05:23  19  briefing -- when I have the plaintiffs' briefing.  And

09:05:27  20  also at that hearing a week from Monday, I'll be able to

09:05:30  21  more robustly consider the -- assuming I don't go along

09:05:36  22  with what -- assuming I think they have standing and every

09:05:40  23  right to be here, then we'll take up fully the merits of

09:05:46  24  their right to injunctive relief.

09:05:47  25         That makes the most sense to me and so, unless

| | | |
|---|---|---|
| 09:05:51 | 1 | there is objection from the parties, that's the way we're |
| 09:05:53 | 2 | going to proceed.  Yes, ma'am. |
| 09:05:56 | 3 | MS. PRATHER:  Your Honor, can I just get some |
| 09:05:57 | 4 | clarification?  So are you saying that we are able to |
| 09:05:59 | 5 | present our -- what is set today, which is the hearing on |
| 09:06:03 | 6 | the preliminary injunction? |
| 09:06:05 | 7 | THE COURT:  I think -- I'll see once I hear from |
| 09:06:09 | 8 | them.  I don't -- I have reservations about moving forward |
| 09:06:14 | 9 | on anything with respect to the preliminary injunction |
| 09:06:18 | 10 | until I've had a chance to resolve your right to be here |
| 09:06:22 | 11 | and that's -- and so, if you want to go ahead and do it, |
| 09:06:27 | 12 | you know, I've got the morning, I'm happy to hear it.  If |
| 09:06:29 | 13 | you want to preview for them what it is, I'm happy to hear |
| 09:06:33 | 14 | that, too, and I'll just consider it -- I'll just say it's |
| 09:06:38 | 15 | part of the hearing and that I don't know that you'll have |
| 09:06:43 | 16 | -- I don't know that you have standing to do it but I |
| 09:06:45 | 17 | don't know that they'll -- I don't know that the |
| 09:06:47 | 18 | defendants would object to you making -- just making |
| 09:06:49 | 19 | argument today. |
| 09:06:50 | 20 | I'm not going to rule today on the motion with -- |
| 09:06:55 | 21 | will the defendants have objections to allowing the |
| 09:06:58 | 22 | plaintiff to present some of their evidence to go ahead |
| 09:07:00 | 23 | and get that done today? |
| 09:07:05 | 24 | MS. CELLA:  We don't object, your Honor. |
| 09:07:07 | 25 | THE COURT:  Well, then I'll hear what you say |

09:07:07    1    first, and then, I'll decide whether or not it's

09:07:14    2    appropriate for them to move forward.

09:07:15    3          MS. CELLA:  Thank you, your Honor.

09:07:58    4          Okay.  Thank you, your Honor.  This case should

09:08:00    5    be dismissed because plaintiffs lack standing, defendants

09:08:02    6    are entitled to sovereign immunity, and the plaintiffs

09:08:04    7    failed to state a claim upon which relief could be

09:08:07    8    granted.

09:08:08    9          House Bill 900 will be referred to as READER.  It

09:08:11   10    stands for the Restricting Explicit and Adult-Designed

09:08:14   11    Educational Resources.  Simply put, READER is meant to

09:08:17   12    keep obscene, sexually explicit material out of public

09:08:21   13    school libraries in order to protect Texas children.  And

09:08:23   14    we stand here before you today because plaintiffs seek to

09:08:26   15    place their own interests before the safety of the Texas

09:08:28   16    children this statute seeks to protect.  It is not meant

09:08:33   17    to and does not infringe on plaintiffs' First Amendment

09:08:35   18    rights.

09:08:35   19          Plaintiffs lack standing because there is no

09:08:39   20    Article III case or controversy.  Plaintiffs would have to

09:08:43   21    suffer injury in fact.  The alleged injury would have to

09:08:47   22    be fairly traceable to the defendants.  And the alleged

09:08:49   23    injuries would have to be redressable by a favorable

09:08:51   24    decision.  None of those things are true here.  The

09:08:53   25    plaintiffs have not suffered an injury in fact.  When

09:08:56  1   they're seeking prospective relief and there's no imminent

09:08:59  2   injury, there is no injury in fact.  Anything that they

09:09:03  3   are claiming is harm or injury is entirely speculative.

09:09:08  4   As we've just discussed, lists are not due until April 1st

09:09:11  5   of 2024.  And we don't even know if there will be a

09:09:14  6   disputed rating.

09:09:15  7          The statute provides in relevant part that not

09:09:18  8   later than April 1st of 2024, library material vendors

09:09:21  9   have to submit their lists to TEA of any material rated

09:09:27  10  sexually explicit or sexually relevant.  Those lists must

09:09:29  11  be updated by each year by September 1st, but the first

09:09:31  12  one is due on April 1, 2024.  The TEA can review the

09:09:35  13  material rate -- the library material ratings.  They don't

09:09:37  14  have to.  There's nothing in the statute mandating that

09:09:39  15  they review every single list.  So they may, they may not.

09:09:44  16         Any of this is all speculative.  Vendors then

09:09:47  17  have 60 days to correct any ratings and then, notify TEA

09:09:50  18  of action taken.  If the vendor fails to correct a rating,

09:09:54  19  the school district won't be able to purchase books from

09:09:57  20  them; but they can petition TEA to take them off of that

09:10:01  21  list and then, begin to sell books again.

09:10:06  22         So any economic injury here is actually from

09:10:09  23  school districts, it's not from the defendants.  So

09:10:15  24  there's just too many things that are speculative.  Will

09:10:19  25  TEA review the ratings?  Will they not review the ratings?

| | | |
|---|---|---|
| 09:10:22 | 1 | Will the plaintiffs and any vendors disagree with those |
| 09:10:26 | 2 | ratings?  This is all just speculative and we won't know |
| 09:10:29 | 3 | until after April 1st, 2024.  Any alleged injury here is |
| 09:10:34 | 4 | not fairly traceable to the defendants.  As I just alluded |
| 09:10:37 | 5 | to, any injury would come from school districts.  There's |
| 09:10:40 | 6 | no economic injury that's going to be forced by |
| 09:10:43 | 7 | defendants.  Plaintiffs -- |
| 09:10:43 | 8 | THE COURT:  Can they sue the school districts? |
| 09:10:46 | 9 | MS. CELLA:  No, your Honor, they can't. |
| 09:10:47 | 10 | THE COURT:  So you have a system where you're |
| 09:10:50 | 11 | saying there's no injury traceable to your defendants.  It |
| 09:10:55 | 12 | would only be traceable to the school districts, but they |
| 09:10:58 | 13 | can get no relief from the school districts. |
| 09:11:00 | 14 | MS. CELLA:  Well, the bill does say that, you |
| 09:11:02 | 15 | know, they -- |
| 09:11:02 | 16 | THE COURT:  That's a great -- I'd love to have a |
| 09:11:04 | 17 | situation where I could, you know, say I'm going to use my |
| 09:11:09 | 18 | friend's credit card and, you know, you can -- you can't |
| 09:11:14 | 19 | sue me for that because it's my friend's credit card. |
| 09:11:17 | 20 | But, you know, so who do they get relief from? |
| 09:11:21 | 21 | MS. CELLA:  Well, your Honor, the problem here is |
| 09:11:24 | 22 | that there may not be relief to get.  I mean -- |
| 09:11:26 | 23 | THE COURT:  Oh, no, no, that's not the problem. |
| 09:11:28 | 24 | That's if there is relief they need to get, who would they |
| 09:11:31 | 25 | get it from? |

09:11:33    1        MS. CELLA:  Well, it would have to be someone
09:11:36    2   that caused them harm, which is not the defendants.
09:11:38    3        THE COURT:  I couldn't understand you.
09:11:38    4        MS. CELLA:  It would have to be whoever caused
09:11:40    5   them harm, which here, would not be the --
09:11:41    6        THE COURT:  And you just said it would be the
09:11:43    7   school districts and they can't sue the school districts.
09:11:45    8   So how would they get relief?
09:11:47    9        MS. CELLA:  Well, your Honor, maybe the answer is
09:11:50   10   they can't.  Maybe they have to rate these books and --
09:11:53   11        THE COURT:  So your position on behalf of your
09:11:57   12   clients is that they can't.
09:11:58   13        MS. CELLA:  Well, they can't sue my clients.
09:12:00   14   They can't get relief from my clients.  Even if you said,
09:12:03   15   you know, this is totally unconstitutional and this isn't
09:12:08   16   going to happen, that still is not going to force the
09:12:12   17   school district to buy books from them.  So Katy ISD in
09:12:16   18   their example.
09:12:16   19        THE COURT:  I don't understand what you're
09:12:19   20   saying.  What you said may have made sense and I just
09:12:24   21   didn't follow.  What you're saying is, were I to go along
09:12:25   22   with the plaintiff and say that the law was uncon --
09:12:28   23   something, unconstitutional or, for some other reason,
09:12:33   24   infirm, even in that case, they couldn't get relief
09:12:36   25   against your clients.  I think -- is that what you're

09:12:38  1  trying to say if I'm understanding you?

09:12:40  2          MS. CELLA:  Well, I think we're understanding

09:12:43  3  each other.  What I'm trying to say is, you know, let's

09:12:45  4  just say this bill didn't exist.

09:12:47  5          THE COURT:  Okay.

09:12:48  6          MS. CELLA:  Which is what plaintiffs are seeking

09:12:50  7  to do.  So if the bill didn't exist but school districts

09:12:53  8  still decided not to buy books from them, from the

09:12:58  9  plaintiffs, the plaintiffs still aren't going to get any

09:13:01  10  relief.  I mean, you can't make somebody buy something

09:13:03  11  from you.

09:13:04  12          THE COURT:  Okay.  But let's go back to the real

09:13:06  13  world.  It does exist.

09:13:07  14          MS. CELLA:  Yes.

09:13:08  15          THE COURT:  And so, I'm still trying to find out,

09:13:10  16  figure out who do they get relief from if this -- if this

09:13:19  17  bill -- I'm not saying it is, but if it is

09:13:22  18  unconstitutional, for whatever reason, who do they get the

09:13:26  19  relief from?

09:13:27  20          MS. CELLA:  Well...

09:13:29  21          THE COURT:  And here's the problem, another

09:13:31  22  problem, I think, is that, for example -- I tried to do my

09:13:37  23  best to get ready for this, but isn't it that if the

09:13:43  24  publishers won't do something correctly, then isn't it --

09:13:47  25  who is it that TEA -- who fixes it for them if -- there's

| | | |
|---|---|---|
| 09:13:52 | 1 | something where if they don't get -- if they won't put the |
| 09:14:00 | 2 | appropriate -- if they put the not correct different |
| 09:14:05 | 3 | warning labels on, then what agency is it that fixes that |
| 09:14:09 | 4 | for them? |
| 09:14:10 | 5 | MS. CELLA:  TEA. |
| 09:14:10 | 6 | THE COURT:  Okay.  And there's -- and my |
| 09:14:13 | 7 | understanding is, there's no appeal for what the TEA |
| 09:14:16 | 8 | decides, right? |
| 09:14:16 | 9 | MS. CELLA:  I'm sorry. |
| 09:14:17 | 10 | THE COURT:  If the TEA says, publisher, you got |
| 09:14:19 | 11 | it wrong, it shouldn't have been -- I'm gonna do my best. |
| 09:14:22 | 12 | Is it sexually explicit versus whatever the different |
| 09:14:26 | 13 | categories are?  They have -- TEA has the right to say, |
| 09:14:29 | 14 | publisher, you got it wrong and we're going to do |
| 09:14:31 | 15 | something different and there's no appeal from that |
| 09:14:33 | 16 | either, right? |
| 09:14:35 | 17 | MS. CELLA:  I believe that's correct, your Honor. |
| 09:14:37 | 18 | I haven't thought that through, but I do believe that is |
| 09:14:39 | 19 | correct.  But the problem here is, they just haven't shown |
| 09:14:41 | 20 | any harm.  We don't know if any of this is actually going |
| 09:14:43 | 21 | to happen.  Nothing is imminent here. |
| 09:14:44 | 22 | THE COURT:  Well, let's just say I don't agree |
| 09:14:52 | 23 | with that. |
| 09:14:52 | 24 | MS. CELLA:  Okay. |
| 09:14:53 | 25 | THE COURT:  I mean, you may be right.  You may be |

| | |
|---|---|
| 09:14:55 | 1 |
| 09:14:59 | 2 |
| 09:15:03 | 3 |
| 09:15:05 | 4 |
| 09:15:08 | 5 |
| 09:15:10 | 6 |
| 09:15:12 | 7 |
| 09:15:13 | 8 |
| 09:15:17 | 9 |
| 09:15:19 | 10 |
| 09:15:24 | 11 |
| 09:15:25 | 12 |
| 09:15:28 | 13 |
| 09:15:33 | 14 |
| 09:15:35 | 15 |
| 09:15:38 | 16 |
| 09:15:40 | 17 |
| 09:15:42 | 18 |
| 09:15:45 | 19 |
| 09:15:48 | 20 |
| 09:15:51 | 21 |
| 09:15:52 | 22 |
| 09:15:54 | 23 |
| 09:15:56 | 24 |
| 09:16:01 | 25 |

1  right that every school district doesn't -- I mean, yeah,

2  I guess that's right.  But are you saying they have no

3  legitimate fear that it might happen?

4            MS. CELLA:  I don't think so, your Honor.  They

5  are fearing too many things so I mean --

6            THE COURT:  Let me try this.

7            MS. CELLA:  Sure.

8            THE COURT:  If you're so sanguine that it might

9  not happen, well then, why do you care if I enter an

10  injunction?  Because it wouldn't happen, anyway.  I'm not

11  enjoining anything.

12            MS. CELLA:  You wouldn't be enjoining anything as

13  far as the plaintiffs -- or, I'm sorry, as far as it just

14  depends of what you would enjoin.  But here, this bill

15  doesn't only talk about these ratings.  There's other

16  things that have to happen.  TSLAC and TEA have other

17  obligations under this.  They need to come up with

18  guidelines for certain things for school districts.  So

19  it's not only this issue if you enjoin this bill.  And

20  that would harm Texas children.  I mean, that's the entire

21  point of this bill is to --

22            THE COURT:  What would harm Texas children?

23            MS. CELLA:  Enjoining this bill because then, TEA

24  and TSLAC would not come up with these other guidelines

25  that have nothing to do with the sexually explicit -- they

09:16:04   1   still have to make other guidelines for the schools

09:16:06   2   related to this bill, but that's not the only thing in

09:16:09   3   this bill.

09:16:09   4         THE COURT:  Well, I can craft an injunction that

09:16:13   5   limits it to only these issues, can't I?

09:16:16   6         MS. CELLA:  Sure.  You could.  It's just to --

09:16:19   7         THE COURT:  I mean, I've got kids.  I don't want

09:16:21   8   to hurt the kids of Texas.

09:16:23   9         MS. CELLA:  Right.  I mean, the problem is,

09:16:25   10  everything is just entirely too speculative.  They're

09:16:28   11  claiming injury that hasn't happened and it's not

09:16:31   12  imminent.  I mean, it's obviously not imminent because

09:16:34   13  their lists are not due trial April 1st, 2024.  That's

09:16:38   14  over seven months from now.

09:16:40   15        THE COURT:  Okay.  I get that argument.  And

09:16:42   16  actually, Ms. Prather, if you're prepared to respond to

09:16:47   17  that today, I'd like to hear that for sure.  But I was

09:16:49   18  really hoping you were going to tell me -- talk to me

09:16:51   19  about the issues of standing.

09:16:53   20        MS. CELLA:  Yes.  Well, I am.  The plaintiffs,

09:16:58   21  they'd have to suffer an injury in fact and I believe

09:17:01   22  that's what we were just discussing.  And then, they'd

09:17:03   23  have prove that any alleged injury is fairly traceable to

09:17:06   24  the defendants.  And the problem here is -- and maybe this

09:17:10   25  will clear up what we were just talking about.  The

09:17:12  1  plaintiffs are attempting to sue the statute.  The

09:17:14  2  defendants here --

09:17:14  3        THE COURT:  I can't understand you.

09:17:17  4        MS. CELLA:  The plaintiffs are attempting to sue

09:17:18  5  the statute.  The defendants here, nothing is fair -- any

09:17:23  6  speculative injury, it's just not fairly traceable to the

09:17:26  7  defendants because the defendants have not done anything

09:17:28  8  and it's not imminent that they're going to do anything or

09:17:32  9  even -- there's been nothing, you know, that they're going

09:17:35  10  to threaten enforcement, that there's going to be

09:17:37  11  enforcement.  We don't even know if they're going to

09:17:38  12  review the lists.  They can under the statute.

09:17:40  13        THE COURT:  Well, as long as they can, why isn't

09:17:44  14  there the potential for harm to these folks?

