IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| BOOK PEOPLE, INC., VBK, INC., d/b/a BLUE WILLOW BOOKSHOP, AMERICAN BOOKSELLERS ASSOCIATION, ASSOCIATION OF AMERICAN PUBLISHERS, AUTHORS GUILD, INC., and COMIC BOOK LEGAL DEFENSE FUND, <br><br>    Plaintiffs, <br><br>v. <br><br>MARTHA WONG, in her official capacity as chair of the Texas State Library Archives Commission, KEVIN ELLIS, in his official capacity as chair of the Texas Board of Education, and MIKE MORATH, in his official capacity as Commissioner of Education, <br><br>    Defendants. | § § § § § § § § § § § § § § § § § § § § § § | Civil Action 1:23-cv-00858-ADA |

**EDUCATIONAL BOOK & MEDIA ASSOCIATION'S *AMICUS CURIAE* BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

TO THE HONORABLE DISTRICT JUDGE ALAN ALBRIGHT:

Educational Book & Media Association respectfully submits this brief as *amicus curiae* supporting the Plaintiffs' Motion for Preliminary Injunction (Doc. 6).

The Educational Book and Media Association represents more than 100 publishers and wholesalers who all sell educational materials to school districts in Texas. Our members are gravely concerned about the financial burden of complying with the Restricting Explicit and Adult-Designated Educational Resources Act ("READER ACT or "Act""). The Act will impose substantial costs on businesses that sell books and other non-curricular materials to schools. The Act requires Booksellers to read and review every title they offer or have ever sold to a school to

assess whether the book is "sexually relevant" or "sexually explicit" material or to stop selling books and other materials to schools.

"Sexually relevant" is defined as any material that "describes or portrays sexual conduct," as defined by the Texas Penal Code to include any "deviate sexual intercourse, sexual contact, and sexual intercourse."  Tex. Educ. Code § 35.001(3); Tex. Penal Code § 43.01(4). "Sexual contact" in turn is defined as "any touching of the anus, breast, or any part of the genitals of another person with intent to arouse or gratify the sexual desire of any person."  Tex. Penal Code § 43.01(3).  The Act defines "sexually explicit" as material that "describes, depicts, or portrays sexual conduct" "in a way that is patently offensive,." as defined by Section 43.21 of the Texas Penal Code.  Tex. Educ. Code § 33.021(a).  The Act requires national booksellers to thoughtfully and thoroughly review each and every book and publication in detail and make highly subjective determinations consistent with Texas's community standards.  *Id*. § 35.0021(b) ("in performing the **contextual** analysis … [the] vendor must consider the following…"); § 35.0021(c) ("a vendor must **weigh** and **balance each factor** …"); § 35.0021(d) ("a library material vendor must consider the **full context** in which the description, depiction, or portrayal of sexual conduct appears, to the extent possible, recognizing that contextual determinations are necessarily **highly fact-specific** and require the consideration of **contextual characteristics** that may exacerbate or mitigate the offensiveness of the material.") (emphasis added).

While the READER ACT does not require **lists** of ratings to be submitted to the state until April 1, 2024, effective September 1, 2023, booksellers are prohibited from selling library materials to a school district or open-enrollment charter school unless all previous material sold has been rated.  Tex. Educ. Code § 35.002(a) ("may not sell library materials to a school district

or open-enrollment charter school unless the vendor has issued appropriate ratings regarding sexually explicit material and sexually relevant material previously sold to a district or school.").

This imposes an immense undertaking. A single phrase within a book could potentially reference "sexual conduct" or "sexual contact," given those terms' broad definitions. Such references can be clear and explicit or written as a euphemism or metaphor. Adding to the difficulty of review is the inclusion of subjective intent in the definition of "sexual contact," placing the burden on reviewers of judging the authors' intent (or the intent of characters in a non-fiction work) to "arouse or gratify" sexual desire. While many would consider this task inherently impossible as to many publications, a bookseller who wants to sell books to Texas schools must review **every** offering - in full – in an attempt to comply with the law, given that school libraries contain a wide range of books including fiction and nonfiction appropriate for students (many of whom are high school seniors, and therefore adults themselves). The financial burden on booksellers to comply is substantial and for some it will be impossible. To give a sense of proportion, EMBA trade publisher members such as Penguin Random House, HarperCollins, Simon & Schuster, Macmillan, and Hachette Book Group each offer tens of thousands of so-called "backlist" titles for purchase. They each publish thousands of new titles every year. Publishers sell directly to Texas K-12 schools as well as through third-party sellers.

