IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS

AUSTIN DIVISION

|  |  |
|---|---|
| BOOK PEOPLE, INC., VBK, INC. d/b/a BLUE WILLOW BOOKSHOP, AMERICAN BOOKSELLERS ASSOCIATION, ASSOCIATION OF AMERICAN PUBLISHERS, AUTHORS GUILD, INC., COMIC BOOK LEGAL DEFENSE FUND, **Plaintiffs,** *v.* MARTHA WONG in her official capacity as chair of the Texas State Library and Archives Commission, KEVEN ELLIS in his official capacity as chair of the Texas Board of Education, MIKE MORATH in his official capacity as Commissioner of Education, **Defendants.** | 1:23-cv-00858-ADA |

## <u>ORDER</u>

Texas faces the important issue of what books should be provided and accessible to students in public school libraries in grades K-12. One of the many issues it considers is the sexual content of the hundreds, if not thousands, of books that are available. Depending on the level of sexual content in each book—a subjective issue reasonable people can disagree about—the state must weigh the appropriateness of purchasing those books and making them available to students.

1

To address this important issue, the Texas Legislature passed HB900, also known as READER, earlier this year. If the law were to go into effect, it would require:

- The Texas State Library and Archives to create standards for "sexually explicit" and "sexually relevant" materials.

- Booksellers to categorize any books they sell or have ever sold to schools according to those standards and issue a recall for any "sexually explicit" materials that they sold to schools.

- Schools to refrain from purchasing any "sexually explicit" materials and to remove "sexually explicit" existing materials from their libraries.

- Librarians to obtain parental consent for students to read or check out any books rated "sexually relevant."

- The Texas Education Agency to oversee the ratings, which includes the power to overrule a vendor's rating.

- Booksellers who do not comply with the rating system (or the overruled ratings) to not sell any books at all to the schools.

The intent of the law is clearly an attempt by the State of Texas to categorize and restrict books based on the level of sexual content in each book. By doing that, the State will determine which books are to be allowed to be purchased by public school libraries and their accessibility by the students with or without parental permission. The issue before this Court is whether the State of Texas is allowed to delegate the categorization to Third Parties like these Plaintiffs. This Court holds that it may not, at least in the manner employed here.

For whatever reason, Texas chose not to have anyone employed by the state at any level make the initial evaluation of the sexual content. It chose instead to impose this extraordinarily

difficult and prohibitively expensive burden solely on third parties with totally insufficient guidance. And worse still, no matter how much time and expense the third parties invest in complying, the State (through the Texas Education Agency) retained the power to unilaterally alter any decision made by the third party.

The TEA has the total, unilateral power to alter any rating with which they disagree. The posting of the assessment made by TEA—not the third party—would then appear on TEA's website as if the third party had made the assessment. Finally, the state denied the third parties the ability to appeal if they disagree with the State's ratings of any book. Therefore, this Court holds that the State of Texas impermissibly seeks to compel an individual or a corporation to create speech that it does not wish to make, and in addition, in which it does not agree with. The question faced by this Court is whether this law violates the Free Speech Clause of the First Amendment. For this and other reasons, the Court finds that this law violates the Free Speech Clause of the First Amendment.

## I. BACKGROUND

Before the Court is Defendants Martha Wong, Keven Ellis, and Mike Morath's ("Defendants") Motion to Dismiss (ECF No. 19), and Plaintiffs Book People, Inc. ("BookPeople"), VBK, Inc. d/b/a Blue Willow Bookshop ("Blue Willow Bookshop"), American Booksellers Association ("ABA"), Association of American Publishers ("AAP"), Authors Guild, Inc. ("Guild"), and Comic Book Legal Defense Fund's ("Plaintiffs") Motion for Preliminary Injunction (ECF No. 6). Having considered the parties' briefs, the record, and the relevant law, the Court finds that the motion to dismiss, (ECF No. 19), is **DENIED**, and the motion for preliminary injunction (ECF No. 6), is **GRANTED** to the extent set out below.

The Texas Legislature passed, and Governor Greg Abbot signed into law, House Bill 900, known as the Restricting Explicit and Adult-Designated Educational Resources Act (hereinafter, "READER"), which was to go into effect on September 1, 2023. The Act purportedly attempts to regulate access to school library books that are deemed "sexually explicit" or "sexually relevant." ECF No. 19 at 2. READER has a multitude of requirements regarding the rating of content in school libraries, many specifically targeted at "[l]ibrary material vendor[s]," which includes "any entity that sells library material to a public primary or secondary school in this state." *See* Tex. Educ. Code § 35.001(1).

Plaintiffs are a collection of book sellers, publishers, and authors who are suing officials from the Texas State Library and Archives Commission ("TSLAC"), Texas State Board of Education ("TSBE"), and Texas Education Agency ("TEA") for violations of their constitutional rights under the First and Fourteenth Amendments. *See* ECF No. 1 at 4–7, 19. Specifically, they allege that READER compels speech, is unconstitutionally vague, acts as a prior restraint, is unconstitutional facially and as applied, is overbroad, and is an unconstitutional delegation of government authority. *Id.* at 19–26. Plaintiffs request an injunction enjoining the Defendants from enforcing READER. *Id.* at 27; ECF No. 27 at 7.  Defendants allege that Plaintiffs' challenge should be dismissed under Fed. R. Civ. P. 12(b)(1) and 12(b)(6). ECF No. 19. Defendants also argue that a preliminary injunction is not proper based on the merits. *Id.*

The rating scheme itself has a complicated web of requirements. READER has three categories that library materials are to be sorted into: "sexually explicit" material, "sexually relevant" material, and material receiving "no rating". Tex. Educ. Code 35.001, 35.003. "Sexually relevant material" is defined as "any communication, language, or material, including a written description, illustration, photographic image, video image, or audio file, other than library material

4

directly related to the curriculum required under Section 28.002(a), that describes, depicts, or portrays sexual conduct, as defined by Section 43.25, Penal Code." § 35.001(3).[1]

However, to determine whether materials should be categorized as "sexually explicit", a vendor must determine if the "sexually relevant material" is described or portrayed in a way that is "patently offensive" as defined by Penal Code Section 43.21. Tex. Educ. Code §§ 33.021(a); 35.001(2). While this is a decision that hundreds, if not thousands, of attorneys who work as prosecutors wrestle with (with a judicial officer being the final potential arbiter of any decision), the statute provides no bright line that any of the Plaintiffs could be certain about when making this assessment for each book it reviews and rates. This definition requires Plaintiffs to determine, for each book, whether it is "so offensive on its face as to affront current community standards of decency." Tex. Penal Code § 43.21(a)(4). One wonders how many times appellate courts have been asked to step in to resolve both the meaning of these words, as well as to determine whether an action taken by a defendant had sufficiently met this standard.

In addition, READER fails to inform the public or any Plaintiff whose community standard it is referencing. It is an open question whether this community standard is based on Austin, Texas, or Onalaska, Texas—or any of the more than 1,200 incorporated municipalities across Texas. The lack of any blueprint for the Plaintiffs to follow creates a blunt reality that under this scheme it is guaranteed that different book distributors and sellers will arrive at different assessments with respect to hundreds if not thousands of books. While the TEA has the authority to resolve conflicts over what the correct assessment is—for potentially hundreds of books—there is no requirement

---

[1] The definition of "sexual conduct" seemingly encompasses any sexual-related topic. It is reproduced as follows: "Sexual conduct" means sexual contact, actual or simulated sexual intercourse, deviate sexual intercourse, sexual bestiality, masturbation, sado-masochistic abuse, or lewd exhibition of the genitals, the anus, or any portion of the female breast below the top of the areola."
Tex. Penal Code § 43.25(a)(2).

in the statute that they do so, and it is unclear from the provisions of the statute what the Plaintiffs (or school districts in Texas) would do in the interim. Thus, school districts across the state of Texas would be able to purchase a book of the exact same content from one provider but not another. Or, if they bought a book from one provider, they might be allowed to make it available to students without parental approval, but if they bought it from a different vendor, parental consent would be required.

The vendor must perform a "contextual analysis" to determine if a book is patently offensive, and must consider (for each of thousands of books) multiple factors, including: "(1) the explicitness or graphic nature of a description or depiction of sexual conduct contained in the material; (2) whether the material consists predominantly of or contains multiple repetitions of depictions of sexual or excretory organs or activities; and (3) whether a reasonable person would find that the material intentionally panders to, titillates, or shocks the reader." Tex. Educ. Code § 35.0021(b). READER asks more though, requiring vendors to "weigh and balance each factor and conclude whether the library material is patently offensive, recognizing that because each instance of a description, depiction, or portrayal of sexual conduct contained in a material may present a unique mix of factors." *Id.* § 35.0021(c). READER further exacerbates the confusion in applying the balancing test by requiring vendors to "consider the full context in which the description, depiction, or portrayal of sexual conduct appears, to the extent possible, recognizing that contextual determinations are necessarily highly fact-specific and require the consideration of contextual characteristics that may exacerbate or mitigate the offensiveness of the material." *Id.* § 35.0021(d). Notably, this definition of "sexually explicit" material does not follow the definition

of obscenity approved by the Supreme Court in *Miller v. California*, 413 U.S. 15, 24 (1973).[2] Because of this, there is the potential that the designation of a book as "sexually explicit" would violate the First Amendment.

While the law indicates that there is an exception for the requirement to rate or list material "directly related to the curriculum" based on § 28.002(a) of the Education Code, *see* Tex. Educ. Code §§ 33.021(a); 35.001(3), closer inspection of the Code provides no clarity to what books would qualify as directly related to the curriculum and be excluded from ratings. The Education Code only provides a general list of subjects that curriculum must cover. *See id.* § 28.002(a). But there is no statewide curriculum in Texas. Therefore, there is no way to for the Plaintiffs to determine what material is "related to the curriculum" across all 1,025 Texas school districts. *See* Aug. 18 Mot. Hr'g Tr. 58:9-59:1. In fact, curricula vary from classroom-to-classroom within a district as well as from day-to-day or year-to-year within a single classroom, requiring consistent reevaluation. But reevaluation by who? The TEA? The schools? The Plaintiffs? Multiple affidavits filed explain that vendors have no insight into what the curriculum entails, or further what "directly related" to the curriculum covers. *See* ECF No. 6-3 at 5; ECF No. 6-4 at 5. Simply put, it is impossible for vendors to ascertain what content falls within this exception, or how to determine its scope on a statewide basis.

READER's requirements for vendors are so numerous and onerous as to call into question whether the legislature believed any third party could possibly comply. The law prohibits "library

---

[2] The *Miller* test requires the following elements: "(a) whether 'the average person, applying contemporary community standards' would find that the work, taken as a whole, appeals to the prurient interest, (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law, and (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value." 413 U.S. at 24 (citation omitted).

material vendor[s]"[3] from selling "library materials" to any school district or open-enrollment charter school ("public schools") unless the vendors issue ratings for any library material "previously sold" to public schools. Tex. Educ. Code § 35.002(a). There is also a complete prohibition on sales of material rated "sexually explicit" to public schools. Tex. Educ. Code § 35.002(b). But the rating of "sexually explicit" is not one made by the State such that the vendor and school districts could simply comply according to a statewide, uniform guideline. Again, it is an assessment that the state is requiring each vendor to separately make. After a vendor issues ratings for all material previously sold to public schools, the Texas Education Agency must post each list submitted by vendors "in a conspicuous place on the agency's Internet website as soon as practicable." Tex. Educ. Code § 35.002(e). READER requires vendors to submit initial lists "[n]ot later than April 1, 2024" and update the list no later than September 1 each year. Tex. Educ. Code § 35.002(c)–(d).

This concern only increases with the power that the statute gives the TEA. After submission of the lists, the TEA can review the ratings and notify the vendor if any library material the vendor sells is not rated or, in the sole opinion of the TEA, is incorrectly rated. Tex. Educ. Code § 35.003. What instructions do the statute provide for the TEA to employ when deciding to substitute their assessment for the good faith assessment of the vendors? None. Does the TEA have a deadline by which it must provide these assessments to the vendor? No. Is the TEA required to apply any standard of good faith? If so, it is implicit at best. There is no good faith requirement imposed on the TEA in the statute. Does the TEA have to perform its assessment in one step and provide it to the vendor, or may the TEA engage in a seriatim process where it identifies one "incorrect"

---

[3] A "library material vendor" is defined as "any entity that sells library material to a public primary or secondary school in this state." Tex. Educ. Code § 35.001(1). This definition could apply broadly to wholesalers, distributors, independent bookstores, online retailers, e-book sellers, publishers, authors, and others.

assessment at a time? The statute provides no answer. In other words, the statute provides the TEA unlimited authority to undermine every minute of the work that the vendors put into rating books without providing any blueprint for the standard that will be employed for this review.

