1          UNITED STATES DISTRICT COURT
            WESTERN DISTRICT OF TEXAS
2                AUSTIN DIVISION

3  BOOK PEOPLE, INC., ET AL ) Docket No. A 23-CA-858 ADA
                            )
4  vs.                      ) Austin, Texas
                            )
5  MARTHA WONG, IN HER      )
   OFFICIAL CAPACITY AS THE )
6  CHAIR OF THE TEXAS STATE )
   LIBRARY AND ARCHIVES     )
7  COMMISSION, ET AL        ) August 28, 2023

8          TRANSCRIPT OF MOTION HEARING (Resumed)
            BEFORE THE HONORABLE ALAN D. ALBRIGHT

9

10  APPEARANCES:

11  For the Plaintiff:      Mr. Michael J. Lambert
                            Mr. W. Reid Pillifant
12                          Ms. Laura L. Prather
                            Ms. Catherine L. Robb
13                          Haynes & Boone, LLP
                            600 Congress Avenue, Suite 1300
14                          Austin, Texas 78701

15

16  For the Defendant:      Ms. Christina Cella
                            Ms. Amy E. Pletscher
17                          Texas Attorney General's Office
                            300 West 15th Street, 6th Floor
18                          Austin, Texas 78711

19

20  Court Reporter:         Ms. Lily Iva Reznik, CRR, RMR
                            501 West 5th Street, Suite 4153
21                          Austin, Texas 78701
                            (512)391-8792
22

23

24

25  Proceedings reported by computerized stenography,
    transcript produced by computer-aided transcription.

| | | |
|---|---|---|
| 09:04:27 | 1 | THE COURT:  Good morning, everyone. |
| 09:04:28 | 2 | Would you call the case, please? |
| 09:04:29 | 3 | THE CLERK:  Court calls:  A-23-CV-858, <u>BookPeople</u> |
| 09:04:34 | 4 | <u>Inc. Et Al vs. Martha Wong, Et Al</u>, for a motions hearing. |
| 09:04:37 | 5 | THE COURT:  Announcements from counsel, please. |
| 09:04:39 | 6 | MS. PRATHER:  Your Honor, Laura Prather with |
| 09:04:44 | 7 | Catherine Robb, Michael Lambert, Reid Pillifant, all from |
| 09:04:47 | 8 | Haynes & Boone on behalf of the plaintiffs. |
| 09:04:50 | 9 | MS. CELLA:  Good morning, your Honor. |
| 09:04:51 | 10 | Christina Cella and Amy Pletscher for defendants. |
| 09:04:57 | 11 | THE COURT:  Let me start off by asking a question |
| 09:05:04 | 12 | I asked last time in terms of timing of when we have to |
| 09:05:10 | 13 | have the decision made by and I think I'm going to start |
| 09:05:14 | 14 | with the defendant.  But is my understanding, correct -- |
| 09:05:22 | 15 | by the way, I'm not planning on taking a very long time to |
| 09:05:25 | 16 | do this.  I'm trying to find out whether or not there's a |
| 09:05:28 | 17 | drop-dead date of just the 1st because that's when the |
| 09:05:31 | 18 | statute would become effective. |
| 09:05:36 | 19 | Is it my understanding that it's the -- I think |
| 09:05:40 | 20 | at the last hearing you saying that until, I believe, |
| 09:05:43 | 21 | April, there's not going to be any enforcement of this; is |
| 09:05:46 | 22 | that correct? |
| 09:05:46 | 23 | MS. CELLA:  Correct, your Honor, because that's |
| 09:05:48 | 24 | when the lists are due. |
| 09:05:49 | 25 | THE COURT:  Okay.  And so, what I'm trying to |

| | | |
|---|---|---|
| 09:05:51 | 1 | figure out here, then I'll turn to the plaintiff and ask |
| 09:05:54 | 2 | again, I would rather get out -- I mean, if we have to, we |
| 09:06:01 | 3 | have to.  But I'd rather get out an order that I think was |
| 09:06:05 | 4 | well considered than feel constrained to get one out by -- |
| 09:06:09 | 5 | in a day or two.  And so, let me hear from the plaintiff |
| 09:06:11 | 6 | if the defendants' representing that there's not going to |
| 09:06:16 | 7 | be any enforcement on this week, even when the statute |
| 09:06:22 | 8 | goes into effect, I'd like to know why we have to have a |
| 09:06:26 | 9 | decision out by this Thursday.  And I think that also |
| 09:06:31 | 10 | indirectly impacts the issue of the injunction, one of the |
| 09:06:37 | 11 | prongs of the injunction in terms of the immediacy of the |
| 09:06:40 | 12 | harm.  I think that was your point last time, too. |
| 09:06:42 | 13 | MS. PRATHER:  Yes, your Honor. |
| 09:06:43 | 14 | THE COURT:  Is if there's no -- if the |
| 09:06:49 | 15 | enforcement's not going to begin until April 1st; is that |
| 09:06:52 | 16 | right? |
| 09:06:53 | 17 | MS. CELLA:  Yes. |
| 09:06:53 | 18 | THE COURT:  Then why we have to have something |
| 09:06:55 | 19 | out by this Thursday. |
| 09:06:58 | 20 | MS. PRATHER:  Your Honor, there's a few reasons |
| 09:07:00 | 21 | for that. |
| 09:07:01 | 22 | THE COURT:  If you'd come up to the podium. |
| 09:07:03 | 23 | MS. PRATHER:  Sure.  Your Honor, unfortunately, |
| 09:07:14 | 24 | the plain language of the statute says that it goes into |
| 09:07:17 | 25 | effect on September the 1st. |

| | | |
|---|---|---|
| 09:07:19 | 1 | THE COURT: And you said that last time but the |
| 09:07:23 | 2 | representation from counsel is, there won't be enforcement |
| 09:07:25 | 3 | of it. So I get that, you know -- but it's not like |
| 09:07:31 | 4 | they're changing the drinking age from 21 to 18 and so, on |
| 09:07:34 | 5 | Thursday, an 18-year-old can -- my representation from |
| 09:07:38 | 6 | counsel is that there will be no enforcement starting this |
| 09:07:41 | 7 | week. |
| 09:07:42 | 8 | MS. PRATHER: Yeah. My understanding for the |
| 09:07:45 | 9 | representation was that the lists were due on April 1st |
| 09:07:48 | 10 | but under Section 35.002(a), the vendors cannot sell |
| 09:07:56 | 11 | library materials to the district until they have issued |
| 09:07:59 | 12 | their ratings on the prior sold books that are in active |
| 09:08:04 | 13 | use. |
| 09:08:05 | 14 | And if your Honor looks at two cases, one is U.S. |
| 09:08:09 | 15 | vs. Stevens, which is a Supreme Court case from 2010, it |
| 09:08:15 | 16 | specifically states that the First Amendment is protected |
| 09:08:19 | 17 | against the government and we cannot be left at the mercy |
| 09:08:23 | 18 | of representations by the government that they will not |
| 09:08:27 | 19 | uphold an unconstitutional statute just because they're |
| 09:08:31 | 20 | promising not to do something, we cannot rely on that |
| 09:08:34 | 21 | promise. |
| 09:08:35 | 22 | The same thing happened in the American |
| 09:08:39 | 23 | Booksellers case where the attorney general's |
| 09:08:42 | 24 | representation about what the state law said or how it |
| 09:08:45 | 25 | would be interpreted is not considered authoritative and |

| | | |
|---|---|---|
| 09:08:49 | 1 | cannot bind the courts or the local authorities. |
| 09:08:53 | 2 | We simply cannot wait until after September 1st |
| 09:08:57 | 3 | because the law under Section 6, Section 7, and under the |
| 09:09:02 | 4 | express provision in 35.002(a) immediately takes effect |
| 09:09:08 | 5 | September 1st and will have an irreparable harm.  Our |
| 09:09:14 | 6 | clients will incur irreparable harm starting on that date. |
| 09:09:17 | 7 | As I mentioned in the prior hearing, as well, these |
| 09:09:21 | 8 | ratings that the booksellers are obligated to be doing |
| 09:09:28 | 9 | have to be done now.  It's not like they do it on March |
| 09:09:33 | 10 | 31st.  It's like discovery:  It happens throughout the |
| 09:09:38 | 11 | ongoing months between. |
| 09:09:42 | 12 | THE COURT:  From my looking -- and I'll hear from |
| 09:09:45 | 13 | the government on this.  My understanding was that the |
| 09:09:50 | 14 | April 1st was not a make-believe date.  It was an |
| 09:09:53 | 15 | understanding that if the law went into effect on the 1st |
| 09:09:57 | 16 | that it was essentially a window to give the folks the |
| 09:10:02 | 17 | opportunity to comply with it and that's why it wouldn't |
| 09:10:04 | 18 | be enforced before April 1st.  That's the way the law is |
| 09:10:08 | 19 | structured, isn't it? |
| 09:10:09 | 20 | MS. CELLA:  Yes, your Honor, because the lists |
| 09:10:10 | 21 | are not due till April 1st.  There's nothing to enforce |
| 09:10:13 | 22 | before that. |
| 09:10:14 | 23 | THE COURT:  And so, that's where I'm having a |
| 09:10:16 | 24 | really hard time with plaintiffs' argument if there's this |
| 09:10:19 | 25 | irreparable harm on September 1st, when the lists aren't |

| | | |
|---|---|---|
| 09:10:23 | 1 | due until April 1st. |
| 09:10:26 | 2 | MS. PRATHER:  There's a couple of irreparable |
| 09:10:28 | 3 | harm.  One is it's just an express prohibition.  They |
| 09:10:31 | 4 | can't sell after September 1st if they don't have the |
| 09:10:34 | 5 | prior books rated, they're prohibited from selling after |
| 09:10:40 | 6 | September 1st.  That's one thing.  The second thing is, |
| 09:10:43 | 7 | they're going to incur costs and those costs are going to |
| 09:10:48 | 8 | be ongoing between now throughout the pendency of the next |
| 09:10:54 | 9 | however many months until April 1st to rate and review |
| 09:10:58 | 10 | these books. |
| 09:10:58 | 11 | And that cost alone causes irreparable harm. |
| 09:11:02 | 12 | There was testimony before the Senate committee about the |
| 09:11:08 | 13 | costs that -- that that would entail and the fact that it |
| 09:11:13 | 14 | would be literally the review of millions of books that |
| 09:11:16 | 15 | would have to be happening.  All that doesn't happen on |
| 09:11:20 | 16 | March 31st.  That happens now and it happens now over the |
| 09:11:24 | 17 | course of several months. |
| 09:11:25 | 18 | THE COURT:  And again, I'm not talking about |
| 09:11:29 | 19 | waiting till April 1st.  I'm trying to figure out why if, |
| 09:11:33 | 20 | for example, the order came out Friday, it doesn't -- I'm |
| 09:11:38 | 21 | having a hard time seeing irreparable harm between |
| 09:11:40 | 22 | Thursday and Friday. |
| 09:11:42 | 23 | MS. PRATHER:  The irreparable harm is that they |
| 09:11:43 | 24 | cannot sell books starting September 1st. |
| 09:11:52 | 25 | THE COURT:  Okay.  Anything else from the |

| | | |
|---|---|---|
| 09:11:54 | 1 | government? |
| 09:11:56 | 2 | MS. CELLA:  Not on that point, your Honor. |
| 09:11:57 | 3 | THE COURT:  Okay.  Then we'll take up the |
| 09:12:01 | 4 | following issues.  First, we're going to start off with -- |
| 09:12:07 | 5 | and, Ms. Prather, you're in the right place.  These |
| 09:12:09 | 6 | questions are primarily for you and then, I'll hear from |
| 09:12:13 | 7 | the defendant.  We have two issues to take up, I think, to |
| 09:12:24 | 8 | determine whether or not the Court has the power to do |
| 09:12:27 | 9 | anything here.  The first is standing. |
| 09:12:29 | 10 | So, Ms. Prather, if you'd come back up, please. |
| 09:12:43 | 11 | Are you the standing person? |
| 09:12:49 | 12 | MR. LAMBERT:  No, sir.  I'm just the tech person. |
| 09:12:51 | 13 | THE COURT:  Okay. |
| 09:13:13 | 14 | MS. PRATHER:  Judge, one other thing with regard |
| 09:13:15 | 15 | to this April 1st date.  If there's no enforcement until |
| 09:13:18 | 16 | April 1st, then the law should actually have an effective |
| 09:13:20 | 17 | date of April 1st.  It doesn't.  It has an effective date |
| 09:13:23 | 18 | of September 1st and it applies to the 2023-2024 school |
| 09:13:27 | 19 | year.  So if they're saying now, which the Court cannot |
| 09:13:31 | 20 | rely on, that they aren't planning to enforce until April |
| 09:13:34 | 21 | 1st, then at a minimum, what the Court should do between |
| 09:13:37 | 22 | now and Friday is enter an injunction that says they can't |
| 09:13:41 | 23 | enforce it between now and April 1st.  That's a happy |
| 09:13:45 | 24 | medium with the Court can then get out a more thoughtful |
| 09:13:49 | 25 | order after Friday, but effectively enjoin the law between |

09:13:55   1   now and April 1st.

09:13:56   2          THE COURT:  Oh, I'm not -- I'm thinking a day or

09:14:03   3   two.  I'm not -- I have no intention of delaying till

09:14:08   4   April 1st getting this order out.  It's more it's Monday

09:14:11   5   and I think the 1st is Thursday.  And so -- but I'll think

09:14:16   6   about if I have to doing something that would be

09:14:20   7   restrictive for a day or two if I need a time to get the

09:14:25   8   order out.

09:14:26   9          At any rate, so with respect to these

09:14:28   10  requirements, I want you to focus on how they apply to the

09:14:34   11  school districts.  How are they different -- how is this

09:14:39   12  requirement passed by the legislature different than any

09:14:43   13  other contract terms that may have the ability to set up

09:14:48   14  for plaintiffs to deal with when they're doing business

09:14:49   15  with the districts?  I mean, you --

09:14:52   16         MS. PRATHER:  Your Honor -- I'm sorry.

09:14:53   17         THE COURT:  I understand you're unhappy with this

09:14:55   18  one but why doesn't the -- why don't they have the power

09:14:59   19  to have this requirement if they have the power to have

09:15:02   20  other requirements for school districts?

09:15:07   21         MS. PRATHER:  Your Honor, the standing in this

09:15:10   22  case has nothing to do with a contractual relationship.

09:15:14   23  The standing here is based upon a pre-enforcement facial

09:15:21   24  challenge to a constitutionally infirm statute, which is

09:15:26   25  permissible under the First Amendment.  We've got several

09:15:29  1  different First Amendment issues that are at stake here:

09:15:33  2  The right to distribute books, the right to be free from

09:15:36  3  compelled speech, the right to receive information.  And

09:15:39  4  under Virginia II, the U.S. Supreme Court said that

09:15:44  5  booksellers can bring pre-enforcement facial challenges to

09:15:47  6  statutes that restrict their ability to sell protected

09:15:50  7  works.

09:15:51  8          So that is just one basis for there to be

09:15:54  9  standing in this case.  I'm happy to go through more, your

09:15:58  10  Honor.  Is it okay to proceed with my argument or --

09:16:01  11          THE COURT:  Yes, please.

09:16:02  12          MS. PRATHER:  Okay.

09:16:06  13          THE COURT:  This is -- I got to pick on the other

09:16:08  14  side at the first hearing because that was just the way it

09:16:13  15  was -- the issues we're going to face today are whether or

09:16:17  16  not the plaintiff had standing.  And also, we didn't

09:16:22  17  really get into the sovereign immunity issue because I

09:16:25  18  didn't have a chance to get your briefing on that, but

09:16:28  19  we're going to get into that today, as well.

09:16:30  20          MS. PRATHER:  Okay, your Honor.  And the

09:16:32  21  preliminary injunction.

09:16:33  22          THE COURT:  Yes.

09:16:34  23          MS. PRATHER:  I assume.  Okay.  So I actually had

09:16:39  24  -- this has been top of mind for me, this case for the

09:16:42  25  last 10 days, perhaps for others as well, and what I

09:16:47  1  started thinking about, your Honor, was the impact that

09:16:52  2  that one teacher seems to have on every person.  There's

09:16:57  3  always one that made a difference in their life and for

09:17:00  4  me, it was Ms. Peterson.  She was the one that sparked

09:17:03  5  curiosity in that sense of wonder for me.

09:17:05  6          THE COURT:  Counsel, I don't care.  I want to

09:17:10  7  move forward.  This isn't a trial.  Just jump ahead,

09:17:16  8  please.

09:17:18  9          MS. PRATHER:  Okay.  So we're here today because

09:17:21  10  we represent a coalition of booksellers, book publishers

09:17:25  11  and authors that sell books to Texas schools.  That's the

09:17:29  12  who of this case.  What the case is about is about the

09:17:35  13  state requiring ratings of books and adoption of state

09:17:38  14  ratings by vendors.  It's not about TEA controlling the

09:17:42  15  curriculum.  In fact, books that are part of the

09:17:47  16  curriculum are expressly exempted from this statute.  The

09:17:53  17  speech at issue is the right to distribute and sell books

09:17:57  18  and to be free from compelled speech.

09:18:01  19          H.B. 900 expressly does not apply to curriculum.

09:18:08  20  So what has to happen in this case?  All books have to be

09:18:12  21  rated.  All books that are in active use have to be rated.

09:18:17  22  When?  By September 1st, otherwise, they can no longer

09:18:22  23  sell books to schools.  How this is done is actually

09:18:28  24  impossible.  If you look at the statute, it actually begs

09:18:34  25  more questions than it answers.  It begs the question of

09:18:38  1   whether or not a book is directly related to curriculum,

09:18:41  2   whether or not it is in active use, what constitutes

09:18:47  3   sexual activity or sexually explicit, what is sexually

09:18:51  4   explicit, how this three-factor balancing test is

09:18:55  5   employed, what community standards are to be looked at,

09:19:01  6   how it does not matter how old the reader is, and one of

09:19:06  7   the things that is completely left out is how the books

09:19:11  8   are acquired.  What happens if books are donated, what

09:19:13  9   happens if books are purchased by the teacher from a

09:19:16  10  garage sale.  Those books aren't covered by this.  This

09:19:20  11  only applies to book vendors, so if the goal here is to

09:19:23  12  have all books in all libraries of public schools rated,

09:19:28  13  it misses the mark.

09:19:30  14         There was testimony in the Senate that just six

09:19:35  15  school districts alone had more than six million items in

09:19:38  16  their library and there are over 1,200 school districts in

09:19:42  17  the state of Texas.  Now, why has this law been passed?

09:19:47  18  Because the state wants books rated, but they don't want

09:19:52  19  to do the work themselves and they don't want to pay for

09:19:57  20  it.  It has been demonstrated by the declarations in

09:20:01  21  support of this case.

