**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| **BOOK PEOPLE, INC., VBK, INC. d/b/a BLUE WILLOW BOOKSHOP, AMERICAN BOOKSELLERS ASSOCIATION, ASSOCIATION OF AMERICAN PUBLISHERS, AUTHORS GUILD, INC., COMIC BOOK LEGAL DEFENSE FUND,** | § § § § § § § | |
| **Plaintiffs,** | § § | |
| **v.** | § § | **CASE NO. 23-CV-00858-ADA** |
| **MARTHA WONG in her official capacity as chair of the Texas State Library and Archives Commission, KEVEN ELLIS in his official capacity as chair of the Texas Board of Education, MIKE MORATH in his official capacity as Commissioner of Education,** | § § § § § § § § § | |
| **Defendants.** | § § | |

---

**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

---

## TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................. ii

TABLE OF AUTHORITIES ................................................................................... iv

I. INTRODUCTION AND SUMMARY OF ARGUMENT ..................................... 1

II. STATEMENT OF FACTS ................................................................................... 3

    A.    The Texas Legislature adopts HB 900 despite significant practical and constitutional concerns ............................................................................ 3

    B.    HB 900 requires booksellers to disregard their conscience and achieve the insurmountable: review and rate all books previously sold to Texas schools as "sexually relevant" or "sexually explicit." ........................... 4

    C.    Under H.B. 900, TEA publishes, evaluates, and overrides the booksellers' ratings unilaterally with no independent review or ability for booksellers to appeal. ....................................................................................... 7

    D.    This Court enjoined the enforcement of H.B. 900, finding that it is unconstitutional in at least three ways; the 5th Circuit affirmed as to Defendant. ........................................................................................ 8

III. ARGUMENT ..................................................................................................... 10

    A.    Plaintiffs can establish success on the merits because, as previously determined, HB 900 violates the First and Fourteenth Amendments. ................. 11

        1.    The 5th Circuit and this Court have previously determined that HB 900 unconstitutionally compels protected speech. ................................... 12

            a.    HB 900 impermissibly compels Plaintiffs to speak in at least two ways under *303 Creative* and its progeny. .......................................................................... 12

            b.    HB 900 impermissibly compels Plaintiffs to violate their First Amendment rights as a condition of obtaining a government benefit. ..................................... 15

        2.    As this Court previously determined and TEA's testimony confirms, the Rating Requirements are void for vagueness. ................... 16

        3.    HB 900 is an unconstitutional prior restraint because it prevents the distribution of constitutionally protected works without independent review. ................................................................. 20

        4.    HB 900 facially violates the First Amendment ....................................... 22

        5.    HB 900 is substantially overbroad because it chills constitutionally protected speech and infringes the rights of students to receive information and ideas. ....................................................................... 26

        6.    HB 900 unconstitutionally delegates government authority to regulate speech to private entities. ......................................................... 28

B.     Plaintiffs have met the four-part test for permanent injunctive relief................. 29

1.     If HB 900 takes effect, Plaintiffs will suffer irreparable injuries for which there is no adequate remedy at law, satisfying the first two prongs of the test. ................................................................................... 29

2.     The third and fourth factors—balance of hardships and public interest—favor a permanent injunction. ................................................. 30

C.     Plaintiffs are entitled to attorney's fees under 42 U.S.C. § 1988........................ 30

IV. CONCLUSION.................................................................................................................... 30

CERTIFICATE OF SERVICE ................................................................................................ 31

## TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*303 Creative LLC v. Elenis*,
   600 U.S. 570 (2023) ................................................................................................ *passim*

*ACLU v. Ashcroft*,
   322 F.3d 240 (3d Cir. 2003), *aff'd*, 542 U.S. 656 (2004) .................................... 18, 28

*Air Evac EMS, Inc. v. Tex. Dep't of Ins., Div. of Workers' Comp.*,
   851 F.3d 507 (5th Cir. 2017) ............................................................................... 11

*Alexander v. United States*,
   509 U.S. 544 (1993) ........................................................................................... 20

*Amawi v. Pflugerville Indep. Sch. Dist.*,
   373 F. Supp. 3d 717 (W.D. Tex. 2019), *vacated after law amended sub nom.*
   *Amawi v. Paxton*, 956 F.3d 816 (5th Cir. 2020) ................................................. 15

*Bantam Books, Inc. v. Sullivan*,
   372 U.S. 58 (1963) ............................................................................................. *passim*

*Bd. of Cnty. Comm'rs, Wabaunsee Cnty., Kan. v. Umbehr*,
   518 U.S. 668 (1996) ........................................................................................... 15

*Bd. of Educ. v. Pico*,
   457 U.S. 853 (1982) ........................................................................................... 23, 27

*Bernard v. Gulf Oil Co.*,
   619 F.2d 459 (5th Cir. 1980), *aff'd*, 452 U.S. 89 (1981) ..................................... 21

*Brown v. Entm't Merchants Ass'n*,
   564 U.S. 786 (2011) ........................................................................................... 24, 25

*Campbell v. St. Tammany Parish School Board*,
   64 F.3d 184 (5th Cir. 1995) ............................................................................... 23, 27

*Chiu v. Plano ISD*,
   339 F.3d 273 (5th Cir. 2003) ............................................................................. 20

*City of Galveston v. Hill*,
   519 S.W.2d 103 (Tex. 1975) .............................................................................. 28

*Computer & Communications Indus. Ass'n v. Paxton*,
   No. 1:24-CV-849-RP, 2024 WL 4051786 (W.D. Tex. Aug. 30, 2024) ............... 22, 24

*Counterman v. Colorado*,
   600 U.S. 66 (2023) ............................................................................................. 6, 19

*eBay, Inc. v. MercExchange, L.L.C.*,
  547 U.S. 388 (2006)...................................................................................................11

*Elrod v. Burns*,
  427 U.S. 347 (1976)...................................................................................................29

*Fayetteville Pub. Library v. Crawford Cnty., Arkansas*,
  684 F. Supp. 3d 879 (W.D. Ark. 2023)....................................................16, 27, 28

*Free Speech Coal., Inc. v. Paxton*,
  95 F.4th 263 (5th Cir. 2024), *cert. granted*, 144 S. Ct. 2714 (2024).....................21

*Freedman v. State of Md.*,
  380 U.S. 51 (1965)....................................................................................................22

*Ginsberg v. State of N. Y.*,
  390 U.S. 629 (1968), *modified by Miller v. California,* 413 U.S. 15 (1973).....................3, 4

*In re Goode*,
  821 F.3d 553 (5th Cir. 2016) ....................................................................................22

*Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston, Inc.*,
  515 U.S. 557 (1995)...................................................................................................12

*Lujan v. Def's of Wildlife*,
  504 U.S. 555 (1992)...................................................................................................10

*Martin v. City of Struthers*,
  319 U.S. 141 (1943)...................................................................................................23

*McClelland v. Katy Indep. Sch. Dist.*,
  63 F.4th 996 (5th Cir. 2023) .....................................................................................19

*Members of City Council of City of Los Angeles v. Taxpayers for Vincent*,
  466 U.S. 789 (1984)...................................................................................................26

*Moody v. NetChoice, LLC*,
  144 S. Ct. 2383 (2024)..................................................................................12, 22, 23

*Nebraska Press Ass'n v. Stuart*,
  427 U.S. 539 (1976)...................................................................................................20

*NetChoice, LLC v. Paxton*,
  No. 21-51178, 2024 WL 4704574 (5th Cir. Nov. 7, 2024) ...................................22

*Nken v. Holder*,
  556 U.S. 418 (2009)...................................................................................................30

*Opulent Life Church v. City of Holly Springs,*
    697 F.3d 279 (5th Cir. 2012) ........................................................11, 30

*Perry v. Sindermann,*
    408 U.S. 593 (1972) ........................................................................15

*Prison Legal News v. Livingston,*
    683 F.3d 201 (5th Cir. 2012) ............................................................23

*Reed v. Town of Gilbert, Ariz.,*
    576 U.S. 155 (2015) ..........................................................12, 24, 25

*Reno v. ACLU,*
    521 U.S. 844 (1997) ..................................................................17, 24

*Roark & Hardee LP v. City of Austin,*
    522 F.3d 533 (5th Cir. 2008) ............................................................16

*Se. Promotions, Ltd. v. Conrad,*
    420 U.S. 546 (1975) ........................................................................21

*Seals v. McBee,*
    898 F.3d 587 (5th Cir. 2018) ............................................................26

*Smith v. Goguen,*
    415 U.S. 566 (1974) ........................................................................16

*Sorrell v. IMS Health Inc.,*
    564 U.S. 552 (2011) ........................................................................12

*State v. Biden,*
    10 F.4th 538 (5th Cir. 2021) ............................................................30

*Sund v. City of Wichita Falls, Tex.,*
    121 F. Supp. 2d 530 (N.D. Tex. 2000) .............................................29

