# EXHIBIT I

Jeffrey Trexler                                    September 24, 2024

1                   UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF TEXAS
2                        AUSTIN DIVISION

3    BOOK PEOPLE, INC., VBK,      )
     INC., AMERICAN              )
4    BOOKSELLERS ASSOCIATION,    )
     ASSOCIATION OF              )
5    AMERICAN PUBLISHERS,        )
     AUTHORS GUILD, INC.,        )
6    COMIC BOOK LEGAL DEFENSE    )
     FUND                        )
7                                )
         Plaintiffs,             )
8                                ) Civil No.
     VS.                         ) AU:  23-CV-00858-ADA
9                                )
     MARTHA WONG, KEVEN ELLIS,   )
10   MIKE MORATH                 )
                                 )
11       Defendants.             )

12

13

     ************************************************************
14

15              ORAL AND VIDEOTAPED DEPOSITION OF

16                      JEFFREY TREXLER

17                     September 24, 2024

18                          Volume 1

     ************************************************************
19

20

21

22

23

24

25



Jeffrey Trexler

September 24, 2024
Pages 2 to 5

## Page 2

```
1              ORAL AND VIDEOTAPED DEPOSITION OF JEFFREY
2   TREXLER, produced as a witness at the instance of the
3   Defendants, and duly sworn, was taken in the
4   above-styled and numbered cause on the 24th day of
5   September, 2024, from 9:03 a.m. to 2:26 p.m., via
6   videoconference, before Abigail Guerra, CSR, in and for
7   the State of Texas, reported by machine shorthand, where
8   all attendees appeared via Zoom in their respective
9   locations, pursuant to the Federal Rules of Civil
10  Procedure and the provisions stated on the record or
11  attached hereto.
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 4

```
1                        INDEX
2
3   Appearances.....................................    3
4   JEFFREY TREXLER
5      Examination by Mr. Berg......................    6
6   Signature and Changes...........................  188
7   Reporter's Certificate..........................  190
8
9
10                       EXHIBITS
11  NO.        DESCRIPTION                        PAGE
```
```
12  Exhibit A   Notice of Deposition               11
13  Exhibit B   "Nonprofit Quarterly"              15
14  Exhibit C   CBLDF Case Files                   28
15  Exhibit D   Texas Penal Code, Title 9          53
16  Exhibit E   CBLDF 000001 - 000368              67
17  Exhibit F   Panel Power CBDLF Website         136
18  Exhibit G   Plaintiff Comic Books Responses   170
19              and Objections to Defendant
20              Morath's First Set of Discovery
21              Requests
22
23
24
25
```

## Page 3

```
1              A P P E A R A N C E S
2                (Appearing Remotely)
3
    FOR THE PLAINTIFFS:
4
    Mr. Michael J. Lambert
5   Mr. Reid Pillifant
    HAYNES BOONE, LLP
6   98 San Jacinto Boulevard
    Suite 1500
7   Austin, Teas 78701
    Phone:  (512) 867-8412
8   Email:  Michael.Lambert@haynesboone.com
                 Reid.pillifant@haynesboone.com
9
    FOR THE DEFENDANTS:
10
    Mr. Zachary Berg
11  Ms. Munera Al-Fuhaid
    OFFICE OF THE ATTORNEY GENERAL OF TEXAS
12  300 West 15th Street
    6th Floor
13  Austin, Texas 78701
    Phone:  (512) 463-2100
14  Email:  Zachary.Berg@oag.texas.gov@oag.texas.gov
              Munera.al-fuhaid@oag.texas.gov
15
    ALSO PRESENT:
16      Mr. John Schmitzer, Videographer
        Mr. Jeremy Cunha, Technician
17
18
19
20
21
22
23
24
25
```

## Page 5

```
1          THE VIDEOGRAPHER:  We on the record.  This
2   begins Media No. 1 in the deposition of Jeff Trexler as
3   corporate representative of Comic Book Defense or --
4   excuse me -- Comic Book Legal Defense Fund in the matter
5   of Book People Inc., et al versus Wong, et al, in the
6   United States District Court Western District of Texas,
7   Austin Division, Case No. 23-CV-00858-ADA.
8          Today is Tuesday, September 24, 2024, and
9   the time is approximately 9:02 a.m. Central.  This
10  deposition is being taken via Zoom at the request of
11  defendants.  The videographer is John Schmitzer of Magna
12  Legal Services.
13          Will counsel and all parties present state
14  their appearances and whom they represent.
15          MR. BERG:  For the defendant, Zachary Berg
16  and Munera Al-Fuhaid.
17          MR. LAMBERT:  Michael Lambert, and I'm here
18  with my cocounsel Reid Pillifant from Haynes and Boone,
19  and we represent Comic Book Legal Defense Fund and Jeff
20  Trexler.
21          THE VIDEOGRAPHER:  Thank you.
22          And will the court reporter please swear in
23  the witness.
24          JEFFREY TREXLER,
25  having been first duly sworn, testified as follows:
```



Jeffrey Trexler

September 24, 2024
Pages 6 to 9

Page 6

1          DIRECT EXAMINATION
2   BY MR. BERG:
3      Q.  Morning, Mr. Trexler.  Where are you Zooming
4   from today?
5      A.  I am in New York City.
6      Q.  Wonderful.
7          Mr. Trexler, would you, please, state and
8   spell your name for the record?
9      A.  Sure.
10         My name -- I'll just -- my full name --
11  although you can call me "Jeff" -- is J-E-F-F-R-E-Y,
12  Trexler, T-R-E-X, as in xylophone, L-E-R.
13     Q.  Have you ever been deposed before?
14     A.  Yes.
15     Q.  Some of this may be a reminder, but I'm going
16  to go over some introductory stuff, and then I'll move
17  on to the main subjects of the deposition, okay?
18     A.  Sure.
19     Q.  You understand that you are under oath, right?
20     A.  Yes.
21     Q.  That even though we are on Zoom, as far as your
22  obligation to be truthful, it is the same as if we were
23  in a courtroom, understand?
24     A.  Yes.
25     Q.  For the court reporter, you will need to

Page 7

1   provide verbal answers like "yes" or "no" rather than
2   nodding or shaking your head.  You've done a good job of
3   it so far.
4          This is extra important here today since
5   this is a deposition on Zoom.  Sometimes the connection
6   might be poor, and we may have attorneys participating
7   remotely who may not be able to see you if they're
8   dialing in.
9          Does that make sense?
10     A.  It makes sense.
11     Q.  It also helps the court reporter and other
12  attorneys if we don't talk over each other.  It's much
13  easier to understand the transcript if I let you finish
14  your answer before I ask my next question, and if you
15  let me finish my question before answering.
16         Does that make sense?
17     A.  Yes.
18     Q.  If you don't understand the question, please
19  let me know.  And if you do answer, then I'll I assume
20  that you did understand; is that fair?
21     A.  That's the rule.
22     Q.  If you need a break at any point, just let me
23  know.  I want you to be as comfortable as possible.  I
24  only ask that, as long as it's not a medical emergency,
25  you finish answering any questions we're in the middle

Page 8

1   of before we take a break; is that fair?
2      A.  That's fine with me.
3      Q.  And mandatory question:  Are you aware of
4   anything that would affect your ability to testify
5   truthfully today?
6      A.  No.
7      Q.  And have you consumed any alcohol or drugs
8   today that would affect your ability to testify
9   truthfully?
10     A.  I live a very boring life, so the answer is no.
11     Q.  In preparing for this deposition, did you
12  review any documents?
13     A.  Trying to think.  I just recently completed
14  discovery, so I looked over a lot of material in
15  conjunction with discovery.  I'm very busy.
16     Q.  Without revealing what you discussed, did you
17  speak with an attorney in preparation for this
18  deposition?
19     A.  I have spoken with an attorney.
20     Q.  And, again, without revealing what you
21  discussed, which attorney or attorneys did you meet
22  with?
23     A.  Michael and -- I believe -- I just don't
24  remember who all was in the room.  I know Mike was.
25     Q.  And how long did you meet with Michael and

Page 9

1   team?
2      A.  I couldn't tell you.
3      Q.  Besides Haynes Boone, do you have any other
4   attorneys representing you in this matter?
5      A.  No.
6      Q.  Do you have prepared notes with you that you
7   intend to consult during the deposition?
8      A.  No.
9      Q.  And Comic Book Legal Defense Fund is a
10  plaintiff in this case, correct?
11     A.  Yes.
12     Q.  And you understand that you were designated as
13  the corporate witness for Comic Book Legal Defense Fund,
14  correct?
15     A.  Yes.
16     Q.  As a shorthand, I'm going to refer to Comic
17  Book Legal Defense Fund as "Comic Book LDF" or "Comic
18  Book" going forward, okay?
19     A.  If that's your preference.  The stand acronym
20  is "CBLDF," but I'm fine to do whatever you want to do.
21     Q.  Okay.
22         MR. BERG:  Could we bring up the
23  "Plaintiff's Responses and Objections to Defendant's
24  Notice of Intent to Take Oral and Videotape Deposition"?
25  That's --



Jeffrey Trexler

September 24, 2024
Pages 10 to 13

Page 10

1    THE TECHNICIAN: (Complies.)
2    MR. BERG: Okay.
3    Q. (BY MR. BERG) So this document is titled
4    "Plaintiff's Comic Book Legal Defense Fund's Responses
5    and Objections to Defendant Morath's First" -- no.
6    Sorry. Not that one.
7        MR. BERG: The document that is dated
8    September 12th, "Comic Book LDF's Response and" -- okay.
9        THE TECHNICIAN: (Complies.)
10   Q. (BY MR. BERG) So this document is titled
11   "Plaintiff Comic Book Legal Defense Fund's Responses and
12   Objections to Defendant's Morath's Notice of Intent to
13   Take Oral and Videotape Deposition of Comic Book Legal
14   Defense Fund Pursuant 'to Rule 30(b)(6)."
15       Did I read that correctly?
16   A. Wasn't tracking every word you said, so I
17   assume that you read (as read): "Plaintiff's Comic Book
18   Legal Defense Fund's Responses and Objections to
19   Defendant Morath's Notice of Intent to take oral and
20   Videotaped Deposition of Comic Book Legal Defense Fund
21   Pursuant to Rule 30(b)(6)."
22       If that's what you said, then that's what
23   it was.
24   Q. And the second paragraph of the main body reads
25   (as read): "Subject to the objection below, Jeff

Page 11

1    Trexler will testify as a corporate representative of
2    CBLDF regarding Topics 1 through 17."
3        Did I read that correctly?
4    A. Yes.
5    Q. And are you in, indeed, prepared to testify
6    about Topics 1 through 17?
7    A. That's -- yes.
8        MR. BERG: Okay. Let's mark this as
9    Exhibit A, and you can take it down.
10       (Exhibit A marked.)
11       THE TECHNICIAN: (Complies.)
12   Q. (BY MR. BERG) If I use the term "HB 900"
13   today, I'm referring to the enactive legislation that
14   forms the basis of this lawsuit Texas House Bill 900
15   also known as the "Reader Act" restricting explicit and
16   adult-designated educational resources, which passed
17   through 88th Legislature Regular Session 2023."
18       Does that make sense?
19   A. Makes sense.
20   Q. And if I use the term "Texas schools," I'm
21   using that as a shorthand for Texas public school
22   districts, school libraries, and open enrollment charter
23   schools, okay?
24   A. Okay.
25   Q. And if it gets confusing, just ask me to

Page 12

1    clarify.
2    A. Okay.
3    Q. What is Comic Book LDF?
4    A. The Comic Book Legal Defense Fund is a
5    Section 501(c)(3) nonprofit organization dedicated to
6    protecting the legal rights of the comic arts and the
7    comic arts community.
8    Q. When was Comic Book LDF founded?
9    A. The Comic Book Legal Defense Fund was founded
10   in the mid-1980s starting in 1986, 1987.
11   Q. And approximately how many employees does Comic
12   Book LDF have?
13   A. Comic Book Legal Defense Fund has two people
14   working for it currently.
15   Q. Are you one of those?
16   A. I am one of those.
17   Q. And who is the other?
18   A. Rachael Andres, our operations manager.
19   Q. Do you have non-paid employees or volunteers?
20   A. We have volunteers.
21   Q. Approximately, how many regular volunteers do
22   you have?
23   A. The number of volunteers varies based on the
24   circumstance.
25   Q. Approximately, how many volunteers do you have

Page 13

1    as we sit here today?
2    A. Right now, it depends. Would you -- how you
3    define volunteer. It depends -- it really depends on
4    you define it.
5        We have dozens of people who volunteer to
6    help the organization. We have people actively
7    assisting in matters at various conventions which can
8    range anywhere from 8 to 20 people at a specific
9    convention largely local.
10   Q. Is Comic Book LDF a membership organization?
11   A. Comic Book Legal Defense Fund has members.
12   Q. How does someone --
13   A. Uh-huh.
14   Q. How does someone become a member of Comic Book
15   LDF?
16   A. Okay.
17       Comic Book Legal Defense Fund, since its
18   beginning, has given people the opportunity to register
19   with the organization as members, and there are various
20   membership tiers.
21   Q. What services does Comic Book legal defense
22   fund provide to its members?
23   A. The Legal Defense Fund protects the rights of
24   the comic arts community and provides education on legal
25   issues pertaining to the comic arts. We cover



Jeffrey Trexler

September 24, 2024
Pages 14 to 17

Page 14

1 everything that could affect anybody who is interested
2 in the comic arts from creators; publishers; retailers;
3 distributors; fans who want to have access to works;
4 even cosplayers, people who dress as their favorite
5 character; or, you know, work in animation. We have a
6 wide scope of interest that we serve.
7     Q. Besides members, how is Comic Book LDF funded?
8     A. Comic Book Legal Defense Fund has -- we have
9 donations -- also donations outside of membership,
10 grants as well -- historically, as well as auctions and
11 book sales and signings. All very standard in the
12 comics community.
13     Q. You executed a Declaration in this case,
14 correct?
15     A. That's correct.
16     Q. And in your Declaration dated July 24th, 2023,
17 you identified yourself as the interim director for the
18 Comic Book Legal Defense Fund, correct?
19     A. That is correct.
20         I don't have that document in front of me,
21 so I am relying purely on memory, and I assume that I
22 did that.
23     Q. And what is your current position?
24     A. Interim director.
25     Q. Approximately, how long have you been interim

Page 15

1 director?
2     A. Since September 2020.
3     Q. And you're an attorney, correct?
4     A. That is correct.
5     Q. What were the circumstances by which you became
6 interim director?
7     A. The previous executive director departed, and I
8 took the position. Actually, I took the position of
9 interim director.
10         MR. BERG: Will you please bring up the
11 document "Comic Book Nonprofit Seeks..."
12         THE TECHNICIAN: (Complies.)
13         MR. BERG: We'll mark this as Exhibit B.
14         (Exhibit B marked.)
15     Q. (BY MR. BERG) This is an article from
16 "Nonprofit Quarterly" that appears to have also ran in
17 "Publishers Weekly" and "The Hollywood Reporter" titled
18 "Comic Book Nonprofit Seeks  to Rebuild After Sexual
19 Harassment Scandal. The author is Drew Adams, and the
20 article is dated August 13th, 2020.
21         Did I read that correctly?
22     A. Correct.
23         MR. BERG: Will you zoom in on the first
24 paragraph -- first full paragraph.
25         THE TECHNICIAN: (Complies.)

Page 16

1     Q. (BY MR. BERG) First paragraph on Page 1 reads
2 (as read): "The Comic Book Legal Defense Fund has
3 announced Jeff Trexler as its interim executive
4 director. Trexler replaces Charles Brownstein, who
5 served as executive director for 18 years, after
6 Brownstein resigned in June amid renewed allegations of
7 sexually assaulting comics creator Taki Soma in 20-" --
8 sorry -- "2005."
9         Did I read that correctly?
10     A. You did indeed.
11         MR. BERG: Let's go to the third paragraph
12 on Page 1.
13         THE TECHNICIAN: (Complies.)
14         MR. BERG: "Brownstein joined."
15     Q. (BY MR. BERG) It reads (as read): "Brownstein
16 joined CBLDF as executive director in 20" -- 2002. His
17 resignation comes as women continue sharing experiences
18 of sexual harassment, assault, and abuse by male
19 professionals in the comics industry. Aside from Soma's
20 initial charge of assault at a comics convention
21 in 2005, an encounter Brownstein recounted from his
22 perspective in a 2006 statement and for which he was
23 reportedly disciplined but not fired. Comics
24 professional Kris Simon recently came forward to share
25 her own experiences with Brownstein. Former CBLDF

Page 17

1 development manager, Cheyenne Allot also spoke out after
2 her release from a 2010 nondisclosure agreement. "The
3 Comics Journal" has extensively investigated both Soma's
4 2005 account and Allot's testimony, the latter of which
5 details years of problem behavior from Brownstein and
6 lack of board oversight."
7         Did I read that correctly?
8     A. You did indeed.
9     Q. The second sentence read talks about (as read):
10 "An environment of sexual harassment assault and abuse
11 by male professionals in the comics industry."
12         Are you aware of any such trend?
13         MR. LAMBERT: Objection, form.
14         Counselor, how is this -- what topic is
15 this related to? I would like to know that before we go
16 too much further.
17         MR. BERG: General background on the
18 organization, his personal knowledge; and I'll loop it
19 back.
20         MR. LAMBERT: But what topic is that? What
21 number is that? I would be -- I would like to know
22 that. I don't remember seeing a general one about
23 background, but I could be wrong.
24         MR. BERG: I'll ask Mr. Trexler as to his
25 personal knowledge.



Page 18

1    MR. LAMBERT:  That's perfectly fine, but I
2  also would like to know what topic it relates to.
3    As you know, we designated Mr. Trexler for
4  Topics 1 through 17 and 1 through 17 only.  So if this
5  relates to one of those documents, then some limiting
6  questions about his personal knowledge would be
7  acceptable but not beyond this topic.
8    I would ask you to reissue a new notice if
9  we're -- if this is going to a new topic that we're
10  talking about so we can make proper objections, but this
11  does not seem to be on one of the listed of topics,
12  unless you can tell me otherwise.
13    MR. BERG:  Well, I can ask outside of the
14  listed topics as to his person knowledge.  I --
15  obviously, I wouldn't have expected that Mr. Trexler
16  would be prepped on this topic.  To the extent that he
17  lacks person knowledge, he can testify to that, and
18  we'll move on.
19    MR. LAMBERT:  Understood.  I will be making
20  objections because they're beyond the topic, but I do
21  understand that he will, you know, he will respond, but
22  I would appreciate it if this has some relation to this
23  case and that they're kept limited.  If not -- if it
24  goes further than that, then we'll stop the deposition,
25  and we'll go to the judge about this, but we'll -- I

Page 19

1  will allow a few questions, but I will be objecting.
2    Q.  (BY MR. BERG)  Mr. Trexler, do you have any
3  personal knowledge about an environment of sexual
4  harassment, assault, and abuse by male professionals in
5  the comic history?
6    MR. LAMBERT:  Objection, form.
7    A.  I have two questions, if the objections are
8  done.
9    MR. LAMBERT:  They are.
10    THE WITNESS:  Okay.  I want to --
11    MR. LAMBERT:  Yes, they are.
12    A.  How do you define "environment," and how do you
13  define "personal knowledge"?  Just because I didn't see
14  the word -- and I can be corrected.  I didn't see the
15  word "environment" in this text, so since you were
16  introducing that, I wanted to know what your definition
17  of environment was; and I want to know what your
18  definition of personal knowledge is because that's
19  necessary for me to answer the question in a way that
20  will satisfy you.
21    Q.  (BY MR. BERG)  Personal knowledge would be
22  knowledge based on your personal experiences versus
23  something another person told you.  Environment in the
24  common parlance of a work environment or industry
25  environment.

Page 20

1    A.  Okay.
2    Q.  Do you see these are somewhat broad concepts?
3    A.  And your definition of personal knowledge is
4  interesting because I personally was never the subject
5  of sexual harassment, and I was not present at any of
6  the incidents involving Charles Brownstein that are
7  mentioned in this paragraph.
8    Q.  Very well.  If you don't have any personal
9  knowledge, we'll move on.
10    MR. BERG:  We can take down this document.
11  Oh wait.  Wait.  We marked this exhibit already.
12    THE TECHNICIAN:  Correct.
13    MR. BERG:  Let's take this down and bring
14  up CBLDF case files "U.S. versus Handley."
15    THE TECHNICIAN:  (Complies.)
16    MR. BERG:  And I'll tell counsel that this
17  will go pretty quickly into topics that have been
18  noticed.
19    MR. LAMBERT:  Thank you.
20    MR. BERG:  So this is -- can you go to the
21  bottom left of the page, please?
22    THE TECHNICIAN:  (Complies.)
23    Q.  (BY MR. BERG)  Would you agree that this
24  document was pulled off of CBLDF's website?
25    A.  I haven't had -- read it word for word; and,

Page 21

1  again, this is a document from before my becoming part
2  of the organization.  So I'm -- it has a CBDLF URL, and
3  I know this was a case in which they were at least -- at
4  least addressed publicly, but that's -- I'm going to
5  say, again, that it appears to be the case.
6    MR. BERG:  Can we zoom out?
7    THE TECHNICIAN:  (Complies.)
8    Q.  (BY MR. BERG)  You said that this document is
9  from before you were interim director?
10    A.  Uh-huh.
11    Q.  How are you able to determine the date this
12  document was created?
13    A.  Because I didn't write it.  So, yeah.
14    Q.  Are you aware that this is a case in which
15  CBLDF participated?
16    A.  I do not know the extent of the CBLDF's
17  involvement in the case.  I only know what is in this
18  article, and my vague memories from the time that the
19  case was taking place.  I was not part of the CBDLF at
20  this time.
21    MR. BERG:  If we -- go to the first, full
22  paragraph on Page 2.
23    THE TECHNICIAN:  (Complies.)
24    Q.  (BY MR. BERG)  I'll represent to you in this
25  case a Christopher Handley was arrested, prosecuted and



Jeffrey Trexler

September 24, 2024
Pages 22 to 25

Page 22

1 pled guilty to provisions of the PROTECT Act (as read):
2 "Which empowered prosecutors with greater ability in
3 bringing cases against crimes related to the sexual
4 exploitation of minors."
5      I will represent to you that the facts in
6 this case was that Mr. Handley possessed drawings of a
7 minor or minors having sex with adults.
8      Would you agree that depictions of children
9 having sex with adults do not belong in school
10 libraries?
11      A. My answer to that question is going to depend
12 on the book; what is contained in the picture; what's
13 contained in the book; what -- how you define sex? It
14 really comes down to a lot of definitions in the
15 material question.
16      Q. For sex, we'll say sexual intercourse.
17      A. Again, it's going to come down --
18      Q. Is there a scenario in which you believe that
19 depictions of children having sexual intercourse with
20 adults belong in school libraries?
21           MR. LAMBERT: Objection, form.
22      A. Yeah, again --
23      Q. (BY MR. BERG) Sorry. What was your answer?
24      A. You're talking to a classics major. I used to
25 study ancient Greek.

Page 23

1      Q. We'll say a book written after 1980.
2      A. I'm not sure the difference between depiction
3 in a book before 1980 and a book after 1980. I wasn't
4 sure what you're getting at there.
5      But it's really going to depend on the
6 context. I mean, there's works in the Louvre. There
7 are -- the works of Plato talk about men discussing
8 philosophy in order to protect their sexual relationship
9 with prepubescent children. I've never spoken out on
10 banning the works of Plato from schools.
11      It really is going to be dependent on the
12 work and the context. There's some works that would
13 not, and there's some works that are.
14      My understanding is -- and you're looking
15 at this paragraph -- my understanding is that just based
16 on the very brief -- because I don't remember the
17 specifics of this case -- I am simply not aware that any
18 of the books at issue in this particular case were books
19 that were in school curricula or libraries or clubs.
20      So maybe you can enlighten me on that
21 because, again, I wasn't involved in this case.
22      Q. Yes.
23      My question prompted by this was: Whether
24 materials similar to those with which Mr. Handley was
25 arrested, which were -- is the correct pronunciation

Page 24

1 manga?
2      A. You can say manga. You can say manga
3 {pronunciation}.
4      Q. -- manga depictions of sexual relations between
5 children and adults.
6      I will represent to you that my
7 understanding of this case is that CBLDF did not
8 represent, him but that they participated in the expert
9 witness --
10      A. Uh-huh.
11      Q. -- process?
12      A. I believe that's what it said in the article.
13      Q. Yes.
14      Would you agree that depictions of children
15 have sex with adults in a manga comic do not belong in
16 school libraries?
17           MR. LAMBERT: Objection, form.
18      A. Again, I don't know the material involved in
19 this case. I don't know the images in this case. I am
20 not aware of any instances in which any of the images in
21 this case or any of the books in this case -- if it was
22 one book, multiple. Again, haven't reviewed this --
23 have ever been in a school library.
24      We defend cases as they come to us. I
25 would -- again, if this were a case in which I was

Page 25

1 involved and I saw the material of which I had reviewed
2 it and I saw the material, I could perhaps opine more;
3 but I literally do not know what you are talking about
4 in the most -- in the strictest sense, so I can't opine
5 on it. You're asking me to generalize from -- not from
6 a specific that you can't define.
7      Q. (BY MR. BERG) Is there any form of sexual
8 content that you think should never be in school
9 libraries?
10           MR. LAMBERT: Objection, form.
11      A. Again, there's a vast...
12      Q. (BY MR. BERG) Can you describe a piece of
13 sexual content that you do not think should be in school
14 libraries?
15           MR. LAMBERT: Objection, form.
16      A. I think it's going to come down to the nature
17 of the library and the nature of the access to the
18 material.
19      Q. (BY MR. BERG) A school library of a K to 12
20 school.
21      A. And, again, it's going to come down to the
22 school library. It's going to come down to access to
23 the material, the library's mission, the nature of the
24 community, and what the community is -- considers to be
25 inconsistent. That, with its -- with the values --



Jeffrey Trexler                                                September 24, 2024
                                                                Pages 26 to 29

Page 26

1  community values.
2        I am not going to give a blanket statement
3  as to all of the works of literature and video and
4  everything that's out there, nor am I going to -- nor am
5  I going to try to come up with an ironclad rule.
6     Q.  Let me try to provide more details for this
7  hypothetical.
8     A.  Great.
9     Q.  Let's say an elementary school in the Austin
10 suburbs.  Is there any form of sexual content that you
11 do not think -- that you think should not be in an
12 elementary school library in suburban Austin?
13       MR. LAMBERT:  Objection, form.
14    A.  I am going to let the community of Austin
15 decide.  And then if there are objections to that
16 material and somebody comes to us concerning that
17 material, then I will address that particular case.
18    Q.  (BY MR. BERG)  So would it be a correct summary
19 of your position to say that you would not object to the
20 sexual content of any material as long as the Austin
21 community was okay with it?
22       MR. LAMBERT:  Objection, form.
23    A.  The -- everything is going to be -- everything
24 is going to be case dependent.
25    Q.  (BY MR. BERG)  Is there any piece of material

Page 27

1  that a Comic Book LDF member sells that you would be
2  uncomfortable selling to an elementary school in
3  suburban Austin?
4        MR. LAMBERT:  Objection, form.
5     A.  If we have -- in the publishing industry, books
6  are marketed to different demographics.  And publisher
7  markets to specific demographics, I, personally -- and
8  you asked if I would sell -- I wouldn't.  Typically,
9  would not.
10       Again -- but, again, a school could look
11 and say, hey, we think our concept of that demographic
12 is different from the publisher, and we think it's
13 actually appropriate for the community.  So, really,
14 it's going to be dependent on the community, and the
15 characterization by the publisher and where the
16 publisher wants it to go.
17       Again, I'm just simply not willing to come
18 out with a blanket statement that every community has
19 the exact same standard, and there's an ironclad rule
20 that if there's a particular image or particular content
21 that it's to be excluded.  I really have to do it on a
22 case-by-case basis.
23    Q.  (BY MR. BERG)  Would CBLDF have any expressive
24 viewpoint in selling a book with sexual content to an
25 Austin elementary school about which you were unsure

Page 28

1  whether the community approved or not?
2        MR. LAMBERT:  Objection, form.
3     A.  And you're saying CBLDF is doing the selling?
4  What -- who is selling here?  At one point, you say
5  members.  At one point, you said CBLDF.  At one point, I
6  originally think you said you.  Who is doing the selling
7  here?
8     Q.  (BY MR. BERG)  We'll say a CBLDF member --
9     A.  Uh-huh.
10    Q.  -- selling a book to an Austin elementary
11 school with some sexual content about which you are
12 unsure whether the community had objections to or
13 approved of.
14       Would the entity Comic Book LDF have an
15 expressive viewpoint of that sale?
16       MR. LAMBERT:  Objection, form.
17       THE WITNESS:  Thank you.  Thank you.  I
18 should have paused.
19    A.  Remember, as I've said, we handle cases on a
20 case-by-case basis.  We don't prescribe or monitor
21 member sales activity.
22       (Exhibit C marked.)
23       MR. BERG:  Let's mark this Exhibit C, and
24 then you can take that down and bring up the Complaint.
25       THE TECHNICIAN:  (Complies.)

Page 29

1        MR. BERG:  We can go to Page 7, please.
2     A.  Could you excuse me just for one second.  There
3  is -- I have my phone here as a clock, and I think one
4  of my app's been spammed, and I'm getting a ton of
5  notices about crypto.  So -- unless -- it's a little
6  distracting.  So if you don't mind, I'm going to figure
7  out how to stop this while you pull up your stuff.
8        MR. BERG:  Could you please zoom in on
9  Paragraph 12?
10       THE TECHNICIAN:  (Complies.)
11    A.  Uh-huh.
12    Q.  (BY MR. BERG)  It reads (as read):  "Plaintiff
13 Comic Book Legal Defense Fund is a nonprofit
14 organization dedicated to protecting the legal rights of
15 the comic arts community."  There's talk about
16 Declaration, and then it says (as read):  "With a
17 membership that includes creators, publishers,
18 retailers, educators, librarians, and fans, CBLDF has
19 participated in dozens of First Amendment cases in
20 courts across the United States and led important
21 educational initiatives promoting comics literacy and
22 free expression."
23    A.  Uh-huh.
24    Q.  (As read):  "The CBLDF has members located in
25 Texas subject to the Book Ban."



Jeffrey Trexler                                     September 24, 2024
                                                    Pages 30 to 33

Page 30

1        Did I read that correctly?
2    A. You did indeed.
3    Q. Does the entity Comic Book LDF sell books or
4  library materials to Texas schools?
5    A. It depends.
6        The entity CBLDF?  So you're not talking
7  about members.  You're talking about the entity,
8  correct?
9    Q. Correct.
10   A. Great.
11       And it depends on what you mean by selling
12 books to public schools.  There's a broad ambit, I
13 think.  My understanding is it's somewhat vague in the
14 statute.
15       So we sell books, and the Comic Book Legal
16 Defense Fund sells books online, and it sells books at
17 conventions.  The number of educators, librarians,
18 school administrators -- many of whom love comics and
19 love our work -- purchase items from us at conventions.
20 I assume that it's also the case online.  But, again, we
21 don't monitor people's professions when they buy from us
22 online.
23       So is it possible that we have sold books
24 that have ended up in a Texas classroom?  It is
25 theoretically possible.  That's obviously one of the

Page 31

1  concerns in this case.
2        So do we have -- does the Comic Book Legal
3  Defense Fund have a formal set of requisition system set
4  up?  We are, you know, getting purchase orders from
5  Texas schools.  We do not.
6        But -- sorry.  I hope you understand the
7  different context, and that's why I can't answer the
8  question more precisely than that.
9    Q. So if I understand your answer correctly,
10 there's no formal process by which Comic Book LDF, the
11 entity, directly sells to schools, but it is possible --
12       (Simultaneous cross-talk ensues.)
13   A. It could.
14   Q. (BY MR. BERG)  But it is possible --
15       (Simultaneous cross-talk ensues.)
16   Q. (BY MR. BERG)  -- that you have sold books to
17 individuals, and those books have wound up in Texas
18 schools; is that correct?
19   A. Again, I have no -- I've only been here
20 through -- since 2020, and I don't handle the book
21 aspect of it, so I don't know every sale that's been
22 done.
23       It's entirely possible, given the
24 educational content of certain works that we sell, that
25 there have been purchase orders in the past.  I don't

Page 32

1  have access to those records.  I reviewed as much as I
2  could in preparation for the -- in discovery, and
3  there's a lot of those records that don't even exist.
4        So I can't tell you what purchase orders we
5  might have received from schools for educational
6  material.  I simply can't.  I wish I could but I can't.
7    Q. Are you aware of any individual title that the
8  entity Comic Book LDF has sold that is currently in a
9  Texas school?
10   A. Our particular items.  I -- again, I didn't do
11 an -- I didn't do an OCLC search.  I didn't do a search
12 of Texas -- the times I've looked at Texas, I'm not even
13 aware that you have a uniform comprehensive library
14 search tool.  So, again, I can't -- I simply can't
15 testify.
16       It is entirely -- I know there are books of
17 ours in schools across the country.  I just don't know
18 there because I can't do the search, and I don't have
19 the records.  So I am not willing to testify that there
20 are none, and I am not willing to testify of certain
21 knowledge that they are.  It literally is of limitations
22 of access to information.
23   Q. My question was slightly different.  I'm not
24 asking if there's none.
25       I'm asking:  Are you aware of any that are

Page 33

1  currently in Texas schools?
2    A. I've told you what I know, which is that I
3  don't have knowledge, so...
4    Q. Does the entity Comic Book LDF sell anything
5  directly to the entity Texas Education Agency?
6    A. Again, I have no knowledge of -- if Texas
7  Education Agency reached out to us and did it, even
8  despite this case, we would gladly sell them material.
9  But to my knowledge, they haven't.
10   Q. Do any of Comic Book LDF's members sell
11 anything directly to the Texas Education Agency?
12   A. Again, I don't -- I'm just not aware.
13       MR. BERG:  Can we go to the Declaration,
14 which is Page 72 of the Complaint?
15       THE TECHNICIAN:  (Complies.)
16   Q. (BY MR. BERG)  Is this the Declaration you
17 executed in this case?
18   A. It appears to be.  It appears --
19       (Simultaneous cross-talk ensues.)
20   A. It appears to be the Declaration.  Obviously, I
21 haven't read the whole thing, so...
22       MR. BERG:  Jeremy, can we go to the end of
23 the Declaration?
24       THE TECHNICIAN:  (Complies.)
25       MR. BERG:  Thank you.



Jeffrey Trexler

September 24, 2024
Pages 34 to 37

Page 34

1  Q. (BY MR. BERG) Does this show that you executed
2  this Declaration on July 24th, 2023?
3  A. It does indeed.
4        MR. BERG: Can we go to Paragraph 5 of the
5  Declaration, please?
6        THE TECHNICIAN: (Complies.)
7  Q. (BY MR. BERG) Paragraph 5 reads (as read):
8  "Comic artists, publishers, and retailers are all
9  subject to the requirements of House Bill 900, the Book
10  Ban."
11       Did I read that correctly?
12  A. Yes, you did.
13  Q. In what way are comic artists subject to the
14  requirements of HB 900?
15  A. Do you have HB 900 up? And so --
16       MR. BERG: Could we bring HB 900 up,
17  please?
18       THE TECHNICIAN: (Complies.)
19  A. Thanks.
20       So, remind me, who's subject to -- take me
21  to -- when you're saying somebody is subject to the ban,
22  what's your understanding of who is subject to the HB
23  900? Who are the affected parties -- just so I know --
24  is your understanding?
25  Q. (BY MR. BERG) Yes. I'm using the wording of

Page 35

1  the Declaration --
2  A. Uh-huh.
3  Q. -- which you said under oath was (as read):
4  "Comic artists, publishers, and retailers are all
5  subject to the requirements of House Bill 900" --
6  A. Uh-huh.
7  Q. -- "the Book Ban."
8  A. Because they are. Because they all are -- you
9  can continue. Page through this, please. I just don't
10  like relying on memory.
11       MR. BERG: Jeremy, would you please page
12  through?
13       THE TECHNICIAN: (Complies.)
14  A. The law applies to vendors, and there's a broad
15  also definition of sale. Every person that I mention
16  there could arguably fall under the definition of
17  vendor, and they all engage in sales that could arguably
18  fall within the ambit of selling material that ends up
19  in a library or to a district.
20  Q. (BY MR. BERG) But your understanding is that
21  Comic Book LDF's member comic artist would fall under
22  the --
23  A. Uh-huh.
24  Q. -- the vendor and seller's definition of HB
25  900.

Page 36

1  A. I mean, look -- yeah. Yes, they would.
2       Do you know how comics are -- well, I'll
3  let you ask because -- I'll let you ask your question.
4  Q. Do you know the anticipated cost to rate books
5  that comic artists, who are members of Comic Book LDF --
6  A. Okay.
7  Q. -- that they will sell to Texas schools?
8  A. And, again, very broad question because there
9  are financial costs that are direct, and there are also
10  costs that are indirect.
11       And so I won't answer your question because
12  I am judging by the question and the tone in which
13  you're asking it, I suspect you don't fully understand
14  the nature of the contemporary comics market.
15       So -- unless you're asking for a particular
16  creator, okay. So a creator can get access to the
17  marketplace in a couple ways -- not two. Multiple ways.
18  There's many ways, not just two.
19       One would be -- which is probably what
20  you're thinking about -- which is somebody selling
21  material to an individual or an entity that then
22  publishes the work, which either the publisher either
23  sells directly or at least -- or markets directly, and
24  then there's a distributor.
25       There are also a number of creators who --

Page 37

1  what's called -- I'll refer to as "self-publishing" --
2  sometimes independent but often self-publishing. And so
3  all of the production and sales and distribution is
4  something that they do themselves. So somebody who is
5  engaged in this, they have to think about if they're
6  going to have to hire a lawyer. They're going to have
7  to, you know, study these standards. There's going to
8  have to parse out these standards.
9       It's -- it's a lot of time. It's a lot of
10  money. There's a potential of lost sales if it's
11  branded a particular way. There's just a lot that's
12  going on here.
13       There are reputational issues if work is
14  branded a certain way. It could limit access to the
15  marketplaces.
16       There's a range of costs, direct and
17  indirect, that would affect a creator who is
18  self-publisher. There's a range of costs that would
19  affect a creator who is selling their work to a company
20  just because it affects the market for that creator's
21  work and the perception of how that material would be
22  rated if it were acquired. Just a lot of touch points
23  for costs.
24       It could even affect things like suppose
25  the creator has an office somewhere or has a store or

**MAGNA** ▶

**LEGAL SERVICES**

Jeffrey Trexler

September 24, 2024
Pages 38 to 41

Page 38

1  the creator's work is sold.  Many independent creators
2  work are sold in local comic shops.
3          Comic shops are often subject to leases
4  much like any other leases that have certain clauses
5  that could affect the viability of the lease based on
6  what's sold in that particular comic shop, which could
7  have costs both to the creator in terms of lost sales if
8  there's a misunderstanding of the nature of the work and
9  could also lead to consequences for the retailer
10  themselves which is, you know, a number of retailers in
11  Texas.
12          So there are a range of costs here, but a
13  lot of it comes down to definition and specifics.  So
14  you're asking for a general thing, and there's a lot
15  here.
16      Q.  I appreciate that background.
17          Are you aware of any Comic Book LDF member
18  who's performed the cost analysis of what it will cost
19  them to comply with HB 900?
20      A.  I don't have a specific -- other than anybody
21  runs the numbers.  A lot of these are -- so I don't know
22  that anybody's done specifics.  I know that there are a
23  lot of people who are concerned that it would impact
24  their ability to sell their book either to a publisher
25  or have it marketplace on their own.  We've handled, you

Page 39

1  know, any number of cases where direct -- directed at
2  certain books have impacted the market.  It's -- but in
3  terms of, you know, kind of a -- an economic analysis or
4  the creator for the publisher for the industry, I don't
5  know that that's been done.  I know that there are
6  specifics in terms of what people have experienced, but
7  I don't have that particular case study.
8      Q.  Comic Book LDF, the entity, are you alleging
9  that you were financially injured by HB 900?
10      A.  Well, I think there are two -- two types -- two
11  levels of injury.  We are the voice of the comics
12  community and particular of our members but also the
13  broader comics community.  Many people support us and
14  interact with us.
15      Q.  But in this case, I'm asking particular about
16  financial injury.
17      A.  You know, I mean, we've had people who have
18  told us, you know, they're concerned about -- that they
19  support our work, but they can't do it publicly because
20  of, like, people in Texas -- and I'm talking
21  specifically of Texas -- because of allegations like the
22  allegations that have made -- false allegations that
23  have been made by people advocating for HB 900 or
24  challenging certain books.  So it's cost us, you know,
25  memberships, and that's a financial impact.

Page 40

1          I don't recall if we mentioned that in the
2  material or not.  Like I said, I haven't sat and reread
3  everything for this, but I can tell you that it has cost
4  us.  Not something I'm quantifying, but I know from
5  conversations that it has.
6      Q.  Has the entity Comic Book LDF performed any
7  financial analysis of the impact of HB 900?
8      A.  No.
9          Again, we don't -- we don't -- you can look
10  at our testimony, and I would have to look at the
11  testimony.  I'd be interested in this.  But to my
12  knowledge, I'm trying to think of a case where we
13  calculated damages, and I just don't know.  I would have
14  to go through our records to the extent that they are
15  extant.
16          Again, I just -- HB 900, no, I know haven't
17  -- I haven't run the numbers on that in terms of the
18  impact.  I know there is an impact, and I know there's a
19  lot of concern; but I haven't run the specific number.
20      Q.  Are you aware of any Comic Book LDF member who
21  has analyzed the time that it will take them to rate
22  books subject to HB 900?
23      A.  A formal study of the time, no.  A discussion
24  of what would be necessary in order to conform to it,
25  obviously, I've already answered that some of the things

Page 41

1  that would have to be done in order to comply with it,
2  and the costs that would have to be incurred.  I'm just
3  not aware of a study.
4      Q.  Has the entity Comic Book LDF conducted any
5  study of the time that it would take to comply with HB
6  900?
7      A.  I haven't conducted a study.
8      Q.  What materials does the entity Comic Book LDF
9  sell that would be regulated by HB 900?
10          MR. LAMBERT:  Objection, form.
11      A.  Part of the problem here for me just is -- in
12  terms of understanding the bill -- and as I recall, this
13  is a part of the complaint -- is that we're not sure the
14  scope of this legislation is -- it's rather vague.
15      Q.  (BY MR. BERG)  When you say "the scope," could
16  you expand a little on that?
17      A.  Yeah, sure.
18          You have certain definitions, 43.25.
19  There's also -- I think there's a -- I'm looking at it
20  right here.  There's another one on another page.  I
21  think it ends dot two one.
22          There are various definitions of what's
23  depicting sexual content, sexual conduct.  There's a
24  standard that gets into -- yeah, 33021.  There's a
25  standard that gets into a patently offensive standard.



Jeffrey Trexler

September 24, 2024
Pages 42 to 45

Page 42

1 Then you question what is patently offensive and how
2 that's defined. What's encompassed by these?
3          Again, I -- in the work that I do, if you
4 look at those definitions and you see things like sexual
5 contact, you know, there are people out there who
6 believe a kiss or holding hands or dancing -- depending
7 on how it's done -- would qualify as that, and depiction
8 should be banned from all schools. It really is vague.
9          You know, you talk about sexual intercourse
10 in one minute; and, yet, you are not enforcing this law,
11 and you're not having to make decisions under this law
12 in terms of what you will sell or what you will publish
13 or what you will distribute. It's much broader than
14 anything you've said so far in this -- in this case --
15 in this deposition, I mean.
16    Q. When you use the word "you," to what entity are
17 you referring?
18    A. Zachary Berg.
19    Q. You said that there were people who were
20 concerned that definition of sexual conduct could
21 include kissing, holding hands, or dancing; is that
22 correct?
23    A. Yeah, yeah.
24    Q. Who has expressed this viewpoint?
25    A. Retailers; creators; myself, as somebody who is

Page 43

1 the history of -- understands the history of this sort
2 of legislation and has had cases and matters around the
3 country where people are making allegations.
4          You know, there's a wide -- sexual content
5 is susceptible to a wide range of definitions. And, you
6 know, I can go into the history, if you like, but it
7 is --
8    Q. That's okay. Let's -- sorry.
9          MR. BERG: We can take that off. Let's go
10 back to the Declaration.
11    A. Uh-huh.
12          MR. BERG: Can you bring that back up,
13 Jeremy, please? Paragraph 6.
14          THE TECHNICIAN: (Complies.)
15    A. I'm sorry. Am I now testifying on behalf of
16 the Authors Guild?
17          MR. BERG: I think we're on the wrong page.
18 Can we go to -- it's going to be Page 73 of
19 the PDF of the Complaint.
20          THE TECHNICIAN: (Complies.)
21          MR. BERG: Thank you.
22 Can you zoom in on Paragraph 6, please?
23          THE TECHNICIAN: (Complies.)
24    A. Uh-huh.
25    Q. (BY MR. BERG) Paragraph 6 states (as read):

Page 44

1 "Despite their accolades and obvious literary merit, all
2 of the award-winning works listed above would likely be
3 subject to restriction or removal under the definition
4 of sexually relevant and sexually explicit contained in
5 the Book Ban."
6          Did I read that correctly?
7    A. Yep.
8          MR. BERG: And could we zoom out and zoom
9 in on Paragraph 4?
10          THE TECHNICIAN: (Complies.)
11    Q. (BY MR. BERG) And are these the books that in
12 Paragraph 6 you say would likely be subject to
13 restriction or removal under the definitions of sexually
14 relevant and sexually explicit?
15    A. They are all examples of books, yes.
16    Q. When you say that "they would likely be subject
17 to restriction or removal," what do you mean?
18    A. These are all examples of books that have been
19 either -- these are all examples of books where people
20 applying the same sort of concept that you have there
21 where they think of something sexually explicit have all
22 been challenged or removed. So it's happened before,
23 and including, you know, a number of, if not all of them
24 in the state of Texas, prior to HB 900, and so we these
25 are ones where they would likely happen again.

Page 45

1          (Simultaneous cross-talk ensues.)
2    A. Because my understanding of HB 900 is that it
3 wasn't designed to curb Book Bans. It was actually
4 designed to kind of expand them.
5          MR. BERG: Can we go back to Paragraph 6?
6          THE TECHNICIAN: (Complies.)
7    Q. (BY MR. BERG) So when you say that these works
8 would likely be subject to restriction or removal --
9    A. Uh-huh.
10    Q. -- is that based on your understanding of
11 pre-HB 900 removal of these books or specific language
12 in HB 900 itself?
13    A. Both.
14          It has to do with books that have been
15 challenged in Texas and beyond for rational similar to
16 rationales used for adopting HB 900. It's based on how
17 librarians and others have reacted to the enactment of
18 legislation similar to HB 900, whether the criminal
19 legislation, or restrictions what schools can do, or the
20 imposition of ratings, which there is a long history in
21 the comics community going back decades.
22          There are certain behaviors. There are
23 certain ways people respond when they have this type of
24 legislation or where they have these kind of ratings.
25 And all -- and since all of the books have been



Jeffrey Trexler

September 24, 2024
Pages 46 to 49

Page 46

1  challenged repeatedly in recent years, particularly
2  since the surge in 2020, 2021, it is quite likely that
3  all of these books will be the subject of some sort of
4  challenge or restriction under HB 900.
5      Q.  Would you agree with me that the books
6  challenged in 2021 were not challenged under HB 900
7  considering it did not yet exist?
8      A.  Oh, I was wondering what the nature of the
9  question was.
10         So it is -- when HB 900 did not exist,
11  there were no books that were challenged under HB 900.
12     Q.  In Paragraph 7, at the start, you say (as
13  read):  "Determining where books may fall in line of
14  these vague categories is not at all clear."
15         How is -- how are the categories not clear
16  if in Paragraph 6 you were able to say that they -- the
17  books will likely be subject to restriction or removal
18  under HB 900?
19     A.  These are not the only books that we're talking
20  about.  My understanding and -- of the text here is not
21  that we're saying these are the only books that we'd be
22  restricted, but that there are a lot of books that are
23  likely to be restricted.
24         So there's a lot of that goes into making
25  these assessments.  It's even with respect to the

Page 47

1  assessments here.  Even the named books, there are --
2  you can go through each, book and you can go, well,
3  maybe this wouldn't fall under HB 900.  But given the
4  fact that HB 900 exists and the state can
5  re-characterize it and these particular titles, it
6  categories sexually explicit, sexually relevant,
7  redefines the whole work as sexual in some way when it
8  may be just one image in an entire book.  It is all very
9  vague and uncertain that they -- it's not even -- it's
10  not even from my perspective.
11         When I say that they'll be likely to
12  restriction or removal, I'm not saying that restriction
13  or removal is valid or that they should be.  What I'm
14  saying is that people take a look at the statute and
15  say, oh, to be safe, we need to get rid of these.  Even
16  if they technically -- I would argue -- shouldn't be
17  covered by this particular rule.  It really is that
18  vagueness that's the problem or a big part of the
19  problem.
20     Q.  So you're including in your projected books
21  that would be removed, books that would be removed
22  through an incorrect application of HB 900; is that
23  correct?
24     A.  An overbroad.  You're using the word
25  "incorrect."  There's no -- the problem with the statute

Page 48

1  is it isn't even clear what correct is.
2         You know, if I have -- if I have somebody
3  who says that any -- any depiction of anything, you
4  know, it can range from a kiss to whatever -- that any
5  depiction for anything under the age of 18 or under the
6  age of 17 is restricted sexual content, then you're
7  getting rid of a lot of books.  It's just unclear what
8  this -- what this means.
9      Q.  Are you aware if anyone's who has done that?
10     A.  I am aware --
11         THE WITNESS:  I'm sorry.  Michael, did you
12  want say something?  I didn't mean to jump in too
13  quickly.  I thought I heard something in the background.
14         MR. LAMBERT:  No, no.  Thank you, Jeff.
15         THE WITNESS:  Uh-huh.
16     A.  I am aware of people who made some very
17  broad -- very broad characterizations of works, yeah.
18     Q.  (BY MR. BERG)  Have they done so under HB 900?
19     A.  I am aware of people who have done so in Texas.
20  I am aware of people who have done so nationwide.
21         I'd have to go back under sort of the past
22  -- excuse me -- I'd have to go back under challenges to
23  specific challenges of Texas since HB number -- HB 900
24  was enacted to see if we're specifically citing this
25  statute.  You know, this statute has been subject to a

Page 49

1  lot of litigation of which we're a part, so...
2      Q.  As we sit here, are you aware of any of this
3  being done under HB 900?
4      A.  As we sit here, I would need to go back and
5  just take a look at the cases because I just don't have
6  that data in hand.
7      Q.  So you couldn't say one way or the other?
8      A.  I couldn't say one way or another.
9         MR. BERG:  Could we zoom in on Page 7?
10  It's bottom of Page 2 of the Declaration and the top of
11  Page 3 of the Declaration.
12         THE TECHNICIAN:  (Complies.)
13     A.  Actually, before you ask that question, could I
14  take a brief pause?
15     Q.  (BY MR. BERG)  Yeah.
16         Would you like to take a ten-minute --
17         (Simultaneous cross-talk ensues.)
18     A.  I'm not asking the counselor anything, so...
19     Q.  (BY MR. BERG)  Yeah.  Let's take a ten-minute
20  break.
21     A.  Great.  Thanks.
22         MR. BERG:  Let's go off the record.
23         THE VIDEOGRAPHER:  Going off the record.
24  The time is 10:11 a.m. Central.
25         (A break was taken from 10:11 a.m. to



Jeffrey Trexler

September 24, 2024
Pages 50 to 53

Page 50

1        10:23 a.m.)
2        THE VIDEOGRAPHER: We are back on the
3   record. The time is 10:23 a.m. Central.
4        Please proceed.
5        MR. BERG: Would you please zoom in on
6   paragraph -- part of Paragraph 7 that appears on this
7   page as well as the part that appears on the next page?
8        THE TECHNICIAN: (Complies.)
9        MR. BERG: Jeremy, could we also see the
10  part on the second page -- or the page after this?
11       THE TECHNICIAN: (Complies.)
12       MR. BERG: Would you be able to display
13  both parts of Paragraph 7 of the same side, please?
14       THE TECHNICIAN: Yes, sir. Working on that
15  now. My apologies.
16   A. Okay.
17   Q. (BY MR. BERG) Mr. Trexler --
18   A. Uh-huh.
19   Q. -- in Paragraph 7 where it stays {sic} (as
20  read): "Determining where books may fall in light of
21  these vague categories is not at all clear especially in
22  light of recent mischaracterizations of certain graphic
23  novels as obscene, pornographic, or otherwise harmful to
24  minors despite the book's demonstratable and widely
25  recognized artistic, meritorious, or and serious value

Page 51

1   for minors."
2        Did I read that correctly?
3    A. The words are "mischaracterizations" and
4   "demonstrable." But other than that, yes.
5    Q. Thank you for fact-checking.
6        The recent mischaracterizations of certain
7   graphic novels, was that done by the Texas Education
8   Agency or by others?
9    A. Don't recall with respect to Texas Education
10  Agency. I do know it was definitely -- I know that
11  others were in mind when writing this.
12       MR. BERG: Let's go to Paragraph 8 --
13   A. Uh-huh.
14       MR. BERG: -- please.
15       THE TECHNICIAN: (Complies.)
16   Q. (BY MR. BERG) In Paragraph 8, you talk
17  about -- it's pronounced "Maus"?
18   A. "Maus" (pronunciation).
19   Q. "Maus."
20   A. Yeah. It's German.
21   Q. Not my best language.
22   A. That's all right. You're forgiven.
23   Q. Paragraph 8 reads (as read): "Maus," for
24  instance, is one of the most respected graphic works of
25  our generation" --

Page 52

1    A. Uh-huh.
2    Q. -- "and the pillar of Holocaust studies, but it
3   contains a single image of a partially nude woman.
4   Under the Book Ban, that would appear to be enough to
5   qualify as sexually-relevant material subject to
6   restriction and parental approval."
7        Did I read that correctly?
8    A. You did indeed.
9    Q. Was this determination by you the result of
10  your analysis of the definition of sexually relevant in
11  the statute?
12   A. Both. Analysis of sexually relevant and also
13  prior experience.
14   Q. Do you think that "Maus," through the single
15  image of a partially nude woman, would qualify as
16  sexually-relevant material under the statute alone?
17   A. You're asking for my opinion?
18   Q. I am.
19   A. I'm not going to -- the reason is, again, this
20  is very vague. So let me --
21        (Simultaneous cross-talk ensues.)
22   Q. (BY MR. BERG) Would you like to see the
23  language of the statute?
24   A. See the language of the statute again.
25        MR. BERG: Could we go -- Paragraph --

Page 53

1   sorry -- Page 30 of the Complaint.
2        THE TECHNICIAN: (Complies.)
3    Q. (BY MR. BERG) And --
4    A. Can you pull up Section 43.25 of the Penal
5   Code, please?
6        MR. BERG: Can you -- yes, can you, please,
7   pull up Texas Penal Code Title 9 document?
8        THE TECHNICIAN: (Complies.)
9        MR. BERG: We'll mark this as Exhibit D.
10        Would you please go to Page 13 of this
11  document to Section 43.25(2)?
12        THE TECHNICIAN: (Complies.)
13        MR. BERG: Would you highlight 43.25(2),
14  "Sexual conduct means."
15        THE TECHNICIAN: (Complies.)
16        (Exhibit D marked.)
17    Q. (BY MR. BERG) Mr. Trexler, are you able to
18  read 43.25(2), or would you like zoom in?
19        (Simultaneous cross-talk ensues.)
20    A. I'm fine to read it, yeah.
21        And in particular -- (as read): "Assuming
22  sexual contact, factual or simulated intercourse
23  (descriptive noise), or lewd exposition of the genitals,
24  the anus, or any portion of the female breasts below the
25  top of areola."



Jeffrey Trexler

September 24, 2024
Pages 54 to 57

Page 54

1        All right.  So give you the example of
2   "Maus" where we have a situation where the author's
3   mother has committed suicide and is nude in a tub.  That
4   has been seen as falling under -- people who see that
5   image and they see that for children.  What's
6   interesting is that the objections that I've seen are
7   not about the fact that it's a suicide, but it's the
8   fact that the woman is nude and that the portion of the
9   breasts and others are indeed visible.  And they view
10  that as something in the context of child -- children's
11  education -- and by children, you're talking perhaps
12  high school on down -- is seen as -- when you're dealing
13  with kids, that that's implicitly lewd; that kids see
14  things as lewd.
15        I disagree, but there are people who
16  interpret it that way.
17        Q.  (BY MR. BERG)  Are you aware of any guidance
18  from TEA that defines lewd, or how it would be used in
19  the statute?
20        A.  I would have to go back and see TA {sic}
21  guidance.
22        I know that I've read some material by TA,
23  but -- in conjunction with this complaint, but it's been
24  a while.
25        MR. BERG:  Could we, please, go back to the

Page 55

1   Declaration, Paragraph 8?
2        THE TECHNICIAN:  (Complies.)
3        Q.  (BY MR. BERG)  While we're waiting for that,
4   would you agree that kissing, holding hands, or dancing
5   would not qualify under sexual conduct as described in
6   Section 43.25(2)?
7        A.  Again, I'm seeing -- I'm thinking about the
8   laws applied and how people would look at a particular
9   image and see what sort of contact they see in the
10  picture, what sort of touching they see in the picture.
11  Again, I -- it really is going to depend on the image
12  and how people respond to it and how people do a risk
13  analysis based on how certain passages are described.
14        You know, we're dealing with a situation
15  I'm regularly encountering people who mischaracterize
16  what's going on in certain works and say there are
17  certain things and works that literally are not there,
18  and that has led to books of all stripes being withdrawn
19  from schools, or, at least concern, about why the books
20  -- certain books should even be sold to schools.  So you
21  have distributors withholding certain books because of
22  the fear it could be -- I would see it as misread in
23  certain ways.
24        So I am not -- my understanding is -- and
25  please, you know, let me know -- that I am not giving a

Page 56

1   legal analysis of how I would interpret this law if I
2   were in the Texas Education Authority, which I am -- or
3   Agency, which I am not.
4        Q.  So your concern is that either the seller of
5   the book or TEA, the two entities that would rate the
6   book, might consider this lewd; is that correct?
7        A.  One of my concerns is -- yes, they would.
8        One of my concerns is that somebody would
9   bring a complaint, somebody making it -- giving advice
10  to a school district; that somebody -- somebody would
11  look at that and consider that lewd, and that's a not
12  a -- that is a reasonable assumption given what other
13  people have said in the past.
14        Q.  You would agree with me that under HB 900
15  school districts would not be rating books, though,
16  correct?
17        A.  Everybody has to make these decisions, and they
18  have to be concerned about what's their library.  The
19  vendors have to be concerned about how they rate these
20  things.  They have to make an analysis of how they view
21  the people in the TEA.  And how anything from reasonable
22  to accurate, they would be in characterizing certain
23  works.
24        Let's just say the track record isn't good
25  in terms of seeing that -- assuming that everybody who

Page 57

1   analyzes a work is going to be doing so either in good
2   faith or with an understanding of what's immaterial.  I
3   mean, I've seen law enforcement officers describe
4   material in books that is not there because they've
5   never read the books, and that makes people -- that
6   leads people to make decisions; or they misinterpret
7   what's there; or they misinterpret the statute; or they
8   read the statute as broader than -- as having a breadth
9   that goes beyond what -- the way you're characterizing
10  the statute.
11        Those words contain multitudes that you're
12  talking about there.  There's a number of
13  interpretations in these words that can take them in
14  lots of different directions.  They're not as bounded as
15  you think, and...
16        Q.  Would you agree with me that regardless of how
17  the booksellers and TEA rate books, school districts can
18  and may still remove books?
19        A.  That there is school challenges that can go on
20  outside of the HB 900 context?
21        Q.  Yes.
22        A.  I would have to -- I've been focusing on the
23  ratings here.  I understand there are other elements to
24  HB 900.  So I need to -- I would need to go back and
25  read the scope of the applicability to HB 900 to school



Jeffrey Trexler

September 24, 2024
Pages 58 to 61

Page 58

1  board policies and the extent to which HB 900 is
2  preemptive.  I just -- that's not something that I
3  recall because my understanding is that we were focusing
4  on the sexually explicit and sexually relevant.
5       Q.  Would you agree --
6            (Simultaneous cross-talk ensues.)
7       A.  Rubric for challenges in Texas.
8       Q.  (BY MR. BERG)  Sorry.  I thought you were
9  finished.
10            Would you agree that schools were removing
11  books for sexual content prior to HB 900?
12       A.  Schools were removing books, yeah, from the
13  very reactions to the challenges prior to HB 900.
14       MR. BERG:  Let's go back to Paragraph 8.
15       THE TECHNICIAN:  (Complies.)
16       Q.  (BY MR. BERG)  It continues (as read):  "That
17  single image could also lead to a total ban --
18       A.  Uh-huh.
19       Q.  -- "depending on who is performing the
20  multilayered contextual analysis required by the Book
21  Ban."
22            In that sense, are you saying that you
23  think that it could qualify for sexually relevant, but
24  depending on interpretation, it could also qualify as
25  sexually explicit?

Page 59

1       A.  And, again, we have to define what you're
2  saying in terms of what I'm saying that it could
3  qualify.  Am I saying that I would make that assessment?
4  No.  Would I argue against that assessment?  Yes.  Are
5  there people who would look at the language and say that
6  that language will support?  They're making that
7  assessment.  There are people who would do that, yes.
8       MR. BERG:  Let's go to Page 30 of the
9  Complaint again.
10       THE TECHNICIAN:  (Complies.)
11       MR. BERG:  Can you zoom in on
12  Section 33.012, "Sexually explicit material"?
13       THE TECHNICIAN:  (Complies.)
14       Q.  (BY MR. BERG)  So Section 33.012 says that (as
15  read):  "Sexually explicit material means any material
16  that" -- and then it just says (as read):  "Describes,
17  depicts, or portrays sexual conduct as defined by
18  Section 43.25 of the Penal Code in a way that is
19  patently offensive as defined by Section 43.21 of the
20  Penal Code."
21       A.  Uh-huh.
22       Q.  Did I read that correctly?
23       A.  Uh-huh.
24       Q.  What part of that definition concerns you that
25  the partially nude woman in "Maus" would be -- or could

Page 60

1  be categorized as sexually explicit?
2            (Simultaneous cross-talk ensues.)
3       Q.  (BY MR. BERG)  Is there any part that concerns
4  you?
5       A.  I've already discussed 43.25, and I always --
6  already discussed the variability and understanding in
7  communities is what's patently offensive under 43.21, so
8  I do believe I've answered that question.
9       Q.  Is -- so your concerns to summarize is the --
10  the lewd in the definition under Section 43.25, and then
11  do you have a concern also for the --
12       A.  Uh-huh.
13       Q.  -- patently offensive?
14       A.  Yeah.
15            And we can -- so -- and, again, this is not
16  my personal understanding of this.  But part of what
17  this does is it de-contextualizes images.  And, also, in
18  the vagueness of breadth of this particular statute,
19  there's a lot of leeway for somebody to look at
20  something and draw some conclusions about how this image
21  is portrayed -- is perceived by a child.  Now, again, I
22  don't think this is good child psychology.  I don't
23  think it's good child psychiatry.  I don't think it's
24  good understanding of the young mind.
25            But, for example, I've encountered people,

Page 61

1  including attorneys, who have argued, drawing on bad
2  psychology from the 1940s and 1950s and the previous
3  comic book scare that led to the enactment of the Comics
4  Code, an earlier rating system, that say that the young
5  mind is incapable of seeing nudity, particularly the
6  adolescent mind is incapable of seeing nudity without
7  having -- seeing it in a lewd context; that any
8  portrayal of -- any depiction of nudity, particularly in
9  an as opposed to text, which some people see as uniquely
10  dangerous -- any depiction of nudity is -- is corrosive
11  of the way youth develop sexually, develop socially.
12            And that in this context, patently
13  offensive should be considered by the local community,
14  and it is irregardless of any literary, artistic,
15  political, or scientific value, which is, you know,
16  strict from consideration, so it is most narrowly
17  defined here.
18            So on the basis of single image and the
19  assumption incorrect, I believe psychologically that
20  this is what the association that's made that any image
21  of nudity is going to be seen as lewd by anybody under
22  the age of 18 and is going to harm them -- harm their
23  mental health.
24            That there are people -- if you had
25  somebody like that -- if you had a lawyer like that or



Jeffrey Trexler

September 24, 2024
Pages 62 to 65

Page 62

1  an educator like that or a principal or a superintendent
2  like that -- and these are all people that I have
3  encountered in real life -- in the Texas Education
4  Agency involved in ratings, they would be exactly the
5  sort of person who would put that book in this category.
6      Q.  Would -- in your opinion, would that be a
7  correct determination and rating under HB 900?
8      A.  I'll repeat what I said earlier.  It depends
9  what you mean by correct.  I would not do it.
10         Is the text susceptible of being applied in
11  that way?  The text is being susceptible of being
12  applied in that way.  I mean, this text, frankly, is
13  being susceptible sexually explicit depending on the
14  nature of what's related in the -- what's in the Texas
15  curriculum.  This same image could be used to classify
16  as sexual -- sexually explicit a book with a painting
17  from the Garden of Eden scene in the Sistine Chapel and
18  certain works of Picasso because, you know, Picasso's
19  paintings of women masturbating, and the Sistine Chapel
20  has some very sexually suggestive scenes in them that
21  are widely recognized as stuff as such by decades of
22  literature written by art historians.
23         So this passage here is capable of
24  encompassing a wide amount of material.  I don't think
25  it should, but, you know, I'm living in a landscape now

Page 63

1  where somebody in Texas -- if they are a principal,
2  superintendent, educator, administrator, bureaucrat,
3  lawyer, a person who just figures themselves an amateur
4  literary analyst or amateur -- analyst -- I could see
5  them making that justification.
6         So the word "correct" here doesn't really
7  -- I think what you're trying to do is get me to say
8  there's a right way to interpret this and a wrong way to
9  interpret this, and it's not enough to say that people
10  will interpret it incorrectly.  What I'm saying is his
11  language is so vague and overbroad that it can be
12  applied in any number of different ways -- a number of
13  which, I think, should not be permitted, and a number,
14  which, I believe, are unconstitutional.
15      Q.  The patently offensive language, which without
16  going Penal Code, I'll represent to you means so
17  offensive on its face as to affront current community
18  standards of decency.
19         Does that standard -- current community
20  standards allay any of your concerns?
21      A.  No.
22      Q.  Why not?
23      A.  Again, you won't put 43.21 up for me.
24      Q.  Would you like me to?  I can.
25      A.  I've asked.  Wherever there's a statute that

Page 64

1  we're discussing, I would like to see it.
2      Q.  Yeah.
3         MR. BERG:  Can we put up the Penal Code,
4  Exhibit D, please?
5         THE TECHNICIAN:  (Complies.)
6         MR. BERG:  Can we go to Page 9, please?
7         THE TECHNICIAN:  (Complies.)
8         MR. BERG:  And go to the bottom No. 4,
9  "Patently offensive."
10         THE TECHNICIAN:  (Complies.)
11         MR. BERG:  Thank you.
12      A.  Actually, that -- no, it doesn't allay my
13  fears.  Standards of decency and community standards --
14  it's not just that there are lots of different
15  communities, which is a very hard decision for if you
16  were a vendor or their publisher or self-publisher,
17  distributor, somebody like this us, sales, that could
18  end up going to a public school, say, to a convention or
19  somebody ordering off our site -- you're going to be
20  controlled selling books to the state of Texas by sort
21  of the most offensive -- the most offended person's
22  standard here, and there are people who are offended by
23  a lot of stuff.  It's hard to determine.
24         See, if you look behind me, you see my
25  library.  You see multicolored books.  Those books are

Page 65

1  the complete reprinting of "EC Comics."
2         "EC Comics" is from the 1950s.  You may
3  probably hear the title "Tales from the Crypt," "Vault
4  of Horror."  They were -- they're know recognized as
5  literary classics that reshaped the 20th and 21st
6  century entertainment and even literature.  Stephen King
7  was heavily influenced by those.  A lot of people in
8  film have been heavily influenced by them as well as in
9  literature beyond just pure horror -- a lot of science
10  fiction.  They published the works of Ray Bradbury.
11         In 1954, there were U.S. Senate hearings,
12  and they turned on what is decent, and the very -- you
13  know, we would now laugh at it honestly because it was
14  so ridiculous the way they understood decency, but they
15  were so strident -- the politicians -- one of whom was
16  running -- going to run for president -- of terms of
17  things being indecent that they were going to -- a
18  number of states had actually passed laws against
19  comics, and the United States Government was going to
20  pass an unconstitutional law against comics because it
21  offended a standard of decency.  Even though, there's no
22  -- you know, nothing in it that we would now consider
23  problematic although many people would given this rule.
24         And so the only way they could get this
25  Congress off their backs and the States off their backs



Jeffrey Trexler

September 24, 2024
Pages 66 to 69

Page 66

1  was to enact a Comics Code, which applied standards of
2  decency, which took all of these books that are behind
3  me off the marketplace. The public tried to shut down
4  -- except for one magazine,
5  "MAD" magazine that ended up reshaping 20th to 21st
6  century humor.
7        So when I see a reference to current
8  community standards of decency, I see the biggest land
9  mine in the world. I see a standard that has been --
10  it's so broad particularly that we're -- as to have been
11  applied inconsistently across a state, across a country.
12  I see a standard that is implied to knock out works that
13  have long since become understood to be literature.
14  There are a number of novels that we now consider to be
15  classics that were knocked out or attempted to get out
16  of bookstores or movies that we now consider to be
17  classics that were considered to be offensive standards
18  of decency that were regularly censored by censorship
19  boards in New York and beyond that are now considered to
20  be classics on the criterion collection, DVD, and online
21  streaming.
22        This patently offensive is a patently
23  offensive standard to me -- when it's applied without
24  any reference to literary, artistic, political, or
25  scientific value. So, no, I'm not assured by the

Page 67

1  standard.
2        MR. BERG: Can we, please, open the
3  document, CBLDF 1 to 368?
4        THE TECHNICIAN: (Complies.)
5        MR. BERG: Can we please go to Page 32?
6  Sorry. Page 31.
7        THE TECHNICIAN: (Complies.)
8        (Exhibit E marked.)
9  A. Uh-huh.
10  Q. (BY MR. BERG) Is this the Comic Book Legal
11  Defense Fund's Retailer Resource Guide?
12  A. That does appear to be it.
13        MR. BERG: Could we please go to the next
14  page, Page 32?
15        THE TECHNICIAN: (Complies.)
16  Q. (BY MR. BERG) At the top it says (as read):
17  "CBLDF advisory. How to manage a media attack."
18  A. Uh-huh.
19  Q. Did I read that correctly?
20  A. That is correct.
21  Q. Are you familiar with this document?
22  A. Yes, yes.
23        MR. BERG: Could we go to the next page,
24  Page 33?
25        THE TECHNICIAN: (Complies.)

Page 68

1        MR. BERG: Can we zoom on the next-to-last
2  bullet point (as read): "If you carry adult content,
3  have a policy..."
4  A. Uh-huh.
5  Q. (BY MR. BERG) This section reads (as read):
6  "If you're carrying adult material, you should already
7  have a policy for its sale and display that is informed
8  by a thorough understanding of your community's
9  standards. This policy should be spelled out in your
10  employee manual and reinforced with training and
11  periodic meetings with your staff. Your store's
12  spokesman should be able to articulate this policy to
13  the media and public and explain how it is consistent
14  with the standards of your community."
15        Did I read that correctly?
16  A. Uh-huh.
17  Q. (Indicating.)
18  A. Yeah, yes.
19  Q. Community -- if community standards is so broad
20  that it's applied inconsistently, as you said 12 minutes
21  ago, why would Comic Book Legal Defense Fund advise
22  vendors to implement a community standards policy?
23  A. Okay. So you're familiar with Miller tests,
24  right --
25  Q. (No response.)

Page 69

1  A. -- which HB 900 does not follow by stripping
2  one element of it, patently offensive. And it
3  doesn't -- you don't have peer interests. You don't
4  have any of that stuff in it. So you skip very small --
5  one portion of it. So -- and you don't have literary,
6  artistic, political value. You don't -- you know, you
7  don't go into peer interests and the full scope of
8  obscenity law. We have different concepts there.
9  Decency, you know. So, you know, that's -- we're
10  talking about apples and oranges, first, here in terms
11  of -- in terms of the context.
12        Second of all, with respect to dealing with
13  community standards and the obscenity context, that's
14  going to be a basic aspect of risk management. So you
15  want to understand what -- you know, why are they
16  producing this guide? Because this Comic Book Legal
17  Defense Fund was founded after we had a wave of arrests
18  -- starting one particular arrest and conviction, which
19  we got overturned of a comic shop realtor -- retailer,
20  who was convicted of selling books, again, that are now
21  acknowledged to be literary classics.
22        So what you want to do if you're selling
23  anything is understand how all of your works fit within
24  the current ambit of obscenity law. That's sort of
25  legal strategy 101. And one of those elements is



Jeffrey Trexler                                                September 24, 2024
                                                              Pages 70 to 73

Page 70

1 looking at the Miller test and understanding, okay, what
2 does that mean in terms of what does community standards
3 mean there?  How does it relate to the other aspects --
4 other elements of the Miller test, and how do we
5 justify -- how do we provide a viable, legal argument
6 that you, as a retailer, are not -- that what you're
7 doing is consistent with the standards of your
8 community?
9         Now, how community standards are applied is
10 -- and understood is something that -- I'm not quite
11 sure people who are advocating for community standards
12 as a clear and love for morality -- if it says what it
13 really think that it says.  So, for example, you know,
14 one of the arguments I've made in a different court case
15 was -- is if you're looking at determining community
16 standards.  We now have a lot of data for determining
17 community standards.  So we have some people saying that
18 community standards would mean strict morality
19 accessible {sic} to kids -- well -- and if certain
20 things have to be inaccessible to kids.
21         Well, what do you do if you have -- how
22 many households in the community have HBO?  How many
23 households in the community have Netflix?  How many
24 households in the community have Hulu?  And allow that
25 in their phones and in their televisions or Rokus or

Page 71

1 whatever they're using without any child blocker, you
2 know.
3         There are a lots of different ways for
4 determining community standards that we're now able to
5 do that go beyond the very simplistic notion that if
6 there's any nudity, it's bad.  So -- and, therefore, the
7 community is against it.  So you want to be able to make
8 this argument.
9         And, again, it's a matter of risk
10 management.  That isn't a matter of saying that we're in
11 favor of community standards particularly stripped of
12 any connection to the Miller test -- which is, again,
13 what I'm dealing with specifically in HB 900.  It's
14 simply this is -- this is -- this is obscenity law.
15 This is obscenity law.  Something that's gotten --
16 that's been misapplied in a number of context, so if you
17 want to make sure that if it's applied to you, you can
18 respond to that accusation.  Then you want to understand
19 what the community is and what the standards are, and
20 there are -- there are ways of defining them that go
21 beyond the -- the way of HB 900.
22     Q.  Does the Comic Book Legal Defense Fund resource
23 guide presume that these vendors can implement a
24 community standards policy?
25     A.  Again, we make no -- and this is -- particular

Page 72

1 this is a retailer's guide, so the retailer has
2 material.  The retailer doesn't want to be arrested, so
3 the retailer -- and the retailer wants to be able to
4 provide an arrest -- a defense if they are arrested.
5 And so they want to understand their local community.
6 They want to understand their market, what books are
7 selling, what books need to be accepted.  So this is
8 just the reality of the Miller test, and so they're
9 trying to -- they're trying to work within the Miller
10 test.
11         Is that an endorsement of every single
12 application of the word "community standards"?  No.
13 There's lots of different ways that the word -- phrase
14 "community standards" is used.
15         This is simply people want to be sure that
16 they cannot be justifiably arrested for an obscenity
17 charge.  Or if they are, that they can challenge it; and
18 this is part of that defense.  Comic Book Legal Defense
19 Fund.  That's what this is about.
20     Q.  Doesn't this guide presume that you are able to
21 educate people to implement the standard?  Otherwise,
22 are you just offering false hopes to these retailers by
23 having them follow this policy?
24     A.  All right.
25         MR. LAMBERT:  Objection, form.

Page 73

1     A.  I ring false hope.  I laugh at that because
2 this is the law.  And when you're dealing with law and
3 you're dealing with trying to develop a policy that
4 complies with the law, it's not offering false hope to
5 say, okay, this -- the Miller test is a standard in this
6 particular thing.  The -- there's certain elements of
7 the Miller test here.  They are bang, bang, bang.
8 Develop, essentially, a memo to file so that you're able
9 to defend if anybody challenges you and says you're
10 selling obscene material.
11         Will everybody agree with it?  Are there --
12 are there people out there who believe?  And there are.
13 There are sheriffs who believe.  There are district
14 attorneys out there who believe that any work that
15 includes any discussion -- gender identity or sexual
16 expression -- below the age of 18 or 17 -- whatever the
17 age of consent is in their jurisdiction -- is inherently
18 harmful to minors.
19         Do I agree with that?  No.  Do I believe
20 the law should interpret that interpretation?  No.  Do I
21 believe that the law will stop them from using the law
22 to threaten people?  No, they won't.
23         You call it false hope to say here you have
24 to have an argument against it.  No.  You're giving
25 people an argument to -- to be able to survive that kind



Jeffrey Trexler

September 24, 2024
Pages 74 to 77

Page 74

1  of attack -- using the law in, I believe, an
2  unconstitutional way.
3          It's the nature of our system that,
4  unfortunately, there are a lot of people who use
5  constitutional standards in an unconstitutional way or
6  even act as if they don't exist, as I believe is in
7  Texas and HB 900. So I don't think it's people giving
8  false hope to give them -- to tell them to take steps
9  against an inappropriate statement or application of the
10  law.
11     Q. (BY MR. BERG)  Would it be correct to say that
12  the primary purpose of this advisory then is to protect
13  retailers from legal liability, and that it's only a
14  secondary goal that material violating community
15  standards not be sold?
16     A. I didn't write this book. I don't know if you
17  noted the date, but the date was 2019; and I came
18  onboard in 2020. So you're asking me to opine on what
19  the intent was. I don't know what the intent was. I
20  know what it says, but I can't speak to the intent
21  because I wasn't there.
22     Q. This policy -- it says (as read):  "It should
23  be spelled out in your employee manual and reinforced
24  with training and periodic meetings with your staff."
25     A. Uh-huh.

Page 75

1     Q. Businesses already had employee handbooks prior
2  to HB 900, correct?
3     A. Uh-huh.
4     Q. And businesses already provided training to
5  their employees prior to HB 900, correct?
6     A. This book is from 2019, and I know just based
7  on personal experience that companies had employee
8  manuals and trainings and meetings for decades before.
9  So, yes, there have been -- there's a long history of
10  employee manuals, training, and periodic meetings.
11     Q. Would you agree with me that contemporary
12  community standards in Texas could be different than in
13  New York?
14          MR. LAMBERT:  Objection, form.
15     A. They could be the different. They can
16  different. They can be the same. It depends on the
17  community, and it depends -- in New York and the
18  community in -- it depends on the community in Texas,
19  and it depends on the community in New York.
20     Q. (BY MR. BERG)  So would you agree with me that
21  it's theoretically possible that even though, you, in
22  New York, disagree that a piece of literature would
23  violate community standards, a seller or agency --
24  government agency in Texas might find that the same work
25  violated community standards?

Page 76

1     A. I think you're --
2          MR. LAMBERT:  Objection, form.
3     A. -- you're changing the definition of community
4  depending on -- point you want to score. So -- which
5  is, again, a problem particularly when you're dealing
6  with this "community standards of decency" question
7  without any consideration of value again. HB 900 and
8  obscenity law don't track.
9          I live in New York State. I happen to be
10  in a small town in New York State. And later today,
11  assuming this gets done before midnight, I'll be going
12  down to Manhattan about an hour away.
13          The standard in this community can differ
14  from the standard in New York. There is no New York
15  standard of community. There's no New York community
16  standard. There's lots of them here, and somebody who's
17  trying to deal with a potential for legal action in
18  their community needs to be able to anticipate that.
19          There is no Texas community standard at
20  this point. It's lots of different communities in
21  Texas. I used to teach in Texas.
22          I was a law professor at Southern Methodist
23  University back in the day, and I know very well that
24  there are differences in community from Dallas to
25  Austin. I know that there are differences in community

Page 77

1  between, you know, Dallas and Waco, you know.
2          So to say that there's a Texas community
3  versus a New York community, as if we're these liberal
4  New Yorkers versus the upstanding Texas people, is a
5  complete misunderstanding of the reality in New York,
6  and it's a complete misunderstanding of the reality in
7  Texas.
8     Q. (BY MR. BERG)  Why would it be incorrect to say
9  that a state could have a community standard?
10     A. You really have to look at your particular law.
11  What -- how is community standard defined? And, again,
12  you're going to have to pull up 21.
13          It defensive to community standards.
14  What's the reference community? I mean, is your
15  interpretation as a state of Texas -- and it's not mine.
16  It's totally yours. Is your interpretation of community
17  standards for purposes of HB 900 -- HB 900 that there's
18  one community in the state of Texas, and that's the
19  State of Texas.
20          And that the -- you know, is there one
21  standard of decency that you can tell to the publisher
22  that there's one absolute standard of decency with such
23  clear boundaries that there's no ambiguity, and there's
24  bright line rules for enacting, no. I mean, it's widely
25  varied.



Page 78

1       You know, I -- what do you do?  I've taught
2  in Texas, and I know that there's wide definitions of
3  decency within my own classroom, you know, back when I
4  taught there.
5       Q.  Is it Comic Book Legal Defense's position --
6  sorry.  Comic Book Legal -- Legal Defense -- sorry --
7  Comic Book LDF's position that a state can only ban
8  material that is legally obscene?
9            MR. LAMBERT:  Objection, form.
10      A.  I don't recall saying that.  I was talking
11 about -- I was comparing standards.  I wasn't making a
12 prescriptive statement about what states can and cannot
13 regulate in different contexts.
14      Q.  (BY MR. BERG)  This was a -- this was a -- my
15 next question -- separate from the last question.
16      A.  And just to understand:  Are we sort of --
17 we're getting -- you're taking into the realm of
18 constitutional analysis sort of as a general -- like if
19 I were teaching a law school course because this
20 deposition seems to be going all over the map in terms
21 of the questions you're asking me, and it's hard for me
22 to assess the specific context that you want me to
23 address.
24      Q.  In the Complaint, is Comic Book LDF alleging
25 that Texas can only ban books from its schools that are

Page 79

1  legally obscene?
2            MR. LAMBERT:  Objection, form.
3       A.  Let's take a look at the Complaint and see what
4  we said.  Go through it.
5            (Simultaneous cross-talk ensues.)
6            MR. BERG:  -- the Complaint.
7            THE TECHNICIAN:  (Complies.)
8       A.  Paragraph by paragraph.  I want to be -- I want
9  to answer your question accurately and fairly, so let's
10 just go through the Complaint paragraph by paragraph.
11      Q.  (BY MR. BERG)  Okay.
12           MR. BERG:  Please go to Paragraph 1 of the
13 Complaint.
14           THE TECHNICIAN:  (Complies.)
15      A.  We can continue to Page 2.
16           MR. BERG:  Next page, please.
17           THE TECHNICIAN:  (Complies.)
18      A.  Page 3.
19           MR. BERG:  Next page, please.
20           THE TECHNICIAN:  (Complies.)
21      A.  Page 4.  I mean, Page 5.
22           MR. BERG:  Next page, please.
23           THE TECHNICIAN:  (Complies.)
24      A.  Page 6, please.
25           MR. BERG:  Next page, please.

Page 80

1            THE TECHNICIAN:  (Complies.)
2       A.  Page 7, please.
3            MR. BERG:  Next page, please.
4            THE TECHNICIAN:  (Complies.)
5       A.  Next page.
6            MR. BERG:  Next page.  We can probably skip
7  over Jurisdiction and Exhibits.
8       A.  We like jurisdiction.
9            THE TECHNICIAN:  (Complies.)
10      A.  Next page, please.
11           THE TECHNICIAN:  (Complies.)
12      A.  Next page, please.
13           THE TECHNICIAN:  (Complies.)
14      A.  Next page, please.
15           THE TECHNICIAN:  (Complies.)
16      A.  Next page, please.
17           THE TECHNICIAN:  (Complies.)
18      A.  Actually, can you go back one, please?
19           THE TECHNICIAN:  (Complies.)
20      A.  Okay.  Next page, please.
21           THE TECHNICIAN:  (Complies.)
22      A.  Next page, please.
23           THE TECHNICIAN:  (Complies.)
24      A.  Next page, please.
25           THE TECHNICIAN:  (Complies.)

Page 81

1       A.  Next page, please.
2            THE TECHNICIAN:  (Complies.)
3       A.  Next page, please.
4            THE TECHNICIAN:  (Complies.)
5       A.  Next page, please.
6            THE TECHNICIAN:  (Complies.)
7       A.  Next page, please.
8            THE TECHNICIAN:  (Complies.)
9       A.  Next page, please.
10           THE TECHNICIAN:  (Complies.)
11      A.  Next page, please.
12           THE TECHNICIAN:  (Complies.)
13      A.  Next page, please.
14           THE TECHNICIAN:  (Complies.)
15      A.  Next page, please.
16           THE TECHNICIAN:  (Complies.)
17      A.  Next page, please.
18           THE TECHNICIAN:  (Complies.)
19      A.  Next page, please.
20           THE TECHNICIAN:  (Complies.)
21      A.  Next page, please.
22           THE TECHNICIAN:  (Complies.)
23      A.  Next page -- hold on one second.  Just want to
24 finish this.
25           Next page, please.



Jeffrey Trexler

September 24, 2024
Pages 82 to 85

Page 82

1    THE TECHNICIAN: (Complies.)
2   A. Next page, please.
3    THE TECHNICIAN: (Complies.)
4   A. Next page, please.
5    THE TECHNICIAN: (Complies.)
6   A. Thanks for the review. That was very helpful
7  because I had -- it had slipped my mind about Katy ISD,
8  and I'm glad that you -- that you refreshed my memory by
9  having that there. So that was actually very helpful in
10  the context of impact of HB 900 on after its passage.
11    Because Katy as, you know, is a district
12  where there was activity before HB 900, and there's also
13  been ongoing activity afterwards, and I apologize of
14  having that slip my mind in the context of the
15  deposition. So that was very helpful, and we can -- I
16  can amend my past statement with respect to that.
17  Obviously, it has an impact on graphic novels. So,
18  again, that was very helpful to me.
19    So would you mind repeating your question
20  again?
21   Q. (BY MR. BERG) Yes.
22    Is Comic Book LDF alleging that a book or a
23  comic must be legally obscene to be removed from a
24  school?
25   A. Okay. I reread the entire thing, and my

Page 83

1  understanding of the Complaint was that it was very
2  specifically targeting HB 900 and specific elements of
3  HB 900, and that it was not a constitutional treatise on
4  all aspects in which expressive material can and cannot
5  be removed from schools.
6    So I was trying to find a statement in
7  there that it was an absolute, and I'm just going to --
8  I'm just bounding myself by that. I'm not going to
9  constitutional doctrine or any of that because I think
10  that's outside the scope of what we're doing here. I'm
11  just looking at -- I'm just looking at the complaint,
12  and I don't see that kind of sort of broad, discursive
13  blackletter analysis of what -- of expressive materials
14  in schools. I don't see that there.
15    So I know I wasn't sure. I didn't
16  understand that -- I didn't understand that to be the
17  purpose of this -- the purpose of this lawsuit.
18   Q. Very well.
19    Would you like a break, or shall we
20  continue?
21    THE WITNESS: Michael, I'll let it be your
22  call.
23    MR. LAMBERT: Yeah, it's up to you, Jeff.
24  I know it's 12:00. It's almost 12:30 your time, so I
25  don't know if you wanted a little break to eat

Page 84

1  something.
2    THE WITNESS: You know, I snuck a couple of
3  squares of chocolate in the previous break, so I think I
4  got a little energy to go.
5    THE STENOGRAPHER: This is --
6    THE WITNESS: They had -- they Corn Flakes
7  in them, so they're extra nutritious.
8    MR. LAMBERT: There you go.
9    THE STENOGRAPHER: This is the court
10  reporter. I would like to take a break, please.
11    (Simultaneous cross-talk ensues.)
12    MR. LAMBERT: No problem.
13    THE STENOGRAPHER: Thank you.
14    THE WITNESS: I highly recommend chocolate
15  with Corn Flakes, by the way. If you got them, they're
16  really good.
17    MR. BERG: Let's go off the record.
18    THE VIDEOGRAPHER: Going off the record
19  the. Time is 11:25 a.m. Central.
20    (A break was taken from 11:25 a.m. to
21    11:36 a.m.)
22    THE VIDEOGRAPHER: We are back on the
23  record. The time is 11:36 a.m. Central.
24    Please proceed.
25    MR. BERG: We go to the Complaint Page 75,

Page 85

1  Paragraph 13, please.
2    THE TECHNICIAN: (Complies.)
3    MR. BERG: Page 75, Page 13. Paragraph 13
4  of the Declaration.
5    THE TECHNICIAN: (Complies.)
6   Q. (BY MR. BERG) Paragraph 13 of the Declaration
7  reads (as read): "For creators in the comic arts, these
8  restrictions would substantially limit their ability to
9  write freely on topics of their choosing and to have
10  their work purchased by school districts and available
11  to students."
12    Did I read that correctly, Mr. Trexler?
13   A. You did indeed.
14   Q. In this paragraph, are you saying that Comic
15  Book LDF members are currently selling books to Texas
16  schools that would be marked sexually explicit under HB
17  900, or that that is -- that that is a concerned?
18   A. I am saying that -- okay. Let's read it
19  literally, okay? Read this literally.
20    Now, there's lots of different aspects of
21  this law and the impact of this law that we could be
22  discussing, but the scope of this question is specific
23  to this paragraph and we're going to parse it, okay?
24  (as read): "For creators in the comic arts" -- "these
25  restriction would substantially limit their ability to


MAGNA
LEGAL SERVICES

Jeffrey Trexler

September 24, 2024
Pages 86 to 89

Page 86

1 write freely on topics of their own choosing and to have
2 their work purchased by school districts and available
3 to students," okay?  So that is a forward-looking
4 statement.
5         Now, I'm not -- in answering your question
6 about Paragraph 13, I am not denying that there is an
7 impact for present sales or past sales.  I am simply --
8 you asked me what is in that paragraph?  And I told you
9 what that paragraph is.
10         That paragraph is for creators in the comic
11 arts.  These restrictions would limit their ability to
12 write freely and to have their work purchased.
13     Q.  So are you saying that in the future Comic Book
14 LDF members would sell comics or books to Texas --
15         (Simultaneous cross-talk ensues.)
16     A.  I'm saying it would --
17         (Simultaneous cross-talk ensues.)
18     Q.  (BY MR. BERG)  -- sexually explicit --
19         (Simultaneous cross-talk ensues.)
20     A.  I'm saying that it would have an impact on
21 their ability --
22         THE STENOGRAPHER:  Excuse me.  Excuse me.
23 This is the court reporter.  I need the question
24 repeated again.
25     Q.  (BY MR. BERG)  Are you saying that in the

Page 87

1 future Comic Book Legal Defense Fund members would sell
2 comics or books to Texas schools that would be marked
3 sexually explicit under HB 900?
4         MR. LAMBERT:  Objection, form.
5     A.  Now, that -- that's not a statement.  I am
6 saying that there's the prospect of that happening, and
7 I am saying that -- am I saying that it is certain that
8 we have somebody who would write something that is -- I
9 said what I said, you know, which is that there is this
10 prospect that it has this impact and impedes speech;
11 that it's overbroad; that it could have its reading
12 {sic}.  You're trying to get me to say something, and I
13 understand why you're doing it.
14         But, again, this is -- we have -- we have
15 people who have nationwide markets including in Texas.
16 We have people who, you know, they would love to have
17 their book adopted in a school in Texas, in a library in
18 Texas.  It's a -- every copy is a sale, and, now,
19 there's this risk.
20     Q.  (BY MR. BERG)  So are you saying that you're
21 not sure whether Comic Book LDF members will sell books
22 or comics to Texas schools that would be marked sexually
23 explicit?
24     A.  I am saying it would substantially limit their
25 ability to write freely on topics and to have their work

Page 88

1 purchased.
2         So, again, I kind of need to have your
3 specific definition of the scenario you're trying to get
4 me to -- what you're trying to have me say here.
5     Q.  So you're saying -- you said that this is a
6 future concern, correct?
7     A.  It's a present concern, and it's based in
8 experience of the past.  So, I mean, HB -- HB 900 was
9 enacted at that point.
10         And so, you know -- again, you're trying to
11 read -- I'm trying to be very specific with you here.
12 So -- and I think you're trying to get to read one
13 sentence as a statement of the entire case and a
14 statement of all the -- like a substitute for all of the
15 allegations in the Complaint.
16         And, specifically, this is addressing the
17 scenario where that people in light of -- in light of HB
18 900, which has now been around for a while, it would
19 affect their ability to write freely on topics of their
20 choosing and to have their work purchased by school
21 districts that would impact the decision the
22 school districts made.  Having already seen with Katy
23 has -- is -- is people are now having to make purchasing
24 based on -- and re-decisions based on the possibility
25 that what's in HB 900, including the rating system,

Page 89

1 could at some point be imposed.  So that's what I'm
2 stating here.
3     Q.  Do --
4         (Simultaneous cross-talk ensues.)
5     A.  -- 2023 -- so in a very real sense, we are
6 living in the future.
7     Q.  (BY MR. BERG)  Do Comic Book LDF members intend
8 to sell Comic Books to Texas schools in the future that
9 could fall under the definition of sexually explicit in
10 HB 900?
11         MR. LAMBERT:  Objection, form.
12     A.  We have members that have a regular market in
13 Texas, you know, and that's always a possibility and
14 even an aim, you know.
15         So Texas is a very marketplace.  Texas
16 schools are a big marketplace, and the school market is
17 a significant percentage of retail market.  They're
18 people who have done studies on this, and they're plenty
19 of people who have done analysis on the impact of Texas
20 nationwide.
21         And so there are a number of people who
22 would love to sell to Texas schools.  There are
23 retailers who would love to sell to Texas schools in
24 their community.  There are distributors who would love
25 to sell to Texas schools around the state.



Jeffrey Trexler                                         September 24, 2024
                                                        Pages 90 to 93

Page 90

1    And this -- particularly, if they have to
2  put in -- brand each book sexually explicit or sexually
3  relevant, if there's a scintilla of a connection of
4  anything related to sexuality in it, which covers a wide
5  range of material, it's -- you know, this has an
6  significant impact.
7    Q.  (BY MR. BERG)  You would agree with me that
8  even Comic Book members wrote comic books specifically
9  for Texas schools, there's no guarantee that Texas
10  schools would buy any of the comic books, correct?
11    A.  There's no guarantee that Texas would buy any
12  of the comic books if there's also a likelihood under
13  this statute that either Texas wouldn't buy them, or
14  authors would feel a chilling effect in their ability to
15  write certain things without having a significant
16  detrimental effect on the market for their works or
17  retailers, as well, you know; but this paragraph here is
18  about creators.  So that's why I'm focused on creators.
19    Q.  How do you quantify whether writers are writing
20  about what they want to write about?
21    A.  I can tell you, you know, in terms of numbers
22  if there's a poll of writers and that sort of thing.  I
23  don't know -- I am not an econometrician.  When I did my
24  Ph.D. work, I focused primarily in intellectual social
25  history.  I did not do statistics.  I know there are

Page 91

1  people who specialize in that thing -- that sort of
2  thing, but quantitative analysis is not something that I
3  do.  So, you know, I would defer to others on that.
4    Q.  That being the case, if HB 900 were found to be
5  constitutional and legal, how would you assess whether
6  Comic Book LDF members had altered their writing in the
7  future?
8    A.  Well, given that I have people telling me that
9  they're altering their writing now, I -- there would be
10  two ways, you know.  It is enough of a concern given the
11  fears that I've heard and people around the country
12  because of the Texas law.
13    And we're just talking about creators here.
14  I'm not talking about distributors and publishers.
15  There's a whole other thing there where it's equally
16  concerned.
17    I can tell you the concern is real.  The
18  concern is pervasive.  It's something we talk about at
19  comic conventions.
20    It's something I talk about in
21  conversations with people regularly.  They come to me.
22  I do not go to them.
23    And if it came down to quantifying it, if
24  we wanted to do a study, I would probably, you know, I'd
25  bring in some help on that one.

Page 92

1    (Simultaneous cross-talk ensues.)
2    A.  Because it's quantitative studies.  You're
3  asking me to do something that I don't do.  I take
4  professional -- my professional training very seriously.
5  They're things that I'm trained; they're
6  things I'm not trained in.  You're asking me how I would
7  do XYZ.  It's like asking me how I would do surgery.
8    You know, there are people out there who
9  can do this.  I know that I have heard enough of a
10  pervasive concern that is a real concern, and so it's a
11  concern that we're addressing here.
12    I would consider that since, you know,
13  everybody that creates in this business and wants to
14  make some money out of it, either as a side business or
15  as their full-time career, which many comic creators do,
16  I know that there is a significant chilling effect.  I
17  know there are people who make -- beyond creators, I
18  know there are people out there who have either stopped
19  buying material for their stores or even shut down their
20  store or stopped selling comics entirely because of the
21  concerns here.
22    You know, they're people who do not want
23  their works branded sexually explicit.  That is -- that
24  is -- or even sexually relevant.  You're redefining.
25  You're forcing the person -- the creator to find their

Page 93

1  work -- their entire work by single panel or single
2  scene.
3    It's -- it's, you know, for a creator, that
4  is -- that's incredibly discouraging.  It's -- you're
5  doing the equivalent of putting an X rating on every
6  book that just happens to have an incidental reference
7  to sex, and that has a serious chilling effect, and
8  that's the option you get --
9    (Simultaneous cross-talk ensues.)
10    Q.  (BY MR. BERG)  In that statement, are you
11  presuming that every book with any sexual content would
12  be rated either sexually relevant or sexually explicit?
13    A.  I am seeing -- I am seeing -- I am living in a
14  world where books where people are fully clothed are
15  being condemned as being sexually explicit.  I am living
16  in a world where an image of a mouse -- anthropomorphic
17  mouse in a bathtub is considered sexually explicit and
18  withdrawn from schools.  That's the world I'm living in.
19  That's what I deal with daily.
20    And this is not just said by, you know,
21  loons on the Internet.  This is said by sheriffs and
22  district attorneys and teachers and principals,
23  so-called educators.  You know, this is the world I live
24  in.  This is the world creators live in.
25    You're presuming some sort of rationale



MAGNA ❯
LEGAL SERVICES

Jeffrey Trexler

September 24, 2024
Pages 94 to 97

Page 94

1 above.  You know, we have this narrow way of
2 interpreting the law.  That's not the way in which your
3 law has been introduced, and that's not the way people
4 are reading this text.  And that is not -- your
5 particular -- Zachary's way of reading this is not the
6 way -- is not the actual language of the text, and you
7 will not have Zachary at the shoulder of everybody
8 making a decision here.  That's not -- that's not what I
9 see.
10    Q.  Aren't you also assuming that it'll be
11 implemented in a way that will bring in material not
12 covered under the wording of the statute?
13    A.  Look.  Read the testimony, you know.  It's
14 linked in the Complaint.  It's referenced in the
15 Complaint.
16        This is -- when people were advocating for
17 this law, they weren't advocating because there was a
18 flood of all this.  They were -- they were -- they were
19 taking works that had real educational value.  They had
20 works that -- it is a disgraced to call them sexually
21 explicit on the basis of one panel or one scene.
22        It's -- this is -- what you're -- what
23 you're doing really shocks the conscious in terms of an
24 educational institution, particularly an educational
25 institution under currently understanding of Civil

Page 95

1 Rights law.  So it's -- there are Supreme Court cases
2 that you could declare sexually explicit based on this
3 reading if that particular case doesn't fall under the
4 narrow parameters of a curriculum that you couldn't have
5 in a library.  Because to my knowledge, most schools in
6 Texas aren't law schools when they're K through 12.
7        So I happen to be able to read Hebrew and
8 biblical Greek.  That's what I went into graduate school
9 to do and college to do, and I can tell you there are
10 things in the bible that don't relate to your
11 curriculum.  And the language, particularly if you read
12 it in the original, but it also comes through in a
13 number of translations, is very stark, even in King
14 James version.  You just haven't seen it.
15        Shakespeare.  Read "The Taming of the
16 Shrew."  Under your -- read -- "The Taming of the Shrew"
17 is filled with sexual innuendo, not to mention other
18 books.  That would be sexually relevant under your
19 statute here as something you could limit to checking
20 out.
21        The fact that certain people don't
22 understand the language doesn't mean that other people
23 will read it who do understand the language and say this
24 is actually a danger.  That's how overbroad this is.
25    Q.  You talked a little bit about how you feel that

Page 96

1 people are de-emphasizing the educational value of
2 materials, is that correct, at least a part of what
3 you're saying?
4    A.  That's one element of it.
5        You know, we're talking about a lot here,
6 right?
7    Q.  Certainly.
8    A.  We're talking about flaws of the statute.
9 We're talking about constitutional infirmities of the
10 statute.  We're talking about impact of the statute.
11 There's a lot going on here.
12    Q.  Well, let's talk about the educational value.
13        Who is the correct party to assessed --
14 assess a book's educational value in a public school?
15 Who's the -- who decides?
16    A.  Again, we're going beyond here -- beyond the
17 scope of --
18        (Simultaneous cross-talk ensues.)
19    Q.  (BY MR. BERG)  Well, you're saying that the
20 government shouldn't decide.
21        (Simultaneous cross-talk ensues.)
22    Q.  (BY MR. BERG)  So who should decide?
23    A.  Is that what I'm saying?  I'm saying that the
24 rules you give here are bad.  Is that -- are you
25 extrapolating from the fact that I find constitutional

Page 97

1 infirmities with certain elements of a particular
2 certain statute to be a blanket statement about
3 education?  I'm not sure I follow the logic.
4    Q.  Would you agree that someone decides which
5 books go in public school libraries?
6    A.  Someone decides, yeah.
7    Q.  Who is the appropriate party to decide that?
8    A.  I'm going to go away from a prescriptive aspect
9 to a descriptive aspect, okay?  Because I think that
10 that's important here.  Because you seem to be asking
11 these prescriptive question, as if I'm designing the
12 system from the ground up, which I don't understand to
13 be the purpose of the Complaint, and I don't understand
14 to be the purpose of this deposition.
15        Like I said --
16        (Simultaneous cross-talk ensues.)
17    Q.  (BY MR. BERG)  Well, you're -- sorry.  Go
18 ahead.
19    A.  The fact -- the fact that I have trouble with
20 HB 900 and the way it's framed -- particularly, the
21 standards and that particular thing -- does not mean --
22 if I think that a speed limit of 25 miles per hour on an
23 interstate is inappropriate, that doesn't mean that I
24 believe government has no role in imposing a speed
25 limit, okay?



MAGNA
LEGAL SERVICES

Jeffrey Trexler

Page 98

1    In this instance here, let's take a
2  descriptive role rather than prescriptive role, and
3  let's not make the logical leaps that you've been making
4  in this. And I know you're trying to trap me, and
5  that's very good.
6    In this particular system, we have a public
7  school system which there are multiple constituencies
8  that can influence any decision. We have librarians.
9  We have principals. We have superintendents. We have
10  school boards.
11    You have mayors. You have voters. You
12  have parents; but, again, the people who have a voice in
13  the school system go beyond parents. For just parents,
14  property taxes that everybody had to pay into.
15    Q. They're a killer.
16    A. You have state legislatures. You have
17  bureaucrats, people who work in regulatory bodies, and
18  we have also have a federal overlay. All of these
19  people have a voice in school policy.
20    Nothing I say here is going to eliminate
21  that infrastructure. That is just a fact. So it's a
22  complex system with a number of people who make
23  decisions that affect the contents of that system.
24  That's an answer to your question.
25    Q. Would you agree that TEA has a role in managing

Page 99

1  the Texas public school system?
2    A. Okay. Would I agree that TA {sic} has a role
3  is a statement that can be taken in two different ways,
4  and I'm not sure which one you have.
5    Q. Let me rephrase the question.
6    A. Yes.
7    Q. Would you agree that TEA has a role in
8  regulating the content of what is taught in Texas
9  schools?
10    A. All right. I am going to -- again -- and maybe
11  you don't understand what I'm saying here, so I'm going
12  to -- give me a second to explain the nature of -- it's
13  a combination, and it's an observation about the nature
14  of your question.
15    There are two ways in terms of just
16  understanding language in which your particular question
17  and response to that question can be taken. One is
18  descriptive, and one is proscriptive, right?
19  Prescriptive.
20    So descriptive -- would I agree that Texas
21  Education Authority has a role? Well, as a matter of
22  fact, based on the elements of HB 900 and other aspects
23  of Texas state law as they're currently under --
24  currently existing and are currently being applied, it
25  is a fact that TEA has a role. What I think you're

Page 100

1  trying to get me to say --
2    Q. No. That was my question.
3    A. TEA should have a role.
4    Q. Okay. Let's move on.
5    What information does Comic Book LDF
6  maintain regarding what its members sell to Texas
7  schools?
8    MR. LAMBERT: Objection, form.
9    A. We do not -- I don't think keep records as
10  to -- you understand -- you do understand that there's a
11  lot that goes into, you know, business records, right?
12  Some companies keep a lot of that as trade secrets or
13  just proprietary information. There are also antitrust
14  concerns in getting information from --
15    Q. (BY MR. BERG) We don't need to go into
16  antitrust law.
17    (Simultaneous cross-talk ensues.)
18    Q. (BY MR. BERG) I think your answer -- your
19  answer is that Comic Book LDF does not maintain sales
20  numbers of its members to Texas schools; is that
21  correct?
22    A. No, I don't. I just ask --
23    Q. Okay.
24    A. No.
25    MR. BERG: Let's go back to Exhibit E, the

Page 101

1  CBLDF 1 through 368 document.
2    THE TECHNICIAN: (Complies.)
3    MR. BERG: Please go Page 93.
4    Q. (BY MR. BERG) What is Common Sense Media?
5    A. This is an article from 2014. And so I'm going
6  to just qualify this by saying that I was not part of
7  the Comic Book Legal Defense Fund in 2014. I did not
8  write this article. This article was written by Maren
9  Williams.
10    Q. I understand.
11    As part of the deposition notice, one of
12  the topics was Comic Book LDF's responses to defendants'
13  discovery, and this is part of that discovery.
14    (Simultaneous cross-talk ensues.)
15    A. This is part of discovery. I supplied this
16  material -- we supplied this material because it's items
17  I located. When we start getting into intent and depth
18  of knowledge and anything, the inclusion of something in
19  discovery as responsive to a particular request is not
20  an indication that I know about everything about
21  everything in the statement.
22    So I would say that Common Sense Media is
23  an independent nonprofit that rates all sorts of media,
24  books, and movies to music and -- on age-appropriate
25  scale from 2 to 17. That's what I would say Common

Jeffrey Trexler

September 24, 2024
Pages 102 to 105

Page 102

1 Sense Media is or was. I don't know even if it still
2 exists anymore.
3        Q. (BY MR. BERG) Who is Maren Williams? Do you
4 know?
5        A. I could -- I think I could have told you in
6 2020 when I was looking into who was writing what, but
7 my memory fails me right now.
8        Q. Is she is a former employee or a volunteer?
9        A. I -- I don't know.
10             I don't know the person's gender. I don't
11 know -- and I'm going to apologize if Maren Williams and
12 I have had conversations since I come onboard, and I
13 forgot it because I meet thousands of people in this
14 job.
15             I do apologize. I don't want to -- I don't
16 want to Maren Williams to feel ignored and unappreciated
17 because I appreciate any work anyone has done for us,
18 but I just don't know Maren Williams.
19        Q. So you said Common Sense Media rates media.
20             Is Comic Book LDF aware of other entities
21 that rate media whether books or movies?
22        A. Well, there are any number of organizations
23 that have evaluative criteria whether a rating or
24 whether a -- statements that this is a -- ever since --
25 you know, '19, 2020, 2021, there are organizations that

Page 103

1 have arisen that write about graphic novels and other
2 books saying this is content -- this is their content,
3 and this is bad or this is good or whatever.
4             There is the MPAA. You know, I do know --
5 I remember there was an early -- after -- after we did
6 the Virginia Beach case and the lawyers said they were
7 going to next move to ratings, and there was an attempt
8 to have an MPAA rating for book {sic}. I remember
9 challenged that. I told somebody to challenge that
10 because the MPAA ratings were trademarked, and so we
11 ended up getting that taken out of the legislation. So,
12 obviously, I'm aware of that.
13             (Simultaneous cross-talk ensues.)
14        Q. (BY MR. BERG) Is the MPAA, the Motion Picture
15 Association {sic}, or is the --
16             (Simultaneous cross-talk ensues.)
17        Q. (BY MR. BERG) -- comic book --
18             (Simultaneous cross-talk ensues.)
19        A. MPAA, the Motion Picture Association.
20        Q. (BY MR. BERG) Okay.
21        A. Because you asked books and movies, you know.
22             (Simultaneous cross-talk ensues.)
23             THE STENOGRAPHER: Excuse me. There's a
24 lot of cross-talk happening, so I need that question and
25 answer repeated.

Page 104

1        Q. (BY MR. BERG) My question was: Whether MPAA
2 in this context was the Motion Picture Association --
3        A. Yeah.
4        Q. -- or something related to comic books?
5        A. Again, I didn't write this, but MPAA here, this
6 is referring to MPAA movies -- ratings on movies and
7 ESRB -- which I assume is on video games. That would be
8 a reference to the Motion Picture Association that does
9 the -- the trade association that does those ratings.
10        Q. And you mentioned some entities that more
11 recently had started rating comic books.
12             Do you recall any of the names of those
13 organizations or entities?
14        A. No.
15             I would -- I had to look -- I was looking
16 at them last week in conjunction with a case matter, but
17 I don't remember their names.
18             They're pretty commonly and easily
19 searchable. They do graphic novels as well other books.
20 These are people who are -- who are -- the sort of
21 people who have been endorsing HB 900.
22        Q. Are there any of those sorts of companies that
23 are better than the others? Or in your experience, are
24 they all bad actors, or...
25        A. I do it -- I do it -- I look at it on a

Page 105

1 case-by-case basis, and I have to tell you I don't -- I
2 am reluctant to characterize anybody in terms of good or
3 bad. In terms of their intention, I don't know their
4 hearts.
5             What I do know is that there are people
6 advocating for books to be restricted that I don't think
7 should be restricted. There are people raising
8 objections about books that I think are inaccurate
9 because they don't understand the books. They do not
10 know how to read graphic novels.
11             They get characters wrong. They get ages
12 wrong. They get what's in the pictures wrong. They get
13 art history wrong.
14             I don't see a person as bad for that. I
15 will say that -- or just simply, they reach conclusions
16 that I think are either unconstitutional, incorrect, or
17 unfair.
18             (Simultaneous cross-talk ensues.)
19        Q. (BY MR. BERG) Sorry. Go ahead.
20        A. Yeah, so that's it.
21             Do I -- do I -- do I rate? I don't rate
22 anything.
23        Q. Do you rate them poorly?
24        A. No, I don't rate them poorly.
25             I just -- I don't rate them at all. I just



Jeffrey Trexler

September 24, 2024
Pages 106 to 109

Page 106

1  do it on a case-by-case basis where something comes to
2  me, and I say, you know, that's wrong; or that -- I
3  don't agree with that conclusion.  But that's not me
4  saying this is better; this is worse; this is good; this
5  is bad.  That's kind of not how I do things.
6      Q.  Okay.
7          MR. BERG:  Could we go to the same
8  document, Page 363?
9          THE TECHNICIAN:  (Complies.)
10         MR. BERG:  Bates No. CBLDF four zeros, 363.
11  May be three zeros.
12     Q.  (BY MR. BERG)  Okay.
13         This appears to be an email conversation,
14  correct?
15     A.  Yep.
16     Q.  And we are before your time.  We're looking
17  November 2012, correct?
18     A.  Yes.  I was but a youth, my friend.
19     Q.  Glory days.
20         So this appears to be sent from  Betsy
21  Gomez --
22     A.  Yes.
23     Q.  -- who lists herself as a web editor --
24     A.  Uh-huh.
25     Q.  -- for Comic Book LDF.

Page 107

1      A.  Yeah.
2      Q.  Do you know Betsy?
3      A.  Yes, I do.
4      Q.  Does she still work with you?
5      A.  Betsy does no long -- Betsy no longer works
6  with us.
7      Q.  And it's sent to the aforementioned, Maren
8  Williams and Charles Brownstein.
9      A.  Uh-huh.
10     Q.  Correct?
11     A.  Yes.
12     Q.  And the original email says (as read):  "On
13  your ratings article, would it be possible to get a just
14  the facts, ma'am --
15     A.  Uh-huh.
16     Q.  -- "article on rating systems" --
17     A.  Uh-huh.
18     Q.  -- "basically describing existing rating
19  systems -- movies, video games and comics -- for any
20  publishers that have internal rating systems."
21     A.  Uh-huh.
22     Q.  (As read):  "Comics -- even if the publisher
23  doesn't have an explicit rating systems, they often
24  imprints that designate which age group the book is
25  intended for.  For example, Marvel had Marvel Max for

Page 108

1  mature readers" --
2      A.  Uh-huh.
3      Q.  -- "Boom has Boom Town for young readers, et
4  cetera --
5      A.  Uh-huh.
6      Q.  -- "I liked this to be an article that we add
7  to our resources so informative and factual, the
8  ratings, how the rating system started, et cetera.  I've
9  asked you to include movies and video games as a means
10  of comparison, but it will also likely increase our
11  audience to know how those involved and were
12  implemented."
13     A.  Uh-huh.
14     Q.  Did I read that correctly?
15     A.  You did indeed.
16     Q.  And then Maren replies back -- wait.  What we
17  got?  Yeah.  Maren replies back (as read):  "I shared my
18  working document from Google Docs with you both.  I kind
19  of made the MPA a" -- "the villain because they kind of
20  are IMO, so I hope it's okay to poke them a little.
21  They're used to it.  Let me know what you think."
22     A.  Uh-huh.
23     Q.  Did I read that correctly?
24     A.  Yep, yep.
25     Q.  So this appears to be 2012 email conversation

Page 109

1  regarding Comic Book LDF sort of exploring rating
2  systems.
3      A.  Uh-huh.
4      Q.  Would that be a fair characterization?
5      A.  Well, they're describing -- what Betsy did
6  there was trying to describe them.
7      Q.  Okay.
8      A.  So...
9      Q.  And so then Maren sends back a Google Docs,
10  correct?
11     A.  Uh-huh.
12         (Simultaneous cross-talk ensues.)
13     A.  I assume so from the email.  We'll have to --
14         (Simultaneous cross-talk ensues.)
15     Q.  (BY MR. BERG)  Yeah, we'll get there.
16     A.  If that even exists.
17     Q.  Yeah, we'll get there.
18         It appears the emails of the conversance
19  have been redacted.
20         Would you agree with that?
21     A.  To get rid of email addresses.
22     Q.  Without revealing attorney-client
23  communications, do you know why those emails were
24  redacted when you had disclosed the names of the people?
25     A.  I honestly don't recall.



Jeffrey Trexler

September 24, 2024
Pages 110 to 113

Page 110

1  Q. Okay.
2  A. I think -- I think -- I'm trying to remember.
3      (Simultaneous cross-talk ensues.)
4  Q. (BY MR. BERG)  The only thing I can think of
5  was, like, maybe --
6  A. -- why.  I'm literally trying to remember
7  because people -- email's a funny thing.  People in
8  this -- in the world that I'm working in here -- and I'm
9  going back and sort of -- I was -- I'm pretty adamant
10 when I do something like this that I don't want emails
11 disclosed.  It's because people in my world get
12 harassed.
13     And to me, it's -- if I'm going to be
14 disclosing something like this publicly and it was
15 intended as a private communication, just as a blanket
16 rule -- because in the emails that we have, it could be
17 an email from personal email, whatever.  I don't want
18 them to be subject to people calling them names, trying
19 to take action against them, so on and so forth.
20     (Simultaneous cross-talk ensues.)
21 Q. (BY MR. BERG)  It certainly does appear to be a
22 work email, though, correct?
23 A. I don't have them in front of me, you know.
24 Q. No.  I mean, not the email addresses.  The
25 conversation appears to be work related, correct?

Page 111

1  A. That does appear to be work related, yes.
2     MR. BERG:  Okay.  Let's go to the next
3  page, 36- --
4     THE TECHNICIAN:  (Complies.)
5     MR. LAMBERT:  Hey, Zach.  I just want to
6  make sure you know your camera's not aligned.  I don't
7  know if you realized that or not.  If it's -- if that's
8  on purpose, that's fine.  I just want you to know.
9     MR. BERG:  Thank you.  I appreciate that.
10 I stood up to get a better view of the screen.
11 Q. (BY MR. BERG)  So what are we looking at?  This
12 appear to be the Google Doc.  What are we looking at in
13 this Google Doc?
14 A. Yeah, my understanding -- again, this is before
15 my time, so I found this in the context of responding to
16 discovery -- is that they were putting together an
17 anthology of previously published works.
18 Q. Does this relate to the rating systems
19 mentioned in the email?
20 A. The email was from 2012.  This project was
21 2019, early 2020.
22 Q. So this is not the email attachment?
23 A. This is separate, yeah.  Completely unrelated.
24     The email you were just looking at, in
25 context, would have been connected -- and this is just

Page 112

1  based on the context -- appears to have been connected
2  to the article that you previously shown me.
3  Q. Sorry.  Can you -- I didn't quite follow that.
4  A. You had an -- you showed me an article that
5  talked about rating systems.
6  Q. Oh, the books and content ratings.
7  A. Yeah, exactly.
8     And so it appears -- again, I wasn't privy
9  to any of these discussions -- that the email from 2012
10 or 2014 -- you looked at two of them -- had some sort of
11 connection to that kind of discussion or that kind of
12 article.  It didn't appear to have any -- based on
13 context clues, it didn't have any connection to the
14 publication of stories that came out after those emails.
15 Q. Okay.
16     MR. BERG:  Just for the record, the article
17 we looked at is dated October 14th, 2014.
18 A. Right, so...
19 Q. (BY MR. BERG)  But the -- what we're looking at
20 right now is unrelated to ratings, correct?
21 A. It's unrelated to those emails and to rating
22 systems, so...
23 Q. Okay.
24     And I don't suppose you know whether the
25 attachment to the ratings email was something that's

Page 113

1  been produced, correct?
2  A. I honestly don't recall.  I would have to dig
3  through email and see if we even still have that, you
4  know.
5     Remember, you mentioned earlier the
6  circumstances on which we had a previous departure,
7  right?
8  Q. (No response.)
9  A. And I -- without going into details, there's a
10 lot that I don't have access to.
11 Q. Okay.
12     MR. BERG:  Could we go to the next page?
13     THE TECHNICIAN:  (Complies.)
14 Q. (BY MR. BERG)  So this has -- this shows the
15 Excel document we were looking at on the previous page,
16 and it showings columns F through M.
17 A. Uh-huh.
18 Q. Correct?
19 A. Yeah.
20 Q. And column F is titled "Contact question mark,"
21 and everything is blacked out except for one row, which
22 says "owned by CBLDF."
23 A. Yes.
24 Q. Is that correct?
25 A. Correct.



Jeffrey Trexler

September 24, 2024
Pages 114 to 117

Page 114

1    Q. And without revealing attorney-client
2  communication, do you know why this was redacted?
3    A. Uh-huh. Yes, I do.
4    Q. And why is that?
5    A. And, again, this is -- with -- making no -- you
6  know, everything else we're talking about is
7  attorney-client privilege. This is just my insistence
8  because I don't want to dox our creators. I don't want
9  to give their addresses or emails.
10       You know, they -- people are nasty. This
11  is a world where, you know, people show up at other
12  people's doorsteps. They send them -- they send them
13  letters. They bombard -- they sign them from mailing
14  lists. They bombard them with bad emails. And I don't
15  want to -- I didn't feel it was a -- required in this
16  case to include people's addresses or emails.
17    Q. Okay.
18       MR. BERG: Could we go to the next page,
19  please?
20       THE TECHNICIAN: (Complies.)
21    Q. (BY MR. BERG) And same thing here. You just
22  --
23       (Simultaneous cross-talk ensues.)
24    A. Blank it out --
25       (Simultaneous cross-talk ensues.)

Page 116

1  have to refresh my memory -- but they probably just did
2  a notice to who owns the copyright and the particular
3  work.
4    Q. (BY MR. BERG) And all -- this will be a
5  conversation after the depo. Just for the record, if
6  you have to produce documents in the future, we would be
7  open to some sort of confidentiality agreement where
8  these documents with sensitive information could be
9  stamped for extra protection.
10    A. Appreciate that. I certainly appreciate that.
11       I do live in a world where people have
12  leaked that information. I prefer not to have the
13  information out in the wild to begin with. But -- but
14  if you had a blank -- if you had a blanket agreement
15  beforehand that documents would have been produced under
16  seal, I think that would have been a different
17  conversation.
18       MR. BERG: Could we go to the same
19  document, Page 11, please?
20       THE TECHNICIAN: (Complies.)
21    Q. (BY MR. BERG) This is an August 9th, 2019,
22  document by CBLDF titled "Nine Great Graphic Novels to
23  Gear Up for Back to School." And at the bottom of the
24  page, it says "elementary readers"; is that correct?
25    A. That's what it says, yes.

Page 115

1    Q. (BY MR. BERG) No dox.
2    A. Exactly. No dox.
3       MR. BERG: This page, for the record, shows
4  columns N through S, and the column titles are "street
5  address," "city," "state," "zip," "copyright line," and
6  "street address" again.
7    A. Uh-huh.
8    Q. (BY MR. BERG) And it's been all redacted,
9  correct?
10    A. Yep.
11    Q. What is copyright line?
12    A. If you want copyright information for the
13  individual stories, I can try to dig that -- I can dig
14  that out in the -- I just don't recall that in this
15  particular one, so I can go back and look at the
16  document, but I just don't -- I literally don't recall.
17    Q. And --
18       (Simultaneous cross-talk ensues.)
19    A. Assuming -- I'm assuming -- I'm assuming it is
20  -- like I know when I -- and this is just an assumption
21  here since it's been a few weeks since I pulled this
22  document. But I know when I do my diligence on any sort
23  of work, I will look and see who owns the copyright, and
24  I even go a step further and I look to see if it's been
25  registered. But, here, they probably just -- and I'd

Page 117

1    Q. How do you determine what books should be
2  elementary -- for elementary readers?
3    A. With the caveat here that I was not part of
4  this -- and I want {sic} to understand that I was not
5  part of this decision.
6       But there are a number of decisions that go
7  into determining whether something is for elementary
8  readers. First of all, you'll notice in the description
9  of this for elementary readers, what it does not say.
10  This does not say nonsexual books. This does not have
11  the word "sex" in the title. It does not brand the
12  book, refer to sex in any way. So we're dealing with
13  apples and oranges here between what's done here and
14  what's done in HB 900. Two different things.
15       You're doing what's the logical fallacy
16  that's referred to as sort of modern dally in some
17  circles. You're saying it's reasonable for one thing,
18  but that means then you're going to -- more general
19  proposition, and then you're going try to defend
20  indefensible.
21       So elementary readers here. A number of
22  factors, and we'll go into it. Age level is one. In
23  terms of reading level is going to be one aspect, I
24  assume.
25       I would have to go through -- and we can



Jeffrey Trexler

September 24, 2024
Pages 118 to 121

Page 118

1  sit here and do that if you would like.  You wanted
2  books that -- things that talked about this.  I gave
3  them to you in terms of articles, and I also referred to
4  our website generally.
5      I don't know how they made the decisions,
6  but they're going to talk about what is the vocabulary
7  used; what is the visual density of an image or a visual
8  density or textural density of a particular panel?  They
9  may look at certain themes.  They may look at length.
10  They could look at, you know, sort of all sorts of
11  context of different variables that could be -- whether
12  it's political.  They can look at whether it's -- they
13  could look at the types of the maturity of the sexually
14  discussion.  They can look at the maturity of violence
15  and the way violence...
16      All these sort of things that as a
17  constitutional standard may be inappropriate to impose a
18  -- that.  But in terms of recommending and understanding
19  how different communities and different standards and
20  different people market to different demographics that
21  fitting in under that, there's just a lot of traits.  A
22  lot of characteristics go in determining whether
23  something's for elementary readers and -- and not.
24      You know, when I was -- when I was eight
25  years old, I was reading "All the President's Men."  You

Page 119

1  know, I was reading Marshall McLuhan "Understanding
2  Media" when I was seven, you know.  My elementary
3  readers were somebody else's in terms of the way that my
4  school treated me.  So there's just lots of things, and
5  it's very context dependent, and depending on whose
6  doing it.
7      MR. BERG:  Can we go to the next page,
8  please?
9      THE TECHNICIAN:  (Complies.)
10      Q.  (BY MR. BERG)  So this is an example of an
11  elementary readers -- "Noodleheads See the Future" --
12      A.  Uh-huh.
13      Q.  -- by Ted Arnold, Martha Hamilton, and Mitch
14  Weiss, correct?
15      A.  I will say correct, and it delights me to no
16  end to have "Noodleheads" in a deposition.
17      Q.  It's no "Coneheads" but it'll do.
18      So the -- below the picture of the book,
19  has the title again, authors again; and it says (as
20  read):  "Age range, 6 to 9 years old.  Grade range,
21  first through fourth," correct?
22      A.  Yeah.
23      Q.  Are these determinations that Comic Book LDF
24  are coming up with in-house, or are you taking this from
25  a vendor or an outside party?

Page 120

1      A.  I honestly -- again, I don't know from 2019.  I
2  was doing other things, and so I don't know -- I don't
3  know what they did.
4      I do know that, you know, when I talk about
5  it now or refer to what publishers publish -- you know,
6  there's ALA guides.  They have the American Library
7  Associations.  If things are publishers, I really prefer
8  to stick with publishers since they know the work best.
9      I don't -- I don't know how they made these
10  decisions.  And, again, my guess is that -- for example,
11  in this instance "Noodleheads See the Future," I'm
12  guessing it had a lot to do with the visual and textual
13  sophistication of the work because I really -- when it
14  says "Grades, first through fourth," I suspect it's a
15  lot to do with that.  I doubt that it is anything to do
16  with the Noodleheads having or not having sex.  That's
17  just my supposition, though, because I haven't read
18  Noodleheads.
19      Q.  Is sexual content one of the factors in grade
20  range?
21      A.  I honestly -- again, I did not do this.  I
22  don't know how they calculated this.
23      Q.  Well, let's -- let's talk about --
24      (Simultaneous cross-talk ensues.)
25      A.  You're --

Page 121

1      Q.  (BY MR. BERG)  Let's talk about --
2      (Simultaneous cross-talk ensues.)
3      A.  Please don't --
4      (Simultaneous cross-talk ensues.)
5      A.  Please don't tell me you're going to do a
6  hypothetical about Noodleheads having sex, or I just
7  might have to take a break and laugh for a bit.
8      Q.  (BY MR. BERG)  No.  That's even above -- beyond
9  me.
10      Does Comic Book LDF still do these sort of
11  things where --
12      A.  No.
13      Q.  -- they have guides with age range and grade
14  range?
15      A.  We have legacy information on the site, and I
16  anticipate doing, yeah, sort of revising this kind of
17  thing in the future.  But if we do it in the future, it
18  will only have what publishers designate.  It won't have
19  anything that we have in terms of internal standards.
20      I don't know -- I literally don't know what
21  they did back then.  I don't have any evidence.  I
22  looked.
23      As far as I know, this could be publishers.
24  It could have been a teacher who did this and was going
25  by some sort of standard about vocabulary level like Dr.



MAGNA
LEGAL SERVICES

Jeffrey Trexler

September 24, 2024
Pages 122 to 125

Page 122

1  Seuss did when he was determining what words to use in
2  his books, and that was all sort of words that are
3  associated with certain ages. I simply do not know.
4        Q. And you said that now since you've been in
5  charge, you use publisher information and ALA ratings;
6  is that correct?
7        A. Publish -- I go -- I go by what -- how the
8  publisher characterizes it. The ALA does its own thing.
9        Q. Okay. Publishers.
10       A. And as far as I know, the ALA may go by what
11  the publishers say. I just don't know the -- I just
12  don't what's in their system. I just know that I've
13  seen stuff online, and I've seen them reference ages,
14  and I just -- I don't know because I haven't asked them.
15          I prefer going by what publishers do, and
16  then -- and then, you know, people can make their own
17  judgment call based on their reading of the text.
18       Q. Another hypothetical: Say that HB 900 and
19  upheld and goes into effect. If publishers start rating
20  the books for sale in Texas as either no rating,
21  sexually relevant, or sexually explicit, will Comic Book
22  LDF likewise rely on publisher ratings for that purpose
23  as well?
24          MR. LAMBERT: Objection, form.
25       A. I think if we get -- if there's a system that

Page 123

1  brands things as sexually explicit/sexually relevant, I
2  got to tell you even if it's upheld, I'm -- I just -- I
3  find that -- I find that rating system reductionistic
4  and inappropriate. It's not something I would ever
5  endorse.
6          Reducing -- reducing a book to sex is -- is
7  like I said, it shocks the conscious. It's like --
8  think about -- think about all the great works of
9  literature. You could strip out a paragraph. All the
10  great images you could strip out and characters.
11          I mean, do you want -- do you want somebody
12  taking a look at Adam and Eve in the garden by
13  Michelangelo and saying that's sexually explicit because
14  the consensus of scholars is that it's a thinly
15  disguised depiction of oral sex? You know, I would --
16  anybody required to stamp any art history book with
17  sexually explicit or restrict access into the libraries
18  because it contains that or contains the work by
19  Picasso. I find that an unconscionable system in the
20  United States.
21       Q. (BY MR. BERG) I understand you find the idea
22  abhorrent.
23          But for the purpose of the theoretical,
24  would you use the publishers' ratings on that issue to
25  sell books to Texas schools?

Page 124

1          MR. LAMBERT: Objection, form.
2       A. If it's the law and it's been upheld either by
3  the Supreme Court or in the Fifth Circuit with a cert
4  denied by the Supreme Court that you have to have this
5  rating system, I wouldn't advise that people break the
6  law.
7       Q. (BY MR. BERG) Understood.
8          My question's a little bit different. As
9  far as the rating system, would you use a publisher's
10  rating if they used ratings of no rating, sexually
11  relevant, and sexually explicit? Would you use those
12  ratings in the same way you would use the ratings for
13  the books we're looking at now?
14          MR. LAMBERT: Objection, form.
15       A. Now, you're asking me to project something into
16  the future. And, here, which is, again, a situation
17  with which I disagree.
18          I find that this particular -- it's like --
19  there was a Comics Code in comics that many -- the vast
20  majority of people in comics find to have been
21  unconscionable for the harm that it did to the industry.
22  I will -- you know, you make reference to books that had
23  the Comics Code seal on it, but that doesn't mean I
24  approve of the existence of the Comics Code. I'm just
25  trying to imagine a situation where I personally am

Page 125

1  designing a thing would include those ratings without
2  some kind of caveat and just say that this is assuming
3  -- and I don't think it will, and I don't think it
4  should pass constitutional muster in Texas, but let's
5  say -- weirder things have happened in law. You know,
6  Eugenics was approved by the Supreme Court for a period
7  of time. Mandatory sterilization. So we have a weird
8  history in terms of constitutionality.
9          So suppose that these rating system became
10  kind of the mass censorship -- mandatory sterilization
11  of censorship for a temporary period of time or --
12  remember, you know, it was -- Supreme Court said when I
13  was law school that you could through gay people in
14  jail. Then it reversed that ten years later.
15          So suppose we have this system where an
16  unconscionable rating system is required. If I had to,
17  you know, advise people on selling books to Texas, have
18  to acknowledge that. I would disagree with that, and I
19  would fight against it; but I would not endorse it.
20       Q. (BY MR. BERG) When you say you would not
21  endorse it, are you saying that, no, you would not use
22  publishers' ratings to sell the books to Texas public
23  schools?
24          MR. LAMBERT: Objection, form.
25       A. I thought I made it very clear that I wouldn't



Jeffrey Trexler

September 24, 2024
Pages 126 to 129

Page 126

1  recommend that anybody violate whatever the law was at
2  that particular time.  If they were trying to sell
3  something to Texas school {sic} and that had passed
4  constitutional muster, even though I would think that's
5  a serious constitutional mistake along the level of
6  forced sterilization or saying that people should be
7  thrown in jail for having same-sex relationships, which
8  is no longer the law, hasn't been for 20 years.
9      Q.  (BY MR. BERG)  I mean, we all have Supreme
10  Court cases we don't like but --
11      A.  Right.
12      Q.  -- we're getting left field.
13          Let me break this down.  I think I asked
14  too expansive of a question.
15      A.  You did indeed.
16      Q.  Hypothetical --
17          (Simultaneous cross-talk ensues.)
18      A.  That seems to be something that goes on with HB
19  900.  Way too expansive.
20      Q.  (BY MR. BERG)  Well played.
21          So in this hypothetical, would Comic Book
22  LDF continue to sell books to Texas public schools?
23      A.  If I had a teacher at a convention said that
24  they were -- or they were a librarian at a convention
25  and said they were from Texas and they want to buy

Page 127

1  something from our table, you know, and they were going
2  to put it in their library, you know, and they would put
3  me in the standpoint of -- from the framework of being a
4  vendor, you know, then at some point, if that were the
5  law and it were firmly established, then
6  incontrovertibly that's law that predicated at that
7  time, I'm responsible for following that law.
8      Q.  So is that a "yes" you would still sell to
9  Texas school?
10          (Simultaneous cross-talk ensues.)
11      A.  Because if it's sexually explicit, I understand
12  the rule is I couldn't.  And if it's sexually relevant,
13  I understand the rule is I could.  And if it's not
14  rated, no problem, right?  So...
15      Q.  (BY MR. BERG)  Okay.
16          I'll -- if you're worried about sexually
17  explicit, let me rephrase the question.
18          Would you still sell books that were rated
19  either no rating or sexually relevant to Texas schools?
20          MR. LAMBERT:  Objection, form.
21      A.  I would say that the publishers and the
22  creators and the distributors, anybody that got us this
23  book that we're selling have suffered enough.  And if
24  they've managed to have a book survived to the point
25  where it could be sold, that I would not want them to

Page 128

1  suffer further by denying them the ability to sell that
2  book into Texas.  They should at least be able to make
3  some money in Texas after losing a substantial amount of
4  their marketplace to concern over these particular
5  ratings.
6      Q.  So is that a "yes"?
7      A.  I gave you the answer.
8      Q.  Can you clarify whether that's a "yes"?
9      A.  I told -- I told you that if -- and, again,
10  you're doing a hypothetical here.  So I don't know the
11  nature -- I don't know the book.  I don't know the
12  consequences of which somebody is -- the circumstances
13  which somebody is asking me.
14          But I'm not going to rule out selling books
15  to Texas.  But assuming they follow the law -- whatever
16  it is in Texas at that time -- because from my
17  perspective, publishers -- at that point, the publishers
18  and creators and distributors will have suffered enough
19  that I shouldn't impose a complete ban on the state.
20      Q.  So to the extent that you would sell to Texas,
21  would you use the publisher ratings --
22          MR. LAMBERT:  Objection, form.
23      Q.  (BY MR. BERG)  -- on sexual content?
24      A.  All right.  I'm an attorney, okay?  And I
25  advise CBLDF in that capacity.  And if I were an

Page 129

1  attorney, I would say okay, well, if we are selling a
2  book to a librarian, some kind of educator,
3  administrator, whatever in Texas, and they have said
4  they're going to be putting this in the school, not just
5  for their personal use, I would argue, well, you know,
6  there's an argument here that we would fall under the
7  description of a vendor.  And, therefore, in terms of
8  risk management and compliance, we would have to make
9  sure that that was rated in a way that had been upheld
10  by the courts.
11          You know, you're -- I'm trying -- I'm not
12  quite sure what the intent behind this question is, and
13  I'm not quite sure where you want to go with it, but
14  it's -- I disagree with the law.  I think it -- even if
15  the court upheld it, I think it would a reprehensible
16  law with serious financial harm to everybody including
17  us particularly, but I would still -- if there's a book
18  that was salable to Texas, as long as I made sure from a
19  compliance perspective that we were complying with the
20  law applicable to vendors, I wouldn't tell people to
21  say, oh, it's Texas.  We don't sell books to Texas.
22      Q.  Okay.
23          So, yeah, I'm -- so I think that's the
24  first part of the question.
25          The second part -- assuming that you would



Jeffrey Trexler

September 24, 2024
Pages 130 to 133

Page 130

1  comply with the law and follow the law among the ways in
2  which you could come up with a rating and comply with
3  the law, would you choose to proceed with using the
4  publisher's rating to the extent it existed, or would
5  you do something else to come up the rating?
6  　　　MR. LAMBERT:  Objection, form.
7  　A.  I just don't know what you're talking about.  I
8  don't know what your hypothetical is.
9  　　　I am talking about compliance with a Texas
10  person.  And from my understanding -- and, please,
11  elaborate.  If you have an understanding of HB 900
12  that's different, I need to know.  It's hard to
13  understand H- -- a lot of HB 900.
14  　Q.  (BY MR. BERG)  So my question assumes that
15  you're complying with the law.
16  　A.  Okay.
17  　Q.  And that in selling the books that the books
18  will be rated.
19  　　　I'm asking would you come by that rating
20  through using the publisher's rating, or would you come
21  up with the rating some other way like a third-party
22  vendor?
23  　A.  It would be a combination of the publisher's
24  rating.  Probably at this point ask several lawyers and
25  educators to review it just to make sure that it's not

Page 131

1  my reading -- just my reading.  It would be an expensive
2  and time-consuming process.  You know, just as I would
3  do doing diligence in any kind of transaction where I
4  am -- at this point, it's like -- at this point, it's
5  like applying with Customs' ratings -- you know,
6  Customs' rules for determining what can and cannot be
7  imported, what can and cannot be exported, how they're
8  characterized, you know.
9  　　　And so I would have to look at this and
10  determine, okay, where is this book going to fall?  What
11  would the rating be?  The publisher's is this.  But
12  ultimately as a vendor, I'm responsible for selling
13  this, and it could have implications for the people to
14  whom I sell, and they may want to buy from me again.  So
15  I'm going to need to do an analysis with second and
16  third opinions as to how it should be rated.
17  　　　And then -- then there are other factors
18  that go into, you know, determining where the book is
19  sold, and that's going to be largely up to the educator,
20  which is -- which is, you know, they have to think about
21  language level and what, you know, what's the reading
22  level of kids in their classroom, and all those sort of
23  things that come into play.
24  　　　But if I am doing legal -- there's a
25  difference between doing this sort of thing

Page 132

1  "Noodleheads" best for this range of kids versus a legal
2  compliance to make sure that I, as a vendor, are
3  minimizing the risk and risk of my clients under Texas
4  law.  That's just a different kind of analysis.  And as
5  I lawyer -- and I have to -- I have to -- honestly, I
6  have to talk to rest of my board about this.  But I, as
7  a lawyer, you know, whatever I do, I tend not to rely
8  solely on the opinions of third parties.  I always have
9  to look at it myself.
10  　　　MR. BERG:  Can we go to Page 16 of this
11  document?
12  　　　THE TECHNICIAN:  (Complies.)
13  　Q.  (BY MR. BERG)  We have "Anne Frank's Diary:
14  The Graphic Adaptation" adopted by Ari Folman,
15  illustrations by David Polonsky?
16  　A.  Uh-huh.
17  　Q.  My question --
18  　A.  It's digital, yeah {sic}.
19  　Q.  It says "Age range, 12-plus" --
20  　A.  Uh-huh.
21  　Q.  -- and then "Grade range, third through seven."
22  　　　MR. BERG:  And, then, could we go to
23  Page 19, please?
24  　　　THE TECHNICIAN:  (Complies.)
25  　Q.  (BY MR. BERG)  So this is "Strange Fruit

Page 133

1  Volume II:  More Uncelebrated Narratives from Black
2  History" by Joel Christian Gill.
3  　　　So this "Strange Fruit" is in high school
4  readers; the Anne Frank one is in middle grade readers.
5  They both say age range 12-plus.  "Strange Fruit" says
6  grade range 8 through 12.
7  　A.  Uh-huh.
8  　　　MR. BERG:  And then if we could go back to
9  Page 16, please.
10  　　　THE TECHNICIAN:  (Complies.)
11  　Q.  (BY MR. BERG)  The grade range for "Anne
12  Frank's Diary:  The Graphic Adaptation" is third through
13  seven.
14  　　　So if you know, why would an age range be
15  the same but a grade range be different?
16  　A.  I have no --
17  　　　MR. LAMBERT:  Objection, form.
18  　A.  Yeah, I have no idea.
19  　　　I didn't -- I didn't write this.  I don't
20  know if that's a typo.  I don't know if that's based on
21  a publisher's description.  I didn't do that.
22  　　　And seeing that discrepancy, I'll take a
23  look.  It a different -- it's a different -- again,
24  grade range, age range is a different assessment from
25  just purely judging an image on the basis of sexual



Page 134

1  content. Completely -- I mean, they're just different
2  analyses. They may have some points of intersection,
3  but just a different kind of -- you know, one's an
4  holistic analysis and another one isn't. The HB 900
5  isn't a holistic analysis at all.
6        But I -- honestly, I didn't write this. I
7  don't know if it's a typo. I don't know why they have
8  -- I don't know if it's a publisher thing. I'll just
9  have to go back and take a look.
10       Glad that you flagged, though. I think
11 it's -- I'll try to figure it out just now that I see
12 the inconsistency. I don't know. I literally don't
13 know.
14    Q. (BY MR. BERG) Yeah, I don't know enough to
15 know that -- whether it's inconsistent or not is -- it
16 struck me as interesting, and I wanted to see if you had
17 a --
18    A. It is interesting. I just -- I just don't
19 know.
20    Q. Okay.
21    A. I haven't -- I haven't yet gone through a
22 comprehensive revisiting of everything on the website,
23 particularly, older guides, and that's something that I
24 have in my mind to do. But I'm -- you know, we're two
25 people.

Page 135

1    Q. And many volunteers.
2    A. And volunteers.
3        MR. BERG: We go to page --
4    A. Volunteers, none of whom have been involved yet
5  in website redaction. Just so you know that.
6    Q. (BY MR. BERG) Sorry. Involved in what?
7    A. None of the volunteers thus far have been
8  involved in reviewing the website, so...
9    Q. Okay.
10    A. So volunteering at a booth is different from
11 reviewing the website. Equally valued, but it's a
12 different task.
13    Q. Are you familiar with Panel Power?
14    A. Yeah. Yeah, I'm familiar with Panel Power.
15    Q. I can bring that up if it's helpful. It's --
16    A. It would be great. Anything we talk about here
17 I want to see because there's a lot of material that
18 this organization.
19       (Simultaneous cross-talk ensues.)
20       THE STENOGRAPHER: Gentlemen, this is
21 becoming very conversational. Please keep it to
22 question and answers for clarity of the record.
23       MR. BERG: My apologies.
24       Jeremy, would you please bring up Panel
25 Power CBLDF website?

Page 136

1        THE TECHNICIAN: (Complies.)
2        MR. BERG: And we'll mark this as Exhibit
3  F.
4        (Exhibit F marked.)
5        MR. BERG: Could we go to Page 2, please?
6        THE TECHNICIAN: (Complies.)
7        MR. BERG: Go to Page 4, please.
8    Q. (BY MR. BERG) Okay. So the Panel Power has
9  book records, and the fifth column appears to be an
10 age-plus rating for what age is appropriate for the
11 book; is that right?
12    A. Uh-huh.
13       (Simultaneous cross-talk ensues.)
14    A. Let's go back to Page 1 so I can see the header
15 on the column.
16       MR. BERG: Can we go to -- yeah, Page 2,
17 please?
18       THE TECHNICIAN: (Complies.)
19    A. It's good to refresh my memory. Yep. Age
20 group. So there you go.
21    Q. (BY MR. BERG) So the age group number in that
22 column, do you know whether that is also a publisher's
23 rating or something that Comic Book LDF did internally?
24    A. So, you know, just in terms of context clues --
25 and I think this is important as a rule of thumb when

Page 137

1  analyzing any document like this -- one of the first
2  things I would do is look at the asterisk and then go to
3  the asterisks where it says (as read): "Age groups
4  based on publisher classifications. If no age group is
5  listed, the publisher did not specify an intended
6  audience. So consult your librarian or comic bookseller
7  for intended recommendations."
8        Having not prepared the list, I'm going to
9  go by the asterisk.
10    Q. So publisher.
11    A. So publisher.
12       MR. BERG: Can we go back to CBLDF 1
13 through 368 document, please?
14       THE TECHNICIAN: (Complies.)
15       MR. BERG: Can we go to Page 31?
16       THE TECHNICIAN: (Complies.)
17    Q. (BY MR. BERG) So this is -- got the CBLDF logo
18 or a logo, and then it says: "Best" -- "The
19 Best Defense: Retailer Resource Guide, Comic Book Legal
20 Defense Fund"; is that correct?
21    A. Yes. Correct.
22       MR. BERG: Could we go to Page 35, please?
23       THE TECHNICIAN: (Complies.)
24    Q. (BY MR. BERG) This is a guide or essay. It's
25 titled, "'Marketing to Kids: An Introduction' by Andrew



Jeffrey Trexler

September 24, 2024
Pages 138 to 141

Page 138

1  Neal, Chapel Hill Comics."
2      A. Uh-huh.
3      Q. Are you familiar with this document?
4      A. I believe I submitted this document.
5          MR. BERG: Could we go to the next page,
6  please?
7      Q. (BY MR. BERG) Under "Customer Service for
8  Kids," in the first paragraph it reads (as read):
9  "There are still" -- or sorry.
10         MR. BERG: Can we zoom in on the first
11  paragraph under "Customer Service for Kids and Parents,"
12  please, starting "as mentioned above..."
13         THE TECHNICIAN: (Complies.)
14     Q. (BY MR. BERG) So starting from there, it says
15  (as read): "There are also still plenty of folks who
16  assume that all comics are kids comics, so making sure
17  they know that not everything in the store is for kids
18  is usually a good idea. I always tell parents that I'm
19  available if they have any questions about age
20  appropriateness on any of the merchandise in the store.
21  This all goes a long way towards calming parents who are
22  nervous about the media their kids consume."
23     A. Uh-huh.
24     Q. Did I read that correctly?
25     A. You did indeed.

Page 139

1      Q. What sort of things would make a comic not a
2  kids' comic?
3      A. Lots of different factors, and it depends on
4  how they -- you know what they define -- it depends on
5  how -- it depends on the -- on how they understand their
6  market and what the personal, you know, beliefs of the
7  proprietor are, how they relate to publisher's
8  characterizations, what their clients view as kids'
9  comics. I think a lot of stuff is going to go into
10  that.
11         I'd be interested just to speak to the
12  retailers here to determine what they -- what they see
13  as going into kids' group. You know, there's -- there's
14  a legal analysis, and then there's a market analysis;
15  and they're two different things.
16     Q. When Mr. Neal says that (as read): "Making
17  sure that parents know that not everything in the store
18  is for kids is usually a good idea," what does he mean?
19     A. He means that they're going to be -- you know,
20  when -- parents have different sensibilities, and, you
21  know, particularly if you are at this age where people
22  have an item on Nextdoor or Yelp or Google reviews or
23  something like that, I think one of the things you want
24  to be -- back when we were founded, one of the things
25  you were concerned about would be that somebody would

Page 140

1  buy a book often undercover. Actually, it wasn't really
2  people doing complaints. They'd send undercover agents
3  in to buy a book, and then they say, aha, you have this
4  book in the store and kids can access it; and,
5  therefore, it's harmful to minors. Go directly to jail.
6  Do not pass go. And so we have to advise people.
7  That's the backdrop in which we're advising people here.
8          This goes a little further and also just
9  how to manage reputation. Make sure that somebody just
10  doesn't say, oh, my God, this book had this content it
11  in, and that -- so it shouldn't be in kids, and those
12  concepts are influx. They really are influx in ways
13  that, you know, what was considered to be for kids 25
14  years ago and what's considered to be for kids now is
15  different. It's because there are evolving
16  sensibilities what most parents and most community
17  members see. So I would -- I would have to really take
18  a look at, you know, at how the retailer was assessing
19  their market.
20          And, again, it goes into -- it could go --
21  the sexual content could be part of it. May not
22  necessarily be determinative, could be violence, could
23  be themes. It could be -- again, the types of image
24  involve, the types of grade level of the readers. A lot
25  of things -- the publisher characterization. A lot of

Page 141

1  things come into play. Relative tolerance of the area.
2  I mean, just lots of things factor in.
3      Q. Would sexual content be one of the things
4  factored in?
5      A. I think that any -- you know, when you're doing
6  a store, people are thinking about that. They're not
7  rating the books.
8          But, again, they're doing risk management.
9  They don't -- you know, they -- they are a number of
10  retailers out there. Some retailers are totally
11  copacetic, and they think that everything's cool and
12  they understand that the market -- they let parents make
13  the decisions -- and you know. And then others as --
14  you know, people two people kissing knocks them out. It
15  really just depends on their sort of sensibilities.
16          So a person -- a retailers, who's assessing
17  this is going to make these decisions based on a lot of
18  factors of which sexuality is one, but I can tell you I
19  don't know, you know. When it comes to making these
20  distinctions among these different types books,
21  you're -- a lot of it isn't going to be, you know, these
22  are -- if it's for teenagers, it's a sex book. You
23  know, that's not how it's done.
24          We don't have, you know, sexually explicit,
25  sexually relevant. These are -- these are sort of



Jeffrey Trexler

September 24, 2024
Pages 142 to 145

Page 142

1 idiosyncratic Texas ratings. They're not something I
2 know sort of in the mass marketplace.
3          And, again, a lot of it's risk management.
4 They just -- they either are concerned about -- they
5 used to be -- 20 to 25 years ago -- concerned about
6 getting arrested. Although, that concern has come back
7 in the past five years, but they're also concerned about
8 somebody blast -- putting them on blast in the community
9 on some sort of message board.
10     Q. Earlier you said that Comic Book LDF doesn't
11 track sales of its members.
12          Does Comic Book LDF track the types of
13 contracts that its members agree to with schools and
14 their terms?
15     A. If anybody -- if anybody came to us with a bill
16 of sale, an invoice, a contract and said, hey, could you
17 take a look at this? I would certainly look at it.
18     Q. Have you looked at many from Texas?
19     A. I know there've been, you know, situations
20 where people are concerned about books being sold in
21 Texas or books being removed in Texas. But in terms of
22 any contracts, I haven't looked at a contract there.
23     Q. Does Comic Book LDF advise school libraries to
24 stock comics that contain sexual material?
25     A. My -- and this is, again, I have to go through

Page 143

1 and look at everything its done in the past. Do we have
2 a statement that says "you should have books with sex in
3 it"? No. That's not what we do in that sort of crash
4 statement. Again, reductionistic.
5          There are works that have sexual content
6 that have educational significance that students relate
7 to, and they shouldn't be withdrawn from schools. And I
8 think -- certainly think they have traditional content
9 to warrant being standards in school. The ones that I
10 mentioned -- another of them -- you know, Anne Frank and
11 "Maus," and number of other books are such that I
12 certainly would think it would be, you know -- I would
13 understand why educators across the country would want
14 to have them because a lot of good graphic novels that
15 happened to have some sexual content.
16          But am I telling people because it has sex,
17 order this? That's a different kind of thing. Again,
18 it comes down to how your question is phrased and what
19 you're trying to get out of it.
20     Q. Right.
21     A. You know, because, again, there's a way to read
22 your question, which is, if I say, you know, every
23 school library should have a copy of -- of "Romeo and
24 Juliet" and "Merry Wives of Windsor" and "The Taming of
25 the Shrew," you could extrapolate that from Jeff is

Page 144

1 saying every -- every library should books with sex in
2 it, which I think is kind of an unfair characterization
3 of what I'm saying.
4          But, you know, I do think that every
5 library should have books of good, educational,
6 literary, artistic quality and that have educational
7 value, and a number of those happen to have sexual
8 elements.
9          THE STENOGRAPHER: Counsel, when you get to
10 a stopping point, I'd like to take a break, please.
11          MR. BERG: Yeah, let's take -- let's go off
12 record, please.
13          THE VIDEOGRAPHER: We are going off the
14 record. The time is 13:00 p.m. Central.
15          (A break was taken from 1:00 p.m. to
16          1:23 p.m.)
17          THE VIDEOGRAPHER: We are back on the
18 record. This is Media No. 2 in the deposition of Jeff
19 Trexler. The time is 13:23 p.m. Central and we are --
20 or -- and you can begin, counsel.
21          MR. BERG: Thanks so much.
22          Would you please bring up Exhibit E, the
23 CBLDF 1 to 368, please, and go Page 40.
24          THE TECHNICIAN: (Complies.)
25     Q. (BY MR. BERG) So this has a CBDLF logo, and it

Page 145

1 says (as read): "Comics Start Here. An introduction to
2 graphic novels for librarians looking to start, expand,
3 or just better understand comic book collections."
4     A. Uh-huh.
5     Q. Is this part of materials that Comic Book LDF
6 provides to schools on what they should stock in their
7 libraries?
8     A. It is -- well, given -- again, this is -- this
9 is information, I think, is currently given on our
10 website. So this would be information that is being
11 distributed to or was distributed to librarians who are
12 interested in comics and graphic novels.
13          I'd have to refresh my memory of this
14 particular item. Remember, when I provided items for
15 discovery, I reread the items, but I covered a lot of
16 material, and so I'd have to reread the age range of the
17 librarians.
18          And the reason I want to qualify that is
19 that there are librarians who have maintained comic
20 collections in everything from, you know, preschool and
21 kindergarten to the Library of Congress, so -- and
22 colleges and major research universities, so there are a
23 lot of librarians out there.
24     Q. Are there other venues by which Comic Book LDF
25 informs librarians about comic books material and



Jeffrey Trexler

September 24, 2024
Pages 146 to 149

Page 146

1  graphic novels besides online?
2      A.  We speak on panels, and, occasionally, we do
3  things online.  I mean, online panels, but it's been a
4  while.  We did more during COVID.  But large -- largely,
5  our interaction is panels are public events like -- but,
6  yes.  So we do speak to librarians and other events
7  outside of comic context.
8      Q.  Are these panels at conventions and stuff like
9  that?  Festivals?
10     A.  There are comic conventions.  There are
11  academic conferences.  There are librarian conferences,
12  so it really -- just it's different.
13         And by librarian there, I don't just mean
14  school librarians because you know that there are public
15  librarians as well.  You know, or -- there's all sorts
16  of different kinds of librarians, so, you know...
17     Q.  My questions on this document relate to Page 49
18  of this document, which is the appendix.
19         MR. BERG:  If we can, go there.
20         THE TECHNICIAN:  (Complies.)
21     A.  Let's do it.
22         MR. BERG:  Jeremy, could we go to Page 49,
23  please?
24         THE TECHNICIAN:  (Complies.)
25         MR. BERG:  Thank you.

Page 147

1      Q.  (BY MR. BERG)  So at the top, it says (as
2  read):  "Appendix, Subject Headlines, and Genre Terms."
3      A.  Uh-huh.
4      Q.  "Up to date as of May 15th, 2018."
5         So before you assumed your current
6  position, correct?
7      A.  Yeah, yeah, yeah, yeah, yeah.
8      Q.  So there's two boxes.  The top box "LC Subject
9  Headings for Comics."
10     A.  Uh-huh.
11     Q.  In the right column, it says (as read):  "Sex
12  comic books, strips, et cetera."
13     A.  Uh-huh.
14     Q.  What are LC Subject Headings, and what would be
15  encompassed under sex comic books, strips, et cetera?
16     A.  Uh-huh.  Let me think here for a second because
17  I am trying to go back to my time as a bibliographer at
18  Sterling Memorial Library at Yale.  In my peripatetic
19  wanderings, I, also -- between degrees -- was a
20  full-time bibliographer.
21         And Library of Congress heading, you know,
22  you have card numbers.  You have subjects.  They're all
23  categorized as you see here; and I would have to refresh
24  my memory on what specifically falls under the subject
25  heading for sex.

Page 148

1         I mean, my assumption would be that it has
2  do with subjects in which that's a primary category, but
3  I -- or -- but I really have to go back.  It's been --
4  gosh, it's been 30 years since I was librarian, so I
5  apologize.
6      Q.  To the extent you have any knowledge on that
7  subject heading, are you aware of any members of Comic
8  Book LDF who have sold comic books in the sex category
9  to Texas schools?
10     A.  Again, I'd really -- I just -- I just don't
11  recall.  I don't know.
12     Q.  So then the second box on the bottom "LC Genre
13  Terms for Comics."
14         What are "LC Genre Terms for Comics"?
15     A.  So think about -- again, there's -- have you --
16  I have to ask you because I -- conversation.  Library of
17  Congress is very active in the comic space.  There are
18  different -- you can view things in terms of subject
19  heading topics.  You can view things in sort of genres
20  of the comics medium like superheroes, and these are all
21  just, like, different types of -- of comics that much
22  like you would do, like, describe the Western as a genre
23  or something like that.  That's what this is.
24     Q.  Would a genre be akin to categories in a
25  bookstore?

Page 149

1      A.  And, again, I'd have to talk to the people I
2  know at the -- which I'm not offering to do.  I just --
3  if I were to do some research on this, you know, you
4  just go to the source, Library of Congress.
5         But I think it's a little bit more granular
6  than that.  And by the one -- on the one hand, it's more
7  granular.  On the other hand, it's not as comprehensive.
8         So you can think of genres that are in the
9  Library of Congress system that could correspond to
10  things in bookstores, but you could also see that there
11  are a lot of things in bookstores that don't line up
12  with Library of Congress; and they may have other
13  marker-driven means of the classifying the books.
14         I mean, I don't -- yeah, yeah.
15     Q.  At the top of the right-most column is a genre
16  called "pornographic comics."
17     A.  Uh-huh.
18     Q.  What sort of comics would fall within that
19  category?
20     A.  I'd have to see which -- again, this is a
21  Library of Congress.  This isn't me, so I'd have to go
22  back and take a look at what the Library of Congress
23  classifies as pornographic comics.
24         My -- my primary familiarity here is in
25  law, and pornographic is an empty term, you know.



Jeffrey Trexler

September 24, 2024
Pages 150 to 153

Page 150

1    Q.  As we sit here, are you aware of any members of
2  Comic Book LDF who have sold comic books in the
3  pornographic comics genre --
4    A.  No.
5        (Simultaneous cross-talk ensues.)
6    Q.  (BY MR. BERG)  -- to Texas schools?
7    A.  Again, I'm not aware of that.  I'm not aware of
8  people who sold bible comics.  I mean, it really -- it's
9  just like a lack of awareness of how books are
10  categorized by Library of Congress and how it aligns
11  with what people have sold.
12    Q.  These guides that you give to librarians online
13  or at panels at conferences or panels online, in the
14  packets that you provide, do you recommend books that
15  librarians should purchase?
16    A.  I -- again, the packets that I provide?  I
17  don't provide packets.
18        When I do speaking events, there may be CLE
19  material that has cases in it, or I provided a document
20  that's a compilation of briefs that I wrote or, also,
21  the other side wrote in their Virginia Beach case that
22  I -- in which I was counsel, but I'm not distributing
23  packets to librarians.
24        You know, when I'm talking to librarians, a
25  lot of what I do is answer questions about specific

Page 151

1  books or policies or what the law is.
2    Q.  Does --
3        (Simultaneous cross-talk ensues.)
4        THE STENOGRAPHER:  I'm sorry.  Mr. Trexler,
5  I need you to repeat your answer.
6        THE WITNESS:  Oh, I didn't realize he was
7  going to jump in.
8    A.  I was going to say and where litigation like
9  this stands.  They want to know, you know, is -- is the
10  HB 900 litigation over?  What's happening in Arkansas?
11  What's in Iowa?  What's happening with the cosplay law
12  in North Dakota, you know, that kind of thing -- or the
13  gender-appropriate dress law in North Dakota.
14    Q.  (BY MR. BERG)  The -- you'd agree that
15  different states have passed laws regulating content in
16  school libraries, correct?
17    A.  Different states have either passed laws or
18  considered legislation, yeah.
19    Q.  To the extent that Comic Book LDF members
20  allege that they are altering their content to account
21  for these laws, is there any means to separate which
22  state contributes what percentage to the amount that
23  they're changing their work?
24    A.  I don't know that there is a way to do that.  I
25  do know that Texas looms large.  Because, whereas, some

Page 152

1  states threaten prosecution, there is still a -- there
2  isn't been a -- as much of that as it was in the 80s and
3  90s and early 2000s.
4        But the prospect of raiding laws, I mean,
5  I've done speaking engagements where I was specifically
6  asked to talk about Texas even though the conference is
7  taking place outside of Texas because they're concerned
8  about the impact.  Texas is a big market, you know.
9        It's like -- give you an example of just
10  sort of how an analogy that may related to.  You know, I
11  did a -- I did undergraduate and grad work in Greek --
12  and I did my Ph.D. in American religious history at the
13  time when the creationists wars were really big in the
14  1980s, and there was a lot of concern in the 80s and 90s
15  about the impact of book orders in Texas that would
16  restrict the -- that would have limitations on your
17  discussions of evolution as opposed to creationism --
18  what was called scientific creationism.
19        And there was a ripple effect, chilling
20  effect throughout the country in terms of what they
21  could say about evolution in science textbook because
22  Texas was such a big market.  And where Texas went, then
23  the rest of the country would feel like they had to go
24  in terms of authorship acquisitions, distribution, so on
25  and so forth.

Page 153

1        So I -- that's the feeling right now.  The
2  sense of fear and threats of the livelihood and not just
3  on creators.  I've had distributors tell me, you know,
4  they don't distribute certain books in Texas and
5  elsewhere, but Texas is a big driver.  Because if Texas
6  says no, then, again, ripple effects.
7        There's also concern about ripple effects
8  for things like the categorization, sexual explicit,
9  which has, like I said, this overbroad definition that's
10  hard to categorize.  Well, you're not the only state
11  that is -- regulates material or attempts to regulate
12  material that's sexually explicit except, you know, the
13  impact of a book being called sexually explicit has
14  ramifications for people way beyond how it's
15  characterized in a Texas library.
16        So, for example, a book that has sexually
17  explicit on it could provide grounds for a landlord to
18  break a lease for a number of comic shops on the grounds
19  that they're providing what's, you know, public,
20  pornographic, or indecent or immoral material there.
21  There's been a spike in moral clauses in recent years
22  impacting all retailers including comic shop retailers.
23        There are also several states like
24  Missouri, a number one among them, that is trying to get
25  sexually explicit material established as a legal



Jeffrey Trexler

September 24, 2024
Pages 154 to 157

Page 154

1  category for criminal prosecution.  In Missouri, I think
2  it's providing sexually explicit material to students.
3       So if you have a sexually explicit banner
4  on a book for Texas for purpose of exclusion or
5  inclusion, that would then provide fodder for somebody
6  in Missouri, say, to get somebody arrested for selling
7  it in a venue that where students could have access or
8  to making it accessible in school even though their law
9  would prohibit it because it doesn't -- the law doesn't
10 track in Missouri.
11      Or, again, you could just find a wave of
12 people in communities across the country who lose their
13 leases because of what you -- the way you categorize the
14 -- this is -- this is something that has significant
15 financial impact and has -- can, you know -- I've had
16 people tell me they don't want to have this branding
17 because there are people in their localities who will
18 mistakenly call them child pornographers or
19 pornographers, which you put that on Nextdoor, it
20 spreads and pretty soon, nobody wants to go in your door
21 -- go into your shop.
22      You know, this is -- this is something that
23 has financial impact, and you wouldn't have passed the
24 law if it didn't have financial impact because you
25 wouldn't have passed the law if it didn't -- wasn't

Page 155

1  going to affect sales and acquisitions.
2      Q.  You mentioned Missouri, I think, proposing
3  criminal penalties.
4      Are there other states that have passed --
5      A.  Uh-huh.
6      Q.  -- or considering passing laws with --
7      (Simultaneous cross-talk ensues.)
8      THE STENOGRAPHER:  Hold on.  Mr. Trexler,
9  hold on one second.
10      Mr. Berg, can you repeat your question,
11 please?
12      Q.  (BY MR. BERG)  Are there states that are
13 considering or have passed laws criminalizing sexual
14 content in books?
15      A.  Attempting or trying to, and they are different
16 types of laws.  So there could be a law that -- a law
17 that tries to strip out the lapse provision for material
18 that's harmful to minors -- literary, artistic,
19 political, or scientific; or a law, which is similar to
20 what you're doing here.  Also, similar to what you're
21 doing here and Missouri is one among them, a law that
22 tries to reduce a book to a particular image.  So you
23 could a particular disqualifying image, even though the
24 rest of the context is different or provides reasons why
25 that scene is integral to a story or a greater

Page 156

1  political, artistic, literary theme, or scientific
2  theme.
3       You have also a wave of laws that are
4  trying to strip librarians of immunity from criminal
5  prosecution for storing certain books.  And think of
6  this in the public librarian context, a library is like
7  an archive to society.  You study it.
8       So like in the -- you have a document up
9  here that is Tijuana Bibles, okay?  I don't know if you
10 know what a Tijuana Bible is, but a Tijuana Bible is a
11 historic form of comic medium that were self-published
12 or published by companies that didn't have a public
13 identity, and they were sexually-themed humorous comics
14 based on popular movie and comic properties.  So you
15 could -- like Popeye in a pornographic sexual scenario
16 or, you know, Superman or Clark Gable or something like
17 that.  And, again, it's something that was seen as
18 pornography and seen for years in completely
19 nonmainstream distribution.
20      And, now, you have academic conferences,
21 you know, talking about Tijuana Bibles because as here
22 in other countries such as Japan, these comics, which
23 are considered, you know, Outreau and talking about
24 forbidden topics -- did things like normalize same-sex
25 relationships or use of contraceptives, things like that

Page 157

1  referred to in a humorous way that they become sort of
2  accepted; and they become a way of mediating social
3  change.  So it's -- it's -- you know, and, now, there is
4  serious academic study -- of subject of academic study,
5  so a library would archive something like that.
6       And a librarian wouldn't want to go jail
7  for archiving a Tijuana Bible comic that some ambitious
8  sheriff would come in and say, aha, they have that book.
9  We consider to be pornography.  We don't care about the
10 historical significance.  We're going to arrest that
11 librarian.
12      In most states, you couldn't do that, and
13 there's states where you couldn't do that where that
14 immunity is now being stripped.  So, you know, Texas is
15 unfortunately --
16      Q.  Which state are those -- is that happening?
17      A.  I would have -- I would have -- I've written
18 about, it and I've spoken about it.  Again, I'd have to
19 go back and see specific ones.
20      I think --
21      Q.  Does --
22      A.  I think I just did a brief on that, and I think
23 Iowa was one.
24      But, again, memory.  I tend to read things,
25 write things, and I'll think of the most important



Jeffrey Trexler

September 24, 2024
Pages 158 to 161

Page 158

1  detail to remember, which in this case is the trend. I
2  don't know. I just don't keep in my mind all the
3  different states. When you think about all the bills
4  that have been going on across the United States in the
5  past few years, it's just too much to remember.
6      Q. Does Comic Book LDF recommend individual titles
7  to Texas schools?
8      A. And, again, this is -- I'm going to go make a
9  distinction here between before I came onboard and what
10  I've done since because I know what I've done since. I
11  don't know everything that they did before.
12      Q. Since you've -- since you've taken over.
13      A. Since we've taken over, we've recommended that
14  schools not exclude certain books like --
15      Q. Have you affirmatively recommended book?
16      A. We've recommended not removing certain books.
17  I can't recall saying you should include this book
18  because that's kind of not, you know, where -- Comic
19  Book Legal Defense Fund.
20          And so I affirmatively recommend graphic
21  novels. I think every library should have a graphic
22  novel, and that I do not have any differentiation based
23  on the state. I think every library, school, and above
24  should have graphic novels because graphic novels are
25  the key to 21st-century literacy. You understand

Page 159

1  graphic novels. You know how do a video on YouTube.
2  You understand how to do a PowerPoint. Graphic novels
3  are the -- are how we communicate and how we're
4  communicated to. So I think comics -- having graphic
5  novels in the library, and Texas, as everywhere, is
6  essential if you want to have kids be able to function
7  in society for the next 100 to 200 years.
8          But in terms of saying, you must have this
9  book in your library, you know, that's not something I
10  recall doing --
11          (Simultaneous cross-talk ensues.)
12      Q. (BY MR. BERG) Sorry. What was the last part?
13      A. Outside of defending specific books.
14      Q. You talked about defending specific books.
15          What specific books have you recommended
16  not be removed from library collections in Texas?
17      A. Again, we have a number in several in that --
18  in that thing. Look at the -- if you go back over the
19  Katy ISD controversy before HB 900 -- before they did
20  the blanket cutoff, they had a number of graphic novels
21  that were removed. You can go back on that list and see
22  books which we advocated working with the locals in that
23  community.
24          There was another community in Texas that
25  comes to mind where, again, multiple graphic novels. I

Page 160

1  would have to go back through my notes four years ago.
2          Long time. Three years ago, two years ago.
3  I just don't -- I just don't memorize them from year to
4  year.
5          (Simultaneous cross-talk ensues.)
6      A. Books in the Complaint reflect books that have
7  come up in Texas and elsewhere.
8      Q. (BY MR. BERG) Does Comic Book LDF allege that
9  the entity will suffer reputational harms due to HB 900?
10      A. The entity and its members, yeah.
11      Q. What reputational harms would the entity
12  suffer?
13      A. You know, I can say as somebody who's the
14  executive or the interim director, it is common place
15  for people to accuse us of being pornographers now and
16  promoting pornography and promoting child pornography,
17  which we do not do. We don't promote pornography. We
18  don't promote child pornography. We don't say, you
19  know, schools should have, you know, obscene material.
20  We don't do it, but people say we do. People are very
21  up front about that to my face and online and elsewhere.
22          So, you know, that's what they -- that's
23  what they try to do to us. That's what they try to do
24  retailers, creators, publishers, distributors.
25          There is a -- they know that there's

Page 161

1  certain things that are stigmatizing. They try to apply
2  it to us. You know, it's wrong, but that -- but that's
3  what they try to. Unfortunately, the people who do
4  this, whether it's through misunderstanding or
5  malevolence or political expediency -- and I think
6  there's elements of all three in the movement -- have
7  somehow decided is what they can do is we -- we fall
8  into this category, which we don't; or our members fall
9  into this categories, which they don't; and our suppers
10  fall into the categories, which they don't.
11      Q. And does Comic Book LDF -- has Comic Book LDF
12  gained reputationally at all due to HB 900 and its
13  resistance?
14      A. You, earlier in this discussion, included a
15  story. It was actually -- probably of all the stories
16  that I've seen written about me, it's the one that I
17  took closest to heart because I was a nonprofit lawyer
18  when I went to law school and what I did for years in
19  practice and as a professor and shared professor
20  teaching nonprofit law and management. And so the
21  "NonProfit Times," those are my people. Those are my
22  colleagues.
23          And I -- when I took over the organization,
24  it was at the lowest point it had ever been in its
25  history. Everybody, including the "NonProfit Times,"



Jeffrey Trexler

September 24, 2024
Pages 162 to 165

Page 162

1  were saying that this organization needed to die because
2  of the actions of one man.  I believe that it had a
3  higher mission to fulfill.  I still believed that it had
4  value.  I believe of the things it could do, not just
5  for comics, but for everybody out there for whom comics
6  could benefit.
7          And our opposition to a number of
8  challenges, our opposition to HB 900, among some people
9  has affirmed or restored -- I don't want to say affirmed
10 -- has restored their belief that the Comic Book Legal
11 Defense Fund has a role to play, and that it's actually
12 serving the comics community by protecting the comic
13 arts.
14          Now, I do find it somewhat interesting line
15 of legal argument to -- if this is where you're going
16 with it -- to say that we haven't suffered a harm
17 because of posing a harmful bill restores people faith
18 that we're opposing the right thing.  It's a very
19 interesting line of argument.  And maybe if you go
20 there, I'd be interested to see where you go with it.
21          But -- but the fact is there are people who
22 have restored -- we've restored their faith in work
23 because we oppose HB 900 for legitimate reasons.  And
24 there are also people who think that, because we do
25 this, we support child porn.  And there are folks in our

Page 163

1  community that get caught up in that because they don't
2  want to risk that association.
3          It used to be standard in comic shops
4  wherever you would go across the country they would have
5  a little collection thing upfront for Comic Book Legal
6  Defense Fund, or it would be on their website, and there
7  are people who would do that now but for the fact, you
8  know, it's a problem because -- because of the way the
9  people attack.  You know, we were up for a grant.  And
10 because of our position -- we hit the very final.  We
11 were approved for it, and then we were unapproved for it
12 because -- because of this.
13          So, you know, that is several hundred
14 thousands of dollars that we've lost, and that is as
15 real as the reputational benefit of people who are
16 opposed to censorship believing that we are now an
17 anti-censorship organization, and that we haven't gone
18 off in some other direction, so...
19    Q.  Does Comic Book LDF engage in any lobbying?
20    A.  Again, it depends on what you call lobbying.
21 I'm going to take it from the standpoint just so we can
22 avoid talking about legal definitions here or longer
23 than necessary.
24          I look at it from the standpoint of a
25 nonprofit organization's lawyer where lobbying is

Page 164

1  synonymous with influencing legislation, which the
2  Treasury Department has a broad sort of definition that
3  can include everything from speaking with a legislature
4  about a resolution, advocating or opposing a resolution,
5  grassroots -- grassroots activity to get Congress to
6  take certain action or state legislature, or local
7  legislative body to take certain action.
8          So do we lobby in the sense of making
9  statements that influence legislation?  Well, yeah.
10 Because think about it, there's a -- last year -- and I
11 don't know if it's public yet.  So, hopefully, if it
12 isn't public yet, don't, you know, post this deposition
13 on YouTube or whatever until later.  But -- but there's
14 an annual ban book -- a resolution in Congress honoring
15 Bans Books Week, which I advised on, and which uses
16 language that -- uses language with last year's and this
17 year's -- uses language that I personally wrote or
18 recommended.
19          You know, there's -- I've testified on
20 legislation, not in Texas, but elsewhere.  I've -- it's
21 a matter of public record that when there was a popular
22 arts Congress founded in Congress bipartisan -- a
23 bipartisan group of legislatures and the House of
24 Representatives to address legal issues in the comic
25 arts that -- that was announced, actually, with me on

Page 165

1  the panel with the congressman.  And it was me and the
2  Library of Congress and comic creator and Representative
3  Garcia.  So, you know, I'm there.
4          Now, in terms of -- in terms of lobbying,
5  I'm -- I will proudly represent, because I have designed
6  this, it is 100 percent legal.  It is 100 percent in
7  line with internal revenue and statutory standards.
8    Q.  Did Comic Book LDF engage in any lobbying on HB
9  900?
10   A.  Comic -- we did not testify in this one, and we
11 didn't consult with legislatures on this one.
12          It's -- it's something -- I spoke to people
13 who are opposed to it, and I spoke -- I don't remember
14 all their names, but I did speak to people who are
15 opposed to it and being vocal about it.
16          I think I -- I don't remember if I wrote
17 about it before or after it was passed.  I'm sure I
18 spoke about it before it was passed because I think
19 that's how some people had reached out to me, but I'd
20 have to go back.  I just don't recall.
21   Q.  Did --
22   A.  And I know I didn't speak.  I didn't -- I
23 didn't go to any sessions or anything like that.
24   Q.  Did you or another representative of Comic Book
25 LDF submit public comment to the legislature on HB 900?



Jeffrey Trexler

September 24, 2024
Pages 166 to 169

Page 166

1    A.  No.  No, we didn't.
2         Again, to my knowledge, unless -- unless I
3    did something that I don't remember, but it's, you know,
4    because that was years ago at this point, but I don't
5    recall doing that.
6    Q.  What is your understanding of Comic Book LDF
7    members' expectation that Texas schools will purchase
8    comics or books from them or their library materials
9    from them in the future?
10   A.  And I can tell that is -- that this is based
11   on, again, actual conversations.
12        I encounter situations where schools are
13   fundamentally conservative, not political conservative.
14   But from a risk management perspective, school
15   administrators in particular are conservative from a
16   risk management perspective.
17        (Simultaneous cross-talk ensues.)
18   Q.  (BY MR. BERG)  Risk adverse.
19   A.  Risk adverse, right.  So they're risk adverse.
20        So one of the things that I've seen -- one
21   of the fortunate side effects I've seen of this is a
22   belief that graphic novels aren't worth the risk and --
23   as a genre or as a medium.  I should say as a medium --
24   comic book medium.  That they're not worth the risk.
25        And part of the issue here is not just that

Page 167

1    graphic novels have been central to so much testimony
2    and so many challenges and threats of arrest, but it's
3    the name.  I've had people tell me that graphic novels
4    means graphic sexual novels and, you know, I've had to
5    explain -- to help teachers -- explain to their
6    principal that a graphic novel does not mean a novel
7    that's filled with sex.
8         So -- but if you have that somebody get
9    into the minds of somebody or you have that get into the
10   mind of somebody who likes to speak out at school
11   boards, the path of least resistance is to say, well,
12   you know what?  Let's just not deal with.  Let's get all
13   the manga out of the classroom.  Let's get all the manga
14   out of the library.  Let's get all the comics out of the
15   library.  It doesn't matter if it's a DC, Marvel, image,
16   whatever.  Let's just get them out because we're
17   concerned that we're going to get caught up in this.  Or
18   let's make sure that they're all behind the circulation
19   desk.  And unless a student is a certain age or has a
20   permission slip, they can't sign out the graphic novels.
21   Graphic novels being targeted specifically as a medium.
22   It's --
23   Q.  When did you first notice the backlash against
24   graphic novels?
25   A.  Remember, we have a long history here.  We

Page 168

1    exist because, not just what happened in the 80s, but
2    the great comic book scare of the 1950s culminating in
3    the congressional hearings and -- or the Senate in the
4    Comic Code in 1954, 70th anniversary.  Dismal
5    anniversary but it exists.
6         I -- we've had cases ever since I came on
7    here in 2020.  It was slow at first because our
8    reputation had been shattered.  I dedicated -- you know,
9    I shut down everything except our web store in terms of
10   fundraising, and I dedicated this organization 100
11   percent to service.  And the word got around that we
12   were helping people, and I started getting, you know,
13   calls from people around the country to help them.
14        It really, really spiked in -- and started
15   spiking for us.  There was already a lot in 2020 --
16   bang, bang, bang, bang.  You could see heat -- if you
17   had a heat map, you'd see it was increasing from 2019,
18   2018, 2017 -- if that's what you were doing and
19   visualizing it, but we never did it formally.
20        2021, it really hit.  Starting with a
21   couple of cases in Texas -- a couple of three cases in
22   Texas we were involved in.  Katy was one of them.
23        And then I don't know if you remember the
24   Virginia gubernatorial election in 2021, but there was a
25   woman in Fairfax County who realized -- she had actually

Page 169

1    -- she had actually watched what was going on in Texas
2    in a case we were involved.  There was Leander.  There
3    was...
4         She watched what was going on in Texas.
5    She was watching the same Zoom school board meetings
6    that I was watching as part of managing tis -- as
7    working on this case, and said, hey, Zoom is visual.  So
8    she started doing, you know, graphic novel images on the
9    YouTube -- on YouTube, and then they got posted to
10   Twitter back when it was called Twitter, and it went
11   viral.
12        And then it went --
13        (Simultaneous cross-talk ensues.)
14   Q.  (BY MR. BERG)  What sort photographic image --
15   graphic novel?
16        (Simultaneous cross-talk ensues.)
17   A.  It was just some gender queer, yeah.
18        Full disclosure, you know, I was -- Maya's
19   lawyer in the Virginia Beach case, and so it was images
20   from gender queer.
21        And since then, you know, they do images
22   from "Flamer;" they do images from "Maus."  They do
23   images.
24        But that situation in the -- it was
25   summer/fall of 2021 where then it became an electoral



Jeffrey Trexler                                    September 24, 2024
                                                   Pages 170 to 173

Page 170

1  issue, Governor Youngkin -- now, Governor Youngkin
2  unexpectedly won the election. It became a local and
3  political issue across the country.
4        Again, straight line. Texas to Virginia.
5  Virginia, nationwide. The town where I live, it became
6  a big issue in New York, but all trace back -- you can
7  trace it back to the challenges in Texas, the school
8  board meetings in Texas watched by the person in
9  Virginia who added an individual element to it in terms
10 of holding books up to a camera, and then, bang, and
11 here we are. It has been as hot now a subject. Again,
12 I think in terms of heat maps. The number of challenges
13 and graphic novels at the center of it as it was in the
14 mid-to-late 1980s and in the 1950s.
15       MR. BERG: Could we go -- could we bring up
16 September 4th, 2024 "Plaintiff Comic Books Responses and
17 Objections to Defendant Morath's First Set of Discovery
18 Requests," please?
19       THE TECHNICIAN: (Complies.)
20       MR. BERG: Could we go to Page 9, Request
21 For Admission 1, please?
22       THE TECHNICIAN: (Complies.)
23       (Exhibit G marked.)
24    Q. (BY MR. BERG) Request for Admission 1 reads
25 (as read): "Admit that plaintiff has not been harmed by

Page 171

1  an TEA rules or standards implemented because of HB
2  900."
3     A. Uh-huh.
4     Q. And the response reads (as read): "CBLDF
5  objects to the phrase 'any TEA rules or standards
6  implemented because of HB 900' as vague and ambiguous.
7  Otherwise, the request is denied."
8        Did I read that correctly?
9     A. You did indeed.
10    Q. Are you aware of any TEA rule that has harmed
11 Comic Book LDF?
12    A. I think any -- the existence of any rule, which
13 I know you have had guidelines come out, right? In
14 addition to what's already in the rules that govern the
15 TEA that are already in HB 900, again, ambiguous.
16       Don't know exactly what you mean. Don't
17 know the scope of this question. The --
18       (Simultaneous cross-talk ensues.)
19    Q. (BY MR. BERG) Let me rephrase.
20       Has TEA issued any rules since the passage
21 of HB 900 that has -- that have harmed Comic Book Legal
22 Defense Fund?
23    A. Again, with the objection preserved here --
24 although, I'll have to defer to Michael on that -- but,
25 personally, I don't -- in answering this question, I'm

Page 172

1  not removing our objection to this particular phrase.
2        As I said, I very deliberately have not
3  been going over the documentation in this case. I would
4  certainly welcome, if you have any TEA rules of an
5  issued subsequent supplementing what's already in HB 900
6  -- I'd welcome you putting them on the screen so that I
7  could look at them and discuss the harm that they do to
8  CBDLF or its members. But without that level of
9  specificity, it's hard for me to answer that question.
10    Q. Would you admit that you're not aware of any
11 TEA rules passed after -- passed because of HB 900 that
12 have harmed Comic Book LDF Legal Defense Fund?
13       MR. LAMBERT: Objection, form.
14    A. Yeah, I would not answer it that way because
15 my -- I am aware of the fact that the existence of this
16 statute -- the existence of the TEA having the authority
17 to issue standards. And, again, when a -- talks, I
18 research this. I just haven't refreshed my memory for
19 this deposition.
20       So I -- there could even be, you know,
21 notes somewhere that -- there could even be an online
22 report, I don't know, of me talking about this and me
23 referring to a specific TEA rule or standard that I just
24 don't recall. So to say I'm not aware makes it sound
25 like I'm making a blanket statement based on research or

Page 173

1  anything like that. And that, again, I think is -- I
2  know it's a rhetorical trap, but it's also one that I
3  think is a bit unfair and inaccurate in terms of what
4  it's representing.
5        What I'm telling you is I did not research
6  this in terms of the specifics of what TA has done since
7  the enactment of the bill to refresh my memory. I've
8  spoken on it in the past. I've written on it in past.
9  I just do not recall now.
10       And -- but I can tell you the mere
11 existence of the ability to issue those rules and the
12 authority to issue those rules is having a decisive
13 effect, a chilling effect, and ripple effects just in
14 terms of -- of, you know, people -- what books they want
15 to sell, what books they want to distribute, what books
16 they want to put on the shelves, what books they want to
17 create books, willingness to be associated with CBDLF.
18 All these things are affected by this bill.
19       This is -- you know, Texas does it big. I
20 remember this, you know, when I was teaching at SMU.
21 Big Tex at the fair, right?
22       HB 900 looms large nationwide. It's
23 probably -- it is without a doubt the most asked about
24 statute whenever speak anywhere in the country.
25    Q. (BY MR. BERG) Well, on the same page, let's



Jeffrey Trexler

September 24, 2024
Pages 174 to 177

Page 174

1 look at Request For Admission No. 3. The request reads
2 (as read): "Admit that HB 900 does not require
3 plaintiffs to create ratings for books sold to other
4 parties" -- to parties other than public schools or
5 open-enrollment charter schools in Texas." The response
6 was (as read): "CBLDF objects to the request because it
7 calls for a legal conclusion. CBLDF also objects to the
8 request because it calls for speculation and seeks
9 information outside of CBLDF's personal knowledge.
10 Otherwise, the request is denied."
11 Let me rephrase the request. Would you
12 agree it's true that Comic Book Legal Defense Fund could
13 still sell books to non-Texas schools without rating
14 them?
15 A. And, again, when we do Comic Book Legal Defense
16 Fund, I also want to encompass our members because they
17 are, you know, directly impacted by this and our
18 supporters throughout the comics community.
19 There's requires, and there's requires.
20 The market power of Texas is such that if you have a
21 rule that something has to be a certain way for Texas.
22 It costs money and time to make books that are different
23 from -- to produce books that are different from that,
24 so that is a cost that is imposed. A cost that in
25 today's book market where there's a lot of --

Page 175

1 particularly graphic novel market where there's a lot of
2 economic pressure on retailers and creators and
3 publishers. It's a cost that most people can't bear.
4 There's also the problem of -- of -- the --
5 you could say the security of -- or just monitoring the
6 supply chain and distribution. People by books in a
7 number of different ways. They go to Amazon. They go
8 to conventions they go to ALA. They go to local
9 bookstores. They go to flea markets. They go to
10 addall.com. They go to eBay. The marketplace for books
11 is such that people buying books for libraries or
12 classrooms is not limited to people who are invoiced by
13 a school district. Books come from all over.
14 And there's no way for a publisher, a
15 distributor, somebody like us -- charity that's selling
16 books for fundraising, there's no way for us to police,
17 to monitor the entirety of the distribution to make sure
18 that a book that we've sold that has the CBDLF brand on
19 it or that a book that anybody else sells as a member or
20 supporter to make sure that those books don't end up in
21 a Texas school.
22 And the reputational harm is real. If you
23 have something where they -- suppose you have a
24 publisher who rates a book sexually relevant and just
25 for when they're invoiced by Texas, or the distributor

Page 176

1 does that. Makes sure the publisher has that on the
2 title and -- or on the front cover or wherever it is --
3 because I'm not sure it has to be on the front cover --
4 and it's invoiced by a school. But it's entirely
5 possible, even probable, that the library has books that
6 aren't invoiced by the school, direct with the
7 publisher/distributor, but that they picked them up with
8 some other third-party vendor. I know at SMU when I was
9 there, you know, we had a bunch of books that I got off
10 of eBay and Amazon that ended up -- various libraries
11 through donations or whatever.
12 Q. What about selling directly to a company or in
13 Austin?
14 A. Again -- again --
15 Q. If a member sold 1,000 copies of a graphic
16 novel to Tesla --
17 A. Uh-huh.
18 Q. -- would they be required to rate the books
19 before selling them?
20 A. I can tell you from the perspective of a
21 company. Given the risk that those books could end up
22 in a library in Texas, a publisher would feel that it
23 had to do that because they didn't have a choice because
24 there's a possibility it could end up there, because the
25 school would feel like, oh, my, God, it didn't have the

Page 177

1 rating, or if it got into the system and somehow the
2 fact that it didn't have a rating was missed, the
3 addition that didn't have a rating was missed, then it gets
4 reported, and the TEA reviews it and said, oh, this
5 should have been sexually explicit and guess what?
6 We're banning the publisher from selling all books to
7 us. Even though it got there through this convoluted
8 chain where it went from Tesla and the people at Tesla
9 either donated it -- donated it to the library or the
10 spouse of somebody at Tesla worked at the library, and
11 they took it there and put it in the library. They're
12 all sort of -- and these are all realistic.
13 You know, for years, I lived in a small. I
14 read tens -- probably tens of thousands of comics --
15 thousands of thousands of comics. Lifelong reader since
16 I was a little-little kid, and I don't have room for
17 comics.
18 So I bought a ton of comics and graphic
19 novels, and I donated them to libraries because I liked
20 them, and those -- a number of them get cataloged. Some
21 of get sold. A number of them get cataloged. Imagine,
22 you know, that gets into a school library that way.
23 And I know -- I know there are people out
24 there wherever there are instances of book banning
25 including in Texas where they see a book being banned,



Jeffrey Trexler

September 24, 2024
Pages 178 to 181

Page 178

1  they start donating books to the library to stock. And
2  publisher/distributor, you know, they could get busted
3  for that. That could harm their reputation. They could
4  get a reputation of being kind of an unsafe publisher to
5  buy books from because the books are getting into this
6  state without being raided in a way that the TA thinks
7  they should be rated.
8      So you can say it's not required, but it is
9  required because the risk is too great.
10     Q. What about, say, self-published author who has
11  determined that they are not going to comply with the
12  law because of ideological -- of an ideological position
13  that they're taking. If they sold a book to someone,
14  would they be required to rate it for that sale?
15     A. If they sold a book to somebody and it got to
16  Texas and it was branded sexually explicit or sexually
17  relevant and the author got the reputation for not
18  honoring that, it's realistic to assume that there could
19  be essentially some blacklisting by retail stores or
20  distributors or even publishers, who might want to pick
21  up that author, because they view it as too much of a
22  risk for them because the book could end up in the
23  school and could end up causing problems.
24     Again, the word "required" has a lot of
25  freight. And to say, well, the law only requires XYZ

Page 179

1  and ignore the market power that Texas has -- when I say
2  just based on the realities of politics, part of what
3  Texas is doing when it enacts laws like this is they're
4  looking beyond Texas. They want to have national
5  influence. It's not just that they're influenced in
6  Texas. People have ambition just in terms of wanting to
7  make a difference in life but also political ambition,
8  and they know what happens in Texas in the book market
9  affects everywhere. And if they regulate it in Texas,
10  it's going to be regulated everywhere at least be seen
11  as a risk everywhere.
12     So I find that a bit disingenuous to say,
13  oh, we're just doing this in Texas for this narrow crew,
14  and they really don't have to do this. There's not much
15  harm. No, that's not the real world, and, honestly,
16  that's not why they do this.
17     Q. I -- I mean, are you testifying to the state of
18  mind individual legislators now? I think we're a little
19  afield here.
20     A. Yeah, I think we are, but I say that wryly, but
21  I don't think we are because realistically I've known a
22  number of people in politics in Texas and beyond, and
23  that is not just me talking off the top of my head.
24  People have ambition, and people want to have an
25  influence. And when they say that this is book is

Page 180

1  immoral, they don't think of it as immoral within the
2  boundaries of a particular state.
3      I am in this business. I talk to these
4  people all the time on both sides of the fence because I
5  believe in having these conversations. I read the
6  material. I read a lot of material from the other side,
7  and this is not a local phenomenon. This is a -- this
8  is a national phenomenon. It is about signaling things
9  nationally.
10     And so you say, am I testifying to state of
11  mind? No. I'm just saying that this is a national
12  movement.
13     It is a movement when Texas has influence,
14  and I just think it's unrealistic to think that people
15  in Texas think it's poor, little old us that nobody's
16  paying attention to because it's just common knowledge
17  that that's not true.
18     Q. Have you ever sold a book that you were -- has
19  Comic Book LDF ever sold a book that it was morally
20  opposed to?
21     MR. LAMBERT: Objection, form.
22     A. We're a free-express organization.
23     Q. (BY MR. BERG) What does that mean?
24     A. We're an organization that is dedicated to
25  protecting the right to express oneself, to distribute

Page 181

1  oneself, to distribute their works, to have their works
2  out in the marketplace regardless of one's point of
3  view, regardless of the perception of the decency or
4  morality of any particular -- of any content.
5      We've defended works that I know people
6  find -- don't agree with, even people in the CBLDF. I
7  haven't read everything that the CBDLF has ever sold. I
8  know that it has sold things that I wouldn't have sold.
9      Q. Did that make you uncomfortable?
10     A. Huh?
11     Q. Did that make you uncomfortable that Comic Book
12  LDF had sold things that you wouldn't have sold?
13     A. It's -- we're -- it's -- what makes me
14  uncomfortable is the notion that I would think that I
15  was inconsistent in my principle that free expression
16  only -- if I believe that free expression only applied
17  to things that I liked, then I'd leave this job
18  tomorrow. It is the nature of what I do, and it is the
19  nature of sort of how I look at life that if I believe
20  in free expression, that is, free expression for all,
21  even people who disagree with me, even -- even images or
22  words or books or graphic novels or posters or
23  animations that they say or do things that I wouldn't
24  necessarily say or do, but it's the nature of protecting
25  free expression through the comic arts. That used to be



Jeffrey Trexler

September 24, 2024
Pages 182 to 185

Page 182

1  an American value, you know.
2      Q.  Doesn't selling a book imply an opinion about
3  it?
4      A.  No.
5          There are plenty of booksellers, and they
6  are plenty of -- just like there are plenty of libraries
7  out there that have politically, philosophically,
8  morally diverse points of view.  I mean, you can go into
9  a Barnes & Noble or you can go into a Books-A-Million,
10  and you can see books that say transwomen are women; and
11  books that say, there are only two sexes and only two
12  genders; and they can never change.  And you can look at
13  it and say, that's a philosophical statement selling
14  those books; or you can look at it and say the
15  bookseller is -- there are different markets, and it's
16  accommodating different markets; and it's not making a
17  philosophical statement at all.  So, you know, different
18  perspectives.
19         And the same thing for public libraries.
20  You know, a public library has lots of -- a public
21  library has value to the extent that it, you know, is an
22  archive of lots of -- America, which is diversity of
23  opinion, which is very important to me.
24      (Simultaneous cross-talk ensues.)
25      A.  Is just one point of view is not doing its job

Page 183

1  as public library.  That's a censorship machine.
2      Q.  (BY MR. BERG)  I have a question on same
3  document Page 6, Request For Production No. 6.
4      A.  Uh-huh.
5      Q.  Starts on the bottom.
6          MR. BERG:  If Jeremy could follow.
7      A.  Uh-huh.
8      Q.  (BY MR. BERG)  Request for Production No. 6 (as
9  read):  "Produce all emails from January 1st, 2020,
10  through the present and all searchable electronic
11  documents containing any of the phrases" -- "of the
12  following phrases: Sexually explicit,
13  sexually-explicit, sexually relevant, sexually-relevant,
14  obscene, harmful material, harmful-material, pervasively
15  vulgar, or pervasively-vulgar."
16         Did I read that correctly?
17      A.  Yes, you did.
18      Q.  Did Comic Book LDF perform a search of
19  electronic documents for documents containing these
20  search terms?
21      A.  Again, we objected to it, and I'm preserving
22  the objection.
23         I went through and was searching for terms
24  in email and what I found was a number of problems.
25  People come to us looking for legal advice or I am

Page 184

1  advising on a case, and there's a number of things that
2  were just covered by privilege.  There's a lot that
3  needed to be sorted through with privilege being a very
4  serious issue for us.
5          There was, you know, junk, I guess, you
6  could say in terms of, you know, news notices or
7  something like that that you could find through a Google
8  search that just incidentally used the words "sexually
9  explicit," in it, but it wasn't the document that we
10  produced or anybody sent to us as content.  It's just
11  something that, say, showed up on the Associated Press.
12  And because I have an article on a search thing on book
13  banning or something or graphic novel ban or something
14  with Google notifications, then every time those words
15  "graphic novel ban" show up, it has that, and a number
16  of them have sexually -- the words "harmful," "obscene,"
17  "sexually explicit" in them or "pervasively vulgar,"
18  anything that has to do with PICOT, you know, on a
19  notice, then, again, it just becomes unwieldy to do.
20         So it's -- in terms of material that's
21  relevant to this case or is not protected by privilege,
22  what I tried to do was find something that was -- when
23  you got the disclosures, if it had something that was
24  related to what you're talking about in this case, it
25  was here.  But to produce that other stuff, that was

Page 185

1  just too -- too great of a risk of the stuff that was
2  privileged or just really -- it's not even clear to me
3  how it's relevant to what -- whether newspapers article
4  that mentions sexual explicit is even relevant to this
5  particular -- to this particular question.
6      Q.  Was it unclear whether that document would be
7  responsive to the request?
8      A.  Yeah.
9          MR. LAMBERT:  Objection, form.
10      Q.  (BY MR. BERG)  You mentioned that when you
11  performed a search, you came across a number of
12  privileged documents, correct?
13      A.  Yeah.
14      Q.  Has Comic Book LDF produced a privilege log in
15  this matter?
16      A.  No, we have not.
17      Q.  Do you intend to?
18          MR. LAMBERT:  Objection, form.
19          (Simultaneous cross-talk ensues.)
20      Q.  (BY MR. BERG)  Sorry.  What was that?
21      A.  I said, I will speak with counsel.
22      Q.  Okay.  I'm going to speak with counsel too.
23          MR. BERG:  Pending this conversation, I'm
24  going to leave this deposition open, but otherwise I
25  pass the witness.



MAGNA
LEGAL SERVICES

Jeffrey Trexler

September 24, 2024
Pages 186 to 189

Page 186

1    MR. LAMBERT:  Yeah, no further questions
2  from the plaintiffs.
3    MR. BERG:  Can we go off the record,
4  please?
5    THE STENOGRAPHER:  Just --
6    THE VIDEOGRAPHER:  Going off the record --
7    THE STENOGRAPHER:  Hold on one second.
8    THE VIDEOGRAPHER:  Is it okay to go off the
9  record?
10    THE STENOGRAPHER:  Hold on one second.
11    Mr. Berg and Mr. Lambert, did you want to
12  get these as expedited as well?
13    MR. BERG:  Yes, please.
14    MR. LAMBERT:  What would be the regular
15  time line?
16    THE STENOGRAPHER:  Ten business days from
17  today.
18    MR. LAMBERT:  Okay, yeah.  Well, we'll do
19  expedited then.
20    THE STENOGRAPHER:  And since this is
21  federal, are there any other stipulations you want to
22  add on the record?
23    MR. BERG:  No.
24    MR. LAMBERT:  No.
25    THE STENOGRAPHER:  Okay.  Then, that's all

Page 187

1  for me.
2    MR. BERG:  Thank you, Abigail.
3    THE STENOGRAPHER:  Thank you.
4    (Simultaneous cross-talk ensues.)
5    THE VIDEOGRAPHER:  And would anybody like
6  to order a video?
7    MR. LAMBERT:  Not at this time.
8    MR. BERG:  Yes, please.
9    THE VIDEOGRAPHER:  Thank you.  This will
10  conclude today's deposition.  The time is 14:26 p.m.
11  Central, and we are off the video record.
12    (Proceedings concluded at 2:26 p.m.)
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 188

1    CHANGES AND SIGNATURE
2    WITNESS NAME:  JEFFREY TREXLER
3    DATE OF DEPOSITION: September 24, 2024
4
5    PAGE    LINE    CHANGE    REASON
6  _____
7  _____
8  _____
9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24  _____
25  _____

Page 189

1    I, JEFFREY TREXLER, have read the foregoing
2  deposition and hereby affix my signature that same is
3  true and correct, except as noted above.
4
5    _____
6    JEFFREY TREXLER
7
8
9  THE STATE OF_____  )
10  COUNTY OF _____  )
11    Before me, _____, on
12  this day personally appeared JEFFREY TREXLER, known to
13  me (or proved to me under oath or through
14  _____) (description of identity card or
15  other document) to be the person whose name is
16  subscribed to the foregoing instrument and acknowledged
17  to me that they executed the same for the purposes and
18  consideration therein expressed.
19    Given under my hand and seal of office this
20  _____ day of _____, 2024.
21
22
23    _____
24    NOTARY PUBLIC IN AND FOR
    THE STATE OF _____
25    Commission Expires: _____



Jeffrey Trexler

September 24, 2024
Pages 190 to 192

Page 190

```
 1
 2              UNITED STATES DISTRICT COURT
                WESTERN DISTRICT OF TEXAS
 3                   AUSTIN DIVISION
 4   BOOK PEOPLE, INC., VBK,   )
     INC., AMERICAN            )
 5   BOOKSELLERS ASSOCIATION,  )
     ASSOCIATION OF            )
 6   AMERICAN PUBLISHERS,      )
     AUTHORS GUILD, INC.,      )
 7   COMIC BOOK LEGAL DEFENSE  )
     FUND                      )
 8                             )
        Plaintiffs,            )
 9                             ) Civil No.
     VS.                       ) AU: 23-CV-00858-ADA
10                             )
     MARTHA WONG, KEVEN ELLIS, )
11   MIKE MORATH               )
                               )
12      Defendants.            )
13
                REPORTER'S CERTIFICATION
14           DEPOSITION OF JEFFREY TREXLER
                September 24, 2024
15
16           That the deposition transcript was delivered
17   to Mr. Zachary Berg.
18           That a copy of this certificate was served on
19   all parties and/or the witness shown herein on
20   _____.
21           I further certify that pursuant to FRCP
22   Rule 30(f)(1) that the signature of the deponent:
23   ____ was requested by the deponent or a party
24   before the completion of the deposition and that
25   signature is to be before any notary public and returned
```

Page 191

```
 1   within 30 days from date of receipt of the transcript.
 2           If returned, the attached Changes and
 3   Signature Page contains any changes and the reasons
 4   therefore:
 5           ____ was not requested by the deponent or a
 6   party before the completion of the deposition.
 7           I certify that I am neither counsel for,
 8   related to, nor employed by any of the parties or
 9   attorneys in the action in which this proceeding was
10   taken, and further that I am not financially or
11   otherwise interested in the outcome of the action.
12           Certified to by me this ____ day of _____,
13   2024.
14
15
16
17
18
             _____
             ABIGAIL GUERRA, Texas CSR 9059
19           Expiration Date: 02/28/26
             MAGNA LEGAL SERVICES
20           Firm Registration No. 633
             1635 Market Street, 8th Floor
21           Philadelphia, Pennsylvania 19103
             (215) 207-9460
22           (215) 207-9461
23
24
25
```

Page 192

```
 1   COUNTY OF _____      )
     STATE OF TEXAS           )
 2
 3           I hereby certify that the witness was notified
 4   on_____, that the witness has 30 days or
 5   (_____days per agreement of counsel) after being
 6   notified by the officer that the transcript is available
 7   for review by the witness and if there are changes in
 8   the form or substance to be made, then the witness shall
 9   sign a statement reciting such changes and the reasons
10   given by the witness for making them;
11           That the witness' signature was/was not returned as
12   of _____.
13           Subscribed and sworn to on this, the _____
14   day of _____, 2024.
15
16
17
18
19           _____
             ABIGAIL GUERRA, Texas CSR 9059
20           Expiration Date: 02/28/26
             MAGNA LEGAL SERVICES
21           Firm Registration No. 633
             1635 Market Street, 8th Floor
22           Philadelphia, Pennsylvania 19103
             (215) 207-9460
23           (215) 207-9461
24
25
```



## 1

**1** 5:2 11:2,6 16:1,12 18:4 67:3 79:12 101:1 136:14 137:12 144:23 170:21, 24

**1,000** 176:15

**100** 159:7 165:6 168:10

**101** 69:25

**10:11** 49:24,25

**10:23** 50:1,3

**11** 116:19

**11:25** 84:19,20

**11:36** 84:21,23

**12** 25:19 29:9 68:20 95:6 133:6

**12-plus** 132:19 133:5

**12:00** 83:24

**12:30** 83:24

**12th** 10:8

**13** 53:10 85:1,3,6 86:6

**13:00** 144:14

**13:23** 144:19

**13th** 15:20

**14th** 112:17

**15th** 147:4

**16** 132:10 133:9

**17** 11:2,6 18:4 48:6 73:16 101:25

**18** 16:5 48:5 61:22 73:16

**19** 102:25 132:23

**1940s** 61:2

**1950s** 61:2 65:2 168:2 170:14

**1954** 65:11 168:4

**1980** 23:1,3

**1980s** 152:14 170:14

**1986** 12:10

**1987** 12:10

**1:00** 144:15

**1:23** 144:16

**1st** 183:9

## 2

**2** 21:22 49:10 79:15 101:25 136:5,16 144:18

**20** 13:8 16:16 126:8 142:5

**20-** 16:7

**200** 159:7

**2000s** 152:3

**2002** 16:16

**2005** 16:8,21 17:4

**2006** 16:22

**2010** 17:2

**2012** 106:17 108:25 111:20 112:9

**2014** 101:5,7 112:10,17

**2017** 168:18

**2018** 147:4 168:18

**2019** 74:17 75:6 111:21 116:21 120:1 168:17

**2020** 15:2,20 31:20 46:2 74:18 102:6,25 111:21 168:7,15 183:9

**2021** 46:2,6 102:25 168:20,24 169:25

**2023** 11:17 14:16 34:2 89:5

**2024** 5:8 170:16

**20th** 65:5 66:5

**21** 77:12

**21st** 65:5 66:5

**21st-century** 158:25

**23-CV-00858-ADA** 5:7

**24** 5:8

**24th** 14:16 34:2

**25** 97:22 140:13 142:5

## 3

**3** 49:11 79:18 174:1

## 4

**30** 53:1 59:8 148:4

**30(b)(6)** 10:14,21

**31** 67:6 137:15

**32** 67:5,14

**33** 67:24

**33.012** 59:12,14

**33021** 41:24

**35** 137:22

**36-** 111:3

**363** 106:8,10

**368** 67:3 101:1 137:13 144:23

## 4

**4** 44:9 64:8 79:21 136:7

**40** 144:23

**43.21** 59:19 60:7 63:23

**43.25** 41:18 53:4 59:18 60:5,10

**43.25(2)** 53:11,13,18 55:6

**49** 146:17,22

**4th** 170:16

## 5

**5** 34:4,7 79:21

**501(c)(3)** 12:5

## 6

**6** 43:13,22,25 44:12 45:5 46:16 79:24 119:20 183:3,8

## 7

**7** 29:1 46:12 49:9 50:6,13,19 80:2

**70th** 168:4

**72** 33:14

**73** 43:18

**75** 84:25 85:3



## 8

**8** 13:8 51:12,16,23 55:1 58:14 133:6

**80s** 152:2,14 168:1

**88th** 11:17

## 9

**9** 53:7 64:6 119:20 170:20

**900** 11:12,14 34:9,14,15,16,23 35:5,
25 38:19 39:9,23 40:7,16,22 41:6,9
44:24 45:2,11,12,16,18 46:4,6,10,
11,18 47:3,4,22 48:18,23 49:3 56:14
57:20,24,25 58:1,11,13 62:7 69:1
71:13,21 74:7 75:2,5 76:7 77:17
82:10,12 83:2,3 85:17 87:3 88:8,18,
25 89:10 91:4 97:20 99:22 104:21
117:14 122:18 126:19 130:11,13
134:4 151:10 159:19 160:9 161:12
162:8,23 165:9,25 171:2,15,21
172:5,11 173:22 174:2

**900'** 171:6

**90s** 152:3,14

**93** 101:3

**9:02** 5:9

**9th** 116:21

## A

**a.m.** 5:9 49:24,25 50:1,3 84:19,20,
21,23

**abhorrent** 123:22

**ability** 8:4,8 22:2 38:24 85:8,25
86:11,21 87:25 88:19 90:14 128:1
173:11

**absolute** 77:22 83:7

**abuse** 16:18 17:10 19:4

**academic** 146:11 156:20 157:4

**acceptable** 18:7

**accepted** 72:7 157:2

**access** 14:3 25:17,22 32:1,22 36:16
37:14 113:10 123:17 140:4 154:7

**accessible** 70:19 154:8

**accolades** 44:1

**accommodating** 182:16

**account** 17:4 151:20

**accurate** 56:22

**accurately** 79:9

**accusation** 71:18

**accuse** 160:15

**acknowledge** 125:18

**acknowledged** 69:21

**acquired** 37:22

**acquisitions** 152:24 155:1

**acronym** 9:19

**act** 11:15 22:1 74:6

**action** 76:17 110:19 164:6,7

**actions** 162:2

**active** 148:17

**actively** 13:6

**activity** 28:21 82:12,13 164:5

**actors** 104:24

**actual** 94:6 166:11

**Adam** 123:12

**adamant** 110:9

**Adams** 15:19

**Adaptation** 132:14 133:12

**add** 108:6 186:22

**addall.com.** 175:10

**added** 170:9

**addition** 171:14 177:3

**address** 26:17 78:23 115:5,6
164:24

**addressed** 21:4

**addresses** 109:21 110:24 114:9,16

**addressing** 88:16 92:11

**administrator** 63:2 129:3

**administrators** 30:18 166:15

**Admission** 170:21,24 174:1

**admit** 170:25 172:10 174:2

**adolescent** 61:6

**adopted** 87:17 132:14

**adopting** 45:16

**adult** 68:2,6

**adult-designated** 11:16

**adults** 22:7,9,20 24:5,15

**adverse** 166:18,19

**advice** 56:9 183:25

**advise** 68:21 124:5 125:17 128:25
140:6 142:23

**advised** 164:15

**advising** 140:7 184:1

**advisory** 67:17 74:12

**advocated** 159:22

**advocating** 39:23 70:11 94:16,17
105:6 164:4

**affect** 8:4,8 14:1 37:17,19,24 38:5
88:19 98:23 155:1

**affected** 34:23 173:18

**affects** 37:20 179:9

**affirmatively** 158:15,20

**affirmed** 162:9

**affront** 63:17

**afield** 179:19

**aforementioned** 107:7

**age** 48:5,6 61:22 73:16,17 107:24
117:22 119:20 121:13 132:19 133:5,
14,24 136:10,19,21 137:3,4 138:19
139:21 145:16 167:19

**age-appropriate** 101:24

**age-plus** 136:10

**agency** 33:5,7,11 51:8,10 56:3 62:4
75:23,24

**agents** 140:2

**ages** 105:11 122:3,13

**agree** 20:23 22:8 24:14 46:5 55:4
56:14 57:16 58:5,10 73:11,19 75:11,
20 90:7 97:4 98:25 99:2,7,20 106:3
109:20 142:13 151:14 174:12 181:6



**agreement** 17:2 116:7,14

**aha** 140:3 157:8

**ahead** 97:18 105:19

**aim** 89:14

**akin** 148:24

**Al-fuhaid** 5:16

**ALA** 120:6 122:5,8,10 175:8

**alcohol** 8:7

**aligned** 111:6

**aligns** 150:10

**allay** 63:20 64:12

**allegations** 16:6 39:21,22 43:3 88:15

**allege** 151:20 160:8

**alleging** 39:8 78:24 82:22

**Allot** 17:1

**Allot's** 17:4

**altered** 91:6

**altering** 91:9 151:20

**amateur** 63:3,4

**Amazon** 175:7 176:10

**ambiguity** 77:23

**ambiguous** 171:6,15

**ambit** 30:12 35:18 69:24

**ambition** 179:6,7,24

**ambitious** 157:7

**amend** 82:16

**Amendment** 29:19

**America** 182:22

**American** 120:6 152:12 182:1

**amid** 16:6

**amount** 62:24 128:3 151:22

**analogy** 152:10

**analyses** 134:2

**analysis** 38:18 39:3 40:7 52:10,12 55:13 56:1,20 58:20 78:18 83:13 89:19 91:2 131:15 132:4 134:4,5 139:14

**analyst** 63:4

**analyzed** 40:21

**analyzes** 57:1

**analyzing** 137:1

**ancient** 22:25

**Andres** 12:18

**Andrew** 137:25

**animation** 14:5

**animations** 181:23

**Anne** 132:13 133:4,11 143:10

**anniversary** 168:4,5

**announced** 16:3 164:25

**annual** 164:14

**answering** 7:15,25 86:5 171:25

**answers** 7:1 135:22

**anthology** 111:17

**anthropomorphic** 93:16

**anti-censorship** 163:17

**anticipate** 76:18 121:16

**anticipated** 36:4

**antitrust** 100:13,16

**anus** 53:24

**anybody's** 38:22

**anymore** 102:2

**anyone's** 48:9

**apologies** 50:15 135:23

**apologize** 82:13 102:11,15 148:5

**app's** 29:4

**appearances** 5:14

**appears** 15:16 21:5 33:18,20 50:6,7 106:13,20 108:25 109:18 110:25 112:1,8 136:9

**appendix** 146:18 147:2

**apples** 69:10 117:13

**applicability** 57:25

**applicable** 129:20

**application** 47:22 72:12 74:9

**applied** 55:8 62:10,12 63:12 66:1, 11,23 68:20 70:9 71:17 99:24 181:16

**applies** 35:14

**apply** 161:1

**applying** 44:20 131:5

**appropriateness** 138:20

**approval** 52:6

**approve** 124:24

**approved** 28:1,13 125:6 163:11

**approximately** 5:9 12:11,21,25 14:25

**archive** 156:7 157:5 182:22

**archiving** 157:7

**area** 141:1

**areola** 53:25

**arguably** 35:16,17

**argue** 47:16 59:4 129:5

**argued** 61:1

**argument** 70:5 71:8 73:24,25 129:6 162:15,19

**arguments** 70:14

**Ari** 132:14

**arisen** 103:1

**Arkansas** 151:10

**Arnold** 119:13

**arrest** 69:18 72:4 157:10 167:2

**arrested** 21:25 23:25 72:2,4,16 142:6 154:6

**arrests** 69:17

**art** 62:22 105:13 123:16

**article** 15:15,20 21:18 24:12 101:5,8 107:13,16 108:6 112:2,4,12,16 184:12 185:3

**articles** 118:3

**articulate** 68:12

**artist** 35:21

**artistic** 50:25 61:14 66:24 69:6 144:6 155:18 156:1



**artists** 34:8,13 35:4 36:5

**arts** 12:6,7 13:24,25 14:2 29:15 85:7,24 86:11 162:13 164:22,25 181:25

**aspect** 31:21 69:14 97:8,9 117:23

**aspects** 70:3 83:4 85:20 99:22

**assault** 16:18,20 17:10 19:4

**assaulting** 16:7

**assess** 78:22 91:5 96:14

**assessed** 96:13

**assessing** 140:18 141:16

**assessment** 59:3,4,7 133:24

**assessments** 46:25 47:1

**assisting** 13:7

**association** 61:20 103:15,19 104:2, 8,9 163:2

**Associations** 120:7

**assume** 7:19 10:17 14:21 30:20 104:7 109:13 117:24 138:16 178:18

**assumed** 147:5

**assumes** 130:14

**assuming** 53:21 56:25 76:11 94:10 115:19 125:2 128:15 129:25

**assumption** 56:12 61:19 115:20 148:1

**assured** 66:25

**asterisk** 137:2,9

**asterisks** 137:3

**attachment** 111:22 112:25

**attack** 67:17 74:1 163:9

**attempt** 103:7

**attempted** 66:15

**Attempting** 155:15

**attempts** 153:11

**attention** 180:16

**attorney** 8:17,19,21 15:3 128:24 129:1

**attorney-client** 109:22 114:1,7

**attorneys** 7:6,12 8:21 9:4 61:1 73:14 93:22

**auctions** 14:10

**audience** 108:11 137:6

**August** 15:20 116:21

**Austin** 5:7 26:9,12,14,20 27:3,25 28:10 76:25 176:13

**author** 15:19 178:10,17,21

**author's** 54:2

**authority** 56:2 99:21 172:16 173:12

**authors** 43:16 90:14 119:19

**authorship** 152:24

**avoid** 163:22

**award-winning** 44:2

**aware** 8:3 17:12 21:14 23:17 24:20 32:7,13,25 33:12 38:17 40:20 41:3 48:9,10,16,19,20 49:2 54:17 102:20 103:12 148:7 150:1,7 171:10 172:10,15,24

**awareness** 150:9

## B

**back** 17:19 43:10,12 45:5,21 48:21, 22 49:4 50:2 54:20,25 57:24 58:14 76:23 78:3 80:18 84:22 100:25 108:16,17 109:9 110:9 115:15 116:23 121:21 133:8 134:9 136:14 137:12 139:24 142:6 144:17 147:17 148:3 149:22 157:19 159:18,21 160:1 165:20 169:10 170:6,7

**backdrop** 140:7

**background** 17:17,23 38:16 48:13

**backlash** 167:23

**backs** 65:25

**bad** 61:1 71:6 96:24 103:3 104:24 105:3,14 106:5 114:14

**ban** 29:25 34:10,21 35:7 44:5 52:4 58:17,21 78:7,25 128:19 164:14 184:13,15

**bang** 73:7 168:16 170:10

**banned** 42:8 177:25

**banner** 154:3

**banning** 23:10 177:6,24 184:13

**Bans** 45:3 164:15

**Barnes** 182:9

**based** 12:23 19:22 23:15 38:5 45:10,16 55:13 75:6 88:7,24 95:2 99:22 112:1,12 122:17 133:20 137:4 141:17 156:14 158:22 166:10 172:25 179:2

**basic** 69:14

**basically** 107:18

**basis** 11:14 27:22 28:20 61:18 94:21 105:1 106:1 133:25

**Bates** 106:10

**bathtub** 93:17

**Beach** 103:6 150:21 169:19

**bear** 175:3

**begin** 116:13 144:20

**beginning** 13:18

**begins** 5:2

**behalf** 43:15

**behavior** 17:5

**behaviors** 45:22

**belief** 162:10 166:22

**beliefs** 139:6

**believed** 162:3

**believing** 163:16

**belong** 22:9,20 24:15

**benefit** 162:6 163:15

**Berg** 5:15 6:2 9:22 10:2,3,7,10 11:8, 12 15:10,13,15,23 16:1,11,14,15 17:17,24 18:13 19:2,21 20:10,13,16, 20,23 21:6,8,21,24 22:23 25:7,12,19 26:18,25 27:23 28:8,23 29:1,8,12 31:14,16 33:13,16,22,25 34:1,4,7, 16,25 35:11,20 41:15 42:18 43:9,12, 17,21,25 44:8,11 45:5,7 48:18 49:9, 15,19,22 50:5,9,12,17 51:12,14,16 52:22,25 53:3,6,9,13,17 54:17,25 55:3 58:8,14,16 59:8,11,14 60:3 64:3,6,8,11 67:2,5,10,13,16,23 68:1, 5 74:11 75:20 77:8 78:14 79:6,11,



12,16,19,22,25 80:3,6 82:21 84:17,
25 85:3,6 86:18,25 87:20 89:7 90:7
93:10 96:19,22 97:17 100:15,18,25
101:3,4 102:3 103:14,17,20 104:1
105:19 106:7,10,12 109:15 110:4,21
111:2,9,11 112:16,19 113:12,14
114:18,21 115:1,3,8 116:4,18,21
119:7,10 121:1,8 123:21 124:7
125:20 126:9,20 127:15 128:23
130:14 132:10,13,22,25 133:8,11
134:14 135:3,6,23 136:2,5,7,8,16,21
137:12,15,17,22,24 138:5,7,10,14
144:11,21,25 146:19,22,25 147:1
150:6 151:14 155:10,12 159:12
160:8 166:18 169:14 170:15,20,24
171:19 173:25 180:23 183:2,6,8
185:10,20,23 186:3,11,13,23

**Betsy**  106:20 107:2,5 109:5

**bible**  95:10 150:8 156:10 157:7

**Bibles**  156:9,21

**biblical**  95:8

**bibliographer**  147:17,20

**big**  47:18 89:16 152:8,13,22 153:5
170:6 173:19,21

**biggest**  66:8

**bill**  11:14 34:9 35:5 41:12 142:15
162:17 173:7,18

**bills**  158:3

**bipartisan**  164:22,23

**bit**  95:25 121:7 124:8 149:5 173:3
179:12

**Black**  133:1

**blacked**  113:21

**blackletter**  83:13

**blacklisting**  178:19

**blank**  114:24 116:14

**blanket**  26:2 27:18 97:2 110:15
116:14 159:20 172:25

**blast**  142:8

**blocker**  71:1

**board**  17:6 58:1 132:6 142:9 169:5
170:8

**boards**  66:19 98:10 167:11

**bodies**  98:17

**body**  10:24 164:7

**bombard**  114:13,14

**book**  5:3,4,5,19 9:9,13,17,18 10:4,8,
11,13,17,20 12:3,4,8,9,12,13 13:10,
11,14,17,21 14:7,8,11,18 15:11,18
16:2 22:12,13 23:1,3 24:22 27:1,24
28:10,14 29:13,25 30:3,15 31:2,10,
20 32:8 33:4,10 34:9 35:7,21 36:5
38:17,24 39:8 40:6,20 41:4,8 44:5
45:3 47:2,8 52:4 56:5,6 58:20 61:3
62:5,16 67:10 68:21 69:16 71:22
72:18 74:16 75:6 78:5,6,7,24 82:22
85:15 86:13 87:1,17,21 89:7 90:2,8
91:6 93:6,11 100:5,19 101:7,12
102:20 103:8,17 106:25 107:24
109:1 117:12 119:18,23 121:10
122:21 123:6,16 126:21 127:23,24
128:2,11 129:2,17 131:10,18 136:9,
11,23 137:19 140:1,3,4,10 141:22
142:10,12,23 145:3,5,24 148:8
150:2 151:19 152:15 153:13,16
154:4 155:22 157:8 158:6,15,17,19
159:9 160:8 161:11 162:10 163:5,19
164:14 165:8,24 166:6,24 168:2
171:11,21 172:12 174:12,15,25
175:18,19,24 177:24,25 178:13,15,
22 179:8,25 180:18,19 181:11 182:2
183:18 184:12 185:14

**book's**  50:24 96:14

**books**  23:18 24:21 27:5 30:3,12,15,
16,23 31:16,17 32:16 36:4 39:2,24
40:22 44:11,15,18,19 45:11,14,25
46:3,5,11,13,17,19,21,22 47:1,20,21
48:7 50:20 55:18,19,20,21 56:15
57:4,5,17,18 58:11,12 64:20,25 66:2
69:20 72:6,7 78:25 85:15 86:14
87:2,21 89:8 90:8,10,12 93:14 95:18
97:5 101:24 102:21 103:2,21 104:4,
11,19 105:6,8,9 112:6 117:1,10
118:2 122:2,20 123:25 124:13,22
125:17,22 126:22 127:18 128:14
129:21 130:17 141:7,20 142:20,21
143:2,11 144:1,5 145:25 147:12,15
148:8 149:13 150:2,9,14 151:1
153:4 155:14 156:5 158:14,16
159:13,14,15,22 160:6 164:15 166:8
170:10,16 173:14,15,16,17 174:3,
13,22,23 175:6,10,11,13,16,20
176:5,9,18,21 177:6 178:1,5 181:22
182:10,11,14

**Books-a-million**  182:9

**bookseller**  137:6 182:15

**booksellers**  57:17 182:5

**bookstore**  148:25

**bookstores**  66:16 149:10,11 175:9

**Boom**  108:3

**Boone**  5:18 9:3

**booth**  135:10

**boring**  8:10

**bottom**  20:21 49:10 64:8 116:23
148:12 183:5

**bought**  177:18

**boundaries**  77:23 180:2

**bounded**  57:14

**bounding**  83:8

**box**  147:8 148:12

**boxes**  147:8

**Bradbury**  65:10

**brand**  90:2 117:11 175:18

**branded**  37:11,14 92:23 178:16

**branding**  154:16

**brands**  123:1

**breadth**  57:8 60:18

**break**  7:22 8:1 49:20,25 83:19,25
84:3,10,20 121:7 124:5 126:13
144:10,15 153:18

**breasts**  53:24 54:9

**briefs**  150:20

**bright**  77:24

**bring**  9:22 15:10 20:13 28:24 34:16
43:12 56:9 91:25 94:11 135:15,24
144:22 170:15

**bringing**  22:3

**broad**  20:2 30:12 35:14 36:8 48:17
66:10 68:19 83:12 164:2

**broader**  39:13 42:13 57:8

**Brownstein**  16:4,6,14,15,21,25
17:5 20:6 107:8



MAGNA
LEGAL SERVICES

Jeffrey Trexler

September 24, 2024
Index: bullet..citing

**bullet** 68:2

**bunch** 176:9

**bureaucrat** 63:2

**bureaucrats** 98:17

**business** 92:13,14 100:11 180:3
186:16

**businesses** 75:1,4

**busted** 178:2

**busy** 8:15

**buy** 30:21 90:10,11,13 126:25
131:14 140:1,3 178:5

**buying** 92:19 175:11

**C**

**calculated** 40:13 120:22

**call** 6:11 73:23 83:22 94:20 122:17
154:18 163:20

**called** 37:1 149:16 152:18 153:13
169:10

**calling** 110:18

**calls** 168:13 174:7,8

**calming** 138:21

**camera** 170:10

**camera's** 111:6

**capable** 62:23

**capacity** 128:25

**card** 147:22

**care** 157:9

**career** 92:15

**carry** 68:2

**carrying** 68:6

**case** 5:7 9:10 14:13 18:23 20:14
21:3,5,14,17,19,25 22:6 23:17,18,21
24:7,19,21,25 26:17,24 30:20 31:1
33:8,17 39:7,15 40:12 42:14 70:14
88:13 91:4 95:3 103:6 104:16
114:16 150:21 158:1 169:2,7,19
172:3 184:1,21,24

**case-by-case** 27:22 28:20 105:1
106:1

**cases** 22:3 24:24 28:19 29:19 39:1
43:2 49:5 95:1 126:10 150:19 168:6,
21

**cataloged** 177:20,21

**categories** 46:14,15 47:6 50:21
148:24 161:9,10

**categorization** 153:8

**categorize** 153:10 154:13

**categorized** 60:1 147:23 150:10

**category** 62:5 148:2,8 149:19 154:1
161:8

**caught** 163:1 167:17

**causing** 178:23

**caveat** 117:3 125:2

**CBDLF** 21:2,19 144:25 172:8
173:17 175:18 181:7

**CBDLF's** 174:9

**CBLDF** 9:20 11:2 16:16,25 20:14
21:15 24:7 27:23 28:3,5,8 29:18,24
30:6 67:3,17 101:1 106:10 113:22
116:22 128:25 135:25 137:12,17
144:23 171:4 174:6,7 181:6

**CBLDF's** 20:24 21:16

**censored** 66:18

**censorship** 66:18 125:10,11
163:16 183:1

**center** 170:13

**central** 5:9 49:24 50:3 84:19,23
144:14,19 167:1

**century** 65:6 66:6

**cert** 124:3

**cetera** 108:4,8 147:12,15

**chain** 175:6 177:8

**challenge** 46:4 72:17 103:9

**challenged** 44:22 45:15 46:1,6,11
103:9

**challenges** 48:22,23 57:19 58:7,13
73:9 162:8 167:2 170:7,12

**challenging** 39:24

**change** 157:3 182:12

**changing** 76:3 151:23

**Chapel** 62:17,19 138:1

**character** 14:5

**characteristics** 118:22

**characterization** 27:15 109:4
140:25 144:2

**characterizations** 48:17 139:8

**characterize** 105:2

**characterized** 131:8 153:15

**characterizes** 122:8

**characterizing** 56:22 57:9

**characters** 105:11 123:10

**charge** 16:20 72:17 122:5

**charity** 175:15

**Charles** 16:4 20:6 107:8

**charter** 11:22 174:5

**checking** 95:19

**Cheyenne** 17:1

**child** 54:10 60:21,22,23 71:1 154:18
160:16,18 162:25

**children** 22:8,19 23:9 24:5,14 54:5,
11

**children's** 54:10

**chilling** 90:14 92:16 93:7 152:19
173:13

**chocolate** 84:3,14

**choice** 176:23

**choose** 130:3

**choosing** 85:9 86:1 88:20

**Christian** 133:2

**Christopher** 21:25

**circles** 117:17

**Circuit** 124:3

**circulation** 167:18

**circumstance** 12:24

**circumstances** 15:5 113:6 128:12

**citing** 48:24



Jeffrey Trexler

September 24, 2024
Index: city..concerned

**city** 6:5 115:5

**Civil** 94:25

**clarify** 12:1 128:8

**clarity** 135:22

**Clark** 156:16

**classics** 22:24 65:5 66:15,17,20 69:21

**classifications** 137:4

**classifies** 149:23

**classify** 62:15

**classifying** 149:13

**classroom** 30:24 78:3 131:22 167:13

**classrooms** 175:12

**clauses** 38:4 153:21

**CLE** 150:18

**clear** 46:14,15 48:1 50:21 70:12 77:23 125:25 185:2

**clients** 132:3 139:8

**clock** 29:3

**closest** 161:17

**clothed** 93:14

**clubs** 23:19

**clues** 112:13 136:24

**cocounsel** 5:18

**Code** 53:5,7 59:18,20 61:4 63:16 64:3 66:1 124:19,23,24 168:4

**colleagues** 161:22

**collection** 66:20 163:5

**collections** 145:3,20 159:16

**college** 95:9

**colleges** 145:22

**column** 113:20 115:4 136:9,15,22 147:11 149:15

**columns** 113:16 115:4

**combination** 99:13 130:23

**comfortable** 7:23

**comic** 5:3,4,19 9:9,13,16,17 10:4,8,

11,13,17,20 12:3,4,6,7,8,9,11,13 13:10,11,14,17,21,24,25 14:2,7,8,18 15:11,18 16:2 19:5 24:15 27:1 28:14 29:13,15 30:3,15 31:2,10 32:8 33:4, 10 34:8,13 35:4,21 36:5 38:2,3,6,17 39:8 40:6,20 41:4,8 61:3 67:10 68:21 69:16,19 71:22 72:18 78:5,6, 7,24 82:22,23 85:7,14,24 86:10,13 87:1,21 89:7,8 90:8,10,12 91:6,19 92:15 100:5,19 101:7,12 102:20 103:17 104:4,11 106:25 109:1 119:23 121:10 122:21 126:21 136:23 137:6,19 139:1,2 142:10,12, 23 145:3,5,19,24,25 146:7,10 147:12,15 148:7,8,17 150:2 151:19 153:18,22 156:11,14 157:7 158:6,18 160:8 161:11 162:10,12 163:3,5,19 164:24 165:2,8,10,24 166:6,24 168:2,4 170:16 171:11,21 172:12 174:12,15 180:19 181:11,25 183:18 185:14

**comics** 14:12 16:7,19,20,23 17:3,11 29:21 30:18 36:2,14 39:11,13 45:21 61:3 65:1,2,19,20 66:1 86:14 87:2, 22 92:20 107:19,22 124:19,20,23,24 138:1,16 139:9 142:24 145:1,12 147:9 148:13,14,20,21 149:16,18,23 150:3,8 156:13,22 159:4 162:5,12 166:8 167:14 174:18 177:14,15,17, 18

**comment** 165:25

**committed** 54:3

**common** 19:24 101:4,22,25 102:19 160:14 180:16

**commonly** 104:18

**communicate** 159:3

**communicated** 159:4

**communication** 110:15 114:2

**communications** 109:23

**communities** 60:7 64:15 76:20 118:19 154:12

**community** 12:7 13:24 14:12 25:24 26:1,14,21 27:13,14,18 28:1,12 29:15 39:12,13 45:21 61:13 63:17, 19 64:13 66:8 68:14,19,22 69:13 70:2,8,9,11,15,17,18,22,23,24 71:4, 7,11,19,24 72:5,12,14 74:14 75:12, 17,18,19,23,25 76:3,6,13,15,18,19, 24,25 77:2,3,9,11,13,14,16,18 89:24

140:16 142:8 159:23,24 162:12 163:1 174:18

**community's** 68:8

**companies** 75:7 100:12 104:22 156:12

**company** 37:19 176:12,21

**comparing** 78:11

**comparison** 108:10

**compilation** 150:20

**complaint** 28:24 33:14 41:13 43:19 53:1 54:23 56:9 59:9 78:24 79:3,6, 10,13 83:1,11 84:25 88:15 94:14,15 97:13 160:6

**complaints** 140:2

**complete** 65:1 77:5,6 128:19

**completed** 8:13

**completely** 111:23 134:1 156:18

**complex** 98:22

**compliance** 129:8,19 130:9 132:2

**complies** 10:1,9 11:11 15:12,25 16:13 20:15,22 21:7,23 28:25 29:10 33:15,24 34:6,18 35:13 43:14,20,23 44:10 45:6 49:12 50:8,11 51:15 53:2,8,12,15 55:2 58:15 59:10,13 64:5,7,10 67:4,7,15,25 73:4 79:7,14, 17,20,23 80:1,4,9,11,13,15,17,19, 21,23,25 81:2,4,6,8,10,12,14,16,18, 20,22 82:1,3,5 85:2,5 101:2 106:9 111:4 113:13 114:20 116:20 119:9 132:12,24 133:10 136:1,6,18 137:14,16,23 138:13 144:24 146:20, 24 170:19,22

**comply** 38:19 41:1,5 130:1,2 178:11

**complying** 129:19 130:15

**comprehensive** 32:13 134:22 149:7

**concept** 27:11 44:20

**concepts** 20:2 69:8 140:12

**concern** 40:19 55:19 56:4 60:11 88:6,7 91:10,17,18 92:10,11 128:4 142:6 152:14 153:7

**concerned** 38:23 39:18 42:20 56:18,19 85:17 91:16 139:25 142:4, 5,7,20 152:7 167:17



**concerns** 31:1 56:7,8 59:24 60:3,9 63:20 92:21 100:14

**conclusion** 106:3 174:7

**conclusions** 60:20 105:15

**condemned** 93:15

**conduct** 41:23 42:20 53:14 55:5 59:17

**conducted** 41:4,7

**Coneheads** 119:17

**conference** 152:6

**conferences** 146:11 150:13 156:20

**confidentiality** 116:7

**conform** 40:24

**confusing** 11:25

**Congress** 65:25 145:21 147:21 148:17 149:4,9,12,21,22 150:10 164:5,14,22 165:2

**congressional** 168:3

**congressman** 165:1

**conjunction** 8:15 54:23 104:16

**connected** 111:25 112:1

**connection** 7:5 71:12 90:3 112:11, 13

**conscious** 94:23 123:7

**consensus** 123:14

**consent** 73:17

**consequences** 38:9 128:12

**conservative** 166:13,15

**consideration** 61:16 76:7

**considered** 61:13 66:17,19 93:17 140:13,14 151:18 156:23

**considers** 25:24

**consistent** 68:13 70:7

**constituencies** 98:7

**constitutional** 74:5 78:18 83:3,9 91:5 96:9,25 118:17 125:4 126:4,5

**constitutionality** 125:8

**consult** 9:7 137:6 165:11

**consume** 138:22

**consumed** 8:7

**contact** 42:5 53:22 55:9 113:20

**contained** 22:12,13 44:4

**contemporary** 36:14 75:11

**content** 25:8,13 26:10,20 27:20,24 28:11 31:24 41:23 43:4 48:6 58:11 68:2 93:11 99:8 103:2 112:6 120:19 128:23 134:1 140:10,21 141:3 143:5,8,15 151:15,20 155:14 181:4 184:10

**contents** 98:23

**context** 23:6,12 31:7 54:10 57:20 61:7,12 69:11,13 71:16 78:22 82:10, 14 104:2 111:15,25 112:1,13 118:11 119:5 136:24 146:7 155:24 156:6

**contexts** 78:13

**contextual** 58:20

**continue** 16:17 35:9 79:15 83:20 126:22

**continues** 58:16

**contraceptives** 156:25

**contract** 142:16,22

**contracts** 142:13,22

**contributes** 151:22

**controlled** 64:20

**controversy** 159:19

**convention** 13:9 16:20 64:18 126:23,24

**conventions** 13:7 30:17,19 91:19 146:8,10 175:8

**conversance** 109:18

**conversation** 106:13 108:25 110:25 116:5,17 148:16 185:23

**conversational** 135:21

**conversations** 40:5 91:21 102:12 166:11 180:5

**convicted** 69:20

**conviction** 69:18

**convoluted** 177:7

**cool** 141:11

**copacetic** 141:11

**copies** 176:15

**copy** 87:18 143:23

**copyright** 115:5,11,12,23 116:2

**Corn** 84:6,15

**corporate** 5:3 9:13 11:1

**correct** 9:10,14 14:14,15,18,19 15:3,4,22 20:12 23:25 26:18 30:8,9 31:18 42:22 47:23 48:1 56:6,16 62:7,9 63:6 67:20 74:11 75:2,5 88:6 90:10 96:2,13 100:21 106:14,17 107:10 109:10 110:22,25 112:20 113:1,18,24,25 115:9 116:24 119:14,15,21 122:6 137:20,21 147:6 151:16 185:12

**corrected** 19:14

**correctly** 10:15 11:3 15:21 16:9 17:7 30:1 31:9 34:11 44:6 51:2 52:7 59:22 67:19 68:15 85:12 108:14,23 138:24 171:8 183:16

**correspond** 149:9

**corrosive** 61:10

**cosplay** 151:11

**cosplayers** 14:4

**cost** 36:4 38:18 39:24 40:3 174:24 175:3

**costs** 36:9,10 37:16,18,23 38:7,12 41:2 174:22

**counsel** 5:13 20:16 144:9,20 150:22 185:21,22

**counselor** 17:14 49:18

**countries** 156:22

**country** 32:17 43:3 66:11 91:11 143:13 152:20,23 154:12 163:4 168:13 170:3 173:24

**County** 168:25

**couple** 36:17 84:2 168:21

**court** 5:6,22 6:25 7:11 70:14 84:9 86:23 95:1 124:3,4 125:6,12 126:10 129:15

**courtroom** 6:23



Jeffrey Trexler

September 24, 2024
Index: courts..demonstratable

courts 29:20 129:10

cover 13:25 176:2,3

covered 47:17 94:12 145:15 184:2

covers 90:4

COVID 146:4

crash 143:3

create 173:17 174:3

created 21:12

creates 92:13

creationism 152:17,18

creationists 152:13

creator 16:7 36:16 37:17,19,25 38:7 39:4 92:25 93:3 165:2

creator's 37:20 38:1

creators 14:2 29:17 36:25 38:1 42:25 85:7,24 86:10 90:18 91:13 92:15,17 93:24 114:8 127:22 128:18 153:3 160:24 175:2

crew 179:13

crimes 22:3

criminal 45:18 154:1 155:3 156:4

criminalizing 155:13

criteria 102:23

criterion 66:20

cross-talk 31:12,15 33:19 45:1 49:17 52:21 53:19 58:6 60:2 79:5 84:11 86:15,17,19 89:4 92:1 93:9 96:18,21 97:16 100:17 101:14 103:13,16,18,22,24 105:18 109:12, 14 110:3,20 114:23,25 115:18 120:24 121:2,4 126:17 127:10 135:19 136:13 150:5 151:3 155:7 159:11 160:5 166:17 169:13,16 171:18 182:24 185:19

Crypt 65:3

crypto 29:5

culminating 168:2

curb 45:3

current 14:23 63:17,19 66:7 69:24 147:5

curricula 23:19

curriculum 62:15 95:4,11

Customer 138:7,11

Customs' 131:5,6

cutoff 159:20

---

**D**

daily 93:19

Dakota 151:12,13

Dallas 76:24 77:1

dally 117:16

damages 40:13

dancing 42:6,21 55:4

danger 95:24

dangerous 61:10

data 49:6 70:16

date 21:11 74:17 147:4

dated 10:7 14:16 15:20 112:17

David 132:15

day 76:23

days 106:19 186:16

DC 167:15

de-contextualizes 60:17

de-emphasizing 96:1

deal 76:17 93:19 167:12

dealing 54:12 55:14 69:12 71:13 73:2,3 76:5 117:12

decades 45:21 62:21 75:8

decency 63:18 64:13 65:14,21 66:2, 8,18 69:9 76:6 77:21,22 78:3 181:3

decent 65:12

decide 26:15 96:20,22 97:7

decided 161:7

decides 96:15 97:4,6

decision 64:15 88:21 94:8 98:8 117:5

decisions 42:11 56:17 57:6 98:23 117:6 118:5 120:10 141:13,17

decisive 173:12

Declaration 14:13,16 29:16 33:13, 16,20,23 34:2,5 35:1 43:10 49:10,11 55:1 85:4,6

declare 95:2

dedicated 12:5 29:14 168:8,10 180:24

defend 24:24 73:9 117:19

defendant 5:15 10:5,19 170:17

Defendant's 9:23 10:12

defendants 5:11

defendants' 101:12

defended 181:5

defending 159:13,14

defense 5:3,4,19 9:9,13,17 10:4,11, 14,18,20 12:4,9,13 13:11,17,21,23 14:8,18 16:2 29:13 30:16 31:3 67:11 68:21 69:17 71:22 72:4,18 78:6 87:1 101:7 137:19,20 158:19 162:11 163:6 171:22 172:12 174:12,15

Defense's 78:5

defensive 77:13

defer 91:3 171:24

define 13:3,4 19:12,13 22:13 25:6 59:1 139:4

defined 42:2 59:17,19 61:17 77:11

defines 54:18

defining 71:20

definition 19:16,18 20:3 35:15,16, 24 38:13 42:20 44:3 52:10 59:24 60:10 76:3 88:3 89:9 153:9 164:2

definitions 22:14 41:18,22 42:4 43:5 44:13 78:2 163:22

degrees 147:19

deliberately 172:2

delights 119:15

demographic 27:11

demographics 27:6,7 118:20

demonstrable 51:4

demonstratable 50:24



**denied** 124:4 171:7 174:10

**density** 118:7,8

**denying** 86:6 128:1

**departed** 15:7

**Department** 164:2

**departure** 113:6

**depend** 22:11 23:5 55:11

**dependent** 23:11 26:24 27:14 119:5

**depending** 42:6 58:19,24 62:13
  76:4 119:5

**depends** 13:2,3 30:5,11 62:8 75:16,
  17,18,19 139:3,4,5 141:15 163:20

**depicting** 41:23

**depiction** 23:2 42:7 48:3,5 61:8,10
  123:15

**depictions** 22:8,19 24:4,14

**depicts** 59:17

**depo** 116:5

**deposed** 6:13

**deposition** 5:2,10 6:17 7:5 8:11,18
  9:7,24 10:13,20 18:24 42:15 78:20
  82:15 97:14 101:11 119:16 144:18
  164:12 172:19 185:24

**depth** 101:17

**describe** 25:12 57:3 109:6 148:22

**Describes** 59:16

**describing** 107:18 109:5

**description** 117:8 129:7 133:21

**descriptive** 53:23 97:9 98:2 99:18,
  20

**designate** 107:24 121:18

**designated** 9:12 18:3

**designed** 45:3,4 165:5

**designing** 97:11 125:1

**desk** 167:19

**detail** 158:1

**details** 17:5 26:6 113:9

**determination** 52:9 62:7

**determinations** 119:23

**determinative** 140:22

**determine** 21:11 64:23 117:1
  131:10 139:12

**determined** 178:11

**determining** 46:13 50:20 70:15,16
  71:4 117:7 118:22 122:1 131:6,18

**detrimental** 90:16

**develop** 61:11 73:3,8

**development** 17:1

**dialing** 7:8

**Diary** 132:13 133:12

**die** 162:1

**differ** 76:13

**difference** 23:2 131:25 179:7

**differences** 76:24,25

**differentiation** 158:22

**dig** 113:2 115:13

**digital** 132:18

**diligence** 115:22 131:3

**direct** 6:1 36:9 37:16 39:1 176:6

**directed** 39:1

**direction** 163:18

**directions** 57:14

**directly** 31:11 33:5,11 36:23 140:5
  174:17 176:12

**director** 14:17,24 15:1,6,7,9 16:4,5,
  16 21:9 160:14

**disagree** 54:15 75:22 124:17
  125:18 129:14 181:21

**disciplined** 16:23

**disclosed** 109:24 110:11

**disclosing** 110:14

**disclosure** 169:18

**disclosures** 184:23

**discouraging** 93:4

**discovery** 8:14,15 32:2 101:13,15,
  19 111:16 145:15 170:17

**discrepancy** 133:22

**discursive** 83:12

**discuss** 172:7

**discussed** 8:16,21 60:5,6

**discussing** 23:7 64:1 85:22

**discussion** 40:23 73:15 112:11
  118:14 161:14

**discussions** 112:9 152:17

**disgraced** 94:20

**disguised** 123:15

**disingenuous** 179:12

**Dismal** 168:4

**display** 50:12 68:7

**disqualifying** 155:23

**distinction** 158:9

**distinctions** 141:20

**distracting** 29:6

**distribute** 42:13 153:4 173:15
  180:25 181:1

**distributed** 145:11

**distributing** 150:22

**distribution** 37:3 152:24 156:19
  175:6,17

**distributor** 36:24 64:17 175:15,25

**distributors** 14:3 55:21 89:24 91:14
  127:22 128:18 153:3 160:24 178:20

**district** 5:6 35:19 56:10 73:13 82:11
  93:22 175:13

**districts** 11:22 56:15 57:17 85:10
  86:2 88:21,22

**diverse** 182:8

**diversity** 182:22

**Division** 5:7

**Doc** 111:12,13

**Docs** 108:18 109:9

**doctrine** 83:9

**document** 10:3,7,10 14:20 15:11
  20:10,24 21:1,8,12 53:7,11 67:3,21
  101:1 106:8 108:18 113:15 115:16,



22 116:19,22 132:11 137:1,13
138:3,4 146:17,18 150:19 156:8
183:3 184:9 185:6

**documentation** 172:3

**documents** 8:12 18:5 116:6,8,15
183:11,19 185:12

**dollars** 163:14

**donated** 177:9,19

**donating** 178:1

**donations** 14:9 176:11

**door** 154:20

**doorsteps** 114:12

**dot** 41:21

**doubt** 120:15 173:23

**dox** 114:8 115:1,2

**dozens** 13:5 29:19

**draw** 60:20

**drawing** 61:1

**drawings** 22:6

**dress** 14:4 151:13

**Drew** 15:19

**driver** 153:5

**drugs** 8:7

**due** 160:9 161:12

**duly** 5:25

**DVD** 66:20

---

**E**

---

**earlier** 61:4 62:8 113:5 142:10
161:14

**early** 103:5 111:21 152:3

**easier** 7:13

**easily** 104:18

**eat** 83:25

**ebay** 175:10 176:10

**EC** 65:1,2

**econometrician** 90:23

**economic** 39:3 175:2

**Eden** 62:17

**editor** 106:23

**educate** 72:21

**education** 13:24 33:5,7,11 51:7,9
54:11 56:2 62:3 97:3 99:21

**educational** 11:16 29:21 31:24 32:5
94:19,24 96:1,12,14 143:6 144:5,6

**educator** 62:1 63:2 129:2 131:19

**educators** 29:18 30:17 93:23
130:25 143:13

**effect** 90:14,16 92:16 93:7 122:19
152:19,20 173:13

**effects** 153:6,7 166:21 173:13

**elaborate** 130:11

**election** 168:24 170:2

**electoral** 169:25

**electronic** 183:10,19

**element** 69:2 96:4 170:9

**elementary** 26:9,12 27:2,25 28:10
116:24 117:2,7,9,21 118:23 119:2,
11

**elements** 57:23 69:25 70:4 73:6
83:2 97:1 99:22 144:8 161:6

**eliminate** 98:20

**else's** 119:3

**email** 106:13 107:12 108:25 109:13,
21 110:17,22,24 111:19,20,22,24
112:9,25 113:3 183:24

**email's** 110:7

**emails** 109:18,23 110:10,16 112:14,
21 114:9,14,16 183:9

**emergency** 7:24

**employee** 68:10 74:23 75:1,7,10
102:8

**employees** 12:11,19 75:5

**empowered** 22:2

**empty** 149:25

**enact** 66:1

**enacted** 48:24 88:9

**enacting** 77:24

**enactive** 11:13

**enactment** 45:17 61:3 173:7

**enacts** 179:3

**encompass** 174:16

**encompassed** 42:2 147:15

**encompassing** 62:24

**encounter** 16:21 166:12

**encountered** 60:25 62:3

**encountering** 55:15

**end** 33:22 64:18 119:16 175:20
176:21,24 178:22,23

**ended** 30:24 66:5 103:11 176:10

**endorse** 123:5 125:19,21

**endorsement** 72:11

**endorsing** 104:21

**ends** 35:18 41:21

**energy** 84:4

**enforcement** 57:3

**enforcing** 42:10

**engage** 35:17 163:19 165:8

**engaged** 37:5

**engagements** 152:5

**enlighten** 23:20

**enrollment** 11:22

**ensues** 31:12,15 33:19 45:1 49:17
52:21 53:19 58:6 60:2 79:5 84:11
86:15,17,19 89:4 92:1 93:9 96:18,21
97:16 100:17 101:14 103:13,16,18,
22 105:18 109:12,14 110:3,20
114:23,25 115:18 120:24 121:2,4
126:17 127:10 135:19 136:13 150:5
151:3 155:7 159:11 160:5 166:17
169:13,16 171:18 182:24 185:19

**entertainment** 65:6

**entire** 47:8 82:25 88:13 93:1

**entirety** 175:17

**entities** 56:5 102:20 104:10,13

**entity** 28:14 30:3,6,7 31:11 32:8
33:4,5 36:21 39:8 40:6 41:4,8 42:16


MAGNA
LEGAL SERVICES

Jeffrey Trexler

160:9,10,11

**environment** 17:10 19:3,12,15,17, 23,24,25

**equally** 91:15 135:11

**equivalent** 93:5

**ESRB** 104:7

**essay** 137:24

**essential** 159:6

**essentially** 73:8 178:19

**established** 127:5 153:25

**et al** 5:5

**Eugenics** 125:6

**evaluative** 102:23

**Eve** 123:12

**events** 146:5,6 150:18

**everything's** 141:11

**evidence** 121:21

**evolution** 152:17,21

**evolving** 140:15

**exact** 27:19

**EXAMINATION** 6:1

**examples** 44:15,18,19

**Excel** 113:15

**exclude** 158:14

**excluded** 27:21

**exclusion** 154:4

**excuse** 5:4 29:2 48:22 86:22 103:23

**executed** 14:13 33:17 34:1

**executive** 15:7 16:3,5,16 160:14

**exhibit** 11:9,10 15:13,14 20:11 28:22,23 53:9,16 64:4 67:8 100:25 136:2,4 144:22 170:23

**Exhibits** 80:7

**exist** 32:3 46:7,10 74:6 168:1

**existed** 130:4

**existence** 124:24 171:12 172:15,16 173:11

**existing** 99:24 107:18

**exists** 47:4 102:2 109:16 168:5

**expand** 41:16 45:4 145:2

**expansive** 126:14,19

**expectation** 166:7

**expected** 18:15

**expediency** 161:5

**expedited** 186:12,19

**expensive** 131:1

**experience** 52:13 75:7 88:8 104:23

**experienced** 39:6

**experiences** 16:17,25 19:22

**expert** 24:8

**explain** 68:13 99:12 167:5

**explicit** 11:15 44:4,14,21 47:6 58:4, 25 59:12,15 60:1 62:13,16 85:16 86:18 87:3,23 89:9 90:2 92:23 93:12,15,17 94:21 95:2 107:23 122:21 123:13,17 124:11 127:11,17 141:24 153:8,12,13,17,25 154:2,3 177:5 178:16 183:12 184:9,17 185:4

**explicit/sexually** 123:1

**exploitation** 22:4

**exploring** 109:1

**exported** 131:7

**exposition** 53:23

**express** 180:25

**expressed** 42:24

**expression** 29:22 73:16 181:15,16, 20,25

**expressive** 27:23 28:15 83:4,13

**extant** 40:15

**extensively** 17:3

**extent** 18:16 21:16 40:14 58:1 128:20 130:4 148:6 151:19 182:21

**extra** 7:4 84:7 116:9

**extrapolate** 143:25

**extrapolating** 96:25

**face** 63:17 160:21

**fact** 47:4 54:7,8 95:21 96:25 97:19 98:21 99:22,25 162:21 163:7 172:15 177:2

**fact-checking** 51:5

**factor** 141:2

**factored** 141:4

**factors** 117:22 120:19 131:17 139:3 141:18

**facts** 22:5 107:14

**factual** 53:22 108:7

**fails** 102:7

**fair** 7:20 8:1 109:4 173:21

**Fairfax** 168:25

**fairly** 79:9

**faith** 57:2 162:17,22

**fall** 35:16,18,21 46:13 47:3 50:20 89:9 95:3 129:6 131:10 149:18 161:7,8,10

**fallacy** 117:15

**falling** 54:4

**falls** 147:24

**false** 39:22 72:22 73:1,4,23 74:8

**familiar** 67:21 68:23 135:13,14 138:3

**familiarity** 149:24

**fans** 14:3 29:18

**favor** 71:11

**favorite** 14:4

**fear** 55:22 153:2

**fears** 64:13 91:11

**federal** 98:18 186:21

**feel** 90:14 95:25 102:16 114:15 152:23 176:22,25

**feeling** 153:1

**female** 53:24



Jeffrey Trexler

September 24, 2024
Index: fence..German

fence 180:4

Festivals 146:9

fiction 65:10

field 126:12

fight 125:19

figure 29:6 134:11

figures 63:3

file 73:8

files 20:14

filled 95:17 167:7

film 65:8

final 163:10

financial 36:9 39:16,25 40:7 129:16 154:15,23,24

financially 39:9

find 75:24 83:6 92:25 96:25 123:3, 19,21 124:18,20 154:11 162:14 179:12 181:6 184:7,22

fine 8:2 9:20 18:1 53:20 111:8

finish 7:13,15,25 81:24

finished 58:9

fired 16:23

firmly 127:5

fit 69:23

fitting 118:21

flagged 134:10

Flakes 84:6,15

Flamer 169:22

flaws 96:8

flea 175:9

flood 94:18

focused 90:18,24

focusing 57:22 58:3

fodder 154:5

folks 138:15 162:25

follow 69:1 72:23 97:3 112:3 128:15 130:1 183:6

Folman 132:14

forbidden 156:24

forced 126:6

forcing 92:25

forgiven 51:22

forgot 102:13

form 17:13 19:6 22:21 24:17 25:7, 10,15 26:10,13,22 27:4 28:2,16 41:10 72:25 75:14 76:2 78:9 79:2 87:4 89:11 100:8 122:24 124:1,14 125:24 127:20 128:22 130:6 133:17 156:11 172:13 180:21 185:9,18

formal 31:3,10 40:23

formally 168:19

forms 11:14

fortunate 166:21

forward 9:18 16:24

forward-looking 86:3

found 91:4 111:15 183:24

founded 12:8,9 69:17 139:24 164:22

fourth 119:21 120:14

framed 97:20

framework 127:3

Frank 133:4 143:10

Frank's 132:13 133:12

frankly 62:12

free 29:22 181:15,16,20,25

free-express 180:22

freely 85:9 86:1,12 87:25 88:19

freight 178:25

friend 106:18

front 14:20 110:23 160:21 176:2,3

Fruit 132:25 133:3,5

fulfill 162:3

full 6:10 15:24 21:21 69:7 169:18

full-time 92:15 147:20

fully 36:13 93:14

function 159:6

fund 5:4,19 9:9,13,17 10:14,20 12:4, 9,13 13:11,17,22,23 14:8,18 16:2 29:13 30:16 31:3 68:21 69:17 71:22 72:19 87:1 101:7 137:20 158:19 162:11 163:6 171:22 172:12 174:12, 16

Fund's 10:4,11,18 67:11

fundamentally 166:13

funded 14:7

fundraising 168:10 175:16

funny 110:7

future 86:13 87:1 88:6 89:6,8 91:7 116:6 119:11 120:11 121:17 124:16 166:9

G

Gable 156:16

gained 161:12

games 104:7 107:19 108:9

Garcia 165:3

garden 62:17 123:12

gave 118:2 128:7

gay 125:13

Gear 116:23

gender 73:15 102:10 169:17,20

gender-appropriate 151:13

genders 182:12

general 17:17,22 38:14 78:18 117:18

generalize 25:5

generally 118:4

generation 51:25

genitals 53:23

genre 147:2 148:12,14,22,24 149:15 150:3 166:23

genres 148:19 149:8

Gentlemen 135:20

German 51:20



**get all** 167:12,13,14

**Gill** 133:2

**give** 26:2 54:1 74:8 96:24 99:12
114:9 150:12 152:9

**giving** 55:25 56:9 73:24 74:7

**glad** 82:8 134:10

**gladly** 33:8

**Glory** 106:19

**goal** 74:14

**God** 140:10 176:25

**Gomez** 106:21

**good** 7:2 56:24 57:1 60:22,23,24
84:16 98:5 103:3 105:2 106:4
136:19 138:18 139:18 143:14 144:5

**Google** 108:18 109:9 111:12,13
139:22 184:7,14

**gosh** 148:4

**govern** 171:14

**government** 65:19 75:24 96:20
97:24

**Governor** 170:1

**grad** 152:11

**grade** 119:20 120:19 121:13 132:21
133:4,6,11,15,24 140:24

**Grades** 120:14

**graduate** 95:8

**grant** 163:9

**grants** 14:10

**granular** 149:5,7

**graphic** 50:22 51:7,24 82:17 103:1
104:19 105:10 116:22 132:14
133:12 143:14 145:2,12 146:1
158:20,21,24 159:1,2,4,20,25
166:22 167:1,3,4,6,20,21,24 169:8,
15 170:13 175:1 176:15 177:18
181:22 184:13,15

**grassroots** 164:5

**great** 26:8 30:10 49:21 116:22
123:8,10 135:16 168:2 178:9 185:1

**greater** 22:2 155:25

**Greek** 22:25 95:8 152:11

**ground** 97:12

**grounds** 153:17,18

**group** 107:24 136:20,21 137:4
139:13 164:23

**groups** 137:3

**guarantee** 90:9,11

**gubernatorial** 168:24

**guess** 120:10 177:5 184:5

**guessing** 120:12

**guidance** 54:17,21

**guide** 67:11 69:16 71:23 72:1,20
137:19,24

**guidelines** 171:13

**guides** 120:6 121:13 134:23 150:12

**Guild** 43:16

**guilty** 22:1

**H**

**H-** 130:13

**Hamilton** 119:13

**hand** 49:6 149:6,7

**handbooks** 75:1

**handle** 28:19 31:20

**handled** 38:25

**Handley** 20:14 21:25 22:6 23:24

**hands** 42:6,21 55:4

**happen** 44:25 76:9 95:7 144:7

**happened** 44:22 125:5 143:15
168:1

**happening** 87:6 103:24 151:10,11
157:16

**harassed** 110:12

**harassment** 15:19 16:18 17:10
19:4 20:5

**hard** 64:15,23 78:21 130:12 153:10
172:9

**harm** 61:22 124:21 129:16 162:16
172:7 175:22 178:3 179:15

**harmed** 170:25 171:10,21 172:12

**harmful** 50:23 73:18 140:5 155:18
162:17 183:14 184:16

**harmful-material** 183:14

**harms** 160:9,11

**Haynes** 5:18 9:3

**HB** 11:12 34:14,15,16,22 35:24
38:19 39:9,23 40:7,16,22 41:5,9
44:24 45:2,12,16,18 46:4,6,10,11,18
47:3,4,22 48:18,23 49:3 56:14
57:20,24,25 58:1,11,13 62:7 69:1
71:13,21 74:7 75:2,5 76:7 77:17
82:10,12 83:2,3 85:16 87:3 88:8,17,
25 89:10 91:4 97:20 99:22 104:21
117:14 122:18 126:18 130:11,13
134:4 151:10 159:19 160:9 161:12
162:8,23 165:8,25 171:1,6,15,21
172:5,11 173:22 174:2

**HBO** 70:22

**head** 7:2 179:23

**header** 136:14

**heading** 147:21,25 148:7,19

**Headings** 147:9,14

**Headlines** 147:2

**health** 61:23

**hear** 65:3

**heard** 48:13 91:11 92:9

**hearings** 65:11 168:3

**heart** 161:17

**hearts** 105:4

**heat** 168:16,17 170:12

**heavily** 65:7,8

**Hebrew** 95:7

**helpful** 82:6,9,15,18 135:15

**helping** 168:12

**helps** 7:11

**hey** 27:11 111:5 142:16 169:7

**high** 54:12 133:3

**higher** 162:3

**highlight** 53:13



Jeffrey Trexler

**highly** 84:14

**Hill** 138:1

**hire** 37:6

**historians** 62:22

**historic** 156:11

**historical** 157:10

**historically** 14:10

**history** 19:5 43:1,6 45:20 75:9 90:25 105:13 123:16 125:8 133:2 152:12 161:25 167:25

**hit** 163:10 168:20

**hold** 81:23 155:8,9 186:7,10

**holding** 42:6,21 55:4 170:10

**holistic** 134:4,5

**Hollywood** 15:17

**Holocaust** 52:2

**honestly** 65:13 109:25 113:2 120:1, 21 132:5 134:6 179:15

**honoring** 164:14 178:18

**hope** 31:6 73:1,4,23 74:8 108:20

**hopes** 72:22

**horror** 65:4,9

**hot** 170:11

**hour** 76:12 97:22

**House** 11:14 34:9 35:5 164:23

**households** 70:22,23,24

**Hulu** 70:24

**humor** 66:6

**humorous** 156:13 157:1

**hundred** 163:13

**hypothetical** 26:7 121:6 122:18 126:16,21 128:10 130:8

---

**I**

**idea** 123:21 133:18 138:18 139:18

**identified** 14:17

**identity** 73:15 156:13

**ideological** 178:12

**idiosyncratic** 142:1

**ignore** 179:1

**II** 133:1

**illustrations** 132:15

**image** 27:20 47:8 52:3,15 54:5 55:9, 11 58:17 60:20 61:18,20 62:15 93:16 118:7 133:25 140:23 155:22, 23 167:15 169:14

**images** 24:19,20 60:17 123:10 169:8,19,21,22,23 181:21

**imagine** 124:25 177:21

**immaterial** 57:2

**immoral** 153:20 180:1

**immunity** 156:4 157:14

**IMO** 108:20

**impact** 38:23 39:25 40:7,18 82:10, 17 85:21 86:7,20 87:10 88:21 89:19 90:6 96:10 152:8,15 153:13 154:15, 23,24

**impacted** 39:2 174:17

**impacting** 153:22

**impedes** 87:10

**implement** 68:22 71:23 72:21

**implemented** 94:11 108:12 171:1,6

**implications** 131:13

**implicitly** 54:13

**implied** 66:12

**imply** 182:2

**important** 7:4 29:20 97:10 136:25 157:25 182:23

**imported** 131:7

**impose** 118:17 128:19

**imposed** 89:1 174:24

**imposing** 97:24

**imposition** 45:20

**imprints** 107:24

**in-house** 119:24

**inaccessible** 70:20

**inaccurate** 105:8 173:3

**inappropriate** 74:9 97:23 118:17 123:4

**incapable** 61:5,6

**incidental** 93:6

**incidentally** 184:8

**incidents** 20:6

**include** 42:21 108:9 114:16 125:1 158:17 164:3

**included** 161:14

**includes** 29:17 73:15

**including** 44:23 47:20 61:1 87:15 88:25 129:16 153:22 161:25 177:25

**inclusion** 101:18 154:5

**inconsistency** 134:12

**inconsistent** 25:25 134:15 181:15

**inconsistently** 66:11 68:20

**incontrovertibly** 127:6

**incorrect** 47:22,25 61:19 77:8 105:16

**incorrectly** 63:10

**increase** 108:10

**increasing** 168:17

**incredibly** 93:4

**incurred** 41:2

**indecent** 65:17 153:20

**indefensible** 117:20

**independent** 37:2 38:1 101:23

**Indicating** 68:17

**indication** 101:20

**indirect** 36:10 37:17

**individual** 32:7 36:21 115:13 158:6 170:9 179:18

**individuals** 31:17

**industry** 16:19 17:11 19:24 27:5 39:4 124:21

**infirmities** 96:9 97:1

**influence** 98:8 164:9 179:5,25 180:13



Jeffrey Trexler

**influenced** 65:7,8 179:5

**influencing** 164:1

**influx** 140:12

**information** 32:22 100:5,13,14 115:12 116:8,12,13 121:15 122:5 145:9,10 174:9

**informative** 108:7

**informed** 68:7

**informs** 145:25

**infrastructure** 98:21

**inherently** 73:17

**initial** 16:20

**initiatives** 29:21

**injured** 39:9

**injury** 39:11,16

**innuendo** 95:17

**insistence** 114:7

**instance** 51:24 98:1 120:11

**instances** 24:20 177:24

**institution** 94:24,25

**integral** 155:25

**intellectual** 90:24

**intend** 9:7 89:7 185:17

**intended** 107:25 110:15 137:5,7

**intent** 9:24 10:12,19 74:19,20 101:17 129:12

**intention** 105:3

**interact** 39:14

**interaction** 146:5

**intercourse** 22:16,19 42:9 53:22

**interest** 14:6

**interested** 14:1 40:11 139:11 145:12 162:20

**interesting** 20:4 54:6 134:16,18 162:14,19

**interests** 69:3,7

**interim** 14:17,24,25 15:6,9 16:3 21:9 160:14

**internal** 107:20 121:19 165:7

**internally** 136:23

**Internet** 93:21

**interpret** 54:16 56:1 63:8,9,10 73:20

**interpretation** 58:24 73:20 77:15, 16

**interpretations** 57:13

**interpreting** 94:2

**intersection** 134:2

**interstate** 97:23

**introduced** 94:3

**introducing** 19:16

**introduction** 145:1

**Introduction'** 137:25

**introductory** 6:16

**investigated** 17:3

**invoice** 142:16

**invoiced** 175:12,25 176:4,6

**involve** 140:24

**involved** 23:21 24:18 25:1 62:4 108:11 135:4,6,8 168:22 169:2

**involvement** 21:17

**involving** 20:6

**Iowa** 151:11 157:23

**ironclad** 26:5 27:19

**irregardless** 61:14

**ISD** 82:7 159:19

**issue** 23:18 123:24 166:25 170:1,3,6 172:17 173:11,12 184:4

**issued** 171:20 172:5

**issues** 13:25 37:13 164:24

**item** 139:22 145:14

**items** 30:19 32:10 101:16 145:14,15

---

## J

**J-E-F-F-R-E-Y** 6:11

**jail** 125:14 126:7 140:5 157:6

**James** 95:14

**January** 183:9

**Japan** 156:22

**Jeff** 5:2,19 6:11 10:25 16:3 48:14 83:23 143:25 144:18

**JEFFREY** 5:24

**Jeremy** 33:22 35:11 43:13 50:9 135:24 146:22 183:6

**job** 7:2 102:14 181:17 182:25

**Joel** 133:2

**John** 5:11

**joined** 16:14,16

**Journal** 17:3

**judge** 18:25

**judging** 36:12 133:25

**judgment** 122:17

**Juliet** 143:24

**July** 14:16 34:2

**jump** 48:12 151:7

**June** 16:6

**junk** 184:5

**jurisdiction** 73:17 80:7,8

**justifiably** 72:16

**justification** 63:5

**justify** 70:5

---

### K

**Katy** 82:7,11 88:22 159:19 168:22

**key** 158:25

**kid** 177:16

**kids** 54:13 70:19,20 131:22 132:1 137:25 138:8,11,16,17,22 139:18 140:4,11,13,14 159:6

**kids'** 139:2,8,13

**killer** 98:15

**kind** 39:3 45:4,24 73:25 83:12 88:2 106:5 108:18,19 112:11 121:16 125:2,10 129:2 131:3 132:4 134:3 143:17 144:2 151:12 158:18 178:4



**kindergarten** 145:21

**kinds** 146:16

**King** 65:6 95:13

**kiss** 42:6 48:4

**kissing** 42:21 55:4 141:14

**knock** 66:12

**knocked** 66:15

**knocks** 141:14

**knowledge** 17:18,25 18:6,14,17 19:3,13,18,21,22 20:3,9 32:21 33:3, 6,9 40:12 95:5 101:18 148:6 166:2 174:9 180:16

**Kris** 16:24

---

**L**

**L-E-R** 6:12

**lack** 17:6 150:9

**lacks** 18:17

**Lambert** 5:17 17:13,20 18:1,19 19:6,9,11 20:19 22:21 24:17 25:10, 15 26:13,22 27:4 28:2,16 41:10 48:14 72:25 75:14 76:2 78:9 79:2 83:23 84:8,12 87:4 89:11 100:8 111:5 122:24 124:1,14 125:24 127:20 128:22 130:6 133:17 172:13 180:21 185:9,18 186:1,11,14,18,24

**land** 66:8

**landlord** 153:17

**landscape** 62:25

**language** 45:11 51:21 52:23,24 59:5,6 63:11,15 94:6 95:11,22,23 99:16 131:21 164:16,17

**lapse** 155:17

**large** 146:4 151:25 173:22

**largely** 13:9 131:19 146:4

**laugh** 65:13 73:1 121:7

**law** 35:14 42:10,11 56:1 57:3 65:20 69:8,24 71:14,15 73:2,4,20,21 74:1, 10 76:8,22 77:10 78:19 85:21 91:12 94:2,3,17 95:1,6 99:23 100:16 124:2,6 125:5,13 126:1,8 127:5,6,7 128:15 129:14,16,20 130:1,3,15

132:4 149:25 151:1,11,13 154:8,9, 24,25 155:16,19,21 161:18,20 178:12,25

**laws** 55:8 65:18 151:15,17,21 152:4 155:6,13,16 156:3 179:3

**lawsuit** 11:14 83:17

**lawyer** 37:6 61:25 63:3 132:5,7 161:17 163:25 169:19

**lawyers** 103:6 130:24

**LC** 147:8,14 148:12,14

**LDF** 9:17 12:3,8,12 13:10,15 14:7 27:1 28:14 30:3 31:10 32:8 33:4 36:5 38:17 39:8 40:6,20 41:4,8 78:24 82:22 85:15 86:14 87:21 89:7 91:6 100:5,19 102:20 106:25 109:1 119:23 121:10 122:22 126:22 136:23 142:10,12,23 145:5,24 148:8 150:2 151:19 158:6 160:8 161:11 163:19 165:8,25 166:6 171:11 172:12 180:19 181:12 183:18 185:14

**LDF's** 10:8 33:10 35:21 78:7 101:12

**lead** 38:9 58:17

**leads** 57:6

**leaked** 116:12

**Leander** 169:2

**leaps** 98:3

**lease** 38:5 153:18

**leases** 38:3,4 154:13

**leave** 181:17 185:24

**led** 29:20 55:18 61:3

**leeway** 60:19

**left** 20:21 126:12

**legacy** 121:15

**legal** 5:4,12,19 9:9,13,17 10:4,11,13, 18,20 12:4,6,9,13 13:11,17,21,23,24 14:8,18 16:2 29:13,14 30:15 31:2 56:1 67:10 68:21 69:16,25 70:5 71:22 72:18 74:13 76:17 78:5,6 87:1 91:5 101:7 131:24 132:1 137:19 139:14 153:25 158:19 162:10,15 163:5,22 164:24 165:6 171:21 172:12 174:7,12,15 183:25

**legally** 78:8 79:1 82:23

**legislation** 11:13 41:14 43:2 45:18, 19,24 103:11 151:18 164:1,9,20

**legislative** 164:7

**legislators** 179:18

**legislature** 11:17 164:3,6 165:25

**legislatures** 98:16 164:23 165:11

**legitimate** 162:23

**length** 118:9

**letters** 114:13

**level** 117:22,23 121:25 126:5 131:21,22 140:24 172:8

**levels** 39:11

**lewd** 53:23 54:13,14,18 56:6,11 60:10 61:7,21

**liability** 74:13

**liberal** 77:3

**librarian** 126:24 129:2 137:6 146:11,13 148:4 156:6 157:6,11

**librarians** 29:18 30:17 45:17 98:8 145:2,11,17,19,23,25 146:6,14,15, 16 150:12,15,23,24 156:4

**libraries** 11:22 22:10,20 23:19 24:16 25:9,14 97:5 123:17 142:23 145:7 151:16 175:11 176:10 177:19 182:6,19

**library** 24:23 25:17,19,22 26:12 30:4 32:13 35:19 56:18 64:25 87:17 95:5 120:6 127:2 143:23 144:1,5 145:21 147:18,21 148:16 149:4,9,12,21,22 150:10 153:15 156:6 157:5 158:21, 23 159:5,9,16 165:2 166:8 167:14, 15 176:5,22 177:9,10,11,22 178:1 182:20,21 183:1

**library's** 25:23

**life** 8:10 62:3 179:7 181:19

**Lifelong** 177:15

**light** 50:20,22 88:17

**likelihood** 90:12

**likes** 167:10

**likewise** 122:22



**MAGNA**
**LEGAL SERVICES**

**limit** 37:14 85:8,25 86:11 87:24
95:19 97:22,25

**limitations** 32:21 152:16

**limited** 18:23 175:12

**limiting** 18:5

**linked** 94:14

**list** 137:8 159:21

**listed** 18:11,14 44:2 137:5

**lists** 106:23 114:14

**literacy** 29:21 158:25

**literally** 25:3 32:21 55:17 85:19
110:6 115:16 121:20 134:12

**literary** 44:1 61:14 63:4 65:5 66:24
69:5,21 144:6 155:18 156:1

**literature** 26:3 62:22 65:6,9 66:13
75:22 123:9

**litigation** 49:1 151:8,10

**little-little** 177:16

**live** 8:10 76:9 93:23,24 116:11 170:5

**lived** 177:13

**livelihood** 153:2

**living** 62:25 89:6 93:13,15,18

**lobby** 164:8

**lobbying** 163:19,20,25 165:4,8

**local** 13:9 38:2 61:13 72:5 164:6
170:2 175:8 180:7

**localities** 154:17

**locals** 159:22

**located** 29:24 101:17

**log** 185:14

**logic** 97:3

**logical** 98:3 117:15

**logo** 137:17,18 144:25

**long** 7:24 8:25 14:25 26:20 45:20
66:13 75:9 107:5 129:18 138:21
160:2 167:25

**longer** 107:5 126:8 163:22

**looked** 8:14 32:12 112:10,17 121:22
142:18,22

**looms** 151:25 173:22

**loons** 93:21

**loop** 17:18

**lose** 154:12

**losing** 128:3

**lost** 37:10 38:7 163:14

**lot** 8:14 22:14 32:3 37:9,11,22 38:13,
14,21,23 40:19 46:22,24 48:7 49:1
60:19 64:23 65:7,9 70:16 74:4 96:5,
11 100:11,12 103:24 113:10 118:21,
22 120:12,15 130:13 135:17 139:9
140:24,25 141:17,21 142:3 143:14
145:15,23 149:11 150:25 152:14
168:15 174:25 175:1 178:24 180:6
184:2

**lots** 57:14 64:14 71:3 72:13 76:16,20
85:20 119:4 139:3 141:2 182:20,22

**Louvre** 23:6

**love** 30:18,19 70:12 87:16 89:22,23,
24

**lowest** 161:24

## M

**machine** 183:1

**MAD** 66:5

**made** 39:22,23 48:16 61:20 70:14
88:22 108:19 118:5 120:9 125:25
129:18

**magazine** 66:4,5

**Magna** 5:11

**mailing** 114:13

**main** 6:17 10:24

**maintain** 100:6,19

**maintained** 145:19

**major** 22:24 145:22

**majority** 124:20

**make** 7:9,16 11:18 18:10 42:11
56:17,20 57:6 59:3 71:7,17,25 88:23
92:14,17 98:3,22 111:6 122:16
124:22 128:2 129:8 130:25 132:2
139:1 140:9 141:12,17 158:8 167:18
174:22 175:17,20 179:7 181:9,11

**makes** 7:10 11:19 57:5 172:24
176:1 181:13

**making** 18:19 43:3 46:24 56:9 59:6
63:5 78:11 94:8 98:3 114:5 138:16
139:16 141:19 154:8 164:8 172:25
182:16

**male** 16:18 17:11 19:4

**malevolence** 161:5

**man** 162:2

**manage** 67:17 140:9

**managed** 127:24

**management** 69:14 71:10 129:8
141:8 142:3 161:20 166:14,16

**manager** 12:18 17:1

**managing** 98:25 169:6

**mandatory** 8:3 125:7,10

**manga** 24:1,2,4,15 167:13

**Manhattan** 76:12

**manual** 68:10 74:23

**manuals** 75:8,10

**map** 78:20 168:17

**maps** 170:12

**Maren** 101:8 102:3,11,16,18 107:7
108:16,17 109:9

**mark** 11:8 15:13 28:23 53:9 113:20
136:2

**marked** 11:10 15:14 20:11 28:22
53:16 67:8 85:16 87:2,22 136:4
170:23

**marker-driven** 149:13

**market** 36:14 37:20 39:2 72:6 89:12,
16,17 90:16 118:20 139:6,14 140:19
141:12 152:8,22 174:20,25 175:1
179:1,8

**marketed** 27:6

**Marketing** 137:25

**marketplace** 36:17 38:25 66:3
89:15,16 128:4 142:2 175:10 181:2

**marketplaces** 37:15

**markets** 27:7 36:23 87:15 175:9
182:15,16



Jeffrey Trexler

September 24, 2024
Index: Marshall..move

**Marshall** 119:1

**Martha** 119:13

**Marvel** 107:25 167:15

**mass** 125:10 142:2

**masturbating** 62:19

**material** 8:14 22:15 24:18 25:1,2, 18,23 26:16,17,20,25 32:6 33:8 35:18 36:21 37:21 40:2 52:5,16 54:22 57:4 59:12,15 62:24 68:6 72:2 73:10 74:14 78:8 83:4 90:5 92:19 94:11 101:16 135:17 142:24 145:16, 25 150:19 153:11,12,20,25 154:2 155:17 160:19 180:6 183:14 184:20

**materials** 23:24 30:4 41:8 83:13 96:2 145:5 166:8

**matter** 5:4 9:4 71:9,10 99:21 104:16 164:21 167:15 185:15

**matters** 13:7 43:2

**mature** 108:1

**maturity** 118:13,14

**Maus** 51:17,18,19,23 52:14 54:2 59:25 143:11 169:22

**Max** 107:25

**Maya's** 169:18

**mayors** 98:11

**Mcluhan** 119:1

**means** 48:8 53:14 59:15 63:16 108:9 117:18 139:19 149:13 151:21 167:4

**media** 5:2 67:17 68:13 101:4,22,23 102:1,19,21 119:2 138:22 144:18

**mediating** 157:2

**medical** 7:24

**medium** 148:20 156:11 166:23,24 167:21

**meet** 8:21,25 102:13

**meetings** 68:11 74:24 75:8,10 169:5 170:8

**member** 13:14 27:1 28:8,21 35:21 38:17 40:20 175:19 176:15

**members** 13:11,19,22 14:7 28:5 29:24 30:7 33:10 36:5 39:12 85:15

86:14 87:1,21 89:7,12 90:8 91:6 100:6,20 140:17 142:11,13 148:7 150:1 151:19 160:10 161:8 172:8 174:16

**members'** 166:7

**membership** 13:10,20 14:9 29:17

**memberships** 39:25

**memo** 73:8

**Memorial** 147:18

**memories** 21:18

**memorize** 160:3

**memory** 14:21 35:10 82:8 102:7 116:1 136:19 145:13 147:24 157:24 172:18 173:7

**men** 23:7 118:25

**mental** 61:23

**mention** 35:15 95:17

**mentioned** 20:7 40:1 104:10 111:19 113:5 138:12 143:10 155:2 185:10

**mentions** 185:4

**merchandise** 138:20

**mere** 173:10

**merit** 44:1

**meritorious** 50:25

**Merry** 143:24

**message** 142:9

**Methodist** 76:22

**Michael** 5:17 8:23,25 48:11 83:21 171:24

**Michelangelo** 123:13

**mid-1980s** 12:10

**mid-to-late** 170:14

**middle** 7:25 133:4

**midnight** 76:11

**Mike** 8:24

**miles** 97:22

**Miller** 68:23 70:1,4 71:12 72:8,9 73:5,7

**mind** 29:6 51:11 60:24 61:5,6 82:7,

14,19 134:24 158:2 159:25 167:10 179:18 180:11

**minds** 167:9

**mine** 66:9 77:15

**minimizing** 132:3

**minor** 22:7

**minors** 22:4,7 50:24 51:1 73:18 140:5 155:18

**minute** 42:10

**minutes** 68:20

**misapplied** 71:16

**mischaracterizations** 50:22 51:3, 6

**mischaracterize** 55:15

**misinterpret** 57:6,7

**misread** 55:22

**missed** 177:2,3

**mission** 25:23 162:3

**Missouri** 153:24 154:1,6,10 155:2, 21

**mistake** 126:5

**mistakenly** 154:18

**misunderstanding** 38:8 77:5,6 161:4

**Mitch** 119:13

**modern** 117:16

**money** 37:10 92:14 128:3 174:22

**monitor** 28:20 30:21 175:17

**monitoring** 175:5

**moral** 153:21

**morality** 70:12,18 181:4

**morally** 180:19 182:8

**Morath's** 10:5,12,19 170:17

**Morning** 6:3

**mother** 54:3

**Motion** 103:14,19 104:2,8

**mouse** 93:16,17

**move** 6:16 18:18 20:9 100:4 103:7



**movement** 161:6 180:12,13

**movie** 156:14

**movies** 66:16 101:24 102:21 103:21 104:6 107:19 108:9

**MPA** 108:19

**MPAA** 103:4,8,10,14,19 104:1,5,6

**multicolored** 64:25

**multilayered** 58:20

**multiple** 24:22 36:17 98:7 159:25

**multitudes** 57:11

**Munera** 5:16

**music** 101:24

**muster** 125:4 126:4

**N**

**named** 47:1

**names** 104:12,17 109:24 110:18 165:14

**Narratives** 133:1

**narrow** 94:1 95:4 179:13

**narrowly** 61:16

**nasty** 114:10

**national** 179:4 180:8,11

**nationally** 180:9

**nationwide** 48:20 87:15 89:20 170:5 173:22

**nature** 25:16,17,23 36:14 38:8 46:8 62:14 74:3 99:12,13 128:11 181:18, 19,24

**Neal** 138:1 139:16

**necessarily** 140:22 181:24

**needed** 162:1 184:3

**nervous** 138:22

**Netflix** 70:23

**news** 184:6

**newspapers** 185:3

**next-to-last** 68:1

**Nextdoor** 139:22 154:19

**Noble** 182:9

**nobody's** 180:15

**nodding** 7:2

**noise** 53:23

**non-paid** 12:19

**non-texas** 174:13

**nondisclosure** 17:2

**nonmainstream** 156:19

**nonprofit** 12:5 15:11,16,18 29:13 101:23 161:17,20,21,25 163:25

**nonsexual** 117:10

**Noodleheads** 119:11,16 120:11,16, 18 121:6 132:1

**normalize** 156:24

**North** 151:12,13

**noted** 74:17

**notes** 9:6 160:1 172:21

**notice** 9:24 10:12,19 18:8 101:11 116:2 117:8 167:23 184:19

**noticed** 20:18

**notices** 29:5 184:6

**notifications** 184:14

**notion** 71:5 181:14

**novels** 50:23 51:7 66:14 82:17 103:1 104:19 105:10 116:22 143:14 145:2,12 146:1 158:21,24 159:1,2,5, 20,25 166:22 167:1,3,4,20,21,24 170:13 177:19 181:22

**November** 106:17

**nude** 52:3,15 54:3,8 59:25

**nudity** 61:5,6,8,10,21 71:6

**number** 12:23 17:21 30:17 36:25 38:10 39:1 40:19 44:23 48:23 57:12 63:12,13 65:18 66:14 71:16 89:21 95:13 98:22 102:22 117:6,21 136:21 141:9 143:11 144:7 153:18,24 159:17,20 162:7 170:12 175:7 177:20,21 179:22 183:24 184:1,15 185:11

**numbers** 38:21 40:17 90:21 100:20 147:22

**nutritious** 84:7

**O**

**oath** 6:19 35:3

**object** 26:19

**objected** 183:21

**objecting** 19:1

**objection** 10:25 17:13 19:6 22:21 24:17 25:10,15 26:13,22 27:4 28:2, 16 41:10 72:25 75:14 76:2 78:9 79:2 87:4 89:11 100:8 122:24 124:1,14 125:24 127:20 128:22 130:6 133:17 171:23 172:1,13 180:21 183:22 185:9,18

**objections** 9:23 10:5,12,18 18:10, 20 19:7 26:15 28:12 54:6 105:8 170:17

**objects** 171:5 174:6,7

**obligation** 6:22

**obscene** 50:23 73:10 78:8 79:1 82:23 160:19 183:14 184:16

**obscenity** 69:8,13,24 71:14,15 72:16 76:3

**observation** 99:13

**obvious** 44:1

**occasionally** 146:2

**OCLC** 32:11

**October** 112:17

**offended** 64:21,22 65:21

**offensive** 41:25 42:1 59:19 60:7,13 61:13 63:15,17 64:9,21 66:17,22,23 69:2

**offering** 72:22 73:4 149:2

**office** 37:25

**officers** 57:3

**older** 134:23

**onboard** 74:18 102:12 158:9

**one's** 134:3 181:2

**oneself** 180:25 181:1

**ongoing** 82:13



Jeffrey Trexler

**online** 30:16,20,22 66:20 122:13 146:1,3 150:12,13 160:21 172:21

**open** 11:22 67:2 116:7 185:24

**open-enrollment** 174:5

**operations** 12:18

**opine** 25:2,4 74:18

**opinion** 52:17 62:6 182:2,23

**opinions** 131:16 132:8

**opportunity** 13:18

**oppose** 162:23

**opposed** 61:9 152:17 163:16 165:13,15 180:20

**opposing** 162:18 164:4

**opposition** 162:7,8

**option** 93:8

**oral** 9:24 10:13,19 123:15

**oranges** 69:10 117:13

**order** 23:8 40:24 41:1 143:17

**ordering** 64:19

**orders** 31:4,25 32:4 152:15

**organization** 12:5 13:6,10,19 17:18 21:2 29:14 135:18 161:23 162:1 163:17 168:10 180:22,24

**organization's** 163:25

**organizations** 102:22,25 104:13

**original** 95:12 107:12

**originally** 28:6

**Outreau** 156:23

**overbroad** 47:24 63:11 87:11 95:24 153:9

**overlay** 98:18

**oversight** 17:6

**overturned** 69:19

**owned** 113:22

**owns** 115:23 116:2

P

**p.m.** 144:14,15,16,19

**packets** 150:14,16,17,23

**painting** 62:16

**paintings** 62:19

**panel** 93:1 94:21 118:8 135:13,14, 24 136:8 165:1

**panels** 146:2,3,5,8 150:13

**paragraph** 10:24 15:24 16:1,11 20:7 21:22 23:15 29:9 34:4,7 43:13, 22,25 44:9,12 45:5 46:12,16 50:6, 13,19 51:12,16,23 52:25 55:1 58:14 79:8,10,12 85:1,3,6,14,23 86:6,8,9, 10 90:17 123:9 138:8,11

**parameters** 95:4

**parental** 52:6

**parents** 98:12,13 138:11,18,21 139:17,20 140:16 141:12

**parlance** 19:24

**parse** 37:8 85:23

**part** 21:1,19 41:11,13 47:18 49:1 50:6,7,10 59:24 60:3,16 72:18 96:2 101:6,11,13,15 117:3,5 129:24,25 140:21 145:5 159:12 166:25 169:6 179:2

**partially** 52:3,15 59:25

**participated** 21:15 24:8 29:19

**participating** 7:6

**parties** 5:13 34:23 132:8 174:4

**parts** 50:13

**party** 96:13 97:7 119:25

**pass** 65:20 125:4 140:6 185:25

**passage** 62:23 82:10 171:20

**passages** 55:13

**passed** 11:16 65:18 126:3 151:15, 17 154:23,25 155:4,13 165:17,18 172:11

**passing** 155:6

**past** 31:25 48:21 56:13 82:16 86:7 88:8 142:7 143:1 158:5 173:8

**patently** 41:25 42:1 59:19 60:7,13 61:12 63:15 64:9 66:22 69:2

**path** 167:11

**pause** 49:14

**paused** 28:18

**pay** 98:14

**paying** 180:16

**PDF** 43:19

**peer** 69:3,7

**Penal** 53:4,7 59:18,20 63:16 64:3

**penalties** 155:3

**Pending** 185:23

**people** 5:5 12:13 13:5,6,8,18 14:4 38:23 39:6,13,17,20,23 42:5,19 43:3 44:19 45:23 47:14 48:16,19,20 54:4, 15 55:8,12,15 56:13,21 57:5,6 59:5, 7 60:25 61:9,24 62:2 63:9 64:22 65:7,23 70:11,17 72:15,21 73:12,22, 25 74:4,7 77:4 87:15,16 88:17,23 89:18,19,21 91:1,8,11,21 92:8,17, 18,22 93:14 94:3,16 95:21,22 96:1 98:12,17,19,22 102:13 104:20,21 105:5,7 109:24 110:7,11,18 114:10, 11 116:11 118:20 122:16 124:5,20 125:13,17 126:6 129:20 131:13 134:25 139:21 140:2,6,7 141:6,14 142:20 143:16 149:1 150:8,11 153:14 154:12,16,17 160:15,20 161:3,21 162:8,17,21,24 163:7,9,15 165:12,14,19 167:3 168:12,13 173:14 175:3,6,11,12 177:8,23 179:6,22,24 180:4,14 181:5,6,21 183:25

**people's** 30:21 114:12,16

**perceived** 60:21

**percent** 165:6 168:11

**percentage** 89:17 151:22

**perception** 37:21 181:3

**perfectly** 18:1

**perform** 183:18

**performed** 38:18 40:6 185:11

**performing** 58:19

**period** 125:6,11

**periodic** 68:11 74:24 75:10

**peripatetic** 147:18

**permission** 167:20



**permitted** 63:13

**person** 18:14,17 19:23 35:15 62:5 63:3 92:25 105:14 130:10 141:16 170:8

**person's** 64:21 102:10

**personal** 17:18,25 18:6 19:3,13,18, 21,22 20:3,8 60:16 75:7 110:17 129:5 139:6 174:9

**personally** 20:4 27:7 124:25 164:17 171:25

**perspective** 16:22 47:10 128:17 129:19 166:14,16 176:20

**perspectives** 182:18

**pertaining** 13:25

**pervasive** 91:18 92:10

**pervasively** 183:14 184:17

**pervasively-vulgar** 183:15

**Ph.d.** 90:24 152:12

**phenomenon** 180:7,8

**philosophical** 182:13,17

**philosophically** 182:7

**philosophy** 23:8

**phone** 29:3

**phones** 70:25

**photographic** 169:14

**phrase** 72:13 171:5 172:1

**phrased** 143:18

**phrases** 183:11,12

**Picasso** 62:18 123:19

**Picasso's** 62:18

**pick** 178:20

**picked** 176:7

**PICOT** 184:18

**picture** 22:12 55:10 103:14,19 104:2,8 119:18

**pictures** 105:12

**piece** 25:12 26:25 75:22

**pillar** 52:2

**Pillifant** 5:18

**place** 21:19 152:7 160:14

**plaintiff** 9:10 10:11 29:12 170:16,25

**Plaintiff's** 9:23 10:4,17

**plaintiffs** 174:3 186:2

**Plato** 23:7,10

**play** 131:23 141:1 162:11

**played** 126:20

**pled** 22:1

**plenty** 89:18 138:15 182:5,6

**point** 7:22 28:4,5 68:2 76:4,20 88:9 89:1 127:4,24 128:17 130:24 131:4 144:10 161:24 166:4 181:2 182:25

**points** 37:22 134:2 182:8

**poke** 108:20

**police** 175:16

**policies** 58:1 151:1

**policy** 68:3,7,9,12,22 71:24 72:23 73:3 74:22 98:19

**political** 61:605 66:24 69:6 118:12 155:19 156:1 161:5 166:13 170:3 179:7

**politically** 182:7

**politicians** 65:15

**politics** 179:2,22

**poll** 90:22

**Polonsky** 132:15

**poor** 7:6 180:15

**poorly** 105:23,24

**Popeye** 156:15

**popular** 156:14 164:21

**porn** 162:25

**pornographers** 154:18,19 160:15

**pornographic** 50:23 149:16,23,25 150:3 153:20 156:15

**pornography** 156:18 157:9 160:16, 17,18

**portion** 53:24 54:8 69:5

**portrayal** 61:8

**portrayed** 60:21

**portrays** 59:17

**posing** 162:17

**position** 14:23 15:8 26:19 78:5,7 147:6 163:10 178:12

**possessed** 22:6

**possibility** 88:24 89:13 176:24

**post** 164:12

**posted** 169:9

**posters** 181:22

**potential** 37:10 76:17

**power** 135:13,14,25 136:8 174:20 179:1

**Powerpoint** 159:2

**practice** 161:19

**pre-hb** 45:11

**precisely** 31:8

**predicated** 127:6

**preemptive** 58:2

**prefer** 116:12 120:7 122:15

**preference** 9:19

**preparation** 8:17 32:2

**prepared** 9:6 11:5 137:8

**preparing** 8:11

**prepped** 18:16

**prepubescent** 23:9

**preschool** 145:20

**prescribe** 28:20

**prescriptive** 78:12 97:8,11 98:2 99:19

**present** 5:13 20:5 86:7 88:7 183:10

**preserved** 171:23

**preserving** 183:21

**president** 65:16

**President's** 118:25

**Press** 184:11



**pressure** 175:2

**presume** 71:23 72:20

**presuming** 93:11,25

**pretty** 20:17 104:18 110:9 154:20

**previous** 15:7 61:2 84:3 113:6,15

**previously** 111:17 112:2

**primarily** 90:24

**primary** 74:12 148:2 149:24

**principal** 62:1 63:1 167:6

**principals** 93:22 98:9

**principle** 181:15

**prior** 44:24 52:13 58:11,13 75:1,5

**private** 110:15

**privilege** 114:7 184:2,3,21 185:14

**privileged** 185:2,12

**privy** 112:8

**probable** 176:5

**problem** 17:5 41:11 47:18,19,25 76:5 84:12 127:14 163:8 175:4

**problematic** 65:23

**problems** 178:23 183:24

**proceed** 50:4 84:24 130:3

**process** 24:11 31:10 131:2

**produce** 116:6 174:23 183:9 184:25

**produced** 113:1 116:15 184:10 185:14

**producing** 69:16

**production** 37:3 183:3,8

**professional** 16:24 92:4

**professionals** 16:19 17:11 19:4

**professions** 30:21

**professor** 76:22 161:19

**prohibit** 154:9

**project** 111:20 124:15

**projected** 47:20

**promote** 160:17,18

**promoting** 29:21 160:16

**prompted** 23:23

**pronounced** 51:17

**pronunciation** 23:25 24:3 51:18

**proper** 18:10

**properties** 156:14

**property** 98:14

**proposing** 155:2

**proposition** 117:19

**proprietary** 100:13

**proprietor** 139:7

**proscriptive** 99:18

**prosecuted** 21:25

**prosecution** 152:1 154:1 156:5

**prosecutors** 22:2

**prospect** 87:6,10 152:4

**protect** 22:1 23:8 74:12

**protected** 184:21

**protecting** 12:6 29:14 162:12 180:25 181:24

**protection** 116:9

**protects** 13:23

**proudly** 165:5

**provide** 7:1 13:22 26:6 70:5 72:4 150:14,16,17 153:17 154:5

**provided** 75:4 145:14 150:19

**providing** 153:19 154:2

**provision** 155:17

**provisions** 22:1

**psychiatry** 60:23

**psychologically** 61:19

**psychology** 60:22 61:2

**public** 11:21 30:12 64:18 66:3 68:13 96:14 97:5 98:6 99:1 125:22 126:22 146:5,14 153:19 156:6,12 164:11, 12,21 165:25 174:4 182:19,20 183:1

**publication** 112:14

**publicly** 21:4 39:19 110:14

**publish** 42:12 120:5 122:7

**published** 65:10 111:17 156:12

**publisher** 27:6,12,15,16 36:22 38:24 39:4 64:16 77:21 107:22 122:5,8,22 128:21 134:8 137:4,5,10, 11 140:25 175:14,24 176:1,22 177:6 178:4

**publisher's** 124:9 130:4,20,23 131:11 133:21 136:22 139:7

**publisher/distributor** 176:7 178:2

**publishers** 14:2 15:17 29:17 34:8 35:4 91:14 107:20 120:5,7,8 121:18, 23 122:9,11,15,19 127:21 128:17 160:24 175:3 178:20

**publishers'** 123:24 125:22

**publishes** 36:22

**publishing** 27:5

**pull** 29:7 53:4,7 77:12

**pulled** 20:24 115:21

**purchase** 30:19 31:4,25 32:4 150:15 166:7

**purchased** 85:10 86:2,12 88:1,20

**purchasing** 88:23

**pure** 65:9

**purely** 14:21 133:25

**purpose** 74:12 83:17 97:13,14 111:8 122:22 123:23 154:4

**purposes** 77:17

**Pursuant** 10:14,21

**put** 62:5 63:23 64:3 90:2 127:2 154:19 173:16 177:11

**putting** 93:5 111:16 129:4 142:8 172:6

## Q

**qualify** 42:7 52:5,15 55:5 58:23,24 59:3 101:6 145:18

**quality** 144:6

**quantify** 90:19

**quantifying** 40:4 91:23

**quantitative** 91:2 92:2



Jeffrey Trexler

**Quarterly** 15:16

**queer** 169:17,20

**question** 7:14,15,18 8:3 19:19
22:11,15 23:23 31:8 32:23 36:3,8,
11,12 42:1 46:9 49:13 60:8 76:6
78:15 79:9 82:19 85:22 86:5,23
97:11 98:24 99:5,14,16,17 100:2
103:24 104:1 113:20 126:14 127:17
129:12,24 130:14 132:17 135:22
143:18,22 155:10 171:17,25 172:9
183:2 185:5

**question's** 124:8

**questions** 7:25 18:6 19:1,7 78:21
138:19 146:17 150:25 186:1

**quickly** 20:17 48:13

---

**R**

**Rachael** 12:18

**raided** 178:6

**raiding** 152:4

**raising** 105:7

**ramifications** 153:14

**ran** 15:16

**range** 13:8 37:16,18 38:12 43:5 48:4
90:5 119:20 120:20 121:13,14
132:1,19,21 133:5,6,11,14,15,24
145:16

**rate** 36:4 40:21 56:5,19 57:17
102:21 105:21,23,24,25 176:18
178:14

**rated** 37:22 93:12 127:14,18 129:9
130:18 131:16 178:7

**rates** 101:23 102:19 175:24

**rating** 56:15 61:4 62:7 88:25 93:5
102:23 103:8 104:11 107:16,18,20,
23 108:8 109:1 111:18 112:5,21
122:19,20 123:3 124:5,9,10 125:9,
16 127:19 130:2,4,5,19,20,21,24
131:11 136:10,23 141:7 174:13
177:1,2,3

**ratings** 45:20,24 57:23 62:4 103:7,
10 104:6,9 107:13 108:8 112:6,20,
25 122:5,22 123:24 124:10,12
125:1,22 128:5,21 131:5 142:1
174:3

**rational** 45:15

**rationale** 93:25

**rationales** 45:16

**Ray** 65:10

**re-characterize** 47:5

**re-decisions** 88:24

**reach** 105:15

**reached** 33:7 165:19

**reacted** 45:17

**reactions** 58:13

**read** 10:15,17,25 11:3 15:21 16:2,9,
15 17:7,9 20:25 22:1 29:12,16,24
30:1 33:21 34:7,11 35:3 43:25 44:6
46:13 50:20 51:2,23 52:7 53:18,20,
21 54:22 57:5,8,25 58:16 59:15,16,
22 67:16,19 68:2,5,15 74:22 85:7,
12,18,19,24 88:11,12 94:13 95:7,11,
15,16,23 105:10 107:12,22 108:14,
17,23 119:20 120:17 137:3,18
138:8,15,24 139:16 143:21 145:1
147:2,11 157:24 170:25 171:4,8
174:2,6 177:14 180:5,6 181:7 183:9,
16

**reader** 11:15 177:15

**readers** 108:1,3 116:24 117:2,8,9,
21 118:23 119:3,11 133:4 140:24

**reading** 87:11 94:4,5 95:3 117:23
118:25 119:1 122:17 131:1,21

**reads** 10:24 16:1,15 29:12 34:7
51:23 68:5 85:7 138:8 170:24 171:4
174:1

**real** 62:3 89:5 91:17 92:10 94:19
163:15 175:22 179:15

**realistic** 177:12 178:18

**realistically** 179:21

**realities** 179:2

**reality** 72:8 77:5,6

**realize** 151:6

**realized** 111:7 168:25

**realm** 78:17

**realtor** 69:19

**reason** 52:19 145:18

**reasonable** 56:12,21 117:17

**reasons** 155:24 162:23

**Rebuild** 15:18

**recall** 40:1 41:12 51:9 58:3 78:10
104:12 109:25 113:2 115:14,16
148:11 158:17 159:10 165:20 166:5
172:24 173:9

**received** 32:5

**recent** 46:1 50:22 51:6 153:21

**recently** 8:13 16:24 104:11

**recognized** 50:25 62:21 65:4

**recommend** 84:14 126:1 150:14
158:6,20

**recommendations** 137:7

**recommended** 158:13,15,16
159:15 164:18

**recommending** 118:18

**record** 5:1 6:8 49:22,23 50:3 56:24
84:17,18,23 112:16 115:3 116:5
135:22 144:12,14,18 164:21 186:3,
6,9,22

**records** 32:1,3,19 40:14 100:9,11
136:9

**recounted** 16:21

**redacted** 109:19,24 114:2 115:8

**redaction** 135:5

**redefines** 47:7

**redefining** 92:24

**reduce** 155:22

**reducing** 123:6

**reductionistic** 123:3 143:4

**refer** 9:16 37:1 117:12 120:5

**reference** 66:7,24 77:14 93:6 104:8
122:13 124:22

**referenced** 94:14

**referred** 117:16 118:3 157:1

**referring** 11:13 42:17 104:6 172:23

**reflect** 160:6

**refresh** 116:1 136:19 145:13 147:23
173:7



Jeffrey Trexler

**refreshed** 82:8 172:18

**register** 13:18

**registered** 115:25

**regular** 11:17 12:21 89:12 186:14

**regularly** 55:15 66:18 91:21

**regulate** 78:13 153:11 179:9

**regulated** 41:9 179:10

**regulates** 153:11

**regulating** 99:8 151:15

**regulatory** 98:17

**Reid** 5:18

**reinforced** 68:10 74:23

**reissue** 18:8

**relate** 70:3 95:10 111:18 139:7
143:6 146:17

**related** 17:15 22:3 62:14 90:4 104:4
110:25 111:1 152:10 184:24

**relates** 18:2,5

**relation** 18:22

**relations** 24:4

**relationship** 23:8

**relationships** 126:7 156:25

**Relative** 141:1

**release** 17:2

**relevant** 44:4,14 47:6 52:10,12
58:4,23 90:3 92:24 93:12 95:18
122:21 123:1 124:11 127:12,19
141:25 175:24 178:17 183:13
184:21 185:3,4

**religious** 152:12

**reluctant** 105:2

**rely** 122:22 132:7

**relying** 14:21 35:10

**remember** 8:24 17:22 23:16 28:19
103:5,8 104:17 110:2,6 113:5
125:12 145:14 158:1,5 165:13,16
166:3 167:25 168:23 173:20

**remind** 34:20

**reminder** 6:15

**remotely** 7:7

**removal** 44:3,13,17 45:8,11 46:17
47:12,13

**remove** 57:18

**removed** 44:22 47:21 82:23 83:5
142:21 159:16,21

**removing** 58:10,12 158:16 172:1

**renewed** 16:6

**repeat** 62:8 151:5 155:10

**repeated** 86:24 103:25

**repeatedly** 46:1

**repeating** 82:19

**rephrase** 99:5 127:17 171:19
174:11

**replaces** 16:4

**replies** 108:16,17

**report** 172:22

**reported** 177:4

**reportedly** 16:23

**reporter** 5:22 6:25 7:11 15:17 84:10
86:23

**reprehensible** 129:15

**represent** 5:14,19 21:24 22:5 24:6,8
63:16 165:5

**representative** 5:3 11:1 165:2,24

**Representatives** 164:24

**representing** 9:4 173:4

**reprinting** 65:1

**reputation** 140:9 168:8 178:3,4,17

**reputational** 37:13 160:9,11 163:15
175:22

**reputationally** 161:12

**request** 5:10 101:19 170:20,24
171:7 174:1,6,8,10,11 183:3,8 185:7

**Requests** 170:18

**require** 174:2

**required** 58:20 114:15 123:16
125:16 176:18 178:8,9,14,24

**requirements** 34:9,14 35:5

**requires** 174:19 178:25

**requisition** 31:3

**reread** 40:2 82:25 145:15,16

**research** 145:22 149:3 172:18,25
173:5

**reshaped** 65:5

**reshaping** 66:5

**resignation** 16:17

**resigned** 16:6

**resistance** 161:13 167:11

**resolution** 164:4,14

**resource** 67:11 71:22 137:19

**resources** 11:16 108:7

**respect** 46:25 51:9 69:12 82:16

**respected** 51:24

**respond** 18:21 45:23 55:12 71:18

**responding** 111:15

**response** 10:8 68:25 99:17 113:8
171:4 174:5

**responses** 9:23 10:4,11,18 101:12
170:16

**responsible** 127:7 131:12

**responsive** 101:19 185:7

**rest** 132:6 152:23 155:24

**restored** 162:9,10,22

**restores** 162:17

**restrict** 123:17 152:16

**restricted** 46:22,23 48:6 105:6,7

**restricting** 11:15

**restriction** 44:3,13,17 45:8 46:4,17
47:12 52:6 85:25

**restrictions** 45:19 85:8 86:11

**result** 52:9

**retail** 89:17 178:19

**retailer** 38:9 67:11 69:19 70:6 72:1,
2,3 137:19 140:18

**retailer's** 72:1

**retailers** 14:2 29:18 34:8 35:4 38:10



Jeffrey Trexler

September 24, 2024
Index: revealing..sensitive

42:25 72:22 74:13 89:23 90:17 139:12 141:10,16 153:22 160:24 175:2

**revealing** 8:16,20 109:22 114:1

**revenue** 165:7

**reversed** 125:14

**review** 8:12 82:6 130:25

**reviewed** 24:22 25:1 32:1

**reviewing** 135:8,11

**reviews** 139:22 177:4

**revising** 121:16

**revisiting** 134:22

**rhetorical** 173:2

**rid** 47:15 48:7 109:21

**ridiculous** 65:14

**right-most** 149:15

**rights** 12:6 13:23 29:14 95:1

**ring** 73:1

**ripple** 152:19 153:6,7 173:13

**risk** 55:12 69:14 71:9 87:19 129:8 132:3 141:8 142:3 163:2 166:14,16, 18,19,22,24 176:21 178:9,22 179:11 185:1

**Rokus** 70:25

**role** 97:24 98:2,25 99:2,7,21,25 100:3 162:11

**Romeo** 143:23

**room** 8:24 177:16

**row** 113:21

**Rubric** 58:7

**rule** 7:21 10:14,21 26:5 27:19 47:17 65:23 110:16 127:12,13 128:14 136:25 171:10,12 172:23 174:21

**rules** 77:24 96:24 131:6 171:1,5,14, 20 172:4,11 173:11,12

**run** 40:17,19 65:16

**running** 65:16

**runs** 38:21

## S

**safe** 47:15

**salable** 129:18

**sale** 28:15 31:21 35:15 68:7 87:18 122:20 142:16 178:14

**sales** 14:11 28:21 35:17 37:3,10 38:7 64:17 86:7 100:19 142:11 155:1

**same-sex** 126:7 156:24

**sat** 40:2

**satisfy** 19:20

**scale** 101:25

**Scandal** 15:19

**scare** 61:3 168:2

**scenario** 22:18 88:3,17 156:15

**scene** 62:17 93:2 94:21 155:25

**scenes** 62:20

**Schmitzer** 5:11

**scholars** 123:14

**school** 11:21,22 22:9,20 23:19 24:16,23 25:8,13,19,20,22 26:9,12 27:2,10,25 28:11 30:18 32:9 54:12 56:10,15 57:17,19,25 64:18 78:19 82:24 85:10 86:2 87:17 88:20,22 89:16 95:8 96:14 97:5 98:7,10,13,19 99:1 116:23 119:4 125:13 126:3 127:9 129:4 133:3 142:23 143:9,23 146:14 151:16 154:8 158:23 161:18 166:14 167:10 169:5 170:7 175:13, 21 176:4,6,25 177:22 178:23

**schools** 11:20,23 23:10 30:4,12 31:5,11,18 32:5,17 33:1 36:7 42:8 45:19 55:19,20 58:10,12 78:25 83:5, 14 85:16 87:2,22 89:8,16,22,23,25 90:9,10 93:18 95:5,6 99:9 100:7,20 123:25 125:23 126:22 127:19 142:13 143:7 145:6 148:9 150:6 158:7,14 160:19 166:7,12 174:4,5, 13

**science** 65:9 152:21

**scientific** 61:15 66:25 152:18 155:19 156:1

**scintilla** 90:3

**scope** 14:6 41:14,15 57:25 69:7 83:10 85:22 96:17 171:17

**score** 76:4

**screen** 111:10 172:6

**seal** 116:16 124:23

**search** 32:11,14,18 183:18,20 184:8,12 185:11

**searchable** 104:19 183:10

**searching** 183:23

**secondary** 74:14

**secrets** 100:12

**section** 12:5 53:4,11 55:6 59:12,14, 18,19 60:10 68:5

**security** 175:5

**seeks** 15:11,18 174:8

**self-published** 156:11 178:10

**self-publisher** 37:18 64:16

**self-publishing** 37:1,2

**sell** 27:8 30:3,15 31:24 33:4,8,10 36:7 38:24 41:9 42:12 86:14 87:1,21 89:8,22,23,25 100:6 123:25 125:22 126:2,22 127:8,18 128:1,20 129:21 131:14 173:15 174:13

**seller** 56:4 75:23

**seller's** 35:24

**selling** 27:2,24 28:3,4,6,10 30:11 35:18 36:20 37:19 64:20 69:20,22 72:7 73:10 85:15 92:20 125:17 127:23 128:14 129:1 130:17 131:12 154:6 175:15 176:12,19 177:6 182:2,13

**sells** 27:1 30:16 31:11 36:23 175:19

**Senate** 65:11 168:3

**send** 114:12 140:2

**sends** 109:9

**sense** 7:9,10,16 11:18,19 25:4 58:22 89:5 101:4,22 102:1,19 153:2 164:8

**sensibilities** 139:20 140:16 141:15

**sensitive** 116:8



Jeffrey Trexler

September 24, 2024
Index: sentence..sort

**sentence** 17:9 88:13

**separate** 78:15 111:23 151:21

**September** 5:8 10:8 15:2 170:16

**serve** 14:6

**served** 16:5

**service** 138:7,11 168:11

**services** 5:12 13:21

**serving** 162:12

**Session** 11:17

**sessions** 165:23

**set** 31:3 170:17

**Seuss** 122:1

**sex** 22:7,9,13,16 24:15 93:7 117:11,
12 120:16 121:6 123:6,15 141:22
143:2,16 144:1 147:11,15,25 148:8
167:7

**sexes** 182:11

**sexual** 15:18 16:18 17:10 19:3 20:5
22:3,16,19 23:8 24:4 25:7,13 26:10,
20 27:24 28:11 41:23 42:4,9,20 43:4
47:7 48:6 53:14,22 55:5 58:11 59:17
62:16 73:15 93:11 95:17 120:19
128:23 133:25 140:21 141:3 142:24
143:5,15 144:7 153:8 155:13 156:15
167:4 185:4

**sexuality** 90:4 141:18

**sexually** 16:7 44:4,13,14,21 47:6
52:10,12 58:4,23,25 59:12,15 60:1
61:11 62:13,16,20 85:16 86:18 87:3,
22 89:9 90:2 92:23,24 93:12,15,17
94:20 95:2,18 118:13 122:21 123:1,
13,17 124:10,11 127:11,12,16,19
141:24,25 153:12,13,16,25 154:2,3
175:24 177:5 178:16 183:12,13
184:8,16,17

**sexually-explicit** 183:13

**sexually-relevant** 52:5,16 183:13

**sexually-themed** 156:13

**Shakespeare** 95:15

**shaking** 7:2

**share** 16:24

**shared** 108:17 161:19

**sharing** 16:17

**shattered** 168:8

**shelves** 173:16

**sheriff** 157:8

**sheriffs** 73:13 93:21

**shocks** 94:23 123:7

**shop** 38:6 69:19 153:22 154:21

**shops** 38:2,3 153:18 163:3

**shorthand** 9:16 11:21

**shoulder** 94:7

**show** 34:1 114:11 184:15

**showed** 112:4 184:11

**showings** 113:16

**shown** 112:2

**shows** 113:14 115:3

**Shrew** 95:16 143:25

**shut** 66:3 92:19 168:9

**sic** 50:19 54:20 70:19 87:12 99:2
103:8,15 117:4 126:3 132:18

**side** 50:13 92:14 150:21 166:21
180:6

**sides** 180:4

**sign** 114:13 167:20

**signaling** 180:8

**significance** 143:6 157:10

**significant** 89:17 90:6,15 92:16
154:14

**signings** 14:11

**similar** 23:24 45:15,18 155:19,20

**Simon** 16:24

**simplistic** 71:5

**simply** 23:17 27:17 32:6,14 71:14
72:15 86:7 105:15 122:3

**simulated** 53:22

**simultaneous** 31:12,15 33:19 45:1
49:17 52:21 53:19 58:6 60:2 79:5
84:11 86:15,17,19 89:4 92:1 93:9
96:18,21 97:16 100:17 101:14
103:13,16,18,22 105:18 109:12,14

110:3,20 114:23,25 115:18 120:24
121:2,4 126:17 127:10 135:19
136:13 150:5 151:3 155:7 159:11
160:5 166:17 169:13,16 171:18
182:24 185:19

**single** 52:3,14 58:17 61:18 72:11
93:1

**sir** 50:14

**Sistine** 62:17,19

**sit** 13:1 49:2,4 118:1 150:1

**site** 64:19 121:15

**situation** 54:2 55:14 124:16,25
169:24

**situations** 142:19 166:12

**skip** 69:4 80:6

**slightly** 32:23

**slip** 82:14 167:20

**slipped** 82:7

**slow** 168:7

**small** 69:4 76:10 177:13

**SMU** 173:20 176:8

**snuck** 84:2

**so-called** 93:23

**social** 90:24 157:2

**socially** 61:11

**society** 156:7 159:7

**sold** 30:23 31:16 32:8 38:1,2,6 55:20
74:15 127:25 131:19 142:20 148:8
150:2,8,11 174:3 175:18 176:15
177:21 178:13,15 180:18,19 181:7,
8,12

**solely** 132:8

**Soma** 16:7

**Soma's** 16:19 17:3

**something's** 118:23

**sophistication** 120:13

**sort** 43:1 44:20 46:3 48:21 55:9,10
62:5 64:20 69:24 78:16,18 83:12
90:22 91:1 93:25 104:20 109:1
110:9 112:10 115:22 116:7 117:16
118:10,16 121:10,16,25 122:2



Jeffrey Trexler

September 24, 2024
Index: sorted..struck

131:22,25 139:1 141:15,25 142:2,9
143:3 148:19 149:18 152:10 157:1
164:2 169:14 177:12 181:19

**sorted** 184:3

**sorts** 101:23 104:22 118:10 146:15

**sound** 172:24

**source** 149:4

**Southern** 76:22

**space** 148:17

**spammed** 29:4

**speak** 8:17 74:20 139:11 146:2,6
165:14,22 167:10 173:24 185:21,22

**speaking** 150:18 152:5 164:3

**specialize** 91:1

**specific** 13:8 25:6 27:7 38:20 40:19
45:11 48:23 78:22 83:2 85:22 88:3,
11 150:25 157:19 159:13,14,15
172:23

**specifically** 39:21 48:24 71:13 83:2
88:16 90:8 147:24 152:5 167:21

**specificity** 172:9

**specifics** 23:17 38:13,22 39:6 173:6

**speculation** 174:8

**speech** 87:10

**speed** 97:22,24

**spell** 6:8

**spelled** 68:9 74:23

**spike** 153:21

**spiked** 168:14

**spiking** 168:15

**spoke** 17:1 165:12,13,18

**spoken** 8:19 23:9 157:18 173:8

**spokesman** 68:12

**spouse** 177:10

**spreads** 154:20

**squares** 84:3

**staff** 68:11 74:24

**stamp** 123:16

**stamped** 116:9

**stand** 9:19

**standard** 14:11 27:19 41:24,25
63:19 64:22 65:21 66:9,12,23 67:1
72:21 73:5 76:13,14,15,16,19 77:9,
11,21,22 118:17 121:25 163:3
172:23

**standards** 37:7,8 63:18,20 64:13
66:1,8,17 68:9,14,19,22 69:13 70:2,
7,9,11,16,17,18 71:4,11,19,24
72:12,14 74:5,15 75:12,23,25 76:6
77:13,17 78:11 97:21 118:19 121:19
143:9 165:7 171:1,5 172:17

**standpoint** 127:3 163:21,24

**stands** 151:9

**stark** 95:13

**start** 46:12 101:17 122:19 145:1,2
178:1

**started** 104:11 108:8 168:12,14
169:8

**starting** 12:10 69:18 138:12,14
168:20

**Starts** 183:5

**state** 5:13 6:7 44:24 47:4 64:20
66:11 76:9,10 77:9,15,18,19 78:7
89:25 98:16 99:23 115:5 128:19
151:22 153:10 157:16 158:23 164:6
178:6 179:17 180:2,10

**statement** 16:22 26:2 27:18 74:9
78:12 82:16 83:6 86:4 87:5 88:13,14
93:10 97:2 99:3 101:21 143:2,4
172:25 182:13,17

**statements** 102:24 164:9

**states** 5:6 29:20 43:25 65:18,19,25
78:12 123:20 151:15,17 152:1
153:23 155:4,12 157:12,13 158:3,4

**stating** 89:2

**statistics** 90:25

**statute** 30:14 47:14,25 48:25 52:11,
16,23,24 54:19 57:7,8,10 60:18
63:25 90:13 94:12 95:19 96:8,10
97:2 172:16 173:24

**statutory** 165:7

**stays** 50:19

**STENOGRAPHER** 84:5,9,13 86:22
103:23 135:20 144:9 151:4 155:8
186:5,7,10,16,20,25

**step** 115:24

**Stephen** 65:6

**steps** 74:8

**sterilization** 125:7,10 126:6

**Sterling** 147:18

**stick** 120:8

**stigmatizing** 161:1

**stipulations** 186:21

**stock** 142:24 145:6 178:1

**stood** 111:10

**stop** 18:24 29:7 73:21

**stopped** 92:18,20

**stopping** 144:10

**store** 37:25 92:20 138:17,20 139:17
140:4 141:6 168:9

**store's** 68:11

**stores** 92:19 178:19

**stories** 112:14 115:13 161:15

**storing** 156:5

**story** 155:25 161:15

**straight** 170:4

**Strange** 132:25 133:3,5

**strategy** 69:25

**streaming** 66:21

**street** 115:4,6

**strict** 61:16 70:18

**strictest** 25:4

**strident** 65:15

**strip** 123:9,10 155:17 156:4

**stripes** 55:18

**stripped** 71:11 157:14

**stripping** 69:1

**strips** 147:12,15

**struck** 134:16



Jeffrey Trexler

September 24, 2024
Index: student..terms

**student** 167:19

**students** 85:11 86:3 143:6 154:2,7

**studies** 52:2 89:18 92:2

**study** 22:25 37:7 39:7 40:23 41:3,5,
7 91:24 156:7 157:4

**stuff** 6:16 29:7 62:21 64:23 69:4
122:13 139:9 146:8 184:25 185:1

**subject** 10:25 20:4 29:25 34:9,13,
20,21,22 35:5 38:3 40:22 44:3,12,16
45:8 46:3,17 48:25 52:5 110:18
147:2,8,14,24 148:7,18 157:4
170:11

**subjects** 6:17 147:22 148:2

**submit** 165:25

**submitted** 138:4

**subsequent** 172:5

**substantial** 128:3

**substantially** 85:8,25 87:24

**substitute** 88:14

**suburban** 26:12 27:3

**suburbs** 26:10

**suffer** 128:1 160:9,12

**suffered** 127:23 128:18 162:16

**suggestive** 62:20

**suicide** 54:3,7

**summarize** 60:9

**summary** 26:18

**summer/fall** 169:25

**superheroes** 148:20

**superintendent** 62:1 63:2

**superintendents** 98:9

**Superman** 156:16

**suppers** 161:9

**supplementing** 172:5

**supplied** 101:15,16

**supply** 175:6

**support** 39:13,19 59:6 162:25

**supporter** 175:20

**supporters** 174:18

**suppose** 37:24 112:24 125:9,15
175:23

**supposition** 120:17

**Supreme** 95:1 124:3,4 125:6,12
126:9

**surge** 46:2

**surgery** 92:7

**survive** 73:25

**survived** 127:24

**susceptible** 43:5 62:10,11,13

**suspect** 36:13 120:14

**swear** 5:22

**sworn** 5:25

**synonymous** 164:1

**system** 31:3 61:4 74:3 88:25 97:12
98:6,7,13,22,23 99:1 108:8 122:12,
25 123:3,19 124:5,9 125:9,15,16
149:9 177:1

**systems** 107:16,19,20,23 109:2
111:18 112:5,22

---

**T**

**T-R-E-X** 6:12

**TA** 54:20,22 99:2 173:6 178:6

**table** 127:1

**Taki** 16:7

**taking** 21:19 78:17 94:19 119:24
123:12 152:7 178:13

**Tales** 65:3

**talk** 7:12 23:7 29:15 42:9 51:16
91:18,20 96:12 118:6 120:4,23
121:1 132:6 135:16 149:1 152:6
180:3

**talked** 95:25 112:5 118:2 159:14

**talking** 18:10 22:24 25:3 30:6,7
39:20 46:19 54:11 57:12 69:10
78:10 91:13,14 96:5,8,9,10 114:6
130:7,9 150:24 156:21,23 163:22
172:22 179:23 184:24

**talks** 17:9 172:17

**Taming** 95:15,16 143:24

**targeted** 167:21

**targeting** 83:2

**task** 135:12

**taught** 78:1,4 99:8

**taxes** 98:14

**TEA** 54:18 56:5,21 57:17 98:25 99:7,
25 100:3 171:1,5,10,15,20 172:4,11,
16,23 177:4

**teach** 76:21

**teacher** 121:24 126:23

**teachers** 93:22 167:5

**teaching** 78:19 161:20 173:20

**team** 9:1

**technically** 47:16

**TECHNICIAN** 10:1,9 11:11 15:12,
25 16:13 20:12,15,22 21:7,23 28:25
29:10 33:15,24 34:6,18 35:13 43:14,
20,23 44:10 45:6 49:12 50:8,11,14
51:15 53:2,8,12,15 55:2 58:15
59:10,13 64:5,7,10 67:4,7,15,25
79:7,14,17,20,23 80:1,4,9,11,13,15,
17,19,21,23,25 81:2,4,6,8,10,12,14,
16,18,20,22 82:1,3,5 85:2,5 101:2
106:9 111:4 113:13 114:20 116:20
119:9 132:12,24 133:10 136:1,6,18
137:14,16,23 138:13 144:24 146:20,
24 170:19,22

**Ted** 119:13

**teenagers** 141:22

**televisions** 70:25

**telling** 91:8 143:16 173:5

**temporary** 125:11

**ten** 125:14 186:16

**ten-minute** 49:16,19

**tend** 132:7 157:24

**tens** 177:14

**term** 11:12,20 149:25

**terms** 38:7 39:3,6 40:17 41:12 42:12
56:25 59:2 65:16 69:10,11 70:2
78:20 90:21 94:23 99:15 105:2,3
117:23 118:3,18 119:3 121:19 125:8



129:7 136:24 142:14,21 147:2 148:13,14,18 152:20,24 159:8 165:4 168:9 170:9,12 173:3,6,14 179:6 183:20,23 184:6,20

**Tesla** 176:16 177:8,10

**test** 70:1,4 71:12 72:8,10 73:5,7

**testified** 5:25 164:19

**testify** 8:4,8 11:1,5 18:17 32:15,19, 20 165:10

**testifying** 43:15 179:17 180:10

**testimony** 17:4 40:10,11 94:13 167:1

**tests** 68:23

**Tex** 173:21

**Texas** 5:6 11:14,20,21 29:25 30:4, 24 31:5,17 32:9,12 33:1,5,6,11 36:7 38:11 39:20,21 44:24 45:15 48:19, 23 51:7,9 53:7 56:2 58:7 62:3,14 63:1 64:20 74:7 75:12,18,24 76:19, 21 77:2,4,7,15,18,19 78:2,25 85:15 86:14 87:2,15,17,18,22 89:8,13,15, 19,22,23,25 90:9,11,13 91:12 95:6 99:1,8,20,23 100:6,20 122:20 123:25 125:4,17,22 126:3,22,25 127:9,19 128:2,3,15,16,20 129:3,18, 21 130:9 132:3 142:1,18,21 148:9 150:6 151:25 152:6,7,8,15,22 153:4, 5,15 154:4 157:14 158:7 159:5,16, 24 160:7 164:20 166:7 168:21,22 169:1,4 170:4,7,8 173:19 174:5,20, 21 175:21,25 176:22 177:25 178:16 179:1,3,4,6,8,9,13,22 180:13,15

**text** 19:15 46:20 61:9 62:10,11,12 94:4,6 122:17

**textbook** 152:21

**textual** 120:12

**textural** 118:8

**theme** 156:1,2

**themes** 118:9 140:23

**theoretical** 123:23

**theoretically** 30:25 75:21

**there've** 142:19

**thing** 33:21 38:14 73:6 82:25 90:22 91:1,2,15 97:21 110:4,7 114:21 117:17 121:17 122:8 125:1 131:25

134:8 143:17 151:12 159:18 162:18 163:5 182:19 184:12

**things** 37:24 40:25 42:4 54:14 55:17 56:20 65:17 70:20 90:15 92:5,6 95:10 106:5 117:14 118:2,16 119:4 120:2,7 121:11 123:1 125:5 131:23 137:2 139:1,15,23,24 140:25 141:1, 2,3 146:3 148:18,19 149:10,11 153:8 156:24,25 157:24,25 161:1 162:4 166:20 173:18 180:8 181:8, 12,17,23 184:1

**thinking** 36:20 55:7 141:6

**thinks** 178:6

**thinly** 123:14

**third-party** 130:21 176:8

**thought** 48:13 58:8 125:25

**thousands** 102:13 163:14 177:14, 15

**threaten** 73:22 152:1

**threats** 153:2 167:2

**thrown** 126:7

**thumb** 136:25

**tiers** 13:20

**Tijuana** 156:9,10,21 157:7

**time** 5:9 21:18,20 37:9 40:21,23 41:5 49:24 50:3 83:24 84:19,23 106:16 111:15 125:7,11 126:2 127:7 128:16 144:14,19 147:17 152:13 160:2 174:22 180:4 184:14 186:15

**time-consuming** 131:2

**times** 32:12 161:21,25

**tis** 169:6

**title** 32:7 53:7 65:3 117:11 119:19 176:2

**titled** 10:3,10 15:17 113:20 116:22 137:25

**titles** 47:5 115:4 158:6

**today** 5:8 6:4 7:4 8:5,8 11:13 13:1 76:10 186:17

**today's** 174:25

**told** 19:23 33:2 39:18 86:8 102:5 103:9 128:9

**tolerance** 141:1

**tomorrow** 181:18

**ton** 29:4 177:18

**tone** 36:12

**tool** 32:14

**top** 49:10 53:25 67:16 147:1,8 149:15 179:23

**topic** 17:14,20 18:2,7,9,16,20

**topics** 11:2,6 18:4,11,14 20:17 85:9 86:1 87:25 88:19 101:12 148:19 156:24

**total** 58:17

**totally** 77:16 141:10

**touch** 37:22

**touching** 55:10

**town** 76:10 108:3 170:5

**trace** 170:6,7

**track** 56:24 76:8 142:11,12 154:10

**tracking** 10:16

**trade** 100:12 104:9

**trademarked** 103:10

**traditional** 143:8

**trained** 92:5,6

**training** 68:10 74:24 75:4,10 92:4

**trainings** 75:8

**traits** 118:21

**transaction** 131:3

**transcript** 7:13

**translations** 95:13

**transwomen** 182:10

**trap** 98:4 173:2

**Treasury** 164:2

**treated** 119:4

**treatise** 83:3

**trend** 17:12 158:1

**Trexler** 5:2,20,24 6:3,7,12 11:1 16:3,4 17:24 18:3,15 19:2 50:17 53:17 85:12 144:19 151:4 155:8



MAGNA
LEGAL SERVICES

Jeffrey Trexler

**trouble** 97:19

**true** 174:12 180:17

**truthful** 6:22

**truthfully** 8:5,9

**tub** 54:3

**Tuesday** 5:8

**turned** 65:12

**Twitter** 169:10

**type** 45:23

**types** 39:10 118:13 140:23,24 141:20 142:12 148:21 155:16

**Typically** 27:8

**typo** 133:20 134:7

---

**U**

---

**U.S.** 20:14 65:11

**Uh-huh** 13:13 21:10 24:10 28:9 29:11,23 35:2,6,23 43:11,24 45:9 48:15 50:18 51:13 52:1 58:18 59:21, 23 60:12 67:9,18 68:4,16 74:25 75:3 106:24 107:9,15,17,21 108:2,5,13, 22 109:3,11 113:17 114:3 115:7 119:12 132:16,20 133:7 136:12 138:2,23 145:4 147:3,10,13,16 149:17 155:5 171:3 176:17 183:4,7

**ultimately** 131:12

**unappreciated** 102:16

**unapproved** 163:11

**Uncelebrated** 133:1

**uncertain** 47:9

**unclear** 48:7 185:6

**uncomfortable** 27:2 181:9,11,14

**unconscionable** 123:19 124:21 125:16

**unconstitutional** 63:14 65:20 74:2, 5 105:16

**undercover** 140:1,2

**undergraduate** 152:11

**understand** 6:19,23 7:13,18,20 9:12 18:21 31:6,9 36:13 57:23 69:15,23 71:18 72:5,6 78:16 83:16 87:13 95:22,23 97:12,13 99:11 100:10 101:10 105:9 117:4 123:21 127:11,13 130:13 139:5 141:12 143:13 145:3 158:25 159:2

**understanding** 23:14,15 24:7 30:13 34:22,24 35:20 41:12 45:2,10 46:20 55:24 57:2 58:3 60:6,16,24 68:8 70:1 83:1 94:25 99:16 111:14 118:18 119:1 130:10,11 166:6

**understands** 43:1

**understood** 18:19 65:14 66:13 70:10 124:7

**unexpectedly** 170:2

**unfair** 105:17 144:2 173:3

**uniform** 32:13

**uniquely** 61:9

**United** 5:6 29:20 65:19 123:20 158:4

**universities** 145:22

**University** 76:23

**unrealistic** 180:14

**unrelated** 111:23 112:20,21

**unsafe** 178:4

**unsure** 27:25 28:12

**unwieldy** 184:19

**upfront** 163:5

**upheld** 122:19 123:2 124:2 129:9,15

**upstanding** 77:4

**URL** 21:2

---

**V**

---

**vague** 21:18 30:13 41:14 42:8 46:14 47:9 50:21 52:20 63:11 171:6

**vagueness** 47:18 60:18

**valid** 47:13

**valued** 135:11

**values** 25:25 26:1

**variability** 60:6

**variables** 118:11

**varied** 77:25

**varies** 12:23

**vast** 25:11 124:19

**Vault** 65:3

**vendor** 35:17,24 64:16 119:25 127:4 129:7 130:22 131:12 132:2 176:8

**vendors** 35:14 56:19 68:22 71:23 129:20

**venue** 154:7

**venues** 145:24

**verbal** 7:1

**version** 95:14

**versus** 5:5 19:22 20:14 77:3,4 132:1

**viability** 38:5

**viable** 70:5

**video** 26:3 104:7 107:19 108:9 159:1

**Videotape** 9:24 10:13

**view** 54:9 56:20 111:10 139:8 148:18,19 178:21 181:3 182:8,25

**viewpoint** 27:24 28:15 42:24

**villain** 108:19

**violate** 75:23 126:1

**violated** 75:25

**violating** 74:14

**violence** 118:14,15 140:22

**viral** 169:11

**Virginia** 103:6 150:21 168:24 169:19 170:4,5,9

**visible** 54:9

**visual** 118:7 120:12 169:7

**visualizing** 168:19

**vocabulary** 118:6 121:25

**vocal** 165:15

**voice** 39:11 98:12,19

**Volume** 133:1

**volunteer** 13:3,5 102:8



Jeffrey Trexler

**volunteering** 135:10

**volunteers** 12:19,20,21,23,25 135:1,2,4,7

**voters** 98:11

**vulgar** 183:15 184:17

---

**W**

**Waco** 77:1

**wait** 20:11 108:16

**waiting** 55:3

**wanderings** 147:19

**wanted** 19:16 83:25 91:24 118:1 134:16

**wanting** 179:6

**warrant** 143:9

**wars** 152:13

**watched** 169:1,4 170:8

**watching** 169:5,6

**wave** 69:17 154:11 156:3

**ways** 36:17,18 45:23 55:23 63:12 71:3,20 72:13 91:10 99:3,15 130:1 140:12 175:7

**web** 106:23 168:9

**website** 20:24 118:4 134:22 135:5, 8,11,25 145:10 163:6

**week** 104:16 164:15

**Weekly** 15:17

**weeks** 115:21

**weird** 125:7

**weirder** 125:5

**Weiss** 119:14

**Western** 5:6 148:22

**wide** 14:6 43:4,5 62:24 78:2 90:4

**widely** 50:24 62:21 77:24

**wild** 116:13

**Williams** 101:9 102:3,11,16,18 107:8

**willingness** 173:17

**Windsor** 143:24

**withdrawn** 55:18 93:18 143:7

**withholding** 55:21

**Wives** 143:24

**woman** 52:3,15 54:8 59:25 168:25

**women** 16:17 62:19 182:10

**won** 170:2

**Wonderful** 6:6

**wondering** 46:8

**Wong** 5:5

**word** 10:16 19:14,15 20:25 42:16 47:24 63:6 72:12,13 117:11 168:11 178:24

**wording** 34:25 94:12

**words** 51:3 57:11,13 122:1,2 181:22 184:8,14,16

**work** 14:5 19:24 23:12 30:19 36:22 37:13,19,21 38:1,2,8 39:19 42:3 47:7 57:1 72:9 73:14 75:24 85:10 86:2,12 87:25 88:20 90:24 93:1 98:17 102:17 107:4 110:22,25 111:1 115:23 116:3 120:8,13 123:18 151:23 152:11 162:22

**worked** 177:10

**working** 12:14 50:14 108:18 110:8 159:22 169:7

**works** 14:3 23:6,7,10,12,13 26:3 31:24 44:2 45:7 48:17 51:24 55:16, 17 56:23 62:18 65:10 66:12 69:23 90:16 92:23 94:19,20 107:5 111:17 123:8 143:5 181:1,5

**world** 66:9 93:14,16,18,23,24 110:8, 11 114:11 116:11 179:15

**worried** 127:16

**worse** 106:4

**worth** 166:22,24

**wound** 31:17

**write** 21:13 74:16 85:9 86:1,12 87:8, 25 88:19 90:15,20 101:8 103:1 104:5 133:19 134:6 157:25

**writers** 90:19,22

**writing** 51:11 90:19 91:6,9 102:6

**written** 23:1 62:22 101:8 157:17 161:16 173:8

**wrong** 17:23 43:17 63:8 105:11,12, 13 106:2 161:2

**wrote** 90:8 150:20,21 164:17 165:16

**wryly** 179:20

---

**X**

**xylophone** 6:12

**XYZ** 92:7 178:25

---

**Y**

**Yale** 147:18

**year** 160:3,4 164:10

**year's** 164:16,17

**years** 16:5 17:5 46:1 118:25 119:20 125:14 126:8 140:14 142:5,7 148:4 153:21 156:18 158:5 159:7 160:1,2 161:18 166:4 177:13

**Yelp** 139:22

**York** 6:5 66:19 75:13,17,19,22 76:9, 10,14,15 77:3,5 170:6

**Yorkers** 77:4

**young** 60:24 61:4 108:3

**Youngkin** 170:1

**youth** 61:11 106:18

**Youtube** 159:1 164:13 169:9

---

**Z**

**Zach** 111:5

**Zachary** 5:15 42:18 94:7

**Zachary's** 94:5

**zeros** 106:10,11

**zip** 115:5

**zoom** 5:10 6:21 7:5 15:23 21:6 29:8 43:22 44:8 49:9 50:5 53:18 59:11 68:1 138:10 169:5,7

**Zooming** 6:3



1    CHANGES AND SIGNATURE

2    WITNESS NAME:  JEFFREY TREXLER

3    DATE OF DEPOSITION: September 24, 2024

4

5         PAGE        LINE        CHANGE           REASON

6    12:18 Change "Andras" to "Andreas"

7    24:8 Delete ","

8    24:22 Change "." to ";"; delete a space: change "Again" to "again"

9    27:6 Add "a" before "publisher"

10   31:3 Change "system" to "systems"

11   31:4-5 Change "We are" to "Are we" and add "?" at end of sentence

12   47:24 Change "An" to "And"

13   66:20 Capitalize "Criterion Collection"

14   68:23 Change "Miller tests" to "the Miller test"

15   69:7 Change "peer" to "prurient"

16   69:16 Change "this Comic" to "the Comic"

17   73:1 Change "I ring" to "Offering"

18   94:23 Change "conscious" to "conscience"

19   95:10 Change "bible" to "Bible"

20   102:15 Change "want to" to "want"

21   108:19 Change "MPA a" to "MPAA"

22   117:16 Change "modern dally" to "motte and bailey"

23   123:7 Change "conscious" to "conscience"

24   125:6 Change "Eugenics" to "eugenics"

25   150:8 Change "bible" to "Bible"



1              CHANGES AND SIGNATURE

2   WITNESS NAME:              DATE OF DEPOSITION:

3   JEFFREY TREXLER            September 24, 2024

4   PAGE/LINE          CHANGE              REASON

5   152:4 Change "raiding" to "rating"
    _____

6   156:23 Change "Outreau" to "outré"
    _____

7   160:14 Change "common place" to "commonplace"
    _____

8   162:4 Change "believe of" to "believe in"
    _____

9   162:17 Change "of posing" to "opposing"
    _____

10  164:22 Change "arts Congress" to "arts caucus"
    _____

11  167:15 Change "image" to "Image"
    _____

12  169:17, 20  Change "gender queer" to "Gender Queer"
    _____

13  177:13 Change "small." to "small apartment."
    _____

14  180:22 Change "express" to "expression"
    _____

15  184:18 Change "PICOT" to "Pico"
    _____

16  _____

17  _____

18  _____

19  _____

20  _____

21  _____

22  _____

23  _____

24  _____

25  _____

Jeffrey Trexler                                     September 24, 2024
                                                    Page 189

1         I, JEFFREY TREXLER, have read the foregoing

2   deposition and hereby affix my signature that same is

3   true and correct, except as noted above.

4
                        *Signed by Black Knight EXP-DocVerify. 2024-10-25 10:14:12 EDT
                        _Jeffrey Trexler_
5                       4434656.24477463.34336246
                        _____

                        JEFFREY TREXLER

6

7

8

9   THE STATE OF TEXAS            )

10  COUNTY OF TRAVIS              )

11        Before me, Lori Denise Mitchell        , on

12  this day personally appeared JEFFREY TREXLER, known to

13  me (or proved to me under oath or through

14  driver's license    ) (description of identity card or

15  other document) to be the person whose name is

16  subscribed to the foregoing instrument and acknowledged

17  to me that they executed the same for the purposes and

18  consideration therein expressed.

19        Given under my hand and seal of office this

20  25th day of October        , 2024.

21

22  [NOTARY SEAL:         LORI DENISE MITCHELL
    NOTARY PUBLIC        Notary Public, State of Texas
    STATE OF TEXAS]      Comm. Expires Jan 26, 2027
                         Notary ID 159130-7
23                                              *Signed by Black Knight EXP-DocVerify. 2024-10-25 10:14:25 EDT
                                                _Lori D Mitchell_
                                                4434656.24477463.67041
24                       _____
                         NOTARY PUBLIC IN AND FOR
                         THE STATE OF TEXAS
25                       Commission Expires: 01-26-2027

Notarial Act Performed by Audio visual communication

