# EXHIBIT N

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| BOOK PEOPLE, INC., VBK d/b/a BLUE WILLOW BOOKSHOP, AMERICAN BOOKSELLERS ASSOCIATION, ASSOCIATION OF AMERICAN PUBLISHERS, INC., AUTHORS GUILD, INC., COMIC BOOK LEGAL DEFENSE FUND,<br><br>        Plaintiffs,<br><br>v.<br><br>MARTHA WONG in her official capacity as chair of the Texas State Library and Archives Commission, KEVEN ELLIS in his official capacity as chair of the Texas Board of Education, MIKE MORATH in his official capacity as Commissioner of Education,<br><br>        Defendants. | § § § § § § § § § § § § § § § § § § § § § § | CASE NO. 23-CV-00858-ADA |

---

**DECLARATION OF MATTHEW STRATTON**

---

Pursuant to 28 U.S.C. § 1746, Matthew Stratton declares:

1.      My name is Matthew Stratton. I am over twenty-one (21) years of age and am fully competent to testify about the matters contained herein. The following statements are made within my personal knowledge and are true and correct.

2.      I am the Deputy General Counsel of the Association of American Publishers ("AAP"). I am AAP's corporate representative in this case and participated in a Rule 30(b)(6) deposition on behalf of AAP on October 3, 2024. I have communicated with AAP members about this case and House Bill 900 ("HB 900") in preparation for the Rule 30(b)(6) deposition and to prepare this Declaration.

3.      The Association of American Publishers ("AAP") is a not-for-profit organization that represents the leading book, journal, and education publishers in the United States on matters of law and policy, advocating for outcomes that incentivize the publication of creative expression, professional content, and learning solutions. The twin pillars of AAP's advocacy are defending freedom of expression and a strong and modern copyright system.

4.      AAP's membership includes approximately 110 individual members, who range from major commercial book and journal publishers to small, non-profit, university, and scholarly presses, as well as leading publishers of educational materials and digital learning platforms. AAP's members publish a substantial portion of the general, educational, and religious books produced in the United States in print and digital formats, including critically acclaimed, award-winning literature for adults, young adults, and children. AAP represents an industry that not only depends upon the free exercise of rights guaranteed by the First Amendment, but also exists in service to our Constitutional democracy, including the unequivocal freedoms to publish, read, and inform oneself.

5.      Many AAP members are subject to HB 900 as "library material vendors" because they have sold and intend to continue selling library materials ("books") to Texas public primary or secondary schools, school districts, and open-enrollment charter schools ("Texas public schools").

6.      AAP also has many members that publish book titles that are distributed to Texas public schools through third-party booksellers subject to HB 900.

7.      Many AAP members have only a partial set of records of past sales to Texas public schools. The records are limited because, among other reasons: (i) AAP members may sell books without being aware that a Texas public school will ultimately receive the books; and (ii) AAP

members may have document-retention policies under which records that are no longer needed are destroyed and/or not reasonably accessible. As a result, these AAP members are unable to comply with HB 900.

8.      Even if some AAP members possess these records, AAP members have no way to know which books are in active use (or even what "active use" means), so it is impossible for AAP members to undertake the task of rating and recalling (if applicable) these materials, absent receiving information from Texas public schools.

9.      Furthermore, Texas public schools may purchase the same books from multiple booksellers, so it may not be feasible to determine whether the copies of books sold by AAP members are in active use.  With multiple booksellers for the same book, the likelihood of consistent ratings is slim.

10.      The rating system imposed by HB 900 would be an immense burden on AAP members, requiring significant time and expense to identify past sales and compare those to books in "active use." Some AAP members have sold tens of thousands of books to Texas public schools, and it is estimated that hundreds of hours of work, or even more, would be required by each of these members to attempt to search sales records and compare them against lists of books in active use (assuming such lists were provided to AAP members), as required by HB 900. It would be an enormous burden in terms of resources, staff, and costs and would require significantly diverting existing staff or hiring new staff.

11.      Likewise, applying the ratings under HB 900 would be an immense burden on AAP members. There are millions of books in Texas public school libraries. Our members do not have existing staff or an existing process for the purpose of applying the ratings. It would be cost-prohibitive, difficult, and time-consuming to hire and train new staff (or re-train existing staff) to

DECLARATION OF MATTHEW STRATTON        3

apply ratings, given the confusing process outlined by HB 900, and to hire attorneys to review ratings.

