## IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | |
|---|---|
| BOOK PEOPLE, INC., VBK INC., AMERICAN BOOKSELLERS ASSOCIATION, ASSOCIATION OF AMERICAN PUBLISHERS AUTHORS GUILD INC., COMIC BOOK LEGAL DEFENSE FUND<br><br>    *Plaintiffs,*<br><br>V.<br><br>MARTHA WONG IN HER OFFICIAL CAPACITY AS CHAIR OF THE TEXAS STATE LIBRARY AND ARCHIVES COMMISSION, KEVEN ELLIS, IN HIS OFFICIAL CAPACITY AS CHAIR OF THE TEXAS BOARD OF EDUCATION, MIKE MORATH IN HIS OFFICIAL CAPACITY AS COMMISSIONER OF EDUCATION<br><br>    *Defendants.* | CIVIL ACTION NO. 1:23-CV-00858-ADA |

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' FIRST AND FOURTEENTH AMENDMENT CLAIMS

TABLE OF CONTENTS

Table Of Contents ......................................................................................................... ii

Index Of Authorities ..................................................................................................... iv

Introduction ................................................................................................................... 1

Statement of Grounds & Undisputed Facts ................................................................ 1

I.    Plaintiffs admit they sold books to Texas schools which contained sexually explicit material, as defined by READER. ................................................................ 1

II.   Plaintiffs already treat books containing sexual content differently than books that don't contain such content. ........................................................................... 2

III.  READER does not require TEA to take any actions adverse to Plaintiffs' interests in bookselling, nor has TEA done so. ............................................................ 2

IV.   Texas schools set the conditions by which they purchase books and Plaintiffs have no interest in which titles they sell to Texas schools. ........................... 4

V.    Texas schools have no obligation to buy books from Plaintiffs, now or in the future. ......... 5

VI.   Plaintiffs have not established that they would bear the additional cost of rating books sold to Texas schools or what those costs might be. ................................. 6

VII.  The Plaintiffs have not suffered economic harm traceable to READER. ........................... 7

Argument ....................................................................................................................... 8

I.    Plaintiffs lack Article III standing. .......................................................................... 8

II.   Defendants are entitled to sovereign immunity. .................................................... 12

III.  READER's protections enacted for the benefit of Texas's minor children are in compliance with the First Amendment. ............................................................. 16

IV.   Texas can decline to expend its funds on sexually explicit books for school libraries. ...... 17

V.    Plaintiffs will not suffer irreparable harm if READER is enforced. ..................... 21

VI.   The governmental speech exception applies to READER. ................................... 22

VII.  The commercial speech exception applies to READER. ...................................... 24

VIII. Plaintiffs' facial challenges fail. ............................................................................. 26

A.  READER is not vague. ............................................................................................. 27

B.  READER is not overbroad. ..................................................................................... 27

C.  READER is not an unconstitutional delegation. ................................................... 28

D.  READER is not an unconstitutional prior restraint. ............................................. 28

E.  Public school libraries are nonpublic fora. .......................................................... 29

Conclusion ......................................................................................................................... 29

Certificate of Service ........................................................................................................ 31

Index Of Authorities

| Cases | Page(s) |
|---|---|

*Alexander v. United States*,
509 U.S. 544 (1993) ...................................................................................................... 15, 28

*Am. Meat Inst. v. U.S. Dept. of Agriculture*,
760 F.3d at 21 (D.C. Cir. 2014) (en banc) .............................................................. 24

*Americans for Prosperity Foundation v. Bonta*,
594 U.S. 595 (2021) .......................................................................................................... 27

*Bantam Books, Inc. v. Sullivan*,
372 U.S. 58 (1963) ............................................................................................................ 10

*Bd. Of Educ. v. Pico*,
457 U.S. 853 (1982) .......................................................................................................... 10

*Bennett v. Spear*,
520 U.S. 154 (1997) .......................................................................................................... 10

*Bethel School District No. 403 v. Fraser*,
478 U.S. 675 (1986) .......................................................................................................... 29

*Book People, Inc. v. Wong*,
91 F.4th 318 (5th Cir. 2024) .................................................................................. passim

*Book People, Inc. v. Wong*,
98 F.4th 657 (5th Cir. 2024) .......................................................................................... 17, 24

*Brown v. Bd. of Ed.*,
347 U.S. 483 (1954) .......................................................................................................... 25

*Air Evac EMS, Inc. v. Texas, Dep't of Ins., Div. of Workers' Comp.*,
851 F.3d 507 .......................................................................................................................... 14

*California v. Texas*,
593 U.S. 659 (2021) .......................................................................................................... 11

*Cent. Hudson Gas & Elec. Corp. v. Public Service Comm'n of New York*,
447 U.S. 557 (1980) .......................................................................................................... 24

*City of Austin v. Paxton*,
943 F.3d 993 (5th Cir. 2019) ...................................................................................... 13, 15

*Clapper v. Amnesty Int'l*,
568 U.S. 398 (2013) ............................................................................................................ 9

*E.T. v. Paxton*,
19 F.4th 760 (5th Cir. 2021) .......................................................................................... 16

*Edelman v. Jordan*,
  415 U.S. 651 (1974) ...............................................................................................12

*El Paso County v. Trump*,
  982 F.3d 332 (5th Cir. 2020) ........................................................................... 9, 24

*FCC v. Pacifica Found.*,
  438 U.S. 726 (1978) ................................................................................. 16, 19, 22

*Free Speech Coalition, Incorporated v. Paxton*,
  95 F.4th 263 (C.A.5 (Tex.), 2024) .........................................................................17

*Friends of the Earth, Inc. v. Laidlaw Envt'l. Servs. (TOC), Inc.*,
  528 U.S. 167 (2000) ...............................................................................................11

*Genusa v. City of Peoria*,
  619 F.2d 1203 (7th Cir. 1980)................................................................................10

*Ginsberg v. New York*,
  390 U.S. 629 (1968) ................................................................................. 16, 23, 25

*Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Balt.*,
  721 F.3d 264 (4th Cir. 2013) (en banc), *cert. granted in part on other grounds* 2023 WL
  6319650 (U.S. Sept. 23, 2023) .........................................................................24, 25

*Hazelwood Sch. Dist. v. Kuhlmeier*,
  484 U.S. 260 (1988) ........................................................................................... 29

*In re Abbott*,
  956 F.3d 696 (5th Cir. 2020),
  *cert. granted, judgment vacated as moot sub nom.* .......................................................12

*K.P. v. LeBlanc*,
  627 F.3d 115 (5th Cir. 2010)................................................................................14

*K.P. v. LeBlanc*,
  729 F.3d 427 (5th Cir. 2013) ...............................................................................12

*L.A. Police Dep't v. United Reporting Pub. Corp.*,
  528 U.S. 32 (1999)............................................................................................... 26

*Maher v. Roe*,
  432 U.S. 464 (1977)..............................................................................................18

*Matal v. Tam*,
  582 U.S. 218 (2017)..............................................................................................22

*McCarthy ex rel. Travis v. Hawkins*,
  381 F.3d 407 (5th Cir. 2004) ...............................................................................12

*Mi Familia Vota v. Abbott*,
    977 F.3d 461 (5th Cir. 2020) ............................................................... 13

*Miller v. California*,
    413 U.S. 15 (1973) ............................................................................... 27

*Milwaukee Police Ass'n v. Jones*,
    192 F.3d 742 (7th Cir. 1999) ............................................................... 28

*Moody v. Netchoice, LLC (Netchoice II),* 144 S. Ct. 2383 (2024) ............. 26, 27

*Morales v. Trans World Airlines, Inc.*,
    504 U.S. 374 (1992) ............................................................................. 15

*Murthy v. Missouri*,
    603 U.S. 43 (2024) ...................................................................... 9, 11, 12

*National Endowment for the Arts v. Finley*,
    524 U.S. 569 (1998) ....................................................................... 18, 23

*Netchoice, LLC v. Paxton*
    *(Netchoice I),* 49 F.4th 439 (5th Cir. 2022) .......................................... 26

*New York v. Ferber*,
    458 U.S. 747 (1982) ....................................................................... 17, 26

*NiGen Biotech, L.L.C. v. Paxton*,
    804 F.3d 389 (5th Cir. 2015) ............................................................... 15

*Okpalobi v. Foster*,
    244 F.3d 405 (5th Cir. 2001) ............................................................... 14

*Oles v. City of New York*,
    No. 22-1620-CV, 2023 WL 3263620 (2d Cir. May 5, 2023) ............... 24

*Ostrewich v. Tatum*,
    72 F.4th 94 (5th Cir. 2023) ................................................................. 13

*Palmer v. Jackson*,
    617 F.2d 424 (5th Cir. 1980) ............................................................... 16

*Pennhurst State Sch. & Hosp. v. Halderman*,
    465 U.S. 89 (1984) .............................................................................. 12

*Perry Educ. Assn. v. Perry Local Educators' Assn.*,
    460 U.S. 37 (1983) ........................................................................ passim

*Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*,
    413 U.S. 376 (1973) ............................................................................ 24

*Planned Parenthood Ctr. for Choice v. Abbott*,
  141 S. Ct. 1261 (2021) .......................................................................................................12

*Pleasant Grove City, Utah v. Summum*,
  555 U.S. 460 (2009) .......................................................................................................... 22

*Pope v. Illinois*,
  481 U.S. 497 n.11 (1987) (Stevens, J., dissenting).................................................17

*Prison Legal News v. Livingston*,
  683 F.3d 201 (5th Cir. 2012) ..........................................................................................9, 10

*Railroad Commission of Texas v. Pullman Co.*,
  312 U.S. 496 (1941) ...........................................................................................................16

*Regan v. Taxation with Representation of Washington*,
  461 U.S. 540 (1983) ...........................................................................................................18

*Reynolds v. Sims*,
  377 U.S. 533 (1964) ...........................................................................................................23