09:17:46  15        MS. CELLA:  Eventually, there may be.  It's

09:17:48  16  just --

09:17:48  17        THE COURT:  I know -- okay.  I don't know how to

09:17:54  18  do this thing.  I hate to do this but, you know, when in

09:18:00  19  Roe v. Wade, you know, you could have said, well, maybe no

09:18:03  20  one will get pregnant and need an abortion so there's

09:18:07  21  really not any harm.  I mean, I'm not following you -- I

09:18:14  22  get that it might not happen.  I'm not following that it

09:18:19  23  won't -- that it can't happen.  I guess the difference is

09:18:22  24  between you're saying it might not happen and I'm saying

09:18:25  25  -- and they're saying but it could and I'd like you to

| | |
|---|---|
| 09:18:29 | 1 |

address that in terms of the standing.

MS. CELLA:  Yeah, I mean, it definitely could.
It is just entirely too speculative.

THE COURT:  Well, why -- I'm going to try again.
Why is it -- I don't understand what you mean and maybe
you think you're explaining it.  I don't understand why
you say it's too speculative.  I'm not following.

MS. CELLA:  We just don't know if there's going
to be an issue.  We don't know if they're going to
disagree with ratings.  We don't know that TEA is --

THE COURT:  But it can, right?

MS. CELLA:  Sure, it could.  Sure.

THE COURT:  Okay.  And that's what the plaintiff
is unhappy about.  That's what they're worried about.  And
so, I was hoping -- if your only standing issue is that it
might not happen, then I'm probably ready to rule on that
today.

MS. CELLA:  Well, that's not the only issue, your
Honor.

THE COURT:  Well, then I'd like you to move on to
whatever other issues you have.

MS. CELLA:  Sure.  Defendants are also entitled
to sovereign immunity here.  So should we get to --

THE COURT:  Yes.

MS. CELLA:  If you'd like to get to that, we

| | | |
|---|---|---|
| 09:19:27 | 1 | absolutely can.  Sovereign immunity has not been expressly |
| 09:19:32 | 2 | waived.  <u>Ex Parte: Young</u> exception, I believe the |
| 09:19:35 | 3 | plaintiffs addressed this in their reply.  I haven't fully |
| 09:19:38 | 4 | digested their reply but it just -- it doesn't apply. |
| 09:19:42 | 5 | Plaintiffs can only overcome sovereign immunity when |
| 09:19:45 | 6 | they're seeking prospective injunctive relief based on an |
| 09:19:48 | 7 | alleged ongoing violation of federal law.  There is no |
| 09:19:51 | 8 | violation at this point.  I may have to address this in |
| 09:19:54 | 9 | the failure to state a claim.  But I'd like to stay on |
| 09:19:59 | 10 | sovereign immunity right now, if that's okay. |
| 09:20:01 | 11 | Defendants lack sufficient connection to the |
| 09:20:04 | 12 | enforcement provisions of READER and, again, we're going |
| 09:20:07 | 13 | to get back to -- |
| 09:20:08 | 14 | THE COURT:  Maybe it's the sound.  I just can't |
| 09:20:10 | 15 | understand you. |
| 09:20:13 | 16 | MS. CELLA:  Sorry, your Honor.  Defendants lack |
| 09:20:14 | 17 | any sufficient connection to the enforcement provisions in |
| 09:20:17 | 18 | READER and any allegation doesn't even include any |
| 09:20:22 | 19 | potential enforcement.  So I think that the plaintiffs may |
| 09:20:26 | 20 | have claimed -- and this may be in the reply -- that the |
| 09:20:30 | 21 | state hasn't said it's not going to enforce it. |
| 09:20:34 | 22 | THE COURT:  You're moving back into -- I want you |
| 09:20:38 | 23 | to stick with the sovereign immunity issue as to why they |
| 09:20:41 | 24 | don't have the right to be here.  I mean, I understand the |
| 09:20:45 | 25 | Eleventh Amendment.  I think there is a sovereign -- I'm |

09:20:48  1   not saying -- I think there is one but I don't -- I'm not

09:20:51  2   understanding your articulation of it.

09:20:55  3          MS. CELLA:  Yes.  Well, your Honor, I mean, the

09:20:58  4   reason that defendants are entitled to sovereign immunity

09:21:00  5   is, it hasn't been waived and there's no exception that

09:21:02  6   applies, and there has been no ongoing constitutional

09:21:05  7   violation.

09:21:08  8          THE COURT:  Okay.  Anything else on sovereign

09:21:13  9   immunity?

09:21:13  10          MS. CELLA:  Not on sovereign immunity, your

09:21:15  11   Honor.  I mean, it is fully laid out in our brief.  If

09:21:18  12   you'd like to go through that, we can, but I think that's

09:21:20  13   the main --

09:21:21  14          THE COURT:  No.  I'm giving you an opportunity --

09:21:24  15   anything you want to argue --

09:21:24  16          MS. CELLA:  Yes.  I understand.  I mean, that's

09:21:26  17   the main point.  It just hasn't been waived and there's no

09:21:28  18   exception that applies here.  At this point, I can and I'm

09:21:34  19   prepared to go over that the plaintiffs failed to state a

09:21:37  20   claim upon which relief can be granted.  I don't know if

09:21:39  21   that's something you want to do today.

09:21:41  22          THE COURT:  I'd like to hear everything today.  I

09:21:42  23   want to give the plaintiffs as much opportunity to hear

09:21:45  24   what your arguments are so they can respond to them

09:21:48  25   fulsomely in their briefs and then, we can be efficient on

09:21:51   1   Monday, a week.

09:21:51   2           MS. CELLA:  Yes.  Sure, your Honor.  And these

09:21:53   3   are -- these are most of the same arguments that are

09:21:59   4   involved with the preliminary injunction.  So I believe

09:22:01   5   plaintiffs have responded as far as their injunction, but

09:22:05   6   we'll go through them and we'll start there.

09:22:08   7           The plaintiffs just don't have a First Amendment

09:22:11   8   right in this forum.  So this bill concerns government

09:22:14   9   speech.  It doesn't concern plaintiff speech because it's

09:22:18   10  discussing and it's talking about school libraries.  It's

09:22:22   11  not talking about plaintiff, you know, rating their books

09:22:25   12  for any other purpose other than school libraries.  So

09:22:28   13  that's government speech and government speech is not

09:22:32   14  barred by the free speech laws.

09:22:33   15          THE COURT:  I'm not following you why it's

09:22:36   16  government speech.

09:22:38   17          MS. CELLA:  Well, it's government speech because

09:22:39   18  Texas state entities have wide authority over educational

09:22:43   19  policies and the Supreme Court has told us that education

09:22:48   20  of children is primary responsibility of parents,

09:22:51   21  teachers.

09:22:51   22          THE COURT:  So let me see if -- I'm going to say

09:22:53   23  this and you tell me if I'm following you.  That because

09:22:57   24  these books are destined for schools, then the regulation

09:23:05   25  -- the regulations that are imposed by the law that set

| | | |
|---|---|---|
| 09:23:09 | 1 | out different levels of sexual explicitness, that's a |
| 09:23:20 | 2 | government -- that's a government act and so, it becomes |
| 09:23:23 | 3 | government-controlled speech? |
| 09:23:24 | 4 | MS. CELLA:  Yes, it's government-controlled |
| 09:23:27 | 5 | speech.  Yes, it's government speech.  It's not the |
| 09:23:31 | 6 | plaintiffs' speech.  So the plaintiffs are claiming and |
| 09:23:34 | 7 | indicating that there are -- one of their fears is that |
| 09:23:37 | 8 | these ratings, people are going to think that it's their |
| 09:23:40 | 9 | speech but it's not. |
| 09:23:41 | 10 | THE COURT:  I think I may be following you now. |
| 09:23:45 | 11 | That you are rejecting the idea that -- well, but I follow |
| 09:23:53 | 12 | you that it's the government that's doing it, but really |
| 09:23:56 | 13 | at the first cut, you're requiring them to make the |
| 09:23:59 | 14 | decision. |
| 09:24:00 | 15 | MS. CELLA:  That's correct.  Their lists are due. |
| 09:24:03 | 16 | THE COURT:  So how is it government speech when |
| 09:24:07 | 17 | you're requiring them, the plaintiffs, to make the |
| 09:24:12 | 18 | decision themselves without advice by the government as to |
| 09:24:16 | 19 | how to do it? |
| 09:24:17 | 20 | MS. CELLA:  Well, there is oversight by the TEA. |
| 09:24:19 | 21 | They are the ones that can review these lists. |
| 09:24:20 | 22 | THE COURT:  Oh, they can review -- no.  I get it. |
| 09:24:22 | 23 | They can review them.  But what I'm saying is, how is it |
| 09:24:26 | 24 | not putting the weight on, you know, when I -- you know, I |
| 09:24:35 | 25 | want to put Of Mice And Men in the library and, you know, |

| | | |
|---|---|---|
| 09:24:42 | 1 | there's a scene, you know, where it involves -- with |
| 09:24:46 | 2 | Lennie that involves rape.  How do I -- I'm the publisher, |
| 09:24:49 | 3 | how do I rate that?  Where does that fall in this group? |
| 09:24:53 | 4 | MS. CELLA:  Well, again, that would be a call. |
| 09:24:55 | 5 | THE COURT:  Made by who? |
| 09:24:57 | 6 | MS. CELLA:  At first, the vendor but TEA -- |
| 09:24:59 | 7 | THE COURT:  Okay.  So -- |
| 09:24:59 | 8 | MS. CELLA:  -- the state. |
| 09:25:01 | 9 | THE COURT:  -- made by the vendor and that's one |
| 09:25:02 | 10 | of their concerns, right? |
| 09:25:03 | 11 | MS. CELLA:  But the state has final say and have |
| 09:25:06 | 12 | oversight on that so it's not their speech. |
| 09:25:08 | 13 | THE COURT:  Okay. |
| 09:25:09 | 14 | MS. CELLA:  It's the state speaking. |
| 09:25:11 | 15 | THE COURT:  But they're making the initial |
| 09:25:13 | 16 | decision. |
| 09:25:14 | 17 | MS. CELLA:  Correct. |
| 09:25:14 | 18 | THE COURT:  You are requiring them to make the |
| 09:25:16 | 19 | initial decision. |
| 09:25:17 | 20 | MS. CELLA:  Correct.  And in that case, your |
| 09:25:20 | 21 | Honor, they may rate that book as no rating and if the TEA |
| 09:25:23 | 22 | does not agree with that, they may change that if they |
| 09:25:27 | 23 | think it's incorrect and that is the state speaking.  So |
| 09:25:30 | 24 | the state has final say.  They have oversight over these |
| 09:25:33 | 25 | ratings. |

09:25:34   1        THE COURT:  And the state has the right to do

09:25:35   2   this because the books are ultimately going to be in

09:25:39   3   school libraries.

09:25:40   4        MS. CELLA:  Yes, your Honor, public school

09:25:42   5   libraries, specifically.  And on that same line of

09:25:49   6   thinking, a school library is not a public forum, it's a

09:25:52   7   nonpublic forum.  If as long as the school facility or the

09:25:58   8   school has been reserved for its intended function, it's

09:26:02   9   not opened up by the school board for anybody to come in

09:26:05   10  for whatever reason.  If it's -- if it is a -- reserved

09:26:09   11  for its intended purpose, there's no public forum.  It's a

09:26:13   12  nonpublic forum.

09:26:14   13       THE COURT:  I understand that.

09:26:15   14       MS. CELLA:  And since Texas schools are nonpublic

09:26:18   15  forums, reasonable restrictions can be imposed.  And it is

09:26:23   16  reasonable to restrict obscene, sexually explicit material

09:26:27   17  from being in schools, in public schools that, you know,

09:26:30   18  Texas children are there so this reasonable restriction --

09:26:34   19       THE COURT:  Well, let's say for the moment I

09:26:36   20  agree with you on that.  This isn't binary between obscene

09:26:45   21  and non-obscene.  There are different levels, right?

09:26:50   22       MS. CELLA:  Yes, your Honor.

09:26:51   23       THE COURT:  And so, you're requiring -- if I

09:26:56   24  understand it, this is the question.  This isn't a

09:26:59   25  declared statement.  This is as I recall reading through

| | | |
|---|---|---|
| 09:27:02 | 1 | my brief -- the stuff I got on the briefing, there's -- |
| 09:27:07 | 2 | this is my language that I'm not sure it's not exact.  But |
| 09:27:10 | 3 | there are books, A Farewell To Arms probably gets a no |
| 09:27:17 | 4 | rating, right? |
| 09:27:19 | 5 | MS. CELLA:  Without knowing, I would guess. |
| 09:27:20 | 6 | THE COURT:  No.  I'm saying there's a category |
| 09:27:22 | 7 | that's no -- |
| 09:27:22 | 8 | MS. CELLA:  Yes. |
| 09:27:23 | 9 | THE COURT:  Category of no rating.  And then, you |
| 09:27:26 | 10 | have books that are in the middle that have some sexual |
| 09:27:34 | 11 | content, and then, there are books that are obscene, |
| 09:27:37 | 12 | right?  There are three, right? |
| 09:27:38 | 13 | MS. CELLA:  Yes.  Correct. |
| 09:27:39 | 14 | THE COURT:  Now, let's say for a second that I |
| 09:27:44 | 15 | agree with you that if something is determined to be |
| 09:27:47 | 16 | obscene -- let's go full on and say that, for some reason, |
| 09:27:53 | 17 | they want to put something that has child pornography in |
| 09:27:56 | 18 | it.  Just so we have something I think -- I hope even |
| 09:28:03 | 19 | plaintiffs would agree would qualify as obscene since I |
| 09:28:05 | 20 | actually sentence people for having it.  So that would |
| 09:28:08 | 21 | have to be obscene if it's illegal so let's say that.  I |
| 09:28:13 | 22 | get the argument -- it's a pretty easy argument, I think, |
| 09:28:17 | 23 | to keep things that are obscene out of public school |
| 09:28:21 | 24 | libraries. |
| 09:28:22 | 25 | But what is the justification for the middle |

09:28:27  1   category?

09:28:27  2          MS. CELLA:  Well, it's a reasonable restriction

09:28:30  3   and because it's a nonpublic forum, it's reasonable to

09:28:33  4   keep things that are sexually relevant but not maybe in

09:28:37  5   the obscene category into the hands of consenting parents.

09:28:41  6   So anyone can check that out of the library, a sexually

09:28:46  7   relevant book or material, as long as the parent says

09:28:50  8   that's okay and gives their consent.

09:28:54  9          The Fifth Circuit has said that reasonable

09:28:58  10  restric -- or, I'm sorry, the Supreme Court has said that

09:29:03  11  education is the primary responsibility of one of them,

09:29:06  12  parents.

09:29:07  13         THE COURT:  As a parent, I'm kinda sympathetic to

09:29:11  14  that, too, but let me say this.  And Ms. Prather or

09:29:20  15  whoever on her team can correct me if I'm wrong.

09:29:22  16         But if the TEA has this interest that you -- that

09:29:30  17  the majority of the legislature found to be appropriate,

09:29:36  18  why doesn't the TEA do it?  I mean, if they want to go

09:29:42  19  through and say we're going to give the Lonesome Dove, you

09:29:48  20  know, because it has prostitutes in it, we're going to

09:29:54  21  give it the medium one and we're going to -- whatever,

09:29:54  22  child pornography, we're going to go through.  Why isn't

09:29:57  23  that the job of the TEA and not of the book -- why does

09:30:03  24  the state get to require the publishers of books to make

09:30:09  25  these decisions?

09:30:11  1          MS. CELLA:  Sure.  So as you're aware, when the

09:30:13  2    legislature wants to do something, they will, but this is

09:30:15  3    a business --

09:30:15  4          THE COURT:  That's why we have federal courts.

09:30:20  5          MS. CELLA:  Yes, but this is a business

09:30:21  6    transaction.  So if plaintiffs are seeking to sell books

09:30:24  7    in public schools and public schools have the right to

09:30:28  8    reasonably restrict material that's in there, if they want

09:30:31  9    to conduct that business transaction, this is what the

09:30:35  10   legislature has decided needs to be done.

09:30:37  11         Now, yes, TEA has oversight over that and it's

09:30:41  12   not -- it's not plaintiffs speaking.  So a reasonable

09:30:45  13   restriction -- and that's not just on obscene material.

09:30:48  14   It's reasonable restrictions on education.  But in this

09:30:53  15   context, obviously we're talking about sexually explicit

09:30:56  16   and sexually relevant library material.  But this is a

09:31:00  17   business transaction is all it is.  If the plaintiffs --

09:31:03  18         THE COURT:  What I'm trying to get -- okay.  I

09:31:06  19   was trying to avoid having to do this but let me -- I'm

09:31:11  20   trying to stay away from just the one -- because what I

09:31:22  21   really am most interested in hearing you talk about -- and

09:31:24  22   Ms. Prather may tell me I'm wrong.  She may care about

09:31:26  23   both.  But I think in terms of them having to decide what

09:31:28  24   is what, I'm sure she will.

09:31:29  25         But what I'm trying to figure out is, it seems to

09:31:34  1  me there may be a wide group of people who agree at some

09:31:40  2  level that sexually explicit material shouldn't be in

09:31:43  3  public schools and who has to make that decision.  We can

09:31:47  4  fuss over TEA versus them, the publishers or whoever.  But

09:31:54  5  what I'm trying to figure out is how the legislature can

09:32:00  6  require publishers to determine what is sexually relevant

09:32:08  7  that -- the middle category.  And I get that the state has

09:32:14  8  the power to control what books go into public school

09:32:23  9  libraries.  I get that.  But how do they get to tell

09:32:26  10  publishers that they have to come up with a decision for

09:32:30  11  all books as to whether they are sexually relevant?