Trade publishers do not have any employees trained to evaluate or apply highly subjective and contextual Texas community standards, to the extent such standards exist and could be defined in a state as large and diverse as Texas. Any publisher who, in order to continue selling books to Texas schools, decides to undertake such a review using existing resources, it would require tasking employees with overtime to review titles outside of their regular work hours. Industry-standard starting salary for editorial assistants is approximately

$47,583 dollars a year at major publishers, roughly $25 dollars per hour. *See* Millot, Jim, "Starting Salaries at Big Publishers Grow," Publishers Weekly, Apr. 21, 2023, available at: https://www.publishersweekly.com/pw/by-topic/industry-news/publisher-news/article/92099-starting-salaries-at-big-publishers-grow.html. The overtime rate (time and a half) is roughly $37.50 dollars an hour. On average, it takes approximately one hour to read sixty pages of a book.

Take an average book length of 300 pages: at five hours reading time, complying with the Act would cost publishers a minimum of $187.50 dollars per publication, without considering training, oversight, and time deliberating on whether any given title meets the labeling standard of the Act. Simply reviewing a modest backlist of 500 titles would cost a minimum of $93,750 dollars. For larger publishers with backlists in the tens – or even hundreds – of thousands, that expense can be multiplied a hundred times: 50,000 titles would require 250,000 employee hours and cost at least $9.375 million dollars.

Without question, EMBA's publisher members will incur additional annual costs of millions of dollars to review the tens of thousands of new titles published each year. Furthermore, the standards under the READER Act will be reviewed and updated by the Texas State Library and Archives Commission at least once every five years, and therefore "current" community standards of decency can change. Tex. Educ. Code § 33.021. Therefore, publishers would face the additional and continuing burden of re-reviewing their existing catalogues at additional expense.

For many – if not most – publishers, the amount of analysis required by the READER Act will exceed the number of employee hours available. If a publisher does not have the internal employee bandwidth or necessary training to evaluate books, it must hire outside help. There is

no such thing as a "sexual relevance" reviewer. The closest analogue is "Authenticity Readers," experts in fields outside the expertise of authors retained to provide feedback on the accuracy of the book's depiction of cultural, scientific, or other matter. Authenticity Readers generally charge by the word. According to a survey conducted by the Editorial Freelancers Association, the median Authenticity Reader charges between a cent and two cents per word. "Editorial Rates," Editorial Freelanders Association, accessed August 30, 2023, available at: https://www.the-efa.org/rates/. For an average length work of 300 pages, that comes out to as between $750 dollars (250 words/page at one cent per word) and $1,500 dollars (two cents per word). Therefore, a publisher would incur a fixed upfront cost between $375,000 and $750,000 dollars for every 500 backlist titles – again, a small fraction of the titles many trade publishers individually offer. A backlist of 50,000 titles would cost between $37.5 and $75 million dollars to review. This does not include the annual cost of rating new titles or recurring costs to **re**-review titles due to potential changes in the law and the community standards.

These costs must be borne by a publisher or bookseller to comply with the law in good faith and to compete in the Texas K-12 market. Failure to rate titles results in a total blacklisting of a seller to K-12 buyer. Sec. 35.003 (d). Further, failure to rate titles "accurately" will result in a potential second round of review and complex decision-making process of how to approach the State's proposed "corrected" rating that differs from the results of the bookseller's review process. A minimalist interpretation of criteria will result in titles being flagged and removed from districts, resulting in a lack of trust and confidence with customers. A maximalist view will unnecessarily label titles "sexually relevant" or "sexually explicit," causing them not to be purchased in the first place.

These costs are likely to be prohibitive to even the largest publishers. Few small publishers and booksellers have the resources to comply. They will be unable to deploy (or hire) staff to review every book they offer presently – or all the books they sold to schools in the past. As a result, the law effectively bars them from selling any books to schools in Texas. Without publishers (who are themselves vendors) picking up the cost and burden, retailers will be forced to implement their own methodology and will undoubtedly take shortcuts if they market titles at all.

While the READER Act only purports to govern K-12 sales in Texas, its economic effects will be felt globally. Requiring publishers to self-attribute "ratings" to their publications will communicate to potential customers worldwide that the publishers consider their books to be harmful to minors. These ratings will discourage sales of books to the general public and encourage aspiring censors to ban them outright.

Publishers have never been subject to a ratings system such as this, and in the absence of an injunction, the ratings will forever be promulgated – and its financial effects irreversible – even if the READER Act is ultimately overturned. The bell cannot be unrung and therefore the Court should grant the Plaintiffs' preliminary injunction request to prevent this immediate impact on free speech. Respectfully submitted,

By: /s/ *Peter D. Kennedy*
Peter D. Kennedy
State Bar No. 11296650
pkennedy@gdhm.com
Graves, Dougherty, Hearon & Moody, P.C.
401 Congress Avenue, Suite 2700
Austin, Texas 78701
(512) 480-5764
(512) 536-9908 (Fax)

**ATTORNEYS FOR AMICI CURIAE EDUCATIONAL BOOK AND MEDIA ASSOCIATION**

## **CERTIFICATE OF SERVICE**

I hereby certify that on August 30, 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF electronic filing system, which will send notification of such filing to all counsel of record.

/s/ *Peter D. Kennedy*
Peter D. Kennedy