So, let's assume that one of these Plaintiffs makes a good faith effort and works from now through April 1, 2024, to perform the evaluation on thousands of books and proffers a rating of the sexual content of each. The TEA then determines that they have incorrectly rated some number of the books, from 1 to infinity, and places a different sexual rating on those books. Having already invested thousands, if not hundreds of thousands, if not millions of dollars to comply with the mandates of the statute and performing an assessment of each book, the vendor is then given just 60 days to adopt the TEA's rating (with the updated list being published on the TEA's website in a "conspicuous place") or be censured and placed on a list (also in a "conspicuous place" on the TEA's website) showing failure to comply with the TEA's requirements. Tex. Educ. Code § 35.003(b)–(c). Public schools are prohibited from purchasing library materials from vendors on the latter list. *Id.* § 35.003(d). There is precious little if any language in the statute to ensure that any decision made by the TEA with respect to the rating of any book will be any more "accurate" (whatever that means) allowing for the enormous possibility if not probability that it will be entirely arbitrary and capricious (at best). In other words, vendors must decide between either accepting the state administrative agency substituted speech as their own or being effectively blacklisted. There is no mechanism to appeal the TEA's ratings with respect to any book. There is no dispute that the only way to regain the ability to sell library material to public schools is to submit a list of ratings compliant with the TEA's ratings. Tex. Educ. Code § 35.003(e); *see* Aug. 18 Mot. Hr'g Tr at 71:1.

Additionally, after submitting ratings, vendors are required to issue a recall for "all copies" of material rated sexually explicit that were previously sold to public schools and are currently "in active use by the district or school." Tex. Educ. Code § 35.002(b). However, the statute lacks clarity regarding what "active use" is, and the government, when pressed at the August 18th, 2023, hearing, even admitted, "there's no mechanism for tracing every prior book sold." *See* Aug. 18 Mot. Hr'g Tr. 76:24–25. Plaintiffs confirmed this statement through the multitude of declarations indicating that they do not have records for every book they have ever sold to a public school, and furthermore that they would not know which books are "in active use." *See* ECF No. 6-5 ¶¶ 9–11; ECF No. 6-3 ¶¶ 7–9; ECF No. 6-6 ¶ 6; ECF No. 6-4 ¶¶ 5–6.

The effects of these few short provisions have put Plaintiffs in an impossible position. First, the costs of compliance with issuing ratings are sky high. In addition, Plaintiffs do not believe their members or employees have the time or the training to properly make these assessments, which could lead to banning classic works of literature. *See* ECF No. 6-5 ¶ 17; ECF No. 6-3 ¶¶ 13, 18; ECF No. 6-6 ¶¶ 7, 11.; ECF No. 6-4 ¶ 9; ECF No. 6-7 ¶¶ 8–9. The process of providing a contextual rating is incredibly expensive. Blue Willow estimates that the cost to rate each book would be between $200 and $1,000 per book, and the cost to read and rate books already sold to schools between $4 million and $500 million dollars—Blue Willow's annual sales are only $1,000,000 per year. *See* ECF No. 6-3 ¶¶ 14–16; ECF No. 6-4 ¶¶ 8–9. To put the scale of the number of books that would need to be rated in perspective, a librarian in San Antonio for Northside ISD testified that six school districts alone had library collections totaling over six million items. Hearing on Tex. H.B. 900 before the Senate Comm. on Educ., 88th Leg., R.S. (May 11, 2023) (statement of Lucy Podmore) (available at https://tlcsenate.granicus.com/MediaPlayer.php?view_id=53& clip_id=17930, from 1:12:30 - 1:14:41). To demonstrate how long it takes to review books for

objectionable content, it took Spring Branch ISD more than 220 hours, $30,000, and 16 employees to review *one book* to try to comply with a book removal request that was unrelated to the law at hand. *See* Shannon Ryan, *More than $30K of taxpayers' money, 220 hours spent on single Spring Branch ISD book ban, docs show*, ABC 13 (Mar. 28, 2023), https://abc13.com/spring-branch-isd-book-ban-school-library-books-student-resources-texas-schoolbook-restrictions/13037457/.

Plaintiffs are concerned that the state's coerced revised ratings will be interpreted by the public as Plaintiffs' own independent rating when they are, in fact, speech compelled by the State. *See* ECF No. 6-5 ¶¶ 19–21; ECF No. 6-3 ¶¶ 17, 21–22; ECF No. 6-6 ¶ 15; ECF No. 6-7 ¶¶ 14–16. The requirement acts as a Hobson's Choice requiring booksellers to accept the state's compelled speech as their own or sacrifice their ability to conduct business with Texas school districts. Plaintiffs stand to suffer significant financial—and reputational—damages from their loss of business with Texas school districts. *See* ECF No. 6-5 ¶¶ 20–22; ECF No. 6-3 ¶¶ 14–16, 21–25; ECF No. 6-6 ¶¶ 19–20; ECF No. 6-2 ¶ 7; ECF No. 6-7 ¶ 12.

There is a substantial factual dispute over the operation of many aspects of the law due to the statute's lack of clarity.[4] Generally, the government was confused and unaware of how the law would actually function in practice, even though the hearing was mere days before it would go into effect. There were approximately 40 instances during the August 18th hearing ("Hearing 1") where the government either did not know how the law would function or did not have an answer as to what the effects of certain provisions were. *See generally* Aug. 18 Mot. Hr'g Tr. The Court includes a few examples of this lack of clarity below.

---

[4] "[W]hile disputed facts and law as to the ultimate issue will be considered by the Court on a Motion for Preliminary Injunction, the fact that there are disputed facts and law does not in itself prevent issuance of a preliminary injunction." *United States v. Aluminum Co. of Am.*, 247 F. Supp. 308, 314 (E.D. Mo. 1962), *aff'd per curiam*, 382 U.S. 12 (1965); *see also* 11A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2948.3 (3d ed. 2023) (stating that "it is unacceptable as a general rule" to not grant preliminary injunctions when there is a factual conflict).

The Court addresses first the question of who the statute identifies as having the power to enforce the law (or if the law has any enforcement mechanism). At the hearing, when asked about enforcement and who would enforce the law, Defendants' counsel stated: "That's a good question. A good question that I don't know that anybody has thought that through yet." *Id.* at 66:9–11. Next, the question of what event would trigger the TEA to review and revise Plaintiffs' ratings of one or more books. In response, Defendants' counsel stated: "I haven't thought that through yet. I think this is still being worked out because this is a new [bill.]" *Id.* at 33:3–5. When asked if there is no appeal from the TEA's review and revision of vendors' ratings, the government responded: "I believe that's correct, your Honor. I haven't thought that through, but I do believe that is correct." *Id.* at 12:17–19. Asked how Plaintiffs may seek relief under the law if vendors were harmed, Defendants' counsel stated: "Well, your Honor, maybe the answer is they can't." *Id.* at 10:9–10.

A large point of contention between the parties, for the purposes of the injunctive relief requested, is when the law's provisions actually go into effect. Schools and the Plaintiffs believe, absent an injunction, that they will be unable to sell books as of the date the law goes into effect, September 1, 2023. At least one school district has already stopped buying books completely (including from a Plaintiff) in anticipation of the law coming into effect. *See* ECF No. 6-3 ¶ 24; Claire Goodman, *Katy ISD halts all library book purchases, new books stored*, Houston Chronicle (June 27, 2023), https://www.houstonchronicle.com/neighborhood/katy/article/katy-isd-halts-library-book-purchases-18172597.php. The government stated at the hearing and in its briefing that since rating lists were not due until April 1, 2024, nothing in the status quo would change in the interim. Aug. 18 Mot. Hr'g Tr. 14:12–14, 65:14–23; ECF No. 19 at 8. READER went into effect on September 1, 2023, and by its plain text specifies that its changes apply to the 2023-2024 school year. 2023 Tex. Sess. Law Serv. 808 §§ 6–7 (West). The provisions described above

prohibit vendors from selling to public schools "unless the vendor has issued appropriate ratings." Tex. Educ. Code § 35.002(a). So, a plain reading of the legislation reveals that vendors are prohibited from selling books in the interim, between September 1, 2023, and April 1, 2024, or, at best, creates sufficient ambiguity about providers' ability to sell books to schools.

Plaintiffs filed their complaint on July 25, 2023, (ECF No. 1), and moved for a preliminary injunction on the same date, (ECF No. 6). Defendants jointly responded to the motion for preliminary injunction and moved to dismiss on August 16, 2023 (ECF No. 19). Plaintiffs replied to the motion to dismiss on August 17, 2023 (ECF No. 25). In addition, an amicus brief in support of the preliminary injunction was submitted by American Association of School Librarians, Association of University Presses, Barnes & Noble, Inc., Freedom to Learn Advocates, and Freedom to Read Foundation on August 17, 2023 (ECF No. 26). After the parties submitted their briefing, the Court held an initial hearing on the preliminary injunction and motion to dismiss on August 18, 2023, (Minute entry, ECF No. 27). The parties submitted post hearing briefing on the preliminary injunction. (Pls.' Response in Opposition to Motion, ECF No. 30; Defs.' Response in Support, ECF No. 31). The Court held a second hearing on the preliminary injunction and motion to dismiss on August 28, 2023, (Minute entry, ECF No. 32). Finally, an amicus brief in support of the preliminary injunction was submitted by the Educational Book & Media Association was filed on August 30, 2023 (ECF No. 35).

## II. LEGAL STANDARD

### A.  Motion to Dismiss 12(b)(1)

Rule 12(b)(1) governs motions to dismiss for lack of subject matter jurisdiction. "Federal courts are courts of limited jurisdiction, and absent jurisdiction conferred by statute, lack the power to adjudicate claims." *Stockman v. Fed. Election Comm'n*, 138 F.3d 144, 151 (5th Cir. 1998).

Accordingly, "[a] case is properly dismissed for lack of subject matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate the case." *Home Builders Ass'n of Miss. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998) (citation omitted). "The burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001); *Howery v. Allstate Ins. Co.*, 243 F.3d 912, 916 (5th Cir. 2001). "Accordingly, the plaintiff constantly bears the burden of proof that jurisdiction does in fact exist." *Ramming*, 281 F.3d at 161. "When a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, the court should consider the Rule 12(b)(1) jurisdictional attack before addressing any attack on the merits." *Id.* "If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P. 12(h)(3).

### B. Motion to Dismiss 12(b)(6)

Rule 12(b)(6) governs motions to dismiss for failure to state a claim upon which relief can be granted. "To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead 'enough facts to state a claim to relief that is plausible on its face.'" *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556). "A claim for relief is implausible on its face when 'the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct.'" *Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 634 F.3d 787, 796 (5th Cir. 2011) (quoting *Iqbal*, 556 U.S. at 679).

Although a court accepts all well-pleaded facts as true, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. A plaintiff's obligation to demonstrate his entitlement to relief requires more than mere conclusory statements. *Twombly*, 550 U.S. at 555. Rather, a plaintiff must plead facts with enough specificity "to raise a right to relief above the speculative level." *Id.* A plaintiff must allege more than "labels and conclusions" or a "formulaic recitation of the elements of a cause of action." *Id.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. "Where the facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has stopped short of showing that the pleader is plausibly entitled to relief." *Howe v. Yellowbook, USA*, 840 F. Supp. 2d 970, 975 (N.D. Tex. 2011).

## C. Preliminary Injunction

A preliminary injunction is appropriate if a movant establishes: "(1) they are likely to succeed on the merits, (2) there is a substantial threat they will suffer an irreparable injury otherwise, (3) the potential injury outweighs any harm that will result to the other side, and (4) an injunction will not disserve the public interest.." *State v. Biden*, No. 23-30445, 2023 WL 5821788, at *12 (5th Cir. Sept. 8, 2023), *administrative stay granted sub nom. Murthy v. Missouri*, No. 23A243 (U.S. Sept. 14, 2023) (Alito, J., in chambers); *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 288 (5th Cir. 2012). These elements are not examined in isolation but balanced in consideration of each other. *State of Texas v. Seatrain Int'l, S.A.*, 518 F.2d 175, 180 (5th Cir. 1975).

# III. DISCUSSION

**A. The Court has subject matter jurisdiction over Plaintiffs' constitutional claims for injunctive relief.**

Defendants argue that this case should be dismissed for lack of subject matter jurisdiction because Plaintiffs' claims are non-justiciable and barred by Sovereign Immunity. ECF No. 19. Plaintiffs, however, oppose Defendants' Motion to Dismiss, arguing that they sufficiently allege standing and that the claims at issue are ripe. ECF No. 30 at 4–13. Plaintiffs also assert that Defendants are not entitled to sovereign immunity because of the *Ex parte Young* exception. *Id*. at 13; *see also* 209 U.S. 123, 160 (1908). The Court agrees with Plaintiffs and addresses each argument in turn.

### 1. Plaintiffs sufficiently allege Article III standing to challenge READER.

Article III standing requires Plaintiffs to have suffered an injury-in-fact that is: 1) "concrete and particularized" and "actual or imminent;" (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision. *See, e.g.*, *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992); *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).