09:20:02  22         THE COURT:  So I hear what you're saying.  I

09:20:10  23  don't understand what you mean by as of -- if the books

09:20:13  24  aren't rated by Thursday, they can't sell them.  What

09:20:19  25  prohibits that in the statute?

| | | |
|---|---|---|
| 09:20:21 | 1 | MS. PRATHER:  35.002(a). |
| 09:20:24 | 2 | THE COURT:  Could you read that to me? |
| 09:20:27 | 3 | MS. PRATHER:  Yes, your Honor.  And we have a |
| 09:20:28 | 4 | notebook for you, your Honor.  H.B. 900 is behind the |
| 09:20:31 | 5 | third tab in the notebook. |
| 09:20:33 | 6 | THE COURT:  I think this is disputed, isn't it? |
| 09:20:37 | 7 | MS. PRATHER:  Yes, your Honor. |
| 09:20:38 | 8 | THE COURT:  Okay. |
| 09:20:40 | 9 | MS. PRATHER:  I'm sorry? |
| 09:20:41 | 10 | THE COURT:  I said I think that the state |
| 09:20:44 | 11 | disagrees with what you're telling me and so, if you'll |
| 09:20:47 | 12 | tell me where that specific statute is.  I have H.B. 900. |
| 09:20:55 | 13 | Would it be here or would it be -- |
| 09:20:57 | 14 | MS. PRATHER:  Yes.  If you go to 35.002(a), third |
| 09:21:03 | 15 | page of the statute, it says a library material vendor may |
| 09:21:10 | 16 | not sell library materials to a school library or open |
| 09:21:16 | 17 | enrollment charter school unless the vendor has issued |
| 09:21:21 | 18 | appropriate ratings regarding sexually explicit material, |
| 09:21:26 | 19 | sexually relevant material, previously sold to a school |
| 09:21:30 | 20 | district or school. |
| 09:21:34 | 21 | Then if you go to Section 6 of the bill, which is |
| 09:21:43 | 22 | on the seventh page, it says the changes in law made by |
| 09:21:52 | 23 | this act to the educational code apply beginning with -- |
| 09:21:58 | 24 | with the 2023-2024 school year.  Turn the page to Section |
| 09:22:04 | 25 | 7 and it says that if this act does not receive the vote |

09:22:10  1  necessary for immediate effect, which it did not, this act

09:22:14  2  takes effect September 1st, 2023.

09:22:28  3      THE COURT:  Well, what impact does Section (b) of

09:22:33  4  -- Subsection (b) of Section 4 have?  This says not later

09:22:36  5  than September 1st, 2024, each library material vendor

09:22:42  6  will submit the initial updated list required.

09:22:48  7      MS. PRATHER:  That's the updated list.

09:22:49  8      THE COURT:  As opposed to the initial list.

09:22:51  9      MS. PRATHER:  Correct, your Honor.

09:22:52  10      THE COURT:  Okay.  And so, let's say it's Friday

09:23:01  11  and I've done nothing.  On Friday, can your clients no

09:23:08  12  longer sell books to a school district if they're not

09:23:13  13  rated?

09:23:14  14      MS. PRATHER:  Under the plain language of the

09:23:16  15  statute, yes.

09:23:18  16      THE COURT:  Okay.  Let me hear from the attorney

09:23:20  17  general as to why she disagrees with that.

09:23:23  18      MS. CELLA:  Your Honor, the statute --

09:23:25  19      THE COURT:  If you'll come.

09:23:28  20      MS. CELLA:  Oh.  Your Honor, the statute, it

09:23:45  21  can't be parsed out like that.  So although the bill is

09:23:47  22  effective on September 1st, the lists are not due till

09:23:51  23  April 1st.  So as I mentioned, there's nothing to enforce.

09:23:54  24  The introduced version of the bill actually had that the

09:23:57  25  lists were due on September 1st, Thursday of this week,

09:24:02  1   but that got changed.  So there's just nothing to enforce.

09:24:07  2         So I'm not really sure the fear is just it's just

09:24:10  3   conjecture.  There's nothing to enforce until April 1st

09:24:14  4   when those lists are due.

09:24:16  5         THE COURT:  Okay.  And as of April 1st, let's say

09:24:18  6   it is April 1st or March 30th or 31st, what happens then

09:24:26  7   if they haven't created these lists?

09:24:28  8         MS. CELLA:  The -- if they have not submitted the

09:24:31  9   list to TEA, the school districts cannot purchase books

09:24:35  10  from them.  The way -- and I think we talked about this

09:24:37  11  last time but the way that's enforced is through the

09:24:41  12  education code, the TEA has the option to open a special

09:24:48  13  investigation to determine if the school districts have

09:24:49  14  complied and if so, they can -- there are sanctions in the

09:24:52  15  education code they would be against school districts, not

09:24:55  16  against any book vendors.  In fact, TEA specifically told

09:24:58  17  me they have no jurisdiction against any book vendor.

09:25:01  18  It's all against school districts.

09:25:02  19        THE COURT:  Say that again.  I'm sorry.

09:25:04  20        MS. CELLA:  TEA specifically told me that any

09:25:08  21  enforcement, any jurisdiction they have would be against a

09:25:13  22  school district, not against a book vendor.

09:25:14  23        THE COURT:  And what would that enforcement

09:25:16  24  entail?

09:25:17  25        MS. CELLA:  So it's laid out in the education

09:25:19   1   code once they open a special investigation, depending on

09:25:24   2   their findings, there's certain sanctions that can be

09:25:27   3   issued against the school districts.

09:25:28   4          THE COURT:  So if school district bought -- I

09:25:32   5   want to make sure I'm right.  This is a situation where if

09:25:35   6   on April 2nd, the school district continued to buy books

09:25:40   7   from a vendor that had not rated them, then there would be

09:25:44   8   an issue of between TEA and the school district.

09:25:48   9          MS. CELLA:  There could be.  It's not definite

09:25:50   10  but it's an option they have.  They can open up a special

09:25:52   11  investigation.

09:25:53   12         THE COURT:  Okay.  Is what you're telling me the

09:25:59   13  school districts would have the power to continue to

09:26:02   14  purchase from vendors even if they had not rated the books

09:26:08   15  only -- the problem would be they would face potential

09:26:12   16  liability from the TEA.

09:26:13   17         MS. CELLA:  Correct.

09:26:14   18         THE COURT:  Okay.  So again, with regard -- and

09:26:17   19  I'll have Ms. Prather respond to this, too.  With regard

09:26:20   20  to the standing issues for her clients in challenging

09:26:25   21  this, what impact do you think that scenario -- that

09:26:28   22  reality has that there's not a direct enforcement by

09:26:34   23  anyone against -- I think what I hear you saying is

09:26:37   24  there's no direct enforcement -- there can be no direct

09:26:41   25  enforcement against vendors.  It could impact the vendors

| | | |
|---|---|---|
| 09:26:46 | 1 | if they don't turn in the list and the school districts |
| 09:26:50 | 2 | decide not to purchase from them.  I'm not saying there's |
| 09:26:53 | 3 | not an impact, but in terms of penalties, there is no |
| 09:26:57 | 4 | potential for penalties in this case against this group of |
| 09:27:02 | 5 | plaintiffs. |
| 09:27:02 | 6 |             MS. CELLA:  Correct. |
| 09:27:03 | 7 |             THE COURT:  So what impact do you think that that |
| 09:27:04 | 8 | has on standing? |
| 09:27:06 | 9 |             MS. CELLA:  Well, we believe there's no standing |
| 09:27:08 | 10 | at all in this case.  Any -- like we just said, any |
| 09:27:12 | 11 | enforcement would be against someone that's not the |
| 09:27:15 | 12 | plaintiffs, the school districts.  But that's one of the |
| 09:27:19 | 13 | biggest reasons we believe there's no standing.  And I can |
| 09:27:21 | 14 | go into the other issues unless you want me to wait |
| 09:27:23 | 15 | until -- |
| 09:27:23 | 16 |             THE COURT:  Let me hear from Ms. Prather. |
| 09:27:25 | 17 |             MS. CELLA:  Sure. |
| 09:27:26 | 18 |             THE COURT:  I am going to get to them and so... |
| 09:27:29 | 19 |             MS. CELLA:  Thank you, your Honor. |
| 09:27:30 | 20 |             THE COURT:  Yes, ma'am.  So, Ms. Prather, I'm not |
| 09:27:32 | 21 | ignorant of the fact that this could -- would have -- |
| 09:27:39 | 22 | could have an impact.  I see that.  But if you could |
| 09:27:42 | 23 | respond to counsel's argument that there is no direct |
| 09:27:45 | 24 | action that could be taken against -- again, from the |
| 09:27:48 | 25 | perspective of standing, what impact that has on standing |

09:27:58  1  because your argument is that the law will damage your

09:28:03  2  client and/or that there could be a penalty for this

09:28:09  3  against your client and I don't see the penalty.

09:28:11  4          MS. PRATHER:  The penalty is that they will no

09:28:12  5  longer be able to sell books.

09:28:14  6          THE COURT:  That's not a penalty.  I get that

09:28:16  7  that's an impact.  But that's not a penalty that's being

09:28:22  8  enacted by the state.  And in fact, the school districts

09:28:28  9  could continue to buy the books, right?

09:28:32  10         MS. PRATHER:  Not under the express terms of

09:28:34  11 the --

09:28:34  12         THE COURT:  Well, no.  They could decide to

09:28:38  13 continue to -- they would have to deal with the TEA but

09:28:41  14 they could continue to buy them, right?

09:28:44  15         MS. PRATHER:  The express provisions of the

09:28:46  16 statute prohibit that.

09:28:48  17         THE COURT:  I understand that.  But that's only

09:28:53  18 -- there's an enforcement mechanism against them doing it

09:28:55  19 but the school districts could choose to do it.

09:28:58  20         MS. PRATHER:  Which honestly, your Honor, is all

09:29:00  21 the more reason why a preliminary injunction needs to be

09:29:02  22 entered here because --

09:29:04  23         THE COURT:  No, no.  Stick with the standing.

09:29:07  24 I'm trying to figure out -- I want you to give me -- the

09:29:10  25 standing issue's a very difficult one for your side and I

09:29:13  1  want you to give me the very best argument you can give me

09:29:16  2  as to why you have standing.  I want to give you every

09:29:19  3  opportunity to do that.

09:29:21  4          MS. PRATHER:  Sure.  We have standing on a number

09:29:23  5  of grounds.

09:29:23  6          THE COURT:  Okay.

09:29:24  7          MS. PRATHER:  So the first is, we have standing

09:29:27  8  under the First Amendment.  We have standing because this

09:29:32  9  deals with the constitutional rights of the booksellers.

09:29:36  10 Those constitutional rights that are at issue are the

09:29:39  11 right to distribute books, the right to be free from

09:29:41  12 compelled speech, that compelled speech is the

09:29:45  13 TEA-required ratings and the right to receive information.

09:29:49  14 Under Virginia II, all of these pre-enforcement challenges

09:29:53  15 were recognized as a basis for standing.

09:29:57  16          In the Speech First vs. Fenves case, that's one

09:30:01  17 which Judge Yeakel denied a preliminary injunction based

09:30:04  18 upon a lack of standing and the Fifth Circuit overturned

09:30:08  19 Judge Yeakel, and they overturned Judge Yeakel because

09:30:12  20 they allowed for pre-enforcement challenge of a campus

09:30:16  21 speech policy that violated the First Amendment.  The

09:30:21  22 chilling effect is --

09:30:22  23          THE COURT:  I don't think that's an -- I mean, I

09:30:27  24 don't think this is an analogous case to that.  I don't

09:30:32  25 think that that -- I think it's different when you are

09:30:35  1  restricting that kind of speech than what you're doing

09:30:38  2  here.  I'm really trying to burrow down and find out your

09:30:43  3  best standing argument under this act that y'all are the

09:30:49  4  appropriate people to bring the case.

09:30:50  5      MS. PRATHER:  We're the appropriate people to

09:30:52  6  bring the case because our First Amendment rights are at

09:30:54  7  issue.  There's a potential chilling effect that has

09:30:58  8  already gone into effect as a result of this statute,

09:31:03  9  we've already got libraries that are refusing to purchase

09:31:06  10  books from our clients and others, which is a basis for

09:31:11  11  standing in and of itself, we've got an injury in fact.

09:31:17  12  That injury in fact arises from the Katy Independent

09:31:21  13  School District where they have said we are no longer

09:31:24  14  buying books.  And Blue Willow, one of our clients, has

09:31:29  15  submitted a declaration.

09:31:29  16      THE COURT:  Well, has anyone complied with this

09:31:36  17  statute?

09:31:38  18      MS. PRATHER:  Katy Independent School District

09:31:40  19  has already.

09:31:40  20      THE COURT:  Any vendor.

09:31:42  21      MS. PRATHER:  Complied with it?  Meaning

09:31:44  22  submitted ratings?

09:31:45  23      THE COURT:  Uh-huh.

09:31:46  24      MS. PRATHER:  Not yet.  Not that I'm aware of.

09:31:49  25      THE COURT:  I would think.  So how is Katy ISD

| | | |
|---|---|---|
| 09:31:56 | 1 | going to get books? |
| 09:31:59 | 2 | MS. PRATHER:  Well, Katy ISD has already said |
| 09:32:01 | 3 | that they're not purchasing any books until they see |
| 09:32:03 | 4 | ratings.  They haven't seen ratings, they're not |
| 09:32:05 | 5 | purchasing books. |
| 09:32:06 | 6 | THE COURT:  Okay.  And if none of the vendors do |
| 09:32:10 | 7 | rating -- rate their books, where are they going to get |
| 09:32:13 | 8 | books?  I'm saying if no one, if none of the vendors do |
| 09:32:26 | 9 | the ratings, where will they get the books?  I mean, you |
| 09:32:30 | 10 | say Katy ISD has told your vendors this but essentially, |
| 09:32:34 | 11 | they're just -- to the extent they're just complying with |
| 09:32:38 | 12 | the statute on this, they're saying to all vendors, right? |
| 09:32:48 | 13 | MS. PRATHER:  Yes. |
| 09:32:48 | 14 | THE COURT:  Okay.  So -- and this goes back to my |
| 09:32:54 | 15 | question of why is this any different than any other |
| 09:32:59 | 16 | requirement that the state might impose on what school |
| 09:33:05 | 17 | districts do in terms of their selection of books? |
| 09:33:10 | 18 | MS. PRATHER:  This has nothing to do with |
| 09:33:12 | 19 | curriculum.  I think your Honor may be getting confused |
| 09:33:14 | 20 | with regard to curriculum versus non-curriculum.  The |
| 09:33:18 | 21 | state can put parameters on books for curriculum.  This is |
| 09:33:22 | 22 | not that.  In fact, books related -- that are directly |
| 09:33:26 | 23 | related to curriculum are exempt from this statute. |
| 09:33:30 | 24 | So what we've got here is, we have a First |
| 09:33:34 | 25 | Amendment basis for standing.  We have under Susan B. |

09:33:40  1  <u>Anthony vs. Driehaus</u>, we've got an injury in fact.  Katy

09:33:44  2  Independent School District, we've got imminent injury,

09:33:48  3  which you don't even have to have an jury in fact as long

09:33:51  4  as you have imminent injury.  And we have imminent injury,

09:33:55  5  as well, which is the chilling effect of schools not

09:33:58  6  purchasing books.  We've got financial harm, which is the

09:34:03  7  cost of review.  And just earlier this month, the Fifth

09:34:06  8  Circuit said economic harm was the quintessential Article

09:34:13  9  III injury in the mifepristone case.  Here, we have to

09:34:16  10  begin -- our clients have to begin the costly process of

09:34:19  11  identifying, rating and recalling books under the statute.

09:34:22  12  That is economic harm.

09:34:24  13       THE COURT:  Well, but why can't the state -- I'm

09:34:30  14  not saying it's a good idea but why can't the state

09:34:32  15  require them to do whatever the state wants to and if the

09:34:36  16  cost is too great, if the financial cost is too great,

09:34:41  17  then they don't sell books to schools.

09:34:43  18       MS. PRATHER:  They can't require them to do

09:34:45  19  something that's unconstitutional, your Honor.

09:34:46  20       THE COURT:  I know that.  What I'm saying is

09:34:51  21  here, let's assume for a second, the ratings are -- let's

09:34:55  22  leave out -- aside the constitutional issue.  Why can't

09:35:01  23  the state require them to do these ratings?

09:35:05  24       MS. PRATHER:  It's -- the Constitution -- you

09:35:08  25  can't really set aside the constitutional issue.  This is

09:35:11  1  compelled speech.

09:35:12  2          THE COURT:  Okay.

09:35:13  3          MS. PRATHER:  They can't compel them to speak.

09:35:17  4          THE COURT:  Again, if under your scenario then,

09:35:21  5  if plaintiffs wouldn't give every book a rating of no

09:35:25  6  rating, where's the injury?

09:35:28  7          MS. PRATHER:  The injury is still in the fact

09:35:30  8  that they have had to review the books.  There's costs to

09:35:33  9  review.

09:35:34  10         THE COURT:  Why do they have to review the books?

09:35:36  11         MS. PRATHER:  Under the statute, they're required

09:35:37  12  to review the books.

09:35:39  13         THE COURT:  Where does it say they have to review

09:35:41  14  the books?

09:35:54  15         MS. PRATHER:  Under Section 35.001, it requires

09:36:00  16  the library material vendor not to be able to sell the

09:36:03  17  books until there are ratings that have been issued.

09:36:07  18         THE COURT:  Where does it say they have to review

09:36:10  19  the books?  That's what your harm -- where does it say

09:36:14  20  they have to review the books as opposed to just giving

09:36:16  21  them a rating?

09:36:24  22         MS. PRATHER:  If you look at the 35.003 provision

09:36:27  23  that talks about the agency reviewing the ratings.

09:36:30  24         THE COURT:  That's agency -- that's your

09:36:35  25  get-out-of-jail free card.  Your company gives -- your

09:36:39   1   company complies tomorrow and says we've given every book

09:36:44   2   we're selling a rating of no rating and you're done.

09:36:54   3          MS. PRATHER:  The statute requires -- in addition

09:36:57   4   to them giving the initial rating, it requires them, it

09:37:01   5   says it shall, the vendors shall rate the library

09:37:04   6   materials according to the agency's corrected ratings.  So

09:37:09   7   that's the second layer of this.

09:37:10   8          THE COURT:  Well, that -- we don't know that the

09:37:12   9   agency's going to do that.

09:37:15   10          MS. PRATHER:  Well, the agency is meeting this --

09:37:17   11   I mean, the state board of education --

09:37:19   12          THE COURT:  Agency hasn't done that yet.  There's

09:37:22   13   no injury there yet.  I'm saying tomorrow, your client

09:37:31   14   gives every book that they want to sell to any school

09:37:35   15   district a rating of no rating.  There's no requirement

09:37:37   16   that you've cited to me that they have to review any of

09:37:41   17   these books which eliminates the harm of the cost of

09:37:44   18   reviewing them.  They've complied with the statute.  We

09:37:48   19   know that the TEA is going to -- has the power to.  We

09:37:51   20   don't know that they will, but we know that they have the

09:37:53   21   power to review any of the ratings that you've been given.

09:37:57   22   We know then if they're unhappy with them, then they get

09:38:01   23   to make the change.  You don't have a right to appeal.

09:38:06   24          So at that point, any change that's made to the

09:38:08   25   rating that you gave of no rating to something else is not

09:38:13  1   your speech, it's the TEA's speech.  That rating would be

09:38:18  2   -- you could put on the books, Of Mice And Men is now

09:38:24  3   whatever the TEA says it needs to be and they could put

09:38:28  4   it's a TEA rating.  Not our rating because your rating was

09:38:31  5   no rating.

09:38:33  6             MS. PRATHER:  Well, okay.  Couple of things.

09:38:36  7   Page 4 of H.B. 900, Section 35.0021 says that a library

09:38:45  8   material vendor must perform a contextual analysis of the

09:38:52  9   material to determine whether the material describes,

09:38:56  10  depicts, or portrays sexual conduct any way that is

09:39:02  11  patently offensive.  It requires the vendor to perform a

09:39:06  12  contextual analysis.  That's one thing.