*United States v. Hansen,*
    599 U.S. 762 (2023) ........................................................................26

*Virginia v. Am. Booksellers Ass'n, Inc.,*
    484 U.S. 383 (1988) ........................................................................26

*Wooley v. Maynard,*
    430 U.S. 705 (1977) ........................................................................12

**Statutes**

13 Tex. Admin. Code § 4.2(c) ...............................................................2

13 Tex. Admin. Code § 4.2(c)(7)(B) ..................................................................10, 16

28 U.S.C. § 2201 ..........................................................................................................11

28 U.S.C. § 2202 ..........................................................................................................11

42 U.S.C. § 1983 ................................................................................................... *passim*

42 U.S.C. § 1988 ..........................................................................................................30

Tex. Educ. Code § 33.021 ..................................................................................... *passim*

Tex. Educ. Code § 35.001 ..................................................................................... *passim*

Tex. Educ. Code § 35.002 ..................................................................................... *passim*

Tex. Educ. Code § 35.003 ..................................................................................... *passim*

Tex. Educ. Code § 35.0021 ................................................................................... *passim*

Tex. Penal Code § 43.01 ..........................................................................................5, 18

Tex. Penal Code § 43.21 ...............................................................................................6

Tex. Penal Code § 43.25 ..........................................................................................5, 18

**Other Authorities**

Fed. R. Civ. P. 54(d)(2)...............................................................................................30

Fed. R. Civ. P. 56 .....................................................................................................1, 10

Plaintiffs Book People, Inc., VBK, Inc. d/b/a Blue Willow Bookshop, American Booksellers Association, Association of American Publishers, Authors Guild, Inc., and Comic Book Legal Defense Fund ("Plaintiffs") file this Motion for Summary Judgment under Fed. R. Civ. P. 56 and ask this Court to permanently enjoin the enforcement of HB 900[1] under 42 U.S.C. § 1983 because it violates the First and Fourteenth Amendments to the U.S. Constitution.

## I.    INTRODUCTION AND SUMMARY OF ARGUMENT

HB 900 is an unprecedented law compelling booksellers to speak on controversial topics against their will or face immense economic burdens and palpable constitutional and reputational harm. HB 900 forces Plaintiffs to incur the crippling costs of reviewing and rating thousands of "library materials"[2]—by applying subjective, multi-factor, content-based assessments about sexual content—or else be banned from selling *any* books to Texas public primary or secondary schools, school districts, and open-enrollment charter schools ("Texas schools"). This Court and the 5th Circuit have already held that Plaintiffs have standing and that the rating provisions of HB 900 likely violate the First and Fourteenth Amendments. Dkt. 43; App. Dkt. 186–1 (3-0, Willett, J.).[3] Despite the clear constitutional infirmities of HB 900's rating regime and a recent bill filed by the sponsor of HB 900 indicating that the Texas Legislature may be charting a different path,[4] Defendant Mike Morath, Commissioner of the Texas Education Agency ("TEA"), continues to pursue implementation of this patently unconstitutional legislation.

Now, after discovery, it is clear that this Court and the 5th Circuit were correct and that

---

[1] The text of HB 900, known as the Restricting Explicit and Adult-Designated Educational Resources ("READER") Act, is attached as Ex. A. HB 900 is codified as proposed Tex. Educ. Code §§ 33.021, 35.001–002, 35.0021, 35.003–008.

[2] "Library material" is not defined in HB 900. Read literally, "library material" could include an expansive collection of items, such as books, reference works, magazines, newspapers, and audio and audiovisual materials, in both physical and digital formats ("books").

[3] Citations to 5th Circuit filings will be referred to as "App. Dkt. [X]."

[4] *See* HB 183, filed on November 12, 2024, Ex. B.

Plaintiffs are entitled to a permanent injunction preventing the enforcement of Sections 33.021(a) ("sexually explicit material" definition), 33.021(d)(2)(A)(ii) (incorporation of "sexually explicit material" definition into the Library Standards (13 Tex. Admin. Code § 4.2(c)), 35.001 (definitions), 35.002 (ratings required), 35.0021 (rating guidelines), and 35.003 (TEA review of ratings) (collectively, the "Rating Requirements").

The summary judgment evidence establishes subject-matter jurisdiction and that the Rating Requirements violate the U.S. Constitution in at least six ways. *First*, Plaintiffs' testimony confirms that the Rating Requirements are "textbook compelled speech" (Dkt. 43 at 37) because they impermissibly compel Plaintiffs to speak on a controversial topic that Plaintiffs do not want to and coerce Plaintiffs to adopt the government's message with which Plaintiffs disagree. *Second*, the Rating Requirements are unconstitutionally vague because they require booksellers to make highly personal and subjective assessments based on unclear directions and confusing definitions, do not consider differences in age or community, and fail to consider whether a book "taken as a whole, lacks serious literary, artistic, political, or scientific value." Dkt. 43 at 42–49. Moreover, Plaintiffs have explained that this highly contextual, multi-step, fact-intensive analysis is unclear and unworkable, leaving Plaintiffs with many unanswered questions and a "lack of any blueprint" to follow. Dkt. 43 at 3; *see* Ex. C (16 steps to comply with Rating Requirements). *Third*, the Rating Requirements are an unconstitutional prior restraint because they function as a book licensing scheme and prohibit the distribution of constitutionally protected books to Texas schools without independent review. *Fourth*, the Rating Requirements are facially unconstitutional because their unconstitutional applications substantially outweigh any constitutional ones, and they are content-based restrictions not narrowly tailored to achieve a compelling government interest. *Fifth*, the Rating Requirements are substantially overbroad because they infringe the constitutional rights of

many third parties, including other booksellers, authors, and Texas students, by chilling constitutionally protected speech and infringing the right of students to receive information and ideas. *Finally*, the Rating Requirements unconstitutionally delegate government authority by requiring private entities to review and rate books on the government's behalf.

Because the Rating Requirements strike at the core of a multitude of constitutional rights and there are no genuine issues of material fact, Plaintiffs are entitled to judgment as a matter of law on their First and Fourteenth Amendment claims under 42 U.S.C. § 1983. Plaintiffs are also entitled to a permanent injunction preventing the enforcement of the Rating Requirements because Plaintiffs have suffered an irreparable injury that can only be cured by injunctive relief and the public interest would be served by enjoining an unconstitutional statute.

## II.    STATEMENT OF FACTS

### A.    The Texas Legislature adopts HB 900 despite significant practical and constitutional concerns.

During the legislative debate on HB 900, Texans raised many concerns with the bill,[5] including (but not limited to) its forced rating system, its many confusing terms and definitions, and its lack of constitutional safeguards and omission of critical backstops for constitutionally protected works, such as the *Miller/Ginsberg* test.[6] Private booksellers also voiced concerns that the bill would unduly force them to choose between doing the government's bidding by issuing ratings on every book they ever sold to a school or ceasing business with Texas schools.[7] Critics sounded alarms about the newly created terms "sexually explicit" and "sexually relevant."[8]

---

[5] *See* Debate on Tex. HB 900 in the House Committee on Public Education, 88th Leg. (Mar. 21, 2023) ("House Debate"); Debate on Tex. HB 900 in the Senate Committee on Education, 88th Leg. (May 11, 2023) ("Senate Debate").

[6] *Ginsberg v. State of N. Y.*, 390 U.S. 629 (1968), *modified by Miller v. California,* 413 U.S. 15, 24 (1973) ("*Miller/Ginsberg* test").

[7] *See* House Debate; Senate Debate.

[8] *Id.*

Although lawmakers conceded that HB 900's patchwork of provisions were compiled using disparate sources, judicial opinions, FCC regulations, and the Penal Code,[9] the bill passed the House on April 20, 2023 and the Senate on May 23, 2023. Several proposed amendments to address the constitutional and practical infirmities of HB 900 were rebuffed along the way.[10] Gov. Greg Abbott signed HB 900 into law on June 13, 2023, with an effective date of September 1, 2023. Ex. A §§ 6–7.

## B.  HB 900 requires booksellers to disregard their conscience and achieve the insurmountable: review and rate all books previously sold to Texas schools as "sexually relevant" or "sexually explicit."