12.    The amount of time it would take to review and rate each book is enormous but unknowable, considering that a 450-page work of fiction or non-fiction in a high school library would take significantly longer to review than a picture book in an elementary school library. But broadly speaking, the time to read, analyze, and possibly solicit other viewpoints could require a substantial, double-digit number of hours per book on average.

13.    AAP members will have difficulty applying the unworkable rating standards set forth in HB 900 for at least the following reasons:

   a.    It is unclear to AAP and its members what it means for books to be "directly related" to the required curriculum (and therefore exempt from the ratings). Oftentimes AAP members do not know what is in the curriculum.

   b.    It is unclear to AAP and its members what "active use" means.

   c.    It is unclear to AAP and its members how a bookseller will know if a book remains in "active use."

   d.    The "sexually relevant material" definition is unclear and confusing to AAP and its members insofar as any de minimis, non-explicit reference, in any context, to sexual relations, could result in the rating. It could apply broadly to health-related works, religious texts, historical works, encyclopedias, dictionaries, and many other works.

   e.    The "sexually explicit material" definition is unclear and confusing to AAP and its members because the contextual analysis does not adjust for

differences in ages or communities and does not clearly provide for consideration of the work as a whole.

f.     Booksellers may not have any knowledge about the contemporary community standards of decency nor do they know which community's standards should be considered.

g.     The balancing test required by HB 900 is entirely subjective and cannot be applied with any consistency.

14.     The ratings will stigmatize AAP, AAP members, authors, and books, and will risk reducing sales of these works—not just to Texas schools, but globally, since the ratings are posted online. This, in turn, risks publishers foregoing investment in important new works.

15.     The ratings could also reduce royalties to authors, and therefore reduce the incentive for authors to produce new works or expose those who issue ratings to potential liability for doing so. The ratings could further damage AAP and AAP members' relationships with authors.

16.     The ratings will also chill AAP members' and their authors' constitutionally protected speech. The ratings require our members to espouse a highly subjective opinion that they patently disagree with or suffer a significant financial penalty. They also require our members to adopt the State's ratings. If members refuse to issue ratings or adopt the State's speech as their own, then they lose all business with Texas public schools, which would harm AAP members and AAP as an organization because it relies on membership dues.

17.     By refusing to rate books, or by being placed on the State's blacklist, the universe of booksellers and book titles would substantially diminish. A member would be forced to weigh the prejudice to sales and distribution globally against the prospect of losing the school market in

Texas. Many AAP members would consider no longer selling books to Texas schools. The impact of this State licensing regime could extend beyond the State's borders. Because a substantial number of books sales stem from Texas and Texas has such a large influence on other markets, other localities or states may rely on the ratings, either informally or formally. In addition, other states may decide to adopt their own ratings requirements, which could lead to a patchwork of inconsistent rating regimes and likely result in booksellers adopting the most restrictive ratings for all states.

18.     AAP members have reported that Texas public schools have stopped or delayed buying books since the passage of HB 900. AAP and its members believe this trend would substantially escalate if HB 900 took effect. The immense confusion that would be caused if HB 900 is not enjoined would be detrimental to our members' sales.

19.     Even 17 months after HB 900 was signed, AAP members remain confused about their responsibilities under HB 900, including (but not limited to) the following unanswered questions:

      a.  What is the definition of a "recall"? Is a refund required if a bookseller is required to recall material?

      b.  How does a bookseller communicate a book rating to a Texas public school? On the book? In marketing material? On a pro forma invoice? A list? Other?

      c.  What happens if different booksellers adopt different ratings for identical titles?

      d.  What happens if a bookseller no longer sells a book that is still in "active use" by a Texas public school? Is it then required to re-purchase the book and rate it?

e.  If a bookseller changes its rating as instructed by TEA after being added to

the banned list, does TEA have discretion to refuse removal from the banned

list?

20.     If HB 900 does not take effect, AAP members would not need to comply with the

rigorous requirements of the law and could freely sell books to Texas public schools without any

restraints.

21.     I hereby declare under penalty of perjury under the laws of the United States of

America that the above is true and correct.

Executed this 19th day of November, 2024.

/s/ *Matthew Stratton*
Matthew Stratton

**DECLARATION OF MATTHEW STRATTON**       7