*Richardson v. Tex. Sec'y of State*,
  978 F.3d 220 (5th Cir. 2020) ..........................................................................................15

*Rust v. Sullivan*,
  500 U.S. 173 (1991) ...........................................................................................18, 19, 20, 21

*Sable Commc'ns of Cal., Inc. v. FCC*,
  492 U.S. 115 (1989) ...........................................................................................................19

*San Antonio Indep. Sch. Dist. v. Rodriguez*,
  411 U.S. 1 (1973)................................................................................................................25

*Scott v. Schedler*,
  826 F.3d 207 (5th Cir. 2016) ..........................................................................................16

*Simon v. Eastern Ky. Welfare Rights Organization*,
  426 U.S. 26 ..........................................................................................................................9, 10

*Sommers Drug Stores Co. Employee Profit Sharing Tr. v. Corrigan*,
  883 F.2d 345 (5th Cir. 1989) .......................................................................................... 8

*Southern Christian Leadership Conference v. Supreme Court of State of La.*,
  252 F.3d 781 (5th Cir. 2001) .......................................................................................... 18, 19, 20

*Spokeo, Inc. v. Robins*,
  578 U.S. 330 (2016)............................................................................................................ 9

*St. Tammany Par. ex rel. Davis v. FEMA*,
  556 F.3d 307 (5th Cir. 2009) ..........................................................................................15

*supplemented sub nom. Brown v. Bd. of Educ.*,
    349 U.S. 294 (1955) ........................................................................................25

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014) ......................................................................................... 9

*Tex. All. for Retired Americans v. Scott*,
    28 F.4th 669 (5th Cir. 2022) ...........................................................................13

*Tex. Democratic Party v. Abbott*,
    978 F.3d 168 (5th Cir. 2020) ...........................................................................13

*Texas v. Rettig*,
    987 F.3d 518 (5th Cir. 2021) .......................................................................... 28

*Thompson v. Oklahoma*,
    487 U.S. 815 (1988) ........................................................................................17

*Travis Cent. Appraisal Dist. v. Norman*,
    342 S.W.3d 54 (Tex. 2011) ..............................................................................23

*Turtle Island Foods, S.P.C. v. Strain*,
    65 F.4th 211 .................................................................................................... 9

*U.S. v. American Library Ass'n, Inc.*,
    539 U.S. 194 (2003) ........................................................................................19

*United Healthcare Ins. Co. v. Davis*,
    602 F.3d 618 (5th Cir. 2010) ...........................................................................19

*United States Envt'l Prot. Agency*,
    829 F.3d 405 (5th Cir. 2016) .......................................................................... 28

*United States v. Clinical Leasing Serv.*,
    925 F.2d 120 (5th Cir. 1991) .......................................................................... 26

*United States v. Hansen*,
    99 U.S. 762 (2023) ..........................................................................................27

*United States v. Tansley*,
    986 F.2d 880 (5th Cir. 1993) .......................................................................... 26

*Washington State Grange v. Washington State Republican Party*,
    552 U.S. 442 (2008) ....................................................................................... 26

*Will v. Michigan Dep't of State Police*,
    491 U.S. 58 (1989) ..........................................................................................12

*Wisconsin v. Yoder*,
    406 U.S. 205 (1972) ........................................................................................16

*Zauderer v. Off. Of Disciplinary Counsel*,
    471 U.S. 626 (1985) ........................................................................... 24

**Constitutional Provisions & Statutes**

Tex. Educ. Code at 19:9-15 ...........................................................................3

Tex. Educ. Code at 19:16-20:1 ......................................................................3

Tex. Educ. Code at 20:2-13; 61:20-62:9 .......................................................3

Tex. Educ. Code at 27:25-30:10 ................................................................... 6

Tex. Educ. Code at 99:22-101:7 ....................................................................4

Tex. Educ. Code at 127:17-128:5 ..................................................................4

Tex. Educ. Code at 130:5-15 .........................................................................5

Tex. Educ. Code at 147:10-23 .......................................................................5

Tex. Educ. Code at 166:20-25 ..................................................................... 6

Tex. Educ. Code § 25.001(3) .......................................................................27

Tex. Educ. Code § 33.021 ......................................................................10, 27

Tex. Educ. Code § 35.001-.008 ...................................................................10

Tex. Educ. Code § 35.002(a) ........................................................................10

Tex. Educ. Code § 35.003 .............................................................................14

Tex. Educ. Code § 35.003(a) ....................................................................... 29

Tex. Educ. Code § 35.003(e) .........................................................................14

Tex. Educ. Code § 35.008 .............................................................................14

Tex. Educ. Code ¶8 .................................................................................... 22

Tex. Pen. Code § 43.24 .................................................................................23

## INTRODUCTION

I congratulated him with a blowjob. It was the first time I swallowed. That's how happy I was to see him. I acted like a lady after I swallowed, smiling up at him….When I let him cum in my mouth, I had no idea how much there would be. How long I would have to continue swallowing. Keeping my composure was tough while his dick was in my throat, drowning me.[1]

This is content Plaintiffs have admitted selling to a Texas public middle school. *See* Ex. A., Blue Willow's Resps. and Objs. to Defs.['] First Set of Disc. Reqs. at Interrog. 2. This is the kind of content hidden among books sold to Texas public schools and disseminated to Texas public school children. This is the content for which READER serves as a gatekeeper.

READER does not "ban" books. READER does not prevent Plaintiffs from selling explicit material elsewhere. READER does not implicate the First Amendment. READER establishes a system by which school districts can prevent sexually explicit or obscene material from infiltrating public school libraries and subsequently being disseminated to school children and returns oversight of the dissemination of sexually relevant material to the hands of parents.

## STATEMENT OF GROUNDS & UNDISPUTED FACTS

**I.      Plaintiffs admit they sold books to Texas schools which contained sexually explicit material, as defined by READER.**

Blue Willow sold to Memorial Middle School of Spring Branch ISD one copy of *Verity*, *supra* at 2, as well as one copy of *It Ends With Us.*[2] Middle school students can be as young as ten years old. Blue Willow agreed that "I do not believe that content -- this – these excerpts out of these books that you have found to be appropriate for a ten year old."[3] [4] Blue Willow admitted that

---

[1] *Verity*, Colleen Hoover, p.86.
[2] See Ex. B, (Valerie Koehler Sept. 17, 2024 Depo) at 157:5-158:11.
[3] *Id* at 169:13-180:17.
[4] *It Ends With Us*, Colleen Hoover, pp.174-175: "He lowers his mouth to my chest and my eyes fall shut when I feel his tongue slide across my breasts. He takes me in his mouth…. He wraps the stethoscope around his neck again and then pulls me back, unbuttoning my jeans. Once he slides them off me, he turns me over until I'm on my stomach, my arms draped over the arm of the couch. 'Get on your knees,' he says….His other hand slowly begins to find its way between my legs and then inside my panties and then inside of me….He pulls my hips back to meet him and then I can feel him freeing himself from his scrubs. He grips my hip with one hand while shoving my panties aside with the other. Then he pushes forward until he's all the way inside of me…. His hand slides down my stomach and settles between

it would describe both books it sold to Memorial Middle School as sexually explicit, as defined in READER.[5] Blue Willow did not realize it had sold these books to a middle school until it received Defendant's discovery requests.[6]

BookPeople sold eight copies of *It Ends With Us* at Austin's Liberal Arts and Science Academy (LASA) High School in March 2022.[7] Its representative admitted that excerpts read from *It Ends With Us* constituted sexual conduct.[8]

## II.     Plaintiffs already treat books containing sexual content differently than books that don't contain such content.

Blue Willow screens out "porn-related material" from its in-store, consignment author program.[9] It sells adult fiction books containing bestiality,[10] but would refuse to sell them to a ten year old.[11] BookPeople does not currently sell pornography in its store, but when it did sell such material, it required purchasers to show ID.[12] Authors Guild testified that there is no category of children's book that generally includes sexual content.[13]

## III.     READER does not require TEA to take any actions adverse to Plaintiffs' interests in bookselling, nor has TEA done so.

READER requires two things of TEA: (1) to collect, post, and maintain on its website a list of library material vendors who failed to comply with a requirement that they rate material; and (2) to post a list of materials that a vendor rated as sexually explicit material or sexually relevant material that was sold to a school district or open enrollment charter school.[14] There are parts of

---

my legs. I can no longer keep up with his rhythm. I can barely even stay on my knees. He's somehow holding me up with one hand and destroying me in the best possible way with his other hand."

[5] See Ex. B., (Valerie Koehler Sept. 17, 2024 Depo) at 183:14-186:3.

[6] *Id.* at 178:18-179:1.

[7] See Ex. C., Plf. BookPeople, Inc.'s Resps. and Objs. to Defs. First Set of Disc. Reqs at Interrog. 3.

[8] See Ex. D., (Charley Rejsek Oct. 8, 2024 Depo) at 119:12-123:3.

[9] See Ex. B., (Valerie Koehler Sept. 17, 2024 Depo) at 107:10-109:12.

[10] *Id.* at 118:25-121:17.

[11] *Id.* at 164:18-20.

[12] See Ex. D., (Charley Rejsek Oct. 8, 2024 Depo) at 55:7-16.

[13] See Ex. E., (Mary Rasenberger Oct. 1, 2024 Depo) at 52:9-16.