09:32:36  12          MS. CELLA:  Sure.  Well, again, because the

09:32:39  13  publishers and the plaintiffs, they want to sell books in

09:32:43  14  public schools.  So if they are seeking to conduct that

09:32:47  15  business with the state, the public schools, then this is

09:32:52  16  one of the requirements and, you know, it's a partnership

09:32:56  17  with TEA.  TEA has final say over the document -- I'm

09:33:01  18  sorry, over the ratings.

09:33:04  19          So in order for this partnership to work, the

09:33:07  20  publishers will have to rate books that they seek to sell.

09:33:10  21  TEA isn't seeking -- or, you know, the public schools

09:33:12  22  aren't seeking to sell anything, they just want to buy

09:33:16  23  something.  So this is just -- this is strictly a business

09:33:19  24  transaction.  We see this in contracts all the time.  If

09:33:22  25  people want to contract with the state, there's certain

09:33:25  1  requirements they have to meet.

09:33:26  2         THE COURT:  You're saying -- but that's a truism.

09:33:30  3  I mean, yes, that's true.  That's true -- that's just

09:33:33  4  true.  I'm trying to figure out -- so are you familiar

09:33:36  5  with -- my favorite painter is Carpaccio.  Let's say they

09:33:44  6  want to have a book of Carpaccio whose -- everyone would

09:33:49  7  agree, he had some nudes in them.  Who gets to determine

09:33:54  8  -- is that -- how does the state have the power to tell

09:34:00  9  the publisher they have to decide whether a book with

09:34:03  10 Carpaccio paintings is sexually relevant or not?  That's

09:34:08  11 what I'm trying to figure out.  How do they have the power

09:34:10  12 to force commercial entities to make that decision?

09:34:16  13        MS. CELLA:  Because, your Honor, they're seeking

09:34:18  14 to sell that material, in this case, the book of

09:34:22  15 paintings --

09:34:22  16        THE COURT:  No.  I get they have the power.

09:34:25  17 Sure.  They could tell -- what I'm saying, how do they get

09:34:28  18 to regulate on this issue?  I mean, Michelangelo, I mean,

09:34:35  19 what -- I'm the lawyer for the book publisher, what do I

09:34:40  20 do with David?  What do I do with the painting of David?

09:34:44  21 How does the publisher decide what's sexually relevant?

09:34:51  22        MS. CELLA:  Well, it follows the statute, the

09:34:52  23 statute has guidelines for that.  It references the penal

09:34:55  24 code.  There's other guidelines for that.  So I mean, the

09:35:00  25 statute is not vague in that way.  Of course, it's not 100

09:35:04  1   percent perfect all the time.

09:35:05  2           THE COURT:  No, no, no.  I have it, 43.25, sexual

09:35:11  3   conduct, which is what is for sexually relevant, includes

09:35:15  4   or any portion of the female breast below the top of the

09:35:19  5   areola.  I hope I didn't offend anyone there.  But you

09:35:23  6   just included Michelangelo and Carpaccio.

09:35:27  7           MS. CELLA:  Well, your Honor.

09:35:29  8           THE COURT:  And you've required book publishers

09:35:32  9   to make that decision.

09:35:34  10          MS. CELLA:  Initially, but again, TEA has

09:35:37  11  oversight of that.  So, you know, maybe they pick up the

09:35:39  12  phone and call someone at TEA and say, hey, we're not sure

09:35:42  13  what to do with this.  Or maybe they just don't rate it.

09:35:44  14  They give it no rating and then, TEA will review that.

09:35:49  15          THE COURT:  Okay.

09:35:54  16          MS. CELLA:  So in this way, there's just -- the

09:35:56  17  plaintiffs just -- there is no First Amendment right

09:36:01  18  because it's public school libraries and everything we

09:36:04  19  just talked about.

09:36:05  20          THE COURT:  I think I heard you just say -- I

09:36:08  21  don't want to put words in your mouth -- that there are no

09:36:14  22  First Amendment rights in public school libraries?

09:36:17  23          MS. CELLA:  For the vendors.  I'm not talking

09:36:21  24  about any third-party students that may not be a part of

09:36:24  25  this lawsuit.  But the vendors do not have a First

| | | |
|---|---|---|
| 09:36:27 | 1 | Amendment right in the public school library. |
| 09:36:29 | 2 | THE COURT:  Okay.  That's a pretty bright line. |
| 09:36:33 | 3 | I hope the other side's taking notes and you may be right. |
| 09:36:36 | 4 | I don't have any special expertise in this area or any |
| 09:36:40 | 5 | area as it turns out. |
| 09:36:43 | 6 | MS. CELLA:  I don't think that's true, your |
| 09:36:44 | 7 | Honor.  I think a lot of patent litigators would disagree |
| 09:36:48 | 8 | with you. |
| 09:36:49 | 9 | THE COURT:  And I think most of them, actually, |
| 09:36:49 | 10 | the ones that lose, I think, would be the ones who would |
| 09:36:52 | 11 | agree the most. |
| 09:36:55 | 12 | MS. CELLA:  But -- and again, even if the First |
| 09:36:58 | 13 | Amendment did apply -- we've discussed it doesn't, but if |
| 09:37:02 | 14 | it did, let's just say it did, intermediate scrutiny, not |
| 09:37:05 | 15 | strict scrutiny as the plaintiffs have mentioned, would |
| 09:37:07 | 16 | apply because this is commercial speech, which we've |
| 09:37:11 | 17 | already talked about. |
| 09:37:12 | 18 | THE COURT:  I don't actually -- if you did, I |
| 09:37:15 | 19 | missed it.  You might want to spend another minute or two |
| 09:37:18 | 20 | on the fact that this is commercial speech. |
| 09:37:21 | 21 | MS. CELLA:  Sure. |
| 09:37:22 | 22 | THE COURT:  And which is a little switch -- I |
| 09:37:25 | 23 | mean, I get that you're saying the government controls it |
| 09:37:26 | 24 | but I do think -- I would be interested in hearing your |
| 09:37:30 | 25 | thoughts about the fact that this is sale by businesses of |

09:37:36  1  books and you're not restricting their sale of the books.

09:37:41  2  You are restricting them to rate the books and then, the

09:37:45  3  school -- I think you would say the schools can do with

09:37:47  4  them what they will.  They can't take them if they're

09:37:51  5  sexually explicit, which I'm, again, carving out and we'll

09:37:54  6  take up a little bit later.

09:37:56  7       But I think I hear your argument that the law

09:38:04  8  doesn't really prevent the sale of them.  It requires them

09:38:07  9  just to be rated and then, the schools do with them what

09:38:10 10  the schools decide to do with them.  I think that's your

09:38:12 11  argument, right?

09:38:14 12       MS. CELLA:  Yes, your Honor.  As far as the

09:38:16 13  sexually relevant and the not-rated books.  Even if a

09:38:18 14  book's not rated, a school wouldn't have to buy it.  You

09:38:20 15  can't just force them to buy some book based on a rating.

09:38:25 16       THE COURT:  Right.  And that's your argument is

09:38:27 17  that because it's commercial free speech, that's

09:38:32 18  important, too.

09:38:33 19       MS. CELLA:  Yes, your Honor, because commercial

09:38:35 20  speech in Houston Balloons & Promotions vs. City of

09:38:40 21  Houston tells us that speech is no more than a commercial

09:38:44 22  transaction.  And the plaintiffs allege this is compelled

09:38:48 23  speech related solely to their economic interests and

09:38:52 24  their audience by describing goods.  Well, they're trying

09:38:56 25  to sell goods, I mean, this is strictly a commercial

| | | |
|---|---|---|
| 09:38:58 | 1 | transaction and -- |
| 09:39:00 | 2 | THE COURT:  Understood. |
| 09:39:02 | 3 | MS. CELLA:  -- the relevant question with the |
| 09:39:05 | 4 | commercial transaction is, does requiring plaintiffs to |
| 09:39:08 | 5 | rate books they seek to sell in Texas public schools |
| 09:39:11 | 6 | directly advance the governmental interests of regulating |
| 09:39:15 | 7 | the information to which Texas students are subject? |
| 09:39:18 | 8 | Without a doubt, the answer to that is yes.  So because |
| 09:39:23 | 9 | this is commercial speech, even if the First Amendment |
| 09:39:25 | 10 | does apply, the test is intermediate scrutiny, not strict |
| 09:39:29 | 11 | scrutiny. |
| 09:39:31 | 12 | We have some other arguments in our brief, your |
| 09:39:33 | 13 | Honor.  I believe you've read them.  I don't know that we |
| 09:39:37 | 14 | need to go through them here unless you want to.  But -- |
| 09:39:40 | 15 | THE COURT:  I'd like you to -- you know, we've |
| 09:39:43 | 16 | got the morning.  I'd like to hear any arguments you care |
| 09:39:46 | 17 | to make now.  We're not -- it's up to you. |
| 09:39:50 | 18 | MS. CELLA:  Sure, your Honor.  So I will just |
| 09:39:51 | 19 | talk about the vagueness and the overbreadth arguments |
| 09:39:56 | 20 | very briefly.  And unconstitutional -- this is not |
| 09:40:01 | 21 | unconstitutionally vague.  Perfect clarity is not |
| 09:40:04 | 22 | required.  It just has to be -- |
| 09:40:05 | 23 | THE COURT:  I couldn't understand. |
| 09:40:06 | 24 | MS. CELLA:  Sorry, your Honor.  Perfect clarity |
| 09:40:08 | 25 | is not required for a statute.  It just needs to have some |

09:40:12  1    degree of certainty and here, the statute goes through how

09:40:15  2    to rate these books.  It references the penal code.  So

09:40:19  3    it's not like it just says rate these and good luck.

09:40:23  4    There's also oversight by TEA as we discussed.

09:40:28  5            THE COURT:  Well, and I'll try one more time.

09:40:34  6    There certainly is -- this is my word, note yours.

09:40:37  7    There's the backstop of the TEA for if in their sole

09:40:50  8    discretion, they decide that something's been mislabeled,

09:40:52  9    that they can change it.  I'm reluctant to say fix it but

09:40:57  10   they can change it.

09:40:57  11           But the -- again, I don't understand your

09:41:00  12   argument that the original -- that the burden is on the

09:41:13  13   publishers to do this and dare I say -- and I don't know

09:41:16  14   how active parents are.  I'm not really sure -- I'm not

09:41:23  15   really sure who would be motivated to raise the issue of

09:41:28  16   the correctness of the -- you know, if a book -- you know,

09:41:37  17   if X book comes in and is rated as sexually explicit, I'm

09:41:42  18   not sure who's motivated to ask the TEA to re-rate it.

09:41:46  19           Let me ask you this.  Is there any self-actuating

09:41:52  20   where the TEA -- is there someone at the TEA under the

09:41:55  21   statute who is tasked with making sure they get it right?

09:42:00  22   I mean, how does it work that they would come and change

09:42:05  23   the rating?  Why would the TEA take Lonesome Dove that's

09:42:10  24   been rated as -- with no rating and change it to sexually

09:42:16  25   explicit, or vice versa?  What would cause that to happen?

09:42:19  1  I understand it can happen but what would motivate that to

09:42:23  2  happen?

09:42:24  3          MS. CELLA:  You know, your Honor, we haven't -- I

09:42:27  4  haven't thought that through yet.  I think this is still

09:42:29  5  being worked out because this is a new --

09:42:31  6          THE COURT:  That just occurred to me, too.

09:42:32  7          MS. CELLA:  This is a new bill.  But, you know,

09:42:34  8  it may be the case they don't review it or if something's

09:42:39  9  a glaring -- I mean, like you said, if it's something

09:42:42  10 that's clearly child pornography and it's not rated.

09:42:44  11         THE COURT:  No, no.  I'm leaving out -- I'll go

09:42:50  12 on the record if anyone's recording this, I'm against

09:42:53  13 child pornography and so -- and I don't think the

09:42:58  14 publisher can offer any defense that publishers ought to

09:43:02  15 be able to -- I don't think that's even something to --

09:43:05  16 but I just use that to do an easy of what should be kept

09:43:08  17 out.

09:43:09  18         But let me ask you this.  In that it's unclear

09:43:13  19 what would cause the TEA to evaluate or reevaluate or

09:43:19  20 change what the status is, is that something that cuts in

09:43:23  21 your favor that means that the plaintiffs don't have any

09:43:29  22 harm, or is that something that cuts in their favor that

09:43:33  23 says that the statute is vague?

09:43:35  24         MS. CELLA:  Sure.  Well, the first thing I want

09:43:37  25 to say is, I am also against child pornography as I'm sure

09:43:40    1   the plaintiffs are.  I was just using your example if they

09:43:43    2   rated that as no rating and it's clearly that should be

09:43:47    3   changed, it may cause them --

09:43:47    4           THE COURT:  And my guess is -- my guess is

09:43:50    5   there's nothing that a legitimate book publisher is

09:43:53    6   putting out.

09:43:54    7           MS. CELLA:  Sure.

09:43:55    8           THE COURT:  Or that these plaintiffs are carrying

09:43:57    9   that would be considered in that area.

09:43:59   10           MS. CELLA:  Yes, I would agree with that, your

09:44:01   11   Honor.  But as far as what would cause TEA to rate it and

09:44:05   12   that being vague, I don't think that's vague.  State

09:44:08   13   agencies can come up with their own internal workings.  So

09:44:17   14   the way that they would decide what lists to look at or

09:44:20   15   not look at or maybe what books specifically to look at or

09:44:22   16   not look at, if that has been worked out, I have not

09:44:24   17   discussed that with my client at this point at the

09:44:29   18   preliminary injunction stage or the motion to dismiss

09:44:30   19   stage.  So I can't give you a definite answer.

09:44:33   20           I could certainly get with them and see if

09:44:34   21   they've come up with anything, but at this point, I don't

09:44:37   22   have a definite answer.  But I don't think that cuts

09:44:41   23   against the state just because they haven't written it in

09:44:44   24   the statute of how they're going to determine what lists

09:44:47   25   to look at or if they're going to look at them.  That

09:44:50 1 doesn't make the statute vague.  That's just a internal

09:44:53 2 working of a state agency.

09:45:00 3         And unless your Honor has any other questions

09:45:02 4 just for all the reasons we discussed and that are more

09:45:04 5 fully briefed in our motion to dismiss, we do ask this

09:45:07 6 court to dismiss plaintiffs' claims for lack of standing,

09:45:10 7 lack of jurisdiction, and failure to state a claim upon

09:45:14 8 which relief could be granted.  Thank you, your Honor.

09:45:21 9         THE COURT:  What I'm going to hear at least at

09:45:23 10 first from the plaintiff, if the plaintiff would like to

09:45:25 11 respond to anything they've heard, you're more than

09:45:29 12 welcome to.  And then, if there's any argument that the

09:45:31 13 plaintiff wants to make as to any harm that might come to

09:45:35 14 them in the interim between now and when I can have the

09:45:38 15 next hearing and why should move forward today, I'm happy

09:45:41 16 to hear that, as well.  I want to make sure that the

09:45:44 17 rights of the plaintiff are protected, as well.

09:45:46 18         The hearing was set today only because of my

09:45:52 19 trial docket and this was the date we had available.  It

09:45:57 20 didn't really work the best for when everything could be

09:46:00 21 briefed.  So I'm trying to give everyone a fair chance and

09:46:03 22 I now have an opening next week, which is why I want to

09:46:09 23 give everyone as much chance to brief and get ready as

09:46:12 24 long as your -- the plaintiffs' rights are protected, as

09:46:14 25 long as we have a hearing today and Monday and we'll get

09:46:19  1    something done by September 1st.  But you're welcome to
09:46:23  2    say whatever you care to today that you think I need to
09:47:41  3    hear.
09:47:41  4         MS. PRATHER:  Thank you, your Honor.
09:47:41  5         Your Honor, we're caught flatfooted this morning
09:47:45  6    because we're responding to papers we got about 36 hours
09:47:48  7    ago, but I'll do the best that I can and we'll certainly
09:47:51  8    supplement with followup briefing.
09:47:53  9         THE COURT:  Let me just say this also.  Obviously
09:47:58  10   they're going to listen to what you say.  I mean, but if
09:48:01  11   there's something -- I'm going to give you an opportunity
09:48:04  12   when she finishes to respond to anything she says here
09:48:07  13   today, as well.  Yes, ma'am.
09:48:10  14        MS. PRATHER:  Your Honor, we represent a
09:48:13  15   coalition of book sellers, book publishers and authors
09:48:15  16   that sell books to Texas public schools, and the case here
09:48:19  17   today is about whether the state can require ratings of
09:48:23  18   books and adoption of those state ratings by the vendors.
09:48:28  19   I know we've been talking about publishers, but this is
09:48:32  20   also just the middleman, the bookstores.  Not even the
09:48:35  21   people that produce the content.  What the case is not
09:48:40  22   about is whether the books are excluded from school
09:48:43  23   libraries.  This isn't about student speech.  This is
09:48:48  24   about vendors being required to rate books and being
09:48:50  25   compelled to put the state's ratings on the books if they

09:48:54  1  disagree with the ratings that the vendor gave them.