#### a. Plaintiffs sufficiently plead an injury-in-fact under the First Amendment.

Standing rules are unique in First Amendment challenges because of the issues at stake. *Turtle Island Foods, S.P.C. v. Strain*, 65 F.4th 211, 215 (5th Cir. 2023) ("In pre-enforcement free speech challenges, 'chilled speech or self-censorship is an injury sufficient to confer standing.'") (quoting *Barilla v. City of Houston*, 13 F.4th 427, 421 (5th Cir. 2021)). Plaintiffs "need not have experienced 'an actual arrest, prosecution, or other enforcement action' to establish standing." *Id*.

at 215–16 (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)). Instead, Plaintiffs need only show that "(1) [they] intend[] to engage in a course of conduct arguably affected with a constitutional interest; (2) that the course of action is arguably proscribed by statute; and (3) that there exists a credible threat of prosecution under the statute." *Id*. (citing *Driehaus*, 573 U.S. at 159). Plaintiffs can satisfy all three conditions.

First, Plaintiffs have alleged that they will be subject to READER, which regulates book sales to public schools, because Plaintiffs or their members[5] have sold books to Texas public schools and intend to continue selling books to Texas public schools. ECF No. 1-2 ¶¶ 3–7; ECF No. 1-3 ¶¶ 3–5, 27; ECF No. 1-4 ¶ 5; ECF No. 1-5 ¶ 4; ECF No. 1-6 ¶¶ 5–6; ECF No. 1-7 ¶ 5. When READER takes effect on September 1, 2023, injury is "imminent" because Plaintiffs will need to comply with the law's book rating requirement or else be prohibited from selling any books to public schools, regardless of their ratings. *See* Tex. Educ. Code § 35.002(a); ECF No. 1 ¶ 48 ("Booksellers that do not issue ratings are prohibited from selling *any* books to school districts or open-enrollment charter schools.") (footnote omitted).

From both a logistical and substantive standpoint, Plaintiffs have proffered substantial evidence and argument that they cannot comply with § 35.002(a). If Plaintiffs and other companies in their shoes do not have complete records of all books "previously sold to a district or school," then they do not know what books are in "active use," and they do not understand how to apply

---

[5] Some of the plaintiffs, namely ABA, AAP, Authors Guild, and CBLDF, are organizations that do not sell any books. ECF No. 30 at 5 n.1. Plaintiffs claim that these four organizations nevertheless have standing to sue on behalf of their members. *Id.* Yet neither Plaintiffs nor Defendants seriously grapple with the three-factor test necessary to establish such standing. *See Students for Fair Admissions v. President & Fellows of Harvard Coll.*, 143 S. Ct. 2141, 2157 (2023); ECF No. 19 at 5–10; ECF No. 25 at 2–5; ECF No. 30 at 3–12; ECF No. 31 at 2–7. However, because the Court concludes that the bookseller plaintiffs have standing to pursue all their claims and requested forms of relief, it is unnecessary to decide this question. *See State v. Biden*, No. 23-30445, 2023 WL 5821788, at *7 (5th Cir. Sept. 8, 2023) ("The presence of any *one* plaintiff with standing to pursue injunctive relief as to the Plaintiffs' First-Amendment claim satisfies Article III's case-or-controversy requirement."), *administrative stay granted sub nom. Murthy v. Missouri*, No. 23A243 (U.S. Sept. 14, 2023) (Alito, J., in chambers).

the vague criteria in the statute for issuing the ratings. *See* ECF No. 6-3 ¶¶ 8–10; ECF No. 1-3 ¶¶ 7–9; ECF No. 1-4 ¶¶ 6–7, 13–14; ECF No. 1-5 ¶¶ 5–8, 11; ECF No. 1-2 ¶ 11, 17–18; ECF No. 1-7 ¶ 7. If they are banned, because of the statute, from selling any books to public schools on September 1, 2023 (which as discussed above is a reasonable interpretation of the statute's plain text), they will suffer financial harm, satisfying the injury-in-fact requirement. ECF No. 30 at 6 (citing *All. for Hippocratic Med*. *v*. *U.S. Food & Drug Admin*., No. 23-10362, 2023 WL 5266026, at \*14 (5th Cir. Aug. 16, 2023) ("[E]conomic harm—like damage to one's business interest—is a quintessential Article III injury.")).

The Court has analyzed Defendants' contention that Plaintiffs' alleged injury is "speculative," because Plaintiffs only assert ways in which they could "hypothetically be injured." ECF No. 31 at 4. The Court finds that this argument lacks merit. The book vendor Plaintiffs intend to sell books to school districts, and in Defendants' own words, "Texas Education Code §35.002 clearly provides that a schoolbook vendor may not sell to a school district without submitting the required ratings." *Id*. Based on the language in the statute, Plaintiffs' ability to sell books is arguably proscribed by READER unless and until they comply with requirements that are burdensome and costly and will cause them to divert extensive resources and time from their normal operations. *See* ECF No. 30 at 6 (citing *All. for Hippocratic Med*., 2023 WL 5266026, at \*14, for the proposition that plaintiffs "sustain a concrete injury when they are forced to divert time and resources away from their regular" jobs);[6] ECF No. 1-5 ¶ 9. Though the ratings are not

---

[6] Plaintiff Blue Willow Bookshop estimates that it will cost between $200 and $1,000 per book and between $4 million and $500 million total to read and rate books already sold to public schools according to the READER's multi-layered criteria. ECF No. 1-3 ¶¶ 14–16. These estimates do not account for the cost of reviewing future books or the cost of obtaining previously sold books that are no longer stocked by Blue Willow. *Id*. ¶ 15. Lucy Podmore, a San Antonio librarian for Northside ISD, testified during a Texas Senate hearing that her students have read more than 14,000 books from their school library during the 2022-23 school year and that six school districts alone have library collections totaling over six million items. *See* Hearing on Tex. H.B. 900 before the Senate Comm. on Educ., 88th Leg., R.S. (May 11, 2023). Plaintiffs also assert that it took Spring Branch ISD more than 220 hours, $30,000, and 16 employees to review one book in an effort to comply with a book removal request. *See* ECF No. 30 at 7 n.13.

due until April 1, 2024,[7] the injury caused to Plaintiffs by attempting to comply with READER became imminent on September 1, 2023. This confers standing.

Yet even setting aside the burdensome and costly aspects of requiring book vendor plaintiffs to apply ratings, Plaintiffs also satisfy the conditions for injury-in-fact by showing that READER seeks to compel Plaintiffs' speech in at least two ways. The first is compelling the venders to provide ratings. The second is that if Plaintiffs comply with the statute and issue a rating with which the TEA disagrees, TEA still reserves the authority to overrule Plaintiffs' ratings and require Plaintiffs to list the State's rating as their own to sell any books to public schools. *See* Tex. Educ. Code §§ 35.002(e); 35.003(c). If—and almost certainly *when*—the TEA disagrees with a rating, Plaintiffs must re-rate the book consistent with TEA's "corrected" rating, which the TEA will post publicly on its website. *Id.* §§ 35.003(b)(1); 35.002(e); 35.003(c). Any state-issued ratings then adopted by vendors are not confined for viewing by only public schools or Texas residents, but are accessible and viewable by anyone who accesses the TEA website.

In opposition, Defendants insist that this argument is speculative, asserting that there is a "lack of certainty as to whether the Agency will even review Plaintiffs' ratings or require them to be changed." ECF No. 31 at 5. But the fact that the Agency might not review ratings or require them to be changed is vastly different from arguing that the Agency does not have the power to do either or both, or guarantee that the TEA will not sue. Moreover, counsel for Defendants was certainly unable at the hearing to even intimate that the Agency taking this action was not more

---

[7] In their Motion for Stay Pending Appeal, Defendants note that READER also "requires TSLAC, in consultation with SBOE, to devise and adopt standards for school library services in regard to the implementation of READER," a task that must be accomplished "by January 1, 2024." ECF No. 37 at 6. Defendants then contend that this "requires *immediate* action" and that "[m]eeting that *future* deadline is an arduous task that requires significant *present* action." *Id.* a*t* 6–7 (emphases in original). Thus, Defendants claim, failure to stay the injunction won't just cause injury to Defendants—it will cause *irreparable* injury to Defendants. *See id.* These statements also happen to perfectly describe READER's initial ratings list requirements. Thus, Defendants' own briefing shows why the April 1, 2024 deadline to comply with Tex. Educ. Code § 35.002(c) does not render its injury to Plaintiffs speculative or non-imminent.

likely than not. *See* Aug. 18 Mot. Hr'g Tr at 16:4-17; 20:22-23:12; 71:10-72:1; 72:14-22; 73:11-15. In addition, the Court notes that Plaintiffs disagree with the State's compelling of any rating criteria and do not want to be forced to issue any ratings. Regardless, the Court is hard pressed to rely on Defendants' line of argument.

First, if the Court accepts Defendants' arguments as true, why would the Legislature impose such costly and burdensome requirements on Plaintiffs to comply with a law which it did not intend for Defendants to enforce? Second, and along those same lines, the Court is skeptical as to how Defendants can argue that there is no "credible threat" of compelled speech, a claim that requires TEA and Plaintiffs to align on every single rating as to every single book. ECF No. 31 at 5; *see Driehaus*, 573 U.S. at 159 ("[W]e have held that a plaintiff satisfies the injury-in-fact requirement where he alleges an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder.") (internal quotations omitted). Again, given that multiple vendors will be providing ratings for thousands of books, it is beyond question that they will be conflicting rating that the TEA will have to resolve. If the Court accepts Defendants' arguments that the certainty of the TEA reviewing Plaintiffs' ratings or requiring any changes is so lacking that there is no "credible threat" sufficient to confer standing, then apart from the requirements it imposes on vendors, READER is essentially pointless. Defendants cannot have it both ways—either 1) READER, which was enacted by the State to discharge its obligation "to protect children from obscene material in school," ECF No. 19 at 35, will be enforced by Defendants to carry out those obligations, consequently conferring standing; or 2) it will not, instead requiring Plaintiffs to expend upwards

of millions of dollars on the reviewal and rating process[8] to comply with a law which may never be enforced. The bottom line is relatively simple to the Court. There is an existential threat to each of the Plaintiffs of enforcement that the State is unwilling or unable to disavow.

Defendants' next assertion, that there can be no "compelled speech" issue here, is without merit for several reasons. Defendants argue that the "speech" in question is that of the government, not Plaintiffs. ECF No. 31 at 5. But this ignores the fact that the State is compelling the Plaintiffs to engage in speech they do not want to engage in, *i.e.* the publication of ratings of books. In addition, because the government seeks to issue its own speech regarding the appropriate ratings for books, and attribute it publicly on a state agency website to the individual Plaintiffs, the government is clearly compelling that speech as well. The compelled speech point is underscored by READER's plain statutory text, which states that within sixty days after receiving TEA's corrected rating, *"the vendor **shall** (1) rate the library material according to the agency's corrected rating."* Tex. Educ. Code § 35.003(b) (emphases added). Again, to make absolutely clear, the Court is not holding that the State has no interest in assessing and evaluating the content of books that will be in public school libraries. That is not the issue that is before the Court. The issue that is before the Court is the State requiring third parties to rate books and to accept any rating that the TEA elects to assign to any book. By requiring Plaintiffs to undergo the extensive process of reviewing and rating books according to the standards outlined in READER, and then to re-rate

---

[8] The Court also notes that when Plaintiffs presented unrebutted evidence during oral argument, in its initial motion, and in multiple declarations indicating the expected cost of compliance with the rating requirements, Defendants did not object or otherwise contend that Plaintiffs' estimates were incorrect. *See* ECF No. 6-5 ¶ 17; ECF No. 6-3 ¶¶ 13, 14–16, 18; ECF No. 6-6 ¶¶ 7, 11; ECF No. 6-4 ¶ 9; ECF No. 6-7 ¶¶ 8–9; Hearing on Tex. H.B. 900 before the Senate Comm. on Educ., 88th Leg., R.S. (May 11, 2023) (statement of Lucy Podmore) (available at https://tlcsenate.granicus.com/MediaPlayer.php?view_id=53&clip_id= 17930, from 1:12:30 - 1:14:41); Shannon Ryan, *More than $30K of taxpayers' money, 220 hours spent on single Spring Branch ISD book ban, docs show*, ABC 13 (Mar. 28, 2023), https://abc13.com/spring-branch-isd-book-ban-school-library-books-student-resources-texas-schoolbook-restrictions/13037457/.

any books in accordance with TEA's "corrected" ratings with which Plaintiffs disagree, Defendants cannot persuasively maintain that there is no imminent injury.

Plaintiffs accordingly satisfy the injury requirement for First Amendment challenges. *See Turtle Island Foods*, 65 F.4th at 215.