09:39:09  13            Second thing you brought up, well, they can just

09:39:12  14  say it's TEA's ratings.  They can't.  Under the provisions

09:39:17  15  of the statute, TEA forces them to either accept their

09:39:22  16  ratings as their own, TEA publishes those ratings as the

09:39:27  17  vendor's ratings on their website or they can no longer

09:39:34  18  sell books to Texas schools.  So they don't get -- the

09:39:38  19  vendor doesn't get to say these are TEA's ratings.

09:39:40  20            THE COURT:  And what section is that in that you

09:39:44  21  just said with regard to the TEA makes the publishers say

09:39:50  22  that it's the publisher's rating and not the TEA rating?

09:39:53  23            MS. PRATHER:  You have to look at two provisions,

09:39:55  24  your Honor.

09:39:55  25            THE COURT:  Okay.

09:39:56  1          MS. PRATHER:  On the fifth page, Section

09:39:59  2  35.003(b) talks about the fact that TEA will let the

09:40:08  3  vendor know essentially if they disagree with the ratings

09:40:12  4  and then, the vendor shall rate the library material

09:40:17  5  according to the agency's corrected rating.

09:40:21  6          THE COURT:  All right.  That's the agency's

09:40:23  7  corrected rating.

09:40:24  8          MS. PRATHER:  Understood.  Then you look to 35.

09:40:31  9  -- this is on page 4, you look at 35.001(e) and it says

09:40:46 10  the agency shall post each list submitted under subsection

09:40:50 11  (c) and (d), okay?  (C) and (d) are the ones where you're

09:40:57 12  posting the ratings and you're posting those who don't

09:41:01 13  comply with them in a conspicuous place on the agency's

09:41:05 14  internet website as soon as practicable.

09:41:23 15          THE COURT:  I don't see either -- if I'm looking

09:41:26 16  at the right one, 35.002(c), is that what you're citing me

09:41:36 17  to, (c) and (e)?

09:41:37 18          MS. PRATHER:  Just a second.  35.003.

09:41:50 19          THE COURT:  Okay.  I'm on the wrong one.

09:41:58 20          MS. PRATHER:  003(b).  So (a) and (b).  (a)

09:42:03 21  requires the vendor's rating.  (b) requires the vendor to

09:42:09 22  adopt the state's rating if they disagree.

09:42:23 23          THE COURT:  I don't see anything in 35.003 that

09:42:27 24  prevents your clients from making it clear that this is

09:42:30 25  the agency's corrected rating and not theirs.

| | | |
|---|---|---|
| 09:42:33 | 1 | MS. PRATHER:  It doesn't go on the vendor's |
| 09:42:36 | 2 | website.  It goes on TEA's website.  They don't have any |
| 09:42:39 | 3 | control over what goes on TEA's website. |
| 09:42:42 | 4 | THE COURT:  Right.  So how does that impact -- |
| 09:42:46 | 5 | how is that speech from your client? |
| 09:42:49 | 6 | MS. PRATHER:  Because they're forcing our client |
| 09:42:51 | 7 | to adopt TEA's ratings and if they don't adopt TEA's |
| 09:42:55 | 8 | ratings, then they can't do business in Texas anymore. |
| 09:42:59 | 9 | Those corrected ratings are what goes on the TEA website |
| 09:43:03 | 10 | as though they are the vendor's speech. |
| 09:43:06 | 11 | THE COURT:  I don't see that at all.  They go on |
| 09:43:08 | 12 | the agency's website. |
| 09:43:10 | 13 | MS. PRATHER:  They go on the agency's website as |
| 09:43:13 | 14 | the vendor's ratings. |
| 09:43:15 | 15 | THE COURT:  I don't -- am I -- it's the vendor |
| 09:43:26 | 16 | shall rate the library material according to the agency's |
| 09:43:29 | 17 | corrected ratings, which is -- they could say those are |
| 09:43:32 | 18 | the agency's corrected ratings, not the vendor's. |
| 09:43:36 | 19 | MS. PRATHER:  They don't get to decide what they |
| 09:43:37 | 20 | say.  It goes on the agency's website.  They don't get to |
| 09:43:41 | 21 | write out what's on the agency's website. |
| 09:43:43 | 22 | THE COURT:  It's clear it's the agency's ratings |
| 09:43:46 | 23 | and not your clients'. |
| 09:43:48 | 24 | MS. PRATHER:  It's attributed to our client.  The |
| 09:43:51 | 25 | agency has -- they post and they maintain this list on |

| | | |
|---|---|---|
| 09:43:56 | 1 | their website of the vendor's ratings. |
| 09:44:02 | 2 | THE COURT:  Okay.  Could I hear a response to |
| 09:44:05 | 3 | that?  I don't know what I'm missing and I'm not getting |
| 09:44:09 | 4 | there.  Ms. Prather says it's compelled speech because it |
| 09:44:24 | 5 | would be on the vendor's site and my sense is it would be |
| 09:44:28 | 6 | the agency's corrected ratings, but I may be missing |
| 09:44:31 | 7 | something. |
| 09:44:32 | 8 | MS. CELLA:  Yes, your Honor.  It would be the |
| 09:44:33 | 9 | agency's corrected ratings because they have the oversight |
| 09:44:38 | 10 | over the final ratings. |
| 09:44:41 | 11 | THE COURT:  So do you see any issue with |
| 09:44:44 | 12 | compelled speech in that situation? |
| 09:44:46 | 13 | MS. CELLA:  No, your Honor. |
| 09:44:47 | 14 | THE COURT:  Okay.  Wouldn't it be -- I mean, |
| 09:44:54 | 15 | because as I understand, it's not like these ratings are |
| 09:44:57 | 16 | going to be on the books.  It's going -- they're going to |
| 09:45:02 | 17 | be posted on the agency site, correct? |
| 09:45:07 | 18 | MS. CELLA:  Correct. |
| 09:45:07 | 19 | THE COURT:  And so here, even if it was -- if it |
| 09:45:15 | 20 | had to do with the vendors, what those vendors had, it's |
| 09:45:18 | 21 | only because the vendor is selling that group of books, |
| 09:45:21 | 22 | but the ratings would be the agency's ratings, correct? |
| 09:45:23 | 23 | MS. CELLA:  Yes.  That's correct. |
| 09:45:24 | 24 | THE COURT:  So if the vendor started off with no |
| 09:45:28 | 25 | rating and that got amended by the TEA and that rating was |

09:45:32   1   put in -- then the vendor would have a choice, okay, we're

09:45:37   2   not -- we disagree with that, but then, they just wouldn't

09:45:39   3   be able to sell the book, right?

09:45:42   4           MS. CELLA:  They would -- if they don't correct

09:45:45   5   the rating, then they cannot sell -- well, the schools

09:45:48   6   cannot purchase books from them.

09:45:51   7           THE COURT:  But according to the agency's

09:45:53   8   ratings, not the vendor's ratings.

09:45:56   9           MS. CELLA:  According to the agency's ratings,

09:45:57  10   yes.

09:45:57  11           THE COURT:  Okay.  At any rate, okay.  I think I

09:46:05  12   have that.  Okay.  Let me have Ms. Prather again.  If

09:46:07  13   there's anything else you'd like to say with regard to

09:46:11  14   standing, I'd like to hear it and I'll hear from

09:46:13  15   defendant.  And I get your point that the vendor's name is

09:46:28  16   on the ratings.  I get -- I see where the issue is.  So...

09:46:36  17           MS. PRATHER:  The (c) and (d) that is being

09:46:37  18   referenced in 35.002(e) is the (c) and (d) of the vendor's

09:46:44  19   ratings.  So in addition to the standing that is for

09:46:55  20   pre-enforcement challenge of an unconstitutional statute

09:46:59  21   expressly provided under Virginia II and Speech First,

09:47:05  22   we've also established that there is an injury in fact and

09:47:10  23   an imminent injury.  We've talked about the cost of

09:47:13  24   review.  We've talked about the imminent harm the fact

09:47:17  25   that this takes effect September 1st.  We've talked about

09:47:20  1   there is a credible threat of compelled speech, which

09:47:24  2   under 303 Creative, a case handed down in June of this

09:47:28  3   year by the Supreme Court, is prohibited.  The plaintiff

09:47:33  4   cannot be required to assume the state's speech as its

09:47:40  5   own.

09:47:41  6           And then, we've talked about -- or we haven't

09:47:43  7   talked about yet the ability of the plaintiffs to bring a

09:47:47  8   claim based upon third parties' rights.  And here, we have

09:47:52  9   also brought a claim based upon the third-party rights of

09:47:56  10  other publishers and students to receive information.

09:48:01  11  We've got a big problem with this statute from the

09:48:04  12  overbreadth standpoint.

09:48:05  13          THE COURT:  Where does your client -- it may or

09:48:10  14  may not be an issue but where does your client have

09:48:13  15  standing with respect to the information that kids would

09:48:18  16  get in school from school libraries?

09:48:23  17          MS. PRATHER:  Your Honor, under 303 Creative, we

09:48:27  18  are permitted to bring claims on behalf of other parties,

09:48:32  19  on behalf of third parties who have an interest in

09:48:36  20  receiving information, and here, the students have an

09:48:40  21  interest in receiving information.  Standing --

09:48:44  22          THE COURT:  I'm not following you.  And I've read

09:48:47  23  that case.  I'm pretty familiar with it.  I don't see how

09:48:51  24  that case applies to this scenario given the facts of that

09:48:56  25  case.  Help me out with that.  I don't see how your

09:49:02  1  clients have standing in this case to advocate for the

09:49:09  2  students' interests.

09:49:12  3      MS. PRATHER:  Your Honor, there's a series of

09:49:13  4  cases, U.S. Supreme Court and otherwise, that permit this.

09:49:18  5  One of them is the Department of Commerce vs. New York

09:49:22  6  case that allows for standing to be based on the

09:49:26  7  predictable effect of the government action on the

09:49:29  8  decisions of third parties.  Here, you've got librarians

09:49:35  9  that are already acting under this law that is a

09:49:38  10  predictable effect of H.B. 900.  You've got the inability

09:49:45  11  of students to access information.

09:49:47  12      Under Bantam Books vs. Sullivan, book

09:49:51  13  distributors had standing to challenge laws prohibiting

09:49:53  14  the distribution of objectionable books to minors.  This

09:49:58  15  is not just something that is based upon the rights of the

09:50:03  16  plaintiffs in this case, but because the unconstitutional

09:50:06  17  effects of this law permeate throughout, there are also --

09:50:11  18  there is also the right to be able to bring this case on

09:50:15  19  behalf of the rights of those third parties.

09:50:19  20      Here, we've got a credible threat of enforcement,

09:50:23  21  as well.  I know that the AG's office claims that they

09:50:26  22  won't enforce it, but the reality is, they can't make that

09:50:29  23  claim and bind this court.  We have the First Amendment

09:50:36  24  protecting against the government.  This is the U.S. vs.

09:50:40  25  Stevens case where this court cannot rely upon the

09:50:45  1  attorney general to make some promise that they won't

09:50:49  2  enforce a statute.  The statute has an effective date of

09:50:53  3  September 1st.  They can't promise around it.

09:50:56  4          At the prior hearing, the attorney general said

09:51:00  5  -- the attorney general's counsel said that the law

09:51:02  6  definitely could be enforced in the future and that it's

09:51:06  7  likely the defendants in this case will be the ones to

09:51:09  8  enforce it.

09:51:12  9          So we next move on to traceability and that

09:51:17  10  traceability is directly to the defendants in this case.

09:51:26  11  Redressability is the third factor.  If H.B. 900 is

09:51:30  12  enjoined, then we'll no longer need to review and rate

09:51:33  13  these books.  We can resume selling books to public

09:51:37  14  schools and we won't be forced to adopt the state speech

09:51:43  15  as our own.

09:51:47  16          Here, once again, the attorney general has

09:51:50  17  admitted there's no mechanism for the plaintiffs to

09:51:54  18  receive relief under this statute.  The only way in which

09:51:57  19  we can get relief is through this court right now.  How do

09:52:01  20  we get relief?  How do they get relief, your Honor asked

09:52:05  21  at the last hearing, and the response was, well, your

09:52:09  22  Honor, maybe they can't.  An injunction is the only way

09:52:13  23  that we can get relief and a favorable ruling here will

09:52:18  24  permit the plaintiffs not to have to incur the costs to be

09:52:24  25  able to resume selling books and to not have to be

09:52:28  1   compelled to speak against their will.

09:52:35  2         Should I move on to sovereign immunity, your
09:52:37  3   Honor?

09:52:37  4         THE COURT:  No.  I'll hear from the government on
09:52:38  5   standing and then, I'll have her come back on sovereign
09:52:42  6   immunity.  And by the way, when you see me typing, I don't
09:53:01  7   want you to think I'm not listening.  My clerk and I are
09:53:05  8   going back and forth on what y'all are saying.  So I don't
09:53:07  9   mean to be rude here if it's just where we're at.

09:53:15  10        MS. CELLA:  Your Honor, as you pointed out,
09:53:19  11  there's no enforcement against the plaintiffs.  You had
09:53:23  12  pointed that out and that's exactly correct.  That's
09:53:26  13  exactly what the statute says.  I'd also like to point out
09:53:30  14  that there are -- there's no guarantee of the plaintiffs
09:53:34  15  being able to sell books to public schools.  There's just
09:53:38  16  no right to distribute books.  There are certain
09:53:41  17  procurement guideline -- or standards and guidelines that
09:53:46  18  public schools have to follow when they're purchasing
09:53:49  19  books.

09:53:49  20        So in order for a vendor to sell those books to
09:53:54  21  the school districts, the school district has to follow
09:53:57  22  those guidelines.  So there's just no guarantee, there's
09:54:00  23  no property right of the vendors to sell any books.  And
09:54:06  24  as far as the standing on a third party, a party generally
09:54:11  25  must assert his own legal rights and interests and cannot

09:54:15  1  rest his claim to relief on the legal rights or interests

09:54:17  2  of third parties.  That's in <u>Kowalski vs. Tesmer</u>.

09:54:22  3      To confer third-party standing, a party must show

09:54:26  4  a close relationship with the person who possesses the

09:54:28  5  rights.  Plaintiffs have made no effort to plead and they

09:54:32  6  cannot confer third-party standing so that they have to

09:54:37  7  show that they actually have standing here and they just

09:54:40  8  don't.  There's no threat of enforcement against them.

09:54:44  9  There's no harm.  They have no property right to sell

09:54:47  10  these books to public schools in Texas.  If they want to

09:54:51  11  do that, they need to follow what the state guidelines and

09:54:55  12  the state legislature has set forth.

09:55:00  13      And I believe that we talked about this last time

09:55:04  14  so I apologize if I am repeating myself but the threat --

09:55:08  15  and we just talked about, a couple of minutes ago, any

09:55:10  16  threat of enforcement, which there's none, but even if

09:55:13  17  there was, it's not imminent.  April 1st is, I believe,

09:55:16  18  seven months from Thursday.  So there's just no standing.

09:55:21  19      THE COURT:  I don't think the imminentness of the

09:55:25  20  April 1st and the standing have a lot to do with each

09:55:28  21  other, but I mean, I get both points.  But what about

09:55:39  22  going back to the issue Ms. Prather raised?  What impact

09:55:50  23  -- do you not see any injury to the plaintiff because it

09:55:52  24  will be on -- even on the agency's website, it will be the

09:55:56  25  vendor -- it will appear to be the vendor's ratings?

| | | |
|---|---|---|
| 09:56:00 | 1 | MS. CELLA:  No, your Honor.  There would be no |
| 09:56:01 | 2 | injury to plaintiffs.  It is government speech in order to |
| 09:56:05 | 3 | engage in a contract basically with public schools, these |
| 09:56:11 | 4 | ratings are required.  They're TEA's -- TEA has oversight |
| 09:56:13 | 5 | so they're TEA's ratings.  As far as it being on the |
| 09:56:18 | 6 | website, that's just required in the statute.  That |
| 09:56:21 | 7 | doesn't make it not TEA's.  It's still TEA's ratings and |
| 09:56:28 | 8 | it would be on -- I think you pointed out, it would be on |
| 09:56:31 | 9 | TEA's website so that's clearly the agency rating. |
| 09:56:35 | 10 | THE COURT:  Would -- and it hasn't happened yet. |
| 09:56:42 | 11 | But when I'm looking at those ratings for -- if I go to -- |
| 09:56:48 | 12 | so it's going to be on the TEA website, right? |
| 09:56:51 | 13 | MS. CELLA:  Yes. |
| 09:56:51 | 14 | THE COURT:  And then, is there going to be some |
| 09:56:53 | 15 | way -- someone going to the TEA website could find ratings |
| 09:56:58 | 16 | by a publisher or something?  How would -- how are these |
| 09:57:03 | 17 | going to be categoried -- how are these going to be put |
| 09:57:05 | 18 | up? |
| 09:57:06 | 19 | MS. CELLA:  I am not 100 percent sure but I |
| 09:57:09 | 20 | believe it's going to be the list that the vendor -- the |
| 09:57:11 | 21 | publisher submits.  So I do think it may say -- I'm not |
| 09:57:15 | 22 | 100 percent sure, your Honor, but it may say who the |
| 09:57:19 | 23 | vendor is. |
| 09:57:19 | 24 | THE COURT:  So publisher Barnes & Noble sends in |
| 09:57:24 | 25 | their list and they have no ratings.  When they send them |

| | | |
|---|---|---|
| 09:57:28 | 1 | a list, they put no ratings on everything.  Number one, |
| 09:57:32 | 2 | it's an open question -- well, let me go back and what do |
| 09:57:37 | 3 | you understand this statute to say where the vendor must |
| 09:57:42 | 4 | perform a contextual analysis?  What does that mean? |
| 09:57:48 | 5 | MS. CELLA:  Sure.  So they need to review that |
| 09:57:50 | 6 | book to determine if it fits in these -- the certain |
| 09:57:55 | 7 | requirements on how they rate the book. |
| 09:57:57 | 8 | THE COURT:  Every book they're selling, they need |
| 09:57:59 | 9 | to go back and do a contextual analysis of? |
| 09:58:02 | 10 | MS. CELLA:  Well, according to the statute, yes, |
| 09:58:06 | 11 | I mean, they do need to do a good-faith effort to comply |
| 09:58:08 | 12 | with the law and rate these books. |
| 09:58:10 | 13 | THE COURT:  And what about Ms. Prather's argument |
| 09:58:11 | 14 | about the expense of doing it? |
| 09:58:15 | 15 | MS. CELLA:  Again, your Honor, they have no |
| 09:58:16 | 16 | property right to sell these books to the school.  They |
| 09:58:18 | 17 | don't have to engage in that.  It's not like these books |
| 09:58:21 | 18 | are being restricted for sale anywhere.  It's just in |
| 09:58:25 | 19 | public schools. |
| 09:58:29 | 20 | THE COURT:  I got it.  And then, flipping back, |
| 09:58:33 | 21 | if Barnes & Noble sends in their list, it says no ratings |
| 09:58:36 | 22 | on a hundred percent of the books, which is what I had |
| 09:58:41 | 23 | suggested to see if there's harm and what is under this |
| 09:58:47 | 24 | statute, what obligation does the TEA have to even double |
| 09:58:53 | 25 | check on any of the ratings? |

09:58:55  1          MS. CELLA:  It's not mandated.  It's a may.  They

09:58:58  2  may rate them.  So they are not required to.  They may,

09:59:02  3  they may not.