In order to continue selling books to Texas schools, HB 900 requires all "library material vendors,"[11] such as Plaintiffs, to review all "library material" previously sold to Texas schools that remain in "active use" and are not "directly related to the curriculum" and rate them as "sexually relevant," "sexually explicit," or issue no rating using vague and ambiguous content-based criteria with which they disagree.[12] Tex. Educ. Code §§ 33.021(a), 35.001(1), 35.001(3), 35.002(a).[13]

To complete this burdensome task, booksellers are compelled to follow 16 onerous and confusing steps outlined in Ex. C. First, booksellers must perform a four-part assessment just to

---

[9] *Id.*
[10] [Floor Amendment Nos. 1, 2, 3](), S.J. of Tex. 88th Leg. (May 23, 2023).
[11] A "library material vendor" is defined as "any entity that sells library material to a public primary or secondary school in this state." Tex. Educ. Code § 35.001(1) ("bookseller"). This definition includes Plaintiffs and their members and could apply broadly to wholesalers, distributors, online retailers, e-book sellers, publishers, authors, and others.
[12] *See* Deposition of Charley Rejsek, BookPeople representative ("BookPeople Depo.") at 149:2–150:12, Ex. D; Deposition of Valerie Koehler, Blue Willow representative ("Blue Willow Depo.") at 38:20–39:8, Ex. E; Deposition of David Grogan, ABA representative ("ABA Depo.") at 21:4–22:9, 37:3–13, Ex. F; Deposition of Matthew Stratton, AAP representative ("AAP Depo.") at 49:16–50:12, Ex. G; Deposition of Mary Rasenberger, Authors Guild representative ("Authors Guild Depo.") at 72:1–73:14, 74:5–75:7, Ex. H; Deposition of Jeffrey Trexler, CBLDF representative ("CBLDF Depo.") at 59:14–63:14, 66:7–21, Ex. I; Deposition of Monica Martinez, TEA representative ("TEA Depo.") at 60:20–25, 62:2–9, 153:8–22, Ex. J.
[13] All statutory citations will be to the Texas Education Code unless otherwise noted.

decide *which* books to rate: (1) determine what "library material" is subject to HB 900 (step 1) and (2) compile a list of all books "previously sold" to Texas schools or that they wish to sell to Texas schools that are (3) not "directly related to the curriculum" and (4) are currently in "active use" (steps 2–3). §§ 35.001(3), 35.002, 33.021(a). However, no statewide curriculum governs the 1,025 Texas school districts, and "active use" is not defined in the statute or elsewhere in the Education Code. § 35.002; AAP Depo. 33:7–14, 33:7–34:2; Authors Guild Depo. 72:1–73:4; Blue Willow Depo. 49:2–50:7; TEA Depo. 101:10–21. *If* such a list can be compiled, booksellers then must read *every* passage of *every* book and ascribe a subjective view about each book based on the daunting and befuddling definitions of "sexually relevant" and "sexually explicit" that booksellers do not agree with or understand (steps 4–16). §§ 35.002(a), 35.001(3), 35.0021(b); ABA Depo. 21:4–22:9, 26:21–27:2; CBLDF Depo. 59:14–63:14; Authors Guild Depo. 69:21–70:11; BookPeople Depo. 35:5–23, 36:6–15; AAP Depo. 33:7–34:2.

The tortured definitions of "sexually relevant" and "sexually explicit" contort provisions from the Penal Code specifically meant to apply to visual media (not books) and fail to include necessary constitutional safeguards for written works with literary or artistic value. CBLDF Depo. 59:14–63:14, 68:19–69:11; AAP Depo. 49:16–50:12; TEA Depo. 180:10–13. Applying the definition of "sexually relevant" (step 4) involves hopscotching from one definition to the next and guessing what undefined terms mean and what the author's intent was at the time the book was written. § 35.001(3). Embedded within the definition of "sexually relevant" is the term "sexual conduct" (as defined by Penal Code § 43.25) (step 5), which then leads to one defined term and one undefined term. The defined term, "sexual contact" imposes on the bookseller the impossible task of determining the intent of the author (step 6) (Penal Code § 43.01—"with intent to arouse or gratify the sexual desire of any person"). ABA Depo. 37:3–13. It also exasperatingly leads to

the undefined term "lewd exhibition" (step 7), the meaning of which is anyone's guess in the context of HB 900. TEA Depo. 191:16–21. Most significantly, however, is what is missing from this Frankenstein-like definition—the complete lack of consideration for the artistic, literary, political, or scientific value of the work as a whole as required by the U.S. Supreme Court in *Miller v. California.* Books rated "sexually relevant" can only be accessed "outside the school library" with written parental consent. § 35.001(3); TEA Depo. 191:19–21; 203:11–204:2; ABA Depo. 37:3–13.

Applying the definition of "sexually explicit" is equally opaque, subjective, and constitutionally infirm (step 8). § 33.021(a). The embedded term "patently offensive" requires booksellers to determine, for each book, whether it is "so offensive on its face as to affront current community standards of decency" (step 9). Penal Code § 43.21(a)(4). HB 900 neither identifies a community to consider nor what the standards of decency are in each community (step 10). Authors Guild Depo. 73:10–14, CBLDF Depo. 64:13–23, 66:7–21; TEA Depo. 150:25–151:4. HB 900 also fails to explain which age or grade level should be considered, making it impossible for booksellers to predict where any line should be drawn or ascertain what rating should be awarded to a particular book. Authors Guild Depo. 85:23–86:12; ABA Depo. 28:3–21, 29:10–17; AAP Depo. 49:16–50:12.

In addition, booksellers are compelled to "perform a contextual analysis" (step 11) on "each instance" of sexual conduct by considering three murky factors (steps 12–14), including putting themselves in the shoes of a "reasonable person" (step 14)—a quintessential judicial task. *See Counterman v. Colorado*, 600 U.S. 66, 82 (2023) (discussing "reasonable person" standard); § 35.0021(b). Booksellers must "weigh and balance" these factors, which requires the impossible task of determining what a "reasonable person" would think of an author's "intent," while

recognizing that *each instance* of sexual conduct "may present a unique mix of factors" (steps 12–15). § 35.0021(b), (c). Although not explicitly stating that the entire book should be read nor providing for consideration of the "work as a whole," booksellers must also "consider the full context . . . recognizing that contextual determinations are necessarily highly fact-specific and require the consideration of contextual characteristics that may exacerbate or mitigate the offensiveness of the material" (step 16). § 35.0021(d). After applying this mind-numbing definition, if a book is rated "sexually explicit" and is "in active use," booksellers must "issue a recall for all copies" sold to Texas schools. § 35.002(b). No guidance is provided for how to conduct such a recall. TEA Depo. 139:21–24. Nor is there guidance on what happens when booksellers inevitably provide different ratings. *Id.* at 61:16–19, 139:15–24. Unless and until a bookseller successfully navigates the above labyrinth, the bookseller "may not sell library materials" to Texas schools. § 35.002(a); TEA Depo. 11:6–10, 65:10–15.

**C.     Under H.B. 900, TEA publishes, evaluates, and overrides the booksellers' ratings unilaterally with no independent review or ability for booksellers to appeal.**

After booksellers complete the arduous task of determining which books need to be rated and compiling their initial ratings, they must submit their ratings to TEA, which is led and controlled by Commissioner Mike Morath ("Defendant"). § 35.002(c); TEA Depo. 60:18–61:2. TEA must post each bookseller's list of ratings as the booksellers' own rating "in a conspicuous place" on TEA's website "as soon as practicable." § 35.002(e). Each rating is then subject to second-guessing by TEA. § 35.003. If a bookseller fails to rate a book or TEA believes a book was "incorrectly rated by the vendor," TEA can issue its own rating and compel the bookseller to adopt the government's "corrected rating" (which will be published and attributed to the bookseller on TEA's website). § 35.002(e); § 35.003(b), (c). If a bookseller refuses to accept the government's opinions as its own, the bookseller will be placed on a public blacklist (also published on TEA's

website), school districts are prohibited from purchasing *any* books (not only those with "corrected ratings") from that bookseller, and the bookseller will be subjected to extensive harm. § 35.003(c), (d), (e); TEA Depo. 15:10–20, 20:2–9, 61:24–62:4, 98:8–19, 129:25–130:17, 192:15–193:12; ABA Depo. 51:12–52:23; Authors Guild Depo. 89:6–90:1. Booksellers must repeat the ratings process each year and submit a revised list of ratings to TEA by September 1 for TEA to review and post on its website. § 35.002(d), (e).

TEA admits HB 900 includes no ability to seek independent review of its determinations. TEA Depo. 67:10–18. Nor do booksellers receive any assistance from the State or TEA to help them attempt to comply with HB 900. TEA Depo. 122:6–9. Only compliant booksellers who acquiesce to the government's compelled speech and adopt the government's ratings for each book can be removed from the public blacklist. § 35.003(d), (e); TEA Depo. 192:15–193:12.

**D.    This Court enjoined the enforcement of H.B. 900, finding that it is unconstitutional in at least three ways; the 5th Circuit affirmed as to Defendant.**

On July 25, 2023, Plaintiffs (all of whom are subject to HB 900)[14] filed a Complaint and Motion for Preliminary Injunction seeking preliminary and permanent injunctions under 42 U.S.C. § 1983 preventing Defendant, in his official capacity as TEA Commissioner, and his representatives from enforcing HB 900 because it violates Plaintiffs' First and Fourteenth Amendment rights. Dkt. 1 ¶¶ 6, 20, § VIII.b.; Dkt. 6. On August 16, 2023, Defendants filed a Motion to Dismiss and Response in Opposition to Plaintiffs' Motion for Preliminary Injunction. Dkt. 19. This Court held hearings on August 18, 2023 (Dkt. 27) and August 28, 2023 (Dkt. 32).