[14] See Ex. F., (Monica Martinez Oct. 11, 2024 Depo) at 15:10-20.

the TEA website which only certain school districts' staff with access can see.[15]

The only step TEA has taken to implement READER is to "notify school districts what the legislation requires."[16] When asked who enforces READER if book sellers do not rate books in compliance with statute, TE testified, "I am not sure that there is a specific enforcement mechanism written into the law."[17] Likewise, READER assigns responsibility for determining whether a vendor has rated a book.[18] When asked whether schools are allowed to buy books rated sexually explicit under READER, TEA responded, "Schools are told not to buy it. I don't know if that means they will or they won't."[19] When asked whether TEA anticipated consequences through rulemaking for schools that purchase unrated books, TEA testified "TEA was not given authority to contemplate consequences or build them into a rule."[20]

READER gives TEA permissive authority to review and rate library materials previously rated by vendors, but TEA has had no discussions about whether it will or should do so.[21] READER also gives TEA permissive authority on whether to adopt administrative rules.[22] It does not give TEA explicit authority to enforce school board compliance with library standards.[23]

"[U]nless the Commissioner of Education or TEA is given explicit authority to monitor a specific law, then it automatically defaults to local school districts."[24] Because TEA lacks explicit authority over library book complaints, authority "falls to local school districts," not TEA.[25]

---

[15] *Id.* at 186:14-187:6.
[16] *Id.* at 16:18-23.
[17] *Id.* at 68:21-25.
[18] *Id.* at 73:20-23.
[19] *Id.* at 186:9-13.
[20] *Id.* at 215:9-18.
[21] *Id.* at 20:2-13; 61:20-62:9.
[22] *Id.* at 75:1-76:9.
[23] *Id.* at 69:1-6.
[24] *Id.* at 19:9-15.
[25] *Id.* at 19:16-20:1.

TEA has not begun work on policies or procedures to implement READER.[26] Blue Willow has not sold any books to TEA or Commissioner Mike Morath.[27]

**IV.    Texas schools set the conditions by which they purchase books and Plaintiffs have no interest in which titles they sell to Texas schools.**

Texas schools purchase books through authorized vendors, using requests for proposal (RFP) and requests for quote (RFQ).[28] [29] Vendors must be approved by each separate school district, whose processes vary: "Some are more stringent than others….Each school district being a little bit different."[30] RFPs can be 40 to 50 pages long and the vendor either submits the information requested by the school district or does not get on that district's list of authorized vendors, "There's nothing really negotiated. You either fill out the form or not. There's no negotiation going on."[31] There are many forms that are required to be submitted with the RFP, which cannot be submitted through a district's online portal if even a single required form is missing.[32] Some school districts require vendors applying for RFPs to carry car insurance and liability insurance naming the district as the beneficiary.[33] After a vendor is authorized, it is typically allowed to sell to schools for one to three years.[34] Authorized vendors are not guaranteed that their RFPs will be renewed and Blue Willow testified that once a school district canceled the current vendors' RFPs and made them reapply.[35]

An authorized vendor can sell books to school districts and certain terms can be negotiated, such as price per unit and freight costs.[36] Requests from school districts to purchase books are

---

[26] *Id.* at 26:1-3.
[27] See Ex. B., (Valerie Koehler Sept. 17, 2024 Depo) at 189:10-12.
[28] *Id.* at 16:8-17:24.
[29] Texas schools sometimes also purchase books through co-ops, but Defendant is not aware of any Plaintiffs that sell books to Texas schools through co-ops.
[30] See Ex. B., (Valerie Koehler Sept. 17, 2024 Depo) at 80:21-81:14.
[31] *Id.* at 83:23-85:11.
[32] *Id.* at 87:6-88:13.
[33] *Id.* at 99:22-101:7.
[34] *Id.* at 127:17-128:5.
[35] *Id.* at 95:1-96:10.
[36] *Id.* at 85:12-22.

always title specific.[37] Plaintiffs do not recommend particular books to the school districts: "To be very clear, we don't recommend that they buy any books."[38] "My agnosticism is as a book – as a business person not to make that choice for the customer."[39] BookPeople has never declined to fill a book order and will sell any book it can source.[40] "Once again, we don't choose the titles. If somebody says I want ten Newbery Books, the response would be, which ones? We don't pick titles for schools. We would be like, (d)o you want one of every one, right? Do you want one of every – we don't pick titles for schools at all."[41]

## V.    Texas schools have no obligation to buy books from Plaintiffs, now or in the future.

There are Plaintiffs who are authorized vendors to Texas schools.[42] Authorized vendors are not guaranteed a sale; they are only eligible for sales.[43] In "(e)very contract at the end of the RFP, you have to acknowledge that you know that even if you are an approved vendor, it does not guarantee sales from … that particular school district."[44] "It guarantees me no quote, no request for quote, nor guaranteed sales . . . The school would send a request for a quote. We would return that with a quote, and there's a possibility that the school district will follow through with it and send a purchase order."[45] Outstanding purchase orders usually take about two weeks to fulfill, and vendors have no expectation of future sales to Texas schools.[46]

---

[37] See Ex. D., (Charley Rejsek Oct. 8, 2024 Depo) at 75:10-76:11.
[38] See Ex. B., (Valerie Koehler Sept. 17, 2024 Depo) at 131:23-132:7.
[39] *Id.* at 147:10-23.
[40] See Ex. D., (Charley Rejsek Oct. 8, 2024 Depo) at 85:2-18.
[41] *Id.* at 86:16-24.
[42] See Ex. B., (Valerie Koehler Sept. 17, 2024 Depo) at 78:8-79:8.
[43] *Id.* at 101:16-102:6; See Ex. D., (Charley Rejsek Oct. 8, 2024 Depo) at 165:24-166:14.
[44] See Ex. B., (Valerie Koehler Sept. 17, 2024 Depo) at 129:14-24.
[45] *Id.* at 130:5-15.
[46] *Id.* at 156:3-18.

**VI.**      **Plaintiffs have not established that they would bear the additional cost of rating books sold to Texas schools or what those costs might be.**

If a ratings system were implemented under READER, Plaintiffs have not established that they would be the ones creating the ratings. There is debate whether authors, publishers, distributors, or some third party would ultimately be responsible for the ratings.[47]

The bookstore Plaintiffs already use third-party resources to determine whether books are appropriate for children. BookPeople currently uses data from the digital catalog platform Edelweiss to help categorize books.[48] Edelweiss already categorizes books by age and reading level.[49] BookPeople also uses age-appropriateness information from book distributor Ingram to populate its own website.[50] BookPeople was unaware of the company ever vetting the information provided by Ingram.[51] BookPeople also uses a list ("Kids Alpha List") created by a former employee of 18 years, which it found to be a reliable way of categorizing books for children, even books that had not been read.[52] BookPeople admitted it relied entirely on publishers' evaluations to ensure it did not provide sexually explicit material to minors.[53] BookPeople has never had to reshelve a book because of sexual content in the book while using these third parties' information.[54] Blue Willow relies upon the Book Industry Standards and Communications (BISAC) to determine whether its books are primarily intended for adults or children, and it only recalled one instance where it made a categorization determination different than BISAC – moving a book from the children's section to "personal growth" because it would sell better in that section.[55] Plaintiffs are aware that there are also websites that provide ratings of sexual content in children's books.[56]

---

[47] See Ex. E., (Mary Rasenberger Oct. 1, 2024 Depo) at 42:5-43:22.
[48] See Ex. D., (Charley Rejsek Oct. 8, 2024 Depo) at 20:15-21:5.
[49] *Id.* at 25:16-26.
[50] *Id.* at 27:25-30:10.
[51] *Id.* at 115:13-18.
[52] *Id.* at 41:11-44:24.
[53] *Id.* at 56:20-25.
[54] *Id.* at 54:12-15.
[55] See Ex. B., (Valerie Koehler Sept. 17, 2024 Depo) at 71:5-74:5.
[56] *Id.* at 166:20-25; See Ex. D., (Charley Rejsek Oct. 8, 2024 Depo) at 53:7-12.

Blue Willow allegedly created cost projections to rate books they sold to Texas school under READER, after they had retained counsel, but destroyed the projections before producing them to the Defendant.[57] Additionally, Blue Willow could not say for certain whether any books they sold to Texas schools fell outside Section 3's curriculum exception to the ratings provision.[58]

Plaintiffs have shown they are able to determine whether commonly repeating content in books would be defined as "sexually explicit" or "sexually relevant" under READER. Blue Willow's representative initially expressed concern that READER was vague about whether books which contained kissing, or kissing between members of the same sex, would be considered sexually relevant or explicit. ECF 1, Ex. C at ¶18. After reviewing the statute, she however was able to determine that kissing, up to and including "passionate French kissing," would not be considered sexually relevant or explicit under READER.[59] And both BookPeople and Blue Willow admitted that content in books they sold to Texas schools constituted sexual conduct, sexually relevant content, and sexually explicit content. *Supra* at I.

## VII.    The Plaintiffs have not suffered economic harm traceable to READER.

Blue Willow does not track revenue from school orders versus non-school orders.[60] Blue Willow therefore cannot show whether it profits from sales to Texas schools. Blue Willow made slightly under $20,000 in 2023 due to the purchase of a vehicle, unrelated to READER, but otherwise is within their historical profitability.[61] Similarly, BookPeople does not track sales to Texas schools, and therefore cannot calculate what revenue loss would result from the loss of its Texas school contracts.[62] When asked whether BookPeople could say that it even makes money on its contracts with Texas schools, its representative testified, "I have nothing to prove it."[63]

---

[57] See Ex. B., (Valerie Koehler Sept. 17, 2024 Depo) at 31:16-33:12.
[58] *Id.* at 54:20-55:2.
[59] *Id.* at 38:25-48:22.
[60] *Id.* at 19:3-20:1.
[61] *Id.* at 34:9-36:17.
[62] See Ex. D., (Charley Rejsek Oct. 8, 2024 Depo) at 99:2-100:16.
[63] *Id.* at 101:13-103:17.