09:48:58  2        So we are here challenging the constitutionality

09:49:01  3  of H.B. 900.  And with regard to the reason why we need to

09:49:08  4  be here today and we need relief by September 1st, the

09:49:13  5  language in the statute is very clear.  Under 35.002(a) --

09:49:24  6  and, your Honor, in your notebook, we've put a copy of the

09:49:27  7  bill in there.  It is behind the third tab and you can go

09:49:33  8  to 35.002(a) and see that it requires a library material

09:49:38  9  vendor -- it says very clearly, a library material vendor

09:49:43  10  may not sell library materials to a school district unless

09:49:50  11  the vendor has issued appropriate ratings regarding the

09:49:56  12  sexually explicit material and sexually relevant material

09:50:00  13  previously sold to a district or school.

09:50:06  14        And so, right now, our clients are having to do

09:50:09  15  those ratings because as of September 1st, when this bill

09:50:14  16  goes into effect, according to Section 7 of the bill,

09:50:19  17  their sales will be cut off if they haven't provided the

09:50:22  18  ratings of the previous sales that they have done.

09:50:28  19  Section 6 of the bill also makes it clear that the act

09:50:33  20  applies beginning with the 2023 and 2024 school year,

09:50:38  21  which has already started.  My kids are already in school.

09:50:42  22        So even though the ratings are not, quote,

09:50:45  23  unquote, due until April 1st under 35.002(c), which is

09:50:51  24  what the government keeps referring to, they're ignoring

09:50:55  25  35.002(a), which cuts off all sales starting September 1st

09:51:02  1   if those ratings aren't in.  It's kind of like discovery
09:51:06  2   in a lawsuit.  You have the discovery deadline, but it
09:51:10  3   doesn't mean you aren't supposed to be doing the discovery
09:51:13  4   the whole time before the deadline approaches and that's
09:51:18  5   what we have here.
09:51:19  6         These vendors are having to do these ratings
09:51:23  7   right now.  And the problem with the ability to do the
09:51:26  8   ratings right now is, the law is unconstitutionally vague,
09:51:33  9   overbroad, they can't figure out how to do the ratings.
09:51:36 10   It's also simply cost prohibitive.  We have testimony that
09:51:42 11   was provided during the Senate hearings talking about just
09:51:48 12   in six school districts alone, there were more than six
09:51:53 13   million items in their library.  There are 1,200 school
09:51:57 14   districts in the state of Texas.  That's an unfathomable
09:52:01 15   amount of retroactive ratings that will need to be done
09:52:05 16   before these book sellers can sell anything.
09:52:08 17         We also have Senate committee hearing testimony
09:52:11 18   based on a TPIA request, which is linked to in our reply,
09:52:18 19   where they asked Spring Branch ISD how much it cost to
09:52:22 20   review just one book, and it took 220 staff hours and cost
09:52:29 21   the district $30,000 just to review that one book.  So
09:52:35 22   when you look at the declarations, and they are behind the
09:52:42 23   fifth tab in your notebook, there is significant testimony
09:52:46 24   about the cost, about the uncertainty, and about the
09:52:50 25   inability to do what is being asked of them under the

| | |
|---|---|
| 09:52:54 | 1 |
| 09:52:55 | 2 |
| 09:52:59 | 3 |
| 09:53:04 | 4 |
| 09:53:07 | 5 |
| 09:53:13 | 6 |
| 09:53:15 | 7 |
| 09:53:20 | 8 |
| 09:53:21 | 9 |
| 09:53:25 | 10 |
| 09:53:30 | 11 |
| 09:53:35 | 12 |
| 09:53:37 | 13 |
| 09:53:40 | 14 |
| 09:53:46 | 15 |
| 09:53:51 | 16 |
| 09:53:56 | 17 |
| 09:54:01 | 18 |
| 09:54:03 | 19 |
| 09:54:06 | 20 |
| 09:54:13 | 21 |
| 09:54:22 | 22 |
| 09:54:25 | 23 |
| 09:54:29 | 24 |
| 09:54:36 | 25 |

statute.

And I know the plaintiff -- I'm sorry, the defendants have talked here about a lack of standing. They say that the injury is not traceable to the defendants. But standing rules in First Amendment cases, because of the importance of the constitutional issues and the potential chilling effect, are actually slightly different.

In a First Amendment case, an actual and well-founded fear that the law will be enforced against the plaintiffs suffices. And that's the Virginia II case, which is in your notebook, we put twelve cases, kind of the twelve most significant cases we think for the Court to review. And it's under tab No. 12 in that notebook. Also, the Susan B. Anthony case discusses the fact that prior enforcement of a law is not required to establish standing in a First Amendment case.

Your Honor asked the question of who do they get relief from? Who do these vendors get relief from under this law? And I'd refer you back to the bill itself again. If you look at the bill under 35.004, the answer is, they don't get relief. There's no avenue for relief. There's no judicial recourse, which is another reason this is unconstitutional. It basically absolves the school districts, librarians, the employees of any liability to

09:54:41  1   the vendors.  So the answer is to your question, who do

09:54:46  2   they get relief from, no one.

09:54:49  3        The harm here is that they actually start

09:54:55  4   reviewing of these books now, which is a costly and

09:54:58  5   essentially impossible process.  The harm is also that

09:55:03  6   they can't sell books until they are rated and the harm is

09:55:08  7   that they have to agree with the state ratings.  The other

09:55:13  8   thing that's been --

09:55:15  9        THE COURT:  Well, I'm not sure why -- setting

09:55:19 10   aside everything else, assuming everything else is okay,

09:55:20 11   why it's a harm that they have to accept the state

09:55:26 12   ratings.

09:55:27 13        MS. PRATHER:  Well, for one thing, your Honor,

09:55:29 14   it's compelled speech.  If they disagree with those

09:55:31 15   ratings under 303 Creative, which was handed down June

09:55:35 16   30th by the U.S. Supreme Court, the government can't force

09:55:40 17   a private party to convey speech that they disagree with.

09:55:45 18        THE COURT:  I'm not following that.  I understand

09:55:49 19   what you're saying.  But they're not -- I have a big

09:55:57 20   problem with them making y'all determine whether it's not

09:56:02 21   sexually explicit or is sexually explicit or is whatever

09:56:05 22   is next.  And the remedy I hear from the other side, in

09:56:09 23   part, is, well, they're not -- they're doing the first cut

09:56:14 24   and I get why and all the problems you have with that.

09:56:15 25   But ultimately, it's the TEA because we get to come in and

```
09:56:21   1   we're the ultimate ombudsmen and get to say, you were
09:56:23   2   wrong, Lonesome Dove isn't X, it's Y.  And that's -- but
09:56:29   3   at that point, it's no longer -- and help me why I'm
09:56:34   4   wrong.  At that point, it's no longer your speech.  It's
09:56:40   5   -- I'm not sure it's speech at all.  I mean, we could
09:56:42   6   fight -- we'll fight over that.  I'm sure you all will
09:56:44   7   fight over that.  I get it's a ranking.  But I'm not sure
09:56:48   8   how that at the point where the TEA comes in and they
09:56:52   9   modify it and it's now X -- Y instead of X, why that's
09:56:59  10   your compelled speech.
09:57:02  11            MS. PRATHER:  I can help you with that, your
09:57:04  12   Honor.  So if you go to the statute and you go to the
09:57:07  13   Section 35.003, that's where it talks about the agency
09:57:16  14   requiring the library materials to be rated, but then, it
09:57:20  15   also says if the agency determines that the material that
09:57:24  16   has been rated is not consistent with what they believe
09:57:29  17   the ratings should be, then the agency shall provide
09:57:34  18   written notice to the vendor of this corrected rating,
09:57:39  19   okay?
09:57:40  20            Then under the next section, it says no later
09:57:44  21   than the 60th day after the rating on which the library
09:57:48  22   material vendor receives this notice of the, quote,
09:57:51  23   unquote, corrected rating, the vendor shall rate the
09:57:57  24   library material according to the agency's corrected
09:58:01  25   rating.  It requires the vendor to change their rating to
```

| | |
|---|---|
| 09:58:08 | 1 |
| 09:58:13 | 2 |
| 09:58:23 | 3 |
| 09:58:29 | 4 |
| 09:58:35 | 5 |
| 09:58:39 | 6 |
| 09:58:46 | 7 |
| 09:58:53 | 8 |
| 09:58:58 | 9 |
| 09:59:02 | 10 |
| 09:59:07 | 11 |
| 09:59:12 | 12 |
| 09:59:17 | 13 |
| 09:59:21 | 14 |
| 09:59:24 | 15 |
| 09:59:26 | 16 |
| 09:59:28 | 17 |
| 09:59:32 | 18 |
| 09:59:35 | 19 |
| 09:59:41 | 20 |
| 09:59:44 | 21 |
| 09:59:47 | 22 |
| 09:59:53 | 23 |
| 09:59:54 | 24 |
| 09:59:59 | 25 |

what the state believes it should be.  And then, that
rating under 35.002(e) is posted on a website in a
conspicuous manner, well beyond the confines of Texas for
all the world to see that this vendor has rated the book
as whatever TEA told them to, right?

         So they are compelling the vendor to apply their
corrected rating and if they don't under 35.003(c), two
things happen.  One, they're publicly shamed.  They're put
on a list on TEA's website as a vendor who has failed to
comply with the law.  So they're publicly shamed.  And,
two, under the next subsection (d), school districts are
prohibited from purchasing books from them.  Any books.
Not just that book, any books.

         And these book publishers, to the extent we're
talking about publishers as opposed to vendors, they have
lots of different lines.  They have different imprints,
right?  So Penguin Random House has a whole bunch of
different imprints that, you know, deal with a whole bunch
of different topics.  It's unclear whether all of those
imprints are now banned, some of them are banned, we just
don't know.  But it is clear that it's not just the book
at issue.  The school districts are prohibited from buying
books from that vendor.

         So the harm is real.  The April 20 -- the April
1st date, it keeps getting bandied about here, is not a

| | | |
|---|---|---|
| 10:00:05 | 1 | date that we can work with because September 1 is the date |
| 10:00:10 | 2 | that the sales get cut off and the AG does not -- they |
| 10:00:16 | 3 | have not said we're not going to enforce this.  There's |
| 10:00:20 | 4 | been no statement made to that effect.  And under the |
| 10:00:23 | 5 | Consumer Data Industries case -- |
| 10:00:25 | 6 | THE COURT:  What role -- I didn't get it.  What |
| 10:00:29 | 7 | role does the AG play in the enforcement of is? |
| 10:00:35 | 8 | MS. PRATHER:  I don't know.  I mean, good |
| 10:00:36 | 9 | question, your Honor. |
| 10:00:36 | 10 | THE COURT:  That's not something I got prepared |
| 10:00:38 | 11 | on. |
| 10:00:39 | 12 | MS. PRATHER:  I don't know.  Let me rephrase it a |
| 10:00:41 | 13 | different way.  No one, no state agency has made any |
| 10:00:46 | 14 | assurance that they won't enforce this law.  So we are |
| 10:00:54 | 15 | sitting here in a position where the law goes into effect |
| 10:00:57 | 16 | on September 1st.  Even if the Court were inclined to |
| 10:01:00 | 17 | accept the AG's interpretation, under Virginia II, the AG |
| 10:01:07 | 18 | cannot bind the legal interpretation of this statute.  So |
| 10:01:13 | 19 | I don't think standing is an issue.  I think a lot of the |
| 10:01:16 | 20 | response in our case, and I guess not surprisingly, was |
| 10:01:21 | 21 | procedural, not substantive. |
| 10:01:23 | 22 | So from a procedural standpoint, we've |
| 10:01:28 | 23 | established standing.  I think the next issue that the |
| 10:01:31 | 24 | defense brought up was sovereign immunity.  This case |
| 10:01:35 | 25 | falls squarely within the <u>Ex Parte: Young</u> exception.  That |

| | |
|---|---|
| 10:01:42 | 1 |
| 10:01:44 | 2 |
| 10:01:48 | 3 |
| 10:01:53 | 4 |
| 10:01:59 | 5 |
| 10:02:04 | 6 |

exception applies when a suit seeks prospective injunctive
relief from the state actor based on an alleged ongoing
violation of the Constitution.  We are right within those
goal posts.  The K.P. vs. Leblanc case, which is cited at
page 6 of our reply, it's a Fifth Circuit case, is
squarely on point.

7       The drone constitutional challenge, which Judge
8   Pitman handled last year, NPPA vs. McCraw held that Ex
9   Parte: Young exception applied in very circumstances.  And
10   just a little excerpt from that case talks about
11   plaintiffs having no way of knowing whether the defendants
12   will enforce the law moving forward.  Defendants have
13   provided no binding assurance and the Supreme Court has
14   noted that we would not uphold an unconstitutional statute
15   merely because the government promised to use it
16   responsibly.  The First Amendment protects against the
17   government.  It does not leave us at the mercy of noblesse
18   oblige.

19       Given the possibility of enforcement and the duty
20   of defendants to do so if a relevant situation arises, the
21   Court finds that plaintiffs have established sufficient
22   connection to enforcement for defendants to fall within Ex
23   Parte: Young exception to sovereign immunity.  That's from
24   Judge Pitman.

25       But your Honor probably remembers your own case,

| | | |
|---|---|---|
| 10:03:17 | 1 | the <u>Calhoun vs. Collier</u> case in which you made a similar |
| 10:03:21 | 2 | argument. |
| 10:03:21 | 3 | THE COURT:  I probably don't but you're kind to |
| 10:03:25 | 4 | say I would. |
| 10:03:28 | 5 | MS. PRATHER:  I understand.  I think the third |
| 10:03:30 | 6 | issue that was discussed was that somehow this is |
| 10:03:33 | 7 | government speech.  We talked a little bit about this. |
| 10:03:36 | 8 | It's not government speech.  This is speech that's being |
| 10:03:39 | 9 | forced upon vendors by the government.  This isn't speech |
| 10:03:43 | 10 | in libraries.  This is speech that is being forced on |
| 10:03:47 | 11 | vendors to put on public websites for all the world to see |
| 10:03:51 | 12 | as though it is its own.  If it were government speech, |
| 10:03:57 | 13 | then the government should be the one doing the ratings |
| 10:03:59 | 14 | and posting it as their ratings and that didn't happen.  I |
| 10:04:01 | 15 | mean, let's look at the legislation that passed. |
| 10:04:04 | 16 | Note that it did not require schools or |
| 10:04:09 | 17 | librarians or any governmental body to issue these ratings |
| 10:04:12 | 18 | and why?  Because that would have been unfunded mandate. |
| 10:04:16 | 19 | Instead, they pushed it off on the vendors, private |
| 10:04:21 | 20 | parties that should not be subjected to compelled speech. |
| 10:04:28 | 21 | The removal of books is also something that is, you know, |
| 10:04:33 | 22 | a hot topic these days.  It's something that Judge Pitman |
| 10:04:35 | 23 | handled earlier this year, as well, in the Llano County |
| 10:04:41 | 24 | case.  And I've got a copy.  This is not in our notebook |
| 10:04:45 | 25 | because this had to do with the reply which was filed late |

|         |    |                                                          |
|---------|----|----------------------------------------------------------|
| 10:04:48 | 1  | last night.  So I've got a copy for the Court and for   |
| 10:04:57 | 2  | opposing counsel.                                        |
| 10:04:57 | 3  | THE COURT:  That actually, I'm pretty familiar          |
| 10:04:59 | 4  | with.                                                    |
| 10:05:01 | 5  | MS. PRATHER:  So in that case, Judge Pitman             |
| 10:05:02 | 6  | rejected the argument that book removal decisions were  |
| 10:05:08 | 7  | government speech.                                       |
| 10:05:09 | 8  | THE COURT:  But that's on appeal right now,             |
| 10:05:13 | 9  | right?                                                   |
| 10:05:13 | 10 | MS. PRATHER:  It is.  There's another case that         |
| 10:05:16 | 11 | is in your notebook, tab 4, it's a case involving       |
| 10:05:22 | 12 | Fayetteville public libraries.  This case was handed down |
| 10:05:26 | 13 | literally days ago, July 30th, has a similar analysis   |
| 10:05:28 | 14 | about why removal of books is not government speech.     |
| 10:05:34 | 15 | I think the fourth issue that was brought up by         |
| 10:05:37 | 16 | the defendants was school libraries and then being not  |
| 10:05:40 | 17 | public forums.  This misses the mark.  I mean, once again, |
| 10:05:44 | 18 | we're not talking about speech in school libraries.  We're |
| 10:05:47 | 19 | talking about speech being forced on private parties that |
| 10:05:49 | 20 | are vendors.  This isn't about what -- you know, what   |
| 10:05:54 | 21 | discussion can be held by a student in a school library. |
| 10:05:59 | 22 | And most of the cases, if not all of the cases cited by |
| 10:06:01 | 23 | the defendant in their brief, the Hazlewood case and    |
| 10:06:04 | 24 | others, dealt with student speech that's inapplicable   |
| 10:06:08 | 25 | here.                                                    |