### b. Plaintiffs' injuries are fairly traceable to Defendants.

Plaintiffs' injuries are fairly traceable to Defendants, who are tasked with enforcing READER. Plaintiffs are "[l]ibrary material vendor[s]," and are thus subject to READER, even if they take no action. Tex. Educ. Code § 35.001(1). When there is a First Amendment pre-enforcement challenge to a newly enacted law, the Court "will assume a credible threat of prosecution in the absence of compelling contrary evidence." *See Turtle Island Foods*, 65 F.4th at 218 (quoting *Speech First, Inc. v. Fenves*, 979 F.3d 319, 335 (5th Cir. 2020)). Defendants have not provided such compelling contrary evidence. Defendants suggest that they *might* not override Plaintiffs' ratings, but this mere assertion is not "compelling contrary evidence" that would allow the Court to dismiss the imminent threat of enforcement contained in the law. *Id.* Obviously counsel for the State had the opportunity to be unequivocal to avoid the potential of harm to the Plaintiffs by stating that the TEA would not override any ratings made by publishers. But counsel could not do and be faithful to the text of the statute. READER requires Plaintiffs to provide book ratings should they wish to sell books to school districts. If they do not submit ratings, or if they do not adopt the TEA's changed ratings, the TEA will post on its website the list of noncompliant vendors, who are then unable to sell any books to public schools. Tex. Educ. Code §§ 33.021(c), 35.002(e), 35.003(a), (c). What's more, if a vendor rates library material as sexually explicit (either as a result of the TEA compelling them to or as an initial matter), library material vendors are prohibited from selling it and must recall it. *Id.* § 35.002(b). There is a direct causal connection

between the book-buying decisions of school districts and the impending application of the law, which restricts school districts' abilities to purchase certain books.

### c.   Plaintiffs' injuries will be redressed by enjoining READER.

The Court finds that Plaintiffs satisfy the redressability requirement of standing. Redressability requires a plaintiff to show "it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000). If READER is enjoined, Plaintiffs will no longer need to review and rate any books and will not undergo any issues of compelled speech. Accordingly, their First Amendment injuries will be redressed.

The Court acknowledges Defendants' argument that a favorable ruling would not force school districts to purchase books, given the school district's existing discretion to choose the vendors from which it buys books. But to meet the redressability requirement, a favorable ruling need only lessen the harm. *See Sanchez v. R.G.L.*, 761 F.3d 495, 506 (5th Cir. 2014) ("When 'establishing redressability, [a plaintiff] need only show that a favorable ruling could potentially lessen its injury; it need not definitively demonstrate that a victory would completely remedy the harm.'") (quoting *Antilles Cement Corp. v. Fortuno*, 670 F.3d 310, 318 (1st Cir. 2012)).[9] In this case, an injunction would significantly lessen Plaintiffs' injury by eliminating the substantial costs they would incur to comply with READER's rating system and any potential for compelled speech.

Defendants' argument is further undercut by the Supreme Court's opinion in *Northeastern Florida Chapter of the Associated General Contractors of America v. City of Jacksonville*, 508 U.S. 656 (1993). In that case, the Supreme Court held that contractors had standing to challenge

---

[9] Of course, this is a distinct issue that is distinct from the issue of whether the statute causes a constitutional harm in terms of Plaintiffs' right under the First Amendment.

an ordinance preventing them from bidding on contracts set aside for minority business owners. *See id.* at 669. The Court held that the injury in fact is the "inability to compete on an equal footing," not the failure to obtain the benefit. *Id.* at 666. From this definition, the Court also held that the injury was redressable. *Id.* at 666 n.5; *see also State v. Biden*, No. 23-30445, 2023 WL 5821788, at *9 n.5 (5th Cir. Sept. 8, 2023) ("When plaintiffs seek injunctive relief, the injury-in-fact and redressability requirements intersect."), *administrative stay granted sub nom. Murthy v. Missouri*, No. 23A243 (U.S. Sept. 14, 2023) (Alito, J., in chambers). That case applies here. Before READER, library material vendors had an equal opportunity to market their books to Texas public schools. But READER totally forecloses vendors who won't rate, or who won't accept TEA's ratings, from having that opportunity to market. *See* Tex. Educ. Code §§ 35.002(a); 35.003(d). An injunction against READER's enforcement will provide those vendors their opportunity to market back. Plaintiffs thus show their injuries are redressable.

### 2. Plaintiffs' claims are ripe.

A claim is ripe, *i.e.*, fit for judicial decision, if it presents a pure legal question requiring no further factual development. *See New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 833 F.2d 583, 586–87 (5thCir. 1987); *see also Opulent Life Church*, 697 F.3d at 287. Determining whether a claim is ripe for judicial review requires the evaluation of (1) "the fitness of the issues for judicial decision" and (2) "the hardship to the parties of withholding court consideration." *Opulent Life Church*, 697 F.3d at 286.

Plaintiffs' claims are ripe because they raise constitutional questions under the First and Fourteenth Amendment, which are pure questions of law. *See generally* ECF No. 1. Though ratings are not due until April 1, 2024, Plaintiffs present a compelling argument that vendors will be unable to sell books to public schools without issuing ratings once READER goes into effect on

September 1, 2024. *See* Tex. Educ. Code § 35.002(a). ("A library material vendor may not sell library materials to a school district or open-enrollment charter school unless the vendor has issued appropriate ratings regarding sexually explicit material and sexually relevant material previously sold to a district or school."). In any case, there can be no question that to meet the April 1, 2024, deadline, Plaintiffs must begin the costly review and rating process much sooner, most likely immediately. Thus, Plaintiffs' claims are not "contingent [on] future events that may not occur as anticipated, or indeed may not occur at all," as Defendants argue, because READER is effective as of September 1, 2023. *See* ECF No. 19 at 10 (quoting *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580–81 (1985)).

### 3. Defendants are not entitled to sovereign immunity.

The Eleventh Amendment deprives a federal court of jurisdiction to hear a suit against the State of Texas, which includes a suit against a state official in his or her official capacity, unless sovereign immunity is expressly waived. *See Edelman v. Jordan*, 415 U.S. 651, 662–63 (1974); *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989). Under the *Ex parte Young* exception, sovereign immunity may be overcome when a suit "seeks prospective, injunctive relief from a state actor, in [his] official capacity, based on an alleged ongoing violation of the federal constitution." *K.P. v. LeBlanc*, 729 F.3d 427, 439 (5th Cir. 2013). There is significant overlap between the Article III standing analysis and the *Ex parte Young* analysis; thus, a finding of standing tends toward a finding that the *Ex parte Young* exception applies. *See City of Austin v. Paxton*, 943 F.3d 993, 1001 (5th Cir. 2019); *Air Evac EMS, Inc. v. Tex., Dep't of Ins., Div. of Workers' Comp.*, 851 F.3d 507, 520 (5th Cir. 2017). Plaintiffs seek injunctive relief from Defendants in their official capacity based on alleged ongoing constitutional violations. ECF No. 1 ¶¶ 13–16. Accordingly, *Ex parte Young* applies.

The *Ex parte Young* exception turns on whether "'the state officer, by virtue of his office, has some connection with the enforcement of the act.'" *Air Evac EMS*, 851 F.3d at 519 (quoting *Ex parte Young*, 209 U.S. 123, 157 (1908)). And "enforcement means compulsion or constraint." *Tex. All. For Retired Ams. V. Scott*, 28 F.4th 669, 672 (5th Cir. 2022) (cleaned up). Defendants do not contest that Defendant Morath, as commissioner of the TEA, is ultimately responsible for collecting lists of ratings, reviewing booksellers' ratings, notifying booksellers when their ratings are overridden, and posting lists of ratings and recalcitrant vendors on TEA's website. *See* Aug. 18 Mot. Hr'g Tr. At 8:7–21; ECF No. 1 ¶¶ 15, 48, 50. Booksellers that fail to comply with TEA's requirements are barred from doing business with public schools. Tex. Educ. Code § 35.003(d). Similarly, Defendant Wong, as the chair of TSLAC, and Defendant Ellis, as chair of BOE, are responsible for formulating and promulgating mandatory library standards for public schools, which will impact how books ratings are applied. *Id.* § 33.021(b); ECF No. 1 ¶¶ 13, 14, 52–54.

### 4. Injunctive relief under the Declaratory Judgement Act is proper.

The Declaratory Judgement Act ("DJA") is "not an independent source of federal jurisdiction; the availability of such relief presupposes the existence of a judicially remediable right." *Schilling v. Rogers*, 363 U.S. 666, 677 (1960) (citation omitted); *see also Sid Richardson Carbon & Gasoline Co. v. Interenergy Res., Ltd.*, 99 F.3d 746, 752 n.3 (5th Cir. 1996). While the DJA does not create an independent cause of action, the act does provide for declaratory and injunctive relief. *United Transp. Union v. Foster*, 205 F.3d 851, 857 (5th Cir. 2000) (noting that the DJA "provides the statutory mechanism for seeking pre-enforcement review of a statute"). Here, Plaintiffs assert claims under 42 U.S.C. § 1983 and the First and Fourteenth Amendments. *See generally* ECF No. 1. Rather than attempting to assert a standalone cause of action under the

DJA, Plaintiffs invoke the DJA solely to request injunctive relief. ECF No. 1 ¶ 20. Accordingly, Plaintiffs' request for injunctive relief under the DJA is proper.

### 5. Plaintiffs' 1983 claims are proper.

Plaintiffs have brought a claim under 42 U.S.C. § 1983. *See generally* ECF No. 1. "Section 1983 provides a federal remedy for 'the deprivation of any rights, privileges, or immunities secured by the Constitution and laws.'" *Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 105 (1989). "To state a section 1983 claim, 'a plaintiff must (1) allege a violation of a right secured by the Constitution or laws of the United States and (2) demonstrate that the alleged deprivation was committed by a person acting under color of state law.'" *James v. Tex. Collin Cnty.*, 535 F.3d 365, 373 (5th Cir. 2008) (quoting *Moore v. Willis Indep. Sch. Dist.*, 233 F.3d 871, 874 (5th Cir. 2000)).

Defendants argue that the 1983 claim should be dismissed for failure to state a claim. ECF No. 19 at 16. If Plaintiffs fail to raise a claim that implicates a deprivation of rights, Plaintiffs' 1983 claims should be dismissed. *Id.* According to Defendants, Plaintiffs' First and Fourteenth Amendment rights are not implicated by READER. *Id.*

Plaintiffs disagree. ECF No. 30 at 18–19. Plaintiffs assert that the new law violates Plaintiffs' First and Fourteenth Amendment rights by compelling Plaintiffs' speech under the color of state law. *See generally* ECF No. 1. Plaintiffs allege that READER is a state law that provides the TEA the authority to compel Plaintiffs' speech. *Id.* As discussed below, compelling Plaintiffs' speech violates their First Amendment rights. Plaintiffs have alleged also that Defendants violated these rights while acting under the color of state law. *See generally* ECF No. 1. Accordingly, the 1983 claims are proper claims for relief.

**B. Plaintiffs have shown that they are likely to succeed on the merits of their claims.**

    1.  **Government speech doctrine**

The Court finds that the speech at issue is not government speech, so First Amendment protections apply. "When government speaks, it is not barred by the Free Speech Clause from determining the content of what it says." *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 207 (2015). Moreover, when "the State is speaking on its own behalf, the First Amendment strictures that attend the various types of government-established forums do not apply." *Id.* At 215.

Defendants argue at the outset that because READER concerns government speech, First Amendment protections do not apply. They also argue that public education is historically in the purview of the government, including curriculum requirements and library service standards. ECF No. 19 at 17. Under these mandates, Defendants argue that they have the discretion to promote their own policies and values without being subject to forum analysis or viewpoint neutrality, even if private speakers are transmitting the government's message. *Id.* For precedent, Defendants rely primarily on the Fifth Circuit's decision in *Chiras v. Miller*, 432 F.3d 606 (5th Cir. 2005). Finally, Defendants argue that a First Amendment right to receive information, if it exists, does not apply, because it belongs to students, who are not barred from receiving the information elsewhere and whose rights third-party vendors cannot assert. ECF No. 19 at 18–19.

Plaintiffs respond first that READER is subject to the First Amendment because it authorizes the removal of books. ECF No. 25 at 9. Plaintiffs further argue that the initial ratings READER requires are pure speech of the private entities submitting them, not government speech. ECF No. 30 at 19. Plaintiffs note that both initial seller and final TEA ratings are displayed as if

the seller themselves made the rating. *Id.* at 19–20. Plaintiffs distinguish *Chiras* by arguing that it covers textbooks but not non-curricular library books. *Id.* at 20 n.36.

In *Chiras*, the Fifth Circuit affirmed that a textbook author and a student failed to state a First Amendment claim regarding the government's refusal to approve the textbook for state funding, because the selection of textbooks was government speech and was not covered by the student's right to receive information. 432 F.3d at 607. *Chiras* read Supreme Court precedent to hold that educational institutions are not subject to forum analysis or viewpoint neutrality when promoting their own policies and values while establishing and implementing certain government functions. *See id.* at 613. This held true even if the government chose to use private speakers to transmit its message. *Id.* Because "[d]esigning the curriculum and selecting textbooks is a core function of the SBOE," and "it is the state speaking, [] not the textbook author," forum analysis and viewpoint neutrality did not apply. *Id.* at 614–15. As for the right to receive information, *Chiras* refused to apply the Supreme Court's decision in *Board of Education v. Pico*, 457 U.S. 853 (1982) (plurality), because that case revolved around school libraries, not textbooks. *Id.* at 619.