09:59:04  4          THE COURT:  So -- give me one second.  And then,

09:59:15  5  the TEA goes back through under my scenario, decides if Of

09:59:20  6  Mice And Men needs to have a higher rating, a more

09:59:23  7  restrictive rating, and tells Barnes & Noble that.  Barnes

09:59:29  8  & Noble then has to amend its rating on its vendor list

09:59:35  9  when they -- I guess that's the second one that's due in a

09:59:39  10 year after April.  But that's going to be -- it will be on

09:59:45  11 the Barnes & Noble list but it will be on the agency

09:59:47  12 website.

09:59:48  13         MS. CELLA:  Correct.

09:59:49  14         THE COURT:  And is there any way for Barnes &

09:59:51  15 Noble to indicate that that rating is the TEA's rating and

09:59:55  16 not theirs?

09:59:56  17         MS. CELLA:  There's nothing in the statute

09:59:58  18 preventing them from doing that.

10:00:02  19         THE COURT:  Okay.  Do you have anything else you

10:00:05  20 wanted to say on standing?  You said you might have other

10:00:08  21 arguments, I'm happy to hear them if you have any.

10:00:10  22         MS. CELLA:  Just on that point, I think I may

10:00:12  23 have said this but if not, you know, if the vendor decides

10:00:16  24 they don't want to correct that rating to TEA's rating,

10:00:20  25 they can always just take their business somewhere else.

|          |    |                                                                    |
|----------|----|--------------------------------------------------------------------|
| 10:00:24 | 1  | They don't have to sell to public schools and I think I            |
| 10:00:26 | 2  | made that point.  But I do believe that it would be                |
| 10:00:31 | 3  | assumed or it should be assumed that any list that's               |
| 10:00:34 | 4  | listed on a state agency website is the state agency's.            |
| 10:00:38 | 5  | THE COURT:  Got it.  Anything else from --                         |
| 10:00:44 | 6  | MS. CELLA:  That's all I have on this piece.                       |
| 10:00:45 | 7  | THE COURT:  Ms. Prather, if there's anything else                  |
| 10:00:47 | 8  | you want to say on standing.  And also, why would the              |
| 10:00:54 | 9  | Court not be more prudent to wait and see if there was             |
| 10:00:58 | 10 | actually some kind of enforcement action against one of            |
| 10:01:01 | 11 | your clients?  I mean, in other words, you give -- you             |
| 10:01:07 | 12 | comply -- I guess, number one, what y'all are saying is,           |
| 10:01:13 | 13 | you don't want to comply.  You don't want to go through            |
| 10:01:15 | 14 | the expense of doing this.  I get that.  But if you were           |
| 10:01:21 | 15 | to mark all of the books that you are selling to the               |
| 10:01:27 | 16 | libraries -- I'm sorry, to the school districts no rating,         |
| 10:01:35 | 17 | why wouldn't you have standing prior to the -- some                |
| 10:01:39 | 18 | enforcement action by the state?                                   |
| 10:01:41 | 19 | MS. PRATHER:  Your Honor, it's not that we don't                   |
| 10:01:44 | 20 | -- I think saying that we don't want to comply, it is              |
| 10:01:48 | 21 | impossible to comply with this statute.  Counsel just said         |
| 10:01:53 | 22 | that we have to make a good-faith effort to review all the         |
| 10:01:56 | 23 | books.  They've admitted we have to review all the books.          |
| 10:02:00 | 24 | THE COURT:  I guess that's why I go back and it's                  |
| 10:02:03 | 25 | not really a question as much as an observation.  You're           |

| | |
|---|---|
| 10:02:07 | 1 |

welcome to comment on it.  If it's financially -- if your

clients are financially unable to do it, I don't know

whose would; and at that point, why wouldn't the

legislation just fail because the school districts

wouldn't be able to buy any books, right?  If no one

complies with this, then where do they get their books?

          MS. PRATHER:  Well, and then, there's the

constitutional harm to everyone, right, which I guess goes

back to the third-party standing issue.

          THE COURT:  I'm less sure that you have standing

for that.  But what I'm saying is, if this law is as

impossible to comply with as you're indicating it is, then

why won't it be impossible for everybody and why won't

this wind up essentially being a veto over anyone being

able to sell books, which is a different issue that would

have to be brought?

          MS. PRATHER:  I mean, I don't think -- I mean,

the role of the federal court here is to weed out

unconstitutional statutes.

          THE COURT:  I'm familiar with my role.  That's

not my question.  Again, my question is, you're acting

like it's -- would be financially impossible for you all

to do this and has some component in it that y'all are

unable to but others would be able to.  That's what I'm

trying to figure out here is why the law won't fail if no

| | | |
|---|---|---|
| 10:03:52 | 1 | one is able -- if you're correct and no one will be able |
| 10:03:55 | 2 | to comply with it, then ultimately, it can't be enforced. |
| 10:03:58 | 3 | I mean, the schools won't be getting any books, which is a |
| 10:04:03 | 4 | terrible thing, I think. |
| 10:04:06 | 5 | Let me make clear but, again, I'm just trying to |
| 10:04:10 | 6 | ferret -- I'm trying to do the best I can to determine |
| 10:04:13 | 7 | where you have standing.  Is there anything else you |
| 10:04:16 | 8 | wanted to say with regard to standing? |
| 10:04:18 | 9 | MS. PRATHER:  Yes.  I mean, I guess there's -- I |
| 10:04:24 | 10 | think we very clearly establish standing based upon a |
| 10:04:27 | 11 | whole host of different reasons.  The First Amendment |
| 10:04:31 | 12 | pre-enforcement issue, the injury in fact issue, the cost |
| 10:04:38 | 13 | of review, the imminent harm, the credible threat of |
| 10:04:42 | 14 | compelled speech, and the injuries to the third parties. |
| 10:04:47 | 15 | And back to the injuries of the third parties, |
| 10:04:49 | 16 | there are two cases that we cited in our response at pages |
| 10:04:52 | 17 | 8 and 9, Serafine vs. Branaman and Broadrick vs. Oklahoma. |
| 10:04:59 | 18 | One is a Fifth Circuit case, one is a U.S. Supreme Court |
| 10:05:02 | 19 | case, and in both of those instances, people were |
| 10:05:05 | 20 | permitted to have standing on behalf of third parties to |
| 10:05:09 | 21 | challenge various statutes that impacted the third party's |
| 10:05:16 | 22 | rights.  In Broad -- |
| 10:05:17 | 23 | THE COURT:  And -- I'm sorry. |
| 10:05:19 | 24 | MS. PRATHER:  In Broadrick vs. Oklahoma, the |
| 10:05:21 | 25 | litigants were permitted to challenge a statute not |

| | | |
|---|---|---|
| 10:05:23 | 1 | because their own rights of freedom of expression were |
| 10:05:26 | 2 | violated but because of the judicial prediction or |
| 10:05:30 | 3 | assumption that the statute's very existence, much like |
| 10:05:33 | 4 | this statute, may cause others not before the Court to |
| 10:05:37 | 5 | refrain from constitutionally protected speech or |
| 10:05:41 | 6 | expression.  Those two cases support the fact that we do, |
| 10:05:47 | 7 | in fact, have standing to bring this claim on behalf of |
| 10:05:50 | 8 | third parties, which is only one of the bases for |
| 10:05:53 | 9 | standing. |
| 10:05:54 | 10 | The issue of property rights is a complete red |
| 10:05:57 | 11 | herring here.  The AG's brought up the issue of, well, |
| 10:06:00 | 12 | they don't have a property right.  We don't need a |
| 10:06:03 | 13 | contract to have standing here.  We're not challenging any |
| 10:06:08 | 14 | existing contract.  The plaintiffs have already |
| 10:06:11 | 15 | established that they have collectively engaged in |
| 10:06:13 | 16 | millions of dollars in sales with school districts and |
| 10:06:16 | 17 | that they plan to continue to sell books to the school |
| 10:06:19 | 18 | districts of Texas.  Standing can be established based on |
| 10:06:24 | 19 | this predictable effect of the government action on the |
| 10:06:28 | 20 | decisions of third parties. |
| 10:06:30 | 21 | And the last thing I want to bring up and this |
| 10:06:32 | 22 | just was in response to one of the Court's questions that |
| 10:06:36 | 23 | the Court asked if the booksellers would be able to |
| 10:06:41 | 24 | indicate that these were TEA's ratings and the response |
| 10:06:45 | 25 | was interesting.  The response was, there's nothing in the |

| | | |
|---|---|---|
| 10:06:47 | 1 | statute preventing them from doing that.  Well, there is |
| 10:06:51 | 2 | something in the fact that TEA controls its website; the |
| 10:06:55 | 3 | booksellers don't.  They don't control what is put up |
| 10:07:01 | 4 | there and what is being put up there has already by |
| 10:07:04 | 5 | statute been indicated, it will be the vendor's list and |
| 10:07:09 | 6 | that vendor's list will include the compelled speech of |
| 10:07:11 | 7 | the state. |
| 10:07:14 | 8 | THE COURT:  And I don't know if you've had the |
| 10:07:19 | 9 | opportunity to do it but has anyone made any calculation |
| 10:07:24 | 10 | -- maybe it was done back when the law was being debated |
| 10:07:29 | 11 | at the House and Senate.  Were there any estimates of the |
| 10:07:33 | 12 | actual cost it would be to the different entities like |
| 10:07:36 | 13 | yours, or the other plaintiffs, or other companies? |
| 10:07:40 | 14 | MS. PRATHER:  So there are declarations in the |
| 10:07:42 | 15 | record, one of which is from Blue Willow and in that |
| 10:07:46 | 16 | declaration, the bookseller estimates that it will be |
| 10:07:52 | 17 | hundreds of millions of dollars that it will cost them. |
| 10:07:57 | 18 | Also, we talked about this a little bit at the last |
| 10:07:58 | 19 | hearing, which we've discussed the fiscal note that was |
| 10:08:02 | 20 | put on this bill and that fiscal note -- |
| 10:08:04 | 21 | THE COURT:  I remember that. |
| 10:08:06 | 22 | MS. PRATHER:  You remember that. |
| 10:08:07 | 23 | THE COURT:  Could you move to sovereign immunity? |
| 10:08:11 | 24 | MS. PRATHER:  Yes, your Honor. |
| 10:08:13 | 25 | We believe that sovereign immunity has been |

10:08:15  1  waived in this case under the Ex Parte: Young exception

10:08:18  2  which applies, and it applies very clearly, because the

10:08:22  3  complaint alleges an ongoing violation of federal law and

10:08:26  4  it seeks relief properly characterized as prospective.

10:08:31  5  Here, the plaintiffs seek only injunctive relief and

10:08:35  6  they've sued defendants in their official capacity based

10:08:37  7  on this ongoing constitutional violation.  It clearly

10:08:41  8  falls within the Ex Parte: Young exemption.

10:08:45  9        You don't have to have an actual enforcement.

10:08:50  10  That's not required as your Honor said in your case, the

10:08:53  11  Calhoun vs. Collier case.  Instead, you just have to have

10:09:00  12  -- there we go.  Instead, just have to have an enforcement

10:09:07  13  -- you just have to have the defendants have pervasive

10:09:09  14  authority to oversee and enforce a rating system that is

10:09:13  15  premised on compulsion and constraint.  That is exactly

10:09:16  16  what this law is.  The compulsion is, you're compelling

10:09:21  17  booksellers to issue and accept TEA's ratings.  The

10:09:25  18  constraint --

10:09:26  19        THE COURT:  Or not sell.

10:09:29  20        MS. PRATHER:  Or not sell.  But that, too, is a

10:09:33  21  constitutional violation.  You're impeding their ability

10:09:37  22  to distribute books, which is constitutionally protected.

10:09:41  23  The constraint is from selling the books.  So here, we've

10:09:48  24  got the admission by the attorney general's office that

10:09:53  25  enforcement would fall with the defendants in this case.

| | | |
|---|---|---|
| 10:09:57 | 1 | We've got establishment of compulsion or constraint and |
| 10:09:59 | 2 | we've got establishment of the connection to the |
| 10:10:03 | 3 | enforcement. |
| 10:10:07 | 4 | We also have the fact that what we're asking for |
| 10:10:10 | 5 | here is simply for a federal court to command that the |
| 10:10:18 | 6 | defendants refrain from violating the plaintiffs' |
| 10:10:21 | 7 | constitutional rights.  They are not asking them to do |
| 10:10:25 | 8 | anything other than refrain from violating federal law. |
| 10:10:30 | 9 | This all falls within the Ex Parte: Young exemption to |
| 10:10:36 | 10 | sovereign immunity. |
| 10:10:39 | 11 | Would you like for me to go on? |
| 10:10:42 | 12 | THE COURT:  Sure. |
| 10:10:43 | 13 | MS. PRATHER:  The attorney general's office has |
| 10:10:45 | 14 | brought up three or four different red herrings in this |
| 10:10:49 | 15 | case and those red herrings deal with things like a claim |
| 10:10:54 | 16 | that this is somehow government speech.  This is not |
| 10:10:59 | 17 | government speech and, in fact, it's very clear that it's |
| 10:11:03 | 18 | not government speech because the government is not the |
| 10:11:06 | 19 | one who is reviewing and rating these books in the first |
| 10:11:10 | 20 | instance.  They're requiring the bookseller to do so. |
| 10:11:13 | 21 | So it really makes no sense since these initial |
| 10:11:16 | 22 | ratings are being required of private vendors and those |
| 10:11:23 | 23 | ratings, keep in mind, are being -- |
| 10:11:24 | 24 | THE COURT:  I'm not following you.  I'm not |
| 10:11:30 | 25 | following how making them give a rating is compelled |

| | | |
|---|---|---|
| 10:11:34 | 1 | speech.  I mean, they can put whatever rating they want on |
| 10:11:37 | 2 | them, right? |
| 10:11:38 | 3 | MS. PRATHER:  Well, I mean, it's compelled speech |
| 10:11:41 | 4 | because they have to follow the criteria that's in the |
| 10:11:45 | 5 | statute and they don't agree with that criteria.  The |
| 10:11:48 | 6 | declarations in the record specifically -- |
| 10:11:50 | 7 | THE COURT:  What do you mean they don't?  So |
| 10:11:53 | 8 | what.  I mean... |
| 10:11:55 | 9 | MS. PRATHER:  Well, they're being forced to rate |
| 10:11:57 | 10 | something as either sexually explicit or sexually relevant |
| 10:12:00 | 11 | and they don't agree with the criteria that characterizes |
| 10:12:03 | 12 | something as sexually relevant or sexually explicit. |
| 10:12:07 | 13 | That's compelling them to put a rating on a book that they |
| 10:12:12 | 14 | don't agree with the criteria.  That's the first problem. |
| 10:12:18 | 15 | The second problem is when the state disagrees |
| 10:12:20 | 16 | with the rating they've put and then, they're compelled |
| 10:12:23 | 17 | again to adopt the state's ratings.  In any event, it's |
| 10:12:31 | 18 | not government speech.  This compelled rating system, |
| 10:12:35 | 19 | which is being forced on the private vendors, is going to |
| 10:12:39 | 20 | be posted on the Worldwide Web as though it is their own |
| 10:12:42 | 21 | and it will have an impact on their ability well beyond |
| 10:12:49 | 22 | the parameters and the borders of this state.  It goes up |
| 10:12:53 | 23 | on the Worldwide Web so it impacts them everywhere. |
| 10:12:58 | 24 | THE COURT:  Or they can choose just not to sell |
| 10:13:01 | 25 | books in Texas. |

10:13:04  1          MS. PRATHER:  Which, once again, your Honor,

10:13:06  2  would be a violation of their First Amendment rights.

10:13:08  3  They have the right to distribute books under the

10:13:12  4  Constitution.  That is a protected First Amendment right.

10:13:16  5  So what we're dealing with here --

10:13:18  6          THE COURT:  They have a right -- the school

10:13:24  7  districts have 100 percent of the right to state who they

10:13:27  8  buy from, correct?

10:13:28  9          MS. PRATHER:  They can decide who they buy from,

10:13:30  10 yes, your Honor.

10:13:30  11         THE COURT:  So -- okay.  I mean -- go ahead.

10:13:44  12         MS. PRATHER:  So the issue here is whether or not

10:13:46  13 this is government speech.  It's not.  It's private vendor

10:13:49  14 speech that's being forced upon it by the government.  The

10:13:54  15 ratings here.

10:13:55  16         THE COURT:  But only if they want to be eligible

10:13:58  17 to sell books to the school districts.