---

[14] For information about Plaintiffs, their members, and how they are subject to HB 900, *see* Declaration of Charley Rejsek ¶¶ 2–3, Ex. K ("Rejsek Decl."); Declaration of Valerie Koehler ¶¶ 3–5, Ex. L ("Koehler Decl."); Declaration of David Grogan ¶¶ 3–5, Ex. M ("Grogan Decl."); Declaration of Matthew Stratton ¶¶ 3–4, Ex. N ("Stratton Decl."); Declaration of Mary E. Rasenberger ¶¶ 3–5, Ex. O ("Rasenberger Decl."); Declaration of Jeff Trexler ¶¶ 3–4, Ex. P ("Trexler Decl.").

During a remote Status Conference on August 31, 2023, this Court granted Plaintiffs' Motion for Preliminary Injunction, denied Defendants' Motion to Dismiss, and orally enjoined certain provisions of HB 900. Dkt. 36. On September 18, 2023, this Court issued a written Order preliminarily enjoining the enforcement of §§ 35.001, 35.002, 35.0021, and 35.003 because they (1) unconstitutionally compel speech, (2) contain several unconstitutionally vague provisions, and (3) are an unconstitutional prior restraint. Dkt. 43. Although the Court held that the definition of "sexually explicit material" is unconstitutionally vague (Dkt. 43 at 42–49), the Court did not include in its preliminary injunction § 33.021(a), the definition of "sexually explicit material," or § 33.021(d)(2)(A)(ii), which incorporates the same unconstitutional definition into the Library Standards. To be clear, Plaintiffs are seeking a permanent injunction of §§ 33.021(a), 33.021(d)(2)(A)(ii), 35.001, 35.002, 35.0021, and 35.003 (the "Rating Requirements").[15] *See* Dkt. 49.

Defendants filed a Notice of Appeal on September 18, 2023. Dkt. 44. On January 17, 2024, the 5th Circuit, 3-0, affirmed the preliminary injunction as to Defendant Morath. App. Dkt. 186–1. On April 25, 2024, the mandate was issued, and the case was returned to this Court. On July 16, 2024, this Court dismissed Defendants Wong and Ellis. Dkt. 70. Discovery has since concluded.

Now that the 89th Legislative Session is set to begin on January 14, 2025, the Legislature appears to be considering a different approach relying on the same constitutionally deficient definitions. On November 12, 2024, Rep. Jared Patterson, the author of HB 900, introduced HB 183, which (among other things) requires the Texas Board of Education to permit parents to submit requests to the Board to review "library material" that a parent believes "(1) is inappropriate for

---

[15] This is especially important since the new bill filed on November 12, 2024, HB 183, also includes the term "sexually explicit material" throughout.

use by students in one or more of the grade levels for which the material is available; or (2) contains **sexually explicit material**." Ex. B (emphasis added); proposed § 35.151(a).[16] Because the constitutionally deficient term "sexually explicit" currently appears in the un-enjoined Library Standards adopted during the pendency of this case, 13 Tex. Admin. Code § 4.2(c)(7)(B) (Ex. Q), should this bill pass without the Court enjoining §§ 33.021(a) and 33.021(d)(2)(A)(ii), the Legislature will effectively do an end-run around this Court's ruling that the definition is unconstitutional, ensuring repeat litigation and a needless waste of scarce judicial resources.

## III.    ARGUMENT

This Court should grant summary judgment and permanently enjoin the Rating Requirements because there is no genuine dispute of material fact, and Plaintiffs are entitled to judgment as a matter of law on their First and Fourteenth Amendment claims under 42 U.S.C. § 1983. Fed. R. Civ. P. 56(a). This MSJ is supported by pleadings, depositions, documents, declarations, and other materials. Fed. R. Civ. P. 56(c); *see* Exhibit List below.

As a preliminary matter, this Court and the 5th Circuit have already found that Plaintiffs established standing, ripeness, and the lack of sovereign immunity. Dkt. 30 at 3–26; Dkt. 43 at 16–23; App Dkt. 186–1 at 9–20. Plaintiffs have testified extensively, in both depositions and declarations, that they and their members are subject to HB 900 and that the Rating Requirements cause imminent and concrete constitutional, economic, and reputational harms, which are fairly traceable to Defendant and can only be redressed by permanent injunctive relief. *Lujan v. Def's of Wildlife*, 504 U.S. 555, 560–61 (1992); Rejsek Decl. ¶¶ 4–28; Koehler Decl. ¶¶ 3–27; Rasenberger Decl. ¶¶ 6–15; Grogan Decl. ¶¶ 5–23; Stratton Decl. ¶¶ 4–20; Trexler Decl. ¶¶ 4–11. Plaintiffs' claims are ripe because it is even more evident after discovery that this case presents pure questions

---

[16] The term is used two more times in the bill.

of law that need no further factual development. *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 287 (5th Cir. 2012). Defendant is not entitled to sovereign immunity because Plaintiffs seek injunctive relief against a state actor in his official capacity who bears a "sufficient connection" to the enforcement of the Rating Requirements. *Air Evac EMS, Inc. v. Tex. Dep't of Ins., Div. of Workers' Comp.*, 851 F.3d 507, 519 (5th Cir. 2017).

At this juncture, the appropriate relief is a permanent injunction, and to obtain that, a plaintiff must first establish success on the merits and then meet a four-part test showing that: (1) it has suffered an irreparable injury; (2) remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) considering the balance of the hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) the public interest would not be disserved by a permanent injunction. *eBay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 390 (2006). As shown in § III.A below, Plaintiffs have established success on the merits. As shown in § III.B below, all four factors weigh in favor of granting Plaintiffs permanent injunctive relief.

**A.**    **Plaintiffs can establish success on the merits because, as previously determined, HB 900 violates the First and Fourteenth Amendments.**

The Rating Requirements violate the First and Fourteenth Amendments as a matter of law and should be permanently enjoined because they (1) compel private speech, (2) are void for vagueness, (3) create a book licensing regime that functions as a prior restraint on speech without due process, (4) facially violate the First Amendment, (5) are unconstitutionally overbroad because they chill a substantial amount of constitutionally protected speech and infringe the right of students to receive information and ideas, and (6) improperly delegate government authority. *See* Dkt. 1 ¶¶ 6, 20, 55–98; 28 U.S.C. §§ 2201, 2202; 42 U.S.C. § 1983.

The Rating Requirements are subject to review under the First and Fourteenth Amendments at this pre-enforcement stage because, as explained below, their unconstitutional

applications to Plaintiffs and other booksellers—compelling speech and infringing the rights to distribute books and not be subject to vague or overbroad laws—substantially outweigh their constitutional applications, if any. *Moody v. NetChoice, LLC*, 144 S. Ct. 2383, 2398 (2024). Further, the Rating Requirements are content-based restrictions subject to strict scrutiny. *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015).

**1.    The 5th Circuit and this Court have previously determined that HB 900 unconstitutionally compels protected speech.**

    **a.    HB 900 impermissibly compels Plaintiffs to speak in at least two ways under *303 Creative* and its progeny.**

It is axiomatic that "the right of freedom of thought protected by the First Amendment against State action includes both the right to speak freely and the right to refrain from speaking at all." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977). The latter encompasses the dual principles that the government cannot (1) compel speech if the speaker chooses to remain silent, nor can it (2) compel a speaker to adopt the government's speech. *303 Creative LLC v. Elenis*, 600 U.S. 570, 586 (2023). The Rating Requirements flagrantly flout both these core constitutional tenets as a matter of law by compelling Plaintiffs to make controversial statements against their will and acquiesce to the government's preferred messages in violation of their sincerely held beliefs. Dkt. 43 at 32–38. App. Dkt. 186–1 at 28–31; *id.*; *see also, e.g., Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston, Inc.*, 515 U.S. 557 (1995).

First, the Rating Requirements compel Plaintiffs to express "pure speech" protected under the First Amendment because the ratings "communicate ideas"—whether a book contains content that is "sexually explicit" or "sexually relevant." *303 Creative*, 600 U.S. at 587; *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011) ("[T]he creation and dissemination of information are speech within the meaning of the First Amendment."). Because Plaintiffs must conduct a complex and subjective "contextual analysis" for each book, each rating will be an "'original, customized'

creation" attributed to each Plaintiff on TEA's website for the world to see. *303 Creative*, 600 U.S. at 587; §§ 33.021(a), 35.001, 35.002, 35.0021; TEA Depo. 153:8–22 (the ratings will be attributed to each bookseller); August 28, 2023 hearing (Ex. R) at 34:10–23 (TEA will post the booksellers' lists on its website with the bookseller's name), 77:17–78:4 (the ratings would be posted under the booksellers' name because otherwise "[t]here would be no other way for the school district[s] to know who they can purchase from"). Plaintiffs wish to not express their views on the content of books and not be associated with HB 900's ratings mandate, much less engage in the labyrinth of analysis required to attempt to determine a rating. Rejsek Decl. ¶¶ 20–22; Koehler Decl. ¶¶ 17–22; Grogan Decl. ¶¶ 14–15, 20; Rasenberger Decl. ¶¶ 9, 15; Stratton Decl. ¶ 16; Trexler Decl. ¶ 6.