Authors Guild has shown no economic harm from READER. Its representative testified that some self-published members *might* sell directly to Texas schools.[64]  Members who are "traditional authors" could sell to schools through distributors like Follett, but "aren't necessarily aware of who the publisher is selling the books to and how."[65] Authors Guild also testified that she did not know whether any Guild members routinely sold books to Texas ISDs or directly to public school librarians in Texas.[66] She further testified that she was unaware whether Guild members had existing contracts with Texas schools or whether READER had affected these theoretical contracts.[67] The Guild's representative mentioned three of its members who were having down years in Texas, financially, but none had been told it was because of READER, and the author that was used to illustrate the point writes on topics unrelated to those covered by the statute.[68]

Plaintiffs also allege that they were already harmed by READER when Katy ISD ceased library book purchases. ECF 1 at n.44. This claim however is not supported by the evidence. TEA has not ordered or recommended to Katy ISD, or any other Texas ISD, not to purchase books.[69] Katy ISD did not cancel any purchase orders from Blue Willow and Blue Willow received compensation for books they had sold to Katy ISD.[70] And Blue Willow is unaware of any Texas school cancelling a purchase order with Blue Willow because of READER.[71]

## ARGUMENT

### I.    Plaintiffs lack Article III standing.

Standing can be raised at any time. *Sommers Drug Stores Co. Employee Profit Sharing Tr. v. Corrigan*, 883 F.2d 345, 348 (5th Cir. 1989). Defendants having challenged Plaintiffs' standing at the inception of this litigation; both this Court and the Fifth Circuit found that Plaintiffs established

---

[64] See Ex. E., (Mary Rasenberger Oct. 1, 2024 Depo) at 21:1-24.
[65] *Id.* at 28:22-29:8.
[66] *Id.* at 32:20-33:13.
[67] *Id.* at 34:12-35:20.
[68] *Id.* at 36:21-39:15; 41:8-16.
[69] See Ex. F., (Monica Martinez Oct. 11, 2024 Depo) at 217:25-218:10.
[70] See Ex. B., (Valerie Koehler Sept. 17, 2024 Depo) at 136:22-137:23.
[71] *Id.* at 141:5-7.

standing to raise the claims asserted against Commissioner Morath. ECF 43; *Book People, Inc. v. Wong*, 91 F.4th 318 (5th Cir. 2024). Specifically, the Fifth Circuit found that although Commissioner Morath only has authority to enforce library collection standards against school districts, Plaintiffs' injury was sufficiently demonstrated through the "determinative or coercive effect" Commissioner Morath's authority has on school districts' purchasing decisions. *Book People, Inc.*, 91 F.4th at 331 (citations omitted).

Since then, the Supreme Court has issued *Murthy v. Missouri*, 603 U.S. 43 (2024). In *Murthy*—like here—Plaintiffs' theories of standing depended upon an attenuated finding of injury allegedly inflicted by parties with no actual enforcement authority. Emphasizing the "bedrock principle that a federal court cannot redress injury that results from the independent action of some third party not before the court," *Murthy*, 603 U.S. at 44 (internal quotations omitted) (citing *Simon v. Eastern Ky. Welfare Rights Organization*, 426 U.S. 26, 41–42 (1976)), the Court declined to make such a finding. *See generally*, *Murthy*, 603 U.S. 43.

To establish standing, Plaintiffs "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016); *accord El Paso County v. Trump*, 982 F.3d 332, 337 (5th Cir. 2020). The alleged "injury in fact" will suffice only if it is "concrete, particularized, and actual or imminent." *Clapper v. Amnesty Int'l*, 568 U.S. 398, 409 (2013). Plaintiffs can demonstrate injury in fact in a pre-enforcement challenge by showing that: "(1) [they] intend[] to engage in a course of conduct arguably affected with a constitutional interest; (2) that the course of action is arguably proscribed by statute; and (3) that there exists a credible threat of prosecution under the statute." *Turtle Island Foods, S.P.C. v. Strain*, 65 F.4th 211, 215–16 (5th Cir. 2023) (citing *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014)).

First, Plaintiffs have failed to demonstrate that they intend to engage in a course of conduct arguably affected with a constitutional interest *as it relates specifically to particular purchasers,* such as the State of Texas or a school district. Selling books *in general* may arguably be affected with a First Amendment interest. *Book People, Inc.*, 91 F.4th at 329 (citing *Prison Legal News v. Livingston*,

683 F.3d 201, 212 (5th Cir. 2012); *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 64 n.6 (1963); *Genusa v. City of Peoria*, 619 F.2d 1203, 1218 (7th Cir. 1980); *Bd. Of Educ. v. Pico*, 457 U.S. 853, 867 (1982)). However, the cases cited by the Fifth Circuit are distinguishable. *Prison Legal News*, *Bantam Books*, and *Genusa* involve government censorship or meddling in the general ability of book vendors to sell certain books to *private* purchasers. *See generally*, *Prison Legal News*, 683 F.3d 201; *Bantam Books*, 372 U.S. 58; *Genusa*, 619 F.2d 1203. READER does no such thing. *Bd. Of Educ. v. Pico* concerns removal of books from public school libraries. *See generally*, *Pico*, 457 U.S. 853. READER does not do this, either. Rather, READER merely seeks to establish criteria to be used as the basis of the bargain when the State, as a purchaser, decides whether to enter into a contractual relationship to buy books from any particular vendor. Although Plaintiffs may have a constitutional interest in selling books as a general matter, they do not have a constitutional interest in forcing the sale of books to any purchaser of their choosing, including Texas or its school districts.

Second, Plaintiffs have failed to demonstrate a credible threat of enforcement that is traceable to Commissioner Morath. It is undisputed that Commissioner Morath "cannot enforce the library-collection standards against Plaintiffs." *Book People, Inc.*, 91 F.4th at 330; *see generally*, TEX. EDUC. CODE §§ 33.021, 35.001-.008. Additionally, no Plaintiff has a duty to adhere to any library collection standards. *Id.* The Fifth Circuit's prior characterization that "[READER] facially forbids Plaintiffs from selling books to public schools unless they comply with the statute and provide ratings" is an incomplete construction. *Book People, Inc.*, 91 F.4th at 330; TEX. EDUC. CODE § 35.002(a). READER does not operatively prohibit Plaintiffs from doing anything because it contains no mechanism allowing or requiring Commissioner Morath to enforce any of its provisions against Plaintiffs; rather, it prohibits the school districts from purchasing books from vendors who have failed to comply with some of its requirements. Whether school districts abide by READER's requirements effectively constitutes potential "injury [to Plaintiffs] that results from the independent action of some third party not before the court." *Simon*, 426 U.S. at 41–42. To the extent that Plaintiffs argue this standard does not "exclude injury produced by determinative or coercive effect upon the action of someone else," *Bennett v. Spear*, 520 U.S. 154,

169 (1997), Plaintiffs have not established this to be the case. To the contrary, here, as in *Murthy*, Plaintiffs themselves have pled that the third-party school districts paused purchases from Plaintiffs, independently, long before READER was to take effect and could have had any coercive effect. ECF 1 at ¶ 36; *Book People, Inc.*, 91 F.4th at 332 n.65 ("[W]e agree with the State that Katy ISD's decision to pause purchasing due to 'uncertainty surrounding [READER]' cannot confer standing. . . the decision was apparently based on the district's internal process. . . and has no connection to Plaintiffs."). Further, Marfa ISD approved a new school library policy in March 2024, despite the Court's injunction of READER. Plaintiffs do not sell books directly to the Texas Education Agency or to Commissioner Morath.[72] *See* Ex. B., Koehler Dep. 189:10-12, Sept. 17, 2024. The school districts here have "independent incentives" and may "exercise[] their own judgment," just as the third party social media platforms had in *Murthy*. 603 U.S. at 44.

In *Murthy*, even with voluminous, documented past censorship—relevant for the predictive value of future censorship—the Court declined to find a traceable, credible threat of enforcement in such an attenuated chain of events. The basis for such a finding here is even less tenable, as there is no demonstrable past enforcement by which one can rely upon for any predictive value. Thus, because Article III standing "still requires that a federal court act only to redress injury that fairly can be traced to the challenged action of the defendant," *id.*, Plaintiffs have failed to demonstrate a credible threat of enforcement traceable to Commissioner Morath.

Finally, a favorable decision would not redress Plaintiffs' alleged injuries. Redressability requires a plaintiff to show "it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envt'l. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000). Remedies "operate with respect to specific parties." *California v. Texas*, 593 U.S. 659, 672 (2021) (citation omitted). Here, as in *Murthy*, "the plaintiffs' theories of standing depend on the [*school districts'*] actions—yet the plaintiffs do not seek to enjoin the [school

---

[72] *See* Ex. G., Cantrell, M. (March 6, 2024) "Impacts unclear as Marfa ISD adopts controversial, state-mandated school library policy"; https://bigbendsentinel.com/2024/03/06/impacts-unclear-as-marfa-isd-adopts-controversial-state-mandated-school-library-policy/ (last visited November 22, 2024).

districts] . . . [i]nstead, they seek to enjoin the *Government* [] *official* [] from pressuring or encouraging the [school districts] . . . ." *Murthy*, 603 U.S. at 44. Plaintiffs have not demonstrated that a favorable decision by this Court would alter the decisions of school districts to buy or decline to buy books from them. Plaintiffs have no pre-existing right to, or promise of, future book sales to any school district or charter school, and their requested relief would create no such assurance. Enjoining enforcement of READER would not require any school district to contract with any Plaintiff or purchase any book from any Plaintiff. Plaintiffs have failed to establish the existence of an Article III case or controversy and thus, have no standing to maintain this suit.