| | | |
|---|---|---|
| 10:06:11 | 1 | Here, we've got a situation where under Pico and |
| 10:06:17 | 2 | under Campbell, this does not -- the public forum issue |
| 10:06:25 | 3 | simply does not apply.  School libraries in both of those |
| 10:06:30 | 4 | cases were designated public forums for the receipt of |
| 10:06:36 | 5 | information and content-based restrictions cannot be |
| 10:06:40 | 6 | imposed unless the government meets strict scrutiny.  But |
| 10:06:45 | 7 | again, we are not even talking about speech in the school |
| 10:06:50 | 8 | library.  We're talking about private parties. |
| 10:06:57 | 9 | I think the last point was about -- or actually, |
| 10:07:00 | 10 | second to last point was about commercial speech and |
| 10:07:04 | 11 | commercial speech is also not relevant in this context. |
| 10:07:10 | 12 | This is not commercial speech.  This is not speech |
| 10:07:16 | 13 | inviting a commercial transaction.  This is forcing a |
| 10:07:19 | 14 | vendor to rate books in a way in which they don't |
| 10:07:23 | 15 | necessarily agree.  It's also not -- the rating of books, |
| 10:07:29 | 16 | forcing vendors to rate books is not an essential |
| 10:07:31 | 17 | operation of government.  Making decisions about what goes |
| 10:07:35 | 18 | into a library may be an essential government function, |
| 10:07:39 | 19 | but those decisions can be made without forcing vendors to |
| 10:07:43 | 20 | adopt and endorse the ratings of the state simply is not |
| 10:07:51 | 21 | commercial speech. |
| 10:07:52 | 22 | Your Honor, opposing counsel started to get into |
| 10:07:55 | 23 | vagueness.  Vagueness and overbreadth arguments.  They |
| 10:08:01 | 24 | didn't address any of the four examples of vagueness that |
| 10:08:03 | 25 | we provided in or papers.  I think the Court raised a |

| | | |
|---|---|---|
| 10:08:10 | 1 | valid concern:  How do we know what criteria TEA is |
| 10:08:12 | 2 | considering when they do change the ratings?  But the |
| 10:08:16 | 3 | reality is, this entire statute is one that is fatally |
| 10:08:21 | 4 | flawed by significant vagueness of a number of the various |
| 10:08:26 | 5 | terms in it. |
| 10:08:28 | 6 | So I would like to be able to get into some of |
| 10:08:34 | 7 | our discussion today.  I don't know if the Court wants us |
| 10:08:36 | 8 | to or not, but with regard to bringing up vagueness and |
| 10:08:41 | 9 | overbreadth, I think we've brought up issues that pertain |
| 10:08:44 | 10 | to the unconstitutionality of the statute. |
| 10:08:46 | 11 | THE COURT:  I think it would help me here on the |
| 10:08:51 | 12 | vagueness issues for sure. |
| 10:08:53 | 13 | MS. PRATHER:  Sure. |
| 10:08:54 | 14 | THE COURT:  So I can -- the more information I |
| 10:08:55 | 15 | have today, the easier it will be for me to get an order |
| 10:08:58 | 16 | out in a timely manner. |
| 10:09:01 | 17 | MS. PRATHER:  So we believe that the statute |
| 10:09:09 | 18 | fails for six different reasons, okay?  We've got -- let |
| 10:09:19 | 19 | me back up.  Six different reasons.  The first of which |
| 10:09:24 | 20 | is, it compels speech, right?  We've talked about that |
| 10:09:28 | 21 | briefly.  It compels the booksellers to adopt the |
| 10:09:35 | 22 | government's views that they may disagree with.  On |
| 10:09:37 | 23 | vagueness, it provides -- it fails to provide clear |
| 10:09:41 | 24 | standards for these vendors to apply when they are |
| 10:09:45 | 25 | attempting to rate the books.  It actually functions as an |

| | | |
|---|---|---|
| 10:09:50 | 1 | unconstitutional prior restraint because it gives the |
| 10:09:54 | 2 | state that exclusive control over what books are allowed |
| 10:09:57 | 3 | in public schools without any judicial review, which is |
| 10:10:00 | 4 | what you touched upon. |
| 10:10:04 | 5 | We believe it fails the strict scrutiny analysis |
| 10:10:08 | 6 | because it is content-based on its face.  It's a |
| 10:10:12 | 7 | content-based regulation and it's not narrowly tailored or |
| 10:10:17 | 8 | the least restrictive means of advancing or compelling a |
| 10:10:21 | 9 | government interest, and we believe it's overbroad.  It |
| 10:10:23 | 10 | prohibits a wide swath of constitutionally protected |
| 10:10:28 | 11 | speech and that's a significant problem. |
| 10:10:31 | 12 | Finally, the sixth ground, and we're just going |
| 10:10:35 | 13 | to rely on our briefing on this, it unconstitutionally |
| 10:10:39 | 14 | delegates government authority to regulate speech to |
| 10:10:42 | 15 | private individuals, these vendors and book publishers |
| 10:10:46 | 16 | that are going to have to be doing these ratings.  We |
| 10:10:49 | 17 | think that we actually win on all six grounds, but you |
| 10:10:51 | 18 | only need to find one to be able to enjoin the law. |
| 10:10:56 | 19 | If the law isn't enjoined by September 1st, not |
| 10:11:01 | 20 | only will the plaintiffs but countless others will suffer |
| 10:11:05 | 21 | irreparable injury because they won't be getting the |
| 10:11:08 | 22 | books.  Lucy Podmore, who's a San Antonio librarian, |
| 10:11:13 | 23 | talked about the fact that she can't order books right now |
| 10:11:18 | 24 | and that's going to be a harm to her students.  Katy ISD |
| 10:11:23 | 25 | has already announced publicly, they're not buying any |

10:11:26  1    books.  That's a harm not only to the vendors but to the

10:11:29  2    students who want and crave the ability to expand their

10:11:34  3    knowledge base.

10:11:36  4          So we talked about why we're here now.  And the

10:11:42  5    key provisions in the statute, the library standards, the

10:11:45  6    ratings, the fact that there's this automatic override, we

10:11:49  7    didn't mention earlier, as well, that those books that are

10:11:54  8    listed as sexually explicit -- and this, in part, goes to

10:11:57  9    the vagueness issue -- have to be recalled.  There's

10:12:01  10   nothing that explains how that recall works.  How does it

10:12:06  11   happen?  Do you have to recall books that you no longer

10:12:11  12   sell?  I mean, one of the things, practically speaking, is

10:12:13  13   these vendors don't necessarily sell the books anymore,

10:12:19  14   but they're being told they have to rate any book they've

10:12:23  15   ever sold to the school district that's still in active

10:12:28  16   use.  Another question is, how do the booksellers know

10:12:31  17   what is in active use?

10:12:32  18         And then, we discussed the blacklist and the lack

10:12:35  19   of judicial oversight.  So when discussing the key

10:12:41  20   provisions and the inability to actually understand and

10:12:46  21   apply them, we've got this one that deals with sexually

10:12:50  22   relevant, one that deals with sexually explicit.  But the

10:12:55  23   key thing here is that those definitions are highly

10:13:02  24   subjective and can easily result in inconsistent ratings.

10:13:08  25   There's also nothing in the law that addresses the

10:13:12  1   inconsistent ratings.  Another thing that's not in the law

10:13:19  2   that's extremely problematic is, there's no

10:13:22  3   differentiation as to age.  The age of the child at issue.

10:13:31  4        So, for instance, I have four children.  That's a

10:13:39  5   lot.  There's a big age gap in my kids, 10 and 12 years.

10:13:46  6   My children when they were five and their older sisters

10:13:51  7   when they were 15 and 17 were reading very different

10:13:57  8   books.  But under this law, there's no differentiation and

10:14:00  9   so, those young adult readers will be deprived of content

10:14:05  10  that is entirely appropriate for them because the law will

10:14:08  11  have to be applied to address the least common

10:14:12  12  denominator, what the five-year-olds read.  It's a

10:14:17  13  problem.

10:14:21  14        Now, we can go through what the definitions say

10:14:27  15  and the problems with the definition.  The biggest

10:14:32  16  problem, honestly, your Honor, is these are like

10:14:35  17  Frankenstein definitions, okay?  What the legislature did

10:14:39  18  -- and I know everyone sort of calls it sausage making,

10:14:43  19  right -- is they cut and pasted portions of the penal code

10:14:50  20  and undefined terms in case law to make entirely new

10:14:55  21  definitions, which inherently results in this vagueness

10:14:59  22  problem, right?

10:15:00  23        So for sexually relevant material, they took some

10:15:09  24  part of the Texas Penal Code.  They basically referred to

10:15:14  25  the Texas Penal Code's definition of sexual conduct and if

10:15:21 1 you look in your notebook, we have these provisions of the

10:15:26 2 penal code in there.  It's behind the statutory

10:15:32 3 references.  So I'm going to go there and look and you'll

10:15:35 4 see that the Texas Penal Code is under tab 3.  Sexual

10:15:41 5 conduct is one part of that definition, but it seemingly

10:15:48 6 encompasses all books that mention any sexually related

10:15:52 7 topics.

10:15:55 8          So that difference in the inability to determine

10:15:57 9 the age of the reader and factor that in is critical here.

10:16:03 10 If you look at -- your Honor mentioned your favorite

10:16:06 11 painter and David, the statue David, right, and does that

10:16:11 12 fall within the sexually relevant definition.  I think

10:16:15 13 it's a question.  I think it's a valid question.  We've

10:16:18 14 got Pulitzer Prize-winning photos like the one on the

10:16:22 15 screen now.  This is the Terror Of War.  This is the

10:16:25 16 Pulitzer Prize-winning photo that depicted a 10-year-old

10:16:31 17 girl completely naked, running away after a napalm bomb

10:16:35 18 had been detonated in her town in Vietnam -- in her

10:16:38 19 village in Vietnam.  Is that going to be banned?  Don't

10:16:42 20 know.  Do the vendors need to rate that as sexually

10:16:47 21 relevant because it shows naked -- a naked person?

10:16:53 22          Sexually explicit is actually even more difficult

10:16:56 23 because -- and the AG here has said -- and I think this is

10:17:04 24 really telling in their briefing, they said we attempted

10:17:09 25 to mirror the definition of obscenity, which acknowledges

| | |
|---|---|
| 10:17:16 | 1 |
| 10:17:22 | 2 |
| 10:17:26 | 3 |
| 10:17:29 | 4 |
| 10:17:34 | 5 |
| 10:17:42 | 6 |
| 10:17:45 | 7 |
| 10:17:50 | 8 |
| 10:17:55 | 9 |

that they didn't mirror the definition of obscenity.

We have the definition of obscenity in our Texas Penal Code.  If you look under the first tab behind the definitions -- statutory definitions section, you'll see 43.21(a)(1) defines obscenity and that definition is entirely consistent with the U.S. Supreme Court's definition under <u>Miller vs. California</u>.  That tells you what is and isn't constitutionally protected.  That is not what the legislature incorporated into the law.

Instead, they went beyond that and only tied the definition to patently offensive, which is 43.21(a)(4). By doing that, the definition is fatally constitutionally flawed because now they have encompassed in their definition constitutionally protected material that will be restricted from access for anyone.  So that is the fact that they left out whether a work has social or literary value and considering the work as a whole is fatal to their point.

Those two factors under <u>Reno vs. ACLU</u> must be included to avoid the sweep of constitutionally protected information.  They didn't do that.  They could have, they didn't.

They also have the definition of sexually explicit tied to community standards, but they don't define community standards.  So Texas has a whole a lot of

| | | |
|---|---|---|
| 10:19:27 | 1 | counties, right?  I think 252.  Community standards in |
| 10:19:32 | 2 | Austin, Texas are very different than the community |
| 10:19:35 | 3 | standards in Pecan Gap.  So what community standards are |
| 10:19:39 | 4 | these vendors supposed to apply?  Unknown, vague, unclear. |
| 10:19:46 | 5 | There are so many different problems with these |
| 10:19:48 | 6 | definitions and the inability for the vendors to apply, it |
| 10:19:54 | 7 | is difficult to even go through them. |
| 10:19:55 | 8 | But the fact that it is not tied to the |
| 10:19:59 | 9 | definition of obscenity is fatal.  The fact that they have |
| 10:20:04 | 10 | to weigh and balance these highly subjective, |
| 10:20:07 | 11 | fact-specific standards is unconstitutionally vague.  And |
| 10:20:14 | 12 | the fact that there's no age-appropriate distinction is |
| 10:20:17 | 13 | also incredibly problematic.  That was one of the big |
| 10:20:21 | 14 | issues in the Fayetteville case that was handed down last |
| 10:20:26 | 15 | month. |
| 10:20:30 | 16 | One of the things worth mentioning when it comes |
| 10:20:34 | 17 | to young adult readers, there are novels like Rescuing |
| 10:20:40 | 18 | Hope by Susan Norris or Sold by Patricia McCormick.  Both |
| 10:20:45 | 19 | of these raise awareness about the horrors of child sex |
| 10:20:49 | 20 | trafficking.  Those books would no longer be available and |
| 10:20:53 | 21 | why is that a problem?  Well, it's a problem because Texas |
| 10:20:58 | 22 | is number two in the nation in the number of child |
| 10:21:02 | 23 | sex-trafficking occurrences.  And the average age of a |
| 10:21:07 | 24 | child that is trafficked is 12 to 14 years old.  They need |
| 10:21:11 | 25 | to be aware of the phenomenon.  This will inhibit their |

```
10:21:14   1   ability to be aware of matters of public concern like
10:21:18   2   that.
10:21:18   3          The law is impossible to comply with.  We've
10:21:24   4   talked about that.  We've got declarations, the tab behind
10:21:30   5   your notebook, declaration provisions that discuss this.
10:21:35   6   One of the very real problems is, some of our clients,
10:21:39   7   some of the plaintiffs here today have been in business --
10:21:42   8   they've had the good fortune of being in business for a
10:21:43   9   really long time.  BookPeople has been in business for 53
10:21:47  10   years.  Imagine the different recordkeeping that exists
10:21:53  11   over 53 years going from no computers to computers, going
10:21:58  12   from no Windows to Windows, going from no Excel to Excel.
10:22:02  13   They have absolutely no way of tracking all the books that
10:22:06  14   they've ever sold and they don't know what's still in
10:22:09  15   active use by the schools.
10:22:16  16          Here, we've got somebody who -- this is Lucy
10:22:24  17   Podmore.
10:22:31  18          MS. CELLA:  Your Honor, we would object to any
10:22:33  19   video that --
10:22:36  20          (Audio and video file played.)
10:22:45  21          MS. CELLA:  Your Honor.
10:22:45  22          MS. PRATHER:  I'm sorry.
10:22:46  23          THE COURT:  We'll take that up at the next
10:22:48  24   hearing if we need to hear it.
10:22:49  25          MS. CELLA:  Thank you, your Honor.
```

| | | |
|---|---|---|
| 10:22:51 | 1 | MS. PRATHER:  Can I play this? |
| 10:22:52 | 2 | THE COURT:  No.  We'll take it up at the next |
| 10:22:53 | 3 | hearing if we need to hear it. |
| 10:22:56 | 4 | MS. PRATHER:  Okay.  What Ms. Podmore testifies |
| 10:23:02 | 5 | to is the fact that this is simply inconceivable.  Six |
| 10:23:08 | 6 | districts in the state of Texas have millions of copies of |
| 10:23:13 | 7 | books to be done.  I also think it's worth noting that the |
| 10:23:18 | 8 | fiscal note on this bill was $2.6 million.  Now, that's |
| 10:23:22 | 9 | just the note for the state that's not having to do the |
| 10:23:25 | 10 | ratings, right?  Think about the cost to the vendors that |
| 10:23:28 | 11 | are having to do the ratings.  The cost to the state was |
| 10:23:34 | 12 | over half-a-million dollars just to hire two people to |
| 10:23:37 | 13 | review those books that weren't rated.  So it's clearly |
| 10:23:44 | 14 | going to put small businesses like BookPeople and others, |
| 10:23:53 | 15 | Blue Willow, another one of our clients, out of business. |
| 10:23:58 | 16 | I don't know if your Honor wants me to get into |
| 10:24:00 | 17 | the preliminary injunction piece of this. |
| 10:24:04 | 18 | THE COURT:  No.  I'm not going to take that up |
| 10:24:06 | 19 | today.  I'm sure I understand these issues pretty well -- |
| 10:24:10 | 20 | I mean, at the eye level and I can take that up on next |
| 10:24:14 | 21 | Monday. |
| 10:24:14 | 22 | MS. PRATHER:  Okay.  So we've talked a little bit |
| 10:24:15 | 23 | about vagueness.  I have more discussion about vagueness |
| 10:24:17 | 24 | we can go over at the next hearing if your Honor would |
| 10:24:19 | 25 | like but same with overbreadth.  But as you can see -- |

| | | |
|---|---|---|
| 10:24:23 | 1 | THE COURT:  I'm happy to hear both vagueness and |
| 10:24:26 | 2 | overbreadth so that I can hear from -- either today or |
| 10:24:29 | 3 | next week, I'll hear a response to that.  I mean, I'm |
| 10:24:33 | 4 | happy to take up those issues today. |
| 10:24:35 | 5 | MS. PRATHER:  Okay.  Then I'll have to flip |
| 10:24:38 | 6 | through some stuff. |
| 10:24:44 | 7 | So unconstitutional vagueness, law's |
| 10:24:51 | 8 | unconstitutionally vague if it fails to provide those |
| 10:24:53 | 9 | targeted by the statute with the reasonable opportunity to |
| 10:24:56 | 10 | know what conduct is prohibited.  Or if it's so indefinite |
| 10:25:00 | 11 | that it allows arbitrary and discriminatory applications. |
| 10:25:07 | 12 | In the drone case, this was one -- this standard was |
| 10:25:12 | 13 | outlined and the drone statute was found to be |
| 10:25:17 | 14 | unconstitutionally vague. |
| 10:25:20 | 15 | We have at least four provisions of the law that |
| 10:25:22 | 16 | we are challenging.  We believe there are quite a bit |
| 10:25:27 | 17 | more.  But one of them is the requirement that books that |
| 10:25:32 | 18 | don't have to be related -- or don't have to be rated are |
| 10:25:35 | 19 | those related to the curriculum.  The second is that the |
| 10:25:40 | 20 | definitions of sexually relevant and sexually explicit are |
| 10:25:44 | 21 | unconstitutionally vague.  The third is this highly |
| 10:25:48 | 22 | subjective contextual analysis that is being required for |
| 10:25:53 | 23 | the vendors.  And the fourth is, there's no guidance for |
| 10:25:58 | 24 | what recall or active-use determinations can be made. |
| 10:26:06 | 25 | In the declarations provisions part of your |

10:26:09   1   notebook, this is where all of the declarations of our

10:26:12   2   clients are, behind tab 4, it has a whole list of

10:26:15   3   testimony from plaintiffs about how they're struggling

10:26:20   4   with the ambiguity in the law and their concerns about

10:26:22   5   being able to comply with it.  It is worth noting that in

10:26:33   6   the response by the state, none of the four areas that

10:26:38   7   we're getting ready to discuss were addressed.  They

10:26:41   8   simply recited the test for vagueness.