Here, however, the Court concludes that READER is at least in one or more substantial and integral parts not government speech. The statute requires that library material vendors submit initial ratings to the State. Tex. Educ. Code § 35.0021. As Plaintiffs contend, these ratings "will be publicly posted as Plaintiffs' own views"—because that's what they are. ECF No. 30 at 19. Section 35.0021 requires "library material vendor[s]" to "perform a contextual analysis" for patent offensiveness; it requires library material vendors to "consider . . . three principal factors with respect to the material;" it requires library material vendors to "weigh and balance each factor and conclude whether the library material is patently offensive;" it requires library material vendors to "consider the full context in which the . . . sexual conduct appears." Tex. Educ. Code § 35.0021(a)–

(d). Nowhere in this section is there a role for the government to perform. *See generally id.* Indeed, at the August 18th hearing, the government argued that the ratings Plaintiffs provide are actually the government speaking because "the state has final say and ha[s] oversight on that so it's not their speech," but ultimately acknowledged that at least "[a]t first, the vendor" makes the "call" about a book's rating. *See* Aug. 18 Mot. Hr'g. Tr. 21:4–12. The government's role is instead prescribed elsewhere: the posting of vendor-submitted lists "as soon as practicable." Tex. Educ. Code § 35.002(e). And while the government "may" review ratings, there is no obligation to do so. Tex. Educ. Code § 35.003.[10] There is no deadline for it do so. *Id.* So if TEA were to elect not to review a list at all, the only government action involved would be limited to placing an unedited list, prepared exclusively by the vendors, online. And a reviewed and corrected rating performed by the TEA does not undo the fact that Plaintiffs were forced to speak an initial rating.

The Court further concludes that the required recall of library material rated "sexually explicit" and in active use is not government speech. *Chiras* does not compel this Court to reach a different result. This is because *Chiras* was about mandatory, curricular textbooks. *See* 432 F.3d at 614–15. The Supreme Court has drawn a sharp distinction between cases involving textbooks and library books. *Pico*, 457 U.S. at 861–62.[11] *Chiras* itself made this distinction. 432 F.3d at 619 ("Because *Pico* addressed the removal of an optional book from the school library, not the selection of a textbook for use in the classroom, we decline to apply *Pico* to the facts before us."). The more appropriate precedent to apply, then, is *Campbell v. St. Tammany Parish School Board*, 64 F.3d 184 (5th Cir. 1995). That case, which involved the removal of a book about voodoo from a public

---

[10] The government does have a stronger case that its own corrected ratings are government speech, but then compelled speech issues arise, as discussed further *infra*.

[11] The Court notes that *Pico* is a fractured plurality opinion, and the Fifth Circuit has had to address its value as a citation multiple times. On one hand, *Muir v. Alabama Educational Television Commission*, 688 F.2d 1033, 1045 n.30 (5th Cir. 1982) (en banc), concludes that "Pico is of no precedential value." On the other hand, *Campbell v. St. Tammany Parish School Board*, 64 F.3d 184, 189 (5th Cir. 1995), "disagree[s] . . . that we are bound to reject the guidance found in *Pico*" because of *Muir*. *Campbell* treated *Pico* as "useful guidance," and so shall the Court.

school library, turned to *Pico* for guidance and noted that "the School Board's decision to remove the Book must withstand greater scrutiny within the context of the First Amendment than would a decision involving a curricular matter." *Id.* at 189. This holding confirms that a book removal decision *is* subject to First Amendment scrutiny, which does not square with the principle that "government statements . . . do not normally trigger the First Amendment rules designed to protect the marketplace of ideas." *See Walker*, 576 U.S. at 207; *see also Little v. Llano Cnty.*, No. 1:22-CV-424-RP, 2023 WL 2731089, at *7–8 (W.D. Tex. Mar. 30, 2023) (rejecting the argument that the government speech doctrine applied to the removal of allegedly obscene books from a general public library), *appeal docketed*, No. 23-50224 (5th Cir.).

## 2. Applicability of forum doctrine

Defendants argue this case should be guided by a non-public forum analysis. ECF No. 19 at 19. The Court disagrees. For a First Amendment claim to be subject to forum analysis, the claim must seek access to speech in a government owned or controlled space. *See, e.g.*, *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 800 (1985). "[P]ublic schools do not possess all of the attributes of streets, parks, and other traditional public forums that 'time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.'" *Hazelwood Sch. Dist. V. Kuhlmeier*, 484 U.S. 260, 267 (1988) (citation omitted). While the ultimate objective of READER is to ensure school library materials are age appropriate or appropriate for all students regardless of age, Plaintiffs' cause of action is only tangentially related to which books enter those libraries. ECF No. 30 at 21.

Defendants are correct to note that "First Amendment jurisprudence has acknowledged limitations on the otherwise absolute interest of the speaker in reaching an unlimited audience where the speech is sexually explicit, and the audience may include children." *Bethel Sch. Dist.*

*No. 403 v. Fraser*, 478 U.S. 675, 684 (1986). Further, Defendants have the right, if not the duty, to ensure Texas school children are not exposed to library materials that are inappropriate because of explicit sexual conduct and receive an education that prepares them for the future. Plaintiffs, however, are not asserting an absolute right to having all or even any of their books reach shelves of public-school libraries in Texas—nor would this Court accept such an argument. Instead, Plaintiffs assert a right to be free from compelled speech and a right to offer and distribute books without unconstitutionally vague censorship. ECF No. 6 at 9, 13.

Cases cited by Defendants in support of their argument concern regulated student speech at school or teachers' union's speech. ECF No. 19 at 19–22; *Kuhlmeier*, 484 U.S. at 260 (finding a student newspaper was not a public forum); *Fraser*, 478 U.S. at 675 (finding a school assembly was not a public forum); *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37 (1983) (finding a school's mail system was not a public forum). While those cases are on-point with respect to the right of schools to limit speech in school related activities, they are not instructive on the State's ability to compel speech from third-party book publishers and distributors using imprecise standards. The space where Plaintiff's speech is at issue is not in the school libraries, but in their private activities as book sellers or distributors outside of a school setting. Also, as Plaintiffs note, *Kuhlmeier* and *Fraser* both involved curricular activities (a school newspaper and graduation, respectively), not the non-mandatory, non-curricular school library. *See* ECF No. 30 at 22. The speech at issue here, therefore, is not subject to the forum analysis in the student speech cases advanced by Defendants.

### 3. Compelled speech

As a general matter, the government is not permitted to compel a person or a corporation to speak its own preferred messages. *See 303 Creative LLC v. Elenis*, 143 S. Ct. 2298, 2312 (2023);

32

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 505–06 (1969); *see also, e.g.*, *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 256 (1974); *Wooley v. Maynard*, 430 U.S. 705, 714 (1977); *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2371–72 (2018) ("NIFLA"). Nor may the government compel a person to speak the message the government desires if the speaker chooses to remain silent. Nor may the government compel an individual to adopt or include additional speech with his own if the speaker would rather not include it. *See 303 Creative*, 143 S. Ct. at 2312; *Hurley v. Irish-American Gay, Lesbian & Bisexual Grp. Of Boston*, 515 U.S. 557, 568–70, 576 (1995); *see also Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 63–64 (2006) ("FAIR") (discussing cases). The Court finds that READER violates the First Amendment for both of these reasons.

Plaintiff argues that READER compels speech in at least two ways. First, it coerces Plaintiffs to express "pure speech" which communicates ideas of whether a book is "sexually explicit" or "sexually relevant" (or neither) based on relatively vague standards adopted by the State. Plaintiffs have not agreed to perform this analysis of the level of sexual explicitness, it is required by statute. ECF No. 6 at 9–10; ECF No. 30 at 23–24. In addition, because of the contextual analysis required by the law, it is unlikely that any two vendors would conduct the same subjective analysis, focus on the same parts of the books, or weigh factors, similarly, thus creating an "'original, customized' creation" subject to First Amendment protection. ECF No. 30 at 24 (quoting *303 Creative*, 143 S. Ct. at 2312). Second, READER requires Plaintiffs to revise their independent assessments of the categorization of the content to conform with the government's revised ratings. *Id.*

The government responds that first, the speech that Plaintiffs are being "requested" to engage in is not "compelled" in the relevant sense because Plaintiffs have no protected contrary

message to that which the government is requesting they speak. ECF No. 19 at 7–8. In addition, there are two other exceptions to compelled speech that the defendants argue apply, the commercial speech exception and the essential operation of government exception. Both will be addressed in turn below, *infra* Section III.B.3.a and section III.B.3.b. *See* ECF No. 19 at 24–27; ECF No. 31 at 8.

The Supreme Court has a rich and illustrious history, including as recently as the last term, of strongly protecting First Amendment rights. Compelled speech is one of those doctrines, long being both recognized and protected in a wide variety of situations. The original compelled speech case is *West Virginia State Board of Education v. Barnette*, 319 U.S. 624 (1943)**.** *Barnette* involved whether students had to recite the Pledge of Allegiance and salute the flag or whether they could remain silent and/or seated at their desks. *Id.* at 624–30. If the children would have had the option, they would have remained silent at their desks. *Id.* The Court held that it was impermissible to compel the students to recite the Pledge and salute the flag. *Id.* at 641–43. The Supreme Court would deal with the same issues again in *Wooley v. Maynard*, 430 U.S. at 705. There, New Hampshire placed the phrase "Live Free or Die" on all state license plates and required plaintiffs to not obscure the motto on pain of criminal sanctions. *Id.* at 706–07. The Court must also determine whether any compelled speech is meaningful. The Supreme Court would have to address this issue again in *Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston, Inc.*, 515 U.S. 557 (1995). The organizers of the St. Patrick's Day parade in Boston refused to include a group who wished to represent gay, lesbian, and bisexual individuals in the parade. *Id.* at 559–62. The Supreme Court held that since the parade was constitutionally protected speech, it would be unconstitutional to require the veterans to include speech they wished to exclude. *Id.* at 572– 73. Here, not unlike the veterans in *Hurley*, the Plaintiffs have a constitutional right to choose

what they want to express or say, and also what they choose not to. Indeed, this case may be an even stronger one since in *Hurley*, the point was that the veterans had a First Amendment right to present their message in a manner that was undiluted by views that they disagreed with. *Id.* at 573–75. Here, the Plaintiffs have the right to remain silent and not provide public assessments of the sexual content of various books. In addition, the power given to the TEA to alter any opinion that the Plaintiffs make and substitute their own creates an additional and substantial conflict with the mandate of the First Amendment.

While this case involves certain companies rating the content of speech rather than the creation and administration of websites, the Court agrees with the Plaintiffs that *303 Creative* (as well as *Hurley* and its progeny) compels a conclusion that the statute is unconstitutional. The Supreme Court has continuously affirmed the right of individuals to be free of compelled speech by the government this year in *303 Creative*. The Court in *303 Creative* addressed the issue of whether a state may compel websites to communicate messages that the authors of the speech on the website would rather not make. 143 S. Ct. at 2307–09. Ultimately, the Supreme Court held that the government may not "coopt an individual's voice for its own purposes" by forcing a business to provide an "outlet for speech." *Id.* at 2315. While the issues in this case do not concern the content of speech on the Plaintiffs' own websites, Plaintiffs are certainly the functional equivalent. Plaintiffs publish and sell books to the public, including, but not limited to, public schools in the State of Texas. Additionally, Plaintiffs allow the Public Schools and the State to select which books they choose to purchase based on the criteria determined by the appropriate state agency and school districts.

This case might give the appearance at first blush of being a dispute over the First Amendment because the legislation concerns the content of the books being sold or published by

the Plaintiffs and bought by Texas public school libraries (as argued by Defendants in the hearings and their briefing). The Court's analysis does not focus on that issue. The focus of the Court here is on whether the State of Texas, by requiring the Plaintiffs to perform a rating they would rather not perform and give ratings to books when they would wish to remain silent, has violated the First Amendment, which protects the rights of an individual to speak, or not speak, his mind without interference from the government. *See 303 Creative*, 143 S. Ct. at 2312. Very recently, Justice Gorsuch wrote for the majority in *303 Creative* that the First Amendment does not depend on whether the government considers one's speech sensible and well intentioned, deeply "misguided," or likely to cause "anguish" or "incalculable grief." 143 S. Ct. at 2312 (quoting *Hurley*, 515 U.S. at 574, and *Snyder v. Phelps*, 562 U.S. 443, 456 (2011)). The law requires the Plaintiffs to perform ratings (which they have alleged multiple times that they do not agree with), thereby compelling speech.[12] However, READER goes even further because if the TEA determines that the rating is "incorrect" (or even just misguided) then the TEA has the unilateral ability (but not the obligation) to alter the rating, and force Plaintiffs to allow the TEA to publish the rating as if the revised rating were Plaintiffs' own. *See* Tex. Educ. Code § 35.003. The speech

---

[12] The Fifth Circuit's very recent decision in *State v. Biden*, No. 23-30445, 2023 WL 5821788 (5th Cir. Sept. 8, 2023), *administrative stay granted sub nom. Murthy v. Missouri*, No. 23A243 (U.S. Sept. 14, 2023) (Alito, J., in chambers), is an interesting point of comparison to this case. *Biden* involved First Amendment claims by social media users that various federal government entities had violated their First Amendment rights by coercing social media platforms into censoring them. *See id.* at *1. The Fifth Circuit affirmed that at least some of the entities had engaged in unlawful coercion. *Id. State* is not directly applicable, because the merits of that case focused on whether the actions of private parties (the social media platforms) were effectively state action. *See id.* at *12. But the interesting comparison comes from the fact that private action can become state action "when a private party is coerced or significantly encouraged by the government to such a degree that its choice . . . must in law be deemed to be that of the State." *See id.* (cleaned up). In *State*, the Fifth Circuit clarified that significant encouragement requires "active, meaningful control over the private party's decision" (which includes "entanglement in a party's independent decision-making"), and coercion occurs when government compels the decision "by, through threats or otherwise, intimating that some form of punishment will follow a failure to comply." *Id. at* *18. Here, when TEA determines that a library material vendor rated a book incorrectly and provides the vendor with a corrected rating, it is overriding the vendor's independent judgment. *See* Tex. Educ. Code § 35.003(a), (b)(1) (requiring the vendor to then "rate the library material according to the agency's corrected rating"). And instead of offering veiled, subtle threats, READER directly states that a vendor who refuses to comply will be punished by being barred from selling books to public school libraries. *See id.* § 35.003(d). This comparison illuminates how READER's revised rating scheme gives rise to Plaintiffs' compelled speech harms.

is further compelled because the State prevents sale of those books to Public Schools, creating substantial financial harm, if Plaintiffs either (1) do not provide ratings at all or (2) do not update their initial ratings with the State's ratings. Further, Plaintiffs filed multiple affidavits expressing concern that the initial and revised ratings will be interpreted as their own independent rating. *See* ECF No. 6-5 ¶¶ 19–21; ECF No. 6-3 ¶¶ 17, 21–22; ECF No. 6-6 ¶ 15; ECF No. 6-7 ¶¶ 14–16. Indeed, there is also a risk of reputational harm that ratings put on the internet for all to see will be held against vendors by potential buyers in and outside of the state. The government provided no argument to the contrary. This is textbook compelled speech.