10:14:01  18         MS. PRATHER:  Your Honor, they have sold books to

10:14:02  19 the school districts for decades.  They have indicated

10:14:06  20 that they would like to continue to sell books to the

10:14:10  21 schools.  That establishes their standing to be able to

10:14:13  22 challenge this law, which will inhibit their ability to

10:14:16  23 sell books in the state of Texas.  The speech at issue

10:14:21  24 here is pure speech.  It is speech that is protected by

10:14:24  25 the First Amendment because it communicates ideas, the

| | | |
|---|---|---|
| 10:14:29 | 1 | idea of whether these books contain sexually explicit or |
| 10:14:32 | 2 | sexually relevant information, and the problem is that the |
| 10:14:37 | 3 | state is compelling them to speak in a particular manner, |
| 10:14:40 | 4 | which is unconstitutional under 303 Creative. |
| 10:14:46 | 5 | THE COURT:  I don't -- I'm having a hard time |
| 10:14:54 | 6 | with the 303 Creative analysis.  And what I'm having a |
| 10:15:06 | 7 | hard time with, too, is in terms of sovereign immunity, |
| 10:15:12 | 8 | why the state can't take whatever steps it wants in terms |
| 10:15:17 | 9 | of determining on behalf of the school districts what they |
| 10:15:21 | 10 | will and won't have in the school libraries. |
| 10:15:25 | 11 | MS. PRATHER:  This isn't curriculum, your Honor. |
| 10:15:27 | 12 | This goes beyond curriculum.  If it were curriculum, that |
| 10:15:30 | 13 | would be one thing. |
| 10:15:31 | 14 | THE COURT:  So libraries are outside of |
| 10:15:33 | 15 | curriculum? |
| 10:15:34 | 16 | MS. PRATHER:  Yes. |
| 10:15:38 | 17 | THE COURT:  Okay. |
| 10:15:42 | 18 | MS. PRATHER:  What this statute does is, it sets |
| 10:15:44 | 19 | up a process. |
| 10:15:45 | 20 | THE COURT:  Why is that?  I mean, but why can't |
| 10:15:54 | 21 | the state decide what it's going to allow the school |
| 10:16:00 | 22 | districts -- what books they are going to have in the |
| 10:16:04 | 23 | school library and what manner in which they will be |
| 10:16:08 | 24 | accessible to the kids?  Why is that not a function that |
| 10:16:11 | 25 | the state has the power to have? |

| | | |
|---|---|---|
| 10:16:15 | 1 | MS. PRATHER:  The removal of books, your Honor, |
| 10:16:19 | 2 | which this court -- Judge Pitman dealt with in the Llano |
| 10:16:23 | 3 | County case. |
| 10:16:23 | 4 | THE COURT:  That's a public library.  That's a |
| 10:16:27 | 5 | public library and I don't think -- it has nothing to do |
| 10:16:31 | 6 | with the school library in my opinion. |
| 10:16:33 | 7 | MS. PRATHER:  Your Honor, the school library is |
| 10:16:36 | 8 | also similar to a public library, a place that goes beyond |
| 10:16:43 | 9 | curriculum.  If you look at the Texas Administrative Code |
| 10:16:46 | 10 | and the sections that deal specifically with student |
| 10:16:50 | 11 | libraries, they talk about it enhancing and exceeding the |
| 10:16:54 | 12 | curriculum the ability to evoke and instill curiosity in |
| 10:17:00 | 13 | students beyond the school day.  It is not limited to |
| 10:17:04 | 14 | curriculum. |
| 10:17:05 | 15 | THE COURT:  You're not going to convince me that |
| 10:17:08 | 16 | sexually explicit materials should be allowed in a school |
| 10:17:10 | 17 | library, which is not what Judge Pitman was dealing with |
| 10:17:14 | 18 | in a public library. |
| 10:17:17 | 19 | MS. PRATHER:  I'm not trying to. |
| 10:17:18 | 20 | THE COURT:  Well, the other -- as I understand |
| 10:17:23 | 21 | it, only sexually explicit books are prohibited from being |
| 10:17:27 | 22 | in the library.  My understanding is that all other books |
| 10:17:31 | 23 | could be in the school library. |
| 10:17:33 | 24 | MS. PRATHER:  The way that the law is written, |
| 10:17:35 | 25 | sexually explicit books, which are not tied to the |

| | | |
|---|---|---|
| 10:17:38 | 1 | definition of obscenity, which means that they actually |
| 10:17:42 | 2 | prohibit constitutionally protected works from being in |
| 10:17:46 | 3 | the library, which is problematic, would be removed. |
| 10:17:52 | 4 | Sexually relevant books would be put into a separate |
| 10:17:55 | 5 | section where the parents could decide whether -- |
| 10:17:58 | 6 | THE COURT:  So your argument is that the state |
| 10:18:02 | 7 | doesn't even have the power to deal with sexually explicit |
| 10:18:04 | 8 | in a school? |
| 10:18:06 | 9 | MS. PRATHER:  My argument is, they've exceeded |
| 10:18:08 | 10 | the Constitution in their definition of sexually explicit, |
| 10:18:10 | 11 | which is problematic.  The sexually explicit definition is |
| 10:18:13 | 12 | not tied to Miller v. California.  It's not tied to the |
| 10:18:17 | 13 | penal code provision which outlines the criteria in Miller |
| 10:18:22 | 14 | v. California and so, therefore, it reaches |
| 10:18:24 | 15 | constitutionally protected works and that's problematic. |
| 10:18:27 | 16 | It's overbroad. |
| 10:18:32 | 17 | THE COURT:  Anything else on sovereign immunity? |
| 10:18:35 | 18 | MS. PRATHER:  No, your Honor. |
| 10:18:36 | 19 | THE COURT:  Okay.  A response. |
| 10:18:57 | 20 | MS. CELLA:  Your Honor, the defendants are |
| 10:19:00 | 21 | entitled to sovereign immunity.  It has not been expressly |
| 10:19:04 | 22 | waived and Ex Parte: Young does not apply.  I believe I |
| 10:19:07 | 23 | went through that last time, but I'm happy to do that |
| 10:19:09 | 24 | again if you'd like. |
| 10:19:11 | 25 | THE COURT:  A lot has gone on between then and |

| | | |
|---|---|---|
| 10:19:14 | 1 | now.  I'd be happy for you to repeat it.  I certainly |
| 10:19:17 | 2 | understand no waiver.  You don't need to spend a lot of |
| 10:19:22 | 3 | time on that.  But I'm not -- I haven't cuddled up with <u>Ex</u> |
| 10:19:31 | 4 | <u>Parte: Young</u> very much and so, I'm happy to hear anything |
| 10:19:35 | 5 | plaintiffs want to say about it.  I'm happy for you to |
| 10:19:37 | 6 | explain why it doesn't give them a right to be here. |
| 10:19:41 | 7 | MS. CELLA:  Sure. |
| 10:19:42 | 8 | THE COURT:  I'm familiar enough with it.  I |
| 10:19:44 | 9 | understand the <u>Ex Parte: Young</u> doctrine.  I'm just not |
| 10:19:48 | 10 | familiar with if there are any particular cases that apply |
| 10:19:51 | 11 | here, I wouldn't know that. |
| 10:19:52 | 12 | MS. CELLA:  So mostly what I want to point out is |
| 10:19:55 | 13 | that the plaintiffs can only overcome sovereign immunity |
| 10:19:59 | 14 | when they're seeking prospective injunctive relief based |
| 10:20:02 | 15 | on an alleged ongoing violation of federal law.  We don't |
| 10:20:06 | 16 | have that here.  There is no ongoing violation.  They also |
| 10:20:09 | 17 | lack a sufficient connection and we talked -- |
| 10:20:11 | 18 | THE COURT:  I think that their argument would be |
| 10:20:15 | 19 | it's the Constitution -- their First Amendment claim that |
| 10:20:19 | 20 | gets them out of -- Ms. Prather can correct me if I'm |
| 10:20:23 | 21 | wrong.  But I think that that's where they believe that |
| 10:20:27 | 22 | they get around the sovereign immunity. |
| 10:20:30 | 23 | MS. CELLA:  Sure.  And they just don't have a |
| 10:20:33 | 24 | First Amendment right in this particular forum in the |
| 10:20:36 | 25 | public school libraries.  And I believe we talked about |

10:20:39  1   that last time, as well.  There's a lot of case law on

10:20:43  2   that, so there's just no First Amendment violation.  I'm

10:20:48  3   sorry.

10:20:48  4            THE COURT:  It's okay.  What is your best case

10:20:54  5   that essentially stands -- that separates school -- public

10:21:00  6   school libraries from what we might be -- in my mind at

10:21:05  7   least and, again, I'm not a First Amendment judge.  I'm

10:21:09  8   doing the best I can.  But I do see a distinction between

10:21:14  9   the case Judge Pitman has in a public library, a public

10:21:19  10  library so the general public and school libraries and the

10:21:23  11  power that the state and that TEA and school districts

10:21:27  12  oughta have with respect to the books that are available

10:21:31  13  in them.

10:21:32  14           What do you think is your best case or two with

10:21:35  15  respect to the First Amendment issue in public school,

10:21:41  16  public libraries?

10:21:43  17           MS. CELLA:  Sure.  So Bethel School District No.

10:21:47  18  403 v. Fraser, the Court there indicated and I'm quoting

10:21:52  19  here -- sorry, I lost my spot.  The Court there indicated

10:21:55  20  that the First Amendment jurisprudence has acknowledged

10:22:00  21  limitations on the otherwise absolute interest of the

10:22:02  22  speaker in reaching an unlimited audience where the speech

10:22:06  23  is sexually explicit and the audience may include

10:22:08  24  children.  The Supreme Court there specifically noted in

10:22:12  25  addressing the question whether the First Amendment places

10:22:15  1  any limit on the authority of public schools to remove

10:22:18  2  books from a public school library.  All members of the

10:22:20  3  court otherwise sharply divided, acknowledged that the

10:22:23  4  school board has the authority to remove books that are

10:22:26  5  vulgar.

10:22:28  6          THE COURT:  And do you want to address at all Ms.

10:22:31  7  Prather's argument that if you were talking about the

10:22:35  8  curriculum, there would be one way to evaluate this?  But

10:22:40  9  school libraries are exempt from the control that states

10:22:45  10  have over the curriculum?

10:22:47  11          MS. CELLA:  Yes, your Honor.

10:22:48  12          There is case law and let me get that for you.

10:22:56  13  There is case law that the states -- and this is in

10:22:58  14  Wisconsin vs. Yoder that the states have the high

10:23:02  15  responsibility for the education of their citizens and

10:23:06  16  education is the apex function of a state.

10:23:09  17          To say that the school libraries cannot

10:23:14  18  reasonably restrict or that the state can't come up with

10:23:18  19  guidelines or restrictions in a public school library

10:23:20  20  because it's not curriculum, that's just not the case.

10:23:24  21  The Supreme Court has told us so and there is a difference

10:23:31  22  between curriculum, but that doesn't mean that there's no

10:23:34  23  -- that the state doesn't have a right or the schools

10:23:36  24  don't have a right to reasonably restrict what comes into

10:23:39  25  their libraries for instructional material or, you know,

| | | |
|---|---|---|
| 10:23:42 | 1 | library books.  They can -- any educational policy that |
| 10:23:49 | 2 | the state has the responsibility for that, it can be |
| 10:23:51 | 3 | regulated on a state level. |
| 10:23:55 | 4 | THE COURT:  Okay.  Anything else you want to say |
| 10:23:56 | 5 | on sovereign immunity? |
| 10:23:58 | 6 | MS. CELLA:  I think we talked about almost |
| 10:24:01 | 7 | everything.  Let me just look at my notes real quick if |
| 10:24:04 | 8 | you don't mind.  I think that's it on sovereign immunity, |
| 10:24:16 | 9 | your Honor. |
| 10:24:16 | 10 | THE COURT:  Okay.  Anything else for plaintiff? |
| 10:24:51 | 11 | And I may -- I don't want to blame you for something that |
| 10:24:55 | 12 | I'm saying.  I think your argument with regard to Ex |
| 10:24:59 | 13 | Parte: Young is under the First Amendment, right?  It's |
| 10:25:01 | 14 | not the violation under a federal statute? |
| 10:25:04 | 15 | MS. PRATHER:  That's correct, your Honor. |
| 10:25:05 | 16 | THE COURT:  Okay. |
| 10:25:06 | 17 | MS. PRATHER:  And, your Honor, the case that was |
| 10:25:08 | 18 | -- cases that were decided by the defendant are highly |
| 10:25:12 | 19 | distinguishable and this kind of goes into the fact that |
| 10:25:14 | 20 | we're not dealing with student speech here.  Talk about |
| 10:25:19 | 21 | the public school library and, in fact, this is not even |
| 10:25:23 | 22 | in the public school library setting.  This is booksellers |
| 10:25:27 | 23 | who sell books well beyond the public school libraries |
| 10:25:31 | 24 | being forced to rate books based upon the parameters set |
| 10:25:34 | 25 | forth by TEA. |

| | | |
|---|---|---|
| 10:25:36 | 1 | The Hazelwood case and the Bethel case were both |
| 10:25:40 | 2 | cases that dealt with student speech or speech in a |
| 10:25:45 | 3 | school-sponsored setting.  That's not what you have here. |
| 10:25:49 | 4 | Library books shouldn't be analyzed through this sort of |
| 10:25:52 | 5 | analysis, and they've been expressly prohibited from being |
| 10:25:57 | 6 | analyzed through this analysis under U.S. vs. American |
| 10:26:01 | 7 | Library Associations because librarians, they don't |
| 10:26:04 | 8 | collect books to provide a public forum for authors to |
| 10:26:08 | 9 | speak.  They do so to facilitate research, learning, |
| 10:26:11 | 10 | recreational pursuits. |
| 10:26:13 | 11 | And that's why the Court -- the Supreme Court in |
| 10:26:17 | 12 | Pico and the Fifth Circuit in Campbell vs. St. Tammany |
| 10:26:22 | 13 | Parish School Board support the finding that school |
| 10:26:25 | 14 | libraries are a designated public forum for the receipt of |
| 10:26:29 | 15 | information.  And so, content-based restrictions cannot be |
| 10:26:32 | 16 | imposed upon -- unless -- cannot be imposed unless the |
| 10:26:36 | 17 | government meets the strict scrutiny analysis. |
| 10:26:40 | 18 | So here, it's apples and oranges, they're trying |
| 10:26:44 | 19 | to lull this court into believing this is student speech. |
| 10:26:47 | 20 | It's not student speech.  There's no applicable forum |
| 10:26:50 | 21 | analysis that needs to be applied in this setting; |
| 10:26:56 | 22 | instead, we're talking about speech.  The speech at issue |
| 10:26:58 | 23 | being speech that occurs involving the right to distribute |
| 10:27:03 | 24 | and sell books and the right to be free from compelled |
| 10:27:07 | 25 | speech. |

| | | |
|---|---|---|
| 10:27:09 | 1 | Your Honor, another one of the red herrings that |
| 10:27:14 | 2 | has been brought up in this case is that this might be |
| 10:27:16 | 3 | considered commercial speech.  That, too, is absolutely |
| 10:27:22 | 4 | off point.  Commercial speech is speech that proposes a |
| 10:27:27 | 5 | commercial transaction.  You don't lose the First |
| 10:27:32 | 6 | Amendment protections by selling books.  That is not |
| 10:27:38 | 7 | something that makes or transforms books into commercial |
| 10:27:43 | 8 | speech.  That would be like saying if you put a book in |
| 10:27:45 | 9 | the school -- if you put a book in the window of a |
| 10:27:49 | 10 | bookstore, all of a sudden, it's no longer protected by |
| 10:27:52 | 11 | the First Amendment.  It's commercial speech and that's |
| 10:27:55 | 12 | simply not the law. |
| 10:27:57 | 13 | Here, you've got books, you've got newspapers, |
| 10:28:00 | 14 | you've got magazines.  Even though they're sold for a |
| 10:28:03 | 15 | profit, that does not prevent them from being a form of |
| 10:28:07 | 16 | expression that is protected by the First Amendment. |
| 10:28:14 | 17 | Finally, the last red herring that we believe the |
| 10:28:18 | 18 | defendants have brought up in their motion to dismiss |
| 10:28:21 | 19 | involves whether or not this is an essential operation of |
| 10:28:25 | 20 | government and that is actually an extremely narrow |
| 10:28:32 | 21 | concept.  It applies when you're talking about citizens |
| 10:28:38 | 22 | that are providing factual or demographic information for |
| 10:28:41 | 23 | things like taxes or censuses, and they're not being asked |
| 10:28:47 | 24 | to disseminate a public message with which they disagree. |
| 10:28:51 | 25 | Here, we are being asked to disseminate a public |

| | | |
|---|---|---|
| 10:28:55 | 1 | message with which we disagree.  So it does not fall |
| 10:28:59 | 2 | within the very, very, very narrow confines of an |
| 10:29:03 | 3 | essential operation of government.  Now, at this point, |
| 10:29:06 | 4 | your Honor, I would be prepared to move on to the motion |
| 10:29:10 | 5 | for preliminary injunction, but I'll step back if you have |
| 10:29:14 | 6 | questions. |
| 10:29:14 | 7 | THE COURT:  No.  Go ahead, please. |
| 10:29:15 | 8 | MS. PRATHER:  Okay. |
| 10:29:18 | 9 | MS. CELLA:  Your Honor, we would object to going |
| 10:29:20 | 10 | on to the motion for preliminary injunction without a |
| 10:29:22 | 11 | ruling on the motion to dismiss because of the |
| 10:29:24 | 12 | jurisdictional issues we've raised. |
| 10:29:25 | 13 | THE COURT:  Okay.  I understand. |
| 10:29:28 | 14 | You may proceed. |
| 10:29:29 | 15 | MS. PRATHER:  Thank you, your Honor. |
| 10:29:32 | 16 | So, your Honor, the plaintiffs are entitled to a |
| 10:29:38 | 17 | preliminary injunction if they can establish a substantial |
| 10:29:40 | 18 | likelihood of success on the merits that they have |
| 10:29:45 | 19 | suffered, that there is a substantial threat of |
| 10:29:47 | 20 | irreparable harm if the injunction is not granted, and |
| 10:29:50 | 21 | that the injury outweighs any harm that the injunction |
| 10:29:53 | 22 | might cause to the defendant and will not disserve the |
| 10:29:58 | 23 | public interest. |
| 10:29:59 | 24 | Here, we've got six different ways in which H.B. |
| 10:30:06 | 25 | 900 violates the Constitution.  We've got the fact that it |

10:30:09    1   compels speech in violation of 303 Creative because it
10:30:13    2   forces booksellers to express government views with which
10:30:17    3   they disagree.  We've got a problem of unconstitutional
10:30:21    4   vagueness because it fails to provide clear standards for
10:30:25    5   rating the books.  We've got a problem that it is a prior
10:30:29    6   restraint.  It actually functions in a manner in which the
10:30:33    7   state has exclusive control over what books are allowed in
10:30:38    8   public schools without any judicial review.  We have the
10:30:43    9   fact that it fails the strict scrutiny test.  It is a
10:30:47   10   content-based restriction that is not narrowly tailored to
10:30:51   11   serve a compelling governmental interest and we've got the
10:30:54   12   fact that it is overbroad.  It prohibits the distribution
10:30:58   13   of constitutionally protected speech and we'll go through
10:31:03   14   each one of these.
10:31:04   15          The unconstitutional compelled speech, we've
10:31:08   16   talked about a bit already, but basically it forces the
10:31:14   17   booksellers to enter into a Hobson's choice, both of which
10:31:18   18   cause injury.  They can either adopt the state's rating
10:31:21   19   system and subsequently, their alternative ratings if
10:31:27   20   there's disagreement, or they can follow their own
10:31:30   21   sincerely held beliefs which may or may not align with the
10:31:34   22   state's parameters.  But if they refuse to adopt the
10:31:38   23   state's mandated ratings, then they will be permanently
10:31:41   24   banned from selling books to Texas schools.
10:31:49   25          The book ban compels speech in two different

| | | |
|---|---|---|
| 10:31:52 | 1 | ways.  It does so both because it requires the initial |
| 10:31:56 | 2 | rating and it does so because it requires the booksellers |
| 10:32:02 | 3 | to conform with the government's ratings with which they |
| 10:32:05 | 4 | disagree.  Our clients have made it very clear in their |
| 10:32:10 | 5 | declarations, they don't agree with this.  They don't want |
| 10:32:15 | 6 | to be forced to provide as though they are their own |
| 10:32:20 | 7 | ratings, the state's ratings.  They don't want to be the |
| 10:32:23 | 8 | mouthpiece for the state. |
| 10:32:27 | 9 | In your notebook, your Honor, there's a whole |
| 10:32:29 | 10 | section of declarations about this.  It's behind tab 4 and |
| 10:32:34 | 11 | the problem here is, we do run afoul directly of the 303 |
| 10:32:42 | 12 | Creative decision because you're forcing the booksellers |
| 10:32:47 | 13 | to adopt the state's preferred message against their own |
| 10:32:51 | 14 | conscience in violation of the First Amendment. |
| 10:32:54 | 15 | The second ground upon which we believe that the |
| 10:32:57 | 16 | statute is unconstitutional -- your Honor, you only need |
| 10:33:00 | 17 | to find one of these.  So we've given you five, actually, |
| 10:33:03 | 18 | six in our briefing because we also talk about the |
| 10:33:07 | 19 | delegation doctrine in there.  But you just need to find |
| 10:33:10 | 20 | one of these is applicable. |
| 10:33:16 | 21 | So second is the book ban is unconstitutionally |
| 10:33:20 | 22 | vague.  The way that it's set forth, it actually fails to |
| 10:33:26 | 23 | provide the reviewer, which is now the bookseller, a |
| 10:33:30 | 24 | reasonable opportunity to know what conduct is prohibited |
| 10:33:33 | 25 | and it exudes the ability to have indefinite, arbitrary |

10:33:39   1   and discriminatory applications.  That is a problem under

10:33:42   2   the Constitution.  It's similar to the drone law which

10:33:46   3   Judge Pitman held was unconstitutionally vague.  And when

10:33:49   4   you look at just a sampling of the areas in which the

10:33:53   5   vagueness is present, there are a couple here that we've

10:33:58   6   gone over briefly.  It requires that you have to determine

10:34:01   7   what is related to the curriculum.  There's no guidance on

10:34:07   8   what is related to the curriculum in the statute.