Second, in the case of disagreement with the State, the Rating Requirements compel Plaintiffs to adopt the government's views. If TEA determines that any one of Plaintiffs' ratings is "incorrect," TEA has the unilateral ability to alter the rating and require Plaintiffs to conform to the government's revised rating. That revised rating, as dictated by TEA, will be attributed to Plaintiffs on TEA's website. § 35.003; TEA Depo. 15:10–20, 98:8–19. Plaintiffs do not want to be coerced into expressing the State's rating as their own. Rejsek Decl. ¶ 21; ABA Depo. 51:12–52:1; Authors Guild Depo. 81:15–24; Grogan Decl. ¶ 14; Stratton Decl. ¶ 16.

Assuming Plaintiffs can determine *which* books to rate (steps 1–3) prior to addressing *how* to rate them, the Rating Requirements present Plaintiffs with a series of Hobson's choices. First, if they can even afford to do so without going out of business (Rejsek Decl. ¶¶ 16–17; Koehler Decl. ¶¶ 16, 25; ABA Depo. 70:11–71:2, 76:16–77:1), Plaintiffs must choose whether to issue ratings or stick to their sincerely held beliefs and remain silent, in which case they are permanently banned from selling books to Texas schools, which can be as much as 20 percent of total sales. Koehler Decl. ¶ 23; ABA Depo. 18:12–22; Authors Guild Depo. 31:17–32:10, 90:2–16, 91:6–24.

Second, Plaintiffs must decide whether to revise their ratings to match the State's "corrected ratings" or stand firm and, again, be permanently banned from selling books to Texas schools. § 35.003; TEA Depo. 11:6–10, 98:8–19. Plaintiffs will be irreparably injured either way. *See* § III.B.1 below. If Plaintiffs yield to the State's demands, they may go out of business trying to comply, will betray their conscience, and could incur "reputational harm" because their coerced ratings, published online, will be attributed to them by their loyal customers and potential buyers in their communities and across the country. Authors Guild Depo. 81:4–24, ABA Depo. 37:18– 38:5. If Plaintiffs fail to provide ratings or do not accept the State's ratings, they will face "substantial financial harm" by being blacklisted from selling *any* books to Texas schools. § 35.002(a); *see* § III.B.1 below.

Like the regulation in *303 Creative*, HB 900 "does not seek to impose an incidental burden on speech;" rather, it allows the State to "coopt" Plaintiffs' voices "for its own purposes" and requires Plaintiffs to "utter what is not in [their] mind[.]" 600 U.S. at 592, 596. Plaintiffs do not wish to publicly rate thousands of books based on the State's subjective criteria, which conflict with their own values. Rejsek Decl. ¶¶ 20–22; Koehler Decl. ¶¶ 17–22; Grogan Decl. ¶¶ 14, 20; ABA Depo. 21:4–22:9; Rasenberger Decl. ¶ 9; Authors Guild Depo. 81:15–24; Stratton Decl. ¶ 16; Trexler Decl. ¶ 6. Like the plaintiff in *303 Creative*, Plaintiffs "must either speak as the State demands or face sanctions for expressing [their] own beliefs," 600 U.S. at 589, including being permanently barred from selling any books to Texas schools—sacrificing longstanding relationships (and revenue streams) that, in some cases, date back decades. *See, e.g*., Rejsek Decl. ¶¶ 3, 5–8, 20–21, 25–27; Koehler Decl. ¶¶ 3–6, 11, 16, 25.

Thus, because the Rating Requirements compel Plaintiffs to speak when they prefer to remain silent and to adopt the government's speech as their own, they should be struck down as unconstitutional compelled speech. *303 Creative*, 600 U.S. at 602–03.

> **b.    HB 900 impermissibly compels Plaintiffs to violate their First Amendment rights as a condition of obtaining a government benefit.**

In addition to violating traditional compelled speech doctrine, the Rating Requirements impose unconstitutional conditions on Plaintiffs' ability to contract with the government. *Perry v. Sindermann*, 408 U.S. 593, 597 (1972). The U.S. Supreme Court has "made clear" that the government "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech." *Id.*

The Rating Requirements deny Plaintiffs the benefit of selling books to Texas schools if they refuse to opine on the highly controversial topic of which books are suitable for Texas students. § 35.002(a); TEA Depo. 11:6–10, 65:10–15 (booksellers cannot sell books to Texas schools if they have not issued book ratings), 98:8–19. Even if Plaintiffs acquiesce to compelled speech in the first instance, the government may nonetheless *still* withhold benefits if TEA "corrects" a rating, and the bookseller refuses to adopt the government's ratings. § 35.003(d); TEA Depo. 98:8–19 (school districts are prohibited from purchasing books from booksellers if they do not adopt TEA's corrected rating). These are quintessential unconstitutional conditions. *See, e.g.*, *Bd. of Cnty. Comm'rs, Wabaunsee Cnty., Kan. v. Umbehr*, 518 U.S. 668, 674 (1996) (the government may not deny a benefit on a basis that infringes one's constitutionally protected freedom of speech, even if there is no entitlement to that benefit); *Amawi v. Pflugerville Indep. Sch. Dist.*, 373 F. Supp. 3d 717, 755 (W.D. Tex. 2019), *vacated after law amended sub nom. Amawi v. Paxton*, 956 F.3d 816 (5th Cir. 2020) (enjoining law that compelled contractors to certify that they do not boycott Israel as a condition of public employment).

2.     **As this Court previously determined and TEA's testimony confirms, the Rating Requirements are void for vagueness.**

Because HB 900 contains a "web of unconstitutionally vague requirements," the Rating Requirements, including § 33.021(a) and § 33.021(d)(2)(A)(ii), should be permanently enjoined.[17] Dkt. 43 at 58. A law is void for vagueness under the First Amendment when it (1) fails to provide a "person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly" or (2) fails to provide "explicit standards" for applying the law "to avoid arbitrary and discriminatory applications." *Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 551 (5th Cir. 2008). When a law, like HB 900, reaches "expression sheltered by the First Amendment," the vagueness doctrine "demands a greater degree of specificity than in other contexts." *Smith v. Goguen*, 415 U.S. 566, 573 (1974); *see also Fayetteville Pub. Library v. Crawford Cnty., Arkansas*, 684 F. Supp. 3d 879, 906 (W.D. Ark. 2023) (enjoining "fatally vague" provisions of law that require evaluating the "appropriateness" of library books).

Defendant's representative testified that not even TEA, the agency tasked with overseeing and enforcing HB 900, understands the terms in the Rating Requirements or how they will be applied.[18] TEA could not explain how a bookseller can determine if a book is "sexually relevant," in "active use," "directly related to the curriculum," or which community standards to apply. TEA Depo. 101:10–21, 133:15–134:3, 136:1–17, 150:25–152:25. Plaintiffs testified extensively that the Rating Requirements are subjective, confusing, and unworkable, leaving them with many unanswered questions and without a clear way to apply the Rating Requirements. Authors Guild

---

[17] Now that the Legislature is again relying on the vague term "sexually explicit material" in HB 183, it is imperative that this Court clarify that *all* uses of that term, as defined in HB 900 (§ 33.021(a)) and included in the Library Standards (§ 33.021(d)(2)(A)(ii); 13 Tex. Admin. Code § 4.2(c)(7)(B) (Ex. Q)), are barred.

[18] Defendant's representative could not even answer if a film was considered "library material" under HB 900 or how to handle donated books. TEA Depo. at 124:2–127:4.

Depo. 69:21–70:11; Blue Willow Depo. 36:21–38:24; CBLDF Depo. 59:14–63:14; ABA Depo. 37:3–13; Rejsek Decl. ¶¶ 18–19; Stratton Decl. ¶¶ 13, 19.