## II.    Defendants are entitled to sovereign immunity.

Under the Eleventh Amendment, this Court lacks jurisdiction to hear a suit against the State of Texas—irrespective of the relief sought—in the absence of an explicit waiver of sovereign immunity. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100-02 (1984); *Edelman v. Jordan*, 415 U.S. 651, 662-63 (1974). A suit against a state official in his or her official capacity is effectively a suit against the state. *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989). Therefore, as a preliminary matter, any Section 1983 claim or request for declaratory relief against Defendants in their official capacities is flatly barred by sovereign immunity unless an exception applies. *See McCarthy ex rel. Travis v. Hawkins*, 381 F.3d 407, 412 (5th Cir. 2004) (citation omitted). *Ex parte Young* provides one such exception, allowing sovereign immunity to be overcome when a suit "seeks prospective, injunctive relief from a state actor, in [his] official capacity, based on an alleged ongoing violation of the federal constitution." *K.P. v. LeBlanc*, 729 F.3d 427, 439 (5th Cir. 2013). Plaintiffs cannot show that this exception applies for several reasons.

First, the Defendants lack a sufficient connection to enforcement of the provisions of READER challenged by Plaintiffs. "*Ex parte Young* allows suits for injunctive or declaratory relief against state officials [in their official capacities], provided they have sufficient 'connection' to enforcing" a state action that allegedly violates federal law. *In re Abbott*, 956 F.3d 696, 708 (5th Cir. 2020) (citations omitted), *cert. granted, judgment vacated as moot sub nom. Planned Parenthood Ctr.*

*for Choice v. Abbott*, 141 S. Ct. 1261 (2021). If there is no such connection to enforcement, "the suit is effectively against the state itself and thus barred by the Eleventh Amendment and sovereign immunity." *Id.* (citations omitted).

To have the requisite connection to enforcement, an official must have more than "the general duty to see that the laws of the state are implemented." *City of Austin v. Paxton*, 943 F.3d 993, 999-1000 (5th Cir. 2019); *Ostrewich v. Tatum*, 72 F.4th 94, 100 (5th Cir. 2023) (holding that because the Secretary of State of Texas had only "broad duties to oversee administration of Texas's election laws" the Secretary was not subject to *Ex Parte Young*'s narrow exception to sovereign immunity.). Rather, the official must have "the particular duty to enforce the statute in question and a demonstrated willingness to exercise that duty." *Tex. Democratic Party v. Abbott*, 978 F.3d 168, 179 (5th Cir. 2020) (citation omitted). This means that the statutory analysis is performed "provision-by-provision": the officer must enforce "the particular statutory provision that is the subject of the litigation." *Id.* (citation omitted); *see also Mi Familia Vota v. Abbott*, 977 F.3d 461, 467-68 (5th Cir. 2020). And, importantly, "enforcement' means 'compulsion or constraint.'" *Tex. All. for Retired Americans v. Scott*, 28 F.4th 669, 672 (5th Cir. 2022) (quoting *City of Austin*, 943 F.3d at 1000). Enforcement does not mean application of the second half of a conditional based on compliance or noncompliance with the first half; it does not mean providing notification to, or public notice of, those in noncompliance with the conditional. Enforcement only means compulsion or constraint. *Id.*

Here, the Fifth Circuit has already held that the library-collection standards—which Chairs Wong and Ellis are responsible for promulgating—are not enforceable against plaintiffs, meaning that the sovereign immunity analysis is relevant only with regards to Commissioner Morath. *Book People, Inc. v. Wong*, 91 F.4th 318, 332 n.72 (5th Cir. 2024). And READER does not task Commissioner Morath with compelling or constraining any of the behavior of any Plaintiff in this case. Rather, READER tasks Commissioner Morath with a responsibility that is predominantly repertorial in nature: to post the ratings received from library vendors compliant with READER on the TEA's website, and to determine and appropriately list which library material vendors have

not complied with the ratings requirements of READER. In particular, READER imbues Commissioner Morath, as head of TEA, with discretionary authority to review library materials sold by a library vendor that are either not rated or are incorrectly rated, and to "provide assistance to school districts and open-enrollment charter schools in complying" with the terms of the Act. TEX. EDUC. CODE §§ 35.003, 35.008. When a TEA review reveals unrated or incorrectly rated materials subject to the Act, READER requires TEA to provide written notice to the noncompliant vendor and add that vendor to a list of noncompliant vendors "post[ed] and maintain[ed] in a conspicuous place on the agency's Internet website." *Id.* at § 35.003.

Plaintiffs do not plead any facts indicating that Commissioner Morath is tasked with "enforcement" of READER within the meaning of *Ex parte Young*. Even assuming that any named Plaintiff is—following proper notice—identified as a noncompliant library vendor under Section 35.003, such identification could not be considered to be "compulsion or constraint" sufficient to fall within the *Ex parte Young* exception to sovereign immunity. Such identification would merely be an acknowledgement and recordation of a conditional status: that *if* a library vendor is noncompliant with the terms of READER, *then* that vendor is added to a list of noncompliant vendors located on the TEA website. While Commissioner Morath's responsibility under READER is not akin to that at issue in *Okpalobi v. Foster*, where "no state official ha[d] any duty or ability to do *anything*" with regard to application of the challenged statute, it is also not akin to the enforcement responsibility at issue in *K.P. v. Leblanc*, where the defendant officials' "role start[ed] with deciding whether to have a medical review panel consider abortion claims and end[ed] with deciding whether to pay them." *Okpalobi v. Foster*, 244 F.3d 405, 427 (5th Cir. 2001); *K.P. v. LeBlanc*, 627 F.3d 115, 125 (5th Cir. 2010). And though Commissioner Morath's responsibility under READER includes reviewing vendors' petitions for removal from the noncompliance list, his responsibilities do not include setting standards for compliance or imposing monetary penalties for noncompliance. TEX. EDUC. CODE § 35.003(e); *c.f. Air Evac EMS, Inc. v. Texas, Dep't of Ins., Div. of Workers' Comp.*, 851 F.3d 507, 514 (5th Cir. 2017). At bottom, Commissioner Morath's duty to log and list vendors noncompliant with READER does not

compel or restrain the actions of any named Plaintiff, and therefore is not "enforcement" within the meaning of *Ex parte Young*'s slim exception to sovereign immunity.

Second, and related to the standing defects noted above, any threat of "enforcement" alleged is not *imminent*. *See Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992) (*Ex parte Young* permits enjoinment when officers "who threaten and are about to commence proceedings, either of a civil or criminal nature"). The "Article III standing analysis and *Ex parte Young* analysis 'significant[ly] overlap.'" *City of Austin*, 943 F.3d at 1002. No allegations suggest "that formal enforcement [is] on the horizon" based on a Defendant's conduct. *NiGen Biotech, L.L.C. v. Paxton*, 804 F.3d 389, 392 (5th Cir. 2015). In fact, the TEA does not "believe [READER] gives the Agency explicit authority to enforce school board compliance," does not identify specific "repercussions for a publisher or vendor who doesn't comply," and has not "made a determination about . . . if or when the Agency would review books."[73] Thus, absent any actual imminent compulsion or constraint, Plaintiffs cannot invoke *Ex parte Young* against Defendants.

Third, Plaintiffs' requested relief does not fall within the *Ex parte Young* exception to sovereign immunity. By seeking injunctive relief aimed at preventing Defendants from implementing READER, *see* ECF 6 at p. 20, Plaintiffs improperly seek to "'control an officer in the exercise of his [or her] discretion.'" *Richardson v. Tex. Sec'y of State*, 978 F.3d 220, 242 (5th Cir. 2020) (citation omitted). Under *Ex parte Young*, a federal court "cannot control the exercise of the discretion of an officer. It can only direct affirmative action where the officer having some duty to perform not involving discretion, but merely ministerial in its nature, refuses or neglects to take such action." 209 U.S. at 158.

If, as here, "'a statute, regulation, or policy leaves it to . . . [an] agency to determine when and how to take action, the agency is not bound to act in a particular manner and the exercise of its authority is discretionary." *Richardson*, 978 F.3d at 242 (quoting *St. Tammany Par. ex rel. Davis v.*

---

[73] See Ex. F., (Monica Martinez Oct. 11, 2024 Depo) at 69:1–20.

*FEMA*, 556 F.3d 307, 323 (5th Cir. 2009)). And when a statute "leaves [officials] considerable discretion and latitude" in how to implement uniform standards, challengers cannot invoke *Ex parte Young. Id.* As the Supreme Court has recognized, states have the "high responsibility for education of its citizen," which includes the obligations to set standards for what children learn in school and to protect parents' rights to protect their children from inappropriate material. *Wisconsin v. Yoder*, 406 U.S. 205, 213 (1972). States discharge these obligations by "impos[ing] reasonable regulations for the control and duration of basic education." *Id.* This is, in fact, "the very apex of the function of a State." *Id.* Because the injunctive relief sought seeks to restrain discretion in carrying out this important responsibility, Plaintiffs cannot invoke *Ex parte Young*.

Fourth, even if *Ex parte Young* were applicable, the relief sought would be impermissible. Statewide relief is improper here because Plaintiffs seek a vague and overbroad injunction. An injunction is "overly vague if it fails to satisfy the specificity requirements set out in Rule 65(d)(1), and it is overbroad if it is not narrowly tailor[ed] . . . to remedy the specific action which gives rise to the order as determined by the substantive law at issue." *Scott v. Schedler*, 826 F.3d 207, 211 (5th Cir. 2016). Additionally, "[i]njunctions must be narrowly tailored within the context of the substantive law at issue to address the specific relief sought." *E.T. v. Paxton*, 19 F.4th 760, 769 (5th Cir. 2021). Plaintiffs' requested statewide injunction is not narrowed to the issues raised in this lawsuit because Plaintiffs have failed to allege an injury by each school district in Texas.

Alternatively, the Court should abstain from exercising jurisdiction under *Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496, 499-500 (1941). Plaintiffs advance an interpretation of READER inapposite to the text of the statute, the construction of which belongs "to the supreme court of Texas." *Pullman*, 312 U.S. at 499-500. There is more than "a possibility that" judicial construction "will moot or present in a different posture the federal constitutional questions raised." *Palmer v. Jackson*, 617 F.2d 424, 428 (5th Cir. 1980).