10:26:45   9           So let's start with directly related to the

10:26:47   10   curriculum.  Here's the problem.  There's no statewide

10:26:54   11   curriculum in Texas.  Curriculum vary.  They vary from day

10:27:01   12   to day, year to year, district to district.  They're

10:27:06   13   regularly reevaluated.  Vendors are not told about these.

10:27:10   14   Vendors are not part of the equation when it comes to

10:27:12   15   curriculum changes.  There's also no clarity as to if a

10:27:18   16   teacher brings a book into a classroom, does that now

10:27:20   17   become part of the curriculum?

10:27:23   18           What about books that are selected by a student

10:27:26   19   from a classroom library where they get to choose what

10:27:29   20   books they read, are those books part of the curriculum?

10:27:33   21   Does it have to be taught in the classroom?  There's no

10:27:38   22   clarity in any of this.  And as the owner of Blue Willow

10:27:42   23   said, there's no realistic way of ascertaining the

10:27:46   24   curriculum for students' grade levels, classrooms in each

10:27:49   25   of the Texas districts to which they sell books.  It

```
10:27:53   1   simply can't be done.
10:27:58   2           The definitions are with regard to sexually
10:28:02   3   explicit and sexually relevant, we've talked about them
10:28:05   4   briefly, but they're both unclear and overinclusive.  If
10:28:10   5   you look at the sexually relevant definition and the words
10:28:15   6   that you relayed earlier in the hearing, it would apply to
10:28:18   7   religious texts like the bible.  There's incest in the
10:28:22   8   bible.  There's all kinds of sexual acts in the bible.  Is
10:28:26   9   that now sexually relevant or sexually explicit?  Should
10:28:30  10   it be banned?  And why should the vendor be the one to
10:28:33  11   make that determination?
10:28:38  12           There are books that would be banned under these
10:28:41  13   definitions out of fear for getting crosswise with TEA,
10:28:45  14   and a lot of those books were highly acclaimed classic
10:28:49  15   novels, books like Atlas Shrugged, Friday Night Lights,
10:28:54  16   The Color Purple, which is not only a Pulitzer
10:28:57  17   Prize-winning book, it's an Academy Award-winning film.
10:29:02  18   The Catcher In The Rye, Rescuing Hope, and others.
10:29:10  19           The contextual analysis, which is under 35.0021
10:29:18  20   of the statute, it actually tells a vendor how they're
10:29:21  21   supposed to go about this analysis.  It's not only
10:29:26  22   convoluted, it's unclear, it's highly subjective, and it
10:29:29  23   will result in a widely disparate rating for each book.
10:29:36  24   And that is something that our clients in their
10:29:41  25   declarations have expressed concerns about.  The lack of
```

10:29:45  1   specificity in the book ban will inevitably lead to

10:29:48  2   inconsistent ratings among our members and the broader

10:29:52  3   bookselling community.  So there's nothing in here that

10:29:56  4   talks about what happens if they have inconsistent

10:29:59  5   ratings.  Nothing.

10:30:01  6        But there is clarity in the law that a law is

10:30:06  7   unconstitutionally vague if it is so indefinite, it allows

10:30:11  8   arbitrary and discriminatory enforcement, which is exactly

10:30:15  9   what would result here.  The plaintiffs don't know how to

10:30:25  10  rate the books.  It's just that simple.  They don't know

10:30:27  11  because of the vague definitions and because of the

10:30:30  12  subjective criteria.

10:30:33  13       Another point that is part of the subjective

10:30:36  14  criteria is that they are supposed to weigh and balance

10:30:41  15  three factors.  Again, these are cut and pasted from other

10:30:44  16  provisions in the law.  One of which is -- includes

10:30:51  17  determining the author's intent.  How in the world is a

10:30:55  18  vendor going to determine what the author intended?

10:31:00  19  Getting into the state of the mind of the author is an

10:31:02  20  impossible task for a vendor or anyone other than the

10:31:06  21  author.

10:31:08  22       It also eschews the review of the work as a

10:31:14  23  whole.  That's contrary to Miller vs. California and that

10:31:18  24  impedes the ability to do a proper contextual analysis.

10:31:23  25  Finally, as we've talked about before, it fails to

10:31:27  1   consider the literary and artistic value of the work as

10:31:32  2   required by the Constitution.

10:31:35  3          The last area of vagueness that we bring up and

10:31:39  4   we're not saying this is the -- these are the only four

10:31:41  5   examples.  We're just saying these are four of many

10:31:45  6   examples -- is this requirement for booksellers to recall

10:31:53  7   books deemed sexually explicit if they are still in active

10:31:58  8   use.  So the recall doesn't describe how that is executed

10:32:04  9   or what happens if a book isn't recalled.  Does it mean

10:32:08  10  that the bookseller has to give a credit for those books?

10:32:15  11  Who knows.

10:32:17  12         Active use, similarly not defined.  And there's

10:32:22  13  no way for a vendor to find out if something is or is not

10:32:27  14  in active use in all of the counties in the state of

10:32:32  15  Texas.  So these areas are completely untenable for a

10:32:40  16  vendor to be able to even attempt to rate the books and

10:32:44  17  comply with the law and certainly can't do so by September

10:32:49  18  1st.

10:32:49  19         I'll skip ahead briefly to the overbroad issue.

10:32:55  20  Like I said, we've got other constitutional infirmities to

10:32:59  21  address, the compelled speech, the prior restraint, we

10:33:01  22  could talk about that at the next hearing.  But with

10:33:04  23  regard to the law being unconstitutionally vague, the

10:33:10  24  problem here is that it captures constitutionally

10:33:14  25  protected speech.  By not tieing to it the definition of

10:33:19  1  obscenity either in the penal code or under <u>Miller vs.</u>

10:33:23  2  <u>California</u>, it captures nonobscene and constitutionally

10:33:28  3  protected speech and that is a significant problem.  That

10:33:34  4  is where the overbreadth component is clear.

10:33:38  5       THE COURT:  What would be an example of that be?

10:33:43  6       MS. PRATHER:  So indecency, right?  Under <u>Reno</u>

10:33:47  7  <u>vs. ACLU</u>, the materials were determined to be indecent and

10:33:51  8  not obscene.  Obscene has to lack literary or artistic

10:33:56  9  value.  So books like Atlas Shrugged, books like Color

10:34:02  10 Purple that have literary and artistic value are not

10:34:05  11 considered obscene.  They will be brought within the

10:34:10  12 confines of this statute, Catcher In The Rye, possibly the

10:34:15  13 bible, because literary and artistic value is no

10:34:22  14 consideration nor is taking the work and looking at it as

10:34:25  15 a whole.  So that's where you have a huge problem, that

10:34:30  16 sweep of constitutionally protected materials is fatal.

10:34:37  17      Here's a list of books that originally trial

10:34:40  18 courts found to be obscene and then, they were reversed,

10:34:46  19 and they were reversed because of exactly what we just

10:34:50  20 talked about:  The books were found to have literary,

10:34:53  21 artistic, political, scientific merit.  Books like Catch

10:34:57  22 22, Slaughterhouse-Five, Ulysses, and others.  And these

10:35:02  23 are already judicial decisions so you'd have a case --

10:35:10  24 you'd have an incident here where you've got a judicial

10:35:11  25 decision saying these books are not obscene and they would

10:35:13  1  still fall within the definition of sexually relevant or

10:35:19  2  sexually explicit under the Texas statute because it is

10:35:21  3  not tied to the definition of obscenity.

10:35:25  4          Another problem with the law being

10:35:30  5  unconstitutionally overbroad is what we've talked about a

10:35:33  6  little bit, which is the failure to distinguish

10:35:37  7  age-appropriateness.  That was a seminal issue in the

10:35:40  8  Fayetteville Public Library case, which is tab 4 in your

10:35:44  9  notebook.  The failure to distinguish what a adult or a

10:35:51  10  young adult versus a young child can view means that you

10:35:57  11  are overly broadly restricting access to constitutional

10:36:01  12  work for those young adult readers.

10:36:05  13          This is not a situation where under H.B. 900,

10:36:13  14  there's a distinction instead is a one-size-fits-all

10:36:16  15  model.  You rate the books for all K through 12 students

10:36:20  16  regardless of their age, their maturity, that's a problem.

10:36:23  17  A high school senior wouldn't have access to books about

10:36:27  18  teen pregnancy or other things that would actually be very

10:36:32  19  relevant to their lives.

10:36:34  20          I'm not exactly sure what happens with

10:36:37  21  periodicals.  I mean, I know West Lake provides

10:36:40  22  subscriptions to the New York Times to all of their

10:36:44  23  students.  What if the New York Times has articles about

10:36:47  24  trafficking, about rape, about things that would fall

10:36:51  25  within these definitions?  I don't know what happens in

10:36:53  1    that instance.  They're not -- I guess not addressed by

10:36:58  2    this because they're a periodical, not a book?  But then,

10:37:02  3    the student's still exposed to these same things that the

10:37:05  4    state is trying to keep them from being exposed to.  So

10:37:09  5    I'm not sure how it accomplishes their goal.

10:37:11  6            And then, because of the overbreadth issue, we

10:37:15  7    end up having a situation where H.B. 900 violates the

10:37:20  8    constitutional rights of third parties.  Those third

10:37:24  9    parties are all booksellers, all publishers, all authors.

10:37:29  10   Because remember these ratings go on a public website for

10:37:34  11   all the world to see and now, all of a sudden, fewer

10:37:39  12   schools feel like they can buy these books.  Publishers

10:37:45  13   are harmed in other states, not just in Texas.  Students

10:37:49  14   lose their constitutional right to receive information and

10:37:54  15   ideas from their school library.  So it's not just the

10:37:57  16   vendors here, the snowball effect is enormous.  We do have

10:38:04  17   declarations, as well, that talk about this issue.

10:38:08  18           So I think, your Honor, I've gone over the issues

10:38:10  19   with regard to the standing, the government speech, the

10:38:18  20   nonpublic forum, the different standards that would apply,

10:38:26  21   the fact that this is not commercial speech, and the

10:38:28  22   vagueness, and the overbreadth issue.  Is there anything

10:38:32  23   else that you'd like to hear from me on?

10:38:34  24           THE COURT:  No.

10:38:35  25           MS. PRATHER:  Okay.  Our concern here is, the

| | | |
|---|---|---|
| 10:38:38 | 1 | First Amendment embraces the right to distribute |
| 10:38:41 | 2 | literature and it protects the right to receive it.  This |
| 10:38:44 | 3 | law violates the Constitution in innumerable ways and we |
| 10:38:48 | 4 | believe it should be enjoined before it takes effect on |
| 10:38:50 | 5 | September 1st.  Thank you, your Honor. |
| 10:38:54 | 6 | THE COURT:  Does the state wish to respond to |
| 10:38:56 | 7 | anything?  Oh, actually, before you sit down, one thing |
| 10:39:01 | 8 | I'd like the plaintiff to focus on in their briefing is |
| 10:39:06 | 9 | anything they wish to amplify with respect to the |
| 10:39:09 | 10 | enforcement issue and its impact on Ex Parte: Young and |
| 10:39:13 | 11 | sovereign immunity. |
| 10:39:16 | 12 | MS. PRATHER:  Yes, your Honor. |
| 10:39:39 | 13 | MS. CELLA:  Thank you, your Honor. |
| 10:39:44 | 14 | With respect to the issue of the effective date |
| 10:39:47 | 15 | of the bill, plaintiffs keep saying that even though their |
| 10:39:52 | 16 | list is not due until April 1st, they can't sell any books |
| 10:39:57 | 17 | by September -- as of September 1st.  But they're parsing |
| 10:40:02 | 18 | out Section 35.002.  All of that is in the same section. |
| 10:40:07 | 19 | So insofar as the bill being effective on September 1st, |
| 10:40:11 | 20 | they still don't have any lists due.  The state does not |
| 10:40:15 | 21 | read that as meaning they can't sell any books.  Nothing |
| 10:40:19 | 22 | -- nothing is going to happen until April 1st.  That's the |
| 10:40:23 | 23 | date their lists are due. |
| 10:40:24 | 24 | THE COURT:  When you say that -- so let me ask |
| 10:40:27 | 25 | you -- let's go back to the beginning.  What is the |

| | |
|---|---|
| 10:40:30 | 1 |
| 10:40:36 | 2 |
| 10:40:44 | 3 |
| 10:40:49 | 4 |
| 10:40:51 | 5 |
| 10:40:58 | 6 |
| 10:41:04 | 7 |
| 10:41:06 | 8 |
| 10:41:09 | 9 |
| 10:41:11 | 10 |
| 10:41:14 | 11 |
| 10:41:17 | 12 |
| 10:41:21 | 13 |
| 10:41:27 | 14 |
| 10:41:31 | 15 |
| 10:41:35 | 16 |
| 10:41:40 | 17 |
| 10:41:48 | 18 |
| 10:41:52 | 19 |
| 10:41:55 | 20 |
| 10:41:57 | 21 |
| 10:41:59 | 22 |
| 10:42:04 | 23 |
| 10:42:07 | 24 |
| 10:42:10 | 25 |

enforcement mechanism under -- for this statute?  I mean, let's just say that the plaintiffs, the publishers don't do any of this.  I mean, it comes -- it's September 3rd or it's April 5th.  I don't care about -- I'm leaving aside the date now.  But they say forget it, we're just going to sell, we're going to ignore the law.  Who enforces it?

          MS. CELLA:  Well, I believe it would be...

          THE COURT:  What happens?

          MS. CELLA:  That's a good question.  A good question that I don't know that anybody has thought that through yet.  I mean, there's no -- in this bill --

          THE COURT:  Don't you think that's important?  I mean, when we're talking about, you know -- for example, I keep bringing this -- I mean, Texas, I think got a little bit famous in their -- the bill they passed where they made it difficult for -- I think they essentially made people, citizens to stop women from having abortions because they said a person, a private citizen had a right to turn in a doctor, whatever.  I may be misstating that but I'm saying -- my point, I don't care about that bill as much as I care about the whole point was who enforced it.  They articulated who enforced it.  And so, who enforces this law?

          MS. CELLA:  As far as if they're not -- if they don't give their lists and they're still selling books,

10:42:13  1   let's say.

10:42:13  2        THE COURT:   Exactly.   Books -- you know, Barnes &

10:42:16  3   Noble or I always hate to say names because I don't care.

10:42:19  4   But Simon & Schuster, Barnes & Noble, BookPeople, whoever,

10:42:23  5   they just say we're going to sell to Austin Independent

10:42:27  6   School District with no -- we're not doing any of this.

10:42:34  7   Who enforces it?

10:42:35  8        MS. CELLA:   Well, the restriction is on the

10:42:38  9   school district so they can't purchase from any vendor

10:42:42  10  that doesn't comply, let's say.