The government argues that the speech here is not "compelled" in the relevant sense because Plaintiffs have no protected contrary message to what the government is requesting they speak. This is patently false and incorrect. Plaintiffs have submitted compelling evidence that (1) they do not wish to speak at all regarding their opinions on the explicit nature of the books that they are rating, and that (2) the government is compelling the vendors to speak the government's preferred message by retaining the unilateral and non-appealable ability to force Plaintiffs to revise their ratings with no other option and publish them online for the world to see. Here, the government has failed to articulate any legitimate reason for requiring the vendors speak at all. The government has the power to do the contextual ratings for the books itself. The government has the power to restrict the ability of its school district as to which books it may purchase. The exercise of these powers must, of course, comply with the requirements of the constitution, but these are powers that should be exercised by the state directly. Not by compelling third parties to perform it or risk losing any opportunity to engage in commerce with the school districts. This Court deeply respects the ability of the state to curate educational content for children. The Court cannot permit private companies to be compelled to become the state's agents and speak, and, if

they do speak, to speak messages that the government prefers. Accordingly, this Court holds that READER compels speech by the Plaintiffs.

### a.   The commercial speech exception does not apply to READER.

The Court believes that the speech engaged in by the vendors is not commercial in nature, so the commercial speech exception does not apply. "Commercial speech is defined as 'expression related solely to the economic interests of the speaker and its audience,'" *Houston Balloons & Promotions, LLC v. City of Houston*, 589 F. Supp. 2d 834, 847 (S.D. Tex. 2008) (quoting *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 561 (1980) and citing *Va. State Bd. Of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748 (1976)), and is "speech that does no more than propose a commercial transaction." *Id.* (quoting *Pittsburgh Press Co. v. Pittsburgh Comm'n on Hum. Rels.*, 413 U.S. 376, 385 (1973)) (internal quotations omitted). The Court in *303 Creative* even held that the government may "sometimes require the dissemination of purely factual and uncontroversial information, particularly in the context of commercial advertising." 143 S. Ct. at 2317–18 (citing *Hurley*, 515 U.S. at 573 (internal quotation marks omitted)); *see also NIFLA*, 138 S. Ct. at 2373; *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 795–96 (1988)) (cleaned up).

The government argues that here, the compelled speech of performing ratings is related solely to the economic interests of the Plaintiffs and their audience (the Agency) by describing books that they seek to sell to the potential buyer. ECF No. 19 at 25–26. Obviously, the vendors wish to sell books to the State of Texas. That does not allow the State to require the vendors to engage in "'pure speech' protected under the First Amendment." ECF No. 30 at 24. It does not immunize the State from complying with the First Amendment because the vendors "communicate ideas," specifically whether a book contains sexually explicit or relevant content. *Id.* Plaintiffs

argue that in addition, because the ratings are subjective, and based on contextual analysis, no two booksellers are likely to conduct the same analysis, which would make each rating a "original, customized" creation subject to First Amendment protection. *Id.* (quoting *303 Creative*, 143 S. Ct. at 2312). The Court agrees with Plaintiffs that the fact that they have economic interests in selling books does not render the speech commercial in and of itself. *Id.* at 25.

*303 Creative* provides a useful roadmap on what speech can be considered commercial versus not commercial. First, as many courts before had indicated, the fact that an economic interest exists does not automatically render the ratings commercial speech. *See 303 Creative*, 143 S. Ct. at 2316 (stating that the creation of websites for profit was entitled to full First Amendment protection; speakers do not "shed their First Amendment protections by employing the corporate form to disseminate their speech"); *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501 (1952) ("That books, newspapers, and magazines are published and sold for profit does not prevent them from being a form of expression whose liberty is safeguarded by the First Amendment."); *Va. State Bd. of Pharmacy*, 425 U.S. at 761 ("Speech likewise is protected even though it is carried in a form that is 'sold' for profit, and even though it may involve a solicitation to purchase or otherwise pay or contribute money.") (citations omitted). The cases relied on by Defendants do not require a different conclusion because most relate to advertising. *See Houston Balloons & Promotions*, 589 F. Supp. 2d at 847 (relating to restrictions on advertising balloons); *Pittsburgh Press Co.*, 413 U.S. at 385 (relating to government restrictions on the content of advertisements); *Cent. Hudson Gas & Elec. Corp.*, 447 U.S. at 561 (relating to the ability of public utilities to publicly advertise).

This case has nothing to do with advertising. To the extent that the ratings involve commercial activity at all, the ratings are only required as a *quid pro quo* for the ability of the vendors to sell books to public schools. As discussed above, this alone does not make the speech

engaged in commercial. The Court believes that this case is controlled by the holding in *303 Creative*, where the Supreme Court found that the creation of websites for profit had a right to full First Amendment protection and specifically stated that speakers do not "shed their First Amendment protections by employing the corporate form to disseminate their speech." *See* 143 S. Ct. at 2316. There the Supreme Court found that the websites at issue were "pure speech" under the First Amendment because they "communicate ideas." *Id.* at 2312. Here, like *303 Creative*, although book sales are implicated, the ratings required by READER do much more than propose a commercial transaction because they are an expression of a bookseller's views about a book and convey ideas. Indeed, the content of the ratings themselves and the message that they convey are what is not commercial, and "communicate ideas," specifically whether a book contains sexually explicit or relevant content. *See id.* That different vendors can submit different ratings supports this understanding and is a strong indicium that each rating is an "original, customized" creation subject to First Amendment protection. *See id.* These differences also show that READER's ratings are neither "purely factual" nor "uncontroversial." *See 303 Creative*, 143 S. Ct. at 2317. Therefore, this Court finds that the commercial speech exception does not apply.

### b.  The essential operation of government exception does not apply to READER.

In addition, the speech is protected because it does not concern an essential operation of government. "There is no right to refrain from speaking when 'essential operations of government require it for the preservation of an orderly society.'" *United States v. Arnold*, 740 F.3d 1032, 1035 (5th Cir. 2014) (quoting *United States v. Sindel*, 53 F.3d 874, 878 (8th Cir. 1995) (quoting *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 645 (1943) (Murphy, J., concurring))).

The Defendants argue that the "compelled speech" here is simply "information" that is being sought by the TEA, and the vendors are not being asked to "disseminate publicly a message

with which [they] disagree." *See Sindel*, 53 F.3d at 878; *Morales v. Daley*, 116 F. Supp. 2d 801, 816 (S.D. Tex. 2000); ECF No. 19 at 26–27. They argue that education is the essential operation of government and that the Plaintiffs are invoking rights which do not belong to them. ECF No. 31 at 8.

Plaintiffs question whether a rating system designed in 2023 but not yet implemented could be considered to be an essential operation of government, especially because the Texas Public school system has operated without substantial issues for 170 years without mandating ratings. ECF No. 30 at 26. Second, Plaintiffs argue that the government overstates activities that the "essential operation of government" exception covers, and that the exception does not reach the speech being compelled here. *Id.* Further, Plaintiffs here are being asked for much more than just information. They are required to perform a highly contextual, multi-step, fact-intensive analysis of sexual content, balanced against contemporary standards, to render a sexual rating for thousands of books which will then be posted online by the State, as Plaintiffs' speech. *Id.*

The Court agrees with Plaintiffs. First, the cases cited by the government are distinguishable. Other courts have recognized only a tiny sliver of government operations as "essential," for example, the registration of sex offenders, the filing of taxes, and the completion of the federal census. *See Arnold*, 740 F.3d at 1035 (finding that requiring a sex offender to register with the government was an essential operation of government); *Sindel*, 53 F.3d at 878 (finding that requiring information on an IRS tax form constituted an essential operation of government); *Morales*, 116 F. Supp. 2d at 816 (finding that the Census Bureau's compulsion of demographic information was an essential operation of government). In each of those cases, individuals were only being asked to provide simple factual or demographic information to the government and were not being asked to disseminate publicly a message with which they disagree. Here, the speech

being compelled is not simply related to education in the same way that something like curriculum setting is. This is about requesting that vendors perform contextual analysis regarding the content of books and make judgments about the sexual nature and value of literature generally.

Even though the speech being requested is indirectly related to education, Plaintiffs (by the plain text of the statute) are being asked to "disseminate publicly a message with which [they] disagree[]," and not just provide information to the TEA. *See Sindel*, 53 F.3d at 878. The ratings will be posted on a government website for the world to see in a "conspicuous place." Tex. Educ. Code § 35.002(e). Further, the government can force ratings on the Plaintiffs by disagreeing with their initial ratings and requiring the Plaintiffs to submit the updated ratings for placement on the TEA's website in a "conspicuous place" for the world to see, without any indication that they are the government's updated ratings. Tex. Educ. Code § 35.003(b)–(c). While it is clear that Plaintiffs would disagree with the government's updated rating, they have alleged that they also do not agree with the rating schemes and categorizations on their face. ECF No. 1-2 ¶ 19; ECF No. 1-3 ¶ 17; ECF No. 1-4 ¶ 15. Plaintiffs are being asked to "disseminate publicly a message with which [they] disagree[]." *Sindel*, 53 F.3d at 878. This Court finds that the "essential operation of government" exception does not apply.

### 4. Vagueness

Plaintiffs claim that READER is unconstitutional for the independent reason that it is void for vagueness. They argue three different aspects of the law which they claim make the law unconstitutionally vague. Each will be discussed in turn. For the reasons below, the Court finds that certain provisions of READER are unconstitutionally vague.

A more stringent vagueness test applies when a law "interferes with the right of free speech." *Village of Hoffman Estates v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 499 (1982).

Such laws may be constitutionally infirm where they "encourage arbitrary and discriminatory enforcement," *Kolender v. Lawson*, 461 U.S. 352, 357 (1983), or "have the capacity 'to chill constitutionally protected conduct, especially conduct protected by the First Amendment.'" *Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 546 (5th Cir. 2008) (quoting *United States v. Gaudreau*, 860 F.2d 357, 360 (10th Cir. 1988)). A law is unconstitutionally vague when it (1) fails to provide a "person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly" or (2) fails to provide "explicit standards" for applying the law "to avoid arbitrary and discriminatory applications." *Roark & Hardee LP*, 522 F.3d at 551. Under most circumstances, "'[p]erfect clarity and precise guidance have never been required even of regulations that restrict expressive activity.'" *Minn. Voters All. v. Mansky*, 138 S. Ct. 1876, 1891 (2018) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989)). However, when a law is "capable of reaching expression sheltered by the First Amendment, the [vagueness] doctrine demands a greater degree of specificity than in other contexts." *Smith v. Goguen*, 415 U.S. 566, 573 (1974); *see also Roark & Hardee LP*, 522 F.3d at 552.