10:34:13   9          I can tell you, for instance, my kids, their

10:34:17  10   third-grade teacher, she was phenomenal, she has books

10:34:20  11   wall to ceiling all over her library in her room and they

10:34:25  12   didn't -- when they were assigned to do reading, they were

10:34:27  13   not assigned to read a particular book.  They were

10:34:32  14   assigned to a genre and then, they went to a shelf and

10:34:35  15   they picked a book from the poetry section, a book from

10:34:38  16   the historical fiction section, a book from the biography

10:34:41  17   section.  Whether or not those books were, quote, unquote,

10:34:43  18   directly related to the curriculum, who knows, it wasn't a

10:34:48  19   specific title that was being assigned.  But those

10:34:51  20   curriculum vary.  They vary from day to day.  They vary

10:34:55  21   from year to year.  They vary from district to district

10:34:58  22   and they're constantly being reevaluated.

10:35:01  23          So again, if you look at the declarations, these

10:35:04  24   will be behind tab 5, the vendors talk about how they

10:35:09  25   don't know how to make this determination.  A second

| | |
|---|---|
| 10:35:13 | 1 |
| 10:35:18 | 2 |
| 10:35:22 | 3 |
| 10:35:25 | 4 |
| 10:35:29 | 5 |
| 10:35:32 | 6 |
| 10:35:35 | 7 |
| 10:35:39 | 8 |
| 10:35:43 | 9 |
| 10:35:46 | 10 |
| 10:35:50 | 11 |
| 10:35:55 | 12 |
| 10:35:57 | 13 |
| 10:35:59 | 14 |
| 10:36:02 | 15 |
| 10:36:05 | 16 |
| 10:36:10 | 17 |
| 10:36:13 | 18 |
| 10:36:17 | 19 |
| 10:36:23 | 20 |
| 10:36:26 | 21 |
| 10:36:31 | 22 |
| 10:36:34 | 23 |
| 10:36:37 | 24 |
| 10:36:42 | 25 |

problem is with these definitions of sexually relevant and sexually explicit and the contextual analysis that is involved and we'll get into this in a little more detail next.  And then, the last one -- and these are just a sampling of the basis upon which we believe that the statute is unconstitutionally vague -- is there's no guidance for what happens if a book has to be recalled. It requires the vendor to recall books, but it doesn't say what happens then.  Do they have to issue a refund?  How do they go about recalling it?  It's very, very unclear and it similarly doesn't provide any guidance as to whether or not a book is in active use.

And so, we talked a little bit last time about kind of the Frankenstein definitions, the cut-and-paste portions of the penal code and the undefined terms from case law that have made its way into this statute and that the fact that the statute does not track the definition of obscenity and so, it doesn't pass constitutional muster. But let's look at the definition of sexually relevant, for instance.

So here, if you look at this, the statute applies to library material.  The first thing you have to do is, you have to determine if it is directly related to curriculum.  No explanation as to what that means.  Then you have to determine if it's in active use.  Again, no

10:36:47  1   explanation but that's what you have to do and that's what
10:36:52  2   has to be done by September 1st.  You have to rate
10:36:54  3   everything that was previously sold that's in active use.

10:36:58  4          Then you look at the passage -- and by the way,
10:37:01  5   it's not just the book.  It's every passage in the book to
10:37:05  6   determine whether or not it is sexually relevant, and that
10:37:10  7   depends on whether or not it describes, depicts, or
10:37:13  8   portrays sexual conduct.  Then you look at the definition
10:37:17  9   of sexual conduct and it seemingly encompasses all books
10:37:22  10  that mention any sexually related topic.

10:37:26  11         It asks for the reviewer to determine the intent
10:37:30  12  of the author, which is an impossible task because when
10:37:34  13  you look under sexual contact, it talks about the intent
10:37:38  14  to arouse or gratify.  So they have to determine the
10:37:41  15  intent of the author and it asks for them to determine
10:37:46  16  whether or not this is a lewd exhibition.  And lewd
10:37:50  17  exhibition is not a defined term in the penal code.  None
10:37:56  18  of this, none of this is evaluated through the lens of
10:38:01  19  different age groups either.  So there's no distinction
10:38:05  20  that's being made between what's appropriate for a young
10:38:07  21  adult reader versus what is suitable for a first-grade
10:38:12  22  reader.

10:38:13  23         Then we move on to sexually explicit and the
10:38:17  24  reason I say we move on is because you have to satisfy the
10:38:21  25  definition of sexually relevant before you get to the

10:38:24  1  definition of sexually explicit.  So now you're looking at

10:38:28  2  what you've already deemed to be a sexually relevant

10:38:31  3  passage.  Again, not book.  Passage.  Each passage in the

10:38:35  4  book has to be reviewed.  And then, you have to look at

10:38:38  5  whether or not it qualifies as sexually explicit.

10:38:42  6        So here, you're considering community standards.

10:38:48  7  Well, there's absolutely no definition of community

10:38:52  8  standards at all.  There is different communities in the

10:38:57  9  state of Texas, Austin, Big Spring, different community

10:39:00  10  standards.  There's no distinction for the age of the

10:39:04  11  reader.  And then, you embark upon this multi-tier

10:39:08  12  analysis without any consideration of the social or

10:39:14  13  literary value of the work.

10:39:17  14        So this again runs afoul of the Constitution.

10:39:22  15  You wonder under sexually relevant, under sexually

10:39:27  16  explicit, whether or not the undefined lewd exhibition,

10:39:31  17  you know, has books like Captain Underpants and things

10:39:35  18  like that, or books with a Carpaccio painting in it,

10:39:40  19  whether those fall within the definition.  And it's hard

10:39:42  20  to tell without there being some sort of parameter for in

10:39:48  21  the case of Carpaccio, social or literary value.

10:39:53  22        So I think one thing that I was wanting to do

10:39:57  23  today that will help to be able to put this in context and

10:40:03  24  today is my kid's birthday so I brought party favors.  I

10:40:07  25  brought a book to the Court and I have a copy for opposing

| | | |
|---|---|---|
| 10:40:11 | 1 | counsel and this book is what many would call one of the |
| 10:40:17 | 2 | preeminent books in Texas literature.  It's Lonesome Dove. |
| 10:40:24 | 3 | So I'm handing the Court both the book and a breakdown of |
| 10:40:30 | 4 | what has to be done. |
| 10:40:31 | 5 | THE COURT:  Are you actually giving me a copy of |
| 10:40:34 | 6 | the book? |
| 10:40:35 | 7 | MS. PRATHER:  I've got a copy of the book.  Happy |
| 10:40:38 | 8 | birthday. |
| 10:40:38 | 9 | THE COURT:  It's my favorite book. |
| 10:40:40 | 10 | MS. PRATHER:  There we go. |
| 10:40:43 | 11 | THE COURT:  I may have to report this on my... |
| 10:40:51 | 12 | MS. PRATHER:  So like I said, your Honor, today's |
| 10:40:53 | 13 | my kid's birthday, everybody gets a party favor.  And what |
| 10:40:57 | 14 | we've got is a copy of Lonesome Dove and if you turn to |
| 10:41:02 | 15 | page 200 and you look at the passage there and you do that |
| 10:41:10 | 16 | alongside this worksheet, this two-page, front-and-back |
| 10:41:15 | 17 | worksheet, which is the valuation that has to be done for |
| 10:41:19 | 18 | every passage of every book that might fall within the |
| 10:41:21 | 19 | parameters of H.B. 900. |
| 10:41:23 | 20 | So I'm looking at it right now and the first |
| 10:41:27 | 21 | thing that I have to determine is whether or not this |
| 10:41:32 | 22 | falls within the curriculum.  And I don't know the answer |
| 10:41:35 | 23 | to that question and that's part of the issue here, right, |
| 10:41:39 | 24 | is that this definition or this statute is going to impact |
| 10:41:45 | 25 | a number of different books that are not part of the |

10:41:50  1   curriculum but that are contained in libraries and that

10:41:54  2   may be considered classics.

10:41:56  3            So when I look at this passage, let's just assume

10:42:01  4   that it's not part of the curriculum and then, we have to

10:42:05  5   decide whether or not it's in active use.  Again, no clue,

10:42:09  6   no way to determine that.  But if we assume that it's in

10:42:14  7   active use, then we move down the parameters and we

10:42:17  8   determine whether or not it's sexually relevant.  So

10:42:21  9   sexually relevant material has to describe, depict, or

10:42:25  10  portray sexual conduct.  And then, there's a definition of

10:42:29  11  sexual conduct that includes that undefined term "lewd

10:42:33  12  exhibition."

10:42:33  13           Sexual contact is also part of the definition and

10:42:37  14  that includes touching certain body parts.  Now, when I

10:42:42  15  read this, the only body part that is listed here is

10:42:49  16  Lorie's back.  It says Lorie let him rub her back.  Now,

10:42:53  17  that's not listed in here as one of these sort of

10:42:57  18  off-limits body parts, so I'm not quite sure what to do

10:43:01  19  with that.  And then, it doesn't actually say that they

10:43:07  20  have sex.  It just says that Jake got tired of the back

10:43:12  21  rub and tried to roll her over for another poke.  Now, I

10:43:19  22  don't know, your definition of poke might be different

10:43:21  23  than my definition of poke, but it doesn't specifically

10:43:24  24  describe excretory organs or the act of having sex.

10:43:29  25           It also mentions that she pushed his carrot away.

| | | |
|---|---|---|
| 10:43:34 | 1 | Again, not specifically describing a body part, don't know |
| 10:43:38 | 2 | if it falls within this definition or not.  And it |
| 10:43:42 | 3 | mentions that he made a second try and she pushed him |
| 10:43:46 | 4 | away.  So don't know if it qualifies as repetitive or not |
| 10:43:51 | 5 | under the statute.  But you get to the end of this and |
| 10:43:57 | 6 | your rating might be different than my rating.  I might |
| 10:44:01 | 7 | say, well, I think that it's sexually relevant because it |
| 10:44:06 | 8 | seems to be implying some sort of sexual conduct.  And you |
| 10:44:11 | 9 | might say it's sexually explicit because it actually has |
| 10:44:17 | 10 | this, you know, repetitive context to it, it's graphic in |
| 10:44:21 | 11 | detail, et cetera. |
| 10:44:23 | 12 | What happens then?  If you say it's sexually |
| 10:44:28 | 13 | explicit and I say it's sexually relevant, does that mean |
| 10:44:32 | 14 | that the school district can purchase this book from me |
| 10:44:38 | 15 | because I said it was sexually relevant and not from you |
| 10:44:42 | 16 | because you said it was sexually explicit?  This is one of |
| 10:44:46 | 17 | the problems.  This is one of the problems with the vague |
| 10:44:48 | 18 | definitions at issue in this case. |
| 10:44:53 | 19 | The other problems, and some of them the Court |
| 10:44:56 | 20 | flagged at the last hearing, involve the operation of the |
| 10:45:01 | 21 | statute itself.  So it's not just the ability to apply the |
| 10:45:05 | 22 | definitions within the statute, but it's also what books |
| 10:45:10 | 23 | have to be rated, what happens if the vendor no longer |
| 10:45:13 | 24 | carries the books, when do these ratings have to be |
| 10:45:17 | 25 | complete?  That's been a big topic of discussion today. |

| | |
|---|---|
| 10:45:20 | 1 |
| 10:45:24 | 2 |
| 10:45:28 | 3 |
| 10:45:29 | 4 |
| 10:45:32 | 5 |
| 10:45:36 | 6 |
| 10:45:38 | 7 |
| 10:45:40 | 8 |
| 10:45:43 | 9 |
| 10:45:47 | 10 |
| 10:45:54 | 11 |
| 10:45:58 | 12 |
| 10:46:05 | 13 |
| 10:46:09 | 14 |
| 10:46:17 | 15 |
| 10:46:24 | 16 |
| 10:46:27 | 17 |
| 10:46:31 | 18 |
| 10:46:37 | 19 |
| 10:46:38 | 20 |
| 10:46:41 | 21 |
| 10:46:44 | 22 |
| 10:46:48 | 23 |
| 10:46:52 | 24 |
| 10:46:56 | 25 |

Can the vendor sell books in the interim?  What are the penalties for noncompliance?  What if those books are rated -- are donated?

That was one thing my kids, their third-grade teacher had this wall-to-ceiling books, a lot them, she said, were donated.  She got them at garage sales.  Who rates those books?  What happens if two vendors have different ratings?  What is the --

THE COURT:  I know it cuts both ways.  I think I said this last time, but to me, the vagueness in the penalties for noncompliance, I'm not sure what to do with that because I don't think -- the only penalty you all have for noncompliance, the only penalty against plaintiff is that you would not be able to sell books to the school district.  But even that -- my concern about that being considered a penalty is that the school districts always have that power to decide.

So maybe you could help me on that issue.

MS. PRATHER:  Your Honor, if the state just wanted to rate the books themselves and then say, school districts, you can only purchase books based on what we say here, that will be one thing.  That's not this law.  That's the problem.  That's not this law.  This law, instead, requires my clients and other book vendors throughout the state of Texas to embark upon this two-page

10:47:01  1   analysis, front and back for every passage of every book

10:47:04  2   they've ever sold to any Texas school.  That's the problem

10:47:11  3   and it's hard to do.

10:47:12  4          You looked at the two pages, it's not a clear-cut

10:47:17  5   -- as required by the Constitution, it is not a clear-cut

10:47:23  6   way of being able to implement the law.  It is fraught

10:47:29  7   with peril because there will be tremendous disparity.

10:47:31  8   The vagaries make it unconstitutional.

10:47:34  9          THE COURT:  Let me give you two homework

10:47:38  10  assignments that will help us.  One is, any cases that you

10:47:44  11  could cite to us where there was standing found based on

10:47:50  12  the compliance of the law.  I mean, it seems to me, this

10:47:53  13  has been fought about probably in the EPA context but, I

10:47:59  14  mean, where -- your argument is -- I get -- I'm not

10:48:03  15  ignoring your -- for the moment, I am ignoring the

10:48:07  16  argument that there is a constitutional issue.  I get

10:48:09  17  that.  I'm not -- but it seems to me, another compelling

10:48:13  18  argument that you are making is that the cost of

10:48:18  19  compliance is so prohibitive that it would injure your

10:48:22  20  client.  That's part of your preliminary injunction issue

10:48:26  21  and if you could -- if you get us cases that deal directly

10:48:31  22  where someone has obtained an injunction by arguing that

10:48:35  23  the cost of compliance with a law was something I could

10:48:42  24  consider, that would be good.

10:48:45  25          MS. PRATHER:  Your Honor, yes, the mifepristone

10:48:49  1   case that was handed down two weeks ago from the Fifth

10:48:51  2   Circuit is on point in that regard, but I'll be happy to

10:48:54  3   get you more.  But that was handed down on August 16th.

10:48:57  4          THE COURT:  Okay.

10:49:01  5          MS. PRATHER:  Your Honor, another way in which

10:49:03  6   this law is unconstitutional -- this is the third.  We've

10:49:06  7   talked about compelled speech, we've talked about

10:49:09  8   unconstitutional vagueness.  It's also an unconstitutional

10:49:12  9   prior restraint and that's because it prevents the

10:49:15  10  distribution of constitutionally protected works without

10:49:18  11  judicial review.  So remember this goes beyond the

10:49:22  12  definition of obscenity and under Reno vs. ACLU, that is a

10:49:28  13  problem.  Sexual expression, which is indecent but not

10:49:32  14  obscene, is protected by the First Amendment.

10:49:34  15          And here, we've got a book ban that provides the

10:49:38  16  government with complete discretion and that complete

10:49:42  17  discretion has no due process or the ability to challenge

10:49:47  18  the government's final determination of constitutionally

10:49:50  19  protected works and what happens.  This is what happens to

10:49:54  20  them.  This prohibition of distributing literature is a

10:49:58  21  classic form of a prior restraint.

10:50:01  22          It's something that the U.S. Supreme Court dealt

10:50:03  23  with in the Bantam Books case and there, they struck down

10:50:07  24  a Rhode Island law that established a commission similar

10:50:10  25  to the TEA to review and rate books as objectionable for

| | |
|---|---|
| 10:50:14 | 1 |
| 10:50:19 | 2 |
| 10:50:24 | 3 |
| 10:50:27 | 4 |
| 10:50:30 | 5 |
| 10:50:33 | 6 |

sale, or distribution, or display to use under 18 years of
age.  The justices held in that case that this was an
unconstitutional system of a prior restraint because it
suppressed the distribution of non-obscene,
constitutionally protected works without a judicial
determination that the content could be lawfully banned.

This concept of prior restraints being a severe
impingement on the First Amendment is not a new one.  It's
one that Thomas Jefferson talked about early on in the
days of America.  It's one that the U.S. Supreme Court and
the Fifth Circuit have opined about over and over.  In the
Chiu vs. Plano ISD case, they talked about the fact that
the prohibition distributing literature is a classic form
of a prior restraint.

The fourth ground upon which the law is
unconstitutional is because it's a content-based
regulation, which is presumptively unconstitutional, and
it's not narrowly tailored to meet the state's compelling
interest.  So here, you've got this content-based
restriction.  It's content-based because it's requiring
them to determine whether it's sexually explicit or
sexually relevant; and it's not narrowly tailored because
it's reaching constitutionally protected works.  It's
reaching works outside the bounds of obscenity.  It also
does not distinguish the age of the reader, which is

10:51:49  1   significant.  It's not the least restrictive way to go

10:51:54  2   about this.

10:51:54  3          Here you are, you're banning the distribution of

10:51:57  4   constitutionally protected works, you're not considering

10:52:00  5   their literary artistic value, you're not considering the

10:52:03  6   age of the reader, and you're asking booksellers to rate

10:52:08  7   every book that they've ever sold to a public school,

10:52:11  8   which means reviewing every word of every work, including

10:52:16  9   books that they no longer sell or maintain in their

10:52:19  10  inventory.

10:52:20  11         It's also important to note that some of these

10:52:23  12  booksellers like BookPeople and Blue Willow, they

10:52:28  13  participate in festivals.  BookPeople is one of the

10:52:31  14  sponsors of the Texas Book Festival started by former

10:52:35  15  First Lady Laura Bush.  They don't know where those books

10:52:38  16  go.  They sell those books at these festivals, they don't

10:52:41  17  know where they go.  How do they know if they are in a

10:52:44  18  school library, in active use, not part of the curriculum

10:52:47  19  where they're even subjected to this law?  They simply

10:52:50  20  don't know.

10:52:52  21         You asked earlier about costs involved and one of

10:52:56  22  the declarations, again, I referred you to the Blue Willow

10:52:59  23  declaration.  In that declaration, which is in your

10:53:02  24  notebook behind the declarations tab, she says that the

10:53:05  25  total cost to review books already sold -- and this is not

10:53:10  1  future books, this is just already sold -- would be

10:53:13  2  between 4 million and $500 million.  That would put this

10:53:18  3  business -- this bookstore out of business.  Their annual

10:53:24  4  sales are just over a million dollars per year.

10:53:29  5          Finally, the statute is unconstitutionally

10:53:33  6  overbroad.  We talked about the fact that it is not

10:53:38  7  limited to the Miller v. California obscenity declaration.