The 16 steps required to rate books are riddled with vague terms. Ex. C. First, to determine *which* books need to be rated, a bookseller must look at all prior sales (step 1) and determine whether the book is "directly related to the curriculum" (no rating required) (step 2) and whether it is in "active use" (rating required) (step 3). §§ 33.021(a), 35.001(3), 35.002. Neither term is defined in HB 900. Section 28.002(a) of the Education Code provides a general list of subjects that a curriculum must cover, but it contains no specific topics for school districts, and therefore no guidance for booksellers trying to determine whether an individual book is included in the curriculum, much less "directly related to" it. TEA Depo. 101:14–21 (admitting TEA does not know how a bookseller can determine whether a book is directly related to the curriculum and that school districts have different curricula). Because there is no statewide curriculum in Texas across its 1,025 school districts and curricula vary from classroom-to-classroom within a district as well as from day-to-day or year-to-year within a single classroom (requiring consistent reevaluation), it is impossible for booksellers to ascertain what books are "directly related to the curriculum" or in "active use." *Id.*

Then, to determine *what* the rating should be for a single book, a bookseller must apply the multi-prong definitions of "sexually explicit" and "sexually relevant" (steps 4–16), but those definitions exclude the "critical backstop" of the third prong of the *Miller/Ginsberg* test for obscenity. TEA Depo. 180:10–13 (HB 900 does not consider whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value). Without this protection, HB 900's definitions undoubtedly restrict constitutionally protected works. §§ 33.021(a), 33.021(d)(2)(A)(ii), 35.001(3); *Reno v. ACLU*, 521 U.S. 844, 873–74 (1997) (the third prong of

the *Miller/Ginsberg* test "critically limits the uncertain sweep of the obscenity definition").

Determining whether a book is "sexually relevant" (steps 4–7) requires asking whether a book contains "sexual conduct" (Penal Code § 43.25) (step 5), which includes "sexual contact" (Penal Code § 43.01) (step 6) or the "lewd exhibition" of certain body parts (undefined) (step 7). Determining whether a book is "sexually explicit" (steps 8–16) requires considering whether a book "describes, depicts, or portrays sexual conduct, as defined by Section 43.25, Penal Code, in a way that is patently offensive, as defined by Section 43.21, Penal Code." §§ 33.021(a), 33.021(d)(2)(A)(ii). Although "patently offensive" is defined as "so offensive on its face as to affront current community standards of decency" (steps 9–10), there is no indicia of which community to consider. TEA Depo. 150:25–151:4. HB 900 applies to every public school in Texas, spanning urban areas like Houston, Dallas, and Austin and rural areas such as Caldwell, Loving, and San Saba. These locations have vastly different community standards that will change over time. Moreover, no consideration is given to the age of the reader when applying the Rating Requirements, preventing older students from accessing classic and award-winning works with educational value. ABA Depo. 28:3–21, 29:10–17; AAP Depo. 49:16–50:12. This approach flies in the face of school district policies which differentiate human sexuality curriculum based on grade level. *See, e.g.,* Austin ISD. A one-size-fits-all approach to sexual content "encroaches upon speech in a constitutionally overinclusive manner." *ACLU v. Ashcroft*, 322 F.3d 240, 266 (3d Cir. 2003), *aff'd*, 542 U.S. 656 (2004).

The Rating Requirements also demand, without explanation, a "contextual analysis" and "weighing and balancing" three different elements while recognizing that each instance of sexual conduct "may present a unique mix of factors" (steps 11–16). § 35.0021. This includes the impossible task of determining the intent of the author and stepping into the shoes of a "reasonable

person"—a quintessential judicial task (step 14). *Counterman*, 600 U.S. at 82. Plaintiffs must also consider "the *full context in which* the description, depiction, or portrayal of sexual conduct *appears*, to the extent possible, recognizing that contextual determinations are necessarily highly fact-specific and require the consideration of contextual characteristics that may exacerbate or mitigate the offensiveness of the material" (step 16). § 35.0021(d) (emphasis added). All these steps are required to review each passage of thousands of books to develop a rating for all books. These puzzling provisions are "so unclear" that Plaintiffs "must necessarily guess at [their] meaning," ensuring arbitrary and inconsistent applications. *McClelland v. Katy Indep. Sch. Dist.*, 63 F.4th 996, 1013 (5th Cir. 2023); AAP Depo. 49:16–50:12; Authors Guild Depo. 70:1–11; Blue Willow Depo. 36:21–38:24; CBLDF Depo. 59:14–63:14; ABA Depo. 37:3–13; Rejsek Decl. ¶¶ 18–19; Stratton Decl. ¶¶ 13, 19.

Besides the profound vagueness of the definitions, TEA's role in overseeing and enforcing the Rating Requirements is also "so indefinite that it allows arbitrary and discriminatory enforcement." *McClelland*, 63 F.4th at 1013. At the August 18, 2023 hearing, the State was unable to answer fundamental questions about HB 900 mere days before it was to take effect, resulting in approximately 40 instances in which the State either did not know how the law would function or did not have an answer as to the effects of certain provisions. Dkt. 43 at 11. More than a year later, Defendant is just as confused, if not more so. For example, TEA has still not determined what it will consider in reviewing ratings from booksellers, including whether it will respond to public complaints or consult outside sources. TEA Depo. 63:10–14, 68:14–17, 177:2–5. TEA has also not prepared for the inevitable—how to respond when booksellers rate the same book differently. TEA Depo. 61:16–19, 139:15–20. The day before enactment, TEA did not know and still does not know—fourteen months later—how booksellers should determine:

- If a book is "directly related to the curriculum." TEA Depo at 101:14–21.
- If a book is in "active use." TEA Depo at 101:10–13.
- Which community standards to apply. TEA Depo at 150:25–152:25.
- What constitutes a "lewd exhibition." TEA Depo at 133:15–23.
- If library material is "sexually relevant." TEA Depo at 133:24–134:3.
- How to conduct the "contextual analysis." TEA Depo at 136:1–17.

Finally, TEA has no idea how the website—where it must conspicuously display the bookseller's ratings—will work, or how it will handle requests by booksellers to be removed from the blacklist. TEA Depo. 16:4–17, 62:10–17. If TEA, the agency tasked with overseeing the ratings process, does not understand HB 900's language and what it requires, booksellers, with less institutional knowledge, staff, and resources, will be unable to comply with the law.

### 3. HB 900 is an unconstitutional prior restraint because it prevents the distribution of constitutionally protected works without independent review.

The summary judgment evidence confirms that the Rating Requirements grant the government unbridled discretion to prohibit all *future* sales of books to Texas schools with no opportunity to appeal final determinations to third parties or have them judicially reviewed. Thus, the Rating Requirements are an unconstitutional prior restraint as a matter of law, the "most serious and the least tolerable infringement on First Amendment rights." *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 558–59 (1976); *Chiu v. Plano ISD*, 339 F.3d 273, 280 (5th Cir. 2003) (the "prohibition of distributing literature is a classic form of a prior restraint").

The Rating Requirements contain the two hallmarks of an unconstitutional prior restraint— they (1) prevent speech from occurring in the first instance and (2) provide no avenue for independent review. *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 61 (1963); *Alexander v. United States*, 509 U.S. 544, 550 (1993) (prior restraints forbid communications "in advance of the time that such communications are to occur"). In *Bantam Books*, the U.S. Supreme Court held that a

Rhode Island law establishing a Commission to review and rate books as "objectionable for sale, distribution or display to youths under 18 years of age" was an unconstitutional "system of prior administrative restraints" because it (1) suppressed the distribution of non-obscene, constitutionally protected books (2) without a judicial determination that the content could lawfully be banned. *Id*. at 70.

Similarly, the Rating Requirements, which prevent booksellers from selling books with serious literary, artistic, political, or scientific value, suppress the future distribution of constitutionally protected books. It is undisputed that if a bookseller or TEA decides that a book is "sexually explicit," the book is removed and *all* future distribution of that book to Texas schools is prohibited. §§ 33.021(a), 35.002, 35.003(d); TEA Depo. 98:8–19. Although the State could have considered "reasonable alternatives" with a "lesser impact on First Amendment freedoms," *Bernard v. Gulf Oil Co*., 619 F.2d 459, 476 (5th Cir. 1980), *aff'd*, 452 U.S. 89 (1981), it opted to create new standards out of whole cloth without tracking the *Miller/Ginsberg* test, therefore preventing the distribution of and access to books with literary, artistic, political or scientific value. *Free Speech Coal., Inc. v. Paxton*, 95 F.4th 263, 280 n.54 (5th Cir. 2024), *cert. granted*, 144 S. Ct. 2714 (2024) (books have "serious literary, artistic, political, or scientific value for minors").

The Rating Requirements are also an unconstitutional prior restraint because they lack due process safeguards, such as a judicial determination of whether a book is "sexually explicit" and therefore, cannot be lawfully sold to Texas schools. *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 553 (1975) ("The settled rule is that a system of prior restraint avoids constitutional infirmity only if it takes place under procedural safeguards designed to obviate the dangers of a censorship system."). The statute is clear—and TEA has confirmed—that Plaintiffs have no opportunity to contest TEA's "corrected" ratings or decisions to ban them from selling certain books to Texas

schools before any other government agency, let alone a judicial body. *See Freedman v. State of Md.*, 380 U.S. 51, 58 (1965) ("[O]nly a procedure requiring a judicial determination suffices to impose a valid final restraint."); TEA Depo. 67:10–18 (admitting there is no appeal); August 18, 2023 hearing (Ex. S) at 12:6–19; Rejsek Decl. ¶ 21; Koehler Decl. ¶ 20. Because the Rating Requirements suppress the distribution of constitutionally protected books without due process, the Rating Requirements, like the Rhode Island law in *Bantam Books*, are an unconstitutional "system of informal censorship." *Bantam Books*, 372 U.S. at 71.