**III.      READER's protections enacted for the benefit of Texas's minor children are in compliance with the First Amendment.**

Defendant is on firm Constitutional ground in protecting Texas children from sexually

explicit content at Texas's public schools. *See, e.g., Ginsberg v. New York*, 390 U.S. 629, 639 (1968) ("The well-being of its children is of course a subject within the State's constitutional power to regulate," "justify[ing] . . . limitations . . . upon the availability of sex material to minors"); *FCC v. Pacifica Found.*, 438 U.S. 726, 749 (1978) ("Bookstores and motion picture theaters . . . may be prohibited from making indecent material available to children."); *New York v. Ferber*, 458 U.S. 747, 757 (1982) ("we have sustained legislation aimed at protecting the physical and emotional well-being of youth even when the laws have operated in the sensitive area of constitutionally protected rights"); *Thompson v. Oklahoma*, 487 U.S. 815, 824 (1988) (in all "50 States," "no one under age 16 may purchase pornographic materials"); see also *Pope v. Illinois*, 481 U.S. 497, 516 n.11 (1987) (Stevens, J., dissenting) ("As for prohibiting sale or exhibition of sexually explicit material to minors . . . it has long been established that the State may go beyond the constitutional definition of obscenity.").

*Free Speech Coalition, Incorporated v. Paxton*, 95 F.4th 263, 270 (C.A.5 (Tex.), 2024) recently reaffirmed "*Ginsberg*'s central holding—that regulation of the distribution *to minors* of speech obscene *for minors* is subject only to rational-basis review." Prohibiting sexually explicit material from school libraries is rationally related to Texas' interest in protecting the physical and emotional well-being of Texas youth.

## IV.     Texas can decline to expend its funds on sexually explicit books for school libraries.

READER does not compel speech because it does not make Texas a "regulator armed with the coercive powers of the State." *Book People, Inc. v. Wong*, 98 F.4th 657, 660 (5th Cir. 2024) (Ho, J. dissenting from denial of rehearing *en banc*); *cf. Book People Inc. v. Wong*, 91 F.4th 318, 336 n. 103 (5th Cir. 2024). Instead, READER treats public schools seeking to purchase books as what they are: consumers with important questions about the goods they intend to purchase. Vendors need not answer consumer questions, though that choice risks losing customers. So, too, here.

The First Amendment does not require school districts to purchase every single book a vendor has to sell, or that the State can set no terms on how vendors can earn its business.

Consumers may refuse to purchase books from vendors based on the content of the book or based on a host of additional factors. A consumer may wish to purchase only from vendors exclusively peddling books made of recycled paper, or from vendors offering ethically-sourced coffee, or from locally-owned stores. These consumer choices do not impel vendors to restock books made of virgin rainforest timber, or to cancel their Starbucks contract, or to relocate their business.

READER does not send TEA agents fast-roping from helicopters to prevent book vendors from selling sexually explicit materials. On the contrary, under READER, book vendors may sell whatever books they like to whomever they like—provided the targeted consumer is a willing purchaser. READER is not a bookselling regulation, it is a consumer demand.

The government is entitled to broadly define the limits for spending appropriated public funds. *Rust v. Sullivan*, 500 U.S. 173, 194 (1991). "The government may allocate competitive funding according to criteria that would be impermissible were direct regulation of speech or a criminal penalty at stake." *National Endowment for the Arts v. Finley*, 524 U.S. 569, 587-88 (1998). "There is a basic difference between state interference with a protected activity and state encouragement of an alternative activity consonant with legislative policy." *Maher v. Roe*, 432 U.S. 464, 475 (1977). "[A] legislature's decision not to subsidize the exercise of a fundamental right does not infringe on the right." *Rust*, 500 U.S. at 193 (quoting *Regan v. Taxation with Representation of Washington*, 461 U.S. 540, 549 (1983)).

Not every governmental decision is regulatory. A government's "refusal to promote private speech is not on a par with a regulation that prohibits or punishes speech, or which excludes a speaker from a public or nonpublic forum." *Southern Christian Leadership Conference v. Supreme Court of State of La.*, 252 F.3d 781, 193 (5th Cir. 2001). "Constitutional concerns are greatest when the State attempts to impose its will by force of law," *Maher*, 432 U.S. 464, but "the Government can, without violating the Constitution, selectively fund a program to encourage certain activities it believes to be in the public interest, without at the same time funding an alternative program which seeks to deal with the problem in another way." *Rust*, 500 U.S. at 194. "In so doing, the Government has not discriminated on the basis of viewpoint; it has merely chosen to fund one

activity to the exclusion of the other." *Id*. READER puts would-be school book vendors to ordinary vendor choices about what they will sell, to whom, and how. Such choices are fundamentally different from State-mandated restrictions on what vendors may sell to others.

States may exercise wider decision-making authority outside the regulatory context without violating the First Amendment. The State can explicitly prohibit expression of a particular viewpoint by when setting up a State-funded program without running afoul of the First Amendment. *Southern Christian Leadership Conference*, 252 F.3d 794 (citing *Rust*). Indeed, the State can require program participants, "as a condition on [receipt of government funds], to surrender their First Amendment right to provide the public with access to constitutionally protected speech." *U.S. v. American Library Ass'n, Inc.*, 539 U.S. 194, 210 (2003).

The First Amendment does not prevent Texas from making policy choices to appropriate public monies when exercising the power to create government-funded programs; *a fortiori*, the First Amendment does not require the State to abandon those policy choices when acting in the weaker position of consumer. "A state is a market participant if it is purchasing or selling a product or service; in such cases, it can choose its contracting partners as if it were a private party and can choose to deal preferentially []." *United Healthcare Ins. Co. v. Davis*, 602 F.3d 618, 624 (5th Cir. 2010) (citing *Hughes v. Alexandria Scrap Corp.*, 426 (U.S. 794, 809-10 (1976)). It stands to reason that where the law forbids distributing smut to children, the State—acting as a consumer—can set purchase conditions designed to avoid such distribution. Texas has chosen to expend funds on school library books generally, but not to expend funds on certain sexually explicit books to which it may restrict children's access. *Cf. Sable Commc'ns of Cal., Inc. v. FCC*, 492 U.S. 115, 126 (1989).

There is no constitutional right to the State's purchase of a vendor's wares. The Constitution "does not confer an entitlement to such funds as may be necessary to realize all the advantages of [First Amendment] freedom." *McRae*, 448 U.S. at 318. "A refusal to fund protected activity, without more, cannot be equated with the imposition of a 'penalty' on that activity." *Rust*, 500 U.S. at 193 (citing *McRae*, 448 U.S. at 3 17 n.19). Plaintiffs acknowledge they have no guarantee that school districts will award them contracts, or even purchase books under an awarded

contract.[74] Moreover, Plaintiffs do not complain that the procurement and application processes already required to become a book vendor to public schools impedes their First Amendment rights—nor could they. *Southern Christian Leadership Conference*, 252 F.3d at 795 ("Some of the client organizations in this case may indeed find it somewhat more difficult to qualify for clinic representation in the wake of [the challenged provision], and the clinics themselves will either be forced to change their educational model or to refrain from soliciting particular clients"). Thus, Plaintiffs' relationship with public schools requires mutual consent between parties at arms' length—in short, they are seller and buyer.

Finally, Plaintiffs cannot credibly complain READER will chill protected speech. "The fundamental purpose behind the First Amendment is to promote and protect the free expression of ideas, unfettered by government intrusion. We are convinced, however, that [the challenged provision] will produce no legally significant chilling effect on the expressive speech of any of the Plaintiffs in this case." *Southern Christian Leadership Conference*, 252 F.3d at 795. Will READER cause authors to stop writing dirty books simply because vendors can no longer sell those books to public schools? Will vendors stop selling sexually explicit material to all customers simply because they can no longer sell them to schools? Will READER's protection of children from sexually explicit material curtail the public's ancient lust for such material?[75] Plaintiffs offer no such evidence. Nor could they. "This is not a case of the Government 'suppressing a dangerous idea,'" *Southern Christian Leadership Conference*, 252 F.3d at 795 (quoting *Rust*, 500 U.S. at 194), but of the State making ordinary consumer choices about what books it will buy and the process in which would-be school vendors must participate in order to sell books to schools.

---

[74] *See* Ex. B., (Valerie Koehler Sept. 17, 2024 Depo) at 101:16-102:6, 129:14-24; Ex. D., (Charley Rejsek Oct. 8, 2024 Depo) at 165:24-166:14.

[75] *See* Ex. H., Jones, J. (July 9, 2014) OpenCulture.com; The Turin Erotic Papyrus: The Oldest Known Depiction of Human Sexuality (Circa 1150 B.C.E.); https://www.openculture.com/2014/07/the-turin-erotic-papyrus-the-oldest-known-depiction-of-sex-circa-1150-b-c-e.html (last visited November 22, 2024).

**V.        Plaintiffs will not suffer irreparable harm if READER is enforced.**

Plaintiffs allege that they will suffer irreparable harm in two ways, economic and "personal." ECF 1 at ¶¶99-100. The Complaint does not define or otherwise use the term "personal harm," but this may refer to possible "reputational" harm alleged in the Complaint.

Plaintiffs allege potential reputational harm in three possible ways. First, Blue Willow and BookPeople hypothesize that by complying with READER, this could antagonize those of their customers that view a ratings system as a "book ban." *Id.*, Ex. B at ¶21; Ex. C at ¶21. Plaintiffs have not offered any evidence to support this claim or offered any examples when past compliance with Texas law has caused them reputational harm. BookPeople's representative testified that she was unaware of any customers who would stop patronizing BookPeople based on BookPeople's level of compliance with READER.[76] Second, Blue Willow and BookPeople allege that by being identified as ineligible to sell books to Texas schools, should they choose not to participate in the ratings system, they would suffer reputational harm. *Id.,* Ex. B at ¶20; Ex. C at ¶20. Plaintiffs have not offered any evidence to support this claim. Third, Plaintiff BookPeople alleges that if they did not have a business relationship with Texas schools and the "commitment to serving the community" that such a relationship implies, they could suffer reputational harm. *Id.*, Ex. B at ¶26. Plaintiffs have not offered any evidence to support this claim.