10:42:45  11       THE COURT:   So --

10:42:46  12       MS. CELLA:   As far as who enforces --

10:42:47  13       THE COURT:   So you have -- let's say you have

10:42:50  14  Austin Independent School District and they do.   They say,

10:42:56  15  well, we have to have books for kids.   I mean, it's in

10:43:01  16  that way, I guess, the April thing is an even more

10:43:03  17  interesting date in that school's pretty far along then,

10:43:08  18  they'll have the books.   So let me say -- let me try this.

10:43:12  19       You said don't care about -- don't care about

10:43:14  20  September 1st because enforcement doesn't start till

10:43:18  21  April, and so, school's still in in April.   Middle of

10:43:26  22  April, these kids have books that are not marked in any

10:43:35  23  way.   Who enforces it and what happens?

10:43:38  24       MS. CELLA:   Well, I think that would be a policy

10:43:40  25  that TSLAC and board of education would come up with.   I

```
10:43:45   1    agree with you in this bill --
10:43:46   2            THE COURT:  Well, that would be nice but you keep
10:43:48   3    saying who knows it will happen.  Who knows if that will
10:43:52   4    happen.
10:43:52   5            MS. CELLA:  Right.  I agree.  Who knows if that
10:43:55   6    will happen.
10:43:56   7            THE COURT:  So you seem much more sanguine about
10:43:59   8    the fact that there is no specificity on how any of this
10:44:03   9    works than I am.  That we don't know who won't enforce it,
10:44:13  10    it seems an issue.  We don't know what will happen if
10:44:15  11    people ignore, it seems an issue.  You've got books in
10:44:21  12    public school libraries that aren't marked in any way that
10:44:29  13    we don't know how it will be enforced.
10:44:31  14            And what I was going to try and get to is, let's
10:44:34  15    say you have a school district that has a group of school
10:44:43  16    board members.  You know, the way I read the news is,
10:44:48  17    there are some school boards that are probably more
10:44:53  18    conservative than others.  I'm going to guess there is a
10:44:55  19    school board in one county in Texas that's more
10:44:57  20    conservative than other school boards.  The school board
10:45:01  21    in Austin says we don't like this law.  We're not going to
10:45:10  22    obey it.  What happens?
10:45:12  23            MS. CELLA:  So, your Honor, I don't think the
10:45:13  24    question of what happens at the school board or a school
10:45:18  25    purchases books from some vendor that doesn't submit a
```

10:45:24  1  list has anything to do with the vendors.  It actually has

10:45:27  2  to do with the schools because the prohibition is on the

10:45:29  3  schools from buying books from the vendors.

10:45:32  4          THE COURT:  Well, what did -- I think one of the

10:45:37  5  issues that has been raised that and I'm going to have to

10:45:41  6  deal with is that there seems to be -- there is an

10:45:47  7  argument of vagueness.  And it seems to me that if there

10:45:51  8  is no clear articulation of how this will be enforced and

10:45:57  9  even against whom it will be enforced, that seems like a

10:46:00  10  legitimate issue I oughta be concerned about.

10:46:04  11          MS. CELLA:  Well, the prohibition is against

10:46:07  12  school districts purchasing books.  So in this case, the

10:46:11  13  school districts are not a party.  If you're asking what

10:46:14  14  would be enforced against the plaintiffs, the prohibition

10:46:18  15  is not on the plaintiffs, it's on the school districts.

10:46:21  16  They just can't purchase books from those plaintiffs.

10:46:24  17          THE COURT:  Okay.  But let's say that they do,

10:46:26  18  what happens?

10:46:26  19          MS. CELLA:  I don't think that's an issue before

10:46:29  20  this court because the school districts are not a party

10:46:31  21  but, you know --

10:46:32  22          THE COURT:  Well, let's just say I think it is.

10:46:40  23  So what happens?  I mean, because the school -- it will

10:46:47  24  have a chilling effect.  It might or might not have a

10:46:50  25  chilling effect on a school district's willingness to buy

| | | |
|---|---|---|
| 10:46:53 | 1 | books from a publisher that haven't been marked, depending |
| 10:46:57 | 2 | on what the repercussions are.  What are the repercussion? |
| 10:47:01 | 3 | MS. CELLA:  Likely, injunctive relief would be |
| 10:47:05 | 4 | the repercussions. |
| 10:47:06 | 5 | THE COURT:  Where is that in the statute? |
| 10:47:08 | 6 | MS. CELLA:  Well, I mean, if -- |
| 10:47:09 | 7 | THE COURT:  And who would file it?  Who would |
| 10:47:11 | 8 | file for injunctive relief?  I hate to pick on Austin |
| 10:47:16 | 9 | School District.  We're sitting here.  But who would file |
| 10:47:19 | 10 | -- who would have standing to file against Austin |
| 10:47:22 | 11 | Independent School District to enforce this?  Is it the |
| 10:47:25 | 12 | state of Texas?  Would it be the AG?  Would it be the TEA? |
| 10:47:28 | 13 | Would it -- who enforces this? |
| 10:47:32 | 14 | MS. CELLA:  Likely, the defendants in this case, |
| 10:47:34 | 15 | the board of education and TSLAC.  This bill is -- |
| 10:47:39 | 16 | THE COURT:  So they have the power to enforce it |
| 10:47:42 | 17 | but they don't have -- but they're not subject to being |
| 10:47:45 | 18 | sued. |
| 10:47:47 | 19 | MS. CELLA:  And we see this all the time in state |
| 10:47:51 | 20 | agencies.  That's the whole premise of sovereign immunity. |
| 10:47:53 | 21 | And I'd also just like to point out that there is |
| 10:47:56 | 22 | no -- there's no punishment or any sort of enforcement for |
| 10:48:01 | 23 | any initial ratings.  So let's just say a list is |
| 10:48:06 | 24 | submitted and every single book is rated no rating or is |
| 10:48:08 | 25 | given no rating.  The only if you want to call it a |

10:48:14  1   punishment would be if TEA reviews the list --

10:48:18  2          THE COURT:  So let me -- I'm sorry to interrupt

10:48:20  3   you.  But you actually just hit on what I've really been

10:48:26  4   meaning to ask and thought.  So let's say that that's

10:48:29  5   exactly under this statute -- and I actually think this

10:48:33  6   may cut in your favor is why I wanted to ask it.

10:48:37  7          Let's say your argument is, there's no harm here

10:48:40  8   because Ms. Prather's clients can comply with the law by

10:48:47  9   just slapping no rating on a hundred percent of the books

10:48:52  10  and ship them in and now isn't -- what would be illegal

10:48:58  11  under this law if they put no rating on a hundred percent

10:49:03  12  of the books and made TEA go through or someone go through

10:49:07  13  and see if they were wrong?  And in fact, you haven't

10:49:11  14  really been able to articulate who would do that, or when

10:49:14  15  they would do it, or if they would do it.  In fact, you

10:49:16  16  said there may be no harm because maybe no one would do

10:49:18  17  that.

10:49:19  18         So why shouldn't Ms. Prather just give her

10:49:23  19  clients advice, forget Albright and this federal court.

10:49:27  20  Just slap no labels on everything and let them figure out

10:49:33  21  whether it's sexually explicit or not because even if we

10:49:36  22  take the time to do it, they could overrule us and there's

10:49:41  23  no appeal.  So why isn't that your argument to me that

10:49:47  24  they don't have to do anything?

10:49:49  25         MS. CELLA:  Well, that's what I was just getting

| | | |
|---|---|---|
| 10:49:51 | 1 | into.  There's absolutely no punishment in this bill. |
| 10:49:53 | 2 | THE COURT:  So I can write an order that says I'm |
| 10:49:57 | 3 | denying an injunction because you've represented that if |
| 10:50:00 | 4 | the book folks, whoever they are, put no -- I'm saying no |
| 10:50:06 | 5 | labels.  No -- what's the -- |
| 10:50:08 | 6 | MS. CELLA:  Ratings. |
| 10:50:08 | 7 | THE COURT:  No rating.  No labels is a political |
| 10:50:13 | 8 | party.  Just put no ratings on a hundred percent of books, |
| 10:50:16 | 9 | just ship them, have a good day.  That seems to be what |
| 10:50:20 | 10 | you're saying:  Just ignore it because there's no |
| 10:50:23 | 11 | enforcement.  Even if they tried hard and do it, y'all get |
| 10:50:27 | 12 | to overrule them.  Why are we -- why are these fine |
| 10:50:32 | 13 | lawyers taking their time to be here?  Let's just do that. |
| 10:50:36 | 14 | Could I put that -- I'm denying the injunction |
| 10:50:38 | 15 | because you've represented there's no enforcement of the |
| 10:50:43 | 16 | statute, which doesn't seem to be a very effective |
| 10:50:45 | 17 | statute? |
| 10:50:46 | 18 | MS. CELLA:  Well, it's not that there's no |
| 10:50:48 | 19 | enforcement. |
| 10:50:50 | 20 | THE COURT:  So who -- okay.  Who enforces it? |
| 10:50:56 | 21 | MS. CELLA:  So that would likely be board of |
| 10:50:58 | 22 | education and TSLAC.  I just am agreeing with you that -- |
| 10:51:02 | 23 | THE COURT:  Against who?  Would they be able to |
| 10:51:04 | 24 | enforce it against these -- the plaintiffs? |
| 10:51:09 | 25 | MS. CELLA:  Well, no.  The punishment -- I mean, |

10:51:11  1  I'm sorry, the school districts would be the parties that

10:51:15  2  are not able to purchase books from -- I mean, you can't

10:51:20  3  force a sale so a plaintiff can't -- a vendor can't go to

10:51:24  4  the school districts and say, I'm making you buy this.

10:51:27  5  So --

10:51:27  6        THE COURT:  So if the publishers and the

10:51:35  7  booksellers completely ignore it, there are no

10:51:37  8  repercussions against them.

10:51:38  9        MS. CELLA:  I wouldn't say that.  I would say

10:51:41  10  there's no punishment, there's no repercussion for their

10:51:44  11  initial rating.  The only time that -- I don't know if

10:51:49  12  you'd call it a punishment but if their second -- if TEA

10:51:57  13  reviews a book and they say you need to change this rating

10:52:00  14  and they -- the plaintiffs or the vendors refuse to change

10:52:02  15  that rating --

10:52:03  16        THE COURT:  Okay.  That's and I'm sure -- and I

10:52:06  17  get that.  But why not do that and make you all do the

10:52:10  18  work?

10:52:13  19        MS. CELLA:  Well, all I -- I mean, the bill is

10:52:16  20  what it is.  They should -- people should be following the

10:52:19  21  bill.  But --

10:52:19  22        THE COURT:  No, no, no.  I'm saying they are

10:52:21  23  following the bill.  They say -- they are following the

10:52:27  24  bill.  They're labeling it.  They're labeling it no

10:52:30  25  rating.  They have followed the bill.  They have put no

| | | |
|---|---|---|
| 10:52:33 | 1 | rating on a hundred percent of them.  They've followed the |
| 10:52:35 | 2 | bill. |
| 10:52:38 | 3 | MS. CELLA:  And there would be no punishment for |
| 10:52:39 | 4 | that until -- unless and until they decided. |
| 10:52:43 | 5 | THE COURT:  To -- |
| 10:52:45 | 6 | MS. CELLA:  To ignore a TEA rating change. |
| 10:52:48 | 7 | THE COURT:  So I'm just trying to frame so when |
| 10:52:50 | 8 | -- I'm worried about an injunction that the only thing |
| 10:52:54 | 9 | that these folks need to be worried about, what you're |
| 10:52:57 | 10 | saying on behalf of your client is, if down the road, they |
| 10:53:01 | 11 | refuse to comply with a change that was made by the TEA, |
| 10:53:07 | 12 | they put on -- they sell the book -- what was the big book |
| 10:53:13 | 13 | a while back?  Brokeback Mountain, wasn't that a book or a |
| 10:53:17 | 14 | movie?  It was a book and there was a big controversy at |
| 10:53:22 | 15 | one of the schools here about whether or not it was okay |
| 10:53:25 | 16 | for it to be in there -- for it to be in the library.  I |
| 10:53:28 | 17 | think that's the perfect book for this.  I never read that |
| 10:53:32 | 18 | book, but I could see where -- I think I know enough about |
| 10:53:39 | 19 | it to see where it might be no rating, it might be |
| 10:53:42 | 20 | sexually explicit, depending on your view of what sexually |
| 10:53:46 | 21 | explicit is. |
| 10:53:49 | 22 | So why don't they just slap no rating on it and |
| 10:53:55 | 23 | if someone -- and you told me, you don't even know if |
| 10:53:57 | 24 | anyone will go back and look at it.  But if someone has |
| 10:54:03 | 25 | the energy to do that and we have enough time and money in |

```
10:54:06   1   our state that someone would spend the time looking at
10:54:09   2   books to see if the ratings are correct and they come back
10:54:11   3   and they say no, it's sexually -- Brokeback Mountain is
10:54:17   4   sexually explicit and they tell them they've gotta put
10:54:19   5   that on the book.
10:54:20   6            Now, that's the only fight you're saying that
10:54:22   7   these folks should have is we'll -- would they be willing
10:54:27   8   to comply with the change that's ordered because someone
10:54:32   9   inside the state determines to regulate the speech and
10:54:37  10   that would be government speech, they're regulating it to
10:54:40  11   say this label -- if you're going to put Brokeback
10:54:43  12   Mountain in a public school library, it has to have this
10:54:48  13   label on it so the parents know that the state of Texas
10:54:52  14   thinks it is sexually explicit.  The only fear that this
10:54:57  15   company -- these companies have is if they refuse to make
10:55:01  16   that change.
10:55:01  17            MS. CELLA:  Which is why the plaintiffs don't
10:55:03  18   have a claim here, yes.
10:55:04  19            THE COURT:  And so -- okay.  You've said yes.
10:55:06  20   And so, that obviates, for example, their need to go back
10:55:11  21   in your opinion and do all the trouble -- some work Ms.
10:55:15  22   Prather said that her clients might have to do where they
10:55:17  23   have to figure out, well, gosh, we sold thousands of books
10:55:20  24   and do we have to go back through all of them and label
10:55:23  25   them?  You're saying that that's not a problem for them.
```

10:55:26  1        MS. CELLA:  Well --

10:55:27  2        THE COURT:  Because until the TEA tells them

10:55:32  3  they've gotta change it, they have no problem.

10:55:37  4        MS. CELLA:  Yes, your Honor.  I can't tell them

10:55:40  5  not to follow the law.

10:55:42  6        THE COURT:  Well, but you're saying there are no

10:55:44  7  consequences to not following the law.

10:55:46  8        MS. CELLA:  There's no punishment.

10:55:48  9        THE COURT:  And let me be more fair to you.

10:55:51  10  There's no punishment for anything they do until they

10:55:57  11  refuse to comply if, and only if, the state tells them

10:56:01  12  they've gotta change their rating on a book and you can't

10:56:05  13  even say that anyone will do that.  You don't know if

10:56:08  14  anyone will do that.  And if a school won't do it, then

10:56:12  15  you don't even know how that will be enforced.  I think

10:56:16  16  that's all -- but I think what I said is all correct,

10:56:22  17  right?

10:56:23  18        MS. CELLA:  There is no punishment in the statute

10:56:26  19  for their initial ratings.  They should rate the books

10:56:31  20  based on the statute.  If in the TEA's view, they get one

10:56:38  21  wrong, then you know where we go from there, the TEA

10:56:41  22  notifies them.

10:56:41  23        THE COURT:  Okay.

10:56:42  24        MS. CELLA:  As far as the prior books, there's no

10:56:46  25  mechanism for tracing every prior book sold back to

| | | |
|---|---|---|
| 10:56:50 | 1 | whenever. |
| 10:56:52 | 2 | THE COURT: Do they have to do any of them? |
| 10:56:55 | 3 | MS. CELLA: Yes. They need to do what they know. |
| 10:56:57 | 4 | I mean, you -- obviously no one can be made to do |
| 10:57:01 | 5 | something that they don't know. But none of this would |
| 10:57:05 | 6 | fall on the plaintiffs. The plaintiffs need to do their |
| 10:57:07 | 7 | due diligence based on the bill and then, TEA will review |
| 10:57:12 | 8 | their list. That's all this is about -- we're arguing |
| 10:57:14 | 9 | over a list. So TEA has oversight and final say on that |
| 10:57:17 | 10 | list. |
| 10:57:19 | 11 | Once they look at the list prepared by the |
| 10:57:22 | 12 | plaintiffs or any other vendor, they can then determine if |
| 10:57:27 | 13 | there's an incorrect rating or if anything's missing off |
| 10:57:29 | 14 | of that list and, you know, we go from there. But at this |
| 10:57:35 | 15 | initial phase, there is -- I would agree with you that |
| 10:57:37 | 16 | there is no fight. All that the vendors are required to |
| 10:57:41 | 17 | do is submit their list of ratings. |
| 10:57:45 | 18 | THE COURT: Is there anything else you wanted to |
| 10:57:47 | 19 | say? |
| 10:57:48 | 20 | MS. CELLA: About that in particular or in |
| 10:57:50 | 21 | general? |
| 10:57:50 | 22 | THE COURT: Any issue. |
| 10:57:51 | 23 | MS. CELLA: I do want to briefly touch on the |
| 10:57:55 | 24 | vagueness argument. |
| 10:57:56 | 25 | THE COURT: Okay. |

10:57:58  1        MS. CELLA:  The plaintiffs make a lot of claims

10:58:04  2   about it doesn't provide clear standards because it's made

10:58:08  3   entirely of new definitions.  That's not -- that doesn't

10:58:13  4   make a statute vague just because there's a new definition

10:58:16  5   of something.  They also claim that --

10:58:20  6        THE COURT:  I don't think -- in fairness, I don't

10:58:22  7   think that was really the argument they made.  I mean, I'm

10:58:28  8   just telling you, I won't go into it, but I don't think

10:58:29  9   that fairly captures what their argument is.  I mean, I

10:58:34 10   think what I heard her say -- and Ms. Prather can correct

10:58:38 11   me, but I think what she said essentially was combination

10:58:43 12   of that the state sort of cobbled together and did a

10:58:46 13   Frankenstein of different, hey, look -- for this, look at

10:58:48 14   this criminal law, for this, look at this criminal law,

10:58:50 15   which private citizens may or may not be able to use that

10:58:55 16   and use it to apply.