### a.  The definitions of "sexually explicit material" and "sexually relevant material" are unconstitutionally vague.

Plaintiffs argue first that the definitions of "sexually explicit material" and "sexually relevant material" are inherently vague because they are created out of whole cloth by the Legislature, are confusing, and have no basis in existing law. ECF No. 6 at 11–12; Tex. Educ. Code §§ 33.021, 35.001(3). They argue that the definition of "sexually relevant material" is particularly vague because it refers to Tex. Penal Code § 43.21, which defines "obscene" consistent with *Miller*, 413 U.S. at 24. ECF No. 6 at 11–12. But READER cherry-picks the definition of "patently offensive" from that test, noticeably excluding the third prong of the *Miller* test—

whether the material "taken as a whole, lacks serious literary, artistic, political, and scientific value." *Id*. Plaintiff explains that the definition of "sexually explicit" does not resolve this conundrum and compounds the confusion through the consideration of three vague factors not found elsewhere in the law. *Id.* READER also seemingly contradicts itself, by requiring each instance of a "description, depiction, or portrayal of sexual conduct" be considered and that "contextual determinations are necessarily highly fact-specific." *Id.* Indeed, evidence of the confusion and issues with the vague term is included in a plethora of declarations from vendors. *See* ECF No. 6-5 ¶ 17; ECF No. 6-3 ¶ 18; ECF No. 6-6 ¶¶ 9, 12, 13, 17; ECF No. 6-4 ¶ 11; ECF No. 6-2 ¶¶ 7–11. It is unavoidable that the personal and highly subjective test will yield disparate ratings for the same books by different vendors. Plaintiffs argue that taken together, these arguments render the statute unconstitutionally vague.

Defendants respond first that Plaintiffs apply the incorrect standard for vagueness and that perfect clarity and precise guidance are not required, even of regulations that restrict expressive activity. ECF No. 19 at 28; ECF No. 31 at 9–10. And further, the fact that READER includes factors to consider, instructions on how to weigh those factors, and directions to Plaintiffs to consider the full context, means that READER meets the *Miller* test. *Id.*

The Court rejects the arguments made by the Defendants as meritless. Defendants assert that READER is not vague because it meets the *Miller* test. Indeed, Defendants have been shifting their opinion on the matter throughout their briefing. At first, in their response to the initial vagueness argument, the Defendants stated that the language of READER "attempts" to mirror the test in *Miller*, not that it actually does. ECF No. 19 at 23. They even identify the three prongs of the *Miller* test and go on to admit in briefing that ""[i]f a state law that regulates obscene material is thus limited, as written or construed, the First Amendment values applicable to the States

through the Fourteenth Amendment are adequately protected…" *Id.* (quoting *Miller*, 413 U.S. at 25). While they identify *some* language in the statute that parallels the *Miller* test, puzzlingly, they initially did not identify any portion that deals with the third prong of *Miller*. ECF No. 19 at 23–24. After being pressed at the first hearing, in further briefing Defendants made the argument that being asked to "consider the full context of the material when determining a rating" undermines the allegation that READER fails to meet the third prong of the *Miller* test. ECF No. 31 at 9–10. However, the statute only states that the vendor must "consider the full context" of the sexual conduct and "recogniz[e] that contextual determinations are necessarily high fact-specific and require the consideration of contextual characteristics" that mitigate the offensiveness of the material. Tex. Educ. Code § 35.0021(d). Parsing out the text of the statute only highlights its vagueness. "Context" can include (or exclude) many things, is not defined anywhere in the statute, and totally fails to provide the public or Plaintiffs notice of what outside factors must be considered when determining a book's rating. Without knowing what constitutes context, and by not including or evaluating the third prong of the *Miller* test, READER results in nothing more than a highly personal and subjective test and is unconstitutionally vague. The Supreme Court has recognized that the third prong of the *Miller* test "critically limits the uncertain sweep of the obscenity definition." *Reno v. ACLU*, 521 U.S. 844, 873–74 (1997).

Further, there is a substantial question of what (or which) "community standards" the vendors are required to apply. First, READER applies to every public school in Texas. This includes schools in urban areas such as Houston, El Paso, Dallas, San Antonio, and Austin. This also includes schools in less urban areas including Caldwell, Llano, San Saba, and Fredericksburg. All of those locations have vastly different community standards that apply to the acceptability of library materials and concepts contained within those library materials. The State failed to consider

a myriad of factors that complicate the implementation of this statute. For example, take Windham School District, which is a non-geographic public school district that is a part of the Texas Department of Criminal Justice that provides educational services to inmates. Left totally unanswered by the language of the statute is guidance as to how a vendor or even the State are supposed to determine the "correct" single rating for a book that applies to all of the communities in Texas (including the prisoner community writ large that is non-geographic). The simple answer is that whoever is rating the book cannot. At least they certainly cannot by using the text of the statute as a blueprint. This will undoubtedly lead to arbitrary and discriminatory applications of the law to come up with ratings.

Finally, how can someone account for "community standards" and "contextual characteristics" when such a wide range of grades and ages of potential readers are potential consumers for the materials exists? The general Public School system includes students aged from kindergarten through 12th grade. The Windham School District includes adults who may be participating in the public school system. It is common sense that what may be considered sexually explicit or relevant to an adult would substantially vary compared to something considered sexually relevant to a child. For example, the book entitled *It's Perfectly Normal* is a picture book considered by many to be a children's book and is widely debated regarding its sexual content (many consider it to be actual pornography). However, some adults view the book differently, as being related to sexual education and informative regarding sensitive topics. Clearly there are a substantial number of books that might receive one rating if they are going to be in a library for high school seniors who might be adults or kindergarten children who might only be five years olds. This is the difficulty in requiring a single rating for such a book, which may be sexually explicit for children, but would likely receive a different rating for adults. By requiring a single

rating for all books included throughout the public school system which includes a variety of ages and backgrounds, this leads to arbitrary and discriminatory applications of the law to come up with a single example.

Again, the Court expresses no opinion on the scope of the power of a state to create a system where a state agency rates the sexual content of books that will be purchased by public school libraries. Nor does the Court express an opinion on the scope of the power of a state to utilize a rating system in determining whether to purchase a book or not for its libraries, as long as the rating is being performed by the state and not imposed on non-state actors. Those are questions for another day and a different statute. The Court expressly determines that a statute that requires private third parties to perform the scrutiny and review for this content for every book it has sold or intends to sell is beyond the power that is authorized by the Constitution. The Court notes the extraordinary onerous burden of requiring third parties to provide a single rating for each book regardless of the age of the potential student in a particular library is simply an additional basis for this Court to determine that the statue cannot withstand even the most gossamer of scrutinies.

Without the critical backstop of the third step of the *Miller* test and the unworkability of determining what community standards should apply to the ratings themselves, the law fails for its unconstitutional vagueness.

### b.  The curriculum exception is unconstitutionally vague.

The "curriculum exception" described in the law is another point of unconstitutional vagueness. READER exempts "library material directly related to the curriculum" from the definitions of "sexually explicit material" and "sexually relevant material." Tex. Educ. Code §§ 33.021(a); 35.001(3). The ability to be able to accurately determine what is included in the school curriculum is thus critical in determining what books need to be rated to ensure that vendors

comply with the law. The exception gives the impression of a straightforward rule that books used as a part of curriculum would not need to be rated. READER even specifies that the exception includes material "related to the curriculum required under Section 28.002(a)" of the Education Code. Tex Educ. Code § 33.021(a). But as discussed above, § 28.002(a) provides only a general list of subjects that curriculum must cover. And, even more importantly, curricula vary from day-to-day, year-to-year, and district-to-district—and are consistently being reevaluated. Importantly, the Defendants disputed none of the assertions that Plaintiffs made about the amount of variance of curriculum from class to class and school to school and school district to school district. In fact, Defendants did not address it in any briefing or at either hearing. Further, when considering what constitutes curricula, many important questions are left unanswered and unaddressed by the statute. For example, would that include a book that a teacher brings from home for a lesson? Would a book be presumed to "relate[] to the curriculum" when it enters the classroom? *See* Tex. Educ. Code § 33.021(a). There is virtually no way that any of the Plaintiffs would or even could be aware of a book's specific use in a classroom…or which grade it is being used in. In addition, a vendor would have to determine if a book was considered "related to the curriculum" when attempting to perform their rating obligations. The statute provides no guidance of any kind for vendors to use to determine what content falls under the curriculum exception. This will necessarily lead to substantial confusion on the part of any vendor who seeks to participate in the sale of books to the state, and there is nothing in the statute that might resolve this confusion. This confusion is not imaginary, the Plaintiffs proffered numerous affidavits outlining just how READER's vagueness affects vendors. *See* ECF No. 6-3 ¶ 19; ECF No. 6-4 ¶ 11.a-b.

Not having any way to determine whether or not an exception applies so that a vendor needs to rate a book to maintain compliance with the statute fails to provide a "person of ordinary

intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Roark & Hardee LP*, 522 F.3d at 551. For this separate, independent reason, this Court finds READER unconstitutionally vague.

### 5.   READER is an unconstitutional prior restraint.

Ordinances regulating speech contingent on the will of an official—such as the requirement of a license or permit that may be withheld or granted in the discretion of an official—are unconstitutional burdens on speech classified as prior restraints. *Chiu v. Plano Indep. Sch. Dist.*, 339 F.3d 273, 280 (5th Cir. 2003). The prohibition of distributing literature is a classic form of a prior restraint. *Id.* More generally, "[t]he term prior restraint is used 'to describe administrative and judicial orders *forbidding* certain communications when issued in advance of the time that such communications are to occur.'" *Alexander v. United States*, 509 U.S. 544, 550 (1993) (quoting MELVILLE NIMMER, NIMMER ON FREEDOM OF SPEECH § 4.03 (1984)). A prior restraint, while not per se unconstitutional, bears a heavy presumption against its constitutional validity. *Chiu*, 339 F.3d at 280–81.

Once a system has been deemed to be a prior restraint, it is a "settled rule" that the system must include certain procedural protections to be constitutional. *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 559 (1975) (citing *Freedman v. Maryland*, 380 U.S. 51, 58 (1965)). Thus, a lawful prior restraint "first, must fit within one of the narrowly defined exceptions to the prohibition against prior restraints, *and*, second, must have been accomplished with procedural safeguards that reduce the danger of suppressing constitutionally protected speech." *Id.* (emphasis added). A system of prior restraint without at least the three safeguards below is unconstitutional:

> First, the burden of instituting judicial proceedings, and of proving that the material is unprotected, must rest on the censor. Second, any restraint prior to judicial review can be imposed only for a specified brief period and only for the purpose of

preserving the status quo. Third, a prompt final judicial determination must be assured.

*Id.* at 560; *see also Alexander*, 509 U.S. at 551 ("The constitutional infirmity in nearly all of our prior restraint cases involving obscene material . . . was that the Government had seized or otherwise restrained materials suspected of being obscene without a prior judicial determination that they were in fact so.").

Plaintiffs contend that READER is an unconstitutional prior restraint for the following reasons. First, because it does not consider whether books have literary, artistic, political or scientific value, as required by the *Miller* test, it "sweeps a wide swath of constitutionally protected works within its definition of 'sexually explicit material.'" ECF No. 6 at 14. Second, it prevents booksellers from distributing constitutionally protected books in the future based on unrelated past government determinations. *Id.* Third, it provides no due process or ability to challenge the State's final determinations of the ratings required by the TEA. *Id.* at 15.

Defendants respond that READER is not an unconstitutional prior restraint primarily because "READER does not prohibit communication of any kind." ECF No. 19 at 29. According to Defendants, Plaintiffs provide no precedent as to why a prior restraint on a student's right to access information in the form of a particular school-library book would violate the First Amendment. *Id.* at 29–30. Defendants also contend they "are not forbidding any book from being published, nor are they forbidding the sale of the books containing obscene material in any forum or to any audience outside of Texas schools." *Id.* at 29. To the extent READER is a prior restraint, Defendants note that prior restraints in public schools "are not always unconstitutional" and suggest that a lower standard of review applies here. *Id.* at 30. Defendants did not respond to the applicability of *Bantam Books v. Sullivan*, 372 U.S. 58 (1963), to this case, nor do they discuss *Southeastern Promotions*. *See generally id.* at 29–30.

In *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 61, 66 (1963), the U.S. Supreme Court struck down a Rhode Island law that established a Commission that reviewed and rated certain books as "objectionable for sale, distribution or display to youths under 18 years of age." The Court found that this scheme, in which distributors stopped selling the suspect publications in response, was an unconstitutional "system of prior administrative restraints" because it (1) suppressed the distribution of non-obscene, constitutionally protected books (2) without a judicial determination that the content could lawfully be banned. *Id.* at 70–72.

Similarly, in *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546 (1975), the Supreme Court held that a city's denial of usage of a public auditorium to stage a possibly obscene musical was an unconstitutional prior restraint. The Court first held that the denial of usage was a prior restraint that "gave public officials the power to deny use of a forum in advance of actual expression." *Id.* at 553. No exceptions to the rule against prior restraints applied. *Id.* at 555–56. Importantly, the Court held that even if the plaintiff could use an alternate theater, that "alone would not justify an otherwise impermissible prior restraint." *Id.* at 556.

Next, the Court held that the prior restraint was unconstitutional, as the board's denial had not been "accomplished with procedural safeguards that reduce the danger of suppressing constitutionally protected speech." *Id.* at 559. The board's system "did not provide a procedure for prompt judicial review," required plaintiff to institute proceedings and bear the burden of persuasion and altered the status quo. *Id.* at 561–62.

The case law discussed above demonstrates that the prior restraint issue is not one question, but two related sub-questions: first, is READER a prior restraint at all? If the answer is no, then Defendants carry the day. But if the answer is yes, the second question arises: is READER a

constitutionally impermissible prior restraint? Because the Court concludes that both questions must be answered affirmatively, it finds for Plaintiffs on this issue.