10:53:43  8  That is fatal.  That alone is fatal to this lawsuit

10:53:48  9  because it reaches constitutionally protected work.  We

10:53:52  10  talked about the fact that by not doing that, it doesn't

10:53:56  11  consider whether or not the book taken as a whole lacks

10:54:01  12  serious literary, artistic, political, or scientific

10:54:04  13  value.

10:54:05  14          And so then, you end up in a situation where you

10:54:08  15  have classics like the ones that are on the screen now

10:54:11  16  that may not be part of the curriculum, but they could be

10:54:14  17  banned because of this lack of consideration for their

10:54:19  18  artistic value.  Books like Romeo And Juliet, Catcher In

10:54:23  19  The Rye, Gone With The Wind, Color Purple, these are

10:54:26  20  Pulitzer Prize-winning books.  Books that the screen

10:54:29  21  version has won academy awards.  These books, Twelfth

10:54:34  22  Night and others, would be subject to being banned because

10:54:36  23  if they're not part of the curriculum, they would fall

10:54:40  24  within the parameters potentially of sexually relevant or

10:54:44  25  sexually explicit works.

| | | |
|---|---|---|
| 10:54:45 | 1 | So kind of a modern-day example of the impact of |
| 10:54:50 | 2 | this, if you look at Judy Blume's books, Judy Blume has |
| 10:54:55 | 3 | books for all ages.  She has books for five-year-olds, a |
| 10:54:58 | 4 | book like Freckle Juice where the kid desperately wants to |
| 10:55:02 | 5 | have freckles.  A book like Double Fudge, which is |
| 10:55:06 | 6 | appropriate for five to seven-years-olds where the kid in |
| 10:55:08 | 7 | that book is obsessed with money and he embarrasses his |
| 10:55:12 | 8 | 12-year-old brother Peter.  Then you've got books that are |
| 10:55:15 | 9 | more appropriate for middle-school children like Are You |
| 10:55:17 | 10 | There God?  It's Me, Margaret, which talks about sort of |
| 10:55:20 | 11 | the frustration with the differing rates of going through |
| 10:55:25 | 12 | puberty. |
| 10:55:25 | 13 | And then, you talk about a book that's more |
| 10:55:27 | 14 | appropriate for high school and high school seniors, |
| 10:55:29 | 15 | specifically, the book's name is Forever.  When Judy Blume |
| 10:55:34 | 16 | was asked way she wrote this book, she said because her |
| 10:55:37 | 17 | daughter asked her to write a book about consenting adults |
| 10:55:42 | 18 | having sex where the girl doesn't die.  And why did she |
| 10:55:47 | 19 | ask that?  Because every book she had ever read, if the |
| 10:55:50 | 20 | girl got pregnant, she got shipped off to the distant |
| 10:55:54 | 21 | relatives, she got sent to a convent, or she has an |
| 10:55:57 | 22 | abortion and she died.  What Forever is about is two |
| 10:56:01 | 23 | seniors in high school who fall in love who decide to have |
| 10:56:04 | 24 | sex for the first time.  They have it responsibly and |
| 10:56:07 | 25 | protected and then, they realize months later, as they |

| | | |
|---|---|---|
| 10:56:10 | 1 | both move on and are in different places, that life goes |
| 10:56:13 | 2 | on.  Books like that are appropriate for high school |
| 10:56:18 | 3 | seniors, but they're not appropriate for the first |
| 10:56:20 | 4 | graders.  And so, by not having any sort of consideration |
| 10:56:25 | 5 | of age in this statute, you literally end up having the |
| 10:56:30 | 6 | lowest common denominator of books in our school |
| 10:56:34 | 7 | libraries.  It's a race to the bottom.  Basically we are |
| 10:56:36 | 8 | in a world of Freckle Juice and Double Fudge and nothing |
| 10:56:39 | 9 | else. |
| 10:56:41 | 10 | So the unconstitutional overbreadth is |
| 10:56:45 | 11 | significant and it's significant because it closes off |
| 10:56:47 | 12 | access for students to be able to get information.  And I |
| 10:56:52 | 13 | know that the AG had mentioned that this was not something |
| 10:56:55 | 14 | that we had claimed in our complaint and I've got it up on |
| 10:56:58 | 15 | the screen.  All of the various places where we did bring |
| 10:57:00 | 16 | this up in our complaint and we did bring it up -- |
| 10:57:03 | 17 | THE COURT:  You're fine. |
| 10:57:04 | 18 | MS. PRATHER:  In our preliminary injunction |
| 10:57:06 | 19 | motion. |
| 10:57:08 | 20 | Finally, your Honor, we've established that the |
| 10:57:11 | 21 | statute is unconstitutional in a myriad of ways.  Now, you |
| 10:57:16 | 22 | look at whether or not it -- it results in irreparable |
| 10:57:23 | 23 | harm and here, the fact of the matter is that unless the |
| 10:57:26 | 24 | book ban is enjoined, plaintiffs will suffer irreparable |
| 10:57:31 | 25 | harm.  They will do so because their constitutional rights |

| | | |
|---|---|---|
| 10:57:36 | 1 | will be violated. |
| 10:57:37 | 2 | We've got here two cases on the screen, one <u>Elrod</u> |
| 10:57:40 | 3 | <u>vs. Burns</u> talking about the loss of First Amendment rights |
| 10:57:45 | 4 | alone, even for a minimal period, constituting irreparable |
| 10:57:51 | 5 | injury.  We've got the Opulent Life Church case, which is |
| 10:57:55 | 6 | in your notebook under tab 8, talking about when there is |
| 10:57:58 | 7 | an alleged deprivation of constitutional rights, courts |
| 10:58:03 | 8 | hold that no further showing of irreparable injury is |
| 10:58:06 | 9 | necessary. |
| 10:58:07 | 10 | And then, finally, the last two factors are |
| 10:58:10 | 11 | balancing of equities and to the public interest.  Here, |
| 10:58:16 | 12 | you've got both of those weighing heavily in favor of |
| 10:58:20 | 13 | enjoining the book ban because First Amendment rights of |
| 10:58:22 | 14 | the plaintiffs and other Texans will be infringed if a |
| 10:58:26 | 15 | preliminary injunction is not granted.  Injunctions |
| 10:58:31 | 16 | protecting the First Amendment reasons are always |
| 10:58:35 | 17 | considered in the public interest.  That is according to |
| 10:58:39 | 18 | Opulent Life, again, in your notebook, tab 8, and in this |
| 10:58:44 | 19 | instance, we do not have the defendants or the public |
| 10:58:48 | 20 | having a legitimate interest in the enforcement of an |
| 10:58:52 | 21 | unconstitutional law. |
| 10:58:54 | 22 | If <u>De Leon vs. Perry</u>, the Western District, |
| 10:58:58 | 23 | affirmed by the Fifth Circuit, stated very clearly there |
| 10:59:02 | 24 | is no harm for issuing a preliminary injunction that |
| 10:59:05 | 25 | prevents the enforcement of a likely unconstitutional |

| | | |
|---|---|---|
| 10:59:11 | 1 | statute.  That's what we have here, your Honor.  The First |
| 10:59:19 | 2 | Amendment embraces the right to be free from compelled |
| 10:59:21 | 3 | speech.  It embraces the right to distribute literature |
| 10:59:26 | 4 | and it necessarily protects the rights to receive |
| 10:59:30 | 5 | information. |
| 10:59:31 | 6 | H.B. 900 violates the Constitution in innumerable |
| 10:59:36 | 7 | ways.  It should be enjoined before it takes effect on |
| 10:59:39 | 8 | September 1st.  Does your Honor have any questions? |
| 10:59:44 | 9 | THE COURT:  I don't. |
| 10:59:50 | 10 | Anything else?  A response? |
| 10:59:56 | 11 | MS. CELLA:  Yes, your Honor.  Sorry. |
| 11:00:04 | 12 | The first thing I wanted to point out, your |
| 11:00:12 | 13 | Honor, is plaintiffs continually say that this is not |
| 11:00:17 | 14 | looked at -- the books are not to be looked at in any sort |
| 11:00:20 | 15 | of context.  But 35.002(1)(d) talks about that a library |
| 11:00:28 | 16 | material vendor must consider the full context.  So I just |
| 11:00:32 | 17 | want to point that out, this is a contextual analysis. |
| 11:00:36 | 18 | It's not just one paragraph in a book. |
| 11:00:39 | 19 | I want to also briefly go over the points |
| 11:00:43 | 20 | plaintiffs just made.  I did talk about a lot of this in |
| 11:00:46 | 21 | length last time.  It is fully briefed in our submissions |
| 11:00:50 | 22 | but I want to point out a couple things.  On the compelled |
| 11:00:54 | 23 | speech aspect of this, this is just simply not compelled |
| 11:00:57 | 24 | speech.  This is government speech.  We talked about that. |
| 11:01:02 | 25 | The ratings are going to go on TEA's website.  This is |

| | | |
|---|---|---|
| 11:01:06 | 1 | strictly government speech.  Any rating should not be |
| 11:01:10 | 2 | attributed to the plaintiffs. |
| 11:01:13 | 3 | THE COURT:  Well -- and I beat up the other side |
| 11:01:17 | 4 | on part of this.  Ultimately, I think that's correct.  But |
| 11:01:26 | 5 | what you're asking the plaintiff to do is go through and |
| 11:01:31 | 6 | take Lonesome Dove and give it a rating.  In fact, I |
| 11:01:39 | 7 | closed it but the part where it says they're required to |
| 11:01:51 | 8 | perform a contextual analysis of each book and rate it and |
| 11:01:55 | 9 | so -- and those ratings will be posted.  I get that they |
| 11:02:01 | 10 | would be on the TEA website, but they would be there under |
| 11:02:09 | 11 | Barnes & Noble, or whoever, and they actually would be |
| 11:02:16 | 12 | Barnes & Noble's unless they were changed, right? |
| 11:02:20 | 13 | MS. CELLA:  No.  They would still be TEA's. |
| 11:02:24 | 14 | They'd still be the government's.  The government has |
| 11:02:25 | 15 | ultimate oversight. |
| 11:02:26 | 16 | THE COURT:  Well then, why are you -- why does |
| 11:02:29 | 17 | the TEA just have a -- I would be more willing to believe |
| 11:02:32 | 18 | that if the TEA just had a, you know, here's the TEA's |
| 11:02:39 | 19 | website without giving reference to who did the ranking. |
| 11:02:48 | 20 | That's one of the argument -- I think I'm summarizing. |
| 11:02:52 | 21 | Ms. Prather can jump up if I'm wrong, but I think she's |
| 11:02:55 | 22 | saying that as of September 1st, her clients have to |
| 11:03:04 | 23 | perform what I just said, a contextual analysis of every |
| 11:03:08 | 24 | book and rate it, and one of her problems with that is |
| 11:03:15 | 25 | that she feels like the method to rate it by is |

| | |
|---|---|
| 11:03:22 | 1 |

inappropriate.  For example, it's unclear what sexually

explicit is with regard to community norms and other

issues.

But let's say that she didn't even have that

argument.  Let's say she thought that the law was fine in

terms of making it so that her client could actually

perform this contextual analysis and feel comfortable that

what they were -- the label -- I'm sorry, the rating they

were giving it was an accurate one and they don't concede

that but, let's say, for my question, they do, that's

going to be -- that list -- even if it's put on the TEA

website, that's going to -- until there is some analysis,

that's going to be their analysis of what their rating

ought to be, and their rating of no rating, or sexually

explicit, or whatever it is, is speech that you are making

them do.

MS. CELLA:  Well, a couple of things.  First,

they don't have to do it.  They want to make a lot

about --

THE COURT:  I get that.  I get that argument and

I'm sorry.  I fully understand they can say no, we're not

going to do this.  We're not going to be in this market.

Now, that's a different argument because -- and Ms.

Prather would argue that's not okay but I get that.  I get

that argument.

| | | |
|---|---|---|
| 11:04:51 | 1 | And so, let's assume for the moment, if I have to |
| 11:04:55 | 2 | figure out -- if I do have to figure out that it's not |
| 11:05:01 | 3 | enough that they don't have to do it because they don't |
| 11:05:03 | 4 | have to sell to the school districts, what are your other |
| 11:05:08 | 5 | arguments? |
| 11:05:09 | 6 | MS. CELLA:  So TEA is asking for this information |
| 11:05:14 | 7 | for them to be able to sell books.  We've established |
| 11:05:17 | 8 | that.  But the fact that it's going to go on TEA's website |
| 11:05:20 | 9 | and TEA has final say makes that TEA's speech.  It's not |
| 11:05:25 | 10 | -- it shouldn't be attributed to the vendors or to the |
| 11:05:28 | 11 | publishers.  This is speech that -- |
| 11:05:30 | 12 | THE COURT:  Then why is it identified by the |
| 11:05:32 | 13 | distributors and the vendors?  Why are they on it? |
| 11:05:38 | 14 | MS. CELLA:  Well, the list is what would be |
| 11:05:40 | 15 | posted.  Is that what you're -- I want to make sure I |
| 11:05:42 | 16 | understand your question.  Is that what you're asking me? |
| 11:05:44 | 17 | THE COURT:  If I understand what's going to |
| 11:05:47 | 18 | happen and I might not be accurate, they're going to give |
| 11:05:54 | 19 | you by April 1st, this set of ratings and then, the TEA is |
| 11:06:03 | 20 | going to post them, but they're going to post them and |
| 11:06:08 | 21 | identify that these are Barnes & Noble, et cetera, |
| 11:06:14 | 22 | ratings.  And so, I'm asking why the TEA has to attribute |
| 11:06:19 | 23 | the ratings to anyone. |
| 11:06:20 | 24 | MS. CELLA:  Okay.  I understand.  The reason for |
| 11:06:21 | 25 | that is so the school districts know if they can purchase |

11:06:24  1   from those vendors.  There would be no other way for the

11:06:29  2   school district to know who they can purchase from.  They

11:06:32  3   can only purchase books or any of these materials from

11:06:38  4   vendors that submit these lists.

11:06:40  5        THE COURT:  And I may be finally connecting this

11:06:44  6   and you keep looking at me.  I think so -- the point of

11:06:53  7   this is so if Austin Independent School District, where

11:06:58  8   we're sitting, wants to know whether or not they could buy

11:07:00  9   from Barnes & Noble, not only does Barnes & Noble have to

11:07:04  10  have complied or people -- BookPeople, whatever, not only

11:07:09  11  do they have to have complied with the lists but the

11:07:12  12  school district then uses that list of the ratings to know

11:07:16  13  what books they could buy and how to treat the books.

11:07:19  14        MS. CELLA:  Correct.

11:07:20  15        THE COURT:  And so, if they're buying them from

11:07:22  16  the plaintiffs or others, they could -- whatever Lonesome

11:07:29  17  Dove gets rated, because it has the word "poke" in it,

11:07:33  18  whatever it gets rated, because it's on that list, Austin

11:07:37  19  Independent School District can say okay, we can buy this

11:07:42  20  and put it in the main library because it has no rating,

11:07:46  21  we can buy it and put it in the parental consent part, or

11:07:54  22  we can't buy it.

11:07:55  23        MS. CELLA:  Correct.

11:07:56  24        THE COURT:  And so, the purpose of doing this is

11:07:58  25  so that the school district knows what it can and cannot

| | | |
|---|---|---|
| 11:08:02 | 1 | purchase. |
| 11:08:02 | 2 | MS. CELLA:  Correct.  And that's why TEA has that |
| 11:08:05 | 3 | oversight that they have. |
| 11:08:07 | 4 | THE COURT:  And so, while we've been talking a |
| 11:08:10 | 5 | lot about First Amendment -- I've been kind of stuck on |
| 11:08:13 | 6 | the First Amendment aspect of this, but the point of |
| 11:08:16 | 7 | having the TEA having this supervisory ability is if |
| 11:08:22 | 8 | someone from TEA thought, well, Austin's pretty liberal, |
| 11:08:28 | 9 | I'd better look at some of these books, and they went in |
| 11:08:31 | 10 | and determined X book was given no rating and they think |
| 11:08:39 | 11 | it ought to be sexually relevant, or whatever the word is, |
| 11:08:45 | 12 | and so, we're going to change it, even for Barnes & Noble |
| 11:08:50 | 13 | because Barnes & Noble needs to say unless they put this |
| 11:08:55 | 14 | label on it and sell it so that the school library knows |
| 11:09:00 | 15 | how to treat it, then they can't buy that -- the purpose |
| 11:09:04 | 16 | is to help the school decide what they can and can't buy. |
| 11:09:11 | 17 | MS. CELLA:  Correct, your Honor. |
| 11:09:12 | 18 | THE COURT:  I got it. |
| 11:09:13 | 19 | MS. CELLA:  Yes.  That's correct.  This speech -- |
| 11:09:18 | 20 | I'm sorry, this statute is also not vague.  As it pertains |
| 11:09:22 | 21 | to plaintiffs, it's actually very clear.  They need to |
| 11:09:26 | 22 | rate the books, submit a list to TEA, update that list |
| 11:09:30 | 23 | every year and correct any ratings if TEA finds that it |
| 11:09:35 | 24 | was incorrect.  There's no mechanism in the statute that |
| 11:09:42 | 25 | looks at what their analysis consisted of or how they, you |

11:09:46  1   know, how they came to their rating.  There's also no

11:09:49  2   enforcement against plaintiffs or any other vendors or

11:09:53  3   publishers as we've discussed at length.

11:09:55  4          So as it pertains to plaintiffs, it's actually

11:09:58  5   very, very clear.  And then, there's also no penalty for

11:10:03  6   noncompliance.  If the plaintiffs don't submit their

11:10:06  7   lists, the schools can't buy books from them; if the

11:10:09  8   schools do, TEA does what it does.

11:10:12  9          THE COURT:  The reason for the not being able to

11:10:15  10  buy the books from them is without having the list, the

11:10:20  11  concern is that there's no way to force the libraries to

11:10:25  12  comply with the accessibility of the different books or

11:10:28  13  maybe even in fairness, if the TEA believed that they were

11:10:35  14  sexually explicit, then I don't know what the book would

11:10:38  15  be.  But Austin Independent School District might buy a

11:10:44  16  book that the TEA now considers -- from Barnes & Noble, or

11:10:47  17  BookPeople, or whoever, that the TEA considers to be

11:10:51  18  sexually explicit and that's what they're trying to

11:10:53  19  prevent.

11:10:54  20          MS. CELLA:  Correct.

11:10:55  21          THE COURT:  Now, the question, though, of course,

11:10:58  22  is whether that burden should initially be on the

11:11:02  23  plaintiffs or on the TEA, and your position is that it's

11:11:10  24  okay to have this because the plaintiffs have a choice.