Defendant cannot overcome the presumption of the unconstitutionality of the Rating Requirements because he can neither show that distributing books to Texas schools "poses either a clear and present danger or a serious and imminent threat to a protected competing interest" or is "narrowly tailored and provides the least restrictive means to achieve the Government's goal." *In re Goode*, 821 F.3d 553, 559 (5th Cir. 2016).

### 4.    HB 900 facially violates the First Amendment.

The Rating Requirements should be enjoined for a fourth and independent reason—they facially violate the First Amendment. To decide a First Amendment facial challenge, courts must (1) assess the scope of the law and (2) decide which of the law's applications violate the First Amendment and measure them against the rest. *NetChoice,* 144 S. Ct. at 2398; *NetChoice, LLC v. Paxton*, No. 21-51178, 2024 WL 4704574, at *1 (5th Cir. Nov. 7, 2024); *Computer & Communications Indus. Ass'n v. Paxton*, No. 1:24-CV-849-RP, 2024 WL 4051786, at *13 (W.D. Tex. Aug. 30, 2024). If a law's unconstitutional applications *substantially outweigh* its constitutional ones, a court must sustain a facial challenge and strike down the law. *NetChoice*, 144 S. Ct. at 2398.

To determine a law's scope, courts ask which activities, by which actors, the law regulates. *Id*. at 2398. The parties agree that the Rating Requirements apply to booksellers and regulate their

conduct and their ability to sell books to Texas schools. § 35.001(1); TEA Depo. 124:9–12. The Rating Requirements regulate the activities of booksellers in three main ways: (1) requiring them to review all material ever sold and rate each work as "sexually explicit," "sexually relevant," or no rating using a series of subjective factors, (2) requiring them to adopt TEA's "corrected ratings," and (3) restricting their ability to sell books to Texas schools.[19] §§ 33.021(a), 35.001, 35.002, 35.0021, 35.003.

After determining the law's scope, courts consider whether the law's applications intrude on a protected First Amendment right or unduly burden expression of a covered party. *NetChoice*, 144 S. Ct. at 2398. The first two applications unduly burden Plaintiffs' expression by compelling them to issue book ratings against their will using subjective criteria and adopting the government's views on a controversial subject. *See, e.g., 303 Creative*, 600 U.S. at 586. The third application squarely infringes Plaintiffs' First Amendment right to distribute books. *See, e.g., Prison Legal News v. Livingston*, 683 F.3d 201, 212 (5th Cir. 2012) (distributing books "is precisely the type of interest at the core of First Amendment protections"); *Martin v. City of Struthers*, 319 U.S. 141, 143 (1943) (the First Amendment "embraces the right to distribute literature"). No constitutional application of the Rating Requirements exists. Thus, because the Rating Requirements' unconstitutional applications substantially outweigh their constitutional ones, if any, they should be struck down. *NetChoice*, 144 S. Ct. at 2398.

Moreover, the Rating Requirements are unconstitutional content-based regulations subject to strict scrutiny because they apply "to particular speech because of the topic discussed or the idea

---

[19] The Rating Requirements also require booksellers to recall books rated "sexually explicit" (§ 35.002(b)), which intrudes on the protected First Amendment right to "to receive information and ideas" and access non-obscene materials in school libraries. *Bd. of Educ. v. Pico*, 457 U.S. 853, 871 (1982); *Campbell v. St. Tammany Parish School Board*, 64 F.3d 184, 188 (5th Cir. 1995).

or message expressed." *Reed*, 576 U.S. at 163; *Com. & Comm. Indus. Ass'n.*, 2024 WL 4051786, at *12. On their face, the Rating Requirements distinguish between "sexually explicit" and "sexually relevant" books, which are subject to the law's restrictions, and books that receive no rating, which are not restricted, based on their content. A book's content must be analyzed to rate a book and comply with the Rating Requirements. The Rating Requirements also distinguish between "material directly related to the curriculum," which is not subject to the law's restrictions, and material *not* "directly related to the curriculum," which is subject to the law, based on their content. § 35.001(3). Because the Rating Requirements apply to speech depending on the "topic discussed or idea or message expressed," they are content-based regulations and strict scrutiny applies. *Reed*, 576 U.S. at 163.

Although the State claims that HB 900 serves "a compelling interest in both education and in protecting Texas children from obscenity" (Dkt. 19 at 31), the Rating Requirements are not narrowly tailored to achieve those goals, in part, because they broadly block the distribution of non-obscene, constitutionally protected works. *See Reno*, 521 U.S. at 874–75 ("sexual expression which is indecent but not obscene is protected by the First Amendment"). Despite repeated warnings about the scope of HB 900 and proposed amendments to alleviate those concerns,[20] the Legislature did not incorporate the constitutionally sound definition of obscenity and instead created a new, broad category of unprotected speech deemed "sexually explicit." §§ 33.21(a); 35.001(3); *see Brown v. Entm't Merchants Ass'n*, 564 U.S. 786, 791 (2011) (although obscenity is within the "well-defined and narrowly limited classes of speech" that are not constitutionally protected, "new categories of unprotected speech may not be added to the list by a legislature that concludes certain speech is too harmful to be tolerated"). Moreover, the Rating Requirements

---

[20] *See* House Debate; Senate Debate.

burden private booksellers (not entities within the education system) and specifically do not apply to books "directly related to the curriculum." §§ 33.021(a), 35.001(3). Thus, at best, the Rating Requirements are "indirectly related to education," which does not override the critical constitutional interests on the other side. Dkt. 43 at 42.

The Rating Requirements are also not narrowly tailored because the ratings do not vary based on the age of the reader. *See Brown*, 564 U.S. at 812 (law that failed to distinguish between ages of minors was not narrowly tailored). Instead, the Rating Requirements use a one-size-fits-all model for rating books that applies to all K-12 students. Under this policy, a high school senior may not have access to a book about issues of significant concern, such as teen pregnancy, if it is deemed "sexually explicit" for a first grader. This creates a race-to-the-bottom where older students are blocked from accessing books that may not only be age-appropriate for them but also contribute to necessary discourse about matters of public concern facing their grade level.  Nor are the Rating Requirements the least restrictive means of achieving the government's purported interests, as demonstrated by HB 183, which does not require booksellers to provide ratings, and the many other ways the government's interests could be achieved.

Further, the Rating Requirements excessively burden private booksellers by requiring them to rate every book they have ever sold to a Texas school and provide those ratings to TEA. §§ 35.002, 35.003. For Plaintiffs that likely have sold hundreds of thousands of books to Texas schools over the decades, these burdens are onerous and extreme. *See* Rejsek Decl. ¶ 17; Koehler Decl. ¶¶ 8–16; Grogan Decl. ¶¶ 7, 17–18; Stratton Decl. ¶¶ 8–13. Because the Rating Requirements are neither narrowly tailored to achieve a compelling government interest nor the least restrictive means of advancing such an interest, they fail strict scrutiny. *Reed*, 576 U.S. at 172.

**5.    HB 900 is substantially overbroad because it chills constitutionally protected speech and infringes the rights of students to receive information and ideas.**

The overbreadth doctrine permits a plaintiff to assert the First Amendment rights of parties not before the Court. *See Members of City Council of City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 800 (1984) (overbreadth serves the interest in "preventing an invalid statute from inhibiting the speech of third parties who are not before the Court"). Plaintiffs bring this overbreadth claim on behalf of non-party booksellers, authors, and Texas students because the Rating Requirements chill constitutionally protected speech and infringe the rights of students to receive information and ideas. *See Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 392–93 (1988).[21]

The Rating Requirements are substantially overbroad because they "sweep so broadly, encompassing any number of constitutionally protected" rights. *Seals v. McBee*, 898 F.3d 587, 597 (5th Cir. 2018). Specifically, the rating definitions, together with the requirement to rate, and TEA's oversight, "deter or chill constitutionally protected speech" by booksellers (for reasons explained above) and cause authors to self-censor, such that "society will lose their contributions to the marketplace of ideas." *United States v. Hansen*, 599 U.S. 762, 769–70 (2023). HB 900 has caused, and will continue to cause, authors to stop writing on important topics that may be perceived as "sexually explicit" or "sexually relevant" to avoid public backlash and to be able to sell books to Texas schools. Authors Guild Depo. 44:5–45:1, 82:5–11, 87:3–20 (authors will self-censor); Rasenberger Decl. ¶¶ 13–14; Stratton Decl. ¶ 16; CBLDF Depo. 91:4–93:8 (H.B. 900 has had a "serious chilling effect" on authors), 173:10–18; Grogan Decl. ¶ 10. The Rating

---

[21] Plaintiffs, like the bookseller's association in *Virginia*, have standing to assert the First Amendment rights of others. *Virginia*, 484 U.S. at 392–93 (in First Amendment cases, litigants are "permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression").