Plaintiffs have several theories of economically harmed under READER's rating provision. The most prominent is the claim that the cost of rating books sold to Texas schools will fall on Plaintiffs. But Plaintiffs have not substantiated this. *Supra* at VI. Plaintiffs of course would not lose any future revenue if they complied with READER, because they would continue to sell to Texas schools and there is no evidence that Plaintiffs would face a boycott from customers for complying with Texas law. Authorized vendors are allowed to request a higher price from Texas schools for books when they "would be strictly be passing (their) costs along to them."[77]

Blue Willow and Authors Guild have alleged that they will also lose sales connected to

---

[76] *See* Ex. D., (Charley Rejsek Oct. 8, 2024 Depo) at 147:24-148:13.
[77] *See* Ex. B., (Valerie Koehler Sept. 17, 2024 Depo) at 144:13-145:11.

author visits that they coordinate with schools, which they allege have decreased.[78] Plaintiffs however have not demonstrated that (1) the visits have decreased; (2) that any decrease in visits is due to the enjoined READER; (3) that they have been financially harmed or in what amounts; or (4) that a decrease in author visits is likely to occur after READER is implemented. Blue Willow does not differentiate revenue it receives from author visits from its other revenues.[79] It therefore cannot show how much money it made from author visits before or after READER became law, or even whether it makes money on these visits. When asked if Blue Willow tracked unit sales from author visits, its corporate representative testified, "We have recently started to somewhat track it. I'm not sure that those numbers are accurate … If we do that[sic] track it – and that I say very loosely because we don't always do it. It's not a requirement."[80] To say that Blue Willow would lose money on author visits if the law were to go into effect is pure speculation. Authors Guild claims that several members have experienced decreased revenues in Texas, but they do not report than any author has attributed such decreases to READER. *Supra* at VII.

Blue Willow and BookPeople also allege they may lose money from books sold at public held in conjunction with Texas schools. *Id.* at ¶¶7-8. Blue Willow does not track their festival book buyers, however, and so cannot say whether those sales are subject to READER.[81] BookPeople sells books at festivals to anybody who is visiting campus for the festivals, not specifically to persons who would place these books in a school library.[82] Since Plaintiffs cannot establish that books sold at these festivals would be subject to READER, any claims of harm are speculative.

## VI.    The governmental speech exception applies to READER.

The State of Texas can promote its own views: "'it is not easy to imagine how government could function' if it were subject to the restrictions that the First Amendment imposes on private speech." *Matal v. Tam*, 582 U.S. 218, 234 (2017) (quoting *Pleasant Grove City, Utah v. Summum*,

---

[78] *Id.* at ¶8; *See* Ex. E., (Mary Rasenberger Oct. 1, 2024 Depo) at 85:9-15.
[79] *See* Ex. B., (Valerie Koehler Sept. 17, 2024 Depo) at 18:16-19:14.
[80] *Id.* at 60:24-61:15.
[81] *Id.* at 20:19-21:9.
[82] *See* Ex. D., (Charley Rejsek Oct. 8, 2024 Depo) at 82:2-17.

555 U.S. 460, 468 (2009). Indeed, "[i]t is the very business of government to favor and disfavor points of view on (in modern times, at least) innumerable subjects—which is the main reason we have decided to elect those who run the government." *National Endowment for Arts v. Finley,* 524 U.S. 569, 598 (1998) (Scalia, J., concurring in judgment). Texas's expressive right extends to operation of "subordinate governmental instrumentalities created … to assist in the carrying out of state governmental functions." *Reynolds v. Sims*, 377 U.S. 533, 575 (1964). Texas public school districts are unquestionably political subdivisions. *See* TEX. CONST. Art. VIII Sec. 1-b(b) ("[t]he governing body of any … school district, or other political subdivision of the State may …"); *Travis Cent. Appraisal Dist. v. Norman*, 342 S.W.3d 54, 58 (Tex. 2011) (governmental immunity applies to "political subdivisions of the state, such as … school districts.").

Texas has long held and advanced through its statutes, the view that children should not be exposed to obscene material. Independent of READER, it is unlawful to sell, distribute, or exhibit to a minor—or to possess for such purposes—harmful material, which is statutorily defined as "material whose material whose dominant theme taken as a whole (A) appeals to the prurient interest of a minor, in sex, nudity, or excretion; (B) is patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable for minors; and (C) is utterly without redeeming social value for minors." TEX. PEN. CODE § 43.24. The Supreme Court has long upheld, under rational basis scrutiny, the interest of states in holding and defending such a view, and in deploying statutory provisions to advance such an interest. *Ginsberg v. State of N. Y.*, 390 U.S. 629, 640–43 (1968). It cannot be true that Texas is required to distribute obscene material to children solely to protect Plaintiffs' misguided interpretation of the First Amendment.

The curation decisions required by READER do not effect a prohibition on the sale of any books, nor do they even effect a prohibition on any book sold to a Texas school district. Rather, they require prior disclosure of the kind of information contained within such books so that Texas, and Texas's political subdivisions, can make informed decisions about the content of *their own speech*. And given that "[s]tates have a profound interest in protecting the innocence of children from various adult activities"—and therefore have an especial interest in preventing their own

governmental speech from promoting messages that undermine the innocence of children—Texas is well within its authority to require ratings as a condition of purchase. *Book People, Inc. v. Wong*, 98 F.4th 657, 659 (5th Cir. 2024) (Ho, J., dissenting from denial of reh'g en banc).

**VII.    The commercial speech exception applies to READER.**

To the extent that READER affects any speech beyond that of Texas and its political subdivisions, the speech at issue is purely commercial in nature. Commercial speech is "expression related solely to the economic interests of the speaker and its audience." *Cent. Hudson Gas & Elec. Corp. v. Public Service Comm'n of New York,* 447 U.S. 557, 561 (1980). It is "speech that does no more than propose a commercial transaction." *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations,* 413 U.S. 376, 385 (1973) (internal quotations omitted). Here, the "speech" which Plaintiffs allege is compelled—specifically, READER's requirement for them to render book ratings as a condition of sale to Texas school districts—is related solely to the economic interests of the speakers (Plaintiffs) and their audience (the Agency and potential school district purchasers). This speech is simply a description of the saleable goods they seek to transfer to purchasers, and should therefore be classified as commercial.

The Supreme Court upheld commercial disclosure requirements because they were "purely factual and uncontroversial" and "reasonably related to the State's interest." *Zauderer v. Off. Of Disciplinary Counsel*, 471 U.S. 626, 651 (1985). *Zauderer* applies to disclosures informing "purchasers about what the [government] has concluded is appropriate use of the product they are about to buy," so long as they do not require the company to "take sides in a heated political controversy." *CTIA*, 928 F.3d at 848; *see Am. Meat Inst. v. U.S. Dept. of Agriculture*, 760 F.3d at 21 (D.C. Cir. 2014) (en banc). *Zauderer* triggers only rational-basis review. *Oles v. City of New York*, No. 22-1620-CV, 2023 WL 3263620, at *3 (2d Cir. May 5, 2023); *see Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Balt.*, 721 F.3d 264, 283 (4th Cir. 2013) (en banc); *see Netchoice*, 49 F.4th at 485, *cert. granted in part on other grounds* 2023 WL 6319650 (U.S. Sept. 23, 2023).

Education—as a plainly legitimate state interest—and READER's rationally related means of furthering that interest both satisfy the rational-basis review triggered by *Zauderer*. The Supreme Court has unanimously recognized that "education is perhaps the most important function of state and local governments." *Brown v. Bd. of Ed.*, 347 U.S. 483, 493 (1954), *supplemented sub nom. Brown v. Bd. of Educ.*, 349 U.S. 294 (1955). The importance of education is generally undisputed. *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 35 (1973). Texas has a strong and substantial governmental interest in ensuring that Texas educational materials in schools advance Texas's aims of promoting education and preventing children from exposure to obscenity. READER plainly advances that interest by ensuring school library vendors disclose whether the materials sold to Texas school districts contain obscene content inappropriate for Texas schoolchildren.

READER's ratings system inform public schools and parents whether library materials meet standards set by the State. Providing such information does not require a book vendor to pass judgment or express a view on the validity of the standard or even necessarily whether a book is appropriate for children. Rather, like a nutrition label's food-allergen warning, the rating tells the buyer what they are receiving. Such a rating is rationally related to the governmental interest of protecting children from sexually explicit material at school. *See Ginsberg*, 390 U.S. at 641-43 (finding a rational basis for a statute criminalizing distribution of obscene material to minors). And such a rating is related to the interest in ensuring that public school libraries understand, and are not deceived about, the content of their purchases. *See Greater Balt. Ctr. for Pregnancy Concerns*, 721 F.3d at 283. READER survives rational-basis review under *Zauderer*.

Tellingly, Plaintiffs already engage in the kind of commercial speech and associated decision-making required by READER. Blue Willow Bookshop refuses to sell on consignment any "porn-related materials."[83] Authors Guild write literature specifically designed to be read by children, young adults, or teens.[84] BookPeople categorizes books by age and reading level.[85]

---

[83] See Ex. B., (Valerie Koehler Sept. 17, 2024 Depo) at 108:1–109:12.
[84] See Ex. E., (Mary Rasenberger Oct. 1, 2024 Depo) at 15:3–9.
[85] See Ex. D., (Charley Rejsek Oct. 8, 2024 Depo) at 20:15-21:5, 25:16-26.

Plaintiffs are not outliers: bookstores commonly categorize materials by genre.[86] Publishers categorize books by their appropriacy for readers of different age groups, in accordance with the industry standard.[87] In short, Plaintiffs join with the rest of the publishing industry and the State in acknowledging that some books may be inappropriate for some readers, and that it behooves booksellers to inform potential purchasers of that possibility. READER simply requires that library material vendors apply this truth as a condition of selling books to Texas public schools.

## VIII.    Plaintiffs' facial challenges fail.

Plaintiffs have chosen to litigate this case as a facial challenge, "and that decision comes at a cost." *Moody v. Netchoice, LLC (Netchoice II),* 144 S. Ct. 2383, 2397 (2024). "Claims of facial invalidity often rest on speculation" about future enforcement, and "threaten to short circuit the democratic process" by preventing duly enacted laws from being implemented in constitutional ways." *Id.* (quoting *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 450-51 (2008)). This is particularly true where a challenged provision prescribes rulemaking that has not occurred by the time of adjudication. "Invalidate-the-law-now, discover-how-it-works-later judging is particularly troublesome when reviewing state laws, as it deprives 'state courts [of] the opportunity to construe a law to avoid constitutional infirmities.'" *Netchoice, LLC v. Paxton (Netchoice I)*, 49 F.4th 439, 449 (5th Cir. 2022) (vacated and remanded to develop record on overbreadth by *(Netchoice II)* (quoting *New York v. Ferber*, 458 U.S. 747, 768 (1982)). The Supreme Court has made facial challenges "hard to win." *Id.*

Void-for-vagueness challenges typically apply in "criminal or quasi-criminal" contexts. *United States v. Clinical Leasing Serv.*, 925 F.2d 120, 122 (5th Cir. 1991). Even then, only "a reasonable degree of certainty is required" to survive. *United States v. Tansley*, 986 F.2d 880, 885 (5th Cir. 1993) (citation omitted). Similarly, Courts turn to the overbreadth doctrine only as "a last resort." *L.A. Police Dep't v. United Reporting Pub. Corp.*, 528 U.S. 32, 39 (1999).

---

[86] See Ex. E., (Mary Rasenberger Oct. 1, 2024 Depo) at 64:24–65:2.
[87] *Id.* at 50:20–52:21.

### A. READER is not vague.

READER is not void for vagueness. Plaintiffs complain the definitions of "sexually explicit material" and "sexually relevant material" are inherently vague. ECF 6 at 11-12; Tex. Educ. Code §§ 33.021, 25.001(3). This Court has echoed those concerns. ECF 43 at 44-45 (calling Defendants' arguments "meritless."). Plaintiffs (and, respectfully, the Court) miss two important points in their arguments that READER's putatively incomplete application of the *Miller* test as evidence of the statute's vagueness: (1) this argument improperly conflates the *Miller* obscenity test with the vagueness analysis; and (2) *Miller* allowed standards based on the "contemporary standards of the State of California" as "constitutionally adequate." *Miller v. California*, 413 U.S. 15, 33 (1973). In particular, this latter point dismantles Plaintiffs' arguments that "context" and applying a statewide standard render READER void for vagueness.

### B. READER is not overbroad.

Overbreadth turns on whether "a substantial number of [the law's] applications are unconstitutional, judge in relation to the statute's plainly legitimate sweep." *Netchoice II*, 144 S. Ct. at 2397 (citing *Americans for Prosperity Foundation v. Bonta*, 594 U.S. 595, 615 (2021) and *United States v. Hansen*, 99 U.S. 762, 770 (2023) (asking whether the law "prohibits a substantial amount of protected speech relative to its plainly legitimate sweep")). READER does not apply to the vast majority of book sales in Texas. Indeed, even where Plaintiffs complain many of their sales are to public schools, no Plaintiff alleges their books sales to public schools exceed 50% of their total sales. Nor do the complained-of READER provisions apply to all public school vendors. For example, Plaintiffs complain they cannot review every book they have ever sold to a public school to comply with their understanding of the statute. Yet vendors new to selling books to public schools would have no such trouble; indeed, even Plaintiffs admit they do not prepare vast stashes of books to sell to public schools, but only respond to the orders they receive.[88] Thus, new vendors have no need

---

[88] See. Ex. D., (Charley Rejsek Oct. 8, 2024 Depo) at 75:10-76:11.

to review caches of previously-sold books, and could do so going forward on a book-by-book basis.

### C.  READER is not an unconstitutional delegation.

READER does not hand the decision-making reins of governmental power to private parties in violation of constitutional restraints on power delegation. Nondelegation requires transfer of "public power to private bodies," but "a private entity may wield government power … if it 'functions subordinately' to an agency with 'authority and surveillance' over it." *Id.* at 881. Here, Plaintiffs cannot have it both ways: they complain both that their book ratings are subject to re-rating by TEA, but also that the rating requirement unconstitutionally bestows unregulated government authority on private parties. At most, READER tasks vendors with reviewing their wares consonant with pre-set standards set by a purchaser. *See United States Envt'l Prot. Agency*, 829 F.3d 405, 411 (5th Cir. 2016); *accord Black*, 53 F.4th at 886). And that review is expressly subject to TEA's re-rating authority. READER is therefore consistent with Fifth Circuit precedent of permissible private delegation. *See Texas v. Rettig*, 987 F.3d 518, 532-33 (5th Cir. 2021).

### D.  READER is not an unconstitutional prior restraint.

Likewise, READER is not an unconstitutional prior restraint. The "term prior restraint is used 'to describe administrative and judicial orders *forbidding* certain communications when issued in advance of the time that such communications are to occur.'" *Alexander v. United States*, 509 U.S. 544, 550 (1993) (quoting Melville Nimmer, *Nimmer on Freedom of Speech* § 4.03, p. 4–14 (1984)). Such restraints are highly problematic when they "forbid" speech *broadly*, but they are not inherently suspect when limited to furtherance of an important purpose or protection of a vulnerable audience. *Cf. id.* (collecting cases). In the public school context, "prior restraint on speech … is constitutional if reasonably related to legitimate pedagogical goals." *Milwaukee Police Ass'n v. Jones*, 192 F.3d 742, 749 (7th Cir. 1999). READER is not representing an unlawful prior restraint: to the extent that it implicates protected speech, it does not forbid "communications" to any audience outside of Texas schools. *Alexander*, 509 U.S. at 550. And even in relation to Texas schools, READER's only "restraint" on such communication is its requirement that, to be eligible

to sell to Texas public schools, a library material vendor must not "incorrectly rate[]" its materials under the rubric of the statute. TEX. EDUC. CODE § 35.003(a). This "restraint" is inextricably intertwined with the State's duty to monitor children's educational well-being and prevent unwitting exposure to obscene material. READER satisfies the minimal prior restraint standard.

### E. Public school libraries are nonpublic fora.

Public school libraries are nonpublic fora subject to restricted access. This is true even if READER implicated Plaintiffs' First Amendment rights. The Supreme Court has recognized that the State, in the public school context, may restrict a speaker's First Amendment right to reach an audience when the speech in question is sexually explicit and the audience includes children. *Bethel School District No. 403 v. Fraser*, 478 U.S. 675, 684 (1986). Parents and schools may protect public school children from exposure to sexually explicit, lewd, or indecent speech. *Id*.

Texas school libraries are nonpublic fora because school officials have not, by policy or practice, opened school facilities to the public or a segment of the public for indiscriminate use. *Perry Educ. Assn. v. Perry Local Educators' Assn.*, 460 U.S. 37, 46-47 (1983). "[S]chool officials may impose reasonable restrictions on the speech of students, teachers, and other members of the school community" without running afoul of the First Amendment. *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 267 (1988). A school may also refuse to sponsor speech that might reasonably be perceived to advocate for irresponsible sex, to prevent such speech from being attributed to the school. *Id*. at 271-72.

CONCLUSION

For the foregoing reasons, the Court should grant Defendant's Motion for Summary Judgment and dismiss all claims brought pursuant to the First and Fourteenth Amendments.

Date: November 22, 2024                    Respectfully submitted.

**KEN PAXTON**                             */s/ Ryan Kercher*
Attorney General                          **RYAN G. KERCHER**
                                          Deputy Division Chief
                                          Special Litigation Division
**BRENT WEBSTER**                          Texas Bar No. 24060998
First Assistant Attorney General

                                          **MUNERA AL-FUHAID**
**RALPH MOLINA**                           Special Counsel
Deputy First Assistant Attorney General    Tex. State Bar No. 24094501

**AUSTIN KINGHORN**                        **AMY PLETSCHER**
Deputy Attorney General for Legal Strategy  Assistant Attorney General
                                          Tex. State Bar No. 24113663
**RYAN D. WALTERS**
Chief, Special Litigation Division         **ZACHARY BERG**
                                          Special Counsel
                                          Tex. State Bar No. 24107706

                                          **MARK A. CSOROS**
                                          Assistant Attorney General
                                          Tex. State Bar No. 24142814

                                          OFFICE OF THE ATTORNEY GENERAL OF TEXAS
                                          Special Litigation Division
                                          P.O. Box 12548, Capitol Station
                                          Austin, Texas 78711-2548
                                          Tel.: (512) 463-2100
                                          Ryan.Kercher@oag.texas.gov
                                          Munera.Al-Fuhaid@oag.texas.gov
                                          Amy. Pletscher@oag.texas.gov
                                          Zachary.Berg@oag.texas.gov
                                          Mark.Csoros@oag.texas.gov

                                          **COUNSEL FOR DEFENDANT**

### CERTIFICATE OF SERVICE

I certify that a true and accurate copy of the foregoing document was filed electronically

(via CM/ECF) on November 22, 2024 and that all counsel of record were served by CM/ECF.

*/s/ Ryan Kercher*
**RYAN G. KERCHER**