10:59:01 17        And second, that in her opinion that it is not

10:59:03 18   sufficiently clear for her clients, book publishers,

10:59:09 19   booksellers, whatever, that the standard should be clear

10:59:12 20   as to what is or isn't sexually explicit if they're

10:59:16 21   required to label it.  But given that you've just said

10:59:21 22   there's no liability for mislabeling it, I don't know how

10:59:24 23   compelling that argument is.

10:59:26 24        MS. CELLA:  And --

10:59:29 25        THE COURT:  Let me ask you this.

| | | |
|---|---|---|
| 10:59:31 | 1 | MS. CELLA:  Sure. |
| 10:59:31 | 2 | THE COURT:  What standard -- how would the TEA go |
| 10:59:36 | 3 | about going back through and determining whether or not |
| 10:59:40 | 4 | the publishers got it right?  What standard -- who would |
| 10:59:43 | 5 | be tasked with that and what standard would that -- how |
| 10:59:47 | 6 | would that be set? |
| 10:59:48 | 7 | MS. CELLA:  So as far as the person or a |
| 10:59:51 | 8 | department that would be tasked with that, I'm not sure, |
| 10:59:54 | 9 | but it would be someone at TEA.  As far as the standard -- |
| 10:59:56 | 10 | THE COURT:  Why do you say that?  Where does that |
| 10:59:59 | 11 | come from the statute? |
| 11:00:00 | 12 | MS. CELLA:  Sure.  I will get that for you. |
| 11:00:12 | 13 | That, I believe, is under agency review 35.003 and when it |
| 11:00:19 | 14 | says the agency, in the education code, the agency refers |
| 11:00:22 | 15 | to TEA.  So that would be TEA's review.  And as what they |
| 11:00:31 | 16 | would determine these ratings based off of is exactly |
| 11:00:33 | 17 | what's in the statute.  So I mean, it's defined in the |
| 11:00:35 | 18 | statute. |
| 11:00:36 | 19 | Of course, any sort of balancing test, that |
| 11:00:40 | 20 | doesn't make a statute vague.  That happens in law all the |
| 11:00:43 | 21 | time.  So in order to rate these -- or review these |
| 11:00:48 | 22 | ratings, TEA would just simply look at the statute and |
| 11:00:52 | 23 | make a determination based on that. |
| 11:00:56 | 24 | And I just also want to touch on plaintiffs made |
| 11:00:59 | 25 | a couple of claims, one of which is that there's nothing |

| | | |
|---|---|---|
| 11:01:02 | 1 | in the statute for age appropriateness, but that's not a |
| 11:01:04 | 2 | plaintiff issue.  The only thing plaintiff needs to do in |
| 11:01:08 | 3 | this case is to rate books.  Anything to do with age |
| 11:01:12 | 4 | appropriateness, or ratings, or if books can be allowed in |
| 11:01:16 | 5 | the library if they're not rated sexually explicit, we |
| 11:01:20 | 6 | know where that falls.  That's a school issue and a state |
| 11:01:24 | 7 | issue.  That is not the plaintiffs' issue.  So the age |
| 11:01:26 | 8 | appropriateness argument would fail in this context. |
| 11:01:30 | 9 | THE COURT:  Let me interrupt you just to say, I |
| 11:01:36 | 10 | think your point is well taken and if the plaintiff could |
| 11:01:39 | 11 | also address that in their briefing as to why -- I |
| 11:01:42 | 12 | certainly understand the concerns that are raised and if |
| 11:01:46 | 13 | it were being raised to the legislature about whether or |
| 11:01:48 | 14 | not there should be a difference between whether or not |
| 11:01:52 | 15 | the law -- whether the law should be -- whether the law |
| 11:01:55 | 16 | should be concerned about whether it's for a kindergartner |
| 11:01:59 | 17 | or high school senior, that's one thing. |
| 11:02:01 | 18 | I'd like for the plaintiff to make sure they |
| 11:02:03 | 19 | brief why that is -- that is an issue that impacts you |
| 11:02:07 | 20 | all.  And so, I understand your argument and that does |
| 11:02:13 | 21 | seem to go to the standing -- whether they have standing |
| 11:02:18 | 22 | to articulate that -- even if it is deficiency, if they |
| 11:02:21 | 23 | have the right to argue that deficiency. |
| 11:02:24 | 24 | MS. CELLA:  And I would just say the same for |
| 11:02:26 | 25 | their claim of inconsistent ratings, that seems to me to |

| | | |
|---|---|---|
| 11:02:30 | 1 | be the TEA's issue, not the plaintiffs' issue when they're |
| 11:02:34 | 2 | rating a book. |
| 11:02:35 | 3 | THE COURT:  Well, let me say at least off the top |
| 11:02:39 | 4 | of my head, I disagree.  I would agree with that if the |
| 11:02:45 | 5 | TEA were the people that were doing the first cut.  I |
| 11:02:50 | 6 | think when you're requiring them to do it, I think that |
| 11:02:52 | 7 | issue -- I'm not saying they win or lose, but I'm saying I |
| 11:02:55 | 8 | certainly think they have the right to raise that issue. |
| 11:03:01 | 9 | Is there anything else? |
| 11:03:03 | 10 | MS. CELLA:  One second, your Honor.  There is one |
| 11:03:06 | 11 | other point I just wanted to mention.  I just wanted to |
| 11:03:16 | 12 | bring up as far as the compelled speech, because this is |
| 11:03:24 | 13 | an essential operation of the government -- so we're told |
| 11:03:27 | 14 | in the Fifth Circuit in United States vs. Arnold that |
| 11:03:31 | 15 | there is no right to refrain from speaking when essential |
| 11:03:34 | 16 | operations of government require it for the preservation |
| 11:03:36 | 17 | of an orderly society. |
| 11:03:37 | 18 | And that's exactly what's going on here.  We're |
| 11:03:40 | 19 | talking about public school children.  We're not just |
| 11:03:42 | 20 | talking about any citizen in the state that may read these |
| 11:03:47 | 21 | books.  And because we're talking about public school |
| 11:03:49 | 22 | children and because the state has the right to regulate |
| 11:03:53 | 23 | education in its schools, this is not compelled speech as |
| 11:03:58 | 24 | far as the plaintiffs go.  This is just an essential |
| 11:04:00 | 25 | operation of the government. |

| | | |
|---|---|---|
| 11:04:02 | 1 | THE COURT:  I don't understand that argument. |
| 11:04:06 | 2 | MS. CELLA:  So the reason this isn't compelled is |
| 11:04:09 | 3 | because this has to do with an operation of the |
| 11:04:12 | 4 | government.  It doesn't have to do with the plaintiff.  So |
| 11:04:17 | 5 | the plaintiffs' claim is that they're compelled to speak |
| 11:04:19 | 6 | for the government or they're compelled to speak the |
| 11:04:24 | 7 | government's message. |
| 11:04:24 | 8 | THE COURT:  Okay.  I understand that. |
| 11:04:25 | 9 | MS. CELLA:  So that's where this is an operation |
| 11:04:28 | 10 | of the government so it's not -- it's not the plaintiffs |
| 11:04:31 | 11 | speaking the government's message.  It's the government |
| 11:04:34 | 12 | speaking its message. |
| 11:04:36 | 13 | THE COURT:  I understand that argument put that |
| 11:04:40 | 14 | way. |
| 11:04:42 | 15 | MS. CELLA:  And I believe that's all I have for |
| 11:04:45 | 16 | today, your Honor.  Oh, I'm sorry, I did want to bring up |
| 11:04:51 | 17 | one other point and it will be brief.  The plaintiffs |
| 11:04:55 | 18 | claim that -- |
| 11:04:55 | 19 | THE COURT:  I've had three pretrial conferences |
| 11:04:57 | 20 | this week.  When you all -- the fact that we're almost |
| 11:05:00 | 21 | done at 11:00 brings me to tears.  So I'm very happy to be |
| 11:05:06 | 22 | here. |
| 11:05:09 | 23 | MS. CELLA:  The plaintiffs have claimed that this |
| 11:05:11 | 24 | is vague and they're not sure how they would rate books |
| 11:05:13 | 25 | and then, they put up this PowerPoint slide of books that |

| | | |
|---|---|---|
| 11:05:16 | 1 | would certainly be banned under the statute.  So for them |
| 11:05:20 | 2 | to say that they can't determine how to rate books and |
| 11:05:23 | 3 | then, rate five books just -- |
| 11:05:24 | 4 | THE COURT:  Well, I don't think that's fair.  It |
| 11:05:27 | 5 | wouldn't be fair of me in that I'm sure I could find five |
| 11:05:30 | 6 | books that I -- I could find five books at least I would |
| 11:05:38 | 7 | find sexually explicit that might go in it that people -- |
| 11:05:42 | 8 | The Godfather, which my dad let me read it at twelve and |
| 11:05:48 | 9 | he probably shouldn't have.  But I probably would under |
| 11:05:51 | 10 | this put that down as sexually explicit.  But I think that |
| 11:05:57 | 11 | doesn't follow that there aren't many books where ten |
| 11:06:05 | 12 | people would split five and five about whether they |
| 11:06:07 | 13 | thought they were sexually explicit.  I think that was |
| 11:06:10 | 14 | their point and that's the way I took it. |
| 11:06:12 | 15 | I think the fact that there are books they could |
| 11:06:15 | 16 | easily determine are sexually explicit doesn't mean that |
| 11:06:17 | 17 | there aren't books that they wouldn't be able to.  So |
| 11:06:20 | 18 | that's what I took from that. |
| 11:06:22 | 19 | MS. CELLA:  I understand, your Honor.  Just that |
| 11:06:24 | 20 | just doesn't make the statute vague and -- |
| 11:06:26 | 21 | THE COURT:  Well, I think that's why I'm here. |
| 11:06:30 | 22 | MS. CELLA:  Right.  Sure.  My point is just that |
| 11:06:32 | 23 | they are assigning values to certain books.  But that is |
| 11:06:36 | 24 | -- with that point, that's all I have. |
| 11:06:39 | 25 | THE COURT:  Ms. Prather, any short followup |

| | | |
|---|---|---|
| 11:06:42 | 1 | issues, just rebuttal?  I'd like to limit it to rebuttal |
| 11:06:45 | 2 | just out of fairness since I limited them on what they |
| 11:06:54 | 3 | could do.  And then, next Monday, you'll be able to bring |
| 11:06:56 | 4 | up any -- you know, whatever you want. |
| 11:06:58 | 5 | MS. PRATHER:  Understood, your Honor. |
| 11:06:59 | 6 | Super brief.  Love your idea of us just having |
| 11:07:04 | 7 | our clients submit no rating on everything.  There still |
| 11:07:10 | 8 | would be costs associated with doing that, trying to find |
| 11:07:13 | 9 | out what all books they sold, for instance.  We already |
| 11:07:17 | 10 | talked about the fact that the AG can't bind this court to |
| 11:07:25 | 11 | the fact that they aren't going to enforce something.  And |
| 11:07:30 | 12 | that's -- cited case law on that in our reply. |
| 11:07:32 | 13 | But interestingly, if we take that approach and |
| 11:07:36 | 14 | say no rating on everything and submit that by September |
| 11:07:39 | 15 | 1st so that we can continue to have school districts |
| 11:07:43 | 16 | purchase books from us, that $2.6 million fiscal note that |
| 11:07:49 | 17 | the legislative budget board put in for the two additional |
| 11:07:54 | 18 | educational specialists to review all books that were not |
| 11:07:57 | 19 | rated sexually explicit or sexually relevant is going to |
| 11:08:00 | 20 | increase exponentially because then, the burden would be |
| 11:08:05 | 21 | put back on them, which is probably where it should have |
| 11:08:09 | 22 | been to begin with. |
| 11:08:10 | 23 | On your issue of the age appropriateness and that |
| 11:08:15 | 24 | not being an issue for the plaintiff, I think the issue |
| 11:08:17 | 25 | there -- and we can brief this more in the papers that we |

| | | |
|---|---|---|
| 11:08:21 | 1 | file next week -- that the issue there is when a reviewer |
| 11:08:28 | 2 | looks at a book, they have to contemplate whether that |
| 11:08:30 | 3 | rating is appropriate for a child between K through 12. |
| 11:08:37 | 4 | And so, the sexually explicit rating for a kindergartner |
| 11:08:42 | 5 | is likely going to be different in many cases than the |
| 11:08:47 | 6 | sexually explicit rating for a twelfth-grader and that's |
| 11:08:51 | 7 | why it does -- |
| 11:08:51 | 8 | THE COURT:  I'll have to look at that. |
| 11:08:56 | 9 | MS. PRATHER:  Impact the vendor. |
| 11:08:56 | 10 | This being not an essential operation -- or this |
| 11:08:59 | 11 | being an essential operation of the government, this is |
| 11:09:02 | 12 | vendors, not the government, being forced to do something. |
| 11:09:07 | 13 | The government can do whatever it wants with regard to |
| 11:09:09 | 14 | keeping books or not keeping books in a library.  No |
| 11:09:13 | 15 | problem.  The problem is requiring a vendor to do |
| 11:09:16 | 16 | something when the vendor is not the government. |
| 11:09:19 | 17 | And lastly, that you probably already figured |
| 11:09:22 | 18 | this out, those books that we put up as examples were just |
| 11:09:26 | 19 | ones that our team came up with.  They're not something |
| 11:09:29 | 20 | that has been formally rated by our clients.  Thank you, |
| 11:09:32 | 21 | your Honor. |
| 11:09:40 | 22 | THE COURT:  Okeydokey.  Thank you all for doing a |
| 11:09:44 | 23 | great job of helping me -- helping educate me.  I haven't |
| 11:09:49 | 24 | got to spend a lot of time on these issues and they're |
| 11:09:53 | 25 | certainly very important in every way. |

11:09:56   1        I'll plan on getting the plaintiffs' pleadings by

11:10:02   2   a week -- by end of Thursday.  We will see you all back

11:10:09   3   here at 9:00 a.m. on Monday morning, a week from this

11:10:14   4   Monday.

11:10:15   5        Is there anything else we need to take up?  Yes,

11:10:16   6   ma'am.

11:10:16   7        MS. CELLA:  Your Honor, if the -- if we need to

11:10:20   8   reply to plaintiffs' response, what date should we do that

11:10:24   9   by?

11:10:24   10        THE COURT:  Well, we're having a hearing on

11:10:25   11   Monday.  If you want to get something to us -- whenever

11:10:29   12   you get it to us, you get it to us and if you get it to us

11:10:31   13   in time for us to review it, we'll review it.

11:10:33   14        MS. CELLA:  Thank you.

11:10:34   15        THE COURT:  Yes, ma'am.  Anything else?

11:10:39   16        MS. PRATHER:  (Moving head side to side.)

11:10:40   17        THE COURT:  Thank y'all for being here.

         18        (Proceedings concluded.)

         19

         20

         21

         22

         23

         24

         25

1                    * * * * * *

2

3

4    UNITED STATES DISTRICT COURT  )

5    WESTERN DISTRICT OF TEXAS      )

6

7       I, LILY I. REZNIK, Certified Realtime Reporter,

8    Registered Merit Reporter, in my capacity as Official

9    Court Reporter of the United States District Court,

10   Western District of Texas, do certify that the foregoing

11   is a correct transcript from the record of proceedings in

12   the above-entitled matter.

13      I certify that the transcript fees and format comply

14   with those prescribed by the Court and Judicial Conference

15   of the United States.

16      WITNESS MY OFFICIAL HAND this the 22nd day of August,

17   2023.

18

19

20                              /s/Lily I. Reznik
                                LILY I. REZNIK, CRR, RMR
21                              Official Court Reporter
                                United States District Court
22                              Austin Division
                                501 West 5th Street,
23                              Suite 4153
                                Austin, Texas 78701
24                              (512)391-8792
                                SOT Certification No. 4481
25                              Expires:  1-31-25