First, the Court holds that READER is a prior restraint. Defendants' claims that "READER does not prohibit communication of any kind" and "Defendants are not forbidding anyone from any speech," ECF No. 19 at 29, cannot be squared with TEX. EDUC. CODE § 35.002(b), which states, "A library material vendor may not sell library material rated sexually explicit material . . . ." Once TEA has confirmed that a book's proper content rating is sexually explicit, all future attempts to sell that book to school districts are prohibited by law. This suffices as an "administrative . . . order[] *forbidding* certain communications when issued in advance of the time that such communications are to occur." *See Alexander*, 509 U.S. at 550. Defendants similarly get things backwards by claiming that this issue revolves around "an amorphous right of students to receive information." ECF No. 19 at 29. *But see Martin v. City of Struthers*, 319 U.S. 141, 143 (1943) ("The right of freedom of speech and press has broad scope. . . . This freedom embraces the right to distribute literature *and necessarily protects the right to receive it*.") (citation omitted) (emphasis added). For students to receive information, someone must be communicating it— namely, library material vendors such as Plaintiffs. READER's prior restraint is on this communication. And it is no defense that books with sexually explicit or sexually relevant material can still be published and sold elsewhere, for the Supreme Court in *Southeastern Promotions* reminds us that "[e]ven if a privately owned forum had been available, that fact alone would not justify an otherwise impermissible prior restraint." *See* 420 U.S. at 556; *see also Schneider v. State of New Jersey*, 308 U.S. 147, 163 (1939) ("[O]ne is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place."). It is therefore clear that READER is a prior restraint.

Answering the second question, like in *Bantam Books* and *Southeastern Promotions*, READER is an unconstitutional prior restraint. Because it does not consider whether books have literary, artistic, political or scientific value, as required by the *Miller* test, it sweeps a wide swath of constitutionally protected works within its definition of "sexually explicit material." *See Miller*, 413 U.S. at 24. All books sold to a school district, even unquestionably non-obscene ones, are subject to READER's rating regime. All books sold (or that have been sold) to a school district, even ones without a prior judicial determination of obscenity, are at risk of being labelled sexually explicit, either by the vendor or by the TEA. And, as explained *supra* Section III.B.4.a, READER nowhere mandates that either library material vendors or TEA evaluate books under *Miller*'s third prong. Such a regime is far too broad to fit within obscenity as a "narrowly defined exception[]" to the rule against prior restraints. *See Se. Promotions*, 420 U.S. at 559. And also like in *Bantam Books* and *Southeastern Promotions*, READER provides no opportunity for judicial review of the State's final determinations. Indeed, booksellers have no opportunity to challenge the State's "corrected" ratings or decision to ban them from selling books to public schools before the TEA, let alone a judicial body. In such circumstances, READER effectively makes TEA's ratings final, and unappealable, which is unconstitutional. *See Freedman*, 380 U.S. at 58 ("[T]he requirement [of advance submission of films] cannot be administered in a manner which would lend an effect of finality to the censor's determination whether a film constitutes protected expression.").

Most important, however, is that READER is a prior restraint that acts as a prohibition of distributing literature—giving it a heavy presumption against its constitutional validity. *See Chiu*, 339 F.3d at 280–81. The Defendants' arguments here in support of READER's constitutional validity are insufficient to overcome this heavy burden. Although Defendants contend that "prior restraints on speech are not always unconstitutional in a public school setting," ECF No. 19 at 30,

the Fifth Circuit has found prior restraints on speech in the school setting to be unconstitutional. *See Chiu*, 339 F.3d at 280. Furthermore, showing that some public-school prior restraints are constitutional does not show that READER in particular is constitutional. Defendants fail to even respond to the fact that booksellers have no opportunity to challenge the State's "corrected" ratings or decision to ban them from selling books to public schools before the TEA, let alone a judicial body. This utter lack of procedural safeguards renders READER unconstitutional under *Southeastern Promotions*, even if READER would otherwise fit within an exception to the prohibition against prior restraints. *See* 420 U.S. at 559–60. Finally, Defendants suggest that the standard of review for prior restraints in non-public school fora is "reasonably related to legitimate pedagogical goals," ECF No. 19 at 30 (quoting *Milwaukee Police Ass'n v. Jones*, 192 F.3d 742, 749 (7th Cir. 1999)), but the only support they offer is non-binding out-of-circuit dicta that the Court finds unconvincing and inapplicable.[13]

Given the heavy presumption against READER's constitutional validity and the Defendants' failure to overcome that burden, the Court finds that READER is an unconstitutional prior restraint.

## C. The Plaintiffs will be irreparably harmed if READER is allowed to go into effect.

Plaintiffs here will be irreparably harmed in the absence of an injunction. The first and most clear instance of irreparable harm is through violations of Plaintiffs' First Amendment rights. The Supreme Court has recognized that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S.

---

[13] Specifically, *Jones* cites only *Kuhlmeier* as support for the proposition that "a prior restraint on speech in a non-public forum at a school is constitutional if reasonably related to legitimate pedagogical goals." 192 F.3d at 749. But, as explained *supra*, *Kuhlmeier* was about a *curricular* student newspaper, which is distinguishable from the *non-curricular* and non-mandatory library books here, and the Court disagrees that the non-public forum analysis applies to this case. Therefore, the Court will not accept Defendants' invitation to apply *Jones* to this case.

347, 373 (1976). "When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Opulent Life Church*, 697 F.3d at 295 (quoting 11A Charles Alan Wright et al., Federal Practice and Procedure § 2948.1 (2d ed. 1995)). In addition, reputational harm can be considered. 11A Charles Alan Wright et al., Federal Practice and Procedure (Wright & Miller) § 2948.1 (3d ed. 2023) ("Injury to reputation or goodwill is not easily measurable in monetary terms, and so often is viewed as irreparable.").

Plaintiffs argue first that because their First Amendment rights will be violated unless READER is enjoined, they will be irreparably harmed. ECF No. 6 at 19–20. The Court agrees, and as stated above, found that READER likely violates the First Amendment by containing an unconstitutional prior restraint, compelled speech, and unconstitutional vagueness. In addition, Plaintiffs argue (and Defendants do not dispute) that they will suffer reputational damage both if they are forced to comply or end up being unable to comply with READER. *See* ECF No. 6-5 ¶¶ 20–22; ECF No. 6-3 ¶¶ 14–16, 21–25; ECF No. 6-6 ¶¶ 5, 19–20; ECF No. 6-4 ¶ 5; ECF No. 6-2 ¶¶ 7, 11; ECF No. 6-7 ¶ 12. This irreparable harm of the violation of Plaintiffs' First Amendment rights alone is enough for the Court to weigh this factor in favor of Plaintiffs.

In addition, here, ongoing, non-recoverable compliance costs constitute irreparable harm. "[N]onrecoverable costs of complying with a putatively invalid regulation typically constitute irreparable harm." *Rest. L. Ctr. v. U.S. Dep't of Lab.*, 66 F.4th 593, 597 (5th Cir. 2023). "[C]omplying with a regulation later held invalid almost *always* produces the irreparable harm of nonrecoverable compliance costs." *Id.* (quoting *Louisiana v. Biden*, 55 F.4th 1017, 1034 (5th Cir. 2022)). A court should emphasize compliance costs' recoverability, rather than their magnitude. *Id.* (citing *Texas v. EPA*, 829 F.3d 405, 433–34 (5th Cir. 2016)).

Here, there are many ongoing, non-recoverable compliance costs in complying with READER. As averred by Plaintiffs (and undisputed by Defendants), the compliance costs are astronomical. Just for completing the initial book ratings, Blue Willow estimates that the cost to rate each book would be between $200 and $1,000 per book, and that to read and rate books already sold to schools would cost between $4 million and $500 million dollars, while Blue Willow's annual sales are only $1,000,000 per year. *See* ECF No. 6-3 ¶¶ 14–16; ECF No. 6-4 ¶¶ 8–9. This is a reasonable estimate, given it took Spring Branch ISD more than 220 hours, $30,000, and 16 employees to review *one book* in an effort to comply with a book removal request (unrelated to the law at hand). *See* Shannon Ryan, *More than $30K of taxpayers' money, 220 hours spent on single Spring Branch ISD book ban, docs show*, ABC 13 (Mar. 28, 2023), https://abc13.com/spring-branch-isd-book-ban-school-library-books-student-resources-texas-schoolbook-restrictions/13037457. In addition, there are ongoing compliance costs because READER requires vendors to submit an updated list to the TEA on September 1st every year after the law goes into effect, and Plaintiffs will continue to incur costs rating books. Tex. Educ. Code § 35.002(d). Further, vendors have costs related to their duty to determine what library material is in "active use" and which (if any) books have become subject to the curriculum exception to be able to determine what books they need to rate. *Id.* Finally, vendors must issue recalls for books rated "sexually explicit" that were sold to public schools. *Id.* § 35.002(b).

All of these compliance costs are non-recoverable. The state provides no monetary assistance with compliance for vendors. In addition, READER explicitly (and seemingly) exempts public schools from claims or damages. Tex. Educ. Code § 35.004. Finally, at the August 18th hearing, when asked by the Court if vendors could get relief from harm from anyone, the government answered, "Well, your Honor, maybe the answer is they can't." Aug. 18 Mot. Hr'g

Tr. 10:6–10. Therefore, Plaintiff also suffers irreparable harm via the non-recoverable costs of compliance.

Defendants' arguments that there is no irreparable harm are without merit. First, they argue that the Plaintiffs will suffer no irreparable harm because Plaintiffs are not required by the statute to submit ratings until April 1, 2024, and nothing happens in the interim. ECF No. 19 at 34. However, the compelled speech and irreparable harm of compliance costs will be incurred starting September 1st (as discussed above). They also argue that the state and children will suffer harm because TSLAC and the SBOE would not be allowed to create and develop standards for public schools to use in their application of READER. *Id.* First, the Court notes that this injunction maintains the status quo because the law has not gone into effect. Second, balancing the harm is properly considered under other factors (*i.e.*, balancing the harms and considering the public interest) in determining whether an injunction should be granted. Therefore, the Court finds that Plaintiffs have shown irreparable harm.

### D.  The balance of harms and public interest favor an injunction.

The Court finds that the balance of harms and public interest favor an injunction. The balance of the equities and the public interest "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Further, "[I]njunctions protecting First Amendment freedoms are always in the public interest." *Opulent Life Church*, 697 F.3d at 298 (quoting *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006)). The Court also recognizes that the Fifth Circuit recently reaffirmed this principle, explicitly noting that although the government "suffers a form of irreparable injury" when it is enjoined from enforcing its statutes, it likewise has no "interest in enforcing a regulation that violates federal law." *All. for Hippocratic Med.*, 2023 WL 5266026, at *28 (quoting *Maryland v. King*, 567 U.S. 1301, 1303 (2012)).

Defendants primarily argue that states have responsibility for the education of their citizens and the injunction would prevent that from occurring. ECF No. 19 at 35. In addition, they claim that granting the injunction will disserve the public interest to protect children in schools. *Id.* This is not the case. The State still has control over what is included in the curriculum, and further, it has substantial latitude in determining what should be allowed in public schools and school libraries. Indeed, children will continue to be educated even if the injunction is granted. Further, children will continue to be protected, as they have been since the start of public education in Texas, even as the injunction goes into effect.

But still, both complaints would not change the outcome. Here, this Court has found that READER likely violates the First Amendment by containing an unconstitutional prior restraint, compelled speech, and unconstitutional vagueness. Protecting First Amendment rights is always in the public interest. As the Fifth Circuit noted in *Alliance for Hippocratic Medicine*, when assessing the state's interest in a law that conflicts with federal statutes or the Constitution, the "government/public-interest analysis collapses with the merits." 2023 WL 5266026, at *28.

## IV. CONCLUSION

The Court does not dispute that the state has a strong interest in what children are able to learn and access in schools. And the Court surely agrees that children should be protected from obscene content in the school setting. That said, READER misses the mark on obscenity with a web of unconstitutionally vague requirements. And the state, in abdicating its responsibility to protect children, forces private individuals and corporations into compliance with an unconstitutional law that violates the First Amendment. Nothing in the injunction granted here prevents the state from using viable and constitutional means to achieve the state's goals. Therefore, the Court **ORDERS** that Defendants' Motion to Dismiss Pursuant to Federal Rules of

Civil Procedure 12(b)(1) and 12(b)(6) (ECF No. 19) is **DENIED**. Plaintiffs' Motion for Preliminary Injunction (ECF No. 6) is **GRANTED.**

 **IT IS FURTHER ORDERED** that the chair of the Texas State Library Martha Wong, chair of the Texas Board of Education Keven Ellis, and Commissioner of Education Mike Morath and all of their officers, agents, employees, attorneys, and other persons in active concert with them ("Defendants") are **ENJOINED** from applying, enforcing, or attempting to enforce, either criminally or civilly, §§ 35.001, 35.002, 35.0021, and 35.003 of HB 900, the Restricting Explicit and Adult-Designated Educational Resources (READER) Act.

**SIGNED** this 18th day of September, 2023.

ALAN D ALBRIGHT
UNITED STATES DISTRICT JUDGE

59