11:11:14  25  They can either sell to the school districts with the

| | | |
|---|---|---|
| 11:11:20 | 1 | restrictions that are their -- the commercial restrictions |
| 11:11:24 | 2 | or they can avoid the expense and just not sell. |
| 11:11:29 | 3 | MS. CELLA:  Correct, your Honor. |
| 11:11:30 | 4 | THE COURT:  They can sell, for example, to Austin |
| 11:11:33 | 5 | Public Library whatever they want without these ratings. |
| 11:11:37 | 6 | MS. CELLA:  Yes. |
| 11:11:37 | 7 | THE COURT:  It's only if they want to sell to |
| 11:11:40 | 8 | school districts where the -- could one argue that the |
| 11:11:44 | 9 | state has even given them the first opportunity to |
| 11:11:48 | 10 | determine the ratings so, you know, so they can sell as |
| 11:11:52 | 11 | many books as possible. |
| 11:11:54 | 12 | MS. CELLA:  Sure.  That's an argument.  The |
| 11:11:58 | 13 | reason -- like you said, the reason the lists need to be |
| 11:12:01 | 14 | submitted is because the school districts need to know who |
| 11:12:04 | 15 | they can and cannot purchase from and then, any books off |
| 11:12:07 | 16 | of those lists that they can -- |
| 11:12:08 | 17 | THE COURT:  Not just who they can.  That's where |
| 11:12:11 | 18 | you -- I've been kind of tripped up.  I get that they |
| 11:12:14 | 19 | can't buy them from someone who hasn't given them a list. |
| 11:12:17 | 20 | But not only can they buy books from them but which books |
| 11:12:21 | 21 | can they buy and how they need to deal with them. |
| 11:12:24 | 22 | MS. CELLA:  Correct.  Yes.  That's exactly |
| 11:12:26 | 23 | correct. |
| 11:12:28 | 24 | THE COURT:  Did you have anything else? |
| 11:12:31 | 25 | MS. CELLA:  Just give me one second to look |

11:12:33  1    through my notes.  The one point I did want to make

11:12:43  2    quickly about the overbreadth and the age limit analysis,

11:12:48  3    that's just simply not relevant to this.

11:12:50  4          THE COURT:  I'm sorry.

11:12:51  5          MS. CELLA:  The age limit analysis, that's just

11:12:53  6    simply not relevant to plaintiffs.  When a school library

11:12:57  7    can determine what books are for what age of students,

11:13:01  8    they just need to rate those books consistent with the

11:13:05  9    statute.  That is all I have at this time, your Honor.

11:13:10  10         THE COURT:  Okay.  Thank you, ma'am.

11:13:14  11         Ms. Prather.

11:13:17  12         MS. PRATHER:  Your Honor, with regard to the

11:13:29  13   context and the whether or not they consider the full

11:13:32  14   context when they review the -- each passage of each book,

11:13:37  15   if you look at the provision 35.002(1)(d), it talks about

11:13:42  16   reviewing the full context in which the description or

11:13:46  17   depiction of the conduct appears.  It's not talking about

11:13:49  18   the full context of the book as a whole, which is required

11:13:54  19   under Miller.  Miller also requires considering the

11:13:57  20   literary and artistic and political value, also not part

11:14:02  21   of the statutory requirements for review.

11:14:05  22         With regard to government speech, if they want

11:14:09  23   this to be government speech, they should have rated the

11:14:12  24   books themselves.  Here, the problem is that these ratings

11:14:19  25   go up on the Worldwide Web.  They go -- this is not a list

11:14:24  1  that is sent to the Texas public schools.  This is a taint

11:14:29  2  that will be put on my clients as rating these books in a

11:14:34  3  way that they do not necessarily agree with.  They don't

11:14:38  4  agree with the rating parameters and they may not agree

11:14:41  5  with the corrected ratings, and it's going to taint their

11:14:45  6  abilities beyond the state of Texas because they're going

11:14:48  7  to be attributed as issuing these ratings to these books

11:14:53  8  that will be harmful for them beyond the state.  It will

11:14:57  9  be harmful for the book authors beyond the state.  It is

11:15:01  10  absolutely not a situation where the government has spent

11:15:05  11  the time and the money to rate these books and those

11:15:07  12  ratings are put up as the government's.  They're being put

11:15:10  13  up as the booksellers' and they have harm beyond the state

11:15:13  14  borders.

11:15:14  15       Also, before the rating is, quote, unquote,

11:15:19  16  corrected, if this is solely for the purpose of advising

11:15:24  17  school districts as to whether or not they can purchase

11:15:26  18  books from a particular vendor, what happens if there are

11:15:30  19  different ratings?  How does that get resolved?  So once

11:15:34  20  again, the school district goes to the website, it looks

11:15:40  21  and it sees that Lonesome Dove is rated differently by you

11:15:42  22  and by me.  So they purchase it from me because they can't

11:15:45  23  purchase it from you because there's no corrected rating

11:15:48  24  at that point, that's problematic.

11:15:50  25       With regard to the vagueness argument, we went

| | | |
|---|---|---|
| 11:15:54 | 1 | through a series of why this statute is unconstitutionally |
| 11:15:59 | 2 | vague and that series went through an exercise of actually |
| 11:16:02 | 3 | trying to apply the law.  The state came back and just |
| 11:16:06 | 4 | discussed procedure and the fact that the procedure is |
| 11:16:09 | 5 | clear.  That is not discussing the inability to rate these |
| 11:16:15 | 6 | books. |
| 11:16:17 | 7 | And finally, with regard to overbreadth, the |
| 11:16:19 | 8 | problem is that the age is not considered in the |
| 11:16:23 | 9 | contextual analysis for the rating, which is problematic. |
| 11:16:28 | 10 | In a case that was handed down last month, the |
| 11:16:31 | 11 | Fayetteville case, which in your notebook at tab 4 |
| 11:16:35 | 12 | discusses this exact issue, your Honor.  Thank you. |
| 11:16:43 | 13 | THE COURT:  Anything else? |
| 11:16:44 | 14 | MS. CELLA:  Nothing else, your Honor, unless you |
| 11:16:46 | 15 | have specific questions. |
| 11:16:47 | 16 | THE COURT:  I don't think so.  Okay.  Well, thank |
| 11:16:51 | 17 | you again.  I'm sorry you have to have done this in two |
| 11:16:56 | 18 | days, but I thought I was going to be in trial this week |
| 11:16:59 | 19 | and fortunately for me, I'm not with respect to this. |
| 11:17:04 | 20 | Give me one second. |
| 11:17:09 | 21 | Ms. Prather, if you could come back up for a |
| 11:17:11 | 22 | second because you raised something new that I'm not sure |
| 11:17:13 | 23 | I followed.  And you said it and I thought I did but I |
| 11:17:28 | 24 | don't think anyone has raised this before but -- actually, |
| 11:17:31 | 25 | sit down for a second.  I'm going to start with the |

11:17:34  1  government and have them -- tell me what they think

11:17:37  2  they'll have and, then, you could respond.  So if you

11:17:39  3  could come back up for a second.

11:17:53  4        It wasn't until Ms. Prather just mentioned this,

11:17:55  5  but so, let's say that Barnes & Noble ranks Lonesome Dove

11:18:09  6  no rating and BookPeople ranks it something different,

11:18:18  7  whatever, doesn't matter, what happens then?

11:18:23  8        MS. CELLA:  So any of that is not an issue for

11:18:28  9  plaintiff.  That is a TEA issue.  They can review those

11:18:31  10  ratings and correct any rating that they need to correct.

11:18:35  11  Well, have the vendor correct the rating.

11:18:37  12        THE COURT:  Well, I can see your point, on one

11:18:42  13  hand, that it may or may not.  But yeah, I get it, they

11:18:49  14  give the rankings and they are what they are.  But in

11:18:52  15  terms of -- so in that situation, here's the reason I

11:18:59  16  care.  I think Ms. Prather's made it pretty clear that she

11:19:03  17  thinks that the TEA ought to be doing this and not the

11:19:06  18  folks that publish books or sell books.  And if the TEA

11:19:11  19  were to do that, if they had taken this burden on, well,

11:19:15  20  whatever they ranked Lonesome Dove, that's what it would

11:19:19  21  be, the school districts could decide okay, we can buy it

11:19:24  22  and put it on the shelves.  We can buy it and wrap it in

11:19:27  23  brown paper bag and hide it somewhere until the parents

11:19:32  24  say it's okay.  Or maybe we don't get to see it at all.

11:19:36  25        But isn't that another issue with the statute

| | | |
|---|---|---|
| 11:19:41 | 1 | that you're going to have really -- what happens when you |
| 11:19:53 | 2 | have 2,000 books that have different ratings when |
| 11:20:01 | 3 | publishers turn them in and they're -- how does that help |
| 11:20:03 | 4 | the school districts? |
| 11:20:05 | 5 | MS. CELLA:  Well, ultimately, your Honor, that |
| 11:20:08 | 6 | discrepancy would be up to TEA because they have the |
| 11:20:11 | 7 | oversight.  The school districts. |
| 11:20:12 | 8 | THE COURT:  How are they going to deal with it? |
| 11:20:14 | 9 | How does the statute indicate they're going to deal with |
| 11:20:16 | 10 | the fact that there could be thousands of books that have |
| 11:20:19 | 11 | different ratings, depending on -- you know, in terms of |
| 11:20:30 | 12 | kind of like prior restraint on this.  And again, maybe |
| 11:20:33 | 13 | the plaintiff doesn't have the standing to raise this |
| 11:20:35 | 14 | themselves.  But, you know, what happens when there are |
| 11:20:41 | 15 | thousands of books that have different ratings?  And |
| 11:20:46 | 16 | there's a year window there and there's not really, even |
| 11:20:50 | 17 | you admitted.  If I'm wrong, I think you admitted that the |
| 11:20:53 | 18 | TEA doesn't have to do anything.  I mean, TEA can do it |
| 11:20:57 | 19 | but they don't have to.  What happens then? |
| 11:21:02 | 20 | MS. CELLA:  Well, your Honor, the plaintiffs |
| 11:21:05 | 21 | don't have the standing to raise that issue.  That is a |
| 11:21:07 | 22 | TEA issue.  There's just no -- it's a TEA -- |
| 11:21:16 | 23 | THE COURT:  Well, see if I can phrase this the |
| 11:21:18 | 24 | right way.  It may not -- it seems to me, I'm just |
| 11:21:21 | 25 | thinking out loud.  It seems to me that it may not impact |

| | | |
|---|---|---|
| 11:21:31 | 1 | Barnes & Noble, individually, in the sense they turn in |
| 11:21:33 | 2 | their list and it's the list.  But as a group, it seems to |
| 11:21:41 | 3 | me to be a problem because, again, of the vagueness issue |
| 11:21:46 | 4 | of knowing how to rate these things and if as a group, |
| 11:21:51 | 5 | there are all these different, you know -- I mean, they're |
| 11:21:57 | 6 | part of -- they are one of the distributors and |
| 11:22:00 | 7 | booksellers.  And so, you know, their decision about |
| 11:22:05 | 8 | whether or not to --  how to rank Lonesome Dove seems to |
| 11:22:11 | 9 | me to be an important decision in terms of -- and if |
| 11:22:16 | 10 | they're not going to get any guidance -- if they look out |
| 11:22:18 | 11 | and they see that a competitor has rated something |
| 11:22:22 | 12 | differently, then they may want to change it.  I'm just |
| 11:22:25 | 13 | saying this ambiguity in the law doesn't seem to be very |
| 11:22:27 | 14 | helpful. |
| 11:22:29 | 15 | MS. CELLA:  Again, I would point that that is not |
| 11:22:32 | 16 | plaintiffs' issue to bring.  They don't have standing.  To |
| 11:22:37 | 17 | your point, though, TEA can deal with that.  It's in the |
| 11:22:41 | 18 | statute that they can deal with any rating or incorrect |
| 11:22:44 | 19 | rating in their view.  So that's TEA's issue.  That's not |
| 11:22:51 | 20 | -- that doesn't make it ambiguous or vague as to |
| 11:22:54 | 21 | plaintiffs.  Plaintiffs rate the books based on the |
| 11:22:57 | 22 | statute, submit their lists to TEA.  There's nothing |
| 11:23:01 | 23 | further in the statute other than to change a rating that |
| 11:23:06 | 24 | TEA feels is incorrect. |
| 11:23:08 | 25 | THE COURT:  Okay.  Thank you.  I'm sorry to just |

| | | |
|---|---|---|
| 11:23:13 | 1 | pop that on you. |
| 11:23:14 | 2 | And, Ms. Prather, you're certainly welcome to say |
| 11:23:17 | 3 | anything you care to about that issue, as well. |
| 11:23:25 | 4 | MS. PRATHER:  Your Honor, what you pointed out is |
| 11:23:32 | 5 | quintessential unconstitutional vagueness. |
| 11:23:35 | 6 | THE COURT:  Let's say I'm right and I think I am. |
| 11:23:39 | 7 | I think there are issues.  But help me just -- I just need |
| 11:23:42 | 8 | you to help me with the -- y'all's standing to raise the |
| 11:23:46 | 9 | issue. |
| 11:23:47 | 10 | MS. PRATHER:  It's going to harm our clients to |
| 11:23:48 | 11 | have to rate the books and to rate the books under an |
| 11:23:52 | 12 | indefinite statute is a problem. |
| 11:23:55 | 13 | THE COURT:  I got -- you've made that point and I |
| 11:23:58 | 14 | got it.  My question is, does it hurt your clients -- how |
| 11:24:06 | 15 | does it injure your clients and how do they have standing |
| 11:24:08 | 16 | to raise the issue I just did, which is that there could |
| 11:24:11 | 17 | be a multitude of different books getting different |
| 11:24:17 | 18 | ratings and the TEA, number one, there's no system in |
| 11:24:21 | 19 | place for them to resolve it at all.  Two, how they |
| 11:24:26 | 20 | resolve it is sort of, you know, man behind the -- it's |
| 11:24:30 | 21 | Wizard of Oz.  It's the man behind the curtain that's |
| 11:24:34 | 22 | going to decide it and y'all have to live with it. |
| 11:24:36 | 23 | But I'm just saying how does it -- it doesn't |
| 11:24:40 | 24 | sound very good to me that you have all these different |
| 11:24:43 | 25 | ratings on books because there are going to be different |

| | |
|---|---|
| 11:24:46 | 1 |
| 11:24:50 | 2 |
| 11:24:54 | 3 |

11:24:46  1  companies if they all comply and do it but I'm just -- how
11:24:50  2  would it -- how would just that one problem damage your
11:24:54  3  clients?
11:24:55  4          MS. PRATHER:  Because some of my clients might
11:24:59  5  rate a book one way and some might rate the other and that
11:25:02  6  rating is going to impact them beyond the school districts
11:25:05  7  in the state of Texas.
11:25:06  8          THE COURT:  So your argument is that the reality
11:25:15  9  of the world is that your clients will have to have one
11:25:19 10  eye on the rating they do for the school district and
11:25:25 11  then, a concern that it will impact them in 49 other
11:25:29 12  states, for example.
11:25:31 13          MS. PRATHER:  Absolutely.
11:25:31 14          THE COURT:  And everywhere else.  Probably more
11:25:34 15  so for the publishers than the -- well, for Barnes &
11:25:37 16  Noble, they're in all 50 states and also, online.  I got
11:25:43 17  it.  Now that I've kind of rambled and talked about it, I
11:25:48 18  have figured out your issue on that.
11:25:50 19          Is there anything else you wanted to say?
11:25:52 20          MS. CELLA:  One thing, your Honor.
11:25:53 21          THE COURT:  Please.  Whatever you care to.
11:25:57 22          MS. CELLA:  I did just want to point out that the
11:26:01 23  statute is effective September 1st and as we know, lists
11:26:04 24  are not due till April 1st.  That gives TEA and any other
11:26:08 25  agencies that need to seven months to determine and come

| | | |
|---|---|---|
| 11:26:11 | 1 | up with rules on how to deal with any issues like that. |
| 11:26:15 | 2 | THE COURT:  Gosh, I have so much faith in our |
| 11:26:19 | 3 | governments that they would do that.  Have you ever had to |
| 11:26:27 | 4 | like get a roof fixed on a federal building? |
| 11:26:31 | 5 | MS. CELLA:  I have not. |
| 11:26:32 | 6 | THE COURT:  But that's a different issue.  But |
| 11:26:38 | 7 | beyond your, I'm sure, well-intended and good-faith belief |
| 11:26:41 | 8 | that the TEA will -- would do something between now and |
| 11:26:45 | 9 | April 1st to clarify some of the issues that have been |
| 11:26:50 | 10 | raised here, do you have any -- anything more than that |
| 11:26:54 | 11 | you can tell me why you believe that they actually will? |
| 11:26:57 | 12 | MS. CELLA:  Nothing else, your Honor, other than, |
| 11:26:59 | 13 | you know, they will. |
| 11:27:01 | 14 | THE COURT:  Then why just my belief in good |
| 11:27:06 | 15 | government? |
| 11:27:06 | 16 | MS. CELLA:  They do have a good-faith obligation |
| 11:27:08 | 17 | to comply with this law, as well.  So... |
| 11:27:11 | 18 | THE COURT:  Well, they have -- sure, they have, |
| 11:27:14 | 19 | but I don't know why -- let me ask you a question.  If the |
| 11:27:21 | 20 | TEA does nothing between now and April 1st in any respect |
| 11:27:25 | 21 | with this act, they don't give any help with regard to |
| 11:27:31 | 22 | what is meant by sexually explicit if they do nothing, if |
| 11:27:34 | 23 | they just sit on their hands, so what.  I mean, is there |
| 11:27:39 | 24 | anything in -- I get there's a good faith, I would think. |
| 11:27:42 | 25 | Maybe there's a good faith.  I don't know if there is a |

11:27:44  1   good-faith requirement, but if they don't do anything, who

11:27:52  2   can do anything about it?

11:27:53  3           MS. CELLA:  Well, it's TEA's oversight so they

11:27:56  4   would have to do something if they're going to.

11:27:58  5           THE COURT:  Right.  If they're going to and

11:28:02  6   that's my point is, I'd like to think maybe -- your

11:28:05  7   argument is, we've got the window where they could.

11:28:08  8           MS. CELLA:  Right.  But that's also not fatal to

11:28:11  9   the statute.

11:28:13  10          THE COURT:  Okay.  I just wanted -- I thought

11:28:16  11  maybe you had some reason to believe that there actually

11:28:19  12  would be action, that you knew action was being planned on

11:28:23  13  being taken, but my sense is you don't.

11:28:26  14          MS. CELLA:  Other than I know that they are

11:28:29  15  deeply looking at all of their statutes on how to comply

11:28:32  16  with all of them.  You know, the new statutes that have

11:28:34  17  come out.

11:28:35  18          THE COURT:  Okay.  Ms. Prather, anything else?

11:28:37  19          MS. PRATHER:  (Moves head side to side.)

11:28:38  20          THE COURT:  Thank you all for being here.

          21          (Proceedings concluded.)

          22

          23

          24

          25

1                              *  *  *  *  *  *

2

3   UNITED STATES DISTRICT COURT  )

4   WESTERN DISTRICT OF TEXAS      )

5

6      I, LILY I. REZNIK, Certified Realtime Reporter,

7   Registered Merit Reporter, in my capacity as Official

8   Court Reporter of the United States District Court,

9   Western District of Texas, do certify that the foregoing

10  is a correct transcript from the record of proceedings in

11  the above-entitled matter.

12     I certify that the transcript fees and format comply

13  with those prescribed by the Court and Judicial Conference

14  of the United States.

15     WITNESS MY OFFICIAL HAND this the 4th day of September,

16  2023.

17                              *Lily Iva Reznik*

18                              ~~~~~~~~~~~~~~~~~~~~~~~~
                                *LILY I. REZNIK, CRR, RMR*
19                              *Official Court Reporter*
                                *United States District Court*
20                              *Austin Division*
                                *501 West 5th Street,*
21                              *Suite 4153*
                                *Austin, Texas 78701*
22                              *(512)391-8792*
                                *SOT Certification No. 4481*
23                              *Expires: 1-31-25*

24

25