Requirements are also overbroad because they do not consider the ages, maturity, or reading level of students; differing community and school standards; the variety of schools or school districts; or the "literary, artistic, political, or scientific value" of a book.

Collectively, the Rating Requirements further infringe the constitutional right of students "to receive information and ideas" and access non-obscene materials in their school library. *Pico*, 457 U.S. at 871; *Campbell*, 64 F.3d at 188. Section 33.021(d)(2)(A)(ii) directly implicates the rights of students by prohibiting the possession, acquisition, and purchase of books rated "sexually explicit." In *Pico*, a plurality of the U.S. Supreme Court recognized that the "right to receive information and ideas . . . follows ineluctably from the sender's First Amendment right to send them," and applied this right to public school students. 457 U.S. at 867. The *Pico* plurality noted that, while school officials have considerable discretion in shaping curriculum, the "unique role of the school library" is a place of voluntary inquiry where students "must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding." *Id*. at 868–69. Under HB 900, students will be deprived of constitutionally protected works because the capacious definitions of "sexually explicit" and "sexually relevant" encompass many works—from classic literature (*Romeo and Juliet*, *Of Mice and Men*, and *Lonesome Dove*) to dictionaries, encyclopedias, health books, and religious texts—that no reasonable person would find obscene.[22] §§ 33.021(a), 35.001; AAP Depo. 54:1–13; CBLDF Depo. 66:7–67:1; Grogan Decl. ¶ 10.

The Rating Requirements are particularly overbroad as applied to older students. *See Fayetteville Pub. Library*, 684 F. Supp. 3d at 903–06 (enjoining Arkansas law that penalized booksellers for distributing items "harmful to minors" because the law made no distinctions based on age). HB 900 would likely cause an 18-year-old high school senior to be barred from accessing

---

[22] *See* House Debate; Senate Debate.

works that may be considered "sexually explicit" or "sexually relevant" to a kindergartner, creating an unnecessary burden on older students' ability to access books appropriate to his or her age and maturity level. *Id*. at 904; Grogan Decl. ¶¶ 10–11 (students will be deprived of "age-appropriate works of literature"). This one-dimensional approach "encroaches upon speech in a constitutionally overinclusive manner." *Ashcroft*, 322 F.3d at 266.

### 6.    HB 900 unconstitutionally delegates government authority to regulate speech to private entities.

This Court has found that the State is not allowed to delegate the categorization of books to third parties, such as Plaintiffs. Dkt. 43 at 2. As a matter of law, the Rating Requirements unconstitutionally delegate vast amounts of state power to private booksellers, including Plaintiffs, by requiring them to review and rate every book ever sold to Texas schools and thus determine which books can be accessed therein. *See Bantam Books*, 372 U.S. at 71 (delegation of government authority to Commission to rate books is unconstitutional); *City of Galveston v. Hill*, 519 S.W.2d 103, 105 (Tex. 1975) (government functions cannot be "surrendered, delegated or bartered away").

The State seeks to outsource the responsibilities of reviewing and rating books to Plaintiffs and others to defer costs. TEA Depo. 61:24–62:9 (private booksellers conduct the initial ratings), 85:25–86:12 (the government, librarians, and/or school boards could rate books); Ex. S at 24:13–25. The Legislature estimated that it will cost a total of $2.6 million and $600,000 per year just to review books not rated as "sexually explicit" or "sexually relevant." Legislative Budget Board, Fiscal Note, Ex. T. This is a fraction of the financial burden that will be incurred by Plaintiffs and other private entities under HB 900. *See, e.g.,* ABA Depo. 26:21–27:20, 68:4–15; AAP Depo. 33:7–34:2; Koehler Decl. ¶¶ 14–15; Dkt. 35 at 4 (amicus brief explaining the extensive expense of attempting to comply with HB 900). The State should not be permitted to require the private sector to do its bidding by reviewing and rating books when such authority belongs to the State.

*See Bantam Books*, 372 U.S. at 71 (delegation of government authority to Commission to rate books was unconstitutional); *Sund v. City of Wichita Falls, Tex.*, 121 F. Supp. 2d 530, 553 (N.D. Tex. 2000) (enjoining delegation of selection and removal of library books to private citizens as an "improper delegation of governmental authority").

**B.**     **Plaintiffs have met the four-part test for permanent injunctive relief.**

      **1.**     **If HB 900 takes effect, Plaintiffs will suffer irreparable injuries for which there is no adequate remedy at law, satisfying the first two prongs of the test.**

Plaintiffs will suffer irreparable constitutional, reputational, and financial injuries without a permanent injunction. Most critically, as shown above, the Rating Requirements violate Plaintiffs' First Amendment rights in many different ways. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."). Plaintiffs will also suffer financial harm if HB 900 is not enjoined, including ongoing compliance costs and potential closure of their businesses. Koehler Decl. ¶¶ 14–16; Rejsek Decl. ¶ 17; Stratton Decl. ¶¶ 10–12; ABA Depo. 26:21–27:60, 68:4–15; Authors Guild Depo. 77:25–85:8, 89:6–91:24. None of these compliance costs are recoverable, Dkt. 43 at 56–57, nor does the State provide any assistance (monetary or otherwise) to help Plaintiffs comply with the Rating Requirements. TEA Depo. 122:6–9; Ex. S at 10:6–10. Plaintiffs will further suffer reputational damages. Rejsek Decl. ¶¶ 21–22, 26; Koehler Decl. ¶¶ 20–21; ABA Depo. 19:1–20:15, 94:8–19; Rasenberger Decl. ¶¶ 13, 15; AAP Depo. 25:6–26:8, 43:21–44:12; Trexler Decl. ¶ 9; CBLDF Depo. 160:8–161:10; TEA Depo. 153:8–22.

Non-injunctive remedies cannot adequately compensate Plaintiffs for the crippling constitutional harms; dire financial harms, including complete loss of business; and resounding reputational damages, both in Texas and outside its borders, that Plaintiffs would face if the Rating Requirements were not enjoined. Rejsek Decl. ¶¶ 4–28; Koehler Decl. ¶¶ 3–27; Rasenberger Decl.

¶¶ 6–15; Grogan Decl. ¶¶ 5–23; Stratton Decl. ¶¶ 4–20; Trexler Decl. ¶¶ 4–11.

   **2.      The third and fourth factors—balance of hardships and public interest—favor a permanent injunction.**

   The Court's consideration of the final two factors—the balance of equities and public interest—merge when, as here, a permanent injunction is sought against the government. *Nken v. Holder*, 556 U.S. 418, 435 (2009) ("The third and fourth factors, harm to the opposing party and the public interest, merge when the Government is the opposing party."). Both the balance of equities and public interest favor enjoining the Rating Requirements because the First Amendment rights of Plaintiffs and others will be infringed if an injunction is not granted. *See Opulent Life*, 697 F.3d at 298 ("Injunctions protecting First Amendment freedoms are always in the public interest."). By contrast, the government does not have an interest in enforcing a regulation that violates federal law. *State v. Biden*, 10 F.4th 538, 560 (5th Cir. 2021) ("[t]here is generally no public interest in the perpetuation of unlawful agency action")

**C.      Plaintiffs are entitled to attorney's fees under 42 U.S.C. § 1988.**

   If the Court issues a permanent injunction, Plaintiffs are entitled to reasonable attorney's fees as the "prevailing" parties. 42 U.S.C. § 1988 (in an action under 42 U.S.C. § 1983, "the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs."). Plaintiffs thus respectfully request leave to file a motion for attorney's fees within 14 days of the Court's Order. *See* Fed. R. Civ. P. 54(d)(2).

## IV.      CONCLUSION

   For the reasons above, Plaintiffs respectfully request that this Court grant Plaintiffs' Motion for Summary Judgment, enter a Permanent Injunction preventing the enforcement of the Rating Requirements, and grant Plaintiffs leave to file a motion for attorney's fees within 14 days of the Court's Order.

Respectfully submitted,

*/s/ Laura Lee Prather*
Laura Lee Prather
Texas Bar No. 16234200
laura.prather@haynesboone.com
Catherine L. Robb
Texas Bar No. 24007924
catherine.robb@haynesboone.com
Michael J. Lambert
Texas Bar No. 24128020
michael.lambert@haynesboone.com
Reid Pillifant
Texas Bar No. 24126157
reid.pillifant@haynesboone.com

**HAYNES AND BOONE, LLP**
98 San Jacinto Blvd., Suite 1500
Austin, Texas 78701
Telephone: (512) 867-8400
Facsimile: (512) 867-8470

**ATTORNEYS FOR PLAINTIFFS**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on the 22nd day of November 2024, a true and correct copy

of the above document was served via the CM/ECF system to all counsel of record.

*/s/ Laura Lee Prather*
Laura